# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE | § | |
| | § | |
| Stanford International Bank, Ltd. | § | Case No.: 3-09-CV-0721-N |
| | § | |
| Debtor in a Foreign Proceeding | § | |
| | § | |
| SECURITIES AND EXCHANGE COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No.: 03-CV-0298-N |
| | § | |
| STANFORD INTERNATIONAL BANK, LTD., ET AL. | § | |
| | § | |
| Defendants. | § | |

---

**DECLARATION OF**
**RALPH STEVEN JANVEY**

---

Ralph Steven Janvey stated under oath as follows:

**Introduction**

1. I am the Receiver appointed by this Court in the case styled *Securities and Exchange Commission v. Stanford International Bank, Limited, et al.* On February 16, 2009, I became the Receiver for Defendants Stanford International Bank, Ltd., Stanford Group Company, Stanford Capital Management, LLC, Robert Allen Stanford, James M. Davis, Laura Pendergest-Holt, and for all assets and entities owned or controlled by any of them. The facts and matters which I state in this declaration are from my own personal knowledge and they are true. Where I rely on information from others it is true to the best of my knowledge and belief and it is from the source stated.

2. I use the following acronyms or short-hand terms in this declaration:

- Stanford Entities – all legal entities owned, directly or indirectly, by Allen Stanford as of the date the U.S. Receivership was instituted.

- SIB – Stanford International Bank Limited

- STC – Stanford Trust Company Limited, an Antiguan trust company

- SFG – Stanford Financial Group, the name given to Allen Stanford's "global network of financial companies"

- SFGC – Stanford Financial Group Company, a Florida-based, U.S. entity

- SGC – Stanford Group Company, a U.S. broker-dealer entity

3. Attached hereto and marked as **RSJ-1** is a true copy of my CV. I have been licensed as an attorney in the State of Texas since 1976. I primarily practice in the areas of corporate and securities law. As outlined in my CV, I have written extensively on a wide range of business law issues. In addition, I have developed particular expertise in receiverships by virtue of my having served three times previously as a receiver appointed either by the United States Securities Exchange Commissioner or by a court.

4. FTI is one of the professional firms that I retained to assist me in performing my duties under the Receivership Order. I have read the declaration of Karyl Van Tassel, who leads FTI's forensic accounting team in this matter. Based upon my own investigation and my review of materials provided to me by FTI and the other professionals that I have retained, the facts stated in Ms. Van Tassel's declaration are true and correct. I will not repeat the same evidence that Ms. Van Tassel recites in her declaration other than to show that Antigua is not the center of main interests for SIB.

**Stanford's massive U.S.-run fraudulent scheme was based on the sale of SIB CDs.**

5. The U.S. Securities and Exchange Commission alleges in its Amended Complaint that the Stanford Entities constitute "a massive Ponzi scheme" involving "the misappropriation

of billions of dollars of investor funds." My findings to date are consistent with allegations of fraud. At the inception of the U.S. Receivership on February 16, 2009, the total principal amount of outstanding SIB CDs was approximately $7.2 billion (U.S.), according to SIB records. As best I have been able to determine, the assets of all Stanford Entities combined (SIB included) have a total value of far less than $1 billion. Thus, SIB is insolvent and apparently has been for a considerable time. Notwithstanding SIB's insolvency and the rapid liquidation of investments during 2008 and into 2009 to alleviate a severe cash flow crisis, sales of SIB CDs continued almost until February 16, 2009, when the SEC and this Court intervened to stop the fraud. FTI's analysis of 2008 cash flows indicates that proceeds of current sales of SIB CDs were used, among other things, to make interest and redemption payments on pre-existing CDs. Mr. Hamilton-Smith, one of the Liquidators, agrees that "SIB and other Stanford entities were likely engaged in a Ponzi scheme." (*See* Hamilton-Smith Supp. Decl., Doc. 15, at ¶ 4.)

**The Center of Main Interests of SIB and the other Stanford Entities was not in Antigua. Stanford and his confidants, from the United States, directed activities, including CD sales, disposition of proceeds, and investments. SIB's Antiguan presence served principally to give a false appearance of legitimacy to the fraud.**

6. Based on the investigation performed by me and my team of professionals, the center of main interests of SIB, as well as of the combined Stanford Entities, is not in Antigua but in fact is in the United States. The following facts, explained in more detail in Ms. Van Tassel's declaration, support this conclusion.

a) SIB was not operated as a legitimate Antiguan-based bank. It, along with numerous other Stanford entities, were fronts for a massive U.S.-run fraud scheme.

b)  SIB and the other entities involved in the fraud were controlled by Allen Stanford and his close confidants from the United States and the U.S. Virgin Islands.

c)  SIB was just one part of the fraudulent scheme. Although the CDs that were sold to raise funds for the scheme were issued by SIB, the CDs were sold by several different Stanford-owned broker-dealer entities, such as SGC here in the U.S. Sales proceeds that were not used to fund interest and redemption payments, Stanford's lavish lifestyle, and large salaries and bonuses for Stanford confidants were then dispersed by and among numerous other Stanford Entities, none of which are subject to the Liquidators nominal authority.

d)  The misinformation regarding SIB's financial strength and investment portfolio that was used to lure investors into purchasing SIB CDs was disseminated from the U.S. and the U.S.V.I.

e)  SIB was widely advertised as being part of the "Stanford Financial Group" of companies, founded in Texas in 1932 and headquartered in Houston.

f)  SIB's Antiguan workforce of 88 (most of whom were relatively low-level) was inadequate to operate a multi-billion dollar enterprise. Of the 88 employees in Antigua, only 3 were in the accounting staff, 3 were in quality control, 17 coordinated with financial advisors (the people who sold the CDs, who were managed by persons in the U.S.), 22 accomplished the mechanics of the CD sales, and 7 (including 5 "junior associates") were involved in the mechanics of opening accounts. (*See* **RSJ-2**, a summary of SIB's Antiguan personnel prepared by Stanford human resources managers from Stanford business records.)

g)  SIB's core functions – especially those concerning the selling of CDs and the investment (or other use) of sales proceeds – were not directed and managed from Antigua, but were instead directed and managed from the U.S. SIB had agreements with a number of Stanford Entities located in the U.S. for the performance of essential functions. (*See* **RSJ-3**, a collection of Stanford inter-company service agreements. Although we do not have copies of all the signed agreements, it appears that SIB and the U.S.-based entities acted pursuant to such agreements and that SIB paid fees pursuant to them.).

h)  The functions performed by SIB personnel in Antigua related principally to administrative functions such as client accounting and the generation and mailing of client statements. Beyond that, SIB's limited Antiguan presence served principally to give a false impression of legitimacy to what was really a fraudulent scheme.

i)  The detailed records regarding the bulk of SIB's investments – essential to recovering value for claimants – reside in the U.S. and not Antigua.

j)  Most client data that exists in Antigua also exists here in the U.S.

k)  All of SIB's directors were U.S. residents with the exception of two non-Antiguans – one from Barbados and another from Montserrat – who appear to have had little, if any, role in setting SIB's strategy or policy. According to Mr. Hamilton-Smith, one of the Liquidators, most SIB board meetings were not held in Antigua but instead by telephone. (Hamilton-Smith Supp. Decl., Doc. 15, at ¶ 19).

l) U.S. residents accounted for 37% of total CDs by dollar amount (more than residents of any other country) and 25% of all CD holders (more than any other country with the possible exception of Venezuela). (*See* Karyl Van Tassel Decl. at ¶ 46).

m) U.S. brokers accounted for approximately 42%-44% of all CD sales in 2007 and 48% in 2008. (42% in 2007 is an actual figure. 44% in 2007 and 48% in 2008 were derived by comparing commissions paid to U.S. brokers against overall commissions paid.) (*See* Karyl Van Tassel Decl. at ¶¶ 14, 37).

n) Very few, if any, Antiguans invested in SIB CDs. As Antiguan "international business corporations," SIB and its sister trust company, STC, which fed CD sales to SIB, were forbidden from serving Antiguans. Mr. Hamilton-Smith has conceded this in an affidavit filed in the parallel English recognition action. (*See* **RSJ-4**, at 4, ¶ (c), pages from Mr. Hamilton-Smith's May 15, 2009 affidavit in the parallel English proceeding.)

o) Most sale proceeds never touched Antigua's shores. Wire-transfers of investor payments to purchase CDs were directed from the investor directly to Toronto Dominion Bank in Toronto if denominated in dollars or to a bank in the UK if denominated in a different currency. Only checks (which were not the payment method by which SIB received most of its proceeds) were supposed to be sent to Antigua and those were not deposited or otherwise negotiated in Antigua. SIB personnel would bundle checks and send them to Trustmark National Bank in Houston for deposit in a SIB account. (*See* **RSJ-21**, instructions to customers for making payments)

p)   SIB's employees were paid from the U.S. Its payroll was prepared in Houston and paid from an account at Trustmark National Bank in Houston.

q)   SIB's president, Juan Rodriguez-Tolentino, was not employed by SIB. He instead was employed by Stanford Financial Group and paid from the U.S. Two other high-ranking SIB employees, Bhanoo Persaud and Pedro Rodriguez, were also employed and paid by Stanford entities located in the U.S. Virgin Islands, and not by SIB.

r)   The SIB officer with the most responsibility was Chief Financial Officer Jim Davis. Davis, who resided and worked in the United States and reported directly to Allen Stanford, among other duties, oversaw all investments and the handling of investment proceeds.

s)   By contrast, SIB's president in Antigua, Juan Rodriguez-Tolentino, did not perform the duties of a typical bank president. Based on my investigation to date, he had little or nothing to do with SIB's two principal business activities of selling CDs and investing the proceeds. His principal duty in relation to marketing CDs was to meet with and entertain persons who had invested or were considering investing an especially large amount ($5 million or more) in Stanford CDs. These potential large investors would be flown to Antigua, a resort island, as a reward or incentive (using CD proceeds). Rodriguez-Tolentino had no role in SIB's investment activities because those were exclusively handled in the U.S. He also failed to enforce effective internal controls, as evidenced by his acquiescence in the practice of having no internal audits of SIB's investments. (*See* Karyl Van Tassel Decl. at ¶ 41).

t)  Very little of SIB's cash was kept in Antigua – usually, less than $1 million. This did not change until less than three months before the Receivership was instituted, when $9 million – $6 million from Houston and $3 million from Toronto – was sent to the Bank of Antigua (another Stanford-owned bank). (*See* Karyl Van Tassel declaration at ¶¶ 18, 22(b)). These transfers were made in the midst of a CD-redemption run on SIB and then left untouched despite the ongoing liquidation of Tier 2 assets to alleviate a severe cash flow crisis. This suggests the money was only placed in Antigua to serve as an offshore fund outside the reach of U.S. regulators.

u)  SIB's assets are located principally in jurisdictions other than Antigua, and primarily in the U.S., Canada, the United Kingdom, Switzerland, Panama, Venezuela and Mexico.

v)  Equity positions purchased with SIB investment funds principally concern companies located in the U.S. and other countries outside of Antigua.

w)  The making of loans was a very small part of SIB's business. Loans were restricted to advancements against a depositor's CD that was not yet due. The most a depositor could receive on a loan was 80% of his CD balance. At SIB's closing, such loans consisted of only approximately $97 million, with approximately $24 million of that amount owed by depositors from the U.S. (*See* Karen Van Tassel Decl. at ¶ 53.).

**Allen Stanford's residence was in the U.S. and the U.S.V.I. and his "base of operations" was in the U.S.**

7. For the following reasons, I conclude that Allen Stanford was not a resident of Antigua and that it did not serve as his "base of operations." (*See* Hamilton-Smith Supp. Decl., Doc. 15, at ¶ 10).

a) Stanford resided the vast majority of the time in the U.S. or the U.S. Virgin Islands. He had company-owned homes in Houston, Miami, and Christiansted, St. Croix, U.S.V.I. Stanford never lived on Antigua. He visited from time to time, mostly just for the day or, when he would stay overnight, it would typically be aboard his yacht.

b) Stanford's wife of thirty years resides in Houston. All of Stanford's children, which he supported, reside in the United States.

c) Stanford availed himself of tax benefits offered by St. Croix. He and his companion occupied the living quarters at a company-owned complex in Christiansted formerly owned by the pianist Victor Borge. The complex and living quarters were fully staffed with maids, chef, gardeners and security.

d) Stanford purchased an estate on St. Croix, outside of Christiansted, that consisted of a large mansion, with several out-buildings and a swimming pool. He had all of the structures leveled and the pool filled in preparation for beginning construction of his new home. This Receivership intervened before construction could begin.

e) St. Croix was the home port for Stanford's large yacht, which was fully staffed, with captain, crew and chef.

f) Stanford's Antiguan citizenship, like his Antiguan "knighthood," was granted based on the influence Stanford gained by spending large sums of SIB CD proceeds on the island, such as by loaning the Antiguan government $140 million or more. The Antiguan citizenship permitted him to own SIB by himself without the involvement of an Antiguan. (*See* **RSJ-20**, International Business Corporations Act § 61).

g) Stanford's base of operations was Houston, Texas, the headquarters of the Stanford Financial Group of companies, of which SIB was a part. Control was also exerted from Tupelo, Mississippi, Memphis, Tennessee, and Christiansted, St. Croix, U.S.V.I.

**The Antiguan court refused to recognize this Court's Receivership Order.**

8. The Liquidators ask the Court to recognize the Antiguan court's order appointing them as liquidators. However, when I tried to intervene in the Antiguan action to seek recognition of this Court's Receivership Order there, the Antiguan court refused to even recognize, let alone give any effect to, the Order. The Antiguan court stated in its Judgment that (1) this Court's orders are "unenforceable" and have no force of law in Antigua; (2) Antigua "has no reciprocal enforcement of Judgments or orders treaty with the U.S.A."; (3) I have "no legal entitlement to standing in Antigua"; and (4) because my authority derives from an "unenforceable" U.S. Court order, I do not qualify as an "interested person" under Antigua's International Business Corporations Act. (*See* **RSJ-5**, Antiguan judgment of April 17, 2009 at ¶¶ 41-44.) I note that Mr. Hamilton-Smith chose not to attach the Antiguan court's judgment to his declarations to this Court.

**It is neither appropriate nor in the best interests of the Estate to liquidate SIB under the administration of an Antiguan proceeding.**

9. Based on the investigation performed by me and my team of professionals, it is neither appropriate nor in the best interests of the Estate to liquidate SIB under the administration of an Antiguan proceeding. I base this conclusion not only on the facts outlined above that establish that SIB's connections to the United States are much stronger than its connections to Antigua, but also because of the following:

a) Antigua, to the best I have been able to ascertain, has no experience sorting out the kind of complex fraud that we have here. Indeed, I have been able to learn of only two significant insolvencies (one of them mentioned in Mr. Hamilton-Smith's declaration) previously handled by the Antiguan courts, both of which are dwarfed by this matter. This is not surprising given that Antigua has fewer than 90,000 citizens and a national GDP that has ranged from less than $700 million in 2000 to approximately $1.6 billion in 2007. (*See* **RSJ-6**, EarthTrends printout regarding Antiguan economic statistics for 1997-2000; **RSJ-7**, CIA Fact Sheet for Antiguan GDP for 2006-2008). In other words, the fraud that was perpetrated through SIB and other Stanford entities was bigger than the entire Antiguan economy.

b) Mr. Hamilton-Smith states that he and Mr. Wastell were appointed receivers by "the Supervisor of International Banks and Trust Corporations in Antigua." (Hamilton-Smith Decl., Doc. 3, at ¶ 1). The Supervisor is an official of the Financial Services Regulatory Commission (the "FSRC"), the Antiguan agency charged with regulating "international banks" such as SIB. (*See* **RSJ-8**, Affidavit of Paul Ashe of the FSRC filed in Antiguan action.). Later, at the

FSRC's request, Mr. Hamilton-Smith and Mr. Wastell were appointed by the Antiguan court first as court-appointed receivers and then as liquidators. Therefore, the FSRC has a substantial role in the SIB liquidation proceeding. That is troubling because the FSRC appears to have been so under the influence of Allen Stanford that it gave Stanford and/or certain of his employees advance notice of -- and in at least one case, the opportunity to significantly redraft – the FSRC's replies to inquiries from other regulators regarding SIB. The FSRC's chief administrator, Leroy King, sent Allen Stanford personal notes concerning internal FSRC issues that could potentially affect SIB. These notes would be addressed to "Big B" or, in one case, "Big G," which is how the administrator referred to Stanford.

i) Attached as **RSJ-9** is fax correspondence between the Stanford general counsel and the FSRC regarding how the FSRC should respond to the East Caribbean Central Bank's inquiries regarding SIB.

ii) Attached as **RSJ-10** is a September 2006 draft of the FSRC's proposed reply to an inquiry made by the SEC. This document was found among Allen Stanford's papers at the Stanford Group's St. Croix offices and it purports to assure the SEC that "[t]he FSRC confirmed that SIBL is in full compliance with all applicable laws and in good standing with the FSRC, and that there are no outstanding matters or issues of concern to date."

iii) Attached as **RSJ-11**, also found among Allen Stanford's papers at the St. Croix office, are documents which come from the FSRC's administrator, Leroy King. The cover note says "'Big B' -- Just a little teaser. Keeping you updated. Nothing to worry." Following that was a note on King's personal notepad stationery in which he discussed an FSRC employee whom he refers to variously as "the person who wrote #11" or simply as "#11." The #11 writing referred to appears to be the first of two memos that are attached to the note that describe a variety of problems at the FSRC. These are some of the problems mentioned in the memo.

- "faulty judgment that could potentially ruin the reputation of the jurisdiction"

- "the lack of a formal examination framework"

- "difficulties faced in enforcing compliance"

- "the absence of a comprehensive tool set to perform examinations"

- "The FSRC does not require work papers for review and to support findings and conclusions made by examiners. The only requirement is to produce a 'good' report."

- "Except for very serious infractions, off-shore banking does not face very serious sanctions in the jurisdiction."

- "[I]t is even more difficult and serious when political and business relations exist between the bank and upper management of the Commission. This situation can taint or even override the supervisory process. This can lead supervision to become almost impossible."

- "There are a number of steps that the Commission can take to address these issues and challenges: . . . adopt an appropriate and formal code of professional ethics, and adopt and stringently enforce legislations to address banks' non-compliance."

Handwriting in the margins of this memo, apparently in the same hand as the note on the Leroy King stationery, seem to be instructions to FSRC staff: "Mrs. Cherebin (Instructor) – I would like you not to discuss #11. We will strike it from the Record and Mrs. Richardson will deal with it internally. NB: Claudette – We have to identify who #11 and #5 are. We have a serious problem. Thanks, Lee."

iv) I understand from my local counsel in Antigua that just last month, the FSRC terminated Leroy King, its long-time administrator. However, he is still listed as administrator on FSRC's website.

10. Allen Stanford's ties with the Antiguan government extended beyond the FSRC. Stanford, through some of his wholly-owned entities, made two different loans to the government – one in the amount of $40 million (*see* **RSJ-12**, loan agreement) and another in the amount of EC$300 million (about US$100 million) (*see* **RSJ-13**, letter from Antiguan government proposing agreement to grant development rights in return for Stanford's forgiveness of the EC$300 million debt). I have found no records that the Antiguan government repaid either. These amounts are significant by any measure, but are especially large – and likely to carry significant influence – in a relatively small nation such as Antigua.

11. The failure of the Stanford Entities, collectively the largest employer in Antigua behind the government, sparked such a public outcry that, in reaction, the Antiguan parliament authorized the government's expropriation of Stanford real estate. The parliamentary resolution authorizing the expropriation *cites this Court's order* as the reason for the taking.

> . . . Whereas the appointment by the U.S. District court for the Northern District of Texas of a Receiver to take control of the assets of Stanford International Bank Ltd., the Stanford Group of Companies, and Sir Allen Stanford (among others) threatens the financial viability of the Bank of Antigua, the prompt payment by the Stanford Group of companies of the massive outstanding debt to local suppliers, and the continued employment of over eight hundred employees at a time of global financial crisis.

(*See* **RSJ-14**). These are assets that, but for the government's taking, would be available for liquidation for the benefit of defrauded claimants. The Liquidators have stated in the English proceeding that this should not be a consideration because the Antiguan constitution requires the government to pay fair compensation. However, the resolution mentions nothing about compensation and, none has been offered. Moreover, the payment of fair value would be inconsistent with Parliament's stated reason for the expropriation, which is to raise funds with which to assist employees and suppliers. Payment of fair value for the land would leave the

government with no net value to share with employees and vendors. The Liquidators have not spoken out against the expropriation, much less taken steps to challenge it in court. I am informed by my local counsel, though, that at the request of Allen Stanford, an Antiguan court has temporarily stayed the expropriation.

**The Liquidators' conduct in Canada.**

12. On March 27, employees of Vantis, the Liquidators' firm, entered SIB's Montreal office and "wiped" all data from that office's servers. By coincidence, an employee of FTI arrived at the Montreal office as that activity was nearing completion. (*See* **RSJ-15**, the April 15, 2009 affidavit of Dan Roffman, previously submitted in the Canadian proceeding.). Through counsel, I demanded an explanation. The Liquidators' Canadian counsel replied with the assurance that the data that had been on the servers is safe because Vantis imaged it and *sent the images to Antigua*. (*See* **RSJ-16**, letter from Julie Himo, the Liquidators' Canadian counsel.). In other words, the Liquidators moved all SIB electronic data that had existed in Canada out of Canada and to Antigua which boasts a particularly stringent financial secrecy law. I have received no assurances that the Liquidators would not do the same here if given the chance.

13. Only after gathering and sending relevant data outside of Canada did the Liquidators (then still Antiguan receivers) bother to obtain an ex parte Canadian registrar's order recognizing the Antiguan receivership order. They did so without disclosing their previous data destruction, without giving notice to my counsel, and without advising the registrar (whose jurisdiction, I understand, extends only to hearing uncontested matters absent consent) that a U.S. Receiver exists and claims rights in the Stanford Canadian assets.[1] I am presently

---

[1] The Liquidators' Canadian application for recognition did not mention the U.S. Receivership. One of the exhibits to the application, the Antiguan Liquidators' report to the Antiguan Court, did mention the existence of a U.S. Receivership, although the Receiver understands that a reference buried in

challenging the registrar's order and, in addition, seeking recognition of this Court's order in Canada.

**Aggregation v. liquidation in many separate proceedings**

14. Mr. Hamilton-Smith states in his latest declaration that "[t]he Liquidators currently believe that SIB's estate should be liquidated separately and not aggregated with the estate of any other Stanford entities." (Hamilton-Smith Supp. Decl., Doc. 15, at ¶ 25) Although this point does not concern SIB's COMI, which I understand to be the issue raised by the Liquidators' Chapter 15 motion, I will nonetheless state my current view so that it cannot be said I did not address the issue. Based on my investigation to date, the ultimate distributions to SIB claimants would be adversely impacted if all the Stanford Entities were not liquidated in the same proceeding.

a) More than 90% of the ultimate claims, by dollar amount, against the combined Stanford entities (SIB included) will consist of claims by SIB CD holders. Therefore, even if all Stanford Entities are liquidated in a single proceeding, the presence of claims against Stanford Entities other than SIB is unlikely to have a significant dilutive effect on distributions to SIB claimants.

b) In an equity receivership, the Court may classify claims (in effect, equitably subordinate certain classes of claims relative to other classes) if the facts and equities of the case so warrant. At the time a distribution plan is proposed, the Court can consider the facts and hear argument from claimants as to whether and, if so, how classes should be defined. If, as the Liquidators argue, the evidence demonstrates that all Stanford assets ultimately trace back to SIB CD

---

the middle of one of multiple exhibits does not constitute adequate disclosure under Canada's requirement of candor that applies when a party is presenting an ex parte motion.

proceeds, a fact upon which we are in agreement, then the court can take that into account in crafting its distribution plan.

c) Based on my experience as a receiver and as a practicing lawyer, it will be far less costly to liquidate the various Stanford entities in a single proceeding, such as the present U.S. Receivership, than if the various Stanford entities were each made the subject of a separate proceeding with its own set of legal and accounting professionals. The assets of the Estate will not support such an endeavor. The cost savings that will result from having these companies liquidated in a single proceeding will benefit all claimants because less administrative costs means more assets available for ultimate distribution.

**A reply to assertions that I have failed to cooperate.**

15. The Liquidators complain that I have refused to cooperate with them. However, the principal forms of cooperation that they have sought have been for me to cede control over most of the known assets of the Stanford empire and to provide them information regarding the location of assets, no doubt so that they can take possession of them. Mr. Hamilton-Smith candidly stated in his Second Affidavit in the English action that "my belief is that the assets of SIB worldwide should be repatriated to Antigua and distributed to SIB's creditors in the liquidation. . . ." (*See* **RSJ-17**, a page from Mr. Hamilton-Smith's May 15, 2009 affidavit in the English action.). This Court's Receivership Order does not empower me to surrender the Court's jurisdiction. "Cooperation" toward the end of repatriating assets to Antigua would not be in the best interest of Stanford claimants. Moreover, notwithstanding the Liquidators' professed desire to cooperate, their document destruction and *ex parte* conduct in Canada demonstrate that true cooperation has not been on their agenda.

16. I remain willing to cooperate with the Liquidators in order to reduce overall costs to the Estate and to increase the assets available for distribution to all claimants. However, I will not engage in any conduct that cedes jurisdiction, possession, or control over Receivership assets to any other person or entity. Antigua is a haven from which Stanford perpetrated his fraud on the rest of the world while Antigua shared in the benefits, such as the millions in loans discussed *supra*. If the Antiguan liquidation of SIB is recognized as a main proceeding, the adjudication of claims against SIB and distribution of SIB's assets will be accomplished by the Liquidators under the supervision of a court whose government is a significant debtor of SIB.

**The 2002 Vingerhoedt declaration is outdated and plainly ignores established facts regarding Stanford's direction and control of SIB from the U.S.**

17. Mr. Hamilton-Smith attached to his declaration a 2002 declaration of Franciscus Vingerhoedt, who purported to be, at that time, President of SIB. The purpose of the declaration was apparently to support a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2). For at least three reasons, the Vingerhoedt declaration has no relevance to this motion. First, the declaration does nothing to address the point noted above, which is that SIB was one of a number of corporate entities used as instruments to perpetrate a massive fraud directed and managed from the United States. Whether SIB was deemed to be "doing business" in Florida in 2002 for personal jurisdiction purposes is beside the point. Second, the declaration is of no probative value because it is outdated. According to SIB financial statements, SIB's total CD obligations at the end of 2002 were only $1.6 billion, much less than the $7.2 billion that existed when I was appointed Receiver. (*See* Hamilton-Smith Decl., Doc. 3, at Ex. D, p. 58.). We know that, in recent years, SIB assets were inadequate to back its CD obligations, and we are continuing to investigate asset value information for earlier years. Third, the Vingerhoedt declaration does not address the fact that financial advisors located in the Stanford offices in

Florida generated many SIB CD sales. SGC financial advisers, in Florida and elsewhere in the U.S., whether they knew it or not, were an integral part of the fraudulent scheme.

**Documents refuting the contention that SIB did not do business in the United States.**

18. SIB held itself out to creditors, borrowers and other obligees, and even in Internal Revenue Service tax forms, as having locations in the United States at 6075 Poplar Street, Memphis Tennessee and 5050 Westheimer, Houston, Texas. Copies of relevant documents demonstrating this fact are at **RSJ-18**. Although certain of the documents also provide an Antiguan address (such as the tax information form), most of the documents make no reference at all to Antigua.

19. SIB also made regulatory filings with the securities regulatory agencies of all fifty U.S. states, in which it consented to jurisdiction in the courts of those states for suits *arising out of the sale of its CD products*. (*See* **RSJ-19**).

20. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 9th day of June, 2009.

Ralph S Janvey

Ralph Steven Janvey