**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE | § | |
| | § | |
| Stanford International Bank, Ltd. | § | Case No.:  3-09-CV-0721-N |
| | § | |
| Debtor in a Foreign Proceeding | § | |
| | § | |
| SECURITIES AND EXCHANGE COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No.:  03-CV-0298-N |
| | § | |
| STANFORD INTERNATIONAL BANK, LTD., Et Al. | § | |
| | § | |
| Defendants. | § | |

---

**DECLARATION OF**
**KARYL VAN TASSEL**

---

I, Karyl Van Tassel of 1001 Fannin, Suite 1400, Houston, TX 77002 state on oath as follows:

### EXPERIENCE, EXPERTISE, WORK IN THIS CASE

1.     A copy of my resume is attached as exhibit **KVT-1**.  It summarizes my education and relevant work experience.  As it states, I am a Certified Public Accountant in the State of Texas, USA, and a Senior Managing Director of FTI Consulting, Inc.  I have 23 years of experience providing a variety of audit, accounting, tax, litigation, valuation and other financial advisory services.  I have performed detailed financial analyses for a variety of litigation matters, including securities, intellectual property, breach of contract, antitrust, lender liability, fraud and wrongful terminations.  In the litigation context, I have acted as an expert on a variety of

economic damage claims and forensic accounting issues. In several cases alleging fraud and other wrongdoing, I have traced funds for potential recovery. I have also been retained by audit committees to assist in investigating allegations of accounting and financial improprieties.

2.    On February 16, 2009, the United States District Court for the Northern District of Texas (the "U.S. Court") appointed Ralph S. Janvey the Receiver for SIB and the rest of the Stanford Entities. On the same day, the Receiver retained FTI to perform a variety of services, including assisting in the capture and safeguarding of electronic accounting and other records of the Stanford Entities and forensic accounting analyses of those records, including cash tracing. I oversee, and am personally involved in, FTI's forensic accounting and cash tracing activities.

3.    The statements made in this affidavit are true and correct based on the knowledge I have gained from the many documents I have reviewed and other work I and my team have performed in the course of FTI's investigation on behalf of the Receiver. Among other things, we have interviewed numerous present and former Stanford Entity employees. These include, but are not limited to, the persons whose names (as well as employer, title, and supervisor) are listed in **KVT-2**. In addition, we have examined the <u>available</u> accounting and other records for the Stanford Entities located in and/or gathered from Houston, Texas, Tupelo, Mississippi, Baldwyn, Mississippi, Memphis, Tennessee, Miami, Florida, St. Croix, United States Virgin Islands ("U.S.V.I.") and other Stanford locations within and outside the U.S. We have also obtained and reviewed information and data from James Davis's home, which is located in Mississippi.

4.    I use the following acronyms or short-hand terms in this affidavit:

- Stanford Entities — all legal entities owned, directly or indirectly, by Allen Stanford as of the date the U.S. Receivership was instituted.

- SIB — Stanford International Bank, Limited

- STC — Stanford Trust Company Limited, an Antigua trust company

- SFG — Stanford Financial Group, the name given to Allen Stanford's "global network of financial companies"

- SFGC — Stanford Financial Group Company, a U.S. entity incorporated in Florida.

- SGC — Stanford Group Company, a U.S. broker-dealer entity

### SUMMARY FINDINGS

5.      The U.S. Securities and Exchange Commission alleged in its Amended Complaint that the Stanford entities constitute "a massive Ponzi scheme" involving "the misappropriation of billions of dollars of investor funds." My findings to date are consistent with those allegations. At the inception of the U.S. Receivership on February 16, 2009, the total principal amount of outstanding SIB CDs was approximately $7.2 billion (U.S.), according to SIB records. As best I have been able to determine, the assets of all Stanford Entities combined (SIB included) for which we have financial records have a total value of far less than $1 billion. SIB is insolvent and apparently has been for a considerable time. Our preliminary analysis of 2008 cash flows indicates that funds from current sales of SIB CDs were used to make interest and redemption payments on pre-existing CDs. It appears that most CD proceeds not used to pay interest, redemptions and current operating expenses were either placed in investments (many of them illiquid, such as private equity deals), diverted to other Stanford Entities "on behalf of shareholder" — *i.e.*, for the benefit of Allen Stanford, or used to finance Allen Stanford's lavish lifestyle (*e.g.*, jet planes, a yacht, other pleasure craft, cars, homes, travel, company credit card, etc.). Notwithstanding SIB's insolvency and the rapid liquidation of its investments during 2008 and into 2009 to alleviate a severe cash flow crisis, CD sales continued almost until February 16, 2009, when the SEC and the U.S. Court intervened to stop the fraud. I note that Mr. Hamilton-

Smith, one of the Antiguan liquidators, agrees there was a Ponzi scheme. (*See* Hamilton-Smith Supp. Decl. at ¶ 4)

6.    Allen Stanford was sole owner, directly or indirectly, of more than 130 separate entities, including SIB and STC. These entities comprised a single commonly-owned financial services network called the "Stanford Financial Group," which was headquartered in Houston.

7.    Stanford, along with a close band of confidants, controlled SFG (of which SIB was a part). These confidants included Jim Davis, CFO of both SFG and SIB, and Laura Pendergest Holt, Chief Investment Officer for SFG.

8.    Stanford, a U.S. citizen (although said to have been granted Antiguan citizenship also), lived and worked principally in Christiansted, USVI, Miami, Florida, and Houston, Texas. Davis and Holt, also U.S. citizens, lived in Mississippi and had offices in Tupelo, Mississippi, Memphis, Tennessee, and Houston, Texas.

9.    SIB, although incorporated in Antigua, was controlled and managed by Stanford and Davis, apparently with assistance from Holt, from various places within the U.S. Most core functions such as managing investments, directing fund flows, devising investment strategy, and managing legal and information technology were directed from — and for the most part, performed in — the U.S. It also appears that major cash transfers were directed and controlled from within the U.S. by Stanford, Davis and, in some instances, Holt. In addition, it appears that Harry Failing, Stanford's personal accountant in Houston, Texas, had a substantial role in accounting for transfers of SIB assets and perhaps in other aspects of SIB's accounting and disclosures, as well as the structure for SIB and all SFG entities.

10.    All SIB directors (including Allen Stanford) were U.S. citizens except two, and neither of the non-U.S. directors were Antiguans. One was a resident of Montserrat and the

other was a resident of Barbados. I have seen no evidence that either of the two non-American directors played any significant role in SIB affairs or in setting SIB strategy or policy.

11.     SIB was nothing like a typical commercial bank. It did not offer checking accounts and did not, in the normal course, make loans. It had one principal product line — certificates of deposit — and one principal source of income — earnings from investments. Other product lines (*e.g.*, credit card services) were offered only to CD holders and acted as incentives for the purchase of CDs.

12.     SIB's two principal business activities — selling CDs and investing (or otherwise directing) the proceeds of sale — were both controlled from the United States, with no meaningful management input from Antigua.

13.     Most, and perhaps all, of the Stanford Entities were part of the scheme or derived benefit from it. SIB issued CDs, which were then sold by Stanford broker-dealer companies, with the sales proceeds then being widely disbursed throughout the Stanford Entities.

14.     The principal source of funding for the combined Stanford entities was the sale of CDs issued by SIB. Stanford broker dealer entities — in the U.S., SGC — marketed the CDs. CDs were sold to people from all over the world, although in terms of dollar amount, there were more sales to U.S. citizens (37% based on most recent statement mailing address) than to citizens of any other country. Moreover, Stanford brokers located in the U.S. accounted for 42%-44% of all CD sales in 2007 and 48% of sales in 2008.

15.     Misinformation regarding SIB's financial strength, profitability, capitalization, investment strategy, investment allocation, the value of its investment portfolio, and other matters, was disseminated from Stanford, Davis, Holt and others working under them, from the

United States, to the various Stanford brokers around the world, intending for the brokers to use that misinformation to induce potential investors to purchase SIB CDs.

16.     I note that both the Receiver and the Antiguan Liquidators agree that SIB and STC were prohibited by Antiguan law from serving Antiguans. (*See* Janvey Decl. at ¶ 6(n); **RSJ-4**, at 4 ¶ (c), pages from Mr. Hamilton-Smith's May 15, 2009 affidavit in the parallel English proceeding) I additionally note that SIB's Training and Marketing Manual, relevant parts of which are attached as **KVT-3**, states that SIB cannot accept deposits for Antiguan residents.

17.     Sale proceeds largely bypassed Antigua and went directly to accounts in Canada, the United States and England, from where they were disbursed among many other Stanford entities and accounts.    Attached as **RSJ-21** to the Receiver's Declaration is the sheet that instructed customers where to send their money for the purchase of CDs.

18.     SIB's principal operating accounts were maintained in Houston, Texas, at the Bank of Houston and Trustmark National Bank. Only a small amount of SIB funds were kept on deposit in Antigua, and these funds were kept at the Bank of Antigua, another Stanford Entity. Until late November 2008, SIB's average balance at the Bank of Antigua for 2008 was less than $700,000. (In late November and early December, $9 million was transferred from the U.S. and Canada to a SIB account at the Bank of Antigua. The timing of the transfer — in the midst of a cash flow crisis caused by requests for redemptions — combined with the fact that the Antiguan account, having been funded to an inordinately high balance, then went largely untapped despite the liquidation of hundreds of millions in investments to raise cash — suggests the transfer may have been intended to establish a "kitty" outside of the reach of U.S. regulators.

19.    The terms of some SIB CDs permitted partial redemptions before maturity upon customer demand.  CD redemptions increased in late 2008 and early 2009 to the point that continuing CD sales could no longer cover redemptions and normal operating expenses.  This caused such a rapid depletion of liquid assets that the Ponzi scheme began to collapse.  By the time the U.S. Receivership was instituted, SIB had already suspended redemptions and the broader Stanford group of companies had stopped paying many payables.

20.    The records discovered and analyzed to date provide a basis for tracing a large amount of money.  However, an undetermined but nonetheless very large amount of CD sales proceeds — to use a very round figure, approximately $1 billion — cannot be accounted for based on the analysis performed to date.  FTI's efforts to find out what happened to this money so that, if possible, it can be recovered, continues.

### SIB'S INVESTMENTS WERE CONTROLLED BY STANFORD, DAVIS AND (AT LEAST TO THE EXTENT OF TIER 2 INVESTMENTS) HOLT FROM THE UNITED STATES

21.    SIB investments were divided into three tiers, each managed differently, although all ultimately controlled by Stanford, Davis and, at least to the extent of Tier 2 assets, Holt.  All three tiers were controlled from the U.S.  Based on our review to date of a large volume of Stanford Entity records, it appears that SIB's Antiguan employees had no significant involvement in investment policies, investment strategy, or investment choices.

22.    Tier 1, the smallest tier in dollar value, consisted of cash and cash equivalents.

a)    Tier 1 assets were not, as Mr. Hamilton-Smith states, "managed in Antigua."  Tier 1 was managed from Houston, Texas, U.S., by a group headed by Patricia Maldonado, Stanford Financial Group Company Treasurer, who worked at CFO Jim Davis's direction.  Exhibit **KVT-4**, a 2007 internal SIB audit report, states:

> "[T]he Houston Treasury Department (Treasury) manages SIBL [i.e. SIB] cash flow according to corporate guidelines and places short term deposits with other banking institutions as deemed appropriate. However, the SIBL accountant is not informed of the terms of the investments (such as maturity date, interest rate, etc.), so that he can record the interest receivable, accordingly."

This not only demonstrates that the Houston Treasury Department managed SIB's cash flow, but also that SIB's Antiguan accountants did not know how funds were invested or what interest they earned. As further evidence that Tier 1 was managed from Houston, attached as **KVT-5** is a collection of email correspondence within Ms. Maldonado's Houston Treasury group that illustrates the group's management and handling of SIB's cash. For example, the November 10-11, 2008 email chain between Patricia Maldonado, "Treasury Manager — Stanford Financial Group," and one of her "Senior Treasury Analysts" has the assistant recommending, and Maldonado approving, various transfers among SIB accounts at Toronto Dominion (Toronto), Bank of Houston (Houston), Trustmark Bank (Houston) and Comerica (Houston).

      b)      Stanford accounting records indicate that as of February 18, 2009, SIB Tier 1 totaled $31.8 million out of the total of $152.7 million cash available from all Stanford Entities. Of that amount, approximately $7.9 million is located in Antigua, at the Bank of Antigua. The $7.9 million is the remainder of a total of $9 million in deposits (also discussed in paragraph 18 above) which were transferred from the U.S. and Canada in November and early December of 2008. (*See* **KVT-6**) We have found that Jim Davis personally instructed Patricia Maldonado, by email dated 12 November 2008, to wire transfer $6 million of the $9 million to the Bank of Antigua account. (*See* **KVT-7**)

23.     Tier 2 principally consisted of investments placed with a variety of investment firms or funds located in the U.S. and Europe, together with a small amount of cash or cash equivalents.

       a)     It was managed by Holt, the Chief Investment Officer for SGC, from Tupelo, Mississippi; Memphis, Tennessee; and Houston, Texas. Holt reported to Davis and Stanford.

       b)     According to SIB's weekly summary reports, Tier 2 had a total value of approximately $345 million at February 9, 2009, down substantially from $889 million at December 31, 2007. The documents indicate there were approximately $29 million in further liquidations between February 10, 2009 and February 17, 2009.

       c)     Tier 2's precipitous decline in total value over the thirteen months leading up to the Receivership was due to a combination of declining market values and numerous liquidations ordered by Davis and Stanford and implemented by Holt and her staff. One of FTI's assigned tasks has been to trace the cash from these liquidations, which we have partially completed.

24.     Tier 3, by far the most significant financially (as valued by Stanford and Davis) and the most secret, was managed by Stanford and Davis, apparently with assistance and participation by Holt and others working under them. They kept its value and composition secret from regulators, investors, creditors, auditors and others.

       a)     The information that was released to the public regarding Tier 3 (either directly or through presentations to sales staff) grossly overvalued SIB investments (approximately 80% of which consisted of Tier 3) and

misrepresented the relative make-up of the investment categories.  For example, SIB's 2007 financial statements report that SIB's "financial assets" (*i.e.*, investments) had a fair value, at year-end, of $6.347 billion, with an allocation of 7.2% precious metals, 58.6% equity, 18.6% fixed income, and 15.6% "alternative."  It also reported 2007 investment income of almost $642 million. For the reasons discussed below (as well as perhaps other reasons) these amounts and percentages, provided by Davis and those working under him in the United States, appear to have been fictitious.

b)      As to the connections of these Tier 3 "investments" to the United States:-

        i)      Approximately $1.2 billion of Tier 3 value (as apparently valued by Stanford and/or Davis or others acting in concert with them) was in merchant banking assets.  These consisted mostly of equity and debt investments in private and public companies (*see* **KVT-8,** a Stanford Financial Group schedule dated 30 June 2008 listing Tier 3 merchant banking assets).  Most of these companies have headquarters in the U.S.  I am not aware of any of them being located in Antigua.  Early indications are that the fair value of these merchant banking assets was — and remains — only a small fraction of the $1.2 billion value that Stanford and Davis assigned to them for financial reporting purposes.

        ii)     Stanford Tier 3 records indicate that another $1.8 billion in value consisted of notes receivable from Allen Stanford.  It appears this amount corresponds to funds that Stanford, with the assistance of Davis and possibly others, diverted from SIB.  These funds were used for various purposes, including transfers to 51 other Stanford Entities.  (*See* **KVT-9,** an internal Stanford schedule listing past uses of SIB funds supporting Allen Stanford's note receivable liability to SIB in the amount of $1.844 billion.).  Only 24% of these Stanford Entities were chartered in Antigua.

        iii)    In addition, Tier 3 records assigned $3.174 billion of value to real estate.  However, those same records list only two assets in this category, real estate holding companies that own properties in Antigua known as Pelican Island and Asian Village.  The two properties were purchased (via the purchase of their holding companies) in 2008 for a combined $63.5 million.  It seems inconceivable that land purchased in 2008 would have risen in

value almost 50 fold during a mere several month period of what is generally regarded as a global real estate downturn.

iv)   SIB investment earnings amounts were provided monthly by Jim Davis and persons working at his direction and under his supervision within the U.S. and the USVI. I have seen internal Stanford documents that have led me to conclude that earnings were pegged at whatever amount was needed to give SIB acceptable financial performance and capital ratios for regulatory purposes. In other words, earnings — at least for the last two years and probably longer — were fictitious "plugged" numbers.

25.    SIB's Antiguan employees had no substantive role in determining SIB's investment policy, strategy or choices. Investments were chosen by Allen Stanford, Jim Davis and/or Laura Holt. If Antiguan employees transferred money for investment purposes, it would have been on the instructions of Stanford, Davis or Holt or someone acting at their direction. As also noted below, SIB had very limited funds in Antigua. Any "investment payments" would have entailed the transfer of funds outside of Antigua, very likely to some other institution or investment outside of Antigua.

### SIB AND STC RECORDS ARE HELD IN THE UNITED STATES

26.    Records of SIB and STC's investments and cash balances, which comprised more than 90% of their total assets, were kept predominantly in the U.S. — and outside Antigua.

a)    With respect to Tier 2 assets, although monthly statements were sent to Antigua, the detailed weekly Tier 2 summaries, which are important in unraveling what happened to Tier 2 assets and determining whether any can be recovered, were maintained in Memphis, Tennessee.

b)    Information concerning Tier 3, by far the largest collection of investments (as valued by Stanford and Davis), was kept by Davis and those who worked under his direct supervision, in the U.S.

   c)  My firm, FTI, on behalf of the Receiver, has already gathered and preserved U.S. information relating to all three Tiers of investments. I and others in my firm have been actively reviewing and analyzing these records for almost four months.

   d)  Extensive SIB client records exist in the U.S. The brokerage offices maintained duplicates of client CD purchase records. In addition, SIB client data was available to Stanford offices in Houston and Montreal via a computer link-up.

  27.  SIB investment values (90% or more of total reported assets) and investment income (85% or more of total reported income) were, from the client's perspective, the most important figures on SIB's financial statements. As discussed above, these were provided monthly by Jim Davis, the Chief Financial Officer for both SIB and SFG, and persons working at his direction and under his supervision within the U.S. and the USVI. SIB employees in Antigua did not have access to this information.

### SIB CORE FUNCTIONS WERE CONDUCTED IN THE UNITED STATES, NOT IN ANTIGUA

  28.  Mr. Hamilton-Smith states in his first declaration that "the majority of [SIB's] business operations were conducted in Antigua." (Hamilton-Smith Decl. at ¶ 34) He also states in his second declaration that "[t]he day-to-day management of SIB . . . was conducted in Antigua." (Hamilton-Smith Supp. Dec., Doc. 15, at ¶ 19) To the contrary, SIB's principal business activities were selling CDs and investing (or otherwise spending) the sale proceeds, neither of which was managed or conducted within Antigua. As I explain elsewhere, SIB was walled-off from the investment process and its only participation in sales, noted even by Mr. Hamilton-Smith, was in entertaining especially large investors (those who were purchasing CDs of $5 million or more) who were flown to Antigua as an investment incentive or reward. Mr. Hamilton-Smith agrees with this. "Stanford and a small group of confidants appear to have

exerted overall control over all the entities in the group." (Hamilton-Smith Supp. Decl., Doc. 15 at ¶ 9)  "SIB delegated significant investment decision-making to Stanford entities in the United States with regard to the management of the investment portfolios [Tier 2 and Tier 3 investments]." (Hamilton-Smith Supp. Decl., Doc. 15 at ¶ 17)  To put that statement in context, 90+% of SIB's assets were managed exclusively by persons in the U.S., with no involvement from Antigua.

29.    SIB's principal function in Antigua was to keep the client accounting records current, send out client statements, and perform certain private banking functions such as paying credit card bills for a relatively small subset of clients.  These limited functions were performed in Antigua, but they principally served to give SIB a false appearance of legitimacy.  In effect, Stanford and his confidants, from the U.S. and USVI, used SIB's Antiguan employees as instruments of fraud (perhaps unwitting) to further the Ponzi scheme.  Sending out client statements indicating CD balances is fundamentally deceptive if there are woefully insufficient assets backing the CDs.

30.    Moreover, the Antiguan workforce of less than 90 employees, most of whom were relatively low-level, was insufficient by any measure to operate a multi-billion dollar enterprise.  For most of its core operational needs, SIB relied on services provided by Stanford entities located in the U.S. or the USVI.  These other Stanford entities were operated under the direction and control of Allen Stanford, Jim Davis and Laura Holt.  Attached to Receiver Janvey's affidavit as **RSJ-3** are intercompany contracts by which SIB contracted for services.

31.    U.S. and USVI employees of Stanford Group Company, Stanford Financial Group Co., Stanford Financial Group Global Management, and other Stanford Entities provided SIB and STC with marketing, treasury services (*i.e.*, cash management and transfer functions),

accounting, financial statement preparation, investment management, financial consulting and advisory services, human resources, legal, and payroll services, among others. These employees were located in Houston, Texas, Memphis, Tennessee, Tupelo, Mississippi, Miami, Florida and Christiansted, USVI.

32.    In contrast, as set out further below, the Antiguan office of SIB functioned as little more than an operations center where certain customer accounting functions were performed and customer account statements were generated and sent out.

a)    A comparison of the management, administrative and marketing fees paid to Stanford entities based in the United States and the USVI to total salary and benefits paid to Antiguan employees demonstrates that this was the case. In 2008, SIB paid Stanford entities in the U.S. and USVI at least $268 million for management, administrative and marketing fees, as compared to total payroll for all of SIB (including non-Antiguan employees) of only approximately $3.6 million. A schedule of these figures is attached as Exhibit **KVT-10**. Amounts paid to entities based in the U.S. and its territories comprise approximately 75% of SIB's non-interest expenses. Although fees paid to the U.S. based entities may have been in excess of market value as another way to pull money out of SIB (and I have not analyzed the fair market value for the services rendered), there is no question but that real and substantial services were provided by these companies to SIB. My team and I have interviewed numerous U.S. employees who have described the functions they served for SIB. We have also analyzed the results of those efforts such as financial statements and investment analyses, and have documented through email the flow of information, much of which excluded

anyone from Antigua entirely. Further, it is clear that SIB's Antiguan staff of 88 was much too small for the operation of a bank with 28,000 accounts and $7.2 billion in deposits.

b)    SIB employees in Antigua performed some administrative, bookkeeping and operational functions for SIB. However, SIB's core functions of selling CDs and investing the proceeds were managed exclusively from the U.S. In addition, other vital services were provided by SFGGML and other Stanford entities outside of Antigua included, but were not limited to:

i)    Legal Services provided by Mauricio Alvarado and others within the legal department in the United States.

ii)   Jim Davis and Laura Pendergest Holt provided investment services from the United States.

iii)  Accounting services were provided from the United States and the USVI by a group led by Mark Kurht and/or Gil Lopez from Houston and St. Croix.

iv)   Human resources services by Joan Stack and Nancy Rummel from St. Croix.

v)    Information technology services (including IT procurement) provided by John Varkey's group in Houston.

vi)   Lena Stinson, Director of Compliance, and her group provided compliance services from the United States.

vii)  Lula Rodriguez, Global Director of Corporate Communications and Public Relations, provided extensive public relations support from the United States.

viii) Bernie Young and Jason Green, as the Managing Director of SFGC and President of SGC's U.S. private client group, respectively, trained Financial Advisors on how to sell the CDs.

c)    Although there were SIB HR, accounting and IT personnel in Antigua, those functions relied heavily upon Stanford's global HR, accounting and IT groups. Also, it appears that the function of SIB's accounting department was

largely limited to client accounts and sending daily cash reports to Patricia Maldonado in Houston. It did little in terms of accounting for investments. As previously stated, investment accounting was handled by persons in the United States and USVI who reported ultimately to Jim Davis, with only high-level summaries (many of them fictitious and concealing relevant information) periodically sent to Antigua.

### CD SALES WERE GENERATED BY STANFORD ENTITY BROKERS LOCATED IN COUNTRIES OTHER THAN ANTIGUA. INDEED MORE CD SALES, BY DOLLAR AMOUNT, WERE GENERATED BY STANFORD FINANCIAL ADVISERS IN THE U.S. THAN BY FINANCIAL ADVISERS IN ANY OTHER COUNTRY.

33. The SIB CDs — SIB's only product line — were marketed overwhelmingly through Stanford broker-dealer entities located outside of Antigua. These broker-dealer entities included Stanford Group Company (SGC) in the United States, Stanford Bolsa Y Banca S.A. in Mexico, and Comisionista De Bolsa in Columbia, in addition to others.

34. Most SIB customers never saw a SIB employee. They dealt only with their financial adviser, who, to them, was the face of the Stanford companies, including SIB. Customers dealt with their financial advisor, who would help them apply for and manage their CD investments. These same clients took advantage of other services offered by their financial advisors, such as brokerage accounts.

35. The financial advisor would assist a purchaser in completing his or her application and other paperwork. The local branch manager would then review the new account form and perform a suitability review for each client before sending the client's paperwork to SIB for processing. Branch managers also performed anti-money laundering procedures on prospective CD customers who were also opening a brokerage account. Clients could also avail themselves of other services from Stanford Entities, such as brokerage accounts.

36.    Antigua did participate in one limited aspect of marketing.  Investors who had purchased or were considering purchasing $5 million or more in CDs were flown to Antigua as an investment award or incentive and entertained there.  However, these were not typical SIB investors.  At the institution of the U.S. Receivership, the average CD investor held only approximately $257,000 in SIB CDs.

37.    Substantially more SIB CD sales, by dollar amount, were generated by financial advisers located in the U.S. than by financial advisers from any other country.  Mr. Hamilton Smith states, without attaching or even identifying a source document, that "financial advisers in the U.S. [sold] fewer than 20% of the total outstanding number of SIB CDs."  (*See* Hamilton-Smith Supp. Decl. Doc. 15, ¶ 12)  Mr. Hamilton-Smith is incorrect based on my examination of Stanford records.  The percentage of sales generated by U.S. financial advisers can be reasonably approximated by comparing CD commissions paid to U.S. brokers to total CD commissions for all sales.  My team has performed that comparison for the last two years on CD balances and it reveals that U.S. financial advisers were paid 48% of total commissions in 2008 and 44% for 2007.  The reasonableness and reliability of these percentages as estimates of CD sales made from the U.S. is confirmed by reference to 2007 actual CD balances (as reflected in **KVT-11,** the Stanford 2008 budget), which indicates that SGC (the U.S. broker-dealer entity) sold 42% of the total CD balance remaining in 2007.  The close match between the 42% actual figure and the 44% figure calculated using the commission-comparison approach validates the commission-comparison approach.  Although not all sales by U.S. financial advisers were to U.S. citizens, the fact that between 42% and 48%, by dollar amount, of SIB's CD sales were made from the United States is significant in determining SIB's center of main interests.  Certainly no other country approached the United States as a generator of CD sales.

### SIB MANAGEMENT AND STAFF IN ANTIGUA WERE PAID FROM THE UNITED STATES.

38.    SIB's president, Mr. Juan Rodriguez-Tolentino, was not even on SIB's payroll. His salary was paid by SFG from the U.S.  Likewise, two other high-ranking Antiguan managers Bhanoo Persaud and Pedro Rodriguez were paid by Stanford entities located in the U.S. Virgin Islands, and not by SIB.  Additionally, SIB's payroll for its non-management employees was paid from a SIB account located at Trustmark Bank in Houston.  Further, the payroll itself was processed by employees in Houston.  My team has confirmed that this is the case by reviewing images of cancelled payroll checks and also by interviewing Tiffany Petty, a Houston Payroll Supervisor employed by Stanford Financial Group Company who was directly involved in processing SIB's monthly payroll (along with a third-party U.S. payroll services vendor, ADP).

39.    By far, the SIB officer with the most responsibility was Jim Davis, the CFO, who was located in Tupelo, but also had offices in Memphis and Houston.  Davis, who reported directly to Allen Stanford, was responsible for investments and investment accounting, among other duties.

40.    Rodriguez-Tolentino, SIB's president, was located in Antigua but did not perform what I consider the functions of a typical bank president.  For example, with respect to SIB's two principal business functions of selling CDs and investing the sales proceeds, his involvement in the sales effort appears to have been limited to meeting with and entertaining especially large investors and he appears to have had no involvement in the investing function.

41.    Mr. Hamilton-Smith cites the fact that SIB had periodic audits as evidence of its legitimacy as a stand-alone business.  (Hamilton-Smith Supp. Decl., Doc. 15, at ¶ 20)  As they concerned investments and investment income, it appears that the internal audits were shams and that SIB's upper management, as well as its external auditor in Antigua, knew it.  SIB internal audit reports make it clear that investments, which comprised 90% or more of SIB's reported

assets, were not being audited. Investment values contained on financial statements were merely compared against summaries provided by Davis, with no examination of the detailed underlying records that kept in the U.S. Here is a sampling of statements from internal audit reports:

a) "On this occasion, we did not review supporting documentation for the investments and investment income accounts." (*see* **KVT-12**).

b) "The audit process for the investment portfolio solely consisted of tracing the account balances from the trial balance to the account balances as presented on the balance sheet as of March 31, 2006." (*see* **KVT-13**).

c) "Investment Portfolio . . . Account in good order. Investment account was expressed and recorded as per summary analysis reported by CFO office." (*see* **KVT-14**).

The audit reports' distribution list included Allen Stanford, Jim Davis, Juan Rodriguez-Tolentino, and C.A.S. Hewlett, the purported external auditor. Thus, Mr. Rodriguez-Tolentino, SIB's president, knew from the internal audit reports that SIB's investments were not being audited, yet he did not remedy that situation. It would be odd if someone truly functioning as a bank president would both cede control over bank investments and excuse audits for the investments. This is further evidence of the relatively minor role played by SIB's Antiguan management, as well as their deference to Stanford, Davis and others in the United States.

42.     Mr. Hamilton-Smith also cites the fact that SIB had an annual external audit as evidence of its stand-alone nature. "While false information and documentation may have been provided to the auditors from the United States, the audits for SIB were conducted exclusively from Antigua, by Antiguan employees and an external auditor without supervision or oversight from any United States entity." (Hamilton-Smith Supp. Decl., Doc. 15, at ¶ 20)  Based on the

evidence my team has compiled so far, this is true, but it demonstrates that the audits were of minimal utility, and resulted in financial statements using inadequate audit procedures. The detailed records for SIB's assets were in the United States. Mr. Hamilton-Smith himself indicates the audits were performed in Antigua. I conclude, therefore, that Mr. C.A.S. Hewlett did not audit SIB's investments in any manner consistent with reasonable auditing standards. Further, given that Stanford *internal* auditors were denied access to this information, it seems unlikely that the *external* auditor would have been allowed access.

43.     I have tried to find out more about Mr. Hewlett and his firm, but the firm does not have a website and a web based search does not indicate any further information on the firm. The only information we have been able to find about Mr. Hewlett has been from media articles authored by investigative journalists since SIB was placed in receivership. (*See, e.g.,* **KVT-15**) These report that Mr. Hewlett's firm was very small, with a small office in Antigua and a small office in London. Mr. Hewlett, a native of Antigua, was SIB's only external auditor, having begun auditing the bank at its formation. According to these articles, he died in January 2009, the month before the U.S. receivership was instituted.

44.     SIB did not own the building that supposedly served as its headquarters. It leased the building from Stanford Development Company Ltd. While Mr. Stanford directly or indirectly owned other property within Antigua, the vast majority of his assets were outside of Antigua. Further, his "global headquarters" was widely known to be located in Texas.

### ALMOST ALL CD HOLDERS ARE NON-ANTIGUANS. MORE CDs BY DOLLAR AMOUNT ARE HELD BY RESIDENTS OF THE USA, THAN BY RESIDENTS OF ANY OTHER COUNTRY

45.     The Antiguan Liquidators agree that more CDs, by dollar value, are held by U.S. residents than by residents of any other country. However, they put the figure at approximately 22%. (*See* Hamilton-Smith Decl., Doc. 3, at ¶ 28) I disagree with that percentage, as well with

Mr. Hamilton-Smith's assertion that only 16% of individual investors came from the U.S. It appears these percentages are based on a country code field in an SIB accounting system. In my view, the most accurate indication of the number of U.S. residents who purchased SIB CDs and the amount of U.S. funds that went into SIB CDs is obtained by reference to customer statement addresses. If an investor, for example, from Mexico, wanted to establish an out-of-country address for receiving his or her business mail, he or she likely would have chosen Antigua for a mail drop, since "hold-mail" services are readily available in Antigua, a known offshore banking haven.

46.    We have sorted the SIB CD portfolio by statement addresses and ending balances on the last statements that were sent. The results indicate that persons in the United States accounted for 37% of total CDs by dollar amount and 25% of all CD holders. The schedule that follows summarizes our analysis.

| Country | Based on Most Recent Statement Information | | | |
| --- | --- | --- | --- | --- |
|  | Number of Clients | % of Clients | Amount US$ | % of Amount |
| United States of America | 7,072 | 25% | $ 2,660,676,142 | 37% |
| Venezuela | 2,686 | 10% | 402,020,342 | 6% |
| Antigua and Barbuda | 10,926 | 39% | 2,470,203,308 | 34% |
| Mexico | 2,801 | 10% | 605,649,240 | 8% |
| Canada | 215 | 1% | 43,511,546 | 1% |
| Haiti | 18 | 0% | 1,667,010 | 0% |
| Peru | 444 | 2% | 72,412,827 | 1% |
| Colombia | 769 | 3% | 126,368,594 | 2% |
| Panama | 152 | 1% | 38,913,111 | 1% |
| British Virgin Islands | 3 | 0% | 588,335 | 0% |
|  | 25,086 |  | $ 6,422,010,455 |  |
| Other | 2,915 | 10% | 769,001,388 | 11% |
| Total | 28,001 | 100% | $ 7,191,011,843 | 100% |

47.    The 34% by dollar amount and 39% by number of investors attributed to Antigua in this schedule do not indicate the actual amount of funds or number of investors attributable to

Antiguans. First and foremost, SIB was prohibited by law from serving Antiguans. Moreover, an analysis of the Antiguan statement addresses indicates that for almost all, these were merely addresses of convenience for persons who reside outside of Antigua. As indicated by the schedule below based on number of clients, fully 86% of the Antiguan addresses were "hold mail," which most likely indicates that the recipients live elsewhere but for some reason wish to conceal their addresses. Another 12% have SIB or STC addresses, again indicating that these investors likely live elsewhere.

| Category | Based on Most Recent Statement Information | | | |
|---|---|---|---|---|
| | Number of Clients | % of Clients | Amount US$ | % of Amount |
| Hold Mail | 9,413 | 86% | $ 1,787,139,940 | 72% |
| STCL | 1,342 | 12% | 625,716,774 | 25% |
| SIBL | 16 | 0% | 7,742,306 | 0% |
| No Address Information (Just Account Number) | 127 | 1% | 46,583,031 | 2% |
| Other | 28 | 0% | 3,021,256 | 0% |
| Total | 10,926 | 100% | $ 2,470,203,308 | 100% |

*Notes*
The "Category" was determined using a prioritization, therefore "Hold Mail" was identified first, then "STCL", then "SIBL", etc. Thus, some clients and respective ending balances would apply to more than one category.

### MOST OF SIB'S SALES PROCEEDS DID NOT PASS THROUGH ANTIGUA.

48.    Sale proceeds largely bypassed Antigua and went directly to accounts in Canada, the United States and England, from where they were disbursed among many other Stanford entities and accounts. Attached as Exhibit **RSJ-21** to Receiver Janvey's affidavit is the sheet that instructed customers where to send their money for the purchase of CDs.

49.    I understand from reviewing bank statements and other accounting records that most of SIB's CD sale proceeds did not even pass through Antigua and those that did were promptly sent out of the country. (*See* **RSJ-21**, CD investor wiring instructions).

a)    Investors who paid by wire transfer were instructed to send their money to Toronto Dominion Bank in Toronto, Ontario, Canada.

b)    Investments denominated in Euros or other European currency were to be sent to HSBC Bank plc in London, United Kingdom.

c)    Investors who paid by check in U.S. dollars sent their checks to SIB in Antigua, where they were bundled and sent daily to Trustmark National Bank in Houston, Texas, for deposit there.

50.    If any SIB CD sales proceeds were actually paid by investors at SIB's offices in Antigua, it was likely a small amount relative to overall sales.  Further, as stated above, SIB's Antiguan employees would promptly send investor checks to the Houston, Texas branch of Trustmark National Bank.

### THE PROCEEDS OF CD SALES SOON LEFT SIB'S ACCOUNTS AND WERE DISTRIBUTED THROUGHOUT THE STANFORD EMPIRE

51.    Through a preliminary analysis of Stanford financial records, we have been able to trace the flow of SIB funds over the year preceding the institution of the receivership.

a)    During 2008, approximately $474 million funds were transferred from SIB's accounts at Toronto Dominion Bank to SIB's operating account at Bank of Houston in Houston, Texas.  The Bank of Houston account was SIB's principal operating account.

b)    From the Bank of Houston, some of the funds went to investments in various public and private companies, which were then managed as part of Tier 3 under the direction of Davis (as I set out above).

c)    Some of the funds transferred to the Bank of Houston were distributed among various other Stanford Entities.  In 2008 alone, approximately $300

million of SIB funds was disbursed from the Bank of Houston among various Stanford Entities.

d)    Some of the funds that remained in the Toronto Dominion account were transferred through Houston, Texas banks to various investment firms in the U.S. and Europe, where they were managed as Tier 2 investments under the direction of Holt from the U.S. as set out above.

52.    An undetermined but nonetheless very large amount of CD sales proceeds — to use a very round figure, approximately $1 billion — cannot be accounted for based on the analysis performed to date.

### APPROXIMATELY 25% OF SIB'S NOTES RECEIVABLES ARE OWED BY U.S. RESIDENTS

53.    SIB did not, as a general rule, make loans. Limited exceptions were made to that policy toward the end of SIB's existence. SIB assets include $97 million as of February 2009 in customer notes receivable, $23 million of which are owed by persons in the U.S. (as determined by reference to statement mailing addresses). The few loans with Antiguan addresses appear to be associated with STC trusts, which in all likelihood are held by non-Antiguans. (Indeed, according to Mr. Hamilton-Smith, STC, like SIB, was prohibited from doing business with Antiguans. *See* **RSJ-4** at 4, ¶ (c)).

### MISINFORMATION REGARDING SIB'S FINANCIAL STRENGTH WAS DISSEMINATED FROM THE U.S. TO FINANCIAL ADVISERS AROUND THE WORLD WITH THE INTENT THAT FINANCIAL ADVISERS USE THE MISINFORMATION TO CONVINCE POTENTIAL INVESTORS TO PURCHASE SIB CDS.

54.    Financial advisers persuaded their clients to purchase Stanford CDs using misinformation given to the financial advisers in training materials, training sessions and corporate "pep talks." The misinformation came directly or indirectly from Stanford, Davis and/or Holt in the United States. These misrepresentations include the value of SIB's

investments, SIB's investment allocation, SIB's investment strategy, the persons who managed SIB's investments, SIB's history of consistently high earnings, Stanford's purported capital infusion into SIB to strengthen it, and the security of customer's deposits with SIB. I've already reviewed above the misrepresentations regarding investment values and investment income contained in SIB's 2007 financial statements. Some additional examples of the dissemination of misinformation from the U.S. follow.

55.    Attached as **KVT-16** is a transcript of a video of Allen Stanford addressing Stanford financial advisers (*i.e.* brokers) in Miami in October 2008. It is reasonable to assume that Stanford intended his comments to be passed along by the financial advisers to potential purchasers of SIB CDs. Stanford's comments in that video should be read in the context of the following facts:

        a)    Stanford's comments regarding investment performance necessarily relate to SIB's investments because there were few other funds, if any, to invest.

        b)    The true state of SIB's financial affairs — that it was insolvent — was a closely guarded secret, known only to Stanford, Davis and a few others.

        c)    Cash was being rapidly consumed and Tier 2 investments were being liquidated to meet a rising demand for redemptions.

        d)    Plans were being made for fictitious "capital infusions" involving Stanford's contribution to SIB, at greatly inflated values, of real estate that, just a short time before, had been purchased *with SIB funds*. It appears that the purpose of the fictitious capital infusions was to satisfy a regulatory requirement for an equity amount that had been targeted earlier in the year.

Interspersed between Stanford's remarks on the state of the global and U.S. economy, how politicians are ruining "the country" (meaning the U.S., not Antigua), and how he views himself as a "middle [class], common-sense-thinking American [and] [h]opefully, that's where my values will always be," he makes the following statements about the Stanford companies' financial performance:

- "This is not going to be an easy period for any of us, but *we're going to do very well*."

- "But this world is going to change, ladies and gentlemen, and *we're going to be a leader in all areas* of it."

- "I'll say it again:  We have no securitized debt, we don't depend on the credit markets as a company, and our use of leverage has been minimal."

- "We have always had to put the client first, because we were always fighting that uphill battle to get that client, and we're not going to change. That's *the number one priority in this company and always will be, to take care of the client*."

- "Right now it's the worst we've done in a long time.  We're about, as of early October, down about four percent, I guess.  We've had a lot of hot spots within.  I saw one return up 16% here today.  Different things that are, in spite of the confusion, are actually benefiting.  But *overall we're down about four percent.  I'm not happy with that; in this market I guess it's astounding*."

- "We've got a lot of cash, we're positioning to grow our business, and nothing's really changed in our companies."

- "Our investment model works, it's a long-term play, and it's proven itself in this day, in this market to be the toughest I've ever seen to work better than ever."

56.     **KVT-17** is a 12 February 2009 letter from Allen Stanford, on stationery headed merely "Stanford" and bearing the Stanford Eagle logo, to SIB CD investors, along with an email transmitting it to financial advisers for their use in forwarding to investors.  Here are excerpts:

"Yesterday, there was a business magazine article about the Stanford Companies. In light of these recent press reports, I believe it is important for you to hear directly from me.

As you know, the Stanford Companies were built on the values set by my grandfather 77 years ago. We have weathered the ups and downs of the markets and we have used the most challenging economic periods to spot opportunities and grow our company in a steady and consistent manner. …"

"As far as Stanford International Bank is concerned, I want to be very clear, the bank remains a strong institution. … [W]e have already taken a number of decisive steps to preserve our core capital and to reinforce our financial strength and investment base. … [W]e have already added two capital infusions into the bank and are considering additional actions. … You have placed your confidence in the Stanford Companies, and we know you are counting on us more than ever in these uncertain times."

57.    **KVT-18** is an email string, dated 11 November 2008, between a financial adviser and Laura Pendergest Holt. It begins with the financial adviser asking for information regarding SIB's financial strength and investment portfolio performance. Holt responds that "there has not been a loss on the portfolio," a "$235 million capital infusion was just made," and "liquidity stands at $1.5 billion." None of these three statements, made from the United States, was correct. Nonetheless, this illustrates where a financial adviser went — not to Antigua, but to Memphis, Tennessee or Tupelo, Mississippi — to obtain information with which to reassure his clients regarding the safety of their SIB investments.

### MARKETING AND INFORMATIONAL MATERIALS FOR SIB STRESSED THE CONNECTION WITH STANFORD'S GLOBAL NETWORK AND GLOBAL INVESTMENT STRATEGY.

58.    Stanford Financial Group was the "brand name" used in marketing literature to lend credibility to SIB by portraying it as part of a larger global group of companies headquartered in the U.S.

a)    SIB's 2007 Annual Report (its last) (See **KVT-19**) states the following:

Stanford International Bank is a member of the Stanford Financial Group, which is a privately held global group of wholly owned, independently managed financial services companies founded by Lodis B. Stanford in 1932. Stanford's

core businesses are wealth management for high-net worth individuals and investment banking for institutions and emerging growth companies. Knowledgeable private and institutional investors have availed themselves of Stanford's global expertise in asset allocation strategies, investment advisory services, equity and fixed income research, international private banking and trust administration, commercial banking, investment banking, merchant banking, institutional sales and trading, real estate investment and insurance. Stanford serves clients from more than 100 countries on six continents.

b)    **KVT-20** is the transcript of a 2006 marketing video entitled "SFG Corporate Video" in which Allen Stanford explains Stanford Financial Group as follows:

"Stanford Financial Group is a family of financial services companies with global reach. We serve over 40,000 clients who reside in 79 countries on six continents. Our world headquarters are located in Houston, Texas, and we have a continual growing number of offices around the world to serve our clients. …

Although independent, all of our affiliate companies work together to form a powerful cohesive network. Together they represent over 20 billion dollars in assets under management or advisement. We pride ourselves on the extraordinary level of personal service we offer, and we take the time necessary to truly understand your individual financial needs, developing a relationship based on trust and integrity. …

This commitment to outstanding personal service is deeply rooted in our past. In 1932 my grandfather, Lodis Stanford, founded Stanford Insurance Company in my hometown of Mexia, Texas. The Great Depression had its grip on America, and most businesses were sacrificing quality and services to survive. But my grandfather refused to lower his standards. Instead, he made service his top priority. …

The values that built our company to what it is today are the same values that will carry us into the future. Over the past seven decades we've mastered new skills, embraced new technologies, and expanded our opportunities to new markets. Here are some of the products and services that make us unique in the marketplace.

We offer innovative international private and institutional banking services. Stanford International Bank, domiciled in Antigua, was founded for the specific purpose of private-client wealth management. …

Using our unbiased wealth-management approach we tailor a financial plan to your specific requirements, and then we put that plan into action through the

Stanford worldwide network of affiliates. In this way we help you weather the market cycles and, most importantly, we help you reach your financial goals. …

We offer investment banking, merchant banking, institutional equity sales and trading, and the services of our multi-billion-dollar Stanford fixed-income desk from our offices in Houston, Dallas, Miami, San Diego, and New York.

And because information is as important as capital in a global economy, our Memphis office provides cutting-edge research on the latest trends affecting business and finance in the United States and around the world. …

We provide critical financial support for artistic and community programs worldwide, and I am proud to say that we have been a major financial supporter for the restoration of the Leland Stanford mansion in Sacramento, helping preserve an important piece of California and Stanford family history."

c)    **KVT-21** is a 31 March 2004 press release regarding "Stanford Financial Group's CEO R. Allen Stanford['s]" donation of $100,000 to a Dallas, Texas charity. It states this about Stanford Financial Group:

"Stanford Financial Group is an international network of affiliated companies that together provide a wide range of coordinated financial services to more than 40,000 clients in 79 countries. … Headquartered in Houston, Texas, Stanford Financial Group has some 2,000 employees in the United States and worldwide."

59.    SIB advertised to customers and potential purchasers of CDs that it was able to pay higher interest, in part, because of "synergies" and cost-savings that resulted from its being part of Stanford Financial Group and because of globally diversified investment strategy. By way of example only, the following statements were contained in SIB marketing and informational materials:

a)    "The bank … benefits through operational synergies already in place within the Stanford Financial Group." (**KVT-22**, page 0011252)

b)    "We are a member of the Stanford Financial Group of companies and greatly benefit from services and support provided by the wholly owned Stanford affiliates around the globe." (**KVT-22**, page 0011225)

c)    "SIB has received this benefit without the capital expenditures required for opening and maintaining multiple global offices.    As a result the Bank's operational and administrative costs are approximately 40% of revenue, compared to other international banks which generally allocate 60% to 80%." (**KVT-22**, page 0011221).

d)    "We have invested a large percentage of the Bank's assets in globally diversified portfolios, and have proven, for two decades that our investment strategy is a prudent way to protect principal and grow capital." (**KVT-22**, page 0011225)

### SIB's PRINCIPAL OPERATING BANK ACCOUNTS WERE LOCATED IN HOUSTON, TEXAS

60.    An examination of the activity in SIB's Bank of Houston and Trustmark accounts reveals that these two United States based financial institutions played a significant role in SIB's day-to-day operations.

61.    SIB's principal operating account was maintained at the Bank of Houston, in Houston, Texas. (More specifically, this was a pair of accounts — a money market account that was interest-bearing where funds were kept until needed and a separate checking account to which transfers would be made from the money market account when checks were written.) This account was used for a variety of purposes, including the purchase or funding of "Tier 2" and "Tier 3" investments, payments to other Stanford Entities in payment of services rendered to SIB, and for capital contributions or loans to other Stanford entities made "on behalf of shareholder," *i.e.* — Allen Stanford.

62.    There were six SIB accounts at Trustmark Bank (located in Houston, Texas) that also played a significant role in SIB's business.

a)    SIB Sweep Account – 300-310-1707

- • This account sent $295 million to SIB's account at Toronto Dominion in 2008.

- • It appears to have been a primary source of funding for other SIB accounts at Trustmark. In 2008 approximately $66 million was sent to the SIB Client account, $32 million to SIBL Vendor Account and $2 million to the SIB Payroll account.

b) SIB Vendor Account – 300-310-1541

- • There were approximately $34 million in disbursements made from this account in 2008.

c) SIB Client Account – 300-310-1558

- • There were approximately $71.6 million in disbursements from this account in 2008.

- • This account was used for interest payments to CD holders and at least some CD redemptions.

- • There were also checks written to the Bank of Antigua, most of which were deposited into Bank of Antigua's account at Bank of America.

d) SIB – Payroll Account – 300-310-1608

- • Most of SIB's payroll was paid out of this account. Checks were issued to the majority of the employees; very few had direct deposit. Payroll processing occurred in Houston.

**STC'S CORE FUNCTIONS WERE CONDUCTED IN THE UNITED STATES AND NOT ANTIGUA**

63. STC was on the front end of the Ponzi scheme, bringing CD proceeds into the Stanford network:

a) STC was principally in the business of administering trusts for clients. STC was controlled by Stanford and Davis from the U.S., just as SIB was.

b) The assets that fund the STC-administered trusts consist mostly of SIB CDs.

c)    In other words, it appears STC helped feed money to SIB, a principal intake point for the Ponzi apparatus.

d)    STC's records indicate that it loaned money to Stanford and to SIB and also invested heavily in a Stanford Entity located in Colombia.  At December 31, 2008, STC's three largest assets, other than cash and cash equivalents of approximately $11.3 million, were a $1.6 million note receivable from Allen Stanford, a $2.6 million receivable from SIB, and approximately $8.6 million invested in Stanford S.A. Comisionista de Bolsa.

64.    STC's brokerage accounts are predominantly held at Pershing LLC, in Jersey City, New Jersey, and in affiliated Stanford Entity brokerage houses located in Latin America.

## AGGREGATION VS. MANY INDIVIDUAL LIQUIDATIONS

65.    Mr. Hamilton-Smith states in his latest declaration that "[t]he Liquidators currently believe that SIB's estate should be liquidated separately and not aggregated with the estate of any other Stanford entities." (Hamilton-Smith Supp. Decl., Doc. 15, at ¶ 25)  Based on the information I have seen to date, the ultimate distributions to SIB claimants would not be adversely impacted if all the Stanford Entities were liquidated in the same proceeding.

a)    Based on the information I have reviewed to date, more than 90% of the ultimate claims, by dollar amount, against the combined Stanford entities (SIB included) will consist of claims by SIB CD holders.  Therefore, even if all Stanford Entities are liquidated in a single proceeding, the presence of claims against Stanford Entities other than SIB are unlikely to have a significant dilutive effect on distributions to SIB claimants.

b)    Based on my experience as an accounting and fraud-investigation professional involved in numerous complicated proceedings, it will be far less

costly to liquidate the various Stanford entities in a single proceeding, such as the present U.S. receivership, than if the various Stanford entities and/or claimants were each made the subject of a separate proceeding with its own set of legal and accounting professionals. The cost savings that will result from having these companies liquidated in a single proceeding will benefit claimants because less administrative costs means more assets available for ultimate distribution.

66.    I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


Executed this 9th day of June, 2009.

Karyl Van Tassel