IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| Stanford International Bank, Ltd. | § | Case No.  3:09-CV-0721-N |
| | § | |
| Debtor in a Foreign Proceeding | § | |
| | § | |

---

**RECEIVER'S SUPPLEMENTAL BRIEF**

---

Kevin M. Sadler
Texas Bar No. 17512450
kevin.sadler@bakerbotts.com
Scott D. Powers
Texas Bar No. 24027746
scott.powers@bakerbotts.com
David T. Arlington
Texas Bar No. 00790238
david.arlington@bakerbotts.com
1500 San Jacinto Center
98 San Jacinto Blvd.
Austin, Texas 78701-4039
(512) 322-2500
(512) 322-2501 (Facsimile)

Timothy S. Durst
Texas Bar No. 00786924
2001 Ross Avenue
Dallas, Texas 75201
(214) 953-6500
(214) 953-6503 (Facsimile)
tim.durst@bakerbotts.com

**ATTORNEYS FOR RECEIVER RALPH S. JANVEY**

**TABLE OF CONTENTS**

Table of Authorities .................................................................................................... iii

I.       Introduction ....................................................................................................... 1

II.      Discussion .......................................................................................................... 3

         A.       The Antiguan Proceeding is not a foreign main proceeding .................................. 3

                  1.       The Court should not treat SIB as a separate corporate
                           entity for the purposes of determining the relevant COMI
                           because the Stanford entities were operated as a single
                           fraudulent scheme. .................................................................................. 5

                  2.       Even when viewed as a separate entity, SIB's COMI is not
                           Antigua. ................................................................................................... 7

                           a.       SIB's owner, managers, and directors were not
                                    located in Antigua. ...................................................................... 7

                           b.       SIB's principal business activities were not
                                    performed in Antigua. .................................................................. 8

                           c.       SIB's assets are located in countries other than
                                    Antigua. ..................................................................................... 9

                           d.       SIB's creditors are not located in Antigua. ................................. 10

                           e.       Most of SIB's records are located outside of
                                    Antigua. ..................................................................................... 10

         B.       The Antiguan Proceeding is not a foreign nonmain proceeding .......................... 11

         C.       Recognizing the Antiguan Proceeding under Chapter 15 would be
                  manifestly contrary to the public policy of the United States. ............................. 13

                  1.       Recognition would reward the improper conduct that led to
                           the JLs' appointment. ............................................................................ 13

                  2.       Recognition would threaten the interests of the Stanford
                           investors. ............................................................................................... 16

                  3.       Recognition would be used by the JLs to battle the DOJ. ....................... 18

         D.       If the Court grants Chapter 15 recognition, the Court should
                  impose significant conditions on recognition. ................................................... 19

III.     Conclusion ...................................................................................................... 20

i

CERTIFICATE OF SERVICE ........................................................................................................ 22

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan*,
    447 F.3d 411 (5th Cir. 2006) .................................................................................5

*Hertz Corp. v. Friend*,
    130 S. Ct. 1181 (2010).................................................................................4, 7

*In re Basis Yield Alpha Fund (Master)*,
    381 B.R. 37 (Bankr. S.D.N.Y 2008).........................................................4

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*
    374 B.R. 122 (Bankr. S.D.N.Y. 2007).....................................................4, 7, 11, 12

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*
    389 B.R. 325 (S.D.N.Y. 2008)................................................................3, 11

*In re Betcorp Ltd.*,
    400 B.R. 266 (Bankr. D. Nev. 2009) ..........................................................7

*In re British Am. Isle of Venice (BVI), Ltd.*,
    441 B.R. 713 (S.D. Fla. 2010) ...................................................................5

*In re Chiang*,
    437 B.R. 397 (C.D. Cal. 2010) ..................................................................7

*In re Ernst & Young*,
    383 B.R. 773 (Bankr. D. Colo. 2008) ...................................................5, 6

*In re Fairfield Sentry Ltd.*,
    440 B.R. 60 (Bankr. S.D.N.Y. 2010)......................................................5

*In re Fairfield Sentry Ltd.*,
    2011 WL 4359937 (S.D.N.Y. Sept. 19, 2011) .......................................16

*In re Gold & Honey*,
    410 B.R. 357 (Bankr. E.D.N.Y. 2009).................................................13, 15

*In re Millennium Global Emerging Credit Master Fund Ltd.*,
    No. 11–13171, 2011 WL 3805787 (Bankr. S.D.N.Y. Aug. 26, 2011) ...................16

*In re Tri-Cont'l Exch.*,
    349 B.R. 627 (Bankr. E.D. Ca. 2006) ...................................................4, 19

*Lavie v. Ran (In re Ran)*,
    607 F.3d 1017 (5th Cir. 2010) ...............................................................3, 13, 19

*Underwood v. Hilliard (In re Rimsat),*
    98 F.3d 956 (7th Cir. 1996) ...............................................................................16

*United States v. Jon-T Chems., Inc.,*
    768 F.2d 686 (5th Cir. 1985) ...............................................................................5

**STATUTES**

11 U.S.C. § 1502(4) ...............................................................................................3

11 U.S.C. § 1502(5) .............................................................................................11

11 U.S.C. § 1506 ..................................................................................................13

11 U.S.C. § 1515(b) .............................................................................................12

11 U.S.C. § 1516(c) ...............................................................................................3

11 U.S.C. § 1522 ..................................................................................................19

11 U.S.C. § 1522(a) .............................................................................................19

**OTHER AUTHORITIES**

Jay L. Westbrook, *Locating the Eye of the Financial Storm*, 32 BROOK. J. INT'L L. 3, 6
    (2007)E.D.N.Y. 2009 .........................................................................................4

H.R. Rep. No. 109-31 ............................................................................................4

## I.      Introduction

This Court appointed the Receiver to unwind the massive Ponzi scheme perpetrated by Allen Stanford and his co-conspirators through a complex web of Stanford-owned entities, including Stanford International Bank, Ltd. ("SIB").  Almost three years after the Court's order commencing this Receivership, the New Joint Liquidators (the "JLs")—appointed by the same Antiguan court that has refused to recognize the legitimacy of the Receivership and this Court's orders—seek to establish the Antiguan liquidation proceeding (the "Antiguan Proceeding") as the primary liquidation proceeding for the Stanford entities.  The JLs' request for recognition under Chapter 15 would needlessly fracture the Stanford estate and would disrupt three years of work in winding down and liquidating the estate.  The JLs' request should be denied.

First, the Antiguan proceeding is not a foreign main proceeding.  SIB was a sham bank that was merely one component of the global Stanford fraud, the totality of which was created in and controlled from the United States.  Even if one were to ignore the fact that SIB was a sham corporation whose separateness was ignored by Stanford and his co-conspirators, Antigua is not where SIB had the "center of its main interest" (its "COMI").  SIB's Antiguan facility was nothing more than elaborate window dressing designed to hide SIB's fraudulent operations, which the evidence conclusively shows were controlled from the United States.

Second, the Antiguan Proceeding is not a foreign nonmain proceeding.  SIB did not maintain a "local place of business" in Antigua.  Nor did SIB carry out any "nontransitory economic activity" in Antigua.  As recognized by SIB's president and by the former Antiguan liquidators, SIB did not engage, and was prohibited by law from engaging, in banking activities with Antiguan residents.  Moreover, it is undisputed that by the time the JLs sought recognition from this Court in August 2011, all SIB operations in Antigua had been ceased for over two years.  Therefore, SIB does not have an "establishment" in Antigua for Chapter 15 purposes.

Third, even if the JLs could satisfy the other requirements, recognition should be denied under Chapter 15's public policy exception.  In connection with its enforcement of the federal securities laws, the SEC asked the Court, in February 2009, to appoint an equity receiver for the Stanford entities.  The Court immediately appointed the Receiver, took exclusive jurisdiction and control over all Stanford-related assets, and stayed all litigation against the Stanford estate.  Nevertheless, the Antiguan court—aware of, and in direct opposition to, this Court's order— instituted its own liquidation proceeding, installed its own liquidators, and refused to recognize the Receiver or the Court's orders.  Over the next 18 months, the Antiguan liquidators, Vantis, accomplished little beyond interfering with the Receiver's efforts to marshal the assets of the Stanford entities.  Then, a U.S.-based investor subject to this Court's jurisdiction and orders moved to replace Vantis because, in his view, all of Stanford's assets needed to be brought under the control of the Antiguan court, and Vantis was not doing *enough* to interfere with the Receiver's recovery efforts.  The investor, who had tried to get his own choice of liquidator appointed in 2009, succeeded this time, and the Antiguan court removed Vantis just as Vantis and the Receiver had finally reached an agreement to end disputes concerning control of Stanford assets.  Following almost a year of inactivity, the Antiguan court appointed the JLs, who immediately repudiated the agreement between Vantis and the Receiver and who have since redoubled efforts to advance the objective of transferring all Stanford assets to their control.  To achieve this goal, the JLs are, for example, actively challenging the U.S. DOJ's efforts to obtain criminal forfeiture of Stanford fraud proceeds located in Canada, the U.K., and Switzerland.  The consistent theme has been that while preaching the virtues of cooperation, the JLs' actions are directed at taking control of assets that are already under the control of the Receiver and/or law enforcement authorities and are being held for the benefit of the Stanford investors and creditors.

There is no precedent for using Chapter 15 to fracture an ongoing SEC receivership. There is no precedent for allowing a foreign liquidator to use Chapter 15 as a weapon to challenge U.S. law enforcement authorities' control of criminal proceeds.  Chapter 15 should not be misused to reward the efforts of a U.S. investor (represented by the same counsel who now represent the JLs) who chose to ignore this Court's orders and to make an end-run around this Court's jurisdiction.  Because recognition under these facts would severely undermine the public policy interests at stake, the Court should deny any form of recognition to the JLs.[1]

## II.      Discussion

### A.      The Antiguan Proceeding is not a foreign main proceeding.

A foreign main proceeding is "a foreign proceeding pending in the country where the debtor has the *center of its main interests*."   11 U.S.C. § 1502(4) (emphasis added).   The Antiguan Proceeding may be recognized as a foreign main proceeding *only if* the Court finds that SIB's alleged corporate separateness should be honored and that SIB's COMI is Antigua.  *See id.*

"In the absence of evidence to the contrary, the debtor's registered office, . . . is presumed to be the center of the debtor's main interests."  11 U.S.C. § 1516(c).  Despite this presumption, the burden is on the foreign representative to establish the debtor's COMI. *See, e.g.*, *Lavie v. Ran (In re Ran)*, 607 F.3d 1017, 1021 (5th Cir. 2010) ("The ultimate burden of proof on the requirements of recognition is on the foreign representative."); *In re Bear Stearns*

---

[1]  The analysis and conclusions contained in this Supplemental Brief are equally relevant to Stanford Trust Company Limited ("STCL"), a Stanford-owned Antiguan trust company.   STCL's principal business activity—trust administration—was performed in the United States, not in Antigua.  (*See* KVT Test. § V.)  Further, STCL was managed and controlled from the United States.  (*See id.*)  Because the trusts that STCL administered comprised mostly SIB CDs, (*see id.*), it is clear that Stanford and his co-conspirators used STCL to sell SIB CDs in furtherance of the Stanford fraud.  Thus, the Court should deny Chapter 15 recognition with respect to both SIB and STCL.

Exhibits I–IV are being filed concurrently with this Supplemental Brief.  Ex. I is comprised of the Direct Testimony of Karyl Van Tassel ("KVT Testimony") and the exhibits attached thereto (Exs. KVT-1 through KVT-71).  Ex. II is comprised of the Direct Testimony of Ralph S. Janvey ("RSJ Testimony") and the exhibits attached thereto (Exs. RSJ-1 through RSJ-53).  Ex. III is the Direct Testimony of Dr. John R. Wade ("Wade Testimony").  Ex. IV is an SEC analysis related to the Stanford entities.  Unless otherwise specified, citations to court records reference the docket numbers in this case, No. 3:09-CV-0721-N.

*High-Grade Structured Credit Strategies Master Fund, Ltd.* ("*Bear Stearns II*"), 389 B.R. 325, 335 (S.D.N.Y. 2008) ("Such a rebuttable presumption at no time relieves a petitioner of its burden of proof/risk of non-persuasion.").[2]   Recognition under Chapter 15 is certainly not a "rubber stamp exercise," and a court must consider "any and all relevant facts" in making its determination.  *In re Basis Yield Alpha Fund (Master)*, 381 B.R. 37, 40 (Bankr. S.D.N.Y 2008).

Chapter 15 does not define the term COMI.  Several courts have noted that in the context of a corporate debtor, the COMI concept is substantially equivalent to the concept of "principal place of business" under U.S. law.  *See, e.g.*, *In re Basis Yield*, 381 B.R. 37, 48 (Bankr. S.D.N.Y 2008); *In re Tri-Cont'l Exch.*, 349 B.R. 627, 634 (Bankr. E.D. Ca. 2006).  In 2010, the United States Supreme Court substantially clarified the law concerning "principle place of business," defining it as follows:[3]

> "[P]rincipal place of business" is best read as referring to the place where a corporation's officers direct, control, and coordinate the corporation's activities. It is the place that Courts of Appeals have called the corporation's "nerve center." And in practice it should normally be the place where the corporation maintains its headquarters—*provided that the headquarters is the actual center of direction, control, and coordination, i.e., the "nerve center,"* and not simply an office where the corporation holds its board meetings (for example, attended by directors and officers who have traveled there for the occasion).
>
> . . .
>
> For example, if the bulk of a company's business activities visible to the public take place in New Jersey, while its top officers direct those activities just across the river in New York, the "principal place of business" is New York.

---

[2]   *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.* ("*Bear Stearns I*"), 374 B.R. 122, 128 (Bankr. S.D.N.Y. 2007) ("This presumption 'permits and encourages fast action in cases where speed may be essential, while leaving the debtor's true "center" open to dispute in cases where the facts are more doubtful.'  This presumption is not a preferred alternative where there is a separation between a corporation's jurisdiction of incorporation and its real seat." (citation omitted) (citing Jay L. Westbrook, *Locating the Eye of the Financial Storm*, 32 BROOK. J. INT'L L. 3, 6 (2007))); *see also* H.R. Rep. No. 109-31, at 112–13, *as reprinted in* 2005 U.S.C.C.A.N. 88, 175 ("The presumption that the place of the registered office is also the center of the debtor's main interest is included for speed and convenience of proof *where there is no serious controversy*." (emphasis added)).

[3]   The Supreme Court's decision to adopt the "nerve center" test renders moot much of the briefing by the former Antiguan Liquidators on the issue of "principal place of business," in which the former Antiguan liquidators argued that the Fifth Circuit would not apply the "nerve center" test in this context.  (*See, e.g.*, Doc. 55 at 3–10.)

*Hertz Corp. v. Friend*, 130 S. Ct. 1181, 1192, 1194 (2010) (emphasis added).

At least two courts have cited *Hertz*'s "nerve center" test when determining whether to grant recognition under Chapter 15. *See, e.g.*, *In re British Am. Isle of Venice (BVI), Ltd.*, 441 B.R. 713, 720 (S.D. Fla. 2010) ("More recently, in analyzing COMI courts have drawn a parallel to the 'nerve center' analysis described in [*Hertz*]."); *In re Fairfield Sentry Ltd.*, 440 B.R. 60, 64 (Bankr. S.D.N.Y. 2010) (holding that debtor's administrative "nerve center" was in country where foreign proceeding was pending).

> **1.** **The Court should not treat SIB as a separate corporate entity for the purposes of determining the relevant COMI because the Stanford entities were operated as a single fraudulent scheme.**

When several corporate entities are operated as one fraudulent enterprise, the corporate form should be disregarded, and a single COMI should be determined for the entire fraudulent scheme. *Cf. Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 447 F.3d 411, 416 (5th Cir. 2006) (noting that courts will disregard corporate separateness "in the name of equity when the corporate form is used as a sham to perpetuate a fraud" (internal quotation marks omitted); *United States v. Jon-T Chems., Inc.*, 768 F.2d 686, 693 (5th Cir. 1985) (agreeing with the Fourth Circuit that when determining whether to disregard the corporate form, "courts are concerned with reality and not form, with how the corporation operated and the individual defendant's relationship to that operation").

In *In re Ernst & Young*, for example, two fraudsters (both residents of Canada) set up two entities (a Canadian corporation and a Colorado limited liability company) for the purposes of perpetrating a fraudulent investment scheme. *See In re Ernst & Young*, 383 B.R. 773, 774–75 (Bankr. D. Colo. 2008). Although the Colorado LLC was operated by a third fraudster (a Colorado resident), the two Canadians supervised and directed the scheme from Canada. *See id.* at 774. After a Canadian court appointed a receiver for both entities, the receiver filed a

petition for recognition under Chapter 15.  *See id.* at 775–76.  The U.S. bankruptcy court concluded that the Canadian fraudsters formed and directed the fraudulent entities from Canada. *See id.* at 780.  The court further held that the "location of the debtor" was irrelevant to COMI because "there was no real business being operated out of either entity," and "the creation of [both entities] was part of a fraudulent scheme."  *See id.*  Noting that there was a "reasonable probability" that the two debtor entities were "operated as one for purposes of perpetrating a fraud on investors," the court found that the debtors' COMI was Canada and thus recognized the Canadian receivership as a foreign main proceeding.  *See id.* at 781.

Similarly, the Court has recognized that the Stanford entities were operated as one for the purposes of perpetrating a massive Ponzi scheme.  (*See, e.g.*, Doc. 109, No. 3:10-CV-00346-N, at 56 ("The evidence further demonstrates that the [Stanford] Ponzi scheme was comprised of over 100 interrelated entities whose primary, if not exclusive, source of funding was derived from SIB CDs."); Doc. 1483, No. 3:09-CV-0298-N, at 13 ("Stanford's alleged Ponzi scheme spanned at least a decade and involved myriad actors and entities largely owned or controlled by Stanford."); *see also* Ex. IV, SEC Analysis, at 8.)  Indeed, the evidence shows that each of the Stanford entities either participated in the scheme, derived benefit from the scheme, or lent the appearance of legitimacy to the entirety of Stanford's enterprise.  (*See* KVT Test. § I; *see also id.* § II (testifying that SIB CD proceeds were transferred to other Stanford entities without regard for corporate separateness).)  To ignore these findings would be to elevate form over substance and would legitimize the corporate structure that Stanford used to perpetrate his fraud. Accordingly, the Court should determine a single COMI for the entire Stanford scheme.

When viewed as a whole, it is undisputed that the center of the Stanford fraud scheme was located in the United States.  (*See* KVT Test. § XIII ("Stanford Financial Group is a family

of financial services companies with global reach. We serve over 40,000 clients who reside in 79 countries on six continents. Our world headquarters are located in Houston, Texas . . . .")) Because the COMI for the Stanford fraud scheme was the United States, the Court should not find that the Antiguan Proceeding is a foreign main proceeding.

### 2. Even when viewed as a separate entity, SIB's COMI is not Antigua.

There is no support for the JLs position that SIB's COMI is Antigua. Antigua did not serve as SIB's "administrative and executive nerve center." *See In re Betcorp Ltd.*, 400 B.R. 266, 272 (Bankr. D. Nev. 2009); *see also Hertz*, 130 S. Ct. at 1192, 1194 (holding that a corporation's principal place of business is its "nerve center"). Nor did Antigua serve as SIB's "real seat" of operations. *See Bear Stearns I*, 374 B.R. at 130 (Bankr. S.D.N.Y 2007). Although SIB's purported "headquarters" were located in Antigua, no significant business activities were performed there. SIB's facility in Antigua was nothing more than window dressing for the Stanford fraud, which was directed from the United States. (*See* KVT Test. § I–II, IV) As demonstrated here, all of SIB's assets and principal managerial and business activities were controlled from the United States. Because SIB's "nerve center"—its actual center of direction, control, and coordination—was in the United States, SIB's COMI is the United States, not Antigua. (*See* Ex. KVT-71, Blackman Dep., at 16:12–25, 17:1–5 (testifying that "the nerve center of the bank, of SIB, was in the United States" and that SIB's headquarters were "by definition" in the United States)); *cf. In re Chiang*, 437 B.R. 397, 403 (C.D. Cal. 2010) (noting that every debtor has exactly one COMI and "[t]hat country has the greatest interest in the status of the debtor and in the outcome of the insolvency case").

### a. SIB's owner, managers, and directors were not located in Antigua.

SIB's sole owner, its managers, and its directors were located in the United States. SIB is wholly-owned by Stanford Bank Holdings Limited, which, in turn, is wholly-owned by

R. Allen Stanford.  (*See* KVT Test. § I.)  Stanford is a U.S. citizen and a U.S. resident.  (*See id.*)  Stanford resided in and spent the vast majority of his time in the United States or the U.S. Virgin Islands.  (*See* RSJ Test. § II.)  He never resided in Antigua.  (*See id.*)

SIB was managed by Stanford, Jim Davis, and Laura Pendergest-Holt.  (*See* KVT Test. § I.)  Davis and Holt are also U.S. citizens and U.S. residents.  (*See id.*)  Stanford, Davis, and Holt performed the vast majority of their managerial duties in the United States.  (*See id.* §§ I–II.)  All of SIB's head office and management functions—including decision-making related to marketing, investing, and general operations—were performed by Stanford and Davis in the United States.  (*See id.* § I.)  Davis, SIB's Chief Financial Officer, was the SIB officer with the most responsibility; he oversaw all investments and handled all investment proceeds from the United States.  (*See id.* § II.)  All of SIB's directors were non-Antiguans, and all but two were U.S. citizens.  (*See id.* § I.)  SIB employees in Antigua did not have the authority to make any significant managerial decisions.  (*See id.*)

      **b.**      **SIB's principal business activities were not performed in Antigua.**

SIB's two principal business activities—selling SIB CDs and directing SIB CD proceeds—were performed in the United States or in one of several countries around the world; neither one of these activities was performed in Antigua.  (*See id.* §§ I–II.)  SIB's workforce of less than 90 employees in Antigua was insufficient to operate a multi-billion dollar bank.  (*See id.* § IV.)  For example, in 2008, SIB paid Stanford entities in the United States and the U.S. Virgin Islands at least $268 million in management, administrative, and marketing fees, while SIB's total payroll during that same time period was approximately $3.6 million.  (*See id.*)  And the strategic business decision to outsource virtually all of SIB's operations was made not in Antigua, but by individuals in the United States.  (*See id.*)

SIB did not market or sell SIB CDs to Antiguan residents.  (*See id.* §§ I, XII.)  SIB CDs were marketed to investors by Stanford financial advisors employed by other Stanford entities located in the United States or in one of several other countries around the world.  (*See id.* §§ I, XI.)  These financial advisors assured investors that they were dealing with a U.S.-based enterprise and that their investments were subject to the protections of U.S. law.  (*See id.* § XIII; *see also* Wade Test. § II.)[4]  From the investors' perspective, the financial advisors served as the face of SIB; most investors never saw or interacted with any SIB employee in Antigua.  (*See* KVT Test. § XIII ; *see also* Wade Test. § II (testifying that he was told all SIB-related business had to go through his SGC financial advisor); Ex. KVT-68, Fundora Pet., at 2 (testifying that he had been instructed to deal with Miami-based adviser in matters related to SIB).)  Substantially more SIB CDs, by dollar amount, were sold by financial advisors located in the United States than by financial advisors located in any other country.  (*See* KVT Test. § XI.)

With respect to investments made with SIB CD proceeds, all three tiers of SIB investments were controlled and managed from the U.S.  (*See id.* § II.)  SIB employees in Antigua were not involved in SIB's investment policies, strategies, or choices.  (*See id.* § II.)

### c.   SIB's assets are located in countries other than Antigua.

The vast majority of SIB's assets, all of which were controlled from the United States, are located in countries other than Antigua, including the United States, Canada, the United Kingdom, Switzerland, Panama, Venezuela, and Mexico.  (*See* KVT Test. § II.)  A majority of

---

[4]  Stanford financial advisors marketed the SIB CD by portraying SIB as part of Stanford Financial Group—the "brand name" used to refer to the entire network of Stanford financial services companies headquartered in the United States.  (*See* KVT Test. § XIII.; *see also* Wade Test. § II.)  SIB held itself out to creditors, borrowers, and even the IRS as having locations in the U.S.  (*See* KVT Test. § IV.)  SIB also made regulatory filings with state securities regulatory agencies in the U.S., consenting to jurisdiction in the courts of those states for suits arising out of SIB CD sales.  (*See id.*)  SIB's disclosure documents even admitted and assured U.S. investors that "[b]y making this offering to Accredited Investors in the United States, [SIB] and its officers are subject to certain laws of the United States, including the anti-fraud provisions of the U.S. federal securities laws and similar state laws."  (Doc. 3 at 46.)  The Court recently noted that SIB investors were "effectively assur[ed] . . . that the offer and sale of CDs were subject to the antifraud provisions of the federal securities laws."  (Doc. 1483, No. 3:09-CV-0298-N, at 9.)

the private equity positions purchased with SIB funds concerned companies located in the United States and in other countries outside of Antigua.  (*See id.*)  The small amount of cash funds that SIB kept in Antigua were deposited at the Bank of Antigua (another Stanford entity).  (*See* KVT Test. § II.)  And between 2004 and 2008, SIB maintained an average cash balance there of less than $500,000.  (*See id.*)

> **d.**     **SIB's creditors are not located in Antigua.**

Almost all of the Stanford creditors are located in countries other than Antigua. U.S. residents account for 25% of all SIB CD clients (more than any other country) and 37% of the aggregate value of all SIB CDs sold (more than any other country).  (*See* KVT Test. § XII.) Very few, if any, Antiguan residents purchased SIB CDs because, as noted above, Antiguan residents were not allowed to open accounts with SIB.  (*See* KVT Test. §§ I, XII.)

> **e.**     **Most of SIB's records are located outside of Antigua.**

Most of SIB's detailed records, including investment records, were kept in the United States.  (*See* KVT Test. § III.)  Although monthly statements related to Tier 2 assets were sent to Antigua, the detailed weekly summaries related to those assets were kept in the United States. (*See id.*)  Moreover, according to Juan Rodriguez–Tolentino, SIB's president, the Tier 2 statements that were sent to Antigua were kept under lock and key and could only be accessed with Davis's permission, and none of the Antiguan employees received such permission. (*See id.* §§ II–III.)  While some information related to Tier 3 assets may have been kept in Antigua, the majority, if not all, of the information related to Tier 3 assets was kept by Davis (and those working under him) in the United States.  (*See id.* § II.)  SIB's reported investment values and reported investment income—which, from the client's perspective, were the most important figures on SIB's financial statements—were generated in the United States.  (*See id.*) SIB employees in Antigua did not have access to this information.  (*See id.*)  Extensive SIB

client records were kept in the United States.   (*See id.*)   Because SIB client data was also maintained electronically, most client data that was available in Antigua was also available in the United States.   (*See id.*)

In light of the foregoing, it is clear that SIB's COMI is in the United States, not in Antigua.   Accordingly, the Court should not recognize the Antiguan Proceeding as a foreign main proceeding under Chapter 15.

**B.      The Antiguan Proceeding is not a foreign nonmain proceeding.**

Chapter 15 defines a "foreign nonmain proceeding" as "a foreign proceeding, other than a foreign main proceeding, pending in a country where the debtor has an establishment." 11 U.S.C. § 1502(5).   An "establishment" is "any place of operations where the debtor carries out a nontransitory economic activity."   *Id.* § 1502(2).   There is no presumption in favor of finding the existence of an "establishment."   *See Bear Stearns II*, 389 B.R. at 334.

The Antiguan Proceeding is not a "foreign nonmain proceeding."   In *Bear Stearns I*, the court denied foreign nonmain recognition because the debtor did not do business with Cayman citizens:

> If recognition is to be accorded to the Foreign Proceeding as nonmain, . . . there must be an "establishment" in the Cayman Islands for the conduct of *nontransitory* economic activity, i.e., a local place of business.   Here the bar is rather high, especially in view of the Cayman Islands' statutory prohibition against "exempted companies" engaging in business in the Cayman Islands except in furtherance of their business otherwise carried on *outside* of the Cayman Islands. . . .   [T]here is no (pertinent) nontransitory economic activity conducted locally in the Cayman Islands by the [debtors]; only those activities necessary to their offshore "business." . . .   Clearly, even if I were to strain to find sufficient factors to satisfy the "nonmain" eligibility status pursuant to section 1502(5), the effort does not yield a finding of a seat for local business activity (proxy for establishment).

*Bear Stearns I*, 374 B.R. at 131 (footnotes and citations omitted).   Like the debtors in *Bear  Stearns I*, SIB did not maintain a "local place of business" or a "seat for local business

11

activity" in Antigua.   According to both SIB's president and SIB's Marketing and Training Manual, "only non-residents of Antigua and Barbuda [were] allowed to open accounts with the Bank."   (Ex. KVT-5, SIB Marketing and Training Manual, at 16; *see also* KVT Test. § XII.) Therefore, any business activity that SIB conducted in Antigua was in furtherance of SIB's business *outside* of Antigua.

Further, SIB did not conduct "(pertinent) nontransitory economic activity" in Antigua. *See Bear Stearns I*, 374 B.R. at 131.  All of SIB's principal business activities were performed in or controlled from countries other than Antigua.  Even the Antiguan government has affirmed that SIB's operations in Antigua were neither "economic" nor "nontransitory":

> The business of Stanford International Bank Ltd. was run from Houston, Texas, and its books maintained in Memphis, Tennessee.  The bank was operating in Antigua as a *transit point* and for purposes of registration and regulation.

(Ex. KVT-69, Statement from Antiguan Government, at 1 (emphasis added); *see also* Ex. KVT-70, Transcript of Speech by Prime Minister Spencer, at 2.)

To the extent that SIB activity was carried out in Antigua at all, such activity was intended to foster the illusion that SIB was a legitimate bank.  Stanford chartered SIB in Antigua and allotted a limited number of employees there simply to further his fraudulent scheme. Nothing in the text of Chapter 15 or the relevant case law suggests that the façade of "economic activity" will support nonmain recognition.

In any event, by the time that the JLs first asked this Court for recognition (August 2011), SIB was not conducting any business of any kind in Antigua.[5]  Thus, as of the

---

[5]  It should make no difference that a previous foreign representative from Antigua sought recognition in April 2009, given the long delay between the original filing of the petition for recognition and the appointment of the JLs. Indeed, the petition under which the JLs are proceeding is facially deficient in light of the mismatch between the JLs and the foreign representatives identified in the petition.  *See* 11 U.S.C. § 1515(b) (requiring petition for recognition to be accompanied by (1) a certified copy of the decision appointing the foreign representative, (2) a court-issued certificate affirming the appointment, or (3) other acceptable evidence establishing the appointment).

pertinent time,[6] SIB had no place of business of any kind in Antigua.  *See Ran*, 607 F.3d at 1028

(recognition properly refused where debtor had ceased operations in foreign jurisdiction by time

petition for recognition was filed).  Because SIB does not have an "establishment" in Antigua

under Chapter 15, the Antiguan Proceeding is ineligible for recognition as a foreign nonmain

proceeding.

**C.     Recognizing the Antiguan Proceeding under Chapter 15 would be manifestly contrary to the public policy of the United States.**

Even if the JLs were to satisfy their burden for recognition under Chapter 15, the Court

has the authority to deny recognition if it "would be manifestly contrary to the public policy of

the United States."   11 U.S.C. § 1506.   "While the legislative history of Section 1506

demonstrates that this exception should be applied narrowly, it should be invoked when

fundamental policies of the United States are at risk."  *In re Gold & Honey*, 410 B.R. 357, 372

(Bankr. E.D.N.Y. 2009).  Public policy demands that recognition be denied here.

**1.     Recognition would reward the improper conduct that led to the JLs' appointment.**

The circumstances of the JLs' presence before the Court require that recognition be

denied.   On February 16, 2009, the SEC filed its lawsuit and obtained appointment of the

Receiver.   (*See* Doc. 1, No. 3:09-CV-0298-N.)   At that time, the Court stayed all litigation

against the Stanford estate.  (*See* Doc. 10, No. 3:09-CV-0298-N.)  The Antiguan court, however,

refused to recognize the legitimacy of the Receiver or this Court's orders, and instead installed

its own receiver.  (*See* RSJ Test. § VII.)  A month later, the Antiguan regulatory agency, FSRC,

and Alexander Fundora, a Florida-based investor subject to this Court's jurisdiction and orders,

asked the Antiguan court to place SIB into liquidation.   (*See id.*)   FSRC and Fundora each

---

[6] *See Ran*, 607 F.3d at 1026 ("The use of the present tense implies that the court's establishment analysis should focus on whether the debtor has an establishment in the foreign country where the bankruptcy is pending at the time *the foreign representative* files the petition for recognition under Chapter 15." (emphasis added)),

nominated a different candidate to serve as liquidator, with the Antiguan court ultimately selecting Vantis.[7] (*See id.*)  Although Vantis actively interfered with the Receiver's efforts to fulfill his court-imposed duties both here and abroad, the Receiver and Vantis ultimately reached agreement on a protocol that would have resolved conflicts over the collection of Stanford assets. (*See id.*)  Vantis submitted that agreed protocol for approval to both this Court and the Antiguan court, stating that the protocol was "in the best interests of those with claims against Stanford International Bank."  (Doc. 1086, No. 3:09-CV-0298-N, at 1.)  Antigua's Attorney General also stated his strong support for the protocol.  (*See* Ex. RSJ-32, June 2, 2010 Ltr. from AG to Receiver.)

After unsuccessfully seeking appointment of his preferred liquidator in 2009, Fundora moved in 2010 to replace Vantis because, in his view, Vantis was allowing the Receiver to take control of the assets of the Stanford entities:

> [Vantis's] actions also take place in a context where there is fierce competition for assets from the US Receiver who has thus far taken a speedy approach to recovering assets worldwide.  Once these assets have been taken into the jurisdiction of the U.S. Court these will be extremely difficult to regain.

(Ex. RSJ-52, Fundora Brief, at 28 (asking the Antiguan court to "act swiftly" in removing Vantis "to prevent further losses").)  Fundora's effort resulted in the appointment of the JLs, who have categorically rejected the protocol approved by Vantis.[8]  Allowing the JLs to use Chapter 15 to recover Stanford assets located in the United States would improperly reward Fundora's end-run around the receivership proceedings in the United States.  The Court should not countenance such a result.  On this basis alone, public policy demands that the petition for recognition be denied.

---

[7]  Fundora sought the appointment of Marcus Wide, who is now a JL.  (Ex. KVT-68, Fundora Petition, at 3.)

[8]  Among other things, the uncertainty caused by the JLs' repudiation of that protocol, which would have put an end to the Antiguan Proceeding's ongoing interference in Canada, has delayed the implementation of an agreement with the Canadian government to repatriate more than $13 million in assets that remain frozen in Canada.

In *In re Gold & Honey*, a bankruptcy court in the Eastern District of New York relied on Chapter 15's public policy exception to deny recognition to two Israeli receivers under very similar circumstances.  410 B.R. 357 (Bankr. E.D.N.Y. 2009).  The Israeli receivers had been appointed by an Israeli court at the instance of an Israeli creditor in violation of the automatic stay imposed in a U.S. bankruptcy.  *See id.*  The court concluded that the Israeli creditor's action was improper and that the Israeli court's action in violation of the U.S.-imposed stay was invalid. *See id*.  The Court applied the public policy exception, concluding that recognition would "severely impinge the value and import" of the automatic stay and would "severely hinder" the ability of courts "to carry out two of the most fundamental policies and purposes of the automatic stay—namely, preventing one creditor from obtaining an advantage over other creditors, and providing for the efficient and orderly distribution of a debtor's assets to all creditors in accordance with their relative priorities."  *See id.*

The same interests are at stake here—but to an even greater degree.  The Receivership was created and a stay was imposed based on this Court's judgment that it was in the best interests of the Stanford investors, the Stanford creditors, and the United States.  The Antiguan Proceeding was then initiated in direct opposition and contravention of this Court's action. Then, once it became clear that the Antiguan Proceeding was being conducted in such a way that it would at least not interfere with the Receivership within the borders of the United States, a U.S.-based investor, in disregard of the Court's stay order, instigated the appointment of the JLs to *increase* the Antiguan Proceeding's interference with this Receivership.

With the JLs' pursuit of recognition in this Court, that increased interference has now come to pass.  Recognizing the JLs would severely undermine the SEC's and this Court's authority and would reward the JLs' behavior.  Significantly, there are no reported cases in

which a U.S. court granted Chapter 15 recognition to a foreign proceeding seeking to interfere

with an ongoing U.S. insolvency proceeding.[9]  Indeed, Chapter 15's limited purpose is to help

foreign representatives recover foreign assets that have been "squirrel[ed] away" in the U.S.—

not to assist foreign representatives in removing what are primarily U.S. assets that had been

taken primarily from U.S. residents in a fraud perpetrated by U.S. citizens.  *Cf. In re Fairfield*

*Sentry Ltd.*, Nos. 11 MC 224 (LAP), 11 MC 230 (LAP), 11 MC 231 (LAP), 11 MC 235 (LAP),

11 MC 236 (LAP), 11 MC 237 (LAP), 2011 WL 4359937, at *11 (S.D.N.Y. Sept. 19, 2011)

("The purpose of Chapter 15 is to disallow debtors from squirreling away assets in the United

States outside of the reach of the foreign jurisdiction.").

> ### 2.      Recognition would threaten the interests of the Stanford investors.

Although the JLs stated objective is to benefit the Stanford investors and creditors,[10] the

JLs' main objective is clearly to replace the Receivership as the primary liquidation proceeding

for SIB in the United States.  (*See* Doc. 92 at 24 ("The Antiguan Proceeding is the primary

proceeding for the liquidation of SIB.").)  If the Court recognizes the Antiguan Proceeding, the

JLs will interfere with the Receiver's asset-recovery efforts by seeking to recover (and to remove

to Antigua) the very same assets that the Receiver is pursuing and, in some cases, has

successfully recovered.  (*See* Ex. RSJ-52, Fundora Brief, at 28 (asking the Antiguan court to "act

swiftly" in replacing former Antiguan liquidators because "there is fierce competition for assets

from the US Receiver" and because "[o]nce those assets have been taken into the jurisdiction of

---

[9]  *Cf. In re Millennium Global Emerging Credit Master Fund Ltd.*, No. 11–13171, 2011 WL 3805787, at *79 n.34 (Bankr. S.D.N.Y. Aug. 26, 2011) ("Cases prior to the adoption of chapter 15 also denied recognition where the purpose of the foreign case was to 'defeat the [U.S.] bankruptcy proceeding—strategic conduct that is not to be encouraged.'" (quoting *Underwood v. Hilliard (In re Rimsat)*, 98 F.3d 956 (7th Cir. 1996)).

[10]  In direct contrast to the JLs' position that recognition would allow them to bring "clawback" claims under Antiguan law, which, according to the JLs, allows for greater relief than U.S. law, (*see* Doc. 92 at 9–11), the investor-defendants who received the greatest profits in connection with the Stanford scheme recently argued in this Court that Antiguan law—not Texas law—governs the Receiver's claims and that Antiguan law does not provide for the asset recovery sought by the Receiver, (*see* Doc. 700, No. 3:09-CV-00724-N, at 18–22).

the U.S. Court [they] will be extremely difficult to regain"); *see also id.* at 29–30 (taking the position that if the Antiguan Proceeding is recognized by the Court, "[t]he value represented by all assets of S.I.B. will ultimately need to be moved to Antigua, and all claims of creditors of S.I.B. will need to be filed in Antigua, for administration by [the Antiguan court and its officers].").)

Such a transfer of assets would be particularly troubling in light of the Antiguan government's role in facilitating the Stanford fraud. Specifically, Stanford furthered his fraudulent scheme by using his power and influence over the Antiguan government to shield SIB's operations from scrutiny by regulators, including the SEC. For instance, in 1997, Stanford funded and chaired a "task force" that ultimately advised the Antiguan government to eliminate the offenses of "false accounting," "fraud," and "illegal deposit-taking" and to protect Antiguan businesses from enforcement actions initiated by judicial and regulatory authorities in other countries. (*See* RSJ Test. § III.) About a year later, Stanford had the Antiguan government appoint him as chairman of the International Financial Sector Authority (the "IFSA")—the Antiguan agency that was charged with regulating SIB's operations. (*See id.*)

Further, beginning at least as early as February 2005, Stanford made hundreds of thousands of dollars in cash payments and provided valuable non-cash benefits to Leroy King, administrator and chief executive officer of the Financial Services Regulatory Commission (the "FSRC")—the regulatory body that succeeded the IFSA as SIB's overseer. (*See id.* § IV.) King had direct knowledge of the Stanford scheme and used his position in the Antiguan government to ensure that the FSRC did not jeopardize Stanford's scheme. (*See id.*) On more than one occasion, King allowed Stanford and his associates to participate in drafting false and misleading

17

responses to investigative inquiries submitted by the SEC to the FSRC seeking information concerning SIB's operations.  (*See id.*)

There is ample evidence that the Antiguan government allowed Stanford to hide his fraudulent scheme for over a decade.  It would be perverse to allow the JLs, who were appointed by the Antiguan courts (which have rejected the legitimacy of the Receiver and this Court's orders and whose government facilitated the fraud and owes millions to the Stanford estate), to move Stanford assets from the United States to Antigua.[11]  Thus, recognizing the Antiguan Proceeding under Chapter 15 would directly threaten the investors' interests.

### 3.  Recognition would be used by the JLs to battle the DOJ.

The JLs have also made clear their intention to use these Chapter 15 proceedings as a weapon in their fight against the U.S. DOJ.  Since their appointment in May of this year, the JLs have actively objected to DOJ-initiated asset freezes and criminal forfeiture proceedings in Canada, the United Kingdom, and Switzerland.  (*See* Doc. 92 at 12.)  The JLs believe that they, rather than the DOJ, should control the distribution of these assets.  (*See id.* at 15–16 (arguing that they are in a "far better position" than the DOJ to disburse frozen proceeds of Stanford fraud).)  Over the DOJ's objection, the JLs have already obtained access to $20 million that otherwise would be available for distributions to the Stanford investors and creditors.  Yet, the JLs have not filed a *single* claim against any party in the U.K. or Switzerland—the two jurisdictions where the JLs have been recognized.  The JLs have not even brought a lawsuit against the Antiguan government, who borrowed (and has not repaid) approximately $90 million in loans from Stanford entities.  (*See* KVT Test. § XV.)  The JLs' open challenge to the DOJ's

---

[11]  The dangers attendant to such a transfer are further evident in the JLs' plan to use Stanford assets to develop Stanford real estate in Antigua.  (*See* Doc. 92 at 23.)  If such an asset transfer were to occur, the JLs could make speculative, long-term investments using assets that rightfully belong to the Stanford investors and creditors.

efforts to secure Stanford assets is contrary to fundamental U.S. public policy, and it would be an abuse of Chapter 15 to grant recognition that would assist the JLs in their efforts.

**D.      If the Court grants Chapter 15 recognition, the Court should impose significant conditions on recognition.**

Even if the Court recognizes the Antiguan Proceeding under Chapter 15, the Court can and should impose significant conditions on recognition.  *See* 11 U.S.C. § 1522 (providing for protection of creditors and other interested persons); *see also Ran*, 607 F.3d at 1026 ("[T]he relief [available to a foreign nonmain proceeding] is not automatic; rather, whether any such relief is appropriate is determined by the [the Court] after notice and hearing, at the court's discretion, and subject to the requirement that all creditors be sufficiently protected."). Section 1522(a) provides that the Court may grant discretionary relief "only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected."  11 U.S.C. § 1522(a).  Section 1522(b) permits the Court to impose conditions in connection with granting any discretionary relief.  *See id.* § 1522(b).  The public policy exception can also be invoked as a rationale for imposing specific protections.  *In re Tri-Cont'l Exch.*, 349 B.R. at 638.

Therefore, if the Court determines that any Chapter 15 recognition is appropriate, the Court should impose on the JLs a level of court supervision and transparency that is commensurate with the level under which the Receiver performs his duties.  Further, recognition by the Court should be conditioned on the Antiguan court extending the same level of recognition and access to the Receiver.  Thus, if the Court were to recognize the Antiguan proceeding, then the following conditions, at a minimum, should be imposed:

- The JLs' ability to take any action in the U.S. is conditioned on (1) the Antiguan courts granting access to the Receiver, and (2) the Receiver being provided unlimited access to Stanford-related documents and information obtained by the JLs in any jurisdiction, including Antigua, Switzerland, and the U.K.

19

- The JLs shall seek leave of Court before filing any litigation proceeding in the U.S.  Before filing any such motion, the JLs must confer with the Receiver and the Investors' Committee, and the JLs shall demonstrate in any motion for leave that such litigation proceeding would not duplicate any efforts being undertaken by the Receiver or the Investors' Committee and would not otherwise be an inappropriate use of funds that might otherwise be available for distribution to the Stanford investors and creditors.

- If the JLs wish to make any payment related to any activity undertaken by them in the U.S. and such payment will be made from Stanford assets, the JLs shall apply to the Court for approval of such payments, regardless of the country of origin of such Stanford assets.  Barring such approval, such payments shall not be made.

- To the extent that the JLs recover any assets in the U.S., such assets shall remain subject to the jurisdiction of this Court and shall not be moved to an account outside of the U.S. without leave of Court directed to those specific assets.

- Until further order of the Court, the JLs shall not be permitted to institute, and shall not be permitted to seek leave to institute, any litigation against the Receiver or any of the individuals or entities he represents.

- The JLs shall not file any bankruptcy proceeding, nor shall any litigation stay apply to the Receiver or the Investors' Committee as a result of recognition.

- The JLs shall not disrupt or interfere with the Receivership's activities in the U.S. or Canada, and shall immediately dismiss the pending Canadian appeal.

- The JLs shall not disrupt or interfere with the activities of the Investors' Committee in the U.S.  Nor shall the JLs disrupt or interfere with any efforts by the U.S. DOJ to exercise control over any Stanford assets.

### III.    Conclusion

For the foregoing reasons, the Receiver requests that the Court deny the JLs' request for recognition.  In the alternative, the Receiver requests that the Court impose the above-outlined conditions on recognition.  The Receiver further requests all other relief to which he may be justly entitled.

Dated:  December 5, 2011                    Respectfully submitted,


                                            BAKER BOTTS L.L.P.


                                            By:  /s/ Kevin M. Sadler
                                                 Kevin M. Sadler
                                                 Texas Bar No. 17512450
                                                 kevin.sadler@bakerbotts.com
                                                 Scott D. Powers
                                                 Texas Bar No. 24027746
                                                 scott.powers@bakerbotts.com
                                                 David T. Arlington
                                                 Texas Bar No. 00790238
                                                 david.arlington@bakerbotts.com
                                                 1500 San Jacinto Center
                                                 98 San Jacinto Blvd.
                                                 Austin, Texas 78701-4039
                                                 (512) 322-2500
                                                 (512) 322-2501 (Facsimile)

                                                 Timothy S. Durst
                                                 Texas Bar No. 00786924
                                                 2001 Ross Avenue
                                                 Dallas, Texas 75201
                                                 (214) 953-6500
                                                 (214) 953-6503 (Facsimile)
                                                 tim.durst@bakerbotts.com

                                            ATTORNEYS FOR RECEIVER RALPH S. JANVEY

## CERTIFICATE OF SERVICE

On December 5, 2011, I electronically submitted the foregoing response with the clerk of court for the US District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ Kevin M. Sadler
Kevin M. Sadler