# EXHIBIT

# I

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE | § | |
| | § | |
| Stanford International Bank, Ltd. | § | Case No.  3:09-CV-0721-N |
| | § | |
| Debtor in a Foreign Proceeding | § | |
| | § | |

---

### DIRECT TESTIMONY OF KARYL VAN TASSEL

---

## I.    MY EXPERIENCE, EXPERTISE, AND WORK IN THIS MATTER.

**Q.    PLEASE STATE YOUR NAME AND BUSINESS ADDRESS.**

A.    Karyl Van Tassel.  1201 Louisiana, Suite 2600, Houston, Texas 77002.

**Q.    HOW ARE YOU CURRENTLY EMPLOYED?**

A.    I am a partner with PricewaterhouseCoopers LLP in its Forensic Services Group.

**Q.    HOW LONG HAVE YOU BEEN WITH PRICEWATERHOUSECOOPERS LLP?**

A.    Since October 17, 2011.

**Q.    HOW WERE YOU EMPLOYED PRIOR TO SEPTEMBER 30, 2011?**

A.    I was a Senior Managing Director with FTI Consulting, Inc. for 8 years.

**Q.    IS EXHIBIT KVT-1[1] A TRUE AND CORRECT COPY OF YOUR RESUME?**

A.    Yes it is.

**Q.    WHAT IS YOUR EDUCATIONAL BACKGROUND?**

A.    I have a B.S. in Accounting from the University of Northern Colorado.

---

[1]    Citations to exhibits beginning with "KVT" herein refer to exhibits attached to and incorporated in this direct testimony.

**Q.**     **PLEASE GIVE US AN OVERVIEW OF YOUR PROFESSIONAL EXPERIENCE.**

A.     My resume summarizes my relevant work experience.  As it states, I am a Certified Public Accountant in the State of Texas, USA.  I have 26 years of experience providing a variety of audit, accounting, tax, litigation, valuation, investigation, and other financial advisory services.  I have performed detailed investigations and financial analyses for a variety of litigation matters, including securities, intellectual property, breach of contract, antitrust, lender liability, fraud and wrongful termination matters.  In the litigation context, I have acted as an expert on a variety of economic damage claims and forensic accounting issues.  In several cases alleging fraud and other wrongdoing, I have traced funds for potential recovery.  I have also been retained by audit committees to assist in investigating allegations of accounting and financial improprieties.

**Q.**     **PLEASE DEFINE FOR THE COURT ANY SHORTHAND REFERENCES YOU WILL USE IN YOUR TESTIMONY.**

**A.**     I use the following acronyms or short-hand terms in this testimony:

- Stanford Entity or Stanford Entities — the legal entities owned, directly or indirectly, by the named Defendants in the SEC action as of the date the U.S. Receivership was instituted, including, but limited to, those listed below.

- SIB, SIBL, or the Bank — Stanford International Bank, Limited.

- STCL — Stanford Trust Company Limited, an Antiguan trust company.

- STC — Stanford Trust Company, a U.S. entity.

- SFG — Stanford Financial Group, the name given to R. Allen Stanford's "global network of financial companies."

- SFGC — Stanford Financial Group Company, a U.S. entity incorporated in Florida.

- SFGGML — Stanford Financial Group Global Management, LLC.

- SGC — Stanford Group Company, a U.S. broker-dealer entity.

- SFIS — Stanford Fiduciary Investor Services.

- Stanford Enterprise — the collective group of all Stanford Entities, including, but not limited to, those listed above.

- Former Liquidators — Nigel Hamilton-Smith and Peter Wastell of the British accounting firm Vantis, who were previously appointed by the Antiguan court as Joint Liquidators of SIB but who were later removed by that court.

- Current Liquidators — Marcus Wide and Hugh Dickson of the accounting firm Grant Thornton, who have been appointed by the Antiguan court as replacements for the Former Liquidators.

- FSRC — Antigua's Financial Services Regulatory Commission.

**Q.   PLEASE DESCRIBE HOW YOU BECAME INVOLVED WITH THE STANFORD RECEIVERSHIP.**

A.    On February 16, 2009, the United States District Court for the Northern District of Texas appointed Ralph S. Janvey the Receiver for SIB and the rest of the Stanford Entities. On the same day, the Receiver retained FTI (of which I was a Senior Managing Director) to perform a variety of services, including assisting in the capture and safeguarding of electronic accounting and other records of the Stanford Entities, forensic accounting analyses of those records (including cash tracing), and investigation of the underlying scheme. I oversee, and am personally involved in, the forensic accounting and cash tracing activities and the investigation of the Stanford Entities' scheme. The purposes of FTI's work have been, in part, to (a) determine the roles that the various Stanford Entities played in the fraud alleged by the SEC and specifically in the sale and redemption of SIB certificates of deposit ("CDs"); (b) identify the source(s) of income and cash flows of the various Stanford Entities; (c) trace funds to determine how they were allocated and disbursed throughout the Stanford Entities; (d) investigate the circumstances surrounding the scheme and, in particular, the sale of SIB CDs; and (e) assist the Receiver in performing his duty to locate and recover assets traceable to the Receivership Estate.

**Q.**     **PLEASE GIVE THE COURT AN OVERVIEW OF THE WORK YOU AND FTI PERFORMED AND ON WHICH YOUR TESTIMONY IS BASED.**

**A.**     My testimony is based on the knowledge I have gained from the many documents I have reviewed and other work my team and I have performed in the course of FTI's investigation on behalf of the Receiver.  Our analyses of the records of SIB and other Stanford Entities were conducted using reliable practices and methodologies that are standard in the fields of accounting and finance.  Each of the exhibits referenced herein and attached hereto are true and correct copies of documents that FTI and other members of the Receiver's team collected as part of their investigation from (a) Stanford's custodial files, e-mail systems, computer hard drives, or other electronic systems; (b) publicly available sources; and (c) third parties.

As part of our work, we have interviewed numerous present and former Stanford Entity employees.  These include, but are not limited to, the persons whose names (as well as employer, title, and supervisor) are listed in **exhibit KVT-2**, as well as Juan Rodriguez-Tolentino.   In addition, we have examined the available accounting and other records (including email files of certain former Stanford employees) relating to the Stanford Entities located in and/or gathered from Houston, Texas; Tupelo, Mississippi; Baldwyn, Mississippi; Memphis, Tennessee; Miami, Florida; St. Croix, United States Virgin Islands; Antigua; Barbuda; and other Stanford locations within and outside the U.S.  We have also reviewed extensive SIB customer records, including, but not limited to, paper and electronic records documenting SIB CD purchases and purported interest payments and redemptions.

FTI has also obtained and analyzed paper and electronic files from third-party financial institutions where bank accounts of various Stanford Entities are or were located.   These financial institutions include Toronto Dominion Bank in Canada, Trustmark National Bank and

the Bank of Houston.  In addition, FTI has gathered and reviewed electronic and other data from

Pershing, LLC and JP Morgan Clearing Corp., both of which have held or currently hold SGC

customer accounts and former employee accounts, and SEI Private Trust Company, which held

or currently holds STC accounts.  The records, data, interviews with former employees, and

other information my team and I have reviewed and upon which I have relied for the purposes of

this testimony are the types of information that I and those in my business routinely use and rely

upon in forensic investigations.

Q.   CAN YOU GIVE THE COURT A SUMMARY OF YOUR FINDINGS IN THIS MATTER
RELATING TO THE STANFORD ENTERPRISE?

A.   The SEC alleges in its Second Amended Complaint in Case No. 3:09-CV-0298-N

that the Stanford Entities constitute "a massive Ponzi scheme" involving "misappropriat[ion of]

billions of dollars of investor funds."  Likewise, James Davis ("Jim Davis," "Davis," or "Mr.

Davis"), Chief Financial Officer for both SIB (according to SIB's published financial statements)

and SFGC and a long-time business associate and confidant of R. Allen Stanford ("Allen

Stanford" or "Mr. Stanford"), has pled guilty to charges that he conspired with Allen Stanford

and others in running a Ponzi scheme in violation of federal securities laws.  In connection with

his guilty plea, Davis admitted that SIB was a "massive Ponzi scheme whereby CD redemptions

ultimately could only be accomplished with new infusions of investor funds."  James Davis

admitted in his rearraignment that the Stanford Enterprise was a Ponzi scheme from the

beginning, and I have not seen anything in the records I have reviewed to indicate otherwise.  As

explained in more detail below, my findings are consistent with the SEC's allegations and James

Davis's admission that SIB was a Ponzi scheme (copies of Mr. Davis's plea agreement and his

transcript of rearraignment are attached hereto as **exhibits KVT-3 and KVT-4**, respectively).

Specifically:

- Allen Stanford, a U.S. citizen, was sole owner, directly or indirectly, of more than 130 separate Stanford Entities, including, but not limited to, SIB and STCL. These Stanford Entities comprised a single commonly-owned financial services network called the "Stanford Financial Group," which was headquartered in Houston. Mr. Stanford's reported income from at least 1999 forward is comprised almost exclusively of amounts from the Stanford Entities, including proceeds from SIB CDs. Allen Stanford, along with a close band of confidants, controlled the Stanford Enterprise, including SFG (of which SIB was a part). These confidants included Jim Davis, CFO of both SFGC and SIB, and Laura Pendergest-Holt ("Holt" or "Ms. Holt"), Chief Investment Officer for SFGC. Allen Stanford lived and worked principally in Houston, Texas; Miami, Florida; and Christiansted, U.S.V.I. Davis and Holt, also U.S. citizens, lived in Mississippi and had offices in Houston, Texas; Tupelo, Mississippi; and Memphis, Tennessee.

- Allen Stanford, Davis, and their cohorts perpetrated a massive Ponzi scheme that was directed from the United States. From at least 1999 forward, the Stanford Enterprise was a Ponzi scheme and SIB was insolvent (*i.e.*, its liabilities exceeded the fair value of its assets). And from at least 1999 forward, SIB relied on proceeds from the sale of new CDs to make purported interest and principal payments to existing CD investors. The SIB CD sale proceeds that were not used to pay off prior investors were widely disbursed throughout the Stanford Entities and to Mr. Stanford. Each of the Stanford Entities were either part of the Ponzi scheme, were used to lend an appearance of legitimacy to the Stanford Enterprise's operations, or derived benefit from the scheme. Attached hereto as **exhibits KVT-7, KVT-8, KVT-9, KVT-10, KVT-11, and KVT-12** are my prior declarations in the Stanford matter, which provide additional specificity as to my findings regarding the existence, scope, and perpetration of the Stanford Enterprise's Ponzi scheme, as well as the results of FTI's tracing of CD sale proceeds transferred to the many Stanford Entities.

- SIB was nothing like a typical commercial bank. It had one principal product line — certificates of deposit — and one principal source of funds — customer deposits from CD purchases. SIB's two principal activities — selling CDs and otherwise directing the proceeds of such sales — were controlled and conducted from the United States, with no meaningful management input from Antigua. SIB, although incorporated in Antigua, was controlled and managed by Stanford and Davis, with assistance from Holt, from various places within the U.S. All SIB directors (including Allen Stanford) were non-Antiguans, and all but two were U.S. citizens. According to one of the Former Liquidators, most SIB board meetings were not held in Antigua but were, instead, held by telephone. (*See*

**Hamilton-Smith Supp. Decl., Doc. 15 at ¶ 19.)**[2]  Dr. Courtney Blackman, a member of SIB's board of directors, stated that at least two of the four meetings a year would be via telephone, and those that were face-to-face sometimes occurred in the United States.  **(See exhibit KVT-71 at deposition lines 23:25, 24:1-4, 25:2-9.)**

- In addition, Harry Failing, Stanford's personal accountant in Houston, Texas, had a significant role in accounting for certain transfers of SIB assets and other aspects of SIB's accounting and disclosures, as well as the structure for SIB and other Stanford Entities that were part of the Stanford Enterprise.  **(See exhibit KVT-60;** *see also* **KVT-64.)**

- Stanford broker dealer entities — SGC in the U.S. — marketed the SIB CDs through Stanford financial advisors.  Information regarding SIB's financial strength, profitability, capitalization, investment strategy, investment allocation, the value of its investment portfolio, and other matters, was disseminated from Allen Stanford, Davis, Holt and others working under them, from the United States to the various Stanford financial advisors around the world, for use in inducing potential investors to purchase SIB CDs.  The financial advisors who received this misinformation knew or should have known that it was suspicious, inadequate, and raised red flags.  Stanford financial advisors located in the U.S. accounted for 42%-44% of all CD sales in 2007 and 48% of sales in 2008.  In terms of dollar amount, there were more SIB CD sales to U.S. citizens (37% based on most recent statement mailing address) than to citizens of any other country.

- In contrast, SIB and STCL did not market or sell CDs to Antiguan citizens because, as stated by SIB in its Training and Marketing Manual, which is attached as **exhibit KVT-5**, SIB could not accept deposits from Antiguan residents, since "only non-residents of Antigua and Barbuda [were] allowed to open accounts with the Bank." **(See also exhibit KVT-54 at GT03-22-2011ST-0012810.)**  The Former Liquidators agreed that SIB was prohibited by law from selling CDs to Antiguan citizens. **(See 2d Aff. of Hamilton-Smith, Doc. 21-7 at ¶ c.)**

- SIB CD sale proceeds largely bypassed Antigua and went directly to accounts in the United States, Canada, and England, from where they were disbursed among many other Stanford Entities and accounts.  Attached as **exhibit KVT-6** is the document that instructed customers where to send their money for the purchase of CDs. SIB's principal operating accounts were maintained in Houston, Texas, at the Bank of Houston and Trustmark National Bank.  Only a small amount of SIB funds (on average, approximately $485,000 from January 2004 through October 2008) were kept on deposit in Antigua, and these funds were kept at the Bank of Antigua, another Stanford Entity, rather than SIB.

---

[2]     All citations to "Doc." entries are references to documents on file in this matter.

II.   **SIB'S INVESTMENTS WERE CONTROLLED BY STANFORD, DAVIS AND (AT LEAST TO THE EXTENT OF TIER 2 INVESTMENTS) HOLT FROM THE UNITED STATES.**

Q.   **DID SIB INVEST CD SALE PROCEEDS FROM INVESTORS?**

A.   A significant amount of SIB CD proceeds were not invested and were, instead, transferred to Stanford Entities other than SIB (more of which were based in the United States than in any other country), Allen Stanford, and other Stanford employees in the United States. The transfers to the entities comprising the Stanford Enterprise, which was itself based in the United States, were made with no regard for corporate separateness.  As discussed in more detail below, the transfers of CD proceeds were directed from the United States and often utilized U.S.-based bank accounts.

While SIB did invest some proceeds from CD sales, it invested far less than it represented to customers and the public and amounts that were inadequate to cover redemptions or interest payments to investors.  In fact, as of February 16, 2009, SIB's records reflected total CD obligations of approximately $7.2 billion, but the market value of all known assets for all Stanford Entities (not just the SIB investments) combined totaled far less than $1 billion.  SIB's assets are located principally in jurisdictions other than Antigua, and primarily in the United States, Canada, the United Kingdom, Switzerland, Panama, Venezuela, and Mexico.  Private equity positions purchased with SIB funds principally concerned companies located in the United States and other countries outside of Antigua.

Q.   **FOR THE AMOUNTS SIB DID INVEST, WHAT TYPES OF INVESTMENTS DID SIB MAKE?**

A.   SIB's investments were divided into three tiers.  Tier 1 consisted of cash and cash equivalents.  Tier 2 principally consisted of investments placed with a variety of investment firms or funds located in the U.S. and Europe, together with a small amount of cash or cash

equivalents.  Tier 3 consisted of illiquid real estate, private equity investments, and loans to R.

Allen Stanford.  All three tiers were controlled from the U.S.  Each of the tiers was managed

differently, although all ultimately were controlled by Stanford, Davis and, at least to the extent

of Tier 2 assets, Holt.  The Stanford Entity records reflect that SIB's Antiguan employees had no

significant involvement in investment policies, investment strategy, or investment choices.  The

SIB officer with the most responsibility was Chief Financial Officer Jim Davis.  Davis, who

resided and worked in the United States and reported directly to Allen Stanford, among other

duties, oversaw all investments and the handling of investment proceeds.  (*See, e.g.*, **KVT-67,**

**stating that "Portfolio Management" was provided by "CFO's office in Memphis, TN,**

**USA.")**  Jim Davis's handling of SIB's investments — and the exclusion of SIB's Antiguan

employees from such matters — was confirmed by Juan Rodriguez-Tolentino, the president of

SIB, in an interview with my team and me.

> Q.    HOW WAS TIER 1 MANAGED?

A.    Tier 1, the smallest tier in dollar value, was managed from Houston, Texas, by a

group headed by Patricia Maldonado.  Maldonado was the SFGC Treasurer, who worked at Jim

Davis's direction.  A 2007 internal SIB audit report, attached as **exhibit KVT-13**, states:

> "[T]he Houston Treasury Department (Treasury) manages SIBL
> [*i.e.*, SIB] cash flow according to corporate guidelines and places
> short term deposits with other banking institutions as deemed
> appropriate.  However, the SIBL accountant is not informed of the
> terms of the investments (such as maturity date, interest rate, etc.),
> so that he can record the interest receivable, accordingly."

This not only demonstrates that the Houston Treasury Department managed SIB's cash flow, but

also that SIB's Antiguan accountants did not know how funds were invested or what interest

they earned.  As further evidence that Tier 1 was managed from Houston, attached as **exhibit**

**KVT-14** is a collection of email correspondence within Ms. Maldonado's Houston Treasury

group that illustrates the group's management and handling of SIB's cash.  For example, the November 10-11, 2008 email chain between Patricia Maldonado, "Treasury Manager — Stanford Financial Group," and one of her "Senior Treasury Analysts" has the assistant recommending, and Maldonado approving, various transfers among SIB accounts at Toronto Dominion (Toronto), Bank of Houston (Houston), Trustmark Bank (Houston) and Comerica (Houston).

**Q.    HOW MUCH WAS INVESTED IN TIER 1 AT THE BEGINNING OF THE RECEIVERSHIP?**

A.    Stanford accounting records indicate that as of February 18, 2009, SIB Tier 1 totaled $31.8 million out of the total of $152.7 million cash available from all Stanford Entities. Of that amount, approximately $7.9 million was located in Antigua, at the Bank of Antigua.  The $7.9 million is the remainder of a total of $9 million in deposits, which were transferred from the U.S. and Canada in November and early December of 2008.  (***See* exhibit KVT-21.**)  We have found that Jim Davis personally instructed Patricia Maldonado, by email dated 12 November 2008, to wire transfer $6 million of the $9 million to the Bank of Antigua account.  (***See* exhibit KVT-22.**)  As discussed in more detail below, the Bank of Antigua typically held under $500,000 in SIB funds between 2004 and 2009.  I have found no evidence establishing any legitimate reason for the $6 million transfer.

**Q.    HOW WAS TIER 2 MANAGED?**

A.    The Tier 2 funds were invested with outside money managers at banks including Toronto Dominion, HSBC and Société Générale Private Banking (Suisse) S.A.  The investments were overseen by Holt, the Chief Investment Officer for SGC, from Houston, Texas; Tupelo, Mississippi; and Memphis, Tennessee.  Holt reported to Davis and Stanford.  Holt had a team of

research analysts in Memphis, each of whom were assigned to monitor specific investment accounts and outside money managers.  For example, Zach Davis, the son of SIB CFO James Davis, oversaw the SIB Tier 2 investments that were invested through Toronto Dominion. (*See* **exhibit KVT-15 at deposition pages 22-26, 36.**)  Tolentino confirmed that James Davis, Holt, and their team was in charge of managing Tier 2 funds and that SIB's employees in Antigua were not involved in any way.  Moreover, Tolentino revealed that any records regarding Tier 2 sent to SIB in Antigua were held under lock and key with specific instructions precluding any of the Antiguan employees — including Tolentino, the president of the Bank — from reviewing those documents.  Only Davis and approved members of his team were allowed to review such documents.

Q.    **HOW MUCH WAS INVESTED IN TIER 2 AT THE BEGINNING OF THE RECEIVERSHIP?**

A.    According to SIB's weekly summary reports, Tier 2 had a total value of approximately $345 million at February 9, 2009, down substantially from $889 million at December 31, 2007.  The documents indicate there were approximately $29 million in further liquidations between February 10, 2009 and February 17, 2009.  Tier 2's precipitous decline in total value over the thirteen months leading up to the Receivership was due to a combination of declining market values and numerous liquidations ordered by Davis and Stanford and implemented by Holt and her staff in the United States.  For example, between December 2008 and February 2009, Zack Davis was responsible for liquidating at least $30 million from the SIB investment accounts at Toronto Dominion in order to help pay investors.  (*See* **exhibit KVT-15 at deposition pages 39-40, 43, 75-85;** *see also* **exhibit KVT-16, consisting of e-mail exhibits**

referenced in the Zack Davis deposition; exhibit KVT-65, identifying $34 million in liquidations being considered by Davis in early February 2009.)

Q.     HOW WAS TIER 3 MANAGED?

A.     Tier 3, by far the most significant financially (as valued by Allen Stanford and Davis) and the most secret, was managed by Allen Stanford and Davis, with assistance and participation by Holt and others working under them.  They kept its true value and composition secret from regulators, investors, creditors, auditors, and others.  Indeed, Zack Davis testified that when research analysts would inquire of Holt regarding her knowledge of Tier III assets, she would "often dismiss such inquiries and would explain she knew the details of the assets in Tier III and the research analysts did not need to concern themselves with Tier III."  (*See* **exhibit KVT-15 at deposition pages 65, 73, 93-94.**)

Q.     WHAT DID MR. STANFORD AND MR. DAVIS PUBLICLY DISCLOSE REGARDING TIER 3?

A.     The information that was released to the public regarding Tier 3 (either directly or through presentations to sales staff) grossly overvalued SIB investments (approximately 80% of which consisted of Tier 3) and misrepresented the relative make-up of the investment categories. For example, SIB's 2007 financial statements report that SIB's "financial assets" (*i.e.*, investments) had a fair value, at year-end, of $6.347 billion, with an allocation of 7.2% precious metals, 58.6% equity, 18.6% fixed income, and 15.6% "alternative."  It also reported 2007 investment income of almost $642 million.  For the reasons discussed below (as well as perhaps other reasons) these amounts and percentages, provided by Davis and those working under him in the United States, were fictitious.

**Q.  HOW ELSE WAS TIER 3 CONNECTED TO THE UNITED STATES?**

A.  Tier 3 was connected to the United States in at least the following ways:

- Approximately $1.2 billion of Tier 3 value (as fictitiously valued by Stanford and/or Davis or others acting in concert with them) was in "merchant banking" assets. These consisted mostly of equity and debt investments in private and public companies. **(*See* exhibit KVT-23, a schedule listing Tier 3 merchant banking assets as of June 30, 2008.)**  Most of these companies have headquarters in the U.S. I am not aware of any of them being located in Antigua. The fair value of these merchant banking assets was only a small fraction of the $1.2 billion value that Stanford and Davis assigned to them for financial reporting purposes. Indeed, as of the date of this testimony, the Receiver has recovered approximately $37 million from the liquidation of such investments.

- Stanford Tier 3 records indicate that at least another $1.8 billion in value consisted of notes receivable from Allen Stanford. It appears this amount corresponds to funds that Stanford, with the assistance of Davis and possibly others, diverted from SIB. These funds were used for various purposes, including transfers to 51 other Stanford Entities. **(*See* exhibit KVT-24, an internal Stanford schedule listing past uses of SIB funds supporting Allen Stanford's note receivable liability to SIB in the amount of $1.844 billion.)**  Only 24% of these Stanford Entities were chartered in Antigua.

- In addition, Tier 3 records assigned $3.174 billion of value to real estate. However, those same records list only two assets in this category, real estate holding companies that own properties in Antigua known as Pelican Island and Asian Village. The two properties were purchased (via the purchase of their holding companies) in 2008 for a combined $63.5 million. The unsupported 50-fold inflation of value of the real estate assets in approximately six months was directed by Stanford employees, who were consulting with outside counsel from the United States. **(*See* exhibits KVT-17, KVT-18, and KVT-19.)**

- SIB investment earnings amounts were provided monthly by Jim Davis and persons working at his direction and under his supervision in the U.S. and the U.S.V.I. Internal Stanford Entity documents show that earnings were pegged at whatever amount was needed to give SIB acceptable financial performance and capital ratios for regulatory purposes. In other words, earnings — at least for 10 years — were fictitious, reverse-engineered numbers. **(*See* exhibit KVT-11 at ¶¶ 31-33.)**

**Q.  FROM WHAT COUNTRY WAS SIB MANAGED AND OPERATED?**

A.  Although SIB was chartered in Antigua — and prior to that, in Montserrat under the name Guardian International Bank, Ltd. (*see* **exhibit KVT-3 at ¶ 17(a)-(b);** *see also* **exhibit**

**KVT-55 at GT03-22-2011FS-0000465)** — the day-to-day management of SIB and the majority of SIB's business operations were conducted in the United States by other Stanford Entities and employees.  For example, Stanford's long-time attorney Carlos Loumiet stated that "based on the flow of funds," the Stanford Entity SFIS could effectively have been viewed as a "'de facto' office of SIBL in Miami, given the percentage of trust assets that wound up at SIBL."  **(See exhibit KVT-52 at HW_00024814.)**  Even the strategic business decision that other Stanford Entities in the United States would conduct virtually all of SIB's operations was made in the United States, as none of SIB's employees in Antigua had the authority to make such a decision. Tolentino confirmed that only Allen Stanford or Jim Davis could have made such a decision, since their sign-off was required on all SIB business matters.

SIB's principal business activities were selling CDs and directing the CD sale proceeds, neither of which was managed or conducted within Antigua.  By far, the SIB officer with the most responsibility was Jim Davis, the CFO, who was located in Tupelo, but also had offices in Memphis and Houston.  Davis, who reported directly to Allen Stanford, was responsible for investments and investment accounting, among other duties.  SIB was walled off from the investment process.

In a bankruptcy case filing made by Dr. Courtney Blackman, a member of SIB's board of directors from 1999 forward, Blackman stated that "the marketing of CD[s] [and] the investment of receipts from the sale of CD's . . . were carried out by Stanford Financial Group in the United States."  **(See exhibit KVT-20 at ¶¶ 2, 5.)**  In a December 2, 2011 deposition, Dr. Blackman confirmed that the Stanford Entities "in the United States sold -- designed and sold CDs. Stanford International Bank did not sell CDs."  **(See exhibit KVT-71 at deposition lines 19:21-23; *see also* exhibit KVT-71 at deposition lines 20:3-8.)**  According to Dr. Blackman, "Antigua

had nothing at all to do with the marketing or investment of -- marketing of CDs or the investment of proceeds from CDs." **(*See* exhibit KVT-71 at deposition lines 20:10-12.)**

Instead, he explained: "The marketing originated in Houston.  I know training and so on went on in Miami.  And the investment took place in Memphis."  **(*See* exhibit KVT-71 at deposition lines 20:18-22.)**  Dr. Blackman further stated that "the nerve center of the bank, of SIB, was in the United States" and that SIB's headquarters was "by definition" in the United States.  **(*See* exhibit KVT-71 at deposition lines 16:12-25, 17:1-5.)**  Dr. Blackman noted that "the basic strategies and so on were carried out in the United States" and that "all of the sort of substantive fundamental decisions about the operation of the bank were being made in the United States by management that was located here[.]"  **(*See* exhibit KVT-71 at deposition lines 16:15-18, 21:13-17.)**  Dr. Blackman testified as to SIB's management and decision-making, as follows:

> **By Counsel:** For now, I'm only talking about SIB.  You're saying all those decisions were made in the United States; is that correct?
>
> **By Blackman:** Yeah.
>
> **Counsel:** Okay.  All the investment decisions, all the financial planning, all the -- all the substantive work of that business was carried out in the United States?
>
> **Blackman:** Yes.
>
> **Counsel:** And to your knowledge, in Memphis and in Houston, correct?
>
> **Blackman:** To my knowledge.

**(*See* exhibit KVT-71 at deposition lines 78:7-17.)**  Dr. Blackman explained that, as an offshore bank, SIB was essentially a "back office" that just did certain "easy" tasks, while

"outsource[ing]" activities to the United States.  (*See* **exhibit KVT-71 at deposition lines 14:23-25, 15:1-23, 19:12-17.**)

As acknowledged in a declaration by Nigel Hamilton-Smith, one of the Former Liquidators, "SIB delegated significant investment decision-making to Stanford Entities in the United States with regard to the management of the investment portfolios [Tier 2 and Tier 3 investments]."  (*See* **Hamilton-Smith Supp. Decl., Doc. 15 at ¶ 17.**)  To put that statement in context, over 90% of SIB's assets were managed exclusively by persons in the U.S., with no involvement from Antigua.  (*See, e.g.*, **KVT-22 and KVT-34.**)  The Antiguan government itself has acknowledged that SIB was run from the United States and that Antigua was merely a pass-through: "The business of Stanford International Bank Ltd. was run from Houston, Texas, and its books maintained in Memphis, Tennessee.  The bank was operating in Antigua as a transit point and for purposes of registration and regulation."  (*See* **exhibits KVT-56 and KVT-69.**)  The Antiguan government also acknowledged that the Stanford Entities in Antigua "were highly dependent on massive monthly injections of capital from Houston, Texas."  (*See* **exhibits KVT-56 and KVT-69.**)  Prime Minister W. Baldwin Spencer separately stated that "[t]he business of Stanford International Bank was run from Houston, Texas. . . . " and that none of the Stanford Entities in Antigua were profitable, since "they were dependent on massive monthly injection of cash from Houston, Texas."  (*See* **exhibit KVT-70 at page 2.**)

Likewise, the management and banking functions of SIB's predecessor Guardian International Bank, Ltd. ("GIB" or "GIBL") were conducted by other Stanford Entities, and GIB's sister entity Guardian International Investment Services ("GIIS") had an office in Miami, Florida.  (*See* **exhibit KVT-57 at GT03-22-2011ST-0013894, 13897.**) One of the reasons that Stanford closed GIB in Montserrat and chartered it in Antigua was because of increased scrutiny

of GIB by banking regulators, especially as compared to Antigua.  (*See* **exhibit KVT-3 at ¶ 17(a).**)   According to a report from an interview of long-time Stanford associates Yolanda Suarez and Oreste Tonarelli, GIB was "basically an 'operations department'" and had "no real contact with clients and [did] not engage in investment of funds."  (*See* **exhibit KVT-57 at GT03-22-2011ST-0013894.**)   And according to Suarez and Tonarelli, "[a]pproximately 90% of the [GIB] clients ha[d] accounts at U.S. banks and the money [was] deposited into GIB by wire transfer, from either a U.S. bank account or through checks drawn on U.S. banks."  (*See* **exhibit KVT-57 at GT03-22-2011ST-0013896.**)

Q.      **WHAT ROLE DID SIB'S ANTIGUAN EMPLOYEES HAVE IN DETERMINING SIB'S INVESTMENT STRATEGY?**

A.      SIB's Antiguan employees had no substantive role in determining SIB's investment policy, strategy, or choices.  Investments were chosen by Allen Stanford, Jim Davis and/or Laura Holt.

The small amount of funds that SIB kept on deposit in Antigua were kept at the Bank of Antigua, another Stanford Entity.  Between January 2004 and October 2008, SIB's average balance at the Bank of Antigua was approximately $485,000.  As stated previously, in late November and early December 2008, $9 million was transferred from the U.S. and Canada to a SIB account at the Bank of Antigua.  This funding of SIB's Bank of Antigua account to an inordinately high balance was atypical, especially given that SIB was in the midst of a cash flow crisis caused by requests for redemptions and given that the new balance in the account remained largely untapped despite the liquidation of hundreds of millions in other investments to raise cash.

## III.  SIB AND STCL RECORDS ARE HELD IN THE UNITED STATES.

**Q.  WHAT SIB AND STCL RECORDS WERE LOCATED IN THE UNITED STATES?**

A.  Records of SIB and STCL's investments and cash balances, which comprised more than 90% of their total assets, were kept predominantly in the U.S. — and outside Antigua. For example:

- FTI and I gathered and preserved U.S. information relating to all three Tiers of investments.  I and others at FTI have reviewed and analyzed those records.

- With respect to Tier 2 assets, although monthly statements were sent to Antigua, the detailed weekly Tier 2 summaries, which were important in unraveling what happened to Tier 2 assets and in determining the potential for recovery, were maintained in Memphis, Tennessee.  According to Tolentino, the Tier 2 statements that were sent to Antigua were kept under lock and key and could only be accessed with the permission of James Davis, and none of the Antiguan employees received that approval.

- Information concerning Tier 3, by far the largest portion of purported investments (as valued by Allen Stanford and Davis), was kept by Davis and those who worked under his direct supervision, in the United States.  Documents relating to these investments were also maintained by Allen Stanford's outside counsel in the United States.

- Extensive SIB client records exist in the U.S.  The U.S. brokerage offices, as well as STC in the United States, maintained client CD purchase records known as "pouch logs."  In addition, SIB client data was available to Stanford Entity offices in Houston and Montreal via a computer link-up.

- SIB's reported investment values (90% or more of total reported assets) and reported investment income (85% or more of total reported income) were, from the client's perspective, the most important figures on SIB's financial statements and were generated in the United States at Davis's direction.  These reverse-engineered figures were created monthly by Jim Davis, the Chief Financial Officer for both SIB and SFGC, and persons working at his direction and under his supervision within the U.S.  SIB employees in Antigua did not have access to this information.

## IV.   SIB'S OTHER CORE FUNCTIONS WERE CONDUCTED IN THE UNITED STATES, NOT IN ANTIGUA.

Q.   **HOW WERE REPORTS OF SIB'S INVESTMENT VALUE AND INVESTMENT INCOME PREPARED?**

A.      Davis and Houston-based employees, including, but not limited to, Gil Lopez and Mark Kuhrt, prepared the purported financial statements for SIB as well as similar reports concerning SIB's assets that were submitted to the FSRC in Antigua.  **(*See* exhibit KVT-3 at ¶ 17(i); *see also* exhibit KVT-60.)**  Harry Failing, Stanford's long-time accountant in Houston, also had significant input into SIB's financial statements.  **(*See* exhibit KVT-61.)**  Antiguan employees of SIB or other Stanford Entities had very little substantive involvement in SIB's financial reporting process.

Davis states in his plea agreement that as far back as at least 1999 assets were inflated to offset CD obligations and that revenue was "reverse-engineered" to arrive at desired levels.  **(*See* exhibit KVT-3 at ¶¶ 17(c), (l).)**  We found within SIB's accounting records individual worksheets used to derive fictitious SIB revenue for each year from 2004 through 2008.  Within these same worksheets we also found the fictitious SIB revenue derived for the years 1999 through 2003.  Davis and his co-conspirators simply determined what level of fictitious revenue and assets and resulting equity SIB needed to report financial performance and capital ratios that were both acceptable to regulators and attractive to investors and purported to cover its CD obligations and other expenses.  They then backed into that total amount by assigning equally fictitious revenue amounts to each category (equity, fixed income, precious metals, alternative, etc.) of a fictitious investment allocation.  Based on our review and analysis of the worksheets used to derive the fictitious revenue amounts associated with those files, after comparing the figures in the spreadsheets to revenue figures reported on SIB's trial balance and financial

statements, and after considering the statements made by James Davis, I have concluded that such worksheets were used to generate, or "reverse-engineer," false revenue figures back to at least 1999.

**Q.** **IN WHAT MANNER WERE SIB'S OTHER CORE FUNCTIONS PERFORMED IN THE UNITED STATES?**

**A.** For most of its core operational needs, SIB relied on services provided by Stanford Entities located in the U.S. or the U.S.V.I. These other Stanford Entities were operated under the direction and control of Allen Stanford, Jim Davis and Laura Holt. Attached as **exhibit KVT-25** are intercompany contracts by which SIB contracted for services with Stanford Entities in the United States. U.S. and U.S.V.I. employees of Stanford Group Company, Stanford Financial Group Co., Stanford Financial Group Global Management, and other Stanford Entities provided SIB and STCL with marketing, treasury (*i.e.*, cash management and transfer functions), accounting, financial statement preparation, investment management, financial consulting and advisory, human resources, legal, and payroll services, among others. These employees were located in Houston, Texas; Memphis, Tennessee; Tupelo, Mississippi; Miami, Florida; and Christiansted, U.S.V.I.

Our investigation has revealed that services provided to SIB by SFGGML and other Stanford Entities in the United States — and outside of Antigua — included, but were not limited to the following services, which was confirmed by Tolentino:

- Legal services were provided by Mauricio Alvarado and others within the legal department in the United States.

- Investment services were provided by Jim Davis and Laura Pendergest-Holt in the United States.

- Accounting services were provided by a group led by Mark Kuhrt and/or Gil Lopez in Houston, Texas and St. Croix, U.S.V.I.

- Human resources services were provided by Joan Stack and Nancy Rummel in St. Croix, U.S.V.I.

- Information technology services (including IT procurement) were provided by John Varkey's group in Houston, Texas.

- Compliance services were provided by Lena Stinson, Director of Compliance, and her group in the United States.

- Extensive public relations services were provided by Lula Rodriguez, Global Director of Corporate Communications and Public Relations, in the United States.

- Training of Stanford financial advisors on how to sell the SIB CDs was conducted by Bernie Young and Jason Green, as Managing Director of SFGC and President of SGC's U.S. private client group respectively, in the United States.

**Q.**   **WERE ANY OF SIB'S FUNCTIONS PERFORMED IN ANTIGUA?**

A.   Yes, SIB employees in Antigua performed some limited administrative, bookkeeping, and operational functions for SIB.  Although there were SIB HR, accounting, and IT personnel, these functions relied heavily upon Stanford's global HR, accounting, and IT groups.  Also, it appears that the function of SIB's accounting department was largely limited to client accounts and sending daily cash reports to Patricia Maldonado in Houston, Texas.

SIB's principal function in Antigua was to keep the client accounting records current, generate client statements (although client statements were bulk mailed from Puerto Rico), and perform certain private banking functions such as paying credit card bills for a relatively small subset of clients.  These limited functions were insignificant to the overall functioning of SIB.  In effect, Allen Stanford and his confidants, from the U.S., used SIB's Antiguan employees to further the Ponzi scheme.  Allowing Antiguan employees to send client statements indicating CD balances is fundamentally deceptive if there are woefully insufficient assets backing the CDs.  Moreover, SIB's Antiguan workforce of less than 90 employees, most of whom were relatively low-level, was insufficient by any measure to operate a multi-billion dollar enterprise.

**Q.     WERE ANY AUDIT FUNCTIONS PERFORMED IN ANTIGUA?**

A.     SIB purported to undergo periodic internal audits.  The employees who prepared the internal audit reports, however, worked for SFGC or other Stanford Entities in Houston.  It is not clear what, if any, activities associated with the internal audits were performed in Antigua.  Moreover, at least as it relates to the investments and investment income, the pertinent records were maintained in the U.S.

Regardless of where the purported audits were conducted, based on my review of the internal audit reports and related documentation concerning investments and investment income, the internal audits were shams, and SIB's upper management, as well as its external auditor in Antigua, knew it.  SIB internal audit reports show that investments comprising 90% or more of SIB's reported assets were not being analyzed as expected in an internal audit function.  Investment values contained on financial statements were merely compared against summaries provided by Davis, with no examination of the detailed underlying records that were kept in the U.S.  Here is a sampling of statements from internal audit reports:

- "On this occasion, we did not review supporting documentation for the investments and investment income accounts." (*See* **exhibit KVT-27.**)

- "The audit process for the investment portfolio solely consisted of tracing the account balances from the trial balance to the account balances as presented on the balance sheet as of March 31, 2006." (*See* **exhibit KVT-28.**)

- "Investment Portfolio . . . Account in good order.  Investment account was expressed and recorded as per summary analysis reported by CFO office." (*See* **exhibit KVT-29.**)

SIB claimed that external audits were conducted by an Antiguan audit firm, C.A.S. Hewlett & Co. Ltd.  Even though it appears these audits were prepared in Antigua, this fact alone demonstrates that the audits were of minimal utility and were conducted using inadequate audit procedures, as all of the relevant records were in the United States.  Stanford internal auditors

were denied access to this information.   Additionally, we have found no indication that this information was provided to the external auditor.

When the receivership began, I tried to find out more about Mr. Hewlett and his firm, but the firm did not have a website and a web based search did not indicate any further information on the firm.   The only information we were able to obtain about Mr. Hewlett was from media articles authored by investigative journalists since SIB was placed in receivership.   (*See, e.g.,* **exhibit KVT-30.**)   These report that Mr. Hewlett's firm was very small, with a small office in Antigua and a small office in London.   Mr. Hewlett, a native of Antigua, was SIB's only external auditor, having begun auditing the bank at its formation.   According to these articles, he died in January 2009, the month before the U.S. receivership was instituted.

Finally, the SocGen Account #108731 was also used to make regular payments unrelated to and over and above the billed audit fees, via wire transfer to C.A.S. Hewlett & Co. Ltd., further calling into question the veracity of the external audits.   (*See* **exhibit KVT-3 at ¶ 17(q).**) For example, during 2007 and 2008, the payments Hewlett received from the SocGen account were as much as or more than the amount he received in billed audit fees.

Q.     HOW DID THE COST OF SIB SERVICES PROVIDED IN THE UNITED STATES COMPARE TO THOSE PROVIDED BY ANTIGUAN EMPLOYEES?

A.     A comparison of the management, administrative, and marketing fees paid to Stanford Entities based in the United States and the U.S.V.I. to total salary and benefits paid to Antiguan employees illustrates the disparity between SIB services in the United States and those provided by Antiguan employees.   For example, in 2008, Stanford Entities in the U.S. and U.S.V.I. were paid at least $268 million in fees for management, administrative and marketing services to SIB, as compared to total payroll for all of SIB of only approximately $3.6 million.

A schedule of these figures is attached as **exhibit KVT-31**. In 2008, amounts paid to Stanford Entities based in the U.S. and its territories comprised approximately 75% of SIB's expenses other than those for CD interest obligations.

> Q. **WHAT OTHER CONTACTS DID SIB HAVE IN THE UNITED STATES?**

> A. SIB held itself out to creditors, borrowers and other obligees, and even in Internal Revenue Service tax forms, as having locations in the United States at 6075 Poplar Street, Memphis, Tennessee and at 5050 Westheimer, Houston, Texas. Copies of relevant documents demonstrating this fact are attached as **exhibit KVT-32**. Although certain of the documents also provide an Antiguan address (such as the tax information form), most of the documents make no reference at all to Antigua. According to a filing with the Texas State Securities Board, SIB solicited or intended to solicit CD purchasers in all fifty states in the U.S. (**See exhibit KVT-33.**) Further, SIB also made regulatory filings with state securities regulatory agencies in the United States, in which it consented to jurisdiction in the courts of those states for suits arising out of the sale of its CD products. (**See, e.g., exhibit KVT-33.**) Furthermore, Carlos Loumiet, Stanford's U.S. attorney, represented in a draft letter to the Louisiana Chief Examiner of Financial Institutions that "Mr. Stanford and his companies (including the two banks in Antigua) also have their tax returns audited annually by the IRS." (**See exhibit KVT-55 at GT03-22-2011FS-0000466, 467.**)

## V. STCL'S CORE FUNCTIONS WERE CONDUCTED IN THE UNITED STATES, NOT IN ANTIGUA.

> Q. **WHAT WERE THE CORE FUNCTIONS OF STCL, AND WHERE WERE THOSE FUNCTIONS CONDUCTED?**

> A. STCL was principally in the business of administering trusts for clients, and those trusts were administered from the United States and consisted mostly of SIB CDs. STCL's

brokerage accounts were predominantly held at Pershing LLC, in Jersey City, New Jersey, as well as in affiliated Stanford Entity brokerage houses located in Latin America.   In reality, STCL helped feed money to SIB and was controlled by Mr. Stanford and Mr. Davis from the U.S., just as SIB was.

## VI.   SIB AND STCL MANAGEMENT AND STAFF IN ANTIGUA WERE PAID FROM THE UNITED STATES.

Q.   FROM WHAT COUNTRY WERE SIB'S AND STCL'S ANTIGUA-BASED EMPLOYEES PAID?

A.   Between August 2006 and February 2009, approximately $9 million in SIB and STCL payroll funds were administered from and paid by Stanford employees in Houston.  My team has confirmed that this is the case by reviewing images of cancelled payroll checks and also by interviewing Tiffany Petty, a Houston Payroll Supervisor employed by Stanford Financial Group Company who was directly involved in processing SIB's monthly payroll (along with a third-party U.S. payroll services vendor, ADP).  In particular, SIB's president, Juan Rodriguez-Tolentino, was not on SIB's payroll.  His salary was paid by SFGC from the U.S.  Additionally, SIB's payroll for its non-management employees was paid from an account located at Trustmark Bank in Houston.

## VII.   TOLENTINO DID NOT FUNCTION AS A TRUE BANK PRESIDENT.

Q.   WHAT WAS TOLENTINO'S ROLE AT SIB?

A.   As I mentioned earlier in my testimony, we have interviewed Juan Rodriguez-Tolentino as part of our investigation.  During that interview, Tolentino confirmed that, although his title was president of SIB and although he was located in Antigua, he did not perform the functions of a typical bank president and was only a "puppet" of Allen Stanford and Jim Davis. Tolentino described his role as involving largely administrative tasks, including day-to-day

management of basic operations, system account reviews, oversight of SIB client accounts, and customer service.  Records confirm his limited role.  (*See* **exhibit KVT-58.**)

Q.    **WAS TOLENTINO INVOLVED IN SELLING CDS OR IN DECIDING HOW CD-SALE PROCEEDS WERE USED?**

A.    Tolentino told us that he had no control over where SIB's funds were sent or how the funds were invested, and my review of Stanford records corroborates that.  SIB had two principal functions — selling CDs and directing CD-sale proceeds.  Tolentino's involvement in the sales effort was limited primarily to arranging and hosting visits to SIB in Antigua by investors considering or making especially large investments (*i.e.*, CDs of $5 million or more). These investors were flown to Antigua as an incentive to invest large amounts or as a reward for making such investments.  However, such investors were a small subset of the population of SIB CD investors and were not typical.   In fact, as of February 2009, the average CD investor held approximately $257,000 in SIB CDs.  When investors visited SIB, Tolentino would give them a tour of the Bank, take them to dinner, and would show them a slide presentation concerning SIB. However, the information included in Tolentino's presentations came from materials provided to him exclusively from Stanford employees in the United States.  Furthermore, Allen Stanford insisted on personally approving all slide decks before they were presented to investors, and even mandated that Tolentino go through a "dry run" with Mr. Stanford before the presentations were given.

Tolentino had no control over where SIB's funds were sent or how the funds were invested.   Indeed, based on internal Stanford Entity communications, each time SIB was scheduled to make a significant transfer to a non-investor third-party, the treasury department for SFGC in Houston would send an email to Davis seeking his personal approval of the transfer.

**27**

After receiving Davis's approval, SFGC would then execute the transfers from Houston.  For example, between July and November 2008, Davis approved over $84 million in transfers from SIB to non-investor third parties.  Tolentino was not even copied on the communications relating to those transfers.  (*See, e.g.*, **exhibit KVT-34.**)

**Q.   WAS TOLENTINO A SOURCE OF INFORMATION TO OTHERS WITHIN STANFORD CONCERNING THE SIB PORTFOLIO?**

A.      He was not.  In fact, Tolentino told us that any information he had regarding the SIB portfolio was received solely from employees in the United States — primarily Jim Davis.  In addition, all portfolio data that formed the basis of the quarterly and annual reports to the FSRC came to Tolentino from Davis in the United States, and all financial reporting to the FSRC had to be approved by Davis.

When financial advisors and others sought information concerning the SIB investment portfolio or other financial information concerning SIB, they typically turned to Holt and Davis in the United States rather than Tolentino.  For example, attached hereto is **exhibit KVT-35**, a collection of emails including, but not limited to, a 2008 email exchange in which Holt responds to financial advisors concerns regarding the bank's investment portfolio; emails forwarding a financial advisor's questions concerning the financial health of the bank to Holt and Davis; 2002 email exchange in which Davis responds to questions from financial advisor concerning SIB's annual report; and a September 2008 request from president of Stanford Group (Suisse) AG to Davis and Holt for a "conference call concerning SIB and the first possible convenience."  In a March 2008 email exchange, one financial advisor responded to an inquiry from another financial advisor about the SIB CD portfolio by saying:  "All I can tell you is what Laura told me in the past week….Laura has that info because she manages the global managers who are in

charge of the portfolio at the bank….”  (*See* **exhibit KVT-36.**)   Again, these communications very rarely included Tolentino.  When questions about the bank did make it to Tolentino, he referred them to Davis and Holt and others in the United States.  For example, in February 2009 when the Stanford scheme was falling apart and Tolentino was receiving inquiries from the press and regulators, Tolentino referred the inquiries directly to Davis.  (***See, e.g.***, **exhibit KVT-37.**)

Other evidence shows that Tolentino was not kept abreast of significant management decisions made from the U.S.  For example, on the morning that the Receiver took control of the Stanford Entity operations, Tolentino learned from a draft response to a press inquiry that SIB management had decided to impose a moratorium on early CD redemptions.  When he inquired of Stanford Entity employees, he was informed that Allen Stanford had made that announcement in an earlier conference call with employees which Tolentino did not attend.  (*See* **exhibit KVT-66.**)

**Q.   WHAT OTHER EVIDENCE SUPPORTS YOUR CONCLUSION THAT TOLENTINO DID NOT ACT AS A TYPICAL BANK PRESIDENT?**

A.   Tolentino stated, and records confirm, that he received the purported SIB internal audit reports. As I described earlier, and as is stated in the internal audit reports themselves, SIB's investments were not audited.  I have found no record that Tolentino questioned — much less objected to — this practice.  In my experience, the president of a legitimate bank would respond to issues raised in an internal audit report, would be required to propose remedies for any such issues identified, and — at a minimum — would certainly question the lack of an internal audit over 90% of the assets. It is highly unusual for a bank president both to cede control over the bank's assets to others and to allow its assets to go unaudited.

## VIII.   SIB'S PRINCIPAL OPERATING BANK ACCOUNTS WERE LOCATED IN HOUSTON, TEXAS.

**Q.      DESCRIBE HOW SIB'S OPERATING EXPENSES WERE PAID.**

A.      An examination of the activity in SIB's Bank of Houston and Trustmark accounts reveals that these two United States based financial institutions played a significant role in SIB's day-to-day operations.   SIB's principal operating account was maintained at the Bank of Houston, in Houston, Texas.  (More specifically, this was a pair of accounts — a money market account that was interest-bearing where funds were kept until needed and a separate checking account to which transfers would be made from the money market account when checks were written.)  This account was used for a variety of purposes, including: the purchase or funding of "Tier 2" and "Tier 3" investments; payments to other Stanford Entities relating to services rendered to SIB; and for diversion of other SIB CD proceeds to Allen Stanford directly and to other Stanford Entities, which were not disclosed to investors but were classified after the fact as "Loans to Shareholder."  This account was not managed by SIB employees, but rather by other Stanford Entity employees in the United States.

In addition, there were several SIB accounts at Trustmark Bank (also located in Houston, Texas) that played a significant role in SIB's business.

- SIB Sweep Account − 300-310-1707: This account sent $482 million to SIB's account at Toronto Dominion between January 2004 and February 2009.  It was also a primary source of funding for other SIB accounts at Trustmark. Between January 2004 and February 2009, approximately $282 million was sent to the SIB Client account.  For 2008 alone, $32 million was sent to the SIB Vendor Account and $2 million was sent to the SIB Payroll account.

- SIB Vendor Account − 300-310-1541: There were approximately $34 million in disbursements made from this account in 2008.

- SIB Client Account − 300-310-1558: Between January 1, 2004 and February 17, 2009, at least $141 million in purported CD interest and redemption payments were made to CD customers from this account.  There were also checks written to

the Bank of Antigua from this account, most of which were deposited into Bank of Antigua's account at Bank of America in the United States.

- SIB – Payroll Account – 300-310-1608: Most of SIB's payroll was paid out of this account. Checks were issued to the majority of the employees; very few had direct deposit. Payroll processing occurred in Houston.

## IX.   MOST OF SIB'S SALES PROCEEDS DID NOT PASS THROUGH ANTIGUA.

### Q.   DESCRIBE THE PROCESS THAT SIB USED TO RECEIVE CD CUSTOMERS' MONEY FOR THE PURCHASE OF CDS.

A.    Funds used to purchase SIB CDs largely bypassed Antigua and went directly to accounts in the United States, Canada, and England, from where they were disbursed throughout the Stanford Enterprise.  Attached as **exhibit KVT-6** is the document that instructed customers where to send their money for the purchase of CDs, as follows:

- Investors who paid by wire transfer were instructed to send their money to Toronto Dominion Bank in Toronto, Ontario, Canada.

- Investments denominated in Euros or other European currency were to be sent to HSBC Bank plc in London, United Kingdom.

- Investors who paid by check in U.S. dollars initially sent their checks to the attention of SIB in Antigua, but the funds were never deposited in Antigua. Instead, the checks were promptly bundled and sent to Trustmark National Bank in Houston, Texas, on a daily basis for deposit there.

Tolentino stated during his interview that investors did not send checks directly to SIB.  Instead, investors who purchased CDs through this method provided checks to their broker-dealer — in the United States, SGC — who would then send the checks to SIB.  SIB would then simply endorse the checks and then bundle and send them back to Houston, Texas for deposit at Trustmark National Bank.

Tolentino further confirmed that: (a) even if some SIB customers purchased CDs directly from SIB's Antiguan location, the amount of proceeds from such sales were nominal relative to overall sales; (b) such purchases would have been by check or wire, since the Bank did not

accept cash; and (c) no CD sales were made to Antiguans onsite or otherwise.  (*See* **exhibit KVT-55 at GT03-22-2011FS-0000466.**)  Any such payments promptly would have been sent out of the country because, as stated above, SIB employees would send investor checks daily to the Houston, Texas branch of Trustmark National Bank.

## X.    THE PROCEEDS OF CD SALES SOON LEFT SIB'S BANK ACCOUNTS AND WERE DISTRIBUTED THROUGHOUT THE STANFORD EMPIRE.

### Q.    WHERE WERE FUNDS FROM SIB'S BANK ACCOUNTS SENT?

A.    Through an analysis of financial records from the Stanford Entities, we have been able to trace the flow of SIB funds, as follows.  The flow of SIB CD sale proceeds was directed from the United States, and Jim Davis himself approved or initiated several millions of dollars in transfers of CD proceeds among U.S.-based Stanford Entities.  (*See* **exhibit KVT-26.**)  A more comprehensive analysis of the flow of SIB funds is attached hereto as **exhibits KVT-7 and KVT-9**.

- From June 2007 until February 2009, approximately $828 million in funds were transferred from SIB's accounts at Toronto Dominion Bank to SIB's operating account at Bank of Houston in Houston, Texas.  The Bank of Houston account was SIB's principal operating account during this time period.

- SIB made private equity and real estate investments totaling at least $542 million between 1997 and December 31, 2008.  Such investments included approximately $496 million between 2004 and 2008 as well as at least $46 million between 1997 and December 31, 2003.  Contrary to SIB's assurances to customers that its investments consisted of "highly marketable securities issued by stable governments, strong multinational companies and major international banks" so as to "maintain[] the highest degree of liquidity," these real estate and private equity investments were illiquid and highly speculative.  A substantial majority of the funds invested after June 2007 came from SIB's Bank of Houston operating account.  Some of the funds went to investments in various public and private companies, which were then managed as part of Tier 3 under the direction of Davis (as discussed above).

- At least $3.4 billion of SIB CD sale proceeds were diverted to Allen Stanford and other Stanford Entities between 1998 and 2009, as follows:

       ○       $1.4 billion in referral and management fees were paid to other Stanford Entities between 1998 and 2009. The majority of these fees were paid to U.S.-based Stanford Entities, including SGC.

       ○       At least $2 billion more in funds were diverted to other Stanford Entities and/or Allen Stanford directly, often as "Loans to Shareholder," between 1998 and 2009. Substantial amounts of the funds were used for the personal benefit of Allen Stanford including the purchase of homes, luxury cars, yachts, airplanes, *etc.* The majority of these funds were diverted to U.S.-based Stanford Entities. The funds diverted to the Stanford Entities were transferred without any exchange of legitimate services or products.

- Between 2002 and February 2009, at least $4.4 billion was paid to SIB investors in purported principal payments, interest payments, and loan proceeds from SIB's accounts in the United States and Canada.

- Some of the funds that remained in the Toronto Dominion account were transferred through Houston, Texas banks to various investment firms in the U.S. and Europe, where they were managed as SIB's Tier 2 investments under the direction of Holt from the U.S. as set out above. Between 2003 and 2009, SIB made a net investment (*i.e.* deposits minus withdrawals) in Tier 2 accounts of approximately $357.5 million.

## XI.    SIB CD SALES WERE GENERATED BY STANFORD ENTITY BROKERS LOCATED IN THE UNITED STATES AND COUNTRIES OTHER THAN ANTIGUA.

**Q.**    **WHO MARKETED THE SIB CDs?**

A.    The SIB CDs — SIB's only product line — were marketed overwhelmingly through Stanford broker-dealer entities located in the United Stats and in other countries outside of Antigua. These broker-dealer entities included SGC in the United States, Stanford Bolsa Y Banca S.A. in Mexico, Comisionista De Bolsa in Columbia, and others.

**Q.**    **DID CUSTOMERS TYPICALLY INTERACT WITH SIB EMPLOYEES?**

A.    Most SIB customers never saw or interacted with SIB employees in Antigua. They dealt only with their financial advisors, who were not based in Antigua. The financial advisors were the face of SIB and the other Stanford Entities and would help SIB customers complete their SIB CD applications and manage their CD investments. The local branch

manager would then review the new account form and was supposed to perform a suitability review for each client before sending the client's paperwork to SIB for basic processing. Some of the clients took advantage of other services offered by their financial advisors, such as brokerage accounts.

**Q. WHAT WAS THE VOLUME OF CD SALES BY FINANCIAL ADVISORS IN THE UNITED STATES AS COMPARED TO OTHER COUNTRIES?**

A. Substantially more SIB CD sales, by dollar amount, were generated by financial advisors located in the U.S. than by financial advisors from any other country. The percentage of sales generated by U.S. financial advisors can be reasonably approximated by comparing CD commissions paid to U.S. brokers to total CD commissions for all sales. My team has performed that comparison for 2007 and 2008 on CD balances, and it reveals that U.S. financial advisors were paid 48% of total SIB CD commissions in 2008 and 44% in 2007. The reasonableness and reliability of these percentages as estimates of CD sales made from the U.S. are confirmed by reference to 2007 actual CD balances (as reflected in **exhibit KVT-38**, the Stanford 2008 budget), which indicates that SGC (the U.S. broker-dealer entity) sold 42% of the value of the total CD balance at the end of 2007. The close match between the 42% actual figure and the 44% figure calculated using the CD commission-comparison approach validates the CD commission-comparison approach. Although not all sales by U.S. financial advisors were to U.S. citizens, the fact that between 42% and 48%, by dollar amount, of SIB's CD sales were made from the United States is significant in determining SIB's center of main interests. Certainly no other country approached the magnitude of the United States as a generator of CD sales.

## XII.   MORE CDS BY DOLLAR AMOUNT ARE HELD BY RESIDENTS OF THE U.S. THAN BY RESIDENTS OF ANY OTHER COUNTRY.

**Q.**      **HOW MANY SIB CD HOLDERS WERE UNITED STATES RESIDENTS?**

A.        United States residents hold more CDs — in terms of both the number of CD clients and of the aggregate dollar amount of the CDs held — than the residents of any other country in the world, including Antigua.  In particular, our analysis of SIB address data indicates that United States residents accounted for over 25% of all CD clients and for 37% of total CDs by aggregate dollar amount.

To determine how many SIB CD clients resided in the United States and elsewhere, my team and I sorted the SIB CD data by statement addresses and ending balances on the last statements that were sent to investors.  The country-by-country statistics for all CD clients are as follows:

| Address Location | Based on Most Recent Statement Information (Address & Ending Balance) | | | |
| --- | --- | --- | --- | --- |
| | Number of Clients | % of Clients | Amount US$ | % of Amount |
| United States of America | 7,072 | 25.26% | $ 2,660,676,142 | 37.00% |
| Mexico | 2,801 | 10.00% | $ 605,649,240 | 8.42% |
| Venezuela | 2,686 | 9.59% | $ 402,020,342 | 5.59% |
| Colombia | 769 | 2.75% | $ 126,368,594 | 1.76% |
| Peru | 444 | 1.59% | $ 72,412,827 | 1.01% |
| Canada | 215 | 0.77% | $ 43,511,546 | 0.61% |
| Panama | 152 | 0.54% | $ 38,913,111 | 0.54% |
| Antigua and Barbuda | 28 | 0.10% | $ 3,021,256 | 0.04% |
| Haiti | 18 | 0.06% | $ 1,667,010 | 0.02% |
| British Virgin Islands | 3 | 0.01% | $ 588,335 | 0.01% |
| Other Countries | 2,915 | 10.41% | $ 769,001,388 | 10.69% |
| SIB, STCL, or Hold Mail address | 10,771 | 38.47% | $ 2,420,599,021 | 33.66% |
| No Address Information (Just Account Number) | 127 | 0.45% | $ 46,583,031 | 0.65% |
| **Total** | **28,001** | **100.00%** | **$ 7,191,011,843** | **100.00%** |

As evidenced by the chart above, very few — if any — Antiguan residents actually held SIB CDs.  First and foremost, Tolentino confirmed that SIB and STCL were prohibited by law

and by their own policies from serving Antiguans, so it is unlikely that any Antiguans actually held SIB CDs.  (*See* **2d Aff. of Hamilton-Smith, Doc. 21-7 at ¶ c;** *see also* **exhibit KVT-5 at slide 16; exhibit KVT-54 at GT03-22-2011ST-0012810.**)  Tolentino was not aware of any SIB CDs that were sold to Antiguans.  Nonetheless, even if a few Antiguans did have SIB CDs, the chart above shows that they would represent at most only 0.10% of all CD clients and 0.04% of total CDs by dollar amount.

Other customer addresses that may purportedly be associated with Antigua were merely addresses of convenience for SIB clients who actually resided outside of Antigua.  Specifically, SIB clients associated with a "Hold Mail" address were very likely non-Antiguans who had instructed SIB to hold their mail on location, rather than sending correspondence to their actual address of residence.  Similarly, Stanford customers with SIB- or STCL-related physical addresses — who obviously did not reside onsite at SIB or STCL — likely instructed the Stanford Entities to retain their statements, instead of mailing them to their true address.

Q.      IS THERE ANY OTHER EVIDENCE THAT MORE SIB CUSTOMERS WERE FROM THE UNITED STATES THAN FROM ANY OTHER COUNTRY?

A.      Yes.  Although SIB did not, as a general rule, make loans to its customers, limited exceptions were made to that policy toward the end of SIB's existence.  As of February 2009, $23 million of SIB's $97 million in customer notes receivable were owned by persons in the United States.  The few loans with Antiguan addresses appear to be associated with STCL trusts, which in all likelihood are held by non-Antiguans.

XIII. **MARKETING AND INFORMATIONAL MATERIALS FOR SIB STRESSED THE CONNECTION WITH STANFORD'S GLOBAL NETWORK AND GLOBAL INVESTMENT STRATEGY.**

Q. **WHAT INFORMATION WAS DISSEMINATED REGARDING SIB'S CONNECTIONS TO THE UNITED STATES?**

A. Stanford Financial Group was the "brand name" used in marketing literature to lend credibility to SIB by portraying it as part of a larger global group of companies headquartered in the U.S. Marketing and other materials emphasizing SIB's connections to the United States include the following:

- SIB's 2007 Annual Report (its last), attached as **exhibit KVT-39**, states the following:

  Stanford International Bank is a member of the Stanford Financial Group, which is a privately held global group of wholly owned, independently managed financial services companies founded by Lodis B. Stanford in 1932. Stanford's core businesses are wealth management for high-net worth individuals and investment banking for institutions and emerging growth companies. Knowledgeable private and institutional investors have availed themselves of Stanford's global expertise in asset allocation strategies, investment advisory services, equity and fixed income research, international private banking and trust administration, commercial banking, investment banking, merchant banking, institutional sales and trading, real estate investment and insurance. Stanford serves clients from more than 100 countries on six continents.

- Attached as **exhibit KVT-40** is the transcript of a 2006 marketing video entitled "SFG Corporate Video," in which Allen Stanford explains Stanford Financial Group as follows:

  "Stanford Financial Group is a family of financial services companies with global reach. We serve over 40,000 clients who reside in 79 countries on six continents. Our world headquarters are located in Houston, Texas, and we have a continual growing number of offices around the world to serve our clients. …

  Although independent, all of our affiliate companies work together to form a powerful cohesive network. Together they represent over 20 billion dollars in assets under management or advisement. …

  This commitment to outstanding personal service is deeply rooted in our past. In 1932 my grandfather, Lodis Stanford, founded Stanford Insurance Company in my hometown of Mexia, Texas. The Great Depression had its grip on America,

and most businesses were sacrificing quality and services to survive.  But my grandfather refused to lower his standards.  Instead, he made service his top priority. …

Here are some of the products and services that make us unique in the marketplace.

We offer innovative international private and institutional banking services. Stanford International Bank, domiciled in Antigua, was founded for the specific purpose of private-client wealth management. …

We offer investment banking, merchant banking, institutional equity sales and trading, and the services of our multi-billion-dollar Stanford fixed-income desk from our offices in Houston, Dallas, Miami, San Diego, and New York.

And because information is as important as capital in a global economy, our Memphis office provides cutting-edge research on the latest trends affecting business and finance in the United States and around the world. …

We provide critical financial support for artistic and community programs worldwide, and I am proud to say that we have been a major financial supporter for the restoration of the Leland Stanford mansion in Sacramento, helping preserve an important piece of California and Stanford family history."

- Attached as **exhibit KVT-41** is a March 31, 2004 press release regarding "Stanford Financial Group's CEO R. Allen Stanford['s]" donation of $100,000 to a Dallas, Texas charity.  It states this about Stanford Financial Group:

"Stanford Financial Group is an international network of affiliated companies that together provide a wide range of coordinated financial services to more than 40,000 clients in 79 countries.  … Headquartered in Houston, Texas, Stanford Financial Group has some 2,000 employees in the United States and worldwide."

Q.   **WHAT OTHER INFORMATION WAS PROVIDED TO SIB CUSTOMERS ABOUT ITS CONNECTION TO SFG?**

A.   SIB advertised to customers and potential purchasers of CDs that it was able to pay higher interest, in part, because of "synergies" and cost-savings that resulted from its being part of Stanford Financial Group and because of a globally diversified investment strategy.  By way of example only, the following statements were contained in SIB marketing and informational materials (*see* **exhibit KVT-42**):

- "We are a member of the Stanford Financial Group of companies and greatly benefit from services and support provided by the wholly owned Stanford affiliates around the globe."

- "The bank … benefits through operational synergies already in place within the Stanford Financial Group."

- "SIB has received this benefit without the capital expenditures required for opening and maintaining multiple global offices.  As a result the Bank's operational and administrative costs are approximately 40% of revenue, compared to other international banks which generally allocate 60% to 80%."

- "We have invested a large percentage of the Bank's assets in globally diversified portfolios, and have proven, for two decades that our investment strategy is a prudent way to protect principal and grow capital."

## XIV.   INFORMATION REGARDING SIB'S FINANCIAL STRENGTH WAS DISSEMINATED FROM THE U.S.

Q.   FROM WHAT SOURCES DID STANFORD FINANCIAL ADVISORS RECEIVE INFORMATION ABOUT THE SIB CDS TO PROVIDE TO POTENTIAL SIB CUSTOMERS?

A.   Stanford financial advisors persuaded their clients to purchase SIB CDs using information given to the financial advisors in training materials, training sessions and corporate "pep talks."  The misinformation came directly or indirectly from Allen Stanford, Davis, and/or Holt in the United States.  The financial advisors who received this misinformation knew or should have known that it was suspicious, inadequate, and raised red flags.

Q.   WHAT TYPES OF INFORMATION WERE PROVIDED TO THE FINANCIAL ADVISORS FROM THE UNITED STATES?

A.   The information regarded such topics as the value of SIB's investments, SIB's investment allocation, SIB's investment strategy, the persons who managed SIB's investments, SIB's history of consistently high earnings, Allen Stanford's purported capital infusion into SIB to strengthen it, and the security of customers' deposits with SIB.  One source of misinformation originating from the United States that I have located and reviewed and that was disseminated to

financial advisors and investors in the United States is SIB's 2007 financial statements, which contain misrepresentations regarding investment values and investment income.  (*See* **exhibit KVT-39.**)

> Q.    WHAT ARE SOME OTHER EXAMPLES OF INFORMATION DISSEMINATED FROM THE UNITED STATES?

A.    Attached as **exhibit KVT-43** is a transcript of a video of Allen Stanford addressing Stanford financial advisors in Miami in October 2008.  It is reasonable to assume that Stanford intended his comments to be passed along by the financial advisors to potential purchasers of SIB CDs.  Interspersed between Mr. Stanford's remarks on the state of the global and U.S. economy, how politicians were ruining "the country" (meaning the U.S., not Antigua), and how he viewed himself as a "middle [class], common-sense-thinking American [and] [h]opefully, that's where my values will always be," he made the following statements about the Stanford companies' financial performance:

- "This is not going to be an easy period for any of us, but *we're going to do very well*."

- "But this world is going to change, ladies and gentlemen, and *we're going to be a leader in all areas* of it."

- "I'll say it again:  We have no securitized debt, we don't depend on the credit markets as a company, and our use of leverage has been minimal."

- "We have always had to put the client first, because we were always fighting that uphill battle to get that client, and we're not going to change.  That's *the number one priority in this company and always will be, to take care of the client*."

- "Right now it's the worst we've done in a long time.  We're about, as of early October, down about four percent, I guess.  We've had a lot of hot spots within.  I saw one return up 16% here today.  Different things that are, in spite of the confusion, are actually benefiting. But *overall we're down about four percent.  I'm not happy with that; in this market I guess it's astounding*."

- "We've got a lot of cash, we're positioning to grow our business, and nothing's really changed in our companies."

- "Our investment model works, it's a long-term play, and it's proven itself in this day, in this market to be the toughest I've ever seen to work better than ever."

In addition, attached as **exhibit KVT-44** is a February 12, 2009 letter from Allen Stanford, on stationery headed merely "Stanford" and bearing the Stanford Eagle logo, to SIB CD investors, along with an email transmitting it to financial advisors for their use in forwarding to investors.  Here are excerpts:

> "Yesterday, there was a business magazine article about the Stanford Companies.  In light of these recent press reports, I believe it is important for you to hear directly from me.
>
> As you know, the Stanford Companies were built on the values set by my grandfather 77 years ago.  We have weathered the ups and downs of the markets and we have used the most challenging economic periods to spot opportunities and grow our company in a steady and consistent manner. …"
>
> \*       \*       \*
>
> "As far as Stanford International Bank is concerned, I want to be very clear, the bank remains a strong institution.  … [W]e have already taken a number of decisive steps to preserve our core capital and to reinforce our financial strength and investment base. … [W]e have already added two capital infusions into the bank and are considering additional actions. … You have placed your confidence in the Stanford Companies, and we know you are counting on us more than ever in these uncertain times."

Moreover, attached as **exhibit KVT-45** is an email string, dated November 11, 2008, between a financial advisor and Laura Pendergest-Holt and containing misinformation.  It begins with the financial advisor asking for information regarding SIB's financial strength and investment portfolio performance.  Holt responds that "there has not been a loss on the portfolio," a "$235 million capital infusion was just made," and "liquidity stands at $1.5 billion." These three statements, all made from the United States, were incorrect.  Nonetheless, this again illustrates where a financial advisor went — not to Antigua, but to Memphis, Tennessee or

Tupelo, Mississippi — to obtain information with which to reassure his clients regarding the safety of their SIB investments.

## XV.  STATUS OF STANFORD'S LOANS TO ANTIGUAN GOVERNMENT.

Q.      HAS THE ANTIGUAN GOVERNMENT REPAID THE LOANS MADE BY THE STANFORD ENTITIES?

A.      As of February 2009, the Antiguan government owed SFGC in the United States approximately $20 million in unpaid loans and owed the Bank of Antigua, a domestic Antiguan bank also owned by Stanford, at least $70 million in unpaid loans.  Attached as **exhibit KVT-62** is a summary I have prepared regarding these loans, and attached as **exhibit KVT-63** are documents evidencing loans to the Antiguan government.  I have seen other evidence suggesting loans far in excess of that amount.  (***See, e.g.***, **exhibit KVT-46, letter from Antiguan government proposing agreement to grant development rights in return for Stanford's forgiveness of the EC$300 million debt; exhibit KVT-59 at 38 and 45, showing that Antigua owed debts to Stanford of approximately $230 million.**)  I have found no records showing that these loans were paid off.

Q.      HAVE YOU SEEN ANY EVIDENCE OF LOANS MADE DIRECTLY BY SIB TO THE ANTIGUAN GOVERNMENT?

A.      No.  Though I have seen reference to a proposed loan from SIB to the government of Antigua, I have found no record that any such loan was ever made by SIB.  Dr. Blackman, a SIB board member, confirmed that he was unaware of any loans being made by SIB to the government of Antigua.  (***See* exhibit KVT-71 at deposition lines 31:15-24, 39:4-15.**)  Instead, the majority of the loans to the Antiguan government were funded through the Bank of Antigua, which Stanford also owned, and $40 million was loaned from SFGC to the government of

Antigua, although approximately $20.7 million of that loan was assigned to the Bank of Antigua in late 2008 just before the Ponzi scheme collapsed.

Q.     HAS THE ANTIGUAN GOVERNMENT TAKEN ANY OTHER ACTION THAT MAY IMPACT ITS INDEBTEDNESS TO THE STANFORD ENTITIES UNDER THE LOANS?

A.     Yes.  Over $60 million of the loans made by the Stanford Entities were made or later assumed by the Bank of Antigua, which was wholly owned by Allen Stanford.  Based on public reports I have reviewed, it appears that the government of Antigua is now the majority owner of the successor entity to the Bank of Antigua.

In February 2009, the Eastern Caribbean Central Bank (ECCB) set up the Eastern Caribbean Amalgamated Financial Co. Ltd. (ECAFC) to oversee Bank of Antigua operations and to set up a new bank.  (*See* **exhibit KVT-47.**)  The Eastern Caribbean Amalgamated Bank (ECAB) subsequently was granted a banking license in Antigua and obtained regulatory approvals to "purchase and assume certain assets and liabilities of Bank of Antigua Ltd…." (***See*** **exhibit KVT-48.**)  Reportedly, "[t]he savings, deposits, loans and other accounts of current customers of Bank of Antigua [were to be] transferred seamlessly into ECAB with no interruption to service provided to customers." (*See* **exhibit KVT-48.**)

According to other reports, "Antigua and Barbuda has 40 percent interest in ECAB-- 25 per cent belonging to government and the remaining 15 per cent allocated to ACB [Antigua Commercial Bank]; while each of the other four banks [(1) St. Kitts-Nevis-Anguilla National Bank Ltd., (2) Eastern Caribbean Financial Holdings Company Ltd., (3) National Commercial Bank (SVG) Ltd., and (4) National Bank of Dominica Ltd.] have 15 percent share." (***See*** **exhibit KVT-47;** *see also* **exhibit KVT-49.**)  The official Antiguan government website has a video stating that Antigua supports and is a part owner of ECAB.  (*See*

http://ab.gov.ag/gov_v4/article_details.php?id=1019&category=38; *see also* http://www.youtube.com/watch?v=uacPTirNAnU&feature=player_embedded.)   A separate press release on the website acknowledges the government's part ownership and states that the Government of Antigua and Barbuda is "the major shareholder in ECAB, to which Bank of Antigua has transitioned[.]"(*See* **exhibit KVT-50.**)

The fact that the government of Antigua is now the majority shareholder in the entity that assumed the loans from the Bank of Antigua calls into question whether it will ever honor its obligations to repay the loans to the Receivership Estate.

## XVI.   THE ANTIGUAN GOVERNMENT HAS TAKEN REAL ESTATE BELONGING TO THE STANFORD ESTATE.

**Q.    HAS THE ANTIGUAN GOVERNMENT TAKEN ANY ACTION IN REGARD TO STANFORD REAL ESTATE LOCATED IN ANTIGUA?**

A.    Following the failure of the Stanford Entities, the Antiguan parliament authorized the government's expropriation of Stanford real estate.  The parliamentary resolution authorizing the expropriation cites this Court's order as the reason for the taking:

> . . . Whereas the appointment by the U.S. District court for the Northern District of Texas of a Receiver to take control of the assets of Stanford International Bank Ltd., the Stanford Group of Companies, and Sir Allen Stanford (among others) threatens the financial viability of the Bank of Antigua, the prompt payment by the Stanford Group of companies of the massive outstanding debt to local suppliers, and the continued employment of over eight hundred employees at a time of global financial crisis.

(*See* **exhibit KVT-51.**)  As of June 2010, the Antiguan government acknowledged that, although it had released some land to the Former Liquidators, it still retained at least eight parcels of land as a result of its prior acquisition activities.  (*See* **exhibit KVT-53.**)  These are assets that, but for the Antiguan government's taking, would be available for liquidation for the benefit of Estate claimants.

## XVII.  ALEXANDER FUNDORA IS A SIB INVESTOR SUBJECT TO THIS COURT'S JURISDICTION.

**Q.      WHO IS ALEXANDER FUNDORA?**

A.      I have reviewed the pleadings attached as **exhibit KVT-68**, which were filed by Alexander Fundora, a resident of Miami, Florida.  In one of these pleadings, Fundora represented that after SIB was placed in receivership, he "made demand seeking a return of his deposits to Saraminta Perez, the person to whom the Bank directed [Fundora] to deal with and who is Vice President Financial Advisor of Stanford Group Company in Miami." (*See* **exhibit KVT-68 at page 2, ¶ 4.**)

I have investigated Mr. Fundora's relationship to SIB and have determined that he had the following SIB accounts: Express Account 138263 and CD accounts 138384, 138385, 145059, and 174013.  Mr. Fundora invested $2,800,000.00 with SIB, and he had a remaining balance of approximately $2 million in his SIB accounts as of the date of the Receivership.

## XVIII. AGGREGATION VS. MANY INDIVIDUAL LIQUIDATIONS.

**Q.      IN YOUR OPINION, SHOULD THE VARIOUS STANFORD ENTITIES (INCLUDING SIB) BE LIQUIDATED IN SEVERAL SEPARATE PROCEEDINGS OR, INSTEAD, AGGREGATED FOR PURPOSES OF LIQUIDATION?**

A.      From an economic standpoint, I believe all of the Stanford Entities should be aggregated for the purpose of liquidation.  Based on my investigation, ultimate distributions to SIB claimants would be adversely impacted if all the Stanford Entities were not liquidated in the same proceeding for the reasons including, but not limited to, the following:

- More than 90% of the ultimate claims, by dollar amount, against the combined Stanford Entities (SIB included) will consist of claims by SIB CD holders. Therefore, even if all Stanford Entities are liquidated in a single proceeding, the presence of claims against Stanford Entities other than SIB is unlikely to have a significant dilutive effect on distributions to SIB claimants.

- Based on my experience as an accounting and fraud-investigation professional involved in numerous complicated proceedings, it will be far less costly to liquidate the various Stanford Entities in a single proceeding, such as the present U.S. Receivership, than if the various Stanford Entities and/or claimants were each made the subject of a separate proceeding with its own set of legal and accounting professionals.   The assets of the Estate will not support such an endeavor.   The cost savings that will result from having these companies liquidated in a single proceeding will benefit all claimants because less administrative costs means more assets available for ultimate distribution.

Executed this  5  day of  December  2011.



Karyl Van Tassel

SWORN TO and SUBSCRIBED before me by Karyl Van Tassel on this  5  day of
December,  2011.

Cecelia Figueroa

Notary Public in and for
the State of Texas

My commission expires:  4/13/2015

```
CECELIA FIGUEROA
My Commission Expires
April 13, 2015
```