# KVT-6

# ADDITIONAL DEPOSITS

**STANFORD | Stanford International Bank Ltd.**

No. 11 Pavilion Drive, P.O. Box 3300, St. John's, Antigua, West Indies • Tel: 268.480.3700 • Fax: 268.480.3737
www.stanfordinternationalbank.com • A member of the Stanford Financial Group.

Bank clients can make additional deposits to their accounts in one of the following ways:

1. Send personal or bank cheques:

   · The cheque should be made out in favour of Stanford International Bank Ltd. followed, in parentheses, by the name or number of the account to be credited.

   or

   by indicating in the reference section on the front of the cheque, the name or number of the account to be credited.

   or

   by indicating on the back of the cheque, the name or number of the account to be credited.

   · Cheques made out in your favour may also be deposited.

2. Send a wire transfer:

   · Please inform your financial consultant before sending funds in this manner.

   · The instructions you provide your bank should include the following:

   For US Dollars —

   "Please wire US$ _____ (Amount)

   TO:   THE TORONTO-DOMINION BANK
         International Banking Center, Toronto, Ontario, Canada
         SWIFT: TDOM CA TT

         To be deposited to the account of:

         STANFORD INTERNATIONAL BANK LTD. (#0360012161670)
         SWIFT: SIBP AG AG

   REF: _____
                      (Your Name)

        _____ "
                   (Account Number)

FOIA - Confidential Treatment Requested by Ralph S. Janvey, as Receiver for R. Allen Stanford, James M. Davis, Laura Pendergest Holt, Stanford Group Co., Stanford Capital Management LLC, Stanford International Bank Limited, Stanford Financial Group, and The Stanford Financial Group BLDG, Inc.

(continued on reverse)

STAN P DOJ_0031499

**144**

**For Canadian Dollars –**

"Please wire CDN$ _____ (Amount)

TO:   THE TORONTO-DOMINION BANK
International Banking Center, Toronto, Ontario, Canada
SWIFT: TDOM CA TT

To be deposited to the account of:

STANFORD INTERNATIONAL BANK LTD. (#0360012161573)
SWIFT: SIBP AG AG

REF: _____
(Your Name)

"
_____
(Account Number)

**For British Pounds –**

"Please wire GBP _____ (Amount)

TO:   HSBC BANK PLC
London, United Kingdom
SWIFT: MIDLGB22XXX

To be deposited to the account of:

STANFORD INTERNATIONAL BANK LTD. (Sort code 40-05-15, acct. #58180160)
SWIFT: SIBP AG AG

REF: _____
(Your Name)

"
_____
(Account Number)

**For Euros –**

"Please wire Euros _____ (Amount)

TO:   HSBC BANK PLC
London, United Kingdom
SWIFT: MIDLGB22XXX

To be deposited to the account of:

STANFORD INTERNATIONAL BANK LTD. (Sort code 40-05-15, acct. #58293136)
SWIFT: SIBP AG AG

REF: _____
(Your Name)

"
_____
(Account Number)

FOIA - Confidential Treatment Requested by Ralph S. Janvey, as Receiver for R. Allen Stanford, James M. Davis, Laura Pendergest Holt, Stanford Group Co., Stanford Capital Management LLC, Stanford International Bank Limited, Stanford Financial Group, and The Stanford Financial Group BLDG, Inc.

STAN P DOJ_0031500

SIB27 ENG

17296 (Replaces 1862 SB23)  07.06 10M GLF

**145**

# KVT-7

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § | |
| Plaintiff, | § § | |
| v. | § § | Case No.: 03-CV-0298-N |
| STANFORD INTERNATIONAL BANK, LTD., Et Al. | § § § | |
| Defendants. | § § | |

---

## DECLARATION OF
## KARYL VAN TASSEL

---

I, Karyl Van Tassel of 1001 Fannin, Suite 1400, Houston, TX 77002 state on oath as follows:

### EXPERIENCE, EXPERTISE, WORK IN THIS CASE

1.     A copy of my resume is attached as exhibit **KVT-1**.  It summarizes my education and relevant work experience.  As it states, I am a Certified Public Accountant in the State of Texas, USA, and a Senior Managing Director of FTI Consulting, Inc.  I have 24 years of experience providing a variety of audit, accounting, tax, litigation, valuation and other financial advisory services.  I have performed detailed financial analyses for a variety of litigation matters, including securities, intellectual property, breach of contract, antitrust, lender liability, fraud and wrongful terminations.  In the litigation context, I have acted as an expert on a variety of economic damage claims and forensic accounting issues.  In several cases alleging fraud and other wrongdoing, I have traced funds for potential recovery.  I have

also been retained by audit committees to assist in investigating allegations of accounting and financial improprieties.

2.    The statements made in this declaration are true and correct based on the knowledge I have gained from the many documents I have reviewed and other work I and my team have performed in the course of FTI's investigation on behalf of the Receiver.

3.    I use the following acronyms or short-hand terms to refer to certain entities in this declaration:

- Stanford Entities — all legal entities owned, directly or indirectly, by the named Defendants in the SEC action as of the date the U.S. Receivership was instituted.

- SIB — Stanford International Bank, Limited.

- STCL — Stanford Trust Company Limited, an Antigua trust company.

- SFG — Stanford Financial Group, the name given to Allen Stanford's "global network of financial companies."

- SGH — Stanford Group Holdings, Inc., a U.S. holding company incorporated in Delaware.

- SFGC — Stanford Financial Group Company, a U.S. entity incorporated in Florida.

- SFGGM — Stanford Financial Group Global Management, LLC, a U.S. entity incorporated in the U.S. Virgin Islands.

- SGC — Stanford Group Company, a U.S. broker-dealer entity incorporated in Texas.

- STC — Stanford Trust Company, a Louisiana trust company.

- SEI — SEI Private Trust Company.

### SEC ACTION AND FTI'S INVESTIGATION

4.    On February 16, 2009, the United States District Court for the Northern District of Texas appointed Ralph S. Janvey the Receiver for SIB and the rest of the Stanford

Entities. On the same day, the Receiver retained FTI to perform a variety of services, including assisting in the capture and safeguarding of electronic accounting and other records of the Stanford Entities and forensic accounting analyses of those records, including cash tracing. I oversee, and am personally involved in, FTI's forensic accounting and cash tracing activities. The purposes of FTI's work have been, in part, to (a) determine the roles that the various Stanford Entities played in the fraud alleged by the SEC and specifically in the sale and redemption of SIB certificates of deposit ("CDs"); (b) identify the source(s) of income of the various Stanford Entities; and (c) trace those funds to determine how they were allocated and disbursed throughout the Stanford Entities.

5.      As part of our work, we have interviewed numerous present and former Stanford Entity employees. These include, but are not limited to, the persons whose names (as well as employer, title, and supervisor) are listed in **KVT-2**. In addition, we have examined the available accounting and other records relating to the Stanford Entities located in and/or gathered from Houston, Texas; Tupelo, Mississippi; Baldwyn, Mississippi; Memphis, Tennessee; Miami, Florida; St. Croix, United States Virgin Islands; Antigua; Barbuda; and other Stanford locations within and outside the U.S. We have also reviewed extensive SIB customer records, including but not limited to paper and electronic records documenting SIB CD purchases, interest payments and redemptions.

6.      FTI has also obtained and analyzed paper and electronic files from third-party financial institutions where bank accounts of various Stanford Entities are located. These financial institutions include Toronto Dominion Bank in Canada, Trustmark National Bank and the Bank of Houston. In addition, FTI has gathered and reviewed electronic and other

data from Pershing, LLC and JP Morgan Clearing Corp., both of which hold SGC customer accounts, and SEI, which holds STC accounts.

## FACTUAL BACKGROUND

7.     Allen Stanford was sole owner, directly or indirectly, of more than 130 separate entities, including SIB and STC.  These entities comprised a single commonly-owned financial services network called the "Stanford Financial Group," which was headquartered in Houston.

8.     Stanford, along with a close band of confidantes, controlled SFG (of which SIB was a part).  These confidants included Jim Davis, CFO of both SFG and SIB, and Laura Pendergest Holt, Chief Investment Officer for SFGC.

9.     SIB was nothing like a typical commercial bank.  It did not offer checking accounts and did not, in the normal course, make loans.  It had one principal product line — certificates of deposit — and one principal source of funds — customer deposits from CD purchases.  SIB offered three types of certificate of deposit accounts; Fixed CDs, Flex CDs, and Index-Linked CDs.  The terms of some SIB CDs permitted partial redemptions before maturity upon customer demand.

10.     Most, and perhaps all, of the Stanford Entities were part of the scheme alleged by the SEC or derived benefit from it.  The Stanford Entities that were most closely involved with the sale and redemption of SIB CDs were (a) SIB, which issued the CDs and made purported interest and redemption payments to investors; (b) SGC, the broker-dealer whose financial advisors marketed and sold the CDs to investors; (c) STC, where customer accounts were established to hold the purchased SIB CDs as well as purported interest and redemption payments from SIB CDs; and (d) SFGC and SFGGM, companies that provided a broad range

of services, such as human resources, marketing, accounting and legal services, to SIB and SGC. Customer funds intended for the purchase of SIB CDs were deposited into SIB accounts and then disbursed among the many other Stanford Entities and related accounts.

11.    Misinformation regarding SIB's financial strength, profitability, capitalization, investment strategy, investment allocation, the value of its investment portfolio, and other matters, was disseminated from Stanford, Davis, Holt and others working under them to Stanford financial advisors, intending for the brokers to use that misinformation to induce potential investors to purchase SIB CDs.

12.    CD redemptions increased in late 2008 and early 2009 to the point that continuing CD sales could no longer cover purported redemptions, interest payments and normal operating expenses. This caused a rapid depletion of liquid assets. By the time the U.S. Receivership was instituted, SIB had already suspended redemptions for certain investors and many of the Stanford Entities had stopped paying many payables.

13.    At the inception of the U.S. Receivership on February 16, 2009, the total principal amount of outstanding SIB CDs was approximately $7.2 billion (U.S.), according to SIB records. This $7.2 billion reflects a liability on the books of SIB, as it is owed to the investors. Although the SIB financial statements reflect investments valued at $8.3 billion (classified as assets) as of December 31, 2008, based on my analysis to date, the combined assets of all Stanford Entities (SIB included) for which we have financial records have a total value of less than $1 billion. SIB is insolvent and apparently has been for a considerable time.

14.    Our analysis of cash flows for 2008 through February 17, 2009 indicates that funds from sales of SIB CDs were used to make purported interest and redemption payments on pre-existing CDs. Redemptions of principal and payments of interest on CDs should

generally be paid from earnings, liquid assets or reserves. In this case, CD sale proceeds were used because sufficient assets, reserves and investments were not available to cover the liabilities for redemptions and interest payments. Although SIB received some returns on investments, these amounts were miniscule in comparison to the obligations.

15.    It appears that most CD sale proceeds not used to pay interest, redemptions and current CD operating expenses, including commissions, bonuses, Performance Appreciation Rights Plan ("PAR") payments and up-front forgivable loans to financial advisors who sold the CDs, were either placed in speculative investments (many of them illiquid, such as private equity deals), diverted to other Stanford Entities "on behalf of shareholder" — *i.e.*, for the benefit of Allen Stanford, or used to finance Allen Stanford's lavish lifestyle (*e.g.*, jet planes, a yacht, other pleasure craft, luxury cars, homes, travel, company credit card, *etc.*).

16.    SIB investments (which are over 90% of all assets as of December 31, 2008) were divided into three tiers, each managed differently, although all ultimately controlled by Stanford, Davis and, at least to the extent of Tier 2 assets, Holt.

17.    Tier 1, the smallest tier in dollar value, consisted of cash and cash equivalents. Stanford accounting records indicate that as of February 18, 2009, SIB Tier 1 totaled $31.8 million.

18.    Tier 2 principally consisted of investments placed with a variety of investment firms or funds located in the U.S. and Europe, together with a small amount of cash or cash equivalents. According to SIB's weekly summary reports, Tier 2 had a total value of approximately $345 million at February 9, 2009, down substantially from $889 million at December 31, 2007. The documents indicate there were approximately $29 million in further liquidations between February 10, 2009 and February 17, 2009. Tier 2's precipitous decline in

reported value over the thirteen months leading up to the Receivership was due to a combination of declining market values and numerous liquidations ordered by Davis and Stanford and implemented by Holt and her staff.

19.    Tier 3, by far the most significant financially (as valued by Stanford and Davis) and the most secret, was managed by Stanford and Davis, apparently with assistance and participation by Holt and others working under them.   They kept its value and composition secret from regulators, investors, creditors, auditors and others.  Stanford Tier 3 records do indicate, however, that $1.8 billion in value consisted of notes receivable from Allen Stanford.  It appears this amount corresponds to funds that Stanford, with the assistance of Davis and possibly others, diverted from SIB.  These funds were used for various purposes, including transfers to 51 other Stanford Entities.  (*See* **KVT-3**, an internal Stanford schedule listing past uses of SIB funds supporting Allen Stanford's note receivable liability to SIB in the amount of $1.844 billion.).  This receivable appears to be uncollectible, as Mr. Stanford's recent press statements indicate he does not have the $1.8 billion to pay the loan made to him.

20.    Approximately $1.2 billion of Tier 3 value (as apparently valued by Stanford and/or Davis or others acting in concert with them) was in merchant banking assets.  These consisted mostly of equity and debt investments in private and public companies (*see* **KVT-8,** a Stanford Financial Group schedule dated 30 June 2008 listing Tier 3 merchant banking assets), which was contrary to representations made to investors about SIB's investment portfolio.  Early indications are that the fair value of these merchant banking assets was — and remains — only a small fraction of the $1.2 billion value that Stanford and Davis assigned to them for financial reporting purposes.

21.     In addition, Tier 3 records assigned $3.174 billion of value to real estate. However, those same records list only two assets in this category: real estate holding companies that own properties in Antigua known as Pelican Island and Asian Village. The two properties were purchased (via the purchase of their holding companies) in 2008 for a combined $63.5 million. I have seen no evidence — such as appraisals or other similar valuations — that would support this extraordinary and highly improbable increase in value, particularly in a period that generally is regarded as a global real estate downturn.

22.     SIB investment earnings amounts were provided monthly by Jim Davis and persons working at his direction and under his supervision. I have reviewed internal Stanford documents from which I concluded that earnings were "pegged" at whatever amount was needed to give SIB the appearance of acceptable financial performance and capital ratios for regulatory purposes, as well as continuing to induce investors. In other words, earnings — at least for the last three years and probably longer — were fictitious "plugged" numbers.

23.     Notwithstanding SIB's insolvency and the rapid liquidation of its investments during 2008 and into 2009 to alleviate a severe cash flow crisis, CD sales continued until February 16, 2009, when the SEC and the U.S. Court intervened.

24.     Based on FTI's analysis to date, I have reached the following conclusions, which are all to a reasonable degree of certainty, and all of which were determined using reliable practices and methodologies, described herein, that are standard in the fields of finance and accounting:

- The substantial majority of funds received or utilized by the Stanford Entities, and in particular SIB, SGC, SFGC and SFGGM, was proceeds from the sale of SIB CDs;

- The substantial majority of funds used to pay purported CD interest and redemption payments to investors on pre-existing CDs was proceeds from sales of new SIB CDs;

- The schedules attached hereto as exhibits **KVT-4, KVT-5** and **KVT-6** reflect the identity of certain persons and entities holding SIB CD accounts with identified purported CD interest and/or redemption payments from SIB or who otherwise received purported CD interest and/or redemption payments from SIB, and the amounts of payments identified;

- Exhibit **KVT-4** further identifies the Pershing, SEI and JP Morgan accounts currently frozen under the Court's orders determined to be associated with the persons and entities listed on that schedule based on the customer records and other information available;

- Exhibit **KVT-5** further identifies the amounts, which total $18.5 million in the aggregate, transferred by the persons and entities listed on that schedule to the Receiver's segregated escrow account pending final adjudication of rights to those funds;

- Exhibit **KVT-6** identifies persons and entities holding SIB CD accounts with identified purported CD interest and/or redemption payments from SIB or who otherwise received purported CD interest and/or redemption payments from SIB (and the amounts of payments identified) and who do not have any accounts currently frozen at Pershing, JP Morgan or SEI and have not transferred any funds to the Receiver's segregated escrow account; and

- The substantial majority of funds used to pay CD commissions, loans, PAR payments and bonuses to financial advisors who sold SIB CDs was proceeds from sales of new SIB CDs.

### OVERVIEW OF SIB BANK ACCOUNTS

25.     Based on our review of the activity in multiple SIB bank accounts, the primary operating accounts for CD activity utilized by SIB were Toronto Dominion account no. 0360-01-2161670 ("TD 1670"), Trustmark account no. 300-310-1707 ("Trustmark 1707"), Trustmark account no. 300-310-1558 ("Trustmark 1558") and Bank of Houston account no. 8706 ("BOH 8706").    SIB also transferred substantial amounts of money between its operating accounts and two money market accounts, Trustmark account no. 1097 ("Trustmark 1097") and BOH account no. 8284 ("BOH 8284").    These money market accounts were

essentially used as short-term holding locations for the funds from the SIB operating accounts, earning nominal amounts of interest, until those funds were needed by SIB. As explained further below, the overwhelming majority of the funds deposited into all of the aforementioned SIB operating and money market accounts was proceeds from the sale of SIB CDs.

26.    The above accounts were used for a variety of purposes. For example, the TD 1670 and Trustmark 1558 accounts were used to make purported CD interest and redemption payments to investors. The TD 1670 account was also used, along with the Trustmark 1707 and BOH 8706 accounts, for the purchase or funding of Tier 2 and Tier 3 investments, payments for services rendered to other Stanford Entities and capital contributions or loans to other Stanford Entities. In 2008 alone, approximately $474 million was transferred from the TD 1670 account to the BOH 8706 account, which in turn distributed roughly $450 million among the various Stanford Entities.

## SUBSTANTIAL MAJORITY OF FUNDS FOR
## STANFORD ENTITIES CAME FROM CD SALE PROCEEDS

### *Deposits of CD Sale Proceeds*

27.    The SIB CDs were SIB's only product line. Although SIB provided a limited number of other financial products (*e.g.* credit card services and loans), these were offered only to CD holders and acted as incentives for the purchase of CDs.

28.    Based on FTI's review of SIB CD sale records, the majority of CD purchasers paid for their CDs with U.S. dollars, and those funds were deposited into SIB's Trustmark 1707 and TD 1670 accounts. Customers who purchased SIB CDs by wire transfer were instructed to wire their funds directly to SIB's TD 1670 account. (*See* **KVT-7**, CD investor wiring instructions). Investors who paid by check sent their checks to SIB in Antigua, where

those denominated in U.S. Dollars were bundled and sent regularly to Trustmark in Houston for deposit into SIB's Trustmark 1707 account. If any SIB CD sales proceeds were actually paid by investors at SIB's offices in Antigua, it was likely a small amount relative to overall sales. Further, as stated above, SIB would promptly send investor checks denominated in U.S. Dollars to Houston for deposit into the Trustmark 1707 account.

29.    Based on our review of 2008-2009 data for the Trustmark 1707 and TD 1670 accounts, and comparing that to SIB's CD sales records for the same time period, my team and I have been able to confirm that the funds from investors who purchased SIB CDs in U.S. dollars were in fact deposited into these accounts.

30.    Because the wire transfer data from the TD 1670 account and the SIB customer account records are both in electronic form, we were able to electronically match the wire transfers into the TD 1670 account to records of specific CD purchases, CD nos., transaction dates or amounts or other criteria contained in the SIB CD customer account records. Based on this analysis, we have determined that, for the time period of January 1, 2008 through February 17, 2009, approximately $1.7 billion in SIB CD sale proceeds were deposited into the TD 1670 account.

31.    With regard to CD purchases in U.S. Dollars made by check, the data available from Trustmark does not allow for electronic matching with SIB's CD sale records. Instead, FTI has been able to review images of checks provided by Trustmark and then search the SIB CD sale records for transactions in those same amounts. By doing so for checks representing approximately 33% of the commercial deposits reflected on the Trustmark 1707 account statements provided by Trustmark for the time period of January 1, 2008 through February 17, 2009, we have been able to confirm, with only one exception, that each of these checks

corresponds to a specific purchase identified in the SIB CD sale records.[1]   Based on this analysis, we have determined that between January 1, 2008 and February 17, 2009, approximately $384 million in SIB CD sale proceeds were deposited into SIB's Trustmark 1707 account.

32.    In addition to the SIB CD sale proceeds that were deposited directly into the TD 1670 and Trustmark 1707 accounts, there were some small additional amounts of CD sale proceeds that were deposited in other accounts initially and then transferred over to the TD 1670 and Trustmark 1707 accounts.

    (a)    Investors who purchased CDs in Canadian dollars were instructed to wire those funds to SIB's Toronto Dominion account no. 0360-01-2161573 ("TD 1573"). (**KVT-7**). Performing an analysis similar to that performed on the wire transfers into SIB TD 1670, FTI has been able to electronically match the wire transfers into the TD 1573 account to records of specific CD purchases, CD nos., transaction dates or amounts or other criteria contained in the SIB CD sale records. Based on this analysis, we have determined that, for the time period of January 1, 2008 through February 17, 2009, over $5 million in SIB CD sale proceeds were deposited into the TD 1573 account. Correspondingly, Toronto Dominion's records reflect that approximately $10 million was transferred into the TD 1670 account and another approximately $10 million into the Trustmark 1707 account from the TD 1573 account. These transfers included not only the $5 million in deposits referenced above but likely deposits of CD sale proceeds into the TD 1573 account that occurred prior to January 1, 2008.

    (b)    Investors who purchased CDs in British pounds or Euros were instructed to wire those funds to SIB accounts at HSBC Bank PLC in London. (**KVT-7**). Although HSBC has not provided any account data to the Receiver, we have been able to determine that over $36 million was transferred from HSBC accounts to the TD 1670 account between January 1, 2008 and February 17, 2009.

---

[1] Though we have been unable to confirm that the one check identified as an "exception" was used to purchase a CD, circumstantial evidence indicates that it was. The data required to reach a definitive conclusion, however, was not available for this transaction.

*SIB's CD Operating Accounts Were Funded Almost Exclusively from CD Sale*

*Proceeds*

33.     Based on the analysis described above, and additional analysis of data relating to SIB's primary operating accounts — TD 1670, Trustmark 1707, BOH 8706 and Trustmark 1558 — I have determined that the overwhelming majority of funds received by SIB came directly or indirectly from CD sale proceeds.

34.     The deposits into the SIB Trustmark 1707 account between January 1, 2008 and February 17, 2009 totaled approximately $497 million.[2]  The approximately $384 million in checks for CD purchases that were deposited into the account comprised 77% of the deposits into that account between January 1, 2008 and February 17, 2009.  Based on the following, I have concluded that up to an additional $94 million or 19%, for a total of 96%, of the deposits into the Trustmark 1707 account during that time period also consisted primarily of SIB CD sale proceeds.

>     (a)     Approximately $55 million, or 11% of the deposits into the Trustmark 1707 account were funds from the liquidation of Tier 2 investments  Based on my review of the data relating to the Tier 2 investments, it appears that the vast majority of those investments were funded by monies from the TD 1670 account. Further, the vast majority of the liquidations occurred when the investments were in loss positions.  Accordingly, any deposits from the Tier 2 investments would have consisted primarily of the CD sale proceeds that were originally invested rather than investment returns.

>     (b)     Approximately $29 million, or 6%, of the deposits into the account were from SIB's BOH 8706 and TD 1670 accounts,

---

[2] This amount does not include approximately $337 million in deposits from the Trustmark 1097 account.  The Trustmark 1097 account was a short term money market investment account that was funded almost exclusively from the Trustmark 1707 account and used to hold those funds until they were needed by SIB.  At that time, the funds were transferred back into the Trustmark 1707 account. Based on my review of the Trustmark 1097 account records, these funds earned only nominal amounts of interest.

which as discussed below, were funded primarily from CD sale proceeds.

(c) Approximately $10 million, or 2%, of the deposits into the account were transfers from SIB account TD 1573, which was the account into which CD purchase money in Canadian Dollars was deposited, as described above.

(d) The other deposits into this account — approximately $19 million or just 4% of the total — were from other Stanford Entities (funded primarily by CD sale proceeds), unidentified sources or sources on which FTI's analysis is ongoing.

35.    The deposits into the SIB TD 1670 account between January 1, 2008 and February 17, 2009 totaled approximately $2.4 billion. The approximately $1.7 billion in wire transfers for CD purchases that were deposited into the account comprised 71% of the deposits into that account between January 1, 2008 and February 17, 2009. Based on the following, I have concluded that up to an additional 26% or $619 million, for a total of 97%, of the deposits into the TD 1670 account during that time period also consisted primarily of SIB CD sale proceeds.

(a) Approximately $318 million, or 13%, of the deposits into the account were from SIB's Trustmark 1707 account, which as described above, is funded almost exclusively by proceeds from the sale of SIB CDs.

(b) Approximately $154 million, or 6% of the deposits into the account were funds from the liquidation of Tier 2 investments. As described above (*See* ¶34(a) above), such funds primarily consisted of proceeds from the sale of SIB CDs.

(c) Approximately $127 million, or 5%, of the deposits into the account were from SIB's BOH 8706 operating account, which as discussed below, was funded primarily from SIB CD sale proceeds.

(d) Approximately $20 million, or 1%, of the deposits into the account were transfers from HSBC Bank accounts and the TD 1573 account, which were the accounts into which CD purchase

money in non-U.S. currency, were deposited, as described above.[3]

(e)     the other deposits into this account — approximately $82 million or 3% of the total — are from other Stanford Entities (funded primarily by CD sale proceeds), unidentified sources or sources on which FTI's analysis is ongoing.

36.     The total deposits into the SIB BOH 8706 account between January 1, 2008 and February 17, 2009 were approximately $801 million.[4]  Based on the following, I have concluded that up to $710 million or 89%, of the deposits into the BOH 8706 account during that time period consisted primarily of SIB CD sale proceeds.

(a)     Approximately $505 million, or 63%, of the deposits into the account were from SIB's TD 1670 account or Trustmark 1707 account, which as described above, are funded almost exclusively by proceeds from the sale of SIB CDs.

(b)     Approximately $205 million, or 26%, of the deposits into the account were funds from the liquidation of Tier 2 investments. As described above (*See* ¶34(a) above), such funds primarily consisted of proceeds from the sale of SIB CDs.

(c)     The other deposits into this account — approximately $91 million or 11% of the total — were from other Stanford Entities (funded primarily by CD sale proceeds), unidentified sources or sources on which FTI's analysis is ongoing.

37.     The total deposits into the SIB Trustmark 1558 account between January 1, 2008 and February 17, 2009 were approximately $127 million.[5]  Based on FTI's review of

---

[3] Another $26.5 million, or 1%, of the deposits into the TD 1670 account was from HSBC accounts. These funds also likely originated from CD purchase money originally denominated in non-U.S. currencies, as described in the wiring instructions attached hereto as exhibit **KVT-7.**  Because HSBC has not provided the necessary records, we are unable to confirm that this is the case.

[4] This amount does not include approximately $457 million in deposits from the BOH 8284 account. The BOH 8284 account was a short term money market investment account that was funded exclusively from the BOH 8706 account and used to hold those funds until they were needed by SIB. At that time, the funds were transferred back into the BOH 8706 account.  Based on my review of the BOH 8284 account records, these funds earned only nominal amounts of interest.

[5] This amount does not include additional deposits consisting of funds originally paid out of the Trustmark 1558 account that were returned for various reasons (*i.e.*, rejected by recipients, *etc.*).

records from Trustmark relating to this account, 99% of the deposits during this time period were transfers from SIB's Trustmark 1707 account. As discussed in paragraph 34 above, the Trustmark 1707 account was funded almost exclusively from the CD sale proceeds. Accordingly, the overwhelming majority of funds in the Trustmark 1558 account consisted of SIB CD sale proceeds.

### PROCEEDS FROM SALES OF NEW CDS WERE USED TO MAKE PURPORTED CD INTEREST AND REDEMPTION PAYMENTS ON PRE-EXISTING CDS

38.    Based on FTI's analysis to date, I have concluded that the overwhelming majority of the funds used to make purported SIB CD interest and redemption payments was proceeds from the sale of new SIB CDs to investors. Although SIB received some returns on investments, these amounts were miniscule. Moreover, there were not sufficient assets to cover these payments, illustrated by the fact that liquidating Tier 2 allowed SIB to maintain payments for only a short period of time.

39.    Based on SIB CD transaction records reviewed by FTI, SIB made purported principal and interest redemption payments in U.S. Dollars to investors totaling approximately $2 billion from January 1, 2008 through February 17, 2009.

40.    For interest and redemption payments made by wire transfer in U.S. Dollars, SIB used its TD 1670 account. FTI has reviewed the outgoing wire transfer records from the TD 1670 account and electronically matched those records to the CD related payment records from SIB. Based on this analysis, we have been able to confirm that approximately $1.87 billion, or 92%, of all redemption payments made by SIB in U.S. Dollars were made by wire transfer to investors from the SIB's TD 1670 account. Because the funds deposited into SIB's TD 1670 account were almost exclusively proceeds from the sale of new CDs to investors, the

payments made from the TD 1670 account to investors were likewise almost exclusively CD sale proceeds.

41.     SIB also made some purported interest and redemption payments to investors in U.S. Dollars by checks written from its Trustmark 1558 account.  FTI has reviewed approximately 300 checks written to investors from the Trustmark 1558 account.  By comparing those checks to records of specific payments in SIB's records, we have determined that between January 1, 2008 and February 17, 2009, checks totaling $92 million, or 94% of the sample set of purported CD interest and redemption payments selected,[6] were written from SIB's Trustmark 1558 account.  Because the overwhelming majority of the funds deposited into SIB's Trustmark 1558 account was proceeds from the sale of new CDs to investors, the overwhelming majority of payments made from the Trustmark 1558 account to investors was primarily proceeds from the sale of new SIB CDs to investors.

**IDENTIFICATION OF INVESTORS WHO
RECEIVED PURPORTED CD INTEREST AND REDEMPTION PAYMENTS**

42.     Attached as exhibits **KVT-4**, **KVT-5** and **KVT-6** to this declaration are schedules identifying certain investors holding SIB accounts with identified purported CD interest or redemption payments from SIB or who otherwise received purported CD interest or redemption payments from SIB, along with the amounts of payments identified.  The investors listed in **KVT-4** also have Pershing, JP Morgan or SEI accounts that are currently frozen by the Court's orders.  The investors listed in **KVT-5** do not have any accounts that are currently frozen under the Court's orders.  Instead, their accounts were released and they agreed, by stipulations filed with the Court, to transfer funds equal to the amount of purported

---

[6] The sample selected totaled 78% of the population of purported CD interest and redemption payments made by SIB denominated in U.S. Dollars for the period January 1, 2008 through February 17, 2009.

SIB CD redemptions or interest payments they received to the Receiver's segregated escrow account until the rights to those funds are fully adjudicated. The investors listed in **KVT-6** do not have any accounts that are currently frozen under the Court's orders and have not transferred any funds to the Receiver's segregated escrow account.

43.    The schedules contained in exhibits **KVT-4, KVT-5** and **KVT-6** were developed by the FTI team through a detailed review and analysis of the SIB records of CD interest and redemption payments from SIB customer accounts. If a payment was made from an SIB customer account, the customer(s) who held that account were identified as recipient(s) of the purported CD interest or redemptions. Once the customer(s) were identified, the SIB customer records were searched electronically for certain common identifiers, such as name, address, *etc.*, to identify all other SIB accounts associated with the customer(s). If the names on each of the customer accounts appeared to be the same, the purported interest and redemption payments were added together into one line item entry on the schedule. If the names on the accounts did not appear to be the same, they are listed as separate entries on the schedules. If we determined through review of available records that someone other than the SIB account holder received purported CD interest or redemption payments, they are included on the appropriate schedule.

44.    Once the customers who received purported CD interest or redemption payments from SIB were identified, the FTI team also reviewed Pershing, JP Morgan and SEI customer account records to determine whether those previously identified SIB customers also had Pershing, JP Morgan or SEI accounts that are subject to the Court's freeze orders. Similar to how related SIB accounts were identified, the Pershing, JP Morgan and SEI account records were searched electronically for common identifiers — again name, social

security number, tax identification number, address, *etc.* — to identify any Pershing, JP Morgan or SEI accounts associated with those customers. Those identified accounts, to the extent they are still frozen by the Court's orders, are listed on exhibit **KVT-4**.

45.     Many of the customers listed on exhibits **KVT-4** and **KVT-5**, and perhaps some of those listed on exhibit **KVT-6**, had other Pershing, JP Morgan or SEI accounts that were previously subject to the Court's freeze orders but have since been released. Some of those accounts were released pursuant to the Court's orders dated March 5, March 12, or April 23. Other Pershing, JP Morgan and SEI accounts associated with the customers listed on exhibits **KVT-4** and **KVT-5** have been released through the account application review process approved by the Court in its March 27 and May 27 orders and subsequent modifications thereto. As of the date of this declaration, all Pershing, JP Morgan and SEI accounts associated with the customers listed on exhibit **KVT-4** have been released, except those accounts necessary to satisfy an order of disgorgement from this Court being requested by the Receiver. All Pershing, JP Morgan or SEI accounts associated with customers listed on exhibit **KVT-5** have been released, but funds equal to the amount of proceeds received by the customers identified in **KVT-5** have been transferred to the Receiver's segregated escrow account pending adjudication of rights to those funds.

46.     The investors listed on exhibit **KVT-4** received approximately $373 million in purported CD interest and redemption payments in the aggregate. Comparing these amounts and the amounts contained in the Pershing, JP Morgan and SEI accounts associated with those customers, there is approximately $295 million in the Pershing, JP Morgan and SEI accounts that are available to satisfy any claims by the Receiver for the recovery of CD proceeds. The investors listed on exhibit **KVT-5** received approximately $18.5 million in purported CD

interest and redemption payments in the aggregate. Such amount has been transferred by the investors to the Receiver's segregated escrow account pending final adjudication of rights to those funds. The investors listed on exhibit **KVT-6** received approximately $494 million in purported CD interest and redemption payments in the aggregate. There are no frozen Pershing, JP Morgan or SEI accounts that have been identified as associated with these customers, and they have not transferred any funds to the Receiver's segregated escrow account.

### PROCEEDS FROM SALES OF NEW CDs WERE USED TO PAY COMMISSIONS, PAR PAYMENTS AND BONUSES AND MAKE LOANS TO FINANCIAL ADVISORS

47.    Based on a review of accounting and payroll records of SGC, the FTI team and I have determined that many of the financial advisors who marketed and sold SIB CDs to customers received up-front forgivable loans as part of their compensation package when they began work. For the years 2007, 2008 and 2009 (prior to February 17), loans were made to financial advisors in the approximate aggregate amounts of $12.9 million, $35.8 million and $2.76 million respectively.

48.    Many of the financial advisors further received commission, PAR payments and bonus payments associated with SIB CD sales, typically in the range of 1% to 3% percent of the cumulative value of the CDs they sold. For the years 2007 and 2008, SGC made commission, PAR payments and bonus payments to financial advisors in the approximate aggregate amounts of $31 million and $38 million respectively.

49.    Based on our analysis and review of the records and information referenced herein, I have concluded that the substantial majority of funds used to pay the loans, bonuses,

PAR payments and commissions to financial advisors was proceeds from the sale of the SIB CDs.

50.     The loans, bonuses, PAR payments and commissions to financial advisors were funded primarily from two Trustmark bank accounts held in the name of SGC, specifically Trustmark account no. 300-310-7357 ("Trustmark 7357") and Trustmark account no. 300-008-7916 ("Trustmark 7916")(collectively, the "Trustmark 7357/7916 accounts"). These were the primary operating accounts used by SGC. Loans were paid directly to the financial advisors from the Trustmark 7357/7916 accounts.  Commissions, PAR payments and bonuses first passed through SGC's payroll account, which was funded exclusively by the Trustmark 7357/7916 accounts, and were then paid to the financial advisors by SGC's third party payroll services provider, ADP.

51.     The SGC Trustmark 7357/7916 accounts, in turn, were funded directly or indirectly from SIB's operating accounts — TD 1670, Trustmark 1707 and BOH 8706 — which, as detailed above, were funded almost exclusively from SIB CD sale proceeds.

52.     One of the primary funding sources for the SGC Trustmark 7357/7916 accounts from which loans, bonuses, PAR payments and commissions were paid was referral fees paid by SIB as compensation for the sale of CDs.  Over the course of 2007 through February 17, 2009, an aggregate total of $172.3 million in referral fees was transferred directly from SIB's TD 1670, Trustmark 1707 and BOH 8706 operating accounts to the SGC Trustmark 7357/7916 accounts.  Based on our interviews with personnel from the various Stanford Entities, FTI learned that these referral fees were, in part, intended to fund commission and bonus payments and loans to financial advisors who sold SIB CDs.  The

amount of referral fees paid by SIB to SGC between 2007 and 2009 far exceed the amounts of commissions, PAR payments, bonuses and loans paid to financial advisors during that time.

53.    The conclusion that proceeds from the sale of SIB CDs were used to fund commission and loan payments is further confirmed by the fact that another significant source of funding into the Trustmark 7357/7916 accounts was capital contributions that originated from SIB's TD 1670, Trustmark 1707 and BOH 8706 operating accounts.  Although many of these capital contributions passed through other Stanford Entities and their accounts before landing in the Trustmark 7357/7916 accounts, they are traceable back to the SIB accounts and therefore to proceeds from the sales of SIB CDs.

54.    For example, in 2008 alone, funds in the amounts of $396 million and $77 million respectively were transferred from the SIB BOH 8706 account and the TD 1670 account into the operating account of SFGGM, BOH 8870.  During the same time period, a capital contribution in the amount of $47.5 million was made from SFGGM's BOH 8870 account to SGH's operating account, Trustmark account no. 300-310-2150 ("Trustmark 2150").  Finally, a capital contribution went from the Trustmark 2150 account to the SGC Trustmark 7357/7916 accounts in the amount of $46.5 million.  There are many other examples of smaller capital contributions making their way into SGC's Trustmark 7357/7916 accounts that are traceable back to SIB's accounts.  In addition, based on FTI's analysis of records available for the accounts that funded the Trustmark 7357/7916 accounts, I have concluded to a reasonable degree of certainty that a majority of the funds deposited into these accounts came from sources traceable to the SIB accounts that were funded almost exclusively by proceeds from the sale of SIB CDs.

Executed this **27** day of July, 2009.

Karyl Van Tassel

# KVT-1



# Karyl M. Van Tassel, CPA

Senior Managing Director—Forensic and Litigation Consulting
Karyl.vantassel@fticonsulting.com

1001 Fannin
Suite 1400
First City Tower
Houston, TX 77002
Tel: (713) 353-5445
Fax: (713) 353-5459

**Certifications**
Certified Public Accountant

**Professional Affiliations**
American Institute of Certified
Public Accountants

Texas Society of Certified Public
Accountants

**Education**
B.S. in Business Administration,
Emphasis in Accounting,
University of Northern Colorado

Karyl Van Tassel is a senior managing director in the FTI Forensic and Litigation Consulting practice and is based in Houston. Ms. Van Tassel has twenty-three years of experience providing a variety of audit, accounting, tax, litigation, valuation and other financial advisory services. Ms. Van Tassel has been designated as an expert on valuations of closely held businesses, other economic damage claims and forensic accounting issues and has performed detailed financial analyses in a variety of litigation matters, including securities, intellectual property, breach of contract, antitrust, lender liability, fraud and wrongful terminations. She has also been retained by audit committees to assist in investigating allegations of accounting and financial improprieties.

Prior to joining FTI, Ms. Van Tassel was a partner in KPMG's Forensic Dispute Advisory Services practice. Prior to that she was a member of the litigation and bankruptcy consulting divisions of two national accounting firms as well as a regionally based firm, where she provided financial advisory services to the legal and insurance professions and private industry. She has also provided audit and tax services to auto dealerships, construction clients and governmental agencies. In addition, she has provided accounting services and investment analysis to a financial institution.

## Professional Experience

### Forensic Accounting

- Retained by court appointed receiver to investigate and track $85 million of funds embezzled by the CFO of a Texas energy company. Searched the company records to determine the amount of the embezzled funds, and determine the various schemes used to remove the funds from the company. After tracing the amount removed from the company, then traced assets through multiple shell companies and personal bank accounts, utilizing accounting information and electronic data obtained through email, hard drive and server sources. Worked with receiver on monetizing assets recovered.

- Involved in various investigatory matters related to compliance with Foreign Corrupt Practices Act (FCPA), including assisting a monitor appointed under a deferred prosecution agreement of a company to analyze accounting and internal control procedures. Prepared work plan for compliance testing and directed site visits, conducted interviews and assisted in preparing report of findings. As a result of our work, have reported to head of enforcement at the Department of Justice. With the three year term of the monitorship, have ongoing responsibilities for follow up with the company and oversight of responses to monitor's requests and reported findings, as well as follow up site visits for each year.

- Retained by the audit committee on matters related to allegations of round trip trading in the energy industry. Assisted in providing multidisciplinary teams to extract data, analyze trades, document risk management practices and analyze appropriate accounting treatment, including potential restatement. Reports provided to audit committees to assist them in responding to SEC inquiries and investigations.



www.fticonsulting.com

24



Karyl M. Van Tassel

- Retained by company to perform analysis of costs incurred for provider of energy in submitting a claim in the refund of overpayments related to the California power settlements. Reviewed regulatory filings to determine if costs and methodologies complied with FERC guidelines and state mandates. Analyzed source documents as well as documenting the methodology utilized for compiling the information.

- Retained by counsel for a special committee of a publicly traded software company to investigate allegations of potential backdating of stock options. Led a team of accounting and electronic evidence personnel to assist in acquiring and analyzing written and electronic information related to the stock option process and individuals involved. Worked extensively with counsel analyzing accounting issues related to measurement dates and the appropriate accounting of stock grants for new hires, new account acquisition, employee ranking, compensation in lieu of cash, and sales incentive plans. Analyzed appropriate accounting treatment and estimate of annual financial impact based upon alternative measurement dates. Reported results to Board of Directors and auditors of the company.

- Retained by the audit committee of an electronics company to investigate allegations by the SEC related to revenue recognition issues, overstatement of inventory and property, plant and equipment and self-dealing by top level executives. Company eventually settled with the SEC and announced restated financial statements

- Retained by the audit committee of Fortune 500 company to analyze historical accounting issues related to accounting for long-term construction contracts. Issued report and had meetings with the SEC to discuss findings and accounting issues.

- Analyzed historical rates of return for a variety of mutual funds and equity investments to determine the impact of various investing options related to the assets of a trust. Compared actual returns to several indices to determine the difference and the potential damages allegedly incurred by the trust.

- In a securities matter related to the mining industry, analyzed the impact of the accounting and financial disclosures on the stock of a company. Analyzed various returns on equity investments for guideline companies in the industry as well as equity indices to measure impact of announcements and disclosures on the company stock.

- Retained by a hospital chain to analyze billings to Medicaid and insurance providers to determine if billings were appropriate based upon contractual provisions and consistent with the patients file and diagnosis. Worked with multidisciplinary team to consisting of computer specialists to retrieve data, database specialists to analyze information and medical personnel to review medical files.

- Retained to analyze various factors and transactions in matters asserting alter ego claims. Involved in a variety of matters where we provided detailed analyses of corporate governance, financial operational and control factors to determine the extent to which the information would indicate the existence of separate entities.

- Involved in analyzing various complex financial and accounting transactions regarding alleged improprieties in a variety of industries, either for internal investigations or litigation.

- Analyzed accounting treatment of revenues and related party disclosures for a defendant in a securities matter. Software company allegedly had overstated revenues by inappropriate application of accounting principles and improperly disclosed various related party



 

Karyl M. Van Tassel

transactions.

- Analyzed and traced assets between various related and affiliated companies, which involved complex accounting treatments. Traced cash and other assets to offshore companies. Testified in hearing for contempt of court regarding the disposition of certain cash receipts subsequent to the issuance of a temporary restraining order that limited the transfer of assets.

- Analyzed the alleged fraudulent activities of two major auto body repair shops for an insurance company. Determined the overall profitability of the auto body repair shops compared to the industry as a whole. From a large production of documents, also determined the availability of financial documents from the body shops, and their relationship to and substantiation of the results of inspections performed on vehicles after the repairs were completed. Assisted the economist in regards to the total business conducted over a 15-year period and extrapolated sample results to the entire population.

- Reconstructed the trust accounts of a real estate company after a fire suspected to be caused by arson. Determined amounts had been misappropriated for the personal use of various brokers. Analysis used in criminal investigation.

- Analyzed the accounts of a real estate developer accused by a family trust of misappropriation of funds. Analysis included complex transactions between 22 related partnerships. Included database extractions of various computers and synthesizing thousands of records to determine ultimate disposition of proceeds from investments.

- Retained by a lender to the defendant in a case involving an alleged ponzi scheme in the computer hardware industry. Analysis included determining the flow of transactions in the company between actual business operations and alleged fraudulent activities. Utilized large-scale database application to track transactions within the company, to the bank and to the potential investors. Analyzed the companies banking transactions to determine if the bank had allowed a "float" on the account, which the trustee alleged to be an additional loan to the company from the bank. Engagement resulted in settlement with company trustee.

- Analyzed the billings of a construction company related to the renovation and partial construction of a residence. Analyzed application of percentage of completion in monthly billings to determine overcharges throughout a three-year construction period.

- Analyzed the costs of producing a compact product for shipping hazardous materials. Determined if improper allocations were made based upon cost accounting theories, resulting in overcharging to clients.

**Contract Disputes**

- Analyzed the payments made under a treaty whereby client ceded obligations under a reinsurance agreement in the variable annuity business. The allegations involved whether the contract was wrongfully terminated if underpayment of premium had not been made by insurance company to reinsurer. The issues involved included obtaining an understanding of the payment terms for the reinsurance coverage over an extended period on reinsurance of the guaranteed minimum death benefit of variable annuity life insurance policies. Led a multidisciplinary team working with large volumes of transactions data. Team included data analysis and electronic discovery specialists for the extraction of data over an extended



26



Karyl M. Van Tassel

time period with millions of transactions. Also, worked with actuaries to understand variables assumed in their analysis of the book of business and with underwriters to understand policies and procedures. Testified in arbitration that client had not underpaid over the period of time at issue in the matter.

- Analyzed the economic damages in a breach of contract and tort matter between client insurance company and a third party administrator. Analyzed the damages alleged by plaintiff's damage expert and provided rebuttal analysis of damages. Issues in the damage calculation related to valuation of a book of business for dread disease policies and calculation of amounts owed under a contract.

- Analyzed the economic damages sustained by an investor in a failed joint venture in a urea plant in Columbia. Opinion included a valuation of the business enterprise as of the date of the alleged breach, involving various analyses of the urea market, the prospective operation results and ability to attract lenders.

- Analyzed the lost profits sustained by a petrochemical company related to an alleged breach of a joint venture/operations agreement. Issues related to imbalance in the manufacturing facility due to inappropriate levels of various feedstock to the plant. Inability to maintain contracted levels of product forced inefficient plant operations, decreasing profitability.

- Analyzed the lost profits to a large engineering firm related to the inability to complete the construction of a polystyrene plant in the Middle East due to the Gulf War. Analysis involved analyzing the percentage of completion methods and determining profit at time of invasion, compared to projected profit had the event not occurred. Claim was submitted to the neutral arbitrators in Switzerland.

- In a breach of contract dispute, analyzed the economic losses sustained by the creator and distributor of personal care products. Analysis included working with a marketing expert to determine effects of demographic differences of consumers on buying habits and its impact on the subject company's profits and long-term viability.

- Analyzed the economic damage claim of a producer of accounting software. Provided testimony with regard to the out-of-pocket costs incurred for an internally developed product, which was used to replace the component, which the defendant did not deliver. Also analyzed the lost profit damages under a first to market theory.

- Analyzed the lost profits of a used car dealership related to a breach of contract. Analyzed industry margins compared with subject and other market conditions.

- Analyzed the economic damages of an exclusive distributor of sporting good products due to product defects. Calculated the economic impact to the distributor over an eight-year period, including lost profits, carrying costs of inventory and other incremental costs. Project necessitated analyzing the performance of over forty products and determining the cause factors impacting the diminution of profits.

- Provided rebuttal analysis of a $20 million claim for lost profits in a construction claim for an Arkansas highway project. Addressed the issues of causation as well as analyzing the underlying assumptions of the lost profit claim. The indirect claim for lost profits was dismissed on summary judgment, in part based upon our financial analysis of the causation issue.

F T I



Karyl M. Van Tassel

- Determined the lost profits allegedly sustained by a provider of programming to the hotel industry, related to a breach of the right of first refusal for a satellite transponder. Coordinated industry experts in various areas including hotel/motel management, advertising, consumer demands, economic trends, cable programming and venture capital availability to analyze the feasibility of the programmer's claim.

- Calculated the economic damages, including lost profits and incremental expenses, in the largest asbestos case in Colorado for a major suburban shopping mall.

- In a contract dispute, determined the value of the restaurant operations included as part of a major Colorado ski resort. Analyzed market trends and restaurant industry comparables for use in the valuation. Also used industry information to benchmark against actual results, to determine management effectiveness.

- Analyzed the value of a franchise fast food establishment related to a breach of contract. Engagement included analyzing various offering circulars for franchises to determine relevant value drivers for similar franchises. Analyzed demographic data related to California communities included in franchise agreement.

- Analyzed a lost profit claim related to a chain of fast food restaurants in a breach of contract matter. Analyzed store-by-store financial metrics to determine average store results compared to subject stores. Analyzed economic and demographic trends in areas adjacent to subject stores.

Insurance Claims

- Analyzed the claim by a hospital related to the flooding of the facility. Engagement involved detailed analysis of the impacted departments and the financial impact of substituting less profitable services for higher margin services due to inability to provide full service medical operations. Also analyzed specific incremental staff costs incurred during the flood and cleanup period.

- Analyzed and assisted in preparing the claim of a large food manufacturer related to an explosion and fire in its primary manufacturing facility. Claim exceeded $100 million, which was settled expeditiously.

- Assisted risk management officer in analyzing a claim related to a fire at a resort community. Claim involved business interruption for a variety of resort functions as well as property losses.

- Assisted in preparing the claim for a large training facility related to computer outages from lightening strikes. Analyzed business interruption claim and collateral losses. Claim eventually was settled in litigation.

- Assisted in claim related to a power outage for several business related to extended power outages related to a major train derailment.

Intellectual Property

- Analyzed the economic damages sustained by a construction product manufacturer due to an alleged patent infringement. Also analyzed the lost profits of the defendant company in a counterclaim for breach of contract. Analyzed market potential for the product, impact of



F T I

www.fticonsulting.com

5

28

 

Karyl M. Van Tassel

noninfringing substitutes, marketing and distribution channels and other factors impacting sales volume and expenses.

- Analyzed the economic damages sustained in a patent infringement matter by an inventor in the sporting goods industry. Detailed analysis including addressing Georgia Pacific factors related to determining a reasonable royalty. Opinion included market royalty rates, royalty rates on other company products, incremental gross profit on patented property, and profit split method.

- On a consulting basis, analyzed the damages of a producer and global marketer of rubber-based products. Allegations included patent infringement trademark infringement, copyright violations, theft of trade secrets and fraud. Claim for damages exceeded $1 billion. Working for the defendant, analysis included impact of market and distribution channels on lost profits as well as reasonable royalty calculation.

- Analyzed the economic damages of one of the largest software companies in the world related to a patent infringement case. Analysis included determining product gross profitability for those alleged to have infringed the property. Also assisted in analyzing the appropriate royalty rate and allocating the revenue to the patented and nonpatented features of the product. Case settled for $100,000,000 less than claim.

- Analyzed the damages in a patent infringement matter related to modular cells for prison units. Engagement included a detailed analysis of a reasonable royalty, based in part upon the Georgia Pacific factors. Reasonable royalty was based upon market derived data, established rates by licensor and licensee, prior licensing history between the parties and analytical analysis of various profit measures.

- Analyzed value of patented technology for various biomedical devices held by a company for a potential acquisition. Analyzed the patented and nonpatented products to determine synergies and purchase drivers between the products since only a portion of the portfolio of products was to be purchased. Also considered impact of governmental approval process on value of patented properties that were still in clinical trials. Determined range of values based upon reasonable royalties obtained in the market place and from other analytical measures.

- Analyzed the value of patented technology in a laser devise used for noninvasive surgeries and dental work for a transfer to an off-shore entity for tax purposes. Engagement included analyzing the profit stream from the laser device as well as market derived rates.

- Analyzed the range of reasonable royalty for physicians developing a drug for cancer treatment. Patented property was related to improving efficacy of radiation treatments. Using analytical data and market derived rates, assisted in negotiating license with a biotechnology company.

- Analyzed the economic losses in a matter involving the alleged infringement of trademarks for a line of personal beauty products. Testified for the defendant in deposition regarding the economic damages sustained as well as presented counter claim testimony. Issues included analyzing relevant markets for personal care products, product survey information regarding product characteristics influencing buyers decisions, internet advertising, and product distribution channels for impact on damage analysis. Case resolved in settlement.

- Analyzed the lost profits sustained by the developer of a sporting good product resulting

F T I

29

176




Karyl M. Van Tassel

from an alleged trademark infringement. The economic damages were calculated both as the lost profits of the developer of the product based upon its own historical results as well as analyzing the profits of the alleged infringing entity. Also analyzed damages related to the cost of corrective advertising in conjunction with an advertising expert.

- Testified for the defendant in an injunction hearing regarding the nature of the advertising revenue as the primary source of income, the overlap in advertising between the "webzine" and magazine and the potential impact on economic damages. Case related to an alleged trademark infringement by a "webzine" of a magazine title.

- Analyzed damages of plaintiff related to disparagement of Ameritech Corporation's management of the alarm company post-acquisition. The case related to the alleged infringement of a trademark for a burglar alarm company purchased by the plaintiffs. Analyzed detail records of clients for overlap caused by clients subscribing to the defendant company due to disparaging information supplied to Ameritech clients in violation of a noncompete agreement as well as infringing use of trademarks.

- Performed royalty examinations for a multinational software company. Supervised multilingual and disciplinary teams to perform royal "audits" in several countries and domestically. Developed regular maintenance program for ongoing audits of contracts on a scheduled basis. Resulted in recovery in excess of $10,000,000, and assisted in favorable renegotiations with joint venture partners.

- Performed a royalty examination in a dispute between a software producer and distributor. Calculated the economic damages allegedly sustained by the software producer due to the alleged under reporting of software sales. Testified in arbitration regarding the results of our findings.

- Performed royalty examinations of five different licensees under contract "audit" rights for a developer of software. Worked with clients and licensees to resolve disputes, recovery of more than $1,500,000, and renegotiation of contracts.

**Post Acquisition Disputes**

- In a post-acquisition dispute, analyzed the results of certain long-term contracts obtained as part of a purchase of an international engineering firm. Analyzed the accounting treatment and financial results of the contracts, both pre- and post-acquisition, and the impact on the valuation of the business.

- Analyzed the lost profits due to alleged fraudulent misrepresentations in a purchase of a restaurant chain. Analysis included store-by-store data of prospective revenue and profitability, compared to those actually achieved. Analyzed market and economic trends in regions in which the restaurants operated to determine impact on profitability and sales from issues unrelated to the alleged misrepresentations.

- Served as an arbitrator in a dispute involving the closing balance sheet working capital provisions of a purchase agreement. In the medical insurance industry, analyzed the proposed adjustments to working capital including accounts receivable, reserves for losses and contingent liabilities.

- Prepared a claim of working capital adjustment related to the closing-balance sheet provisions of a purchase agreement in the computer storage industry. Analysis included

F T I

www.fticonsulting.com

7

30

177

 

Karyl M. Van Tassel

inventory accounting, accounts receivable and deferred revenue.

- Analyzed the propriety of accounts receivables included in the representations and warranties in the purchase of an environmental services company. Allegations involved intentional overstatement of accounts receivable later determined to be uncollectible by the purchaser.

### Telecommunications

- Analyzed the economic damages of a company that terminates traffic for other telecommunications companies who provide a variety of services to end-users. In a contract dispute with one of its clients, analyzed the lost profits as well as the diminution in the value of the business. Analysis included determining network capabilities in regions covered by the agreement during peak and off-peak time periods to determine availability of volume due to switching constraints.

- Analyzed the economic damages asserted in a class action matter against a RBOC. Analysis included detailed records for thousands of customers asserting held order claims over a six-year time period. Downloaded data records related to customer orders, service delivery, billing and customer data. Analyzed relevant tranches of class participants and related damages.

- Analyzed payments made by a major telecommunications company to a switching vendor over a five-year period of time. Based upon contract terms, worked with the company's engineers to determine how the provisioned switching products impacted the billing requirements under the contract. Analysis related to whether charges made by switching vendors were in excess of contract terms. Analysis resulted in multi-million dollar settlement with vendor.

- Analyzed payments made by a major telecommunications company to a single source construction vendor. Issues related to the propriety of charges incurred compared to services delivered over a period of several years. Analysis was used for negotiating a new contract with the contractor.

- In a contract dispute assisted in analyzing the viability of a "C-Block" license holders' business plan and the reasonableness of the company valuation. Researched "C-Block" license auction values and results of operation of "C-Block" auction recipients.

- Oversaw an engagement in which 200 competitive local exchange carrier (CLEC) contracts were analyzed to extract compliance issues for billing and provisioning by a major telecommunications company. Results provided service representatives with information for communication with CLEC's.

### Miscellaneous

- Prepared analyses of lost wage claims, lost profit claims and incremental costs incurred in various personal injury matters. Based upon the opinions of rehabilitation specialists and career counselors, prepared damage analysis based upon the estimated reduction in worklife expectancy, decreased earnings potential or incremental costs incurred related to the alleged injuries.



www.fticonsulting.com

8

31



**Karyl M. Van Tassel**

- Analyzed value of businesses conveyed in pre-bankruptcy transactions related to claims of fraudulent conveyance.

- Assisted in economic analyses related to wrongful termination matters, including lost wage and benefit claims.

- Valued the stock of closely held businesses in a dissenting shareholder action, lender liability matter, condemnation proceeding and various marital dissolutions.

- Valued the stock of a closely held chain of restaurants for the purpose of spinning off certain restaurants to form a new company.

- Valued the stock of the largest oyster processing company in the world for a Northwest financial institution. The bank had acquired the company through foreclosure and required the valuation as part of its internal procedures required to sell the entity to an outside party.

- Valued a 50 percent ownership interest in an alarm monitoring company for a buyout of the partial owner's interest.

## Speaking Engagements

Addressed various state and local bar associations as well as other continuing legal education providers on the following matters:

- Valuation Intricacies

- Financial Statement Analysis and Presenting Financial Data at Trial

- Use of Economic Experts in Commercial Litigation and Case Management

- Valuation Issues in Fraudulent Conveyance Matters

- Valuation in a Cram Down Bankruptcy Proceeding

- Valuation of Businesses in Mergers and Acquisitions

- Valuation of Intellectual Property

- Valuation Issues for Biotechnology

## Publications

- Coauthor of "Calculation of Economic Damages in Commercial Litigation," Totaltape Publishing Company, Tampa, Florida, 1990.

- "Valuing Intellectual Property: The Science and the Art," The Colorado Lawyer, August, 1997.

## Education

University of Northern Colorado—B.S. in Business Administration, emphasis in Accounting

F T I



Karyl M. Van Tassel

## Summary of Testimony

| Case | Case Number | Type of Testimony | Law Firm Client | Year |
|------|-------------|-------------------|-----------------|------|
| Edward Malo vs. Breckenridge Spa and William Benkelman | U.S. District Court of Colorado 92-M-2537 | Deposition | Bradley Campbell Carney & Madsen | 1994 |
| Asolo SpA, et al. vs. Giancarlo Tanzi | U.S. District Court of Colorado 93-Z-1778 | Deposition, Trial | Hale & Dorr | 1995 |
| LittleWing Co., Ltd. vs. Mesch & Associates d/b/a StarPlay Productions | AAA Arbitration | Arbitration | Holme Roberts & Owen LLC | 1995 |
| TLB, INC., an Ohio corporation, vs. Platinum Software, a California company | U.S. District Court of Colorado 95-WY-621 | Deposition, Trial | Coghill & Goodspeed, P.C. | 1996 |
| Primedia Intertec Corporation vs. Technology Marketing Corporation | U.S. District Court of Kansas 98-2384-KHV | Trial | Locke Reynolds Boyd & Weisell Sonnenschein Nath & Rosenthal | 1998 |
| Mountain Ocean, Ltd. d/b/a Everybody Ltd. vs. For Every Body, Inc. | U.S. District Court Of Colorado | Deposition | Jones, Waldo, Holbrook & McDonough, P.C. | 1999 |
| Prism Management Enterprises, Inc. vs. Crane Leake Casey Ehlers & Eggleston, P.C. | District Court, La Plata County 97-CV-412 | Deposition, Arbitration | Jacobs Chase Frick Kleinkopf & Kelley, LLC | 1999 |



F  T  I

www.fticonsulting.com



Karyl M. Van Tassel

| | | | | |
|---|---|---|---|---|
| Ameritech Corporation v. Jackson Burglar Alarm | U.S. District Court of Colorado 98-N-2432 | Deposition | Holme Roberts & Owen | 1999 |
| The Quizno's Corporation v. Robert W. Mitelhaus | AAA Arbitration | Arbitration | Preeo, Silverman & Green | 1999 |
| Gulf Communications, LLC v. Business Telecom, Inc., d/b/a BTI Telecommunications Services | 398CV2444-6 U.S. District Court for Northern District of Texas, Dallas Division | Deposition | Kyle & Mathis | 1999 |
| Southwest Recreation Industries, Inc. v. Fieldturf, Inc. and Fieldturf International, Inc. | A-00CA063-SS U.S. District Court for the Western District of Texas, Austin Division | Deposition | Brown, Todd & Heyburn PLLC | 2000 |
| Anthony G. Petrello and Cynthia Petrello v. Renaissance Builders, Inc. and Chandler Robinson | 199-51358 The District Court of Harris County, Texas 270th Judicial District | Deposition | Fulbright & Jaworski LLP | 2001 |
| Omagro De Columbia, L.D.C. vs. MCN Energy Enterprises, Inc., formerly named MCN Investment Corporation | 67-180286-99 The District Court of Tarrant County, Texas 67th Judicial District | Deposition and Trial | Shannon, Gracey, Ratliff & Miller | 2001 |
| Blitz Holdings Corp. v. Interamericas Financial Holdings Corp. | Civil Action No. H-00-2247 United States District Court for the Southern District of Texas Houston Division | Contempt Hearing | Wilshire Scott & Dyer | 2001 |
| Hartford Life Insurance Company And Hartford Life & Annuity Insurance Company v. Connecticut General Life Insurance Company | Arbitration | Deposition, Trial | Akin, Gump, Strauss, Hauer & Feld L.L.P. | 2002 |
| National Health Insurance Company vs. National Plan Administrators, Inc. Hartford Life Insurance | GN – 101679, In the District Court, Travis County, Texas 53rd Judicial District | Deposition, Trial | Akin, Gump, Strauss, Hauer & Feld L.L.P. | 2003 |

F T I

34

 

Karyl M. Van Tassel

*Company, and CRS*
*Marketing Agency, Inc.*

| | | | | |
|---|---|---|---|---|
| SOURCECORP, Incorporated, SOURCECORP DMS, Inc. and Information Management Services, Inc. v. Steve Shill, Rita Shill, Robin Meyer, and Mark Meyer | No. 76Y1160016303ARN, American Arbitration Association | Testimony, Arbitration | Steptoe & Johnson, LLP | 2004 |
| David Graben and Frank Strickler v. Western Reserve Life Assurance Company of Ohio; Intersecurities, Inc., and Timothy Hutton | 03-08-648 The District Court of Wise County, Texas 271st Judicial District | Trial | Akin, Gump, Strauss, Hauer & Feld L.L.P. | 2005 |
| Rodney Montello, et al v. Alcoa Inc., Reynolds Metals Company, Bon L. Campo and Tredegar Corporation | The U.S. District Court of Southern District of Texas Victoria Division Civil Action No: V-02-84 | Deposition | Baker Botts LLP | 2006 |
| Bencor, Inc. v. The Variable Annuity Life Insurance Company | AAA Arbitration | Arbitration | Akin, Gump, Strauss, Hauer & Feld LLP | 2006 |
| Highland Crusader Offshore Partners, L.P. et al v. Motient Corporation | Cause No. 05-07996 In the District Court, Dallas County, Texas E-101st Judicial District | Deposition | Fulbright & Jaworksi LLP  Lackey Hershman L.L.P. | 2007 |
| Gascoigne Melotte Holdings LLC (U.S.A.), Boumatic LLC (U.S.A.), Boumatic-Melotte SPRL (Belgium) v. Punch | In the International Chamber of Commerce Court of Arbitration | Arbitration | Baker Botts LLP | 2008 |

F T I



Karyl M. Van Tassel

*Technix N.V. (The
Netherlands), et al*

**KVT-2**

Stanford Financial Group Receivership

| Employee Name | Department | Location | Job Title | Business Card Title | Supervisor Name |
|---|---|---|---|---|---|
| Maldonado, Patricia C. | SFGC Treasury | US TX Houston | Manager | Manager | Davis, James M |
| Holt, Laura L. | SFGC Research and Trading | US TN Memphis | Chief Investment Officer | Chief Investment Officer | Davis, James M |
| Lopez, Gilbert | SFGC Accounting | US TX Houston | Chief Accounting Officer | Chief Accounting Officer | Davis, James M |
| Amadio, Henry | SFGC Accounting | US TX Houston | Accounting Mgr | Accounting Manager | Lopez, Gilbert |
| Jackson, Kerry | SGC Corporate Finance | US TX Houston | Sr VP | Senior Vice President / Controller | Weiser, Charles M. |
| Groves, Denise | SFGC Treasury | US TX Houston | Treasury Analyst | Treasury Analyst | Maldonado, Patricia C. |
| Pallan, Tarrie J. | SFGC Treasury | US TX Houston | Sr Treasury Analyst | Senior Treasury Analyst | Maldonado, Patricia C. |
| Weiser, Charles M. | SGC Corporate Finance | US TX Houston | Executive VP | Chief Financial Officer | Boger, Daniel T. |
| Pi, Osvaldo | SGC Merchant BK | US FL Miami | Managing Director | Managing Director | Boger, Daniel T. |
| Varkey, Johnson (John) | SFGC IT | US TX Houston | Chief Information Officer | Chief Information Officer | Boger, Daniel T. |
| Collinsworth, Mark P | SFGC Research and Trading | US TN Memphis | Managing Director | Managing Director - Global Asset Allocation | Holt, Laura L. |
| Palmieri, Frederic A. | SFGC Research and Trading | US TN Memphis | Research Analyst | Senior Investment Officer - Western Europe | Weeden, Kenneth |
| Leal, Oscar | SFGC Accounting | US TX Houston | Supervisor Corporate Accounting | Supervisor Corporate Accounting | Amadio, Henry |
| Ward, Pamela J. | SFGC Human Resources - North America | US TX Houston | Director | Director of Human Resources - North American Region | Boger, Daniel T. |
| Severtson, Anne M. | SFGC Accounting | US TX Houston | Business Systems Mgr | Business Systems Manager | Lopez, Gilbert |
| Davis, Rhonda L. | SGC Compliance | US TX Houston | Chief Compliance Officer | Chief Compliance Officer, SCM | Young, Bernard E. |
| Weeden, Kenneth | SFGC Research and Trading | US MS Tupelo | Managing Director/Research and Inv | Managing Director - Global Regional Research and Investments | Holt, Laura L. |

37

**KVT-3**



Shareholder Funding by Regions (incl. Airlines)

Shareholder Funding by Month 2007-2008

Shareholder Funding, Assumption of Debt and Notes Payable Acct.
As of 12/31/08 (Preliminary)

38

187

**KVT-4**

# KVT-4

| ID | Name | Accounts[1] | SIB CD Proceeds [2] |
|---|---|---|---|
| 1 | RODRIGO RIVERA ALCAYAGA | NJL022799, NJL009309 | $    721,004 |
| 2 | TOCHAS TRUST | NJL022799, NJL009309 | 100,152 |
| 3 | TOCHAS TRUST AND RODRIGO ALCAYAGA | NJL022799, NJL009309 | 515,629 |
| 4 | JONATHAN LARKIN STOCK TRUST AND JONATHAN LARKIN | 5LW401871 | 262,926 |
| 5 | ATP TOUR, INC. | NMY118075 | 3,438,706 |
| 6 | JOSEPH R. BECKER AND LOLINE BECKER | NJG005253, NJG003340, NMW013542 | 372,225 |
| 7 | JOEL HENRY ORY | NMW025280 | 104,549 |
| 8 | PATRICIA A. THOMAS | NJL028432, NJL028374 | 3,761,189 |
| 9 | STEVEN RIGER AND LINDA RIGER | NMZ001312 | 317,729 |
| 10 | RAY A. BALLANTYNE | NMY120550 | 183,435 |
| 11 | RAY A. BALLANTYNE AND KAREN BALLANTYNE | NMY120550 | 915,748 |
| 12 | GERARD A. DOWD | NJB010175 | 134,800 |
| 13 | HANNAH K. PECK | 0C9605175 | 122,395 |
| 14 | PECK FAMILY TRUST | 0C9605175 | 8,941 |
| 15 | STEPHEN M. BINGHAM | NJL003195 | 107,271 |
| 16 | DAVID A. RUBIN | NMY116863 | 8,455 |
| 17 | DAVID A. RUBIN AND DAWN L. RUBIN | NMY116863 | 370,333 |
| 18 | DEBRA S. GIBBS | NMY136036 | 234,000 |
| 19 | CAMILLE C. WOOD | NMW004764 | 181,305 |
| 20 | ARTHUR J. ORDOYNE | NJG005865 | 301,706 |
| 21 | AARON FOLSE | NJG002342, STSGC40612 | 603,925 |
| 22 | TERRY FOLSE | NJG002342, STSGC40612 | 53,992 |
| 23 | CHRIS SWINDELL | NJG006343, NMW014755 | 192,352 |
| 24 | JEFFREY J. CAMPBELL | NM4011943 | 189,828 |
| 25 | MICHAEL E. STAID | STSGC40951, NMW012767 | 561,656 |
| 26 | WILLIAM C. DAWSON | NMW012080, NMW002800 | 421,497 |
| 27 | LUISA DE LICHI AND JAIME LICHI COHEN AND REBECA LICHI COHEN AND JACOBO LICHI COHEN AND SARA LICHI COHEN | NMY008714 | 10,537 |
| 28 | MATEO LICHI S. AND LUISA DE LICHI AND JAIME LICHI COHEN AND REBECA LICHI COHEN AND JACOBO LICHI COHEN AND SARA LICHI COHEN | NMY008714 | 143,003 |
| 29 | MATEO LICHI S. AND LUISA DE LICHI AND JAIME LICHI COHEN AND REBECA LICHI COHEN AND JACOBO LICHI COHEN AND SARA LICHI COHEN AND EDITH BOGUSKY BEAUJON | NMY008714 | 92,826 |
| 30 | MARTHA J. WITMER | NJG007259 | 284,149 |
| 31 | MYRNA PLATKIN | NJJ002042 | 132,541 |
| 32 | JOHN S. WATTS JR | NJB014201 | 1,054,866 |
| 33 | ALISON LEFFLER | NNC010084 | 106,734 |
| 34 | FRED R. DEMAREST | NJG006277 | 115,625 |
| 35 | JUDITH H. MCCUTCHEON TRUST AND JUDITH H. MCCUTCHEON | NJH310421 | 104,184 |
| 36 | CARROLL D. LEU | NJE260504 | 117,351 |
| 37 | ROBERT J. BRUNO | NMW015158 | 582,264 |
| 38 | ROBERT J. WINTERS AND DARLENE P. WINTERS | NJM027888 | 257,680 |
| 39 | TIMOTHY A. JOHNSON | NMY018887, NMY018861 | 852,446 |
| 40 | PAULA MARLIN | NNC011041 | 663,504 |
| 41 | PHILIP M. ZIMMERMAN AND JENNIFER B. ZIMMERMAN | NMW018517 | 260,031 |

Notes:
1. Accounts with a prefix of "S" are Stanford Trust Company Accounts.
2. The entries on this schedule correspond to the names on the SIBL accounts that received CD proceeds. A given name may appear more than once on this schedule because that name is on more than one SIBL account.

**39**

# KVT-4

| ID | Name | Accounts[1] | SIB CD Proceeds [2] |
|---|---|---|---|
| 42 | KATHLEEN C. DUGGAN AND GEORGE T. DUGGAN | NM4013899 | 293,905 |
| 43 | ROGER LEE HECKMAN | NJL029042 | 14,394 |
| 44 | ROGER LEE HECKMAN AND BRENDA G. HECKMAN | NJL029042 | 222,127 |
| 45 | WYLLY M. GUTERMAN | NJK511669 | 249,873 |
| 46 | JAMES R. CALVIN | NJG008307 | 180,000 |
| 47 | GAINES D. ADAMS | NJJ060586, NJJ002331 | 455,273 |
| 48 | DONNA W. ALLBRITTON | NJJ060404 | 184,221 |
| 49 | JOHN F. THOMPSON | NMY125369 | 969,955 |
| 50 | PETER A. THEVENOT | NJG001203 | 179,338 |
| 51 | DON PARKINSON AND MARILYN PARKINSON | NJD001065, NJB063273, NJA012347, NJA001365 | 19,045 |
| 52 | MARILYN PARKINSON | NJD001065, NJB063273, NJA012347, NJA001365 | 121,254 |
| 53 | INVHERNAR, INC. AND RODRIGO HERNANDEZ | NWR005112 | 420,684 |
| 54 | DORRIS AND LULA BURCHETT TRUST AND DORRIS BURCHETT AND LULA BURCHETT | NJM010991 | 314,618 |
| 55 | BARBARA MILLER OSTROW | NJM028126, NJJ005748 | 102,439 |
| 56 | HENRY A. MENTZ III | NMY100297 | 706,709 |
| 57 | JAMES H. STEGALL | NJG006574 | 163,374 |
| 58 | JAMES H. STEGALL AND CAROL H. STEGALL | NJG006574 | 41,862 |
| 59 | EUGENE D. GAUTHREAUX | NJJ010854 | 104,314 |
| 60 | SUE CHRIS GAUTHREAUX | NJJ010854 | 174,200 |
| 61 | PHYLLIS ETCHEISON TRUST AND PHYLLIS ETCHIESON | NJV002790 | 110,000 |
| 62 | KAVBEL CORP LIMITED | NMY106229 | 124,990 |
| 63 | RA AND FARALL D. CANNING TRUST A AND RA CANNING AND FARALL D. CANNING | NMX011776, NMX011750 | 813,206 |
| 64 | RA AND FARALL D. CANNING TRUST C AND RA CANNING AND FARALL D. CANNING | NMX011776, NMX011750 | 548,942 |
| 65 | MICHAEL A TEAGUE | NMW013716 | 116,732 |
| 66 | JONATHAN IVESTER | NJH001053 | 174,308 |
| 67 | BONNIE CAPSUTO AND ALLEN CAPSUTO | NJB013856 | 1,276,115 |
| 68 | AYG INVESTMENT, LTD. | NMY100313 | 224,328 |
| 69 | CARL M. WEBB III | NMY102947 | 125,392 |
| 70 | DICK COPELAND REV TRUST AND DICK COPELAND | 5LW400121 | 65,048 |
| 71 | DICK COPELAND TRUST AND DICK COPELAND | 5LW400121 | 70,082 |
| 72 | EFRAIN DOS SANTOS MARQUEZ | NWR004347 | 320,937 |
| 73 | PHILIP M. PELTZ | NMW008740, NMW001703 | 123,085 |
| 74 | YOLANDA A. VALDES | NMY011692 | 7,637 |
| 75 | YOLANDA A. VALDES REVOCABLE TRUST AND YOLANDA A. VALDES | NMY011692 | 318,127 |
| 76 | DAVID TOPP AND DORA TOPP | NMY013722, NMY011676 | 598,648 |
| 77 | SHANNON S. BUNDICK | STSGC41087, NMW030181 | 405,289 |
| 78 | BENNIE M. O'REAR | NMW003626 | 132,148 |
| 79 | BENNIE M. O'REAR AND CLAUDIA P. O'REAR | NMW003626 | 54,794 |
| 80 | CHARLES B. THOMSEN AND LOIS ANN THOMSEN | NJL010638 | 646,590 |
| 81 | D. LEE SEAGER | NJL007592 | 105,803 |
| 82 | LINDA R. SEAGER | NJL007592 | 34,608 |
| 83 | JESUS GALARZA MARTIN AND MARIA ESPERANZA MARTELO DE GALARZA | NMY002311 | 252,375 |
| 84 | RENEE LEVINE | NJG002193 | 104,083 |
| 85 | DAVID M. BLAKE AND DIANE M. BLAKE | NMZ015718 | 123,233 |
| 86 | THOMAS W. SCHERER AND VIRGINIA A. SCHERER CRUT, THOMAS W. SCHERER AND VIRGINIA A. SCHERER | NJJ010847, NJJ010821 | 58,968 |
| 87 | VIRGINIA A. SCHERER | NJJ010847, NJJ010821 | 72,910 |
| 88 | DENNIS L. KIRBY | STSGC40214, NMW022782 | 580,959 |
| 89 | HOWARD BISSELL III | NJK510299 | 287,463 |

190

## KVT-4

| ID | Name | Accounts[1] | SIB CD Proceeds [2] |
|---|---|---|---|
| 90 | EARL L. CROSBY | NMW003592 | 175,276 |
| 91 | CATHERINE M. BRENNAN | NNC060394 | 282,381 |
| 92 | WILLIAM RONALD VAN DELL AND LORI G. VAN DELL | NMX010992 | 241,477 |
| 93 | MARK D. BUCKMAN | NJM022053 | 566,514 |
| 94 | EUGENE L. CROXTON JR. | NMW003550 | 161,805 |
| 95 | LEJEUNE T. MILLS AND GILBERT C. MILLS | NMW012304 | 381,354 [3] |
| 96 | KENNETH R. BIRD AND TERESA MICHELLE LAMKE | NMW003618 | 213,748 |
| 97 | DR. RICHARD RATHBONE PR | NMW002537 | 300,000 |
| 98 | GRACE CHEN LEBLANC | NMY135897 | 144,542 |
| 99 | GORDON C. GILL | NMY126359 | 278,986 |
| 100 | VAHLE, INC. | NMY116723 | 124,016 |
| 101 | BRIAN U. LONCAR AND SUE A. LONCAR | 88761041 | 222,518 [4] |
| 102 | MABEL PINO | NJG002375 | 495,386 |
| 103 | SUNNER TRADING LIMITED | NJL027210 | 550,847 |
| 104 | ALBERTO LOPEZ ESPINOSA AND ANA LUISA DE LA ROSA DE LOPEZ | NMY107227 | 231,831 |
| 105 | SHARON J. WITMER AND WALTER BRUCE STONE | NJG005196 | 383,875 |
| 106 | WALTER BRUCE STONE | NJG005196 | 3,500 |
| 107 | RISIA TOPP WINE | NMY013839 | 223,911 |
| 108 | BURNELL WILLIAMS | NJG006210, STSGC40224 | 200,739 |
| 109 | ERIKA TERESA HERRO | NJL028549 | 339,364 |
| 110 | TIMOTHY R. AND SANDRA E. MOORE FAMILY L. P AND TIMOTHY R. MOORE AND SANDRA E. MOORE | NMY019984 | 131,097 |
| 111 | MELVIN WIDES REVOCABLE TRUST AND MELVIN WIDES | 0C9403746 | 261,290 |
| 112 | EISEMANN DEFINED BENEFIT PLAN | NJL026501 | 35,764 |
| 113 | EISEMANN LIMITED | NJL026501 | 107,717 |
| 114 | MICHAEL L. EISEMANN AND LINDA G. EISEMANN | NJL026501 | 136,680 |
| 115 | BETTE JO HEASLIP | NMW015091 | 703,433 |
| 116 | TERRY N. TULLIS | STSGC40336, NMW023418 | 449,245 |
| 117 | HUTCH INVESTMENTS LLC | 5LW001481 | 308,452 |
| 118 | CINDY DOLESHEK | NM4013717 | 161,759 |
| 119 | GARY W. MCKILLIPS AND ANNE H. MCKILLIPS | NJB011249 | 537,739 |
| 120 | FRANK MASSAD AND JO ANN MASSAD | NMY021691 | 107,793 |
| 121 | LYDA D. TYMIAK | NMZ019033, NJV003731 | 394,124 |
| 122 | LYDA D. TYMIAK FAMILY TRUST AND LYDA D. TYMIAK | NMZ019033, NJV003731 | 176,422 |
| 123 | SAMUEL R. MOORE AND MARTHA W. MOORE | NNC010092 | 218,045 |
| 124 | RONALD R. MARSTON | NJG001484 | 474,012 |
| 125 | RONALD R. MARSTON AND SUSAN D. MARSTON | NJG001484 | 257,907 |
| 126 | JOHN BUSCEME AND VIRGINIA B. BUSCEME | NJG001179 | 5 |
| 127 | JOHN C. BUSCEME | NJG001179 | 448,235 |
| 128 | MARK STEPHENS AND JO LYNN STEPHENS | NMW008021 | 198,743 |
| 129 | DIVO MILAN HADDAD | NWR002184 | 560,133 |
| 130 | INFINITUM TRUST AND DIVO MILAN HADDAD | NWR002184 | 1,961,857 |
| 131 | MARIA DE LOURDES MARTINEZ DE SIDNEY AND MARIE ROCHELLE SIDNEY MARTINEZ | NWR002184 | 19,161 |
| 132 | MARIE ROCHELLE SIDNEY MARTINEZ | NWR002184 | 9,372 |
| 133 | MARIE ROCHELLE SIDNEY MARTINEZ AND DIVO MILAN HADDAD | NWR002184 | 8,984 |

Notes:
3. Lejeune T. Mills and Gilbert C. Mills have executed a stipulation. They have transferred to the Receiver's escrow account only $101,353.96 of the SIBL proceeds amount; their Pershing account also remains held.
4. Figures based on SGC accounts residing at JPMorgan.

**41**

# KVT-4

| ID | Name | Accounts[1] | SIB CD Proceeds[2] |
|---|---|---|---|
| 134 | ALFREDO PARRA DAVILA | NMY006759 | 515,000 |
| 135 | STEVEN SILVERMAN TRUST AND STEVEN SILVERMAN | 5LW003446 | 209,033 |
| 136 | BARRY L. RUPERT AND CAROL S. RUPERT | NJH001244 | 186,410 |
| 137 | LOUISE A. HARDIN LIVING TRUST AND LOUISE A HARDIN | NJJ110498 | 115,667 |
| 138 | ANGELO A. PATERNOSTRO AND MARY ANN PATERNOSTRO | NJG004355 | 607,835 |
| 139 | THERESA M. JAMAIL | NMY021659 | 376,554 |
| 140 | SCOTT L. CLARK REV TRUST AND SCOTT L. CLARK | NJK510802 | 1,155,041 |
| 141 | ROBERT APPELMAN | NM2003470, NM2002712 | 442,908 |
| 142 | ABM REVOCABLE TRUST AND ALVARO BUENDIA | NM2011846 | 321,845 |
| 143 | ALVARO BUENDIA | NM2011846 | 22,313 |
| 144 | CLAUDIA GALLAGHER AND CLAUDE MAYALL AND ANNE MAYALL | NMY103515 | 121,837 |
| 145 | RAMON MALCA | NMY060913 | 153,659 |
| 146 | BRUCE E. MCLEOD | NJG004009, NMW001398 | 773,174 |
| 147 | AMARA TRUST | NMZ023324 | 399,949 |
| 148 | DOCTORS DIAGNOSTICS IMAGING | NJV003129 | 177,421 |
| 149 | ERIC A. ORZECK | NMY011999, NJL009465, NJL005695 | 465,412 |
| 150 | DEWAYNE WASHINGTON REV TRUST AND DEWAYNE WASHINGTON | 5LW401798 | 260,868 |
| 151 | NANCIANN EAMES | NMY136721, NMY136317, NMY136283, NMY136002, NMY120881 | 145,080 |
| 152 | RICHARD D. EAMES | NMY136721, NMY136317, NMY136283, NMY136002, NMY120881 | 193,230 |
| 153 | RICHARD DENNIS EAMES AND NACIANN EAMES | NMY136721, NMY136317, NMY136283, NMY136002, NMY120881 | 198,935 |
| 154 | JANE M. PRIDGEN AND ROBERT GRAY MATLOCK | NJM029942 | 185,772 |
| 155 | JASON SCOTT GRAHAM | NJG003886 | 921,005 |
| 156 | ROBERT E. GRAHAM | NJG003936 | 1,005,511 |
| 157 | GROVEMILL HOLDINGS LIMITED | NJL027491 | 384,954 |
| 158 | EDWARD F. BLIZZARD AND CYNTHIA H. BLIZZARD | NMY010272 | 516,631 |
| 159 | FRANCIS NEZIANYA | NMW015497 | 301,636 |
| 160 | WILLIAM S. FLORES JR. AND MARY G. FLORES | NJE260256 | 100,000 |
| 161 | ELECTRI INTERNATIONAL | NJV002881 | 100,329 |
| 162 | RICHARD AND DARLENE MCBRIDE | NJV002881 | 4,604 |
| 163 | HMS AND B, LTD | NJL021551 | 175,000 |
| 164 | DARIO FALLAS AND PAOLA FALLAS | NMZ006394 | 107,546 |
| 165 | HECTOR JOSE PEREZ MORA AND RAFAEL JESUS PEREZ PERDOMO | NMZ006394 | 78,000 |
| 166 | HECTOR PEREZ MORA | NMZ006394 | 298,772 |
| 167 | RONALD B. YOKUBAITIS AND CAROLYN M. YOKUBAITIS | NJH310512 | 100,000 |
| 168 | EMMA LEE LEFEBVRE | NMW019440 | 205,982 |
| 169 | LARRY N. SMITH | STSGC40765 | 485,679 |
| 170 | MURPHY BUELL | STSGC41108 | 417,216 |
| 171 | ROSA MARIBEL OYERVIDES | NWR002663 | 5,036,240 |
| 172 | CHARLES L. WHITE | STSGC40438, NMW024820 | 558,814 |
| 173 | MELVIN MICHEL MARGULES BENHAMOU | NWR005906 | 792,024 |
| 174 | MELVIN MICHEL MARGULES BENHAMOU AND ESTELLE ESTHER BENHAMOU | NWR005906 | 131,047 |
| 175 | EDWARD C. DWECK | NM2003553 | 1,138,693 |
| 176 | ALLEN SCHWARTZ | STSGC40370, NMZ017011, NMZ010511 | 134,775 |

# KVT-4

| ID | Name | Accounts[1] | SIB CD Proceeds [2] |
|----|------|---------|--------------------|
| 177 | THE ANTHONY JOSEPH ANTINORI TRUST AND ANTHONY JOSEPH ANTINORI; AND STEVEN JAMES ANTINORI IN HIS CAPACITY AS TRUSTEE OF THE ANTHONY JOSEPH ANTINORI TRUST | NMY114819, NJL027673, NJL027665 | 1,107,109 |
| 178 | THE STEVEN JAMES ANTINORI TRUST AND STEVEN JAMES ANTINORI | NMY114819, NJL027673, NJL027665 | 3,973,548 |
| 179 | MARIA GUADALUPE MENDOZA AND GUILLERMO HOLMQUIST | NMY001305 | 8,504 |
| 180 | MARIA GUADALUPE MENDOZA ROMERO | NMY001305 | 842,001 |
| 181 | MARIA SOCORRO CELIA ROMERO DE MENDOZA AND MARIA GUADALUPE MENDOZA | NMY001305 | 64,500 |
| 182 | ADRIANA RAMOS | NMY108266 | 96,666 |
| 183 | AYALA TRUST | NMY108266 | 288,000 |
| 184 | EDUARDO SERRANO BERRY | NMY108266 | 430,000 |
| 185 | HECTOR TROCATT AND ADRIANA RAMOS | NMY108266 | 9,802 |
| 186 | JOSE ANTONIO VIGORENA | NMY108266 | 177,500 |
| 187 | JOSE ANTONIO VIGORENA AND ADRIANA RAMOS | NMY108266 | 530,000 |
| 188 | JAMIE COHEN BENREY AND SUSANA PEREZ DE COHEN | NWR003364 | 2,398,317 |
| 189 | GENE CAUSEY | NJG006350, STSGC40170, NMW042665, NMW030769, NMW009649 | 613,289 |
| 190 | KENNETH W. DOUGHERTY | STSGC40400, NMW024275 | 641,527 |
| 191 | TERESA MEMUN DE ALFIE | NWR008272 | 276,091 |
| 192 | FRANKLIN HOWARD STANSEL | NJL028952 | 202,442 |
| 193 | VINETA P. STANSEL AND HOWARD STANSEL | NJL028952 | 256,161 |
| 194 | WESTERN INTERNATIONAL ADVISOR CORP, LTD. S.A. | NWR007696 | 46,010 |
| 195 | WESTERN INTERNATIONAL ADVISOR CORP, LTD. | NWR007696 | 332,906 [5] |
| 196 | WESTERN INTERNATIONAL FINANCIAL CORP, LTD. S.A. | NWR007696 | 58,010 [6] |
| 197 | WESTERN INTERNATIONAL FINANCIAL CORP, LTD. | NWR007696 | 196,896 [7] |
| 198 | ABRAHAM DIAMANT | NWR001475 | 584,785 |
| 199 | LUIS MIGUEL HERNAIZ VIGIL | NMY123166, NMY123125, NJL001199 | 704,735 |
| 200 | ROSA M. HERNAIZ | NMY123166, NMY123125, NJL001199 | 912,618 |
| 201 | HERMAN A. STONE | NJK512733 | 715,241 |
| 202 | PACESETTER ADJUSTMENT COMPANY | NMW011892, NMW011074, NMW001083, NJG007838 | 2,443,956 |
| 203 | KRIMICH LTD. | NWR007431 | 2,634,000 |
| 204 | MARIA TERESA SAN SEBASTIAN DE VALLE AND JOSE MARIA VALLE ESCAMEZ | NWR007431 | 200,000 |
| 205 | JULIO C. RUIZ AND NELLYFER FERRER | NWQ002102 | 4,808,251 |
| 206 | MELVIN S. TAUB AND CAROL TAUB | NJF001535 | 1,065,959 |
| 207 | KEVIN A. MCKENZIE AND DENISE T. MCKENZIE | NNC010100 | 806,974 |
| 208 | DON G. LANDERS | NJG005584, NMW040636, NMW028243, NMW002347 | 803,134 |
| 209 | MALCOLM SPILLERS | STSGC41141, NMW031056 | 589,591 |
| 210 | CYNTHIA R. MORIARTY | NMY118240, NJL021262, NJL007345 | 451,101 |
| 211 | MARY JANE BAXTER AND WILLIAM A. BAXTER | 5LW400592 | 468,862 |
| 212 | CELINA TRUST | NYQ001654 | 1,090,910 |

Notes:

5. This amount includes $42,010 transferred from SIB accounts in the name of Western International Advisor Corp. Ltd. to Pershing accounts in the name of Lukas Corp. This amount is also reflected in the proceeds amount for Lukas Corp.

6. This amount includes $15,000 transferred from SIB accounts in the name of Western International Financial Corp. Ltd. S.A. to Pershing accounts in the name of Gatita Blanca. This amount is also reflected in the proceeds amount for Gatita Blanca.

7. This amount includes $32,010 transferred from SIB accounts in the name of Western International Financial Corp. Ltd. to Pershing accounts in the names of Gatita Blanca and Lukas Corp. This amount is also reflected in the proceeds amounts for Gatita Blanca and Lukas Corp.

## KVT-4

| ID | Name | Accounts[1] | SIB CD Proceeds [2] |
|----|------|------------|------------------|
| 213 | ANTHONY G. PARKER | STSGC40210-1, STSGC40210 | 1,003,163 |
| 214 | SALT POND ASSOCIATES | NMZ018753 | 38,077 |
| 215 | SETTLER'S HILL L.P. AND MARY HOLMES | NMZ018753 | 1,585,423 |
| 216 | THE AMH TRUST AND MARY L. HOLMES | NMZ018753 | 570,233 |
| 217 | THE JLH TRUST | NMZ018753 | 23,469 |
| 218 | THE JLH TRUST AND THE JNH TRUST | NMZ018753 | 569,231 |
| 219 | THE JNH TRUST | NMZ018753 | 569,877 |
| 220 | THE KEH TRUST | NMZ018753 | 570,526 |
| 221 | THE MAH TRUST | NMZ018753 | 570,573 |
| 222 | THE TCH TRUST | NMZ018753 | 885,244 |
| 223 | THOMAS R. HOLMES AND MARY L. HOLMES | NMZ018753 | 518,910 |
| 224 | WATKINS FAMILY LTD. PARTNERSHIP | NJJ004709, NJJ010227, NJM011890 | 2,158,527 |
| 225 | SINGAPORE PUNTAMITA PTE., LTD. | NWR006581 | 7,907,121 |
| 226 | JAMES E. BROWN SR. | STSGC40551, NMW025470 | 590,387 |
| 227 | CARLOS LANDEROS GALLEGOS AND MARIA DE JESUS LANDEROS GALLEGOS | NWR008439 | 268,000 |
| 228 | DENNIS CHILDRESS | STSGC40392, NMW023574 | 646,426 |
| 229 | THOMAS W. SLAUGHTER | STSGC40109 | 634,482 |
| 230 | CHARLES E. SMITH | STSGC40584, NMW025645 | 486,996 |
| 231 | BREWER & PRITCHARD, PC | NMY015594, NMY015578, NMY008953, NJL028671, NJL028531, NJL021775 | 774,586 |
| 232 | THOMAS PRITCHARD | NMY015594, NMY015578, NMY008953, NJL028671, NJL028531, NJL021775 | 84,410 |
| 233 | HARDEE M. BRIAN AND BETTY JO BRIAN | NMW039612 | 600,504 |
| 234 | YOUNG FAMILY CEMETARY TRUST | NMW039612 | 15,000 |
| 235 | ANDREW BYRON WINKLE | NJL023631 | 167,001 |
| 236 | ANDREW BYRON WINKLE AND ROCIO DEL CARMEN WINKLE | NJL023631 | 228,147 |
| 237 | ANNA SANDRA SANTORO TEPEDINO AND VALENTINA MASTROPASQUAS AND ROSA TEPEDINO DE SANTORO | NJL023631 | 38,000 |
| 238 | ALBERTO JAVIER BOTELLO REED | NWR008231, NWR002531 | 1,758,109 |
| 239 | SILVIA GUADALUPE TAMEZ DE BOTELLO | NWR008231, NWR002531 | 3,295,520 |
| 240 | JOSE ANTONIO MONROY CARRILLO | NMY108969 | 1,054,440 |
| 241 | ADRIANA ZARAGOZA DELGADO | NJL026667, NJL026642 | 3,190,440 |
| 242 | NICHOLAS J. LANZA JR. | NMY060087, NMY011221, NJL010141, NJL010067 | 193,955 |
| 243 | NICHOLAS J. LANZA JR. AND BRENDA C. LANZA | NMY060087, NMY011221, NJL010141, NJL010067 | 789,137 |
| 244 | ARCHIE SMITH | STSGC41086, NMW030041 | 510,999 |
| 245 | RICHARD S. FEUCHT | STSGC40209, NMW022790 | 486,119 |
| 246 | RICHARD S. FEUCHT AND JOAN A. FEUCHT | STSGC40209, NMW022790 | 63,745 |
| 247 | ELSIE M. PEREZ | NMZ023183 | 375,171 |
| 248 | ANGEL SALVADOR SCOTTI MATA AND TERESA BAVIELLC DE SCOTTI | NWR005583, NWR005575 | 1,017,775 |
| 249 | MARIANO JOSE SCOTTI MATA | NWR005583, NWR005575 | 1,004 |
| 250 | MARIANO JOSE SCOTTI MATA AND MARIANO JOSE SCOTTI | NWR005583, NWR005575 | 1,053,047 |
| 251 | ROBERT B. CRAWFORD JR. AND JODIE F. CRAWFORD | NMW015729 | 322,198 |
| 252 | DONNA M. VINES | STSGC41328, NMW011389 | 346,143 |
| 253 | DOROTHY M. SELIB TRUST AND DOROTHY M. SELIB | STCI10015, STBR10056, STBR10055 | 126,627 |
| 254 | MARTHA J. CRUMPLER JOHNSON | STSGC20071 | 329,726 |
| 255 | BENTON B. JOHNSON TEST TR II AND BENTON B. JOHNSON | STSGC20072 | 493,871 |
| 256 | JOHN F. LYNCH | STSGC41080, NMW041766 | 3,865,596 |
| 257 | ANTONIO G. PENDAS | STSGC40286 | 253,139 |
| 258 | MATTHEW DELLA POLLA AND NURIA PENDAS | STSGC40286 | 35,000 |

## KVT-4

| ID | Name | Accounts[1] | SIB CD Proceeds [2] |
|----|------|----------|---------------------|
| 259 | KENNETH G. WILKEWITZ | STSGC40167 | 112,314 |
| 260 | DANIEL JOSEPH DAIGLE AND JILDA ANN DAIGLE | STSGC40767 | 206,065 |
| 261 | JILDA A. DAIGLE | STSGC40767 | 76,599 |
| 262 | JOSEPH W. STRENGTH | STSGC41060 | 525,341 |
| 263 | PHILLIP E. LANKFORD JR. | STSGC40193 | 628,592 |
| 264 | JOHN E. WILSON | STSGC41160 | 405,074 |
| 265 | CLAUDE M. NEEDHAM | STSGC40132 | 393,458 |
| 266 | ROBERT SOULE | STSGC40189 | 457,234 |
| 267 | SANDRA F. HARRELL | STSGC40156 | 404,588 |
| 268 | JOSEPH A. CHUSTZ | STSGC41151 | 598,797 |
| 269 | LARRY W. PERKINS | STSGC41127 | 427,641 |
| 270 | LAURA JEANETTE N. LEE | STSGC40137 | 525,006 |
| 271 | JUANITA QUINEALTY | STSGC40685 | 119,446 |
| 272 | CHARLES R. SANCHEZ AND MAMIE C. SANCHEZ | STSGC40268 | 74,261 |
| 273 | CHARLES R. SANCHEZ SR. | STSGC40268 | 368,347 |
| 274 | MAMIE C. SANCHEZ | STSGC40268 | 74,502 |
| 275 | CHERYL B. WATTS | STSGC40276, STSGC40275 | 83,688 |
| 276 | THURSTON WATTS JR. | STSGC40276, STSGC40275 | 136,172 |
| 277 | THURSTON WATTS JR. AND CHERYL B. WATTS | STSGC40276, STSGC40275 | 713,574 |
| 278 | TARRAL E. DAIGLE | STSGC40155 | 407,361 |
| 279 | RICHARD A. DEVALL | STSGC40346, STSGC40334 | 323,730 |
| 280 | RICHARD DEVALL AND SUE M. DEVALL | STSGC40346, STSGC40334 | 112,175 |
| 281 | SUE M. DEVALL | STSGC40346, STSGC40334 | 116,967 |
| 282 | MONTY M. PERKINS | STSGC40410 | 129,492 |
| 283 | CHARLIE L. MASSEY | STSGC40145 | 390,809 |
| 284 | WILLIAM E. ENSMINGER | STSGC40238 | 154,846 |
| 285 | ARISTIDE TRELOAR | STSGC40208 | 650,430 |
| 286 | MICHAEL J. DRAGO | STSGC40114 | 593,268 |
| 287 | JIMMY QUEBEDEAUX | STSGC40538 | 330,756 |
| 288 | JUDITH P. SIMMONS | STSGC41198 | 422,749 |
| 289 | AUDREY LETARD | STSGC40435, STSGC40163 | 73,263 |
| 290 | JUDY A. VARNADO AND PATRICIA A. ALLISON AND AUDREY A. LETARD | STSGC40435, STSGC40163 | 192,008 |
| 291 | PATRICIA A. ALLISON | STSGC40435, STSGC40163 | 78,919 |
| 292 | GWENDOLYN E. FABRE | STSGC40758 | 355,934 |
| 293 | CLYDE ANDERSON | STSGC40092, NMW020315 | 704,867 |
| 294 | JOHN O. LETARD | NMW027559, NMW002271 | 900,452 |
| 295 | HERMAN J. MILLIGAN JR. | STSGC40387 | 1,259,160 |
| 296 | RONALD W. VALENTINE | STSGC41312 | 347,071 |
| 297 | KERRY R. KLING | STSGC41278 | 544,863 |
| 298 | CHARLES A. JAMES | STSGC41252 | 360,149 |
| 299 | EMOLYN L. WATTS | STSGC40344 | 364,391 |
| 300 | LYNN G. GILDERSLEEVE | STSGC41030 | 53,776 |
| 301 | ROBERT GILDERSLEEVE JR. TRUST AND ROBERT GILDERSLEEVE JR. | STSGC41030 | 10,689 |
| 302 | ROBERT V. GILDERSLEEVE JR. | STSGC41030 | 80,333 |
| 303 | WILLA MAE GILDERSLEEVE | STSGC41030 | 171,597 |
| 304 | WILLA MAE GILDERSLEEVE AND LYNN G. GILDERSLEEVE | STSGC41030 | 163,926 |
| 305 | OLIVIA S. WARNOCK | STSGC40934 | 392,684 |
| 306 | KATHLEEN F. MELILLI | STSGC40284 | 298,965 |
| 307 | JOHN E. TAYLOR | STSGC40601 | 639,110 |
| 308 | ARTHUR R. WAXLEY JR. | STSGC40444 | 616,268 |
| 309 | ROBERT YOUNG JR. | STSGC40820 | 360,477 |
| 310 | DOROTHEA M. YOUNG | STSGC40819 | 124,680 |
| 311 | GLENDA D. THOMAS | STSGC41345 | 682,331 |
| 312 | DOT G. MELDER | STSGC41161 | 70,792 |

# KVT-4

| ID | Name | Accounts[1] | SIB CD Proceeds [2] |
|---|---|---|---|
| 313 | JACK W. MELDER | STSGC41161 | 2,200 |
| 314 | JACK W. MELDER AND DOT G. MELDER | STSGC41161 | 433,163 |
| 315 | JOHN D. COOPER | NJG005394, STSGC40347-1 | 619,750 |
| 316 | DARRELL D. COURVILLE | STSGC40105, NMW043226, NMW021297, NMW010324, NMW003857 | 685,960 |
| 317 | DENNIS LANTRIP | STSGC40611 | 477,927 |
| 318 | TROY L. LILLIE JR. | STSGC40384 | 954,310 |
| 319 | ROBERT L. BUSH | STSGC40746 | 826,384 |
| 320 | DOROTHY T. DUNCAN | STSGC40138 | 564,694 |
| 321 | JOHN R. HOLGUIN | STSGC40586 | 660,144 |
| 322 | JOHN G. COHRON | STSGC40249 | 103,321 |
| 323 | JOHN GLEN COHRON | STSGC40249 | 76,844 |
| 324 | BARBARA ANTHONY | STSGC40216-1, STSGC40216 | 345,382 |
| 325 | MICHAEL R. HOLCOMB | STSGC40989 | 278,364 |
| 326 | EDGAR THERON OVERLAND | STSGC41214 | 416,269 |
| 327 | JOHNNIE A. GRIFFITH | STSGC41074 | 504,428 |
| 328 | GARY WOOD | STSGC40515 | 641,620 |
| 329 | AZALEA REST CEMETARY INC. IRREV TRUST, AZALEA REST CEMETARY INC., AND GEORGE B. ANNISON, IN HIS CAPACITY AS TRUSTEE OF AZALEA REST CEMETARY INC. IRREV TRUST | STSGC20113 | 78,985 |
| 330 | GEORGE BUR ANNISON AND DIANE B. ANNISON | STSGC20113 | 1,402,295 |
| 331 | REUEL L. ANDERSON | STSGC20073 | 234,288 |
| 332 | REUEL L. ANDERSON JR. | STSGC20073 | 879,673 |
| 333 | JAMIE/NICKY CARR INS. TRUST AND JAMIE CARR AND NICKY CARR | STSGC20062 | 208,100 |
| 334 | BARBARA RATHBONE AGENCY | STBR10005 | 15,603 |
| 335 | BARBARA V. RATHBONE | STBR10005 | 76,031 |
| 336 | BARBARA V. RATHBONE CRT AND BARBARA V. RATHBONE | STBR10005 | 283,946 |
| 337 | AUBREY O'NEAL CLEMENT | NGW352257 | 8,524,408 |
| 338 | BLUFF CREEK REDI-MIX, INC. | NJG004066, NMW020539, NMW009169 | 114,563 |
| 339 | FLEN ROCK COMPANY, LLC. | NJG004066, NMW020539, NMW009169 | 234,750 |
| 340 | FLENIKEN SAND & GRAVEL, INC. | NJG004066, NMW020539, NMW009169 | 107,944 |
| 341 | LYMAN L. FLENIKEN JR. | NJG004066, NMW020539, NMW009169 | 186,097 |
| 342 | CALVIN DARDEN | NJB010258 | 350,000 |
| 343 | GENESIS TODAY, INC. | NMX012329 | 3,500,000 |
| 344 | MARY MENDOZA DE CAPRILES | NMZ006246 | 157,857 |
| 345 | TULIO M. CAPRILES | NMZ006246 | 119,231 |
| 346 | GATITA BLANCA | NWR007415, NWR002135 | 37,010 [8] |
| 347 | LAURA ROZANES LOMBROZO AND MOISES BOGOMOLNY HOP | NWR007415, NWR002135 | 19,112 |
| 348 | LUKAS CORP. | NWR007415, NWR002135 | 392,495 [9] |
| 349 | BELRON INVESTMENTS LIMITED | NMY101303 | 2,105,198 |
| 350 | RICHARD A. ARKIN AND KAREN J. ARKIN | NM2002365 | 227,908 |
| 351 | ROSS D. BRUCE AND MARSHA C. BRUCE | NMW028011 | 564,992 |
| 352 | PEGGY PAYNE MORAGNE | NMW002172 | 401,818 |
| 353 | DAVID BRUCE EZARIK | NJL024720 | 297,613 |
| 354 | DONALD P. GRIFFITH | NMY125864, NJL009259 | 222,778 |
| 355 | LITHOTRIPSY, LTD. | NMY125864, NJL009259 | 175,057 |

Notes:

8. This amount reflects money transferred from SIB accounts in the names of Western International Financial Corp. Ltd. and Western International Financial Corp. Ltd. S.A. to Pershing accounts in the name of Gatita Blanca. This amount is also reflected in the proceeds amounts for Western International Financial Corp. Ltd. and Western International Financial Corp. Ltd. S.A.

9. This amount includes $52,010 transferred from SIB accounts in the names of Western International Financial Corp. Ltd. and Western International Advisor Corp. Ltd. to Pershing accounts in the name of Lukas Corp. This amount is also reflected in the proceeds amounts for Western International Financial Corp. Ltd. and Western International Advisor Corp. Ltd.

## KVT-4

| ID | Name | Accounts[1] | SIB CD Proceeds [2] |
|---|---|---|---|
| 356 | THE D.P. GRIFFITH FAMILY LIMITED PARTNERSHIP AND D.P. GRIFFITH | NMY125864, NJL009259 | 195,787 |
| 357 | THE K & K GRIFFITH, L.P. | NMY125864, NJL009259 | 276,405 |
| 358 | NEN FAMILY TRUST | 0C9405204 | 1,291,586 |
| 359 | CORPORATE HEALTHCARE MANAGEMENT DEF BEN PL AND CORPORATE HEALTHCARE MANAGEMENT | NMY100123 | 315,637 |
| 360 | PINOT HOLDINGS LIMITED | NMY018622, NJL027517 | 1,083,209 |
| 361 | JULIO SERGIO BUENO Y CADENA AND MARIA ELENA RAMIREZ DE BUENO | NMY119909 | 3,306,667 |
| 362 | MICHAEL A. SPEEG | STSGC40236-1, NMW012247 | 837,380 |
| 363 | JOHN G. DENISON AND KATHY R. DENISON | NJE262369 | 585,734 |
| 364 | DAVID S. CARROLL JR. AND DELAINE D. CARROLL | NJM022699 | 250,000 |
| 365 | GAIL G. MARQUETTE | NMW026858 | 108,783 |
| 366 | NUMA L. MARQUETTE | NMW026858 | 196,875 |
| 367 | PATRICIA W. HIRSCH | NMY112250, NJL021577, NJL007378 | 373,058 |
| 368 | PLATEAU TELECOMMUNICATIONS | NJE212265, NJE212257 | 4,188,567 |
| 369 | ROBERT C. WILLIAMS | NMY129932 | 263,728 |
| 370 | JORGE SOLORZANO Y MOSQUEDA | NMY008755 | 676,720 |
| 371 | ROBERT G. FESSLER 2001 INVESTMENTS TRUST AND ROBERT G. FESSLER | NJF010007, NJF001238, NM2010012 | 13,027,693 |
| 372 | MICHAEL J. TIMMONS | NJM029298 | 540,082 |
| 373 | BYRON A. RATLIFF | NJG004801 | 188,888 |
| 374 | SIDNEY HOLMES | NJL025305 | 125,000 |
| 375 | SIDNEY HOLMES AND VICKI E. HOLMES | NJL025305 | 25,000 |
| 376 | JEFF P. PURPERA JR. | NM4011851, NM4011117 | 597,693 |
| 377 | STEVEN J. BRADING AND SHARON K. BRADING | NJG004215 | 405,895 |
| 378 | BORDEAUX INVESTMENTS I C.V. | NMY136010, NMY135996, NMY135988, NMY135970, NMY020552, NMY020388, NMY020370, NJL029216, NJL029208, NJL029190, NJL029182, NJL029174, NJL029166 | 121,752 |
| 379 | BORDEAUX INVESTMENTS III C.V. | NMY136010, NMY135996, NMY135988, NMY135970, NMY020552, NMY020388, NMY020370, NJL029216, NJL029208, NJL029190, NJL029182, NJL029174, NJL029166 | 72,435 |
| 380 | BORDEAUX INVESTMENTS IX C.V. | NMY136010, NMY135996, NMY135988, NMY135970, NMY020552, NMY020388, NMY020370, NJL029216, NJL029208, NJL029190, NJL029182, NJL029174, NJL029166 | 43,642 |
| 381 | BORDEAUX INVESTMENTS X C.V. | NMY136010, NMY135996, NMY135988, NMY135970, NMY020552, NMY020388, NMY020370, NJL029216, NJL029208, NJL029190, NJL029182, NJL029174, NJL029166 | 12,018 |
| 382 | PROVENCE MANAGEMENT STICHTING I AND BORDEAUX INVESTMENTS I C.V. | NMY136010, NMY135996, NMY135988, NMY135970, NMY020552, NMY020388, NMY020370, NJL029216, NJL029208, NJL029190, NJL029182, NJL029174, NJL029166 | 7,423,766 |
| 383 | PROVENCE MANAGEMENT STICHTING III AND BORDEAUX INVESTMENTS III C.V. | NMY136010, NMY135996, NMY135988, NMY135970, NMY020552, NMY020388, NMY020370, NJL029216, NJL029208, NJL029190, NJL029182, NJL029174, NJL029166 | 4,836,717 |
| 384 | PROVENCE MANAGEMENT STICHTING IX AND BORDEAUX INVESTMENTS IX C.V. | NMY136010, NMY135996, NMY135988, NMY135970, NMY020552, NMY020388, NMY020370, NJL029216, NJL029208, NJL029190, NJL029182, NJL029174, NJL029166 | 2,858,196 |

## KVT-4

| ID | Name | Accounts[1] | SIB CD Proceeds [2] |
|---|---|---|---|
| 385 | PROVENCE MANAGEMENT STICHTING X AND BORDEAUX INVESTMENTS X C.V. | NMY136010, NMY135996, NMY135988, NMY135970, NMY020552, NMY020388, NMY020370, NJL029216, NJL029208, NJL029190, NJL029182, NJL029174, NJL029166 | 652,034 |
| 386 | RONALD E. WELLS | STSGC40564, NMW025413 | 544,643 |
| 387 | RONALD E. WELLS SR. AND LUTHER D WELLS | STSGC40564, NMW025413 | 288,992 |
| 388 | JAMES STANLEY HARRIS | NJG007200, NJG007192, NJG007127, NJG007119, NJG007101, NMW014540, NMW003261 | 1,574,390 |
| 389 | CECILIA VAISMAN VDA. DE CZUKERBERG | NWR002218 | 385,444 |
| 390 | SANFORD STEINBERG | STSGC40942 | 171,534 |
| 391 | GERALD S. PASTERNAK | NMZ011311, NMZ011113, NMZ010867, NJV002808 | 335,000 |
| 392 | BBRATSS PRODUCTIONS, INC. | NJG007150, NJG007143, NMW007239, NMW006462, NJG012432, NJG012416 | 108,658 |
| 393 | TIMOTHY RUSSELL RICKETTS AND ROSE S. RICKETTS | NJG007150, NJG007143, NMW007239, NMW006462, NJG012432, NJG012416 | 2,349,367 |
| 394 | GEORGANN MIRE | NJG001336, STBR20016 | 658,465 |
| 395 | JAMES S. COURIER | NJL001496 | 437,728 |
| 396 | TAHSIN YILMAZ KALKAVAN | NJF010106, NJF010098, NJF010072, NJF001071, NJF001014, N13010009 | 287,705 |
| 397 | MONROE J. RATHBONE | NJG001583, STSGC400801, NMW022766 | 1,697 |
| 398 | MONROE J. RATHBONE IV | NJG001583, STSGC400801, NMW022766 | 145,042 |
| 399 | GNOE C.V. | NMY004093, NJL008921, NJL002197 | 270,726 |
| 400 | DANIEL CHERNITZKY LASKY AND MERY MOTOLA COHEN DE CHERNITZKY | NWR003265 | 10,000 |
| 401 | R AND T CHERNY SISTERS INC. | NWR003265 | 1,619,865 |
| 402 | SAMUEL CHERNITZKY LIFSHITZ AND TERESA LASKY DE CHERNITZKY AND ESTEBAN CHERNITZKY LASKY AND DANIEL CHERNITZKY | NWR003265 | 60,000 |
| 403 | JAMES R. LAWSON | NNC010068, NJK560005, NJK511925 | 1,296,913 |
| 404 | ANTHONY J. VENTRELLA | STSGC41266 | 483,222 |
| 405 | RONALD W. PARKER | NMW022808 | 693,782 |
| 406 | JOSEPH R. THIBODEAUX AND SUSAN E. THIBODEAUX | NJG002458 | 189,661 |
| 407 | WALDMAN, LTD. | NMY100529, NJL027194 | 2,069,266 |
| 408 | THOMAS DE FRANCO JR. REVOCABLE TRUST AND THOMAS DE FRANCO JR. | 0C9600382 | 210,752 |
| 409 | RUBEN J. CRUZ | NJB011199 | 161,609 |
| 410 | STEPHEN J. BURNHAM | NJG003274, NJG002649, NJG002631, NMW007817 | 1,436,883 |
| 411 | JAMES D. SIMMONS | NMW024812 | 836,365 |
| 412 | PATRICK JOSEPH BOYLE AND LAURA MARGARET BOYLE | NMY001842 | 836,310 |
| 413 | CHERAY ZAUDERER HODGES | 88761010 | 506,027 [10] |
| 414 | LUTHER HARTWELL HODGES | 88761010 | 125,027 [10] |
| 415 | LUTHER HARTWELL HODGES AND CHERAY ZAUDERER HODGES | 88761010 | 1,849,647 [10] |
| 416 | MICHAEL A. HILLMAN AND DARLENE M. HILLMAN | NMW028623 | 2,207,940 |
| 417 | DELCO FINANCE, INC. | NMY106435 | 452,205 |
| 418 | DELCO FINANCE, INC. AND RIGOBERTO INIGUEZ | NMY106435 | 1,510,000 |
| 419 | ANTONIO SANCHEZ RAMOS | NMY121343 | 528,919 |
| 420 | GOLD WING PARTNERS | NM2010855 | 1,425,427 |
| 421 | ERIC TUCKER | NJM030312 | 156,101 |
| 422 | ERIC TUCKER AND JENNIFER TUCKER | NJM030312 | 91,414 |
| 423 | CURTIS COLLINS | NGW012539 | 1,752,103 |

Notes:
10. Figures based on SGC accounts residing at JPMorgan.

**48**

# KVT-4

| ID | Name | Accounts[1] | SIB CD Proceeds [2] |
|---|---|---|---|
| 424 | ROBERT S. GREER AND ALICE D. GREER | NM4210081 | 1,152,524 |
| 425 | JEAN G. MANCUSO AND LYDIA O. LEMOINE | NJG004397 | 31,866 |
| 426 | WILLIAM A. MANCUSO AND JEAN G. MANCUSO | NJG004397 | 178,427 |
| 427 | DR. CAROLYN VILLARRUBIA | NJL005026 | 154,602 |
| 428 | THE DAVIS REVOCABLE TRUST | NM4014012 | 857,661 |
| 429 | JAMES W. BORING JR. | NMW011702 | 612,235 |
| 430 | DAVID P. JOHNSON | NM4210057 | 749,579 |
| 431 | ELENA TRON DE ZEPEDA CARRANZA | NMY005611 | 2,424,189 |
| 432 | MAURICIO ZEPEDA CARRANZA | NMY005611 | 131,000 |
| 433 | ANASTACIO MOGOLLON TRUST AND ANASTACIO MOGOLLON | NYQ001134 | 502,544 |
| 434 | ARCHIE TRUST | NYQ001134 | 415,000 |
| 435 | YAIR SHAMIR AND ELLA SHAMIR | NJM007856 | 1,119,721 |
| 436 | ROBERT JUAN DARTEZ, LLC | NJG001617, NMW035743, NJG012549, NJG010097 | 1,689,212 |
| 437 | ROBERT L. HOLLIER | NJG003555, NJG003548, NMW014235 | 1,742,552 |
| 438 | MICHAEL WHEATLEY AND BETTY WHEATLEY | NJE260173, NJE211846, NJE211838, NJE211820, NJE210210, NM4010796 | 1,699,536 |
| 439 | ARACELI DOMINGUEZ DE VALERO TRUST AND ARACELI DOMINGUEZ DE VALERO AND RAFAEL DOMINGUEZ JR. | NMZ023639, NMZ023555 | 300,000 |
| 440 | MARIA TERESA DOMINGUEZ TRUST AND RAFAEL DOMINGUEZ AND MARIA T. DOMINGUEZ AND MARIA TERESA DOMINGUEZ NICOLAS | NMZ023639, NMZ023555 | 380,045 |
| 441 | RADOK INVESTMENTS LIMITED | NMY100420, NJL027129 | 452,870 |
| 442 | RICARDO GONZALEZ CABRERA | NWR002879 | 2,391 |
| 443 | RICARDO GONZALEZ CABRERA AND ALEJANDRA HILDA GONZALEZ GARCIA | NWR002879 | 65,559 |
| 444 | RICARDO GONZALEZ CABRERA AND ALFONSO GONZALEZ GARCIA | NWR002879 | 66,358 |
| 445 | RICARDO GONZALEZ CABRERA AND IGNACIO RICARDO GONZALEZ GARCIA | NWR002879 | 29,554 |
| 446 | RICARDO GONZALEZ CABRERA AND IGNACIO RICARDO GONZALEZ GARCIA AND ALFONSO GONZALEZ GARCIA AND RODOLFO GONZALEZ GARCIA | NWR002879 | 4,129,786 |
| 447 | RICARDO GONZALEZ CABRERA AND RODOLFO GONZALEZ GARCIA | NWR002879 | 118,130 |
| 448 | MARTHA H. BAKER | NJE210152 | 213,709 |
| 449 | RICHARD O. HUNTON | NMY135749 | 1,810,254 |
| 450 | ARTHUR TORNO | NM4010481 | 283,946 |
| 451 | MARY E. GERRY | NJG001344 | 432,443 |
| 452 | DENNIS JAMES MIGL | NMY001131 | 121,348 |
| 453 | MISSISSIPPI POLYMERS, INC. | NJJ010078 | 556,363 |
| 454 | FELIPE GONZALEZ | NMY013334 | 1,024,545 |
| 455 | BILLIE RUTH MCMORRIS | STSGC40252-1, STSGC40252, STSGC40247-1, STSGC40247, NMW009680 | 171,456 |
| 456 | RONALD B. MCMORRIS | STSGC40252-1, STSGC40252, STSGC40247-1, STSGC40247, NMW009680 | 115,356 |
| 457 | RONALD MCMORRIS AND VIRGINIA MCMORRIS | STSGC40252-1, STSGC40252, STSGC40247-1, STSGC40247, NMW009680 | 723,071 |
| 458 | VIRGINIA H. MCMORRIS | STSGC40252-1, STSGC40252, STSGC40247-1, STSGC40247, NMW009680 | 139,716 |
| 459 | FLEX, LTD. | NJL028515 | 221,596 |
| 460 | NADI HOLDINGS, LTD. | NJL028515 | 56,775 |
| 461 | ROMANO INTERNATIONAL, LTD. | NJL027160 | 393,957 |
| 462 | J. MICHAEL GAITHER | NNC010332 | 765,692 |

# KVT-4

| ID | Name | Accounts[1] | SIB CD Proceeds [2] |
|---|---|---|---|
| 463 | KATHY WEISS REVOCABLE TRUST AND KATHY WEISS | NJL010521 | 201,032 |
| 464 | RANDALL E. YOUNGS | NM4063241 | 203,993 |
| 465 | GENEVA SUE PALMER | NJM029843, NJJ002349 | 76,351 |
| 466 | ROBERT E. PALMER | NJM029843, NJJ002349 | 890,037 |
| 467 | J. RUSSELL MOTHERSHED | NJJ110936 | 279,702 |
| 468 | CHARLES E. BAKER | NMY103846 | 410,339 |
| 469 | NORA E. GAY AND RICHARD E. GAY | NM4015183 | 112,338 |
| 470 | WILLIAM C. PROVINE | NMY111898, NMY010389, NJL028002 | 1,949,126 |
| 471 | ROLAND SAM TORN | NMY017897 | 1,035,355 |
| 472 | THE SECOND AMENDED AND RESTATED ROBERT A. HOUSTON REVOCABLE TRUST AND ROBERT A. HOUSTON | NM4015456 | 2,758,146 |
| 473 | MALTON OVERSEAS LTD. | NMY101493, NJL027145 | 1,802,059 |
| 474 | JAIME SOLANO SOTO | NMY122465 | 100,000 |
| 475 | ANGEL DELIO NIEUW | NJV004960 | 20,426 |
| 476 | ANGEL DELIO NIEUW AND MARIA P. C. NIEUW-CAEL | NJV004960 | 438,496 |
| 477 | COUNTRY HILL INVESTMENT, N.A. | NJV004960 | 1,750 |
| 478 | MURFIELD INVESTMENTS INC. | NJV004960 | 174,109 |
| 479 | YOLANDA LORIE | NMW002339 | 278,736 |
| 480 | CHARLES L. FELNER | NJJ006498 | 288,405 |
| 481 | PHILLIP E. MARRETT | NNC010548 | 890,610 |
| 482 | EDITH IRMA WATTS | NMW030918 | 539,225 |
| 483 | PETER MANSUR | NJE261148 | 575,477 |
| 484 | MARY F. MILLS | NMW040545 | 149,152 |
| 485 | MICHAEL C. MOSLEY | NMW040545 | 101,699 |
| 486 | MAPLE LEAF CAPITAL, LLC | NMX990151, NMX090564 | 150,000 |
| 487 | BRILMAR INVESTMENTS LIMITED | NJL027137 | 420,478 [11] |
| 488 | GRACE PEREZ | NMY105700, NMY105312, NMY100933 | 178,301 [12] |
| 489 | KIRKWELL C.V. | NMY102020 | 13,791,011 |
| 490 | DAVID HINOJOSA AND LAURA ANDONEGUI GONZALEZ | NMY135962, NMY100024, NJL029158 | 337,300 |
| 491 | FETZER OVERSEAS LIMITED AND LAURA GONZALEZ DE ANDONEGUI | NMY135962, NMY100024, NJL029158 | 38,238 |
| 492 | INMOBILIARIA EAL | NMY135962, NMY100024, NJL029158 | 170,413 |
| 493 | LAURA GONZALEZ DE ANDONEGUI | NMY135962, NMY100024, NJL029158 | 1,500 |
| 494 | LAURA GONZALEZ DE ANDONEGUI AND LAURA ANDONEGUI GONZALEZ | NMY135962, NMY100024, NJL029158 | 59,500 |
| 495 | VERRET MANAGEMENT CORPORATION | NWR003182 | 1,737,587 |
| 496 | MICHAEL S. ASMER | NMZ016377, NMZ011337, NMZ010057, NJV002337 | 1,029,845 |
| 497 | NANCY E. ENGLE | NJE212844 | 357,024 |
| 498 | JODY L. BOYD AND SHELLEY J. BOYD | NMW014268 | 1,734,336 |
| 499 | THOMAS E. BROWN AND BARBARA BROWN | NMZ020973, NJV004432, NJV004424, NJV003095, NJV003087 | 2,109,254 |
| 500 | GEORGE T. GRAVES III | NM4001076 | 1,225,000 |
| 501 | ALEX FERNANDEZ | NMZ004332 | 410,390 |
| 502 | RENE FERNANDEZ | NMZ004332 | 50,095 |
| 503 | ALGAMA L.T.D. C.A. | NWR004842 | 1,054,650 |
| 504 | INVERSIONES PATRICK ROGER P AND PATRICK PETIOT | NWR004263 | 63,480 |

Notes:

11. The proceeds amount for Brilmar Investments Limited includes $178,301.39 that Brilmar Investments Limited transferred to Grace Perez from its SIB CDs. This amount is also included in Grace Perez's proceeds amount.

12. Grace Perez received $178,301.39 in proceeds from SIB CDs in the name of Brilmar Investments Limited. This amount is also included in Brilmar Investments Limited's proceeds amount.

**50**

## KVT-4

| ID | Name | Accounts[1] | SIB CD Proceeds [2] |
|----|------|----------|-----------|
| 505 | PATRICK LORIS ROGER PETIOT | NWR004263 | 662,678 |
| 506 | JAIME SMOLENSKY | NWR001855 | 1,182,231 |
| 507 | VICSAR INVESTMENTS LIMITED | NMZ005198 | 783,191 |
| 508 | DIFFICULTY HOLDINGS LIMITED | NMY101279 | 616,734 |
| 509 | COFFEY OVERSEAS LIMITED | NMY019299 | 1,493,479 |
| 510 | MUDDY WATER HOLDINGS LIMITED | NMY018630 | 1,585,169 |
| 511 | MANUEL LOPEZ MAZUELAS | NWR008249 | 989,303 |
| 512 | LIGIA ESPINEL MARTINEZ | NWR004578 | 217,559 |
| 513 | SUSAN D. SANFORD | NJL028820 | 664,847 |
| 514 | WILLIAM BRUCE JOHNSON AND JENNIFER SAVOIC JOHNSON | NMW003444 | 245,464 |
| 515 | PAUL BYRD AND KYM BYRD | NMW002594 | 2,826,933 |
| 516 | DIANE DUNN | NMW004368 | 245,528 |
| 517 | JOHN M. COLGIN | NMY001859 | 1,490,113 |
| 518 | JOBEL TRUST | NYQ002108 | 434,147 |
| 519 | JOSEBEL TRUST | NYQ002108 | 122,630 |
| 520 | JOTABE TRUST | NYQ002108 | 2,330,946 |
| 521 | NETFIELDIC TRUST | NYQ001142 | 571,643 |
| 522 | CARLOS BUSTAMANTE ALVAREZ AND LUISA FERNANDA ROMO LEROUX | NWR005138 | 396,978 |
| 523 | JOSE LUCIANO MENDEZ ALONSO AND MARIA DEL ROCIO CORONA ODRIOZOLA | NWR003059 | 753,391 |
| 524 | CELIA DANTUS WEBER AND LEOPOLDO BIMSTEIN RIZERMAN AND MIRIAM BIMSTEIN DANTUS | NWR002812 | 6,000 |
| 525 | LABTEC INV. CORPORATION AND LEONOR RODRIGUEZ | NWR002812 | 816,197 |
| 526 | MIRIAM BIMSTEIN DANTUS | NWR002812 | 9,090 |
| 527 | ALBERTO CARLOS CURIS GARCIA | NWQ001039 | 12,367 |
| 528 | CURRICHI FOUNDATION | NWQ001039 | 700,733 |
| 529 | MARIA DE LOURDES GUEVARA DE CURIS AND ALBERTO CARLOS CURIS GARCIA | NWQ001039 | 849 |
| 530 | LUIS G. PEREZ | NMW011082 | 1,942,929 |
| 531 | JOHN D. SANTI IRA | NJM032789 | 799,038 |
| 532 | JAMES M. BATES | NMY114116 | 425,802 |
| 533 | LPC INTERNATIONAL TRUST AND LPC INTERNATIONAL | NWR006268 | 196,591 |
| 534 | DARSHAN SINGH DHALIWAL TRUST AND DARSHAN SINGH DHALIWAL | NMZ023357 | 3,001,596 |
| 535 | RAUL RODRIGUEZ MENDEZ | NJL028614 | 454,582 |
| 536 | VICTOR MANUEL ALFARO ARAUJO AND MARIA DEL CARMEN ESCOBEDO DE ALFARO | NMY102301 | 720,358 |
| 537 | CRAYFORD HOLDINGS LIMITED | NMY019315 | 2,525,195 |
| 538 | CARL MONTE | NM2090048 | 334,041 |
| 539 | CAROLYN CRANSTON | NMY100065, NMY100057, NMY014845, NJL025503 | 149,055 |
| 540 | DAVID MARK KELSO | NMY100065, NMY100057, NMY014845, NJL025503 | 14,134 |
| 541 | THOMAS H. TURNER | NJE211077, NM4011406 | 2,957,505 |
| 542 | DEBORAH S. FORBES | NMW010936 | 10 |
| 543 | GEORGE KENDALL FORBES | NMW010936 | 699,663 |
| 544 | GEORGE KENDALL FORBES AND DEBORAH S. FORBES | NMW010936 | 981,516 |
| 545 | WAYLAND B. ALEXANDER | NMW020679 | 734,912 |
| 546 | JOHN D. NOTTINGHAM JR. AND JUDITH R. LEWIS | NMY131151 | 39,706 |
| 547 | JOHN D. NOTTINGHAM JR. TRUST AND JOHN D. NOTTINGHAM JR. | NMY131151 | 3,583 |
| 548 | THE J.D. NOTTINGHAM LIMITED PARTNERSHIP | NMY131151 | 9,912 |

## KVT-4

| ID | Name | Accounts[1] | SIB CD Proceeds [2] |
|----|------|-------------|---------------------|
| 549 | THE J.D. NOTTINGHAM LIMITED PARTNERSHIP AND J.D. NOTTINGHAM | NMY131151 | 54,579 |
| 550 | ROBERT H. KLUG | NMY119016 | 279,049 |
| 551 | A.A. BUILDERS LTD. | NWR005211 | 674,210 |
| 552 | DANECO B.V. | NMZ018134, NMZ005966, NMZ005636 | 1,244,875 |
| 553 | DVX CAPITAL | NMZ018134, NMZ005966, NMZ005636 | 1,302,923 |
| 554 | IRM INVESTMENTS, INC. | NMZ018134, NMZ005966, NMZ005636 | 1,422,797 |
| 555 | STICHTING PARTICULIER FONDS EL TRIBUTO | NMZ018134, NMZ005966, NMZ005636 | 637,001 |
| 556 | MARIO BRAUN RUSSEK | NMY121996 | 2,051,958 |
| 557 | TERLINK, INC. | NMY020610 | 3,270,235 |
| 558 | YENZO INVESTMENT, INC. | NMY102004 | 843,542 |
| 559 | SLEEPING DOG HOLDINGS, LTD. | NMY018614 | 1,465,461 |
| 560 | BONNER HOLDINGS, LTD. | NMY020719 | 19,763 |
| 561 | DONEGAN, LTD. | NMY020719 | 1,938,927 |
| 562 | BRIARVALE HOLDINGS, LTD. | NMY101287 | 735,241 |
| 563 | RUBE HOLDINGS, LTD. | NMY118448 | 813,938 |

Total SIBL CD Proceeds    373,000,093 [13]

Notes:
13. This total has been reduced by $267,321.39 to account for the adjustments referenced in footnotes 5-9 and 11.

# KVT-5

## KVT-5

| ID | Name | Amount Funded to Receiver's Escrow Account |
|---|---|---|
| 1 | ROBERT GILLIKIN AND MARTHA GILLIKIN | $ 435,094 |
| 2 | THOMAS J. MORAN | 5,670,425 |
| 3 | JOHN R. PAINTER | 239,857 |
| 4 | DENNIS J. FERRA AND KAREN S. FERRA | 227,962 |
| 5 | DANIEL PAUL LANDRY AND DIANNA LYNN LANDRY | 31,156 |
| 6 | HENRY A. KLEIN | 58,026 |
| 7 | CARLOS FELIPE PENA | 303,635 |
| 8 | DAVID JONATHAN DREW | 1,299,424 |
| 9 | JAY STUART BELL | 1,288,685 |
| 10 | JOHNNY DAVID DAMON | 400,070 |
| 11 | GREGORY ALAN MADDUX | 3,669,735 |
| 12 | BERNABE WILLIAMS | 1,542,962 |
| 13 | ANDRUW RUDOLF BERNARDO JONES | 1,033,732 |
| 14 | SUSAN EPSTEIN | 59,030 |
| 15 | MARVIN WENITSKY | 35,110 |
| 16 | VALERIE J. KALTMAN | 62,112 |
| 17 | ROSINE CHAPPELL | 25,575 |
| 18 | VALERIE DALY HAUSLADEN | 114,373 |
| 19 | GUIFENA CORP. | 28,796 |
| 20 | EDWARD L. VAUGHN AND KAREN E. VAUGHN | 23,102 |
| 21 | WILLIAM A. WELBORN | 153,052 |
| 22 | JON KARL GOECKEL AND LORETTA B. GOECKEL | 24,606 |
| 23 | LUSKY INVESTMENT PARTNERSHIP, LP | 287,820 |
| 24 | MORTIMER F. CURRIER AND KATHERINE F. CURRIER | 88,141 |
| 25 | LEJEUNE T. MILLS AND GILBERT C. MILLS | 101,354 |
| 26 | JAMES F. HAUN AND KALEN K. HAUN | 38,298 |
| 27 | KENNETH MEACHAM | 34,358 |
| 28 | MARTHA AGUADO DE DONNADIEU AND EMILIO DONNADIEU AGUADO | 28,286 |
| 29 | VERONA BELLE SPATZ | 29,243 |
| 30 | ESTATE OF JUSTINE H. SMITH | 33,502 |
| 31 | SUSAN CREEKMORE HEIM | 18,142 |
| 32 | RALPH MACDONALD | 259,894 |
| 33 | WILLIAM K. GREINER | 15,576 |
| 34 | LINDA MCSPADDEN MCNEIL | 55,484 |
| 35 | EDUARDO IGARTUA RUILOBA AND LA ESTANCIA C.C. | 54,051 |
| 36 | BOBBY G. WILKERSON | 76,005 |
| 37 | GEORGE B. LORMAND, JR. | 34,163 |
| 38 | ERIC R. GEORGE | 350,000 |
| 39 | CHRISTOPHER ALLRED | 115,269 |
| 40 | TERENCE BEVEN AND ELIZABETH BEVEN | 119,132 |
| | | $ 18,465,237 |

Notes:

1. Lejeune T. Mills and Gilbert C. Mills have executed a stipulation. They have transferred to the Receiver's escrow account only $101,353.96 of the SIBL proceeds amount, which is $381,353.96; their Pershing account also remains held.

53

204

# KVT-6

# KVT-6

| ID | Name | SIB CD Proceeds (2008 - 2009)[1] |
|---|---|---|
| 1 | GARY D. MAGNESS IRREVOCABLE TRUST, GARY MAGNESS, GMAG LLC AND MAGNESS SECURITIES LLC | $ 88,200,000 |
| 2 | LIBYAN FOREIGN INVESTMENT CO. | 54,830,930 |
| 3 | REGIONS BANK AS TRUSTEE FOR LPFA II CITY PLAZA PROJECT SERIES 2008 AND II CITY PLAZA LLC | 39,108,276 |
| 4 | JUERGEN KURT WAGENTROTZ AND JURGEN KURT WAGENTROTZ ERNST | 38,465,878 |
| 5 | MICHEL MORENO | 27,035,583 |
| 6 | ANGLO-ATLANTIC STEAMSHIP CO. LTD. | 16,276,638 |
| 7 | SALBUR INVERSIONES C.A. | 15,782,610 |
| 8 | CATALYST PRIVATE EQUITY PARTNERS (ISREAL) II L.P. | 12,571,955 |
| 9 | BRUCE THOMPSON AND MICHELLE THOMPSON AND BRUCE THOMPSON | 11,915,092 |
| 10 | COMPANIA MEXICANA DE AVIACION S.A. DE C.V. | 10,159,050 |
| 11 | ANTONY MANSOUR AND REHAN MANSOUR, ANTONY MANSOUR, JOSEPHINE MERY, FRANCOISE SOLANGE MERY AND JOSEPHINE MERY | 9,824,067 |
| 12 | BRETT LANDES | 9,633,275 |
| 13 | FAYHILL INTERNATIONAL | 9,297,644 |
| 14 | MANSURA ENTERPRISES CV | 8,351,534 |
| 15 | EDWARD HYLTON JONES AND EDWARD HYLTON JONES AND SHIRLEY GLORIA JONES | 5,975,887 |
| 16 | GEORGE JOSEPH ROLLAR AND GEORGE JOSEPH ROLLAR AND DOLORES MAY PAYER ROLLAR | 5,953,512 |
| 17 | WEST MEADOWS LTD. | 5,914,956 |
| 18 | AMERICAN FAMILY ASSOCIATION INC. | 5,722,450 |
| 19 | VALNAMEX S.A. | 5,487,179 |
| 20 | FARISTON OVERSEAS LTD. | 5,248,300 |
| 21 | JAMES E. RICHARDSON FAMILY TRUST | 5,097,757 |
| 22 | GALO ENRIQUE VILLAMAR VILLAFUERTE | 5,062,585 |
| 23 | PERFORMANCE CONTRACTORS INC. | 5,035,156 |
| 24 | AGNETA LAURIN, HANS LAURIN AND AGNETA LAURIN AND HANS LAURIN | 5,032,110 |
| 25 | CLAUDIO ENRIQUE HERNANDEZ VILLALOBOS | 4,950,363 |
| 26 | NUNVAV INC. | 4,787,138 |
| 27 | RODOLFO ROYE SOUTOU, JONATHAN ROYE FARCHEG AND RODOLFO ROYE SOUTOU, RODOLFO ROYE SOUTOU AND LOURDES FARCHEG DE ROYE AND JONATHAN ROYE AND ALEXANDER ROYE | 4,734,185 |
| 28 | CORPORACION NACIONAL DE INVERSIONES SA DE CV | 4,635,831 |
| 29 | INVERSIONES VARMOL TRUST CARE OF DR. JORGE MARIO VARGAS P. AND INVERSIONES VARMOL TRUST | 4,378,878 |
| 30 | MR INTERNATIONAL GROUP LTD. | 4,060,329 |
| 31 | ANCAR FUTURE TRUST | 4,000,587 |
| 32 | EDUARDO A. NAJERA AND EDUARDO A. NAJERA AND JENNIFER M. NAJERA | 3,992,535 |
| 33 | INTERMEDIA LTD. | 3,863,952 |
| 34 | RITA MEIER KNUDSON REVOCABLE TRUST | 3,635,537 |
| 35 | OSCAR HUMBERTO VILLARREAL AGUERO AND OSCAR VILLARREAL | 3,528,546 |
| 36 | INTERNATIONAL PETROCHEMICAL SALES LIMITED | 3,463,187 |
| 37 | TRIMECA, TRIMECA TRUST AND TRIMECA (TRABAJOS INDUSTRIALES Y MECANICOS) | 3,440,378 |
| 38 | ELEVEN TWENTY-TWO LLC | 3,247,484 |
| 39 | PINGYI HE ORRUILIAN WU DE HE AND PINGYI HE | 3,237,629 |
| 40 | ARTURO ORTEGA GONZALEZ AND MARIA CAROLINA ORTEGA GONZALEZ AND GERMAN LUIS ORTEGA GONZALEZ AND ARTURO ORTEGA GONZALEZ | 3,226,241 |
| 41 | TA TRUST | 3,200,000 |
| 42 | ALGICA S.A. | 3,186,945 |
| 43 | AIRS LTD. | 3,167,334 |

## KVT-6

| ID | Name | SIB CD Proceeds (2008 - 2009)[1] |
|----|------|-------------------------------|
| 44 | NONNA E TRUST | 3,079,824 |
| 45 | DEMETER A.V.V. | 2,985,953 |
| 46 | GLOBAL ADVISORS C.A. | 2,620,147 |
| 47 | NAIRC B.V., NAIRC-NETHERLANDS ANTILLEAN INSURANCE AND NAIRC-NETHERLANDS ANTILLEAN INSURANCE AND REINSURANCE COMPANY | 2,467,127 |
| 48 | ANIROC HOLDING LTD. | 2,073,448 |
| 49 | INMOFYBE S.A. | 1,857,815 |
| | | $        493,803,818 |

Notes:

1. Those outgoing transactions denominated in a foreign currency were converted on the day of transaction using a historical daily conversion rate.

**55**

**KVT-7**



ADDITIONAL DEPOSITS

STANFORD | Stanford International Bank Ltd.

No. 11 Pavilion Drive, P.O. Box 3300, St. John's, Antigua, West Indies • Tel: 268.480.3700 • Fax: 268.480.3737
www.stanfordinternationalbank.com • A member of the Stanford Financial Group.

Bank clients can make additional deposits to their accounts in one of the following ways:

1. Send personal or bank cheques:

· The cheque should be made out in favour of Stanford International Bank Ltd. followed, in parentheses, by the name or number of the account to be credited,

or

by indicating in the reference section on the front of the cheque, the name or number of the account to be credited,

or

by indicating on the back of the cheque, the name or number of the account to be credited.

· Cheques made out in your favour may also be deposited.

2. Send a wire transfer:

· Please inform your financial consultant before sending funds in this manner.

· The instructions you provide your bank should include the following:

For US Dollars –

"Please wire US$ _____ (Amount)

TO:    THE TORONTO-DOMINION BANK
       International Banking Center, Toronto, Ontario, Canada
       SWIFT: TDOM CA TT

       To be deposited to the account of:

       STANFORD INTERNATIONAL BANK LTD. (#0360012161670)
       SWIFT: SIBP AG AG

REF:   _____
                        (Your Name)

       _____
                      (Account Number)

FOIA - Confidential Treatment Requested by Ralph S. Janvey, as
Receiver for R. Allen Stanford, James M. Davis, Laura Pendergest
Holt, Stanford Group Co., Stanford Capital Management LLC,
Stanford International Bank Limited, Stanford Financial Group, and
The Stanford Financial Group BLDG, Inc.

(continued on reverse)

STAN P DOJ_0031499

56

For Canadian Dollars –

"Please wire CDN$ _____ (Amount)

TO:    THE TORONTO-DOMINION BANK
       International Banking Center, Toronto, Ontario, Canada
       SWIFT: TDOM CA TT

       To be deposited to the account of:

       STANFORD INTERNATIONAL BANK LTD. (#0360012161573)
       SWIFT: SIBP AG AG

REF:   _____
                        (Your Name)

       _____
                      (Account Number)

For British Pounds –

"Please wire GBP _____ (Amount)

TO:    HSBC BANK PLC
       London, United Kingdom
       SWIFT: MIDLGB22XXX

       To be deposited to the account of:

       STANFORD INTERNATIONAL BANK LTD. (Sort code 40-05-15, acct. #58180160)
       SWIFT: SIBP AG AG

REF:   _____
                        (Your Name)

       _____
                      (Account Number)

For Euros –

"Please wire Euros _____ (Amount)

TO:    HSBC BANK PLC
       London, United Kingdom
       SWIFT: MIDLGB22XXX

       To be deposited to the account of:

       STANFORD INTERNATIONAL BANK LTD. (Sort code 40-05-15, acct. #58293136)
       SWIFT: SIBP AG AG

REF:   _____
                        (Your Name)

       _____
                      (Account Number)

FOIA – Confidential Treatment Requested by Ralph S. Janvey, as
Receiver for R. Allen Stanford, James M. Davis, Laura Pendergest
Holt, Stanford Group Co., Stanford Capital Management LLC,
Stanford International Bank Limited, Stanford Financial Group, and
The Stanford Financial Group BLDG, Inc.

STAN P DOJ_0031500

SIB27 ENG                                                                    17296 (Replaces 1862 5823)  07.06 IOM GLF

57

210

**KVT-8**

# Investment Portfolio Summary Information

For the Quarter Ended June 30, 2008

| Tab # | Company | Symbol | Exchange | Right | Invested Amount ($000's) Total | Pro-Forma Estimated Valuation Outlook Low ($000's) | High ($000's) | Fully Diluted Ownership |
|---|---|---|---|---|---|---|---|---|
| 4 | Elandia Solutions, Inc. | ELAN | OTC | $15,665 | $195,312 | $331,000 | $331,000 | $6.44% |
| 5 | American Leisure Group, LTD | ALG | AIM | $24,192 | $50,723 | $105,709 | $105,709 | 15.15% |
| 6 | Forelend Holdings, Inc. | FOFN | OTC | $19,756 | $50,062 | $35,000 | $40,000 | 80.91% |
| 7 | Spring Creek, LLC and Related Companies | | | | $21,842 | $30,000 | $40,000 | 50.00% |
| 8 | Health Systems Solutions, Inc. | HSSO | OTC | $8,850 | $27,308 | $53,000 | $60,000 | 60.25% |
| 9 | DGSE Corporate Assets, Inc. | DGC | AMEX | $20,250 | $74,744 | $64,000 | $64,000 | 28.69% |
| 10 | USFR Media Group | | | $4,222 | $24,472 | $26,000 | $50,000 | 32.04% |
| 11 | The Ultimate Gift Experience | | $14,630 | $14,630 | $10,000 | $10,000 | |
| 12 | Phoenix Bay, Inc. | | $13,630 | $13,630 | $12,000 | $18,000 | 34.19% |
| 13 | Blinnex Broadband Multimedia | | | $9,216 | $9,216 | $40,000 | $49,000 | 14.45% |
| 14 | Golden Financial Services | | $2,600 | $5,030 | $8,650 | $8,650 | 49.69% |
| 15 | Seanco Technologies, Inc. | SNT | AMEX | $5,000 | $3,085 | $31,000 | $31,000 | 23.39% |
| 16 | Caribbean Leisure Marketing, LTD | | $6,813 | $1,000 | $2,100 | $2,100 | 30.00% |
| 17 | Sara Premiere | | $7,000 | $7,000 | | | 29.50% |
| 18 | Lumibeat Corporation | | $6,416 | $46,000 | $46,000 | 10.67% | |
| 19 | DealerArmor, Inc. | DLAV | OTC | $875 | $5,332 | $2,790 | $2,790 | 7.17% |
| 20 | Edgewater Communications | $2,790 | $1,039 | $6,420 | $5,000 | $5,000 | 24.65% |
| 21 | Greymont Pharmaceuticals, Inc. | $5,000 | $990 | $5,490 | $3,810 | $3,810 | 4.31% |
| 22 | Globaloptex, Inc. | $3,107 | $2,155 | $3,233 | | | 71.02% |
| 23 | Tee Top Kids, Inc. | | $4,000 | $4,000 | $24,440 | $24,440 | 2.22% |
| 24 | Kinkind Inc. | | $4,000 | $3,784 | $7,200 | $7,200 | 5.23% |
| 25 | Capture Networks, Inc. | COINW | OTC | $3,577 | $2,500 | $2,500 | 7.91% | |
| 26 | Third Melodic | | $3,000 | $2,450 | $1,450 | $1,450 | 45.33% |
| 27 | Pamatal Building Materials, Inc. | $1,450 | $1,983 | | | | 11.65% |
| 28 | Whispre Corporation | $650 | $1,233 | | | | 41.12% |
| 29 | Beverly Samson & Co. | $150 | $1,573 | $1,600 | $1,600 | 18.02% | |
| 30 | Running the Sahara | | $1,600 | $800 | $800 | 50.00% | |
| 31 | Majestic | $3,318 | $1,123 | $500 | $500 | 50.00% | |
| 32 | The List | | $5 | $500 | | | 25.00% |
| 30 | Milway CC Hotel Partners | | $15,300 | $15,300 | $15,300 | $15,300 | 71.83% |
| 30 | Mountah Partners | | $7,383 | $7,383 | $7,350 | $7,350 | 5.00% |
| 30 | Cadyst Investments II | | $6,045 | $6,045 | $6,000 | $6,000 | 20.00% |
| 30 | Washington National | | $5,878 | $5,878 | $7,200 | $7,200 | 4.00% |
| 30 | ACON Project Milegro | | $4,774 | $4,774 | $7,161 | $7,161 | 1.50% |
| 30 | Louisiana Venture | | $3,530 | $3,530 | $4,000 | $4,000 | 6.70% |
| 30 | ACON Barriott Partners II | | $3,510 | $3,510 | $3,265 | $3,265 | 10.75% |
| 30 | AquaB9 | | $3,800 | $3,800 | $3,800 | $3,800 | 10.00% |
| 30 | ACON Bardco Partners I | | $2,586 | $2,586 | $3,379 | $3,379 | 10.75% |
| 30 | Memphis Bio-Med Venture II | | $2,300 | $2,300 | $3,530 | $3,530 | 0.39% |
| 30 | Panorama | | $2,285 | $2,285 | $3,200 | $3,200 | 0.39% |
| 30 | Danox | $150 | $350 | $500 | | | <5.0% |
| 30 | Infinity Israel-China Fund Partners | $150 | $150 | $150 | $150 | 0.33% | |

E.F. STANFORD

58

212

# KVT-8

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK, LTD., ET AL. | § § § § | |
| Plaintiff, | § § | Case No. 03:09-CV-0724-N |
| v. | § § | |
| JAMES R. ALGUIRE, ET AL. | § § | |
| Defendants. | § § | |

---

**DECLARATION OF
KARYL VAN TASSEL**

---

I, Karyl Van Tassel of 1001 Fannin, Suite 1400, Houston, TX 77002 state on oath as follows:

**EXPERIENCE, EXPERTISE, WORK IN THIS CASE**

1.     A copy of my resume is attached as exhibit **KVT-1**.  It summarizes my education and relevant work experience.  As it states, I am a Certified Public Accountant in the State of Texas, USA, and a Senior Managing Director of FTI Consulting, Inc.  I have 25 years of experience providing a variety of audit, accounting, tax, litigation, valuation and other financial advisory services.  I have performed detailed financial analyses for a variety of litigation matters, including securities, intellectual property, breach of contract, antitrust, lender liability, fraud and wrongful terminations.  In the litigation context, I have acted as an

expert on a variety of economic damage claims and forensic accounting issues. In several cases alleging fraud and other wrongdoing, I have traced funds for potential recovery. I have also been retained by audit committees to assist in investigating allegations of accounting and financial improprieties.

2.      The statements made in this declaration are true and correct based on the knowledge I have gained from the many documents I have reviewed and other work I and my team have performed in the course of FTI's investigation on behalf of the Receiver.

3.      I use the following acronyms or short-hand terms to refer to certain entities in this declaration:

- Stanford Entities      all legal entities owned, directly or indirectly, by the named Defendants in the SEC action as of the date the U.S. Receivership was instituted.

- SIB      Stanford International Bank, Limited.

- STCL      Stanford Trust Company Limited, an Antigua trust company.

- SFG      Stanford Financial Group, the name given to Allen Stanford's "global network of financial companies."

- SFGC -- Stanford Financial Group Company, which provided shared services, including Treasury and Investment services, to SIB and other companies within SFG.

- SGC      Stanford Group Company, a U.S. broker-dealer entity incorporated in Texas.

### SEC ACTION AND FTI'S INVESTIGATION

4.      On February 16, 2009, the United States District Court for the Northern District of Texas appointed Ralph S. Janvey the Receiver for SIB and the rest of the Stanford Entities. On the same day, the Receiver retained FTI to perform a variety of services, including assisting in the capture and safeguarding of electronic accounting and other records

of the Stanford Entities and forensic accounting analyses of those records, including cash tracing. I oversee, and am personally involved in, FTI's forensic accounting and cash tracing activities. The purposes of FTI's work have been, in part, to (a) determine the roles that the various Stanford Entities played in the fraud alleged by the SEC and specifically in the sale and redemption of SIB certificates of deposit ("CDs"); (b) identify the source(s) of income and cash flows of the various Stanford Entities; (c) trace funds to determine how they were allocated and disbursed throughout the Stanford Entities; and (d) review the circumstances relating to the sale of SIB CDs.

5.    As part of our work, we have interviewed numerous present and former Stanford Entity employees. These include, but are not limited to, the persons whose names (as well as employer, title, and supervisor) are listed in exhibit **KVT-2**. In addition, we have examined the available accounting and other records (including email files of certain former Stanford employees) relating to the Stanford Entities located in and/or gathered from Houston, Texas; Tupelo, Mississippi; Baldwyn, Mississippi; Memphis, Tennessee; Miami, Florida; St. Croix, United States Virgin Islands; Antigua; Barbuda; and other Stanford locations within and outside the U.S. We have also reviewed extensive SIB customer records, including but not limited to paper and electronic records documenting SIB CD purchases, interest payments and redemptions.

6.    FTI has also obtained and analyzed paper and electronic files from third-party financial institutions where bank accounts of various Stanford Entities are or were located. These financial institutions include Toronto Dominion Bank in Canada, Trustmark National Bank and the Bank of Houston. In addition, FTI has gathered and reviewed electronic and other data from Pershing, LLC and JP Morgan Clearing Corp., both of which have held or

currently hold SGC customer and former employee accounts, and SEI, which held STC accounts.

7.      FTI's analyses of the records of SIB and other Stanford Entities were conducted using reliable practices and methodologies that are standard in the fields of accounting and finance.  The findings and conclusions set forth herein are based on these analyses.

### SIB WAS A PONZI SCHEME

8.      The SEC alleges in its Second Amended Complaint in Case No. 03-CV-0298-N that the Stanford Entities constitute "a massive Ponzi scheme" involving "misappropriate[ion of] billions of dollars of investor funds."  Likewise, James Davis, Chief Financial Officer for both SIB (according to SIB's published financial statements) and SFGC and a long-time business associate and confidant of Allen Stanford, has pled guilty to charges that he conspired with Allen Stanford and others in running a Ponzi scheme in violation of federal securities laws.  In connection with his guilty plea, Davis admitted that SIB was a "massive Ponzi scheme whereby CD redemptions ultimately could only be accomplished with new infusions of investor funds."  As explained in more detail below, my findings are consistent with the SEC's allegations and Davis's admission.  SIB was insolvent (*i.e.*, its liabilities exceeded its assets) from at least 2004 and probably for much longer, yet it continued selling CDs to the end.  It induced investors to buy CDs by offering substantially above-market rates, issuing financial statements and other data that significantly overstated its earnings and assets, and misrepresenting its business model, investment strategy, financial strength, the safety and nature of its investments and other facts important to investors.  SIB incentivized Stanford-affiliated financial advisors to convince their clients to purchase SIB

CDs over other kinds of investments by paying the financial advisors above-market commissions and other compensation tied to CD sales. SIB's actual (as opposed to reported) earnings and assets, however, were insufficient to meet its CD payment obligations. SIB could only keep the scheme going by selling yet more CDs and using the proceeds to pay redemptions, interest and operating expenses. Significant sums were also diverted to finance Allen Stanford's opulent life style of yachts, jet planes, travel, multiple homes, company credit cards, *etc.* Davis, Holt and other insiders were paid handsomely for their complicity.

9.     Allen Stanford was sole owner, directly or indirectly, of more than 130 separate entities, including SIB and STC. These entities comprised a single commonly-owned financial services network called the "Stanford Financial Group," which was headquartered in Houston.

10.     Stanford, along with a close band of confidantes, controlled SFG (of which SIB was a part). These confidants included Jim Davis, CFO of both SFGC and SIB, and Laura Pendergest Holt, Chief Investment Officer for SFGC.

11.     SIB was nothing like a typical commercial bank. It did not offer checking accounts and did not make loans (other than to CD investors up to 80% of their CD balance). It had one principal product line  certificates of deposit  and one principal source of funds  customer deposits from CD purchases. The terms of some SIB CDs permitted partial redemptions before maturity upon customer demand.

12.     SIB offered CD rates that were significantly greater than those offered in the United States. A SIB 2007 marketing brochure (attached as exhibit **KVT-3**) tracks SIB's historic CD yield against average US CD yields. SIB's yield ranged from a high of 388% of the US yield in 2002 to a low of 140% of the US yield in 2006. According to the brochure,

SIB was able to pay high CD rates by investing in "a well-diversified portfolio of highly marketable securities issued by stable governments, strong multinational companies and major international banks."  As a result, the brochure continues, "[SIB] has been consistently profitable since inception."  In other words, SIB purported to function like a hedge fund but, unlike a hedge fund, its customers were guaranteed (by SIB) a specified return regardless of the fund's performance.  SIB's reported returns were remarkably steady, fluctuating from only 11.7% to 14.9% between 1997 and 2007.  SIB showed a profit in good times and in bad. The one exception was the second half of 2008, when financial sector businesses across the globe were struggling for survival and many feared we were on the brink of financial collapse.  Even then, SIB's accounting records reflected positive investment earnings, but a small overall loss--just 2% of total (purported) financial assets--after deductions for CD interest and other expenses.  What to some appeared to be too good to be true was indeed untrue.  As Stanford himself said at an October 2008 financial advisor conference: "We're about, as of early October, down about four percent, I guess. . . . I'm not happy with that [but] in this market I guess it's astounding."

13.     The most significant numbers on SIB's financial statements--revenues and asset values--were fictitious.  Davis states in his plea agreement that assets were inflated to offset CD obligations and that revenues were "reverse-engineered" to arrive at desired levels. My findings are consistent with those admissions.

14.     We found within SIB's accounting records worksheets used to derive fictitious SIB revenues back to 2004.  The Ponzi scheme conspirators would simply determine what level of revenues SIB needed to report in order to both look good to investors and regulators and to purport to cover CD obligations and other expenses.  They would then back into that

total amount by assigning equally fictitious revenue amounts to each category (equity, fixed income, precious metals, alternative) of a fictitious investment allocation.

15.     The returns were fictitious, and they were based on fictitious asset totals.

(a)     SIB's records reflected that, as of December 31, 2008, it held $8.3 billion in "financial assets" -- presumably actively traded securities and metals, as SIB represented to the public.  The reality was much different.  As of the end of 2008, SIB held less than $500 million in securities, or less than 7% of the total CD obligations.

(b)     FTI also discovered that $3.174 billion of SIB's claimed 2008 assets consisted of two real estate holding entities that had been purchased that same year for only $63.5 million and whose only assets were tracts of undeveloped Antiguan real estate.  The value of those assets was inflated 50 times the purchase price through a series of paper transactions involving other Stanford-owned entities.  These repetitive flips had no apparent economic substance and appear to have been engaged in solely to grossly overstate the value of the assets so as to prop up SIB's balance sheet.

(c)     FTI found that another $1.8 billion in SIB assets consisted of notes receivable from Allen Stanford.  To my knowledge, however, Stanford had no significant assets apart from the various Stanford Entities, which collectively owed billions of dollars more than they had in assets.

(d)     Other assets were similarly overstated.  Private equity investments, for example, were recorded on SIB's books at amounts that the Receiver's subsequent sales efforts have revealed to be many times greater than their

realizable value.  These were valued at $1.2 billion as of June 30, 2008, but it is expected that the Receivership may realize as little as $25 million from such assets.

(e)     Moreover, the fact that many of SIB's assets consisted of real estate, unsecured notes from Allen Stanford, and private equity investments was contrary to SIB's assurances to customers that its investments consisted of "highly marketable securities issued by stable governments, strong multinational companies and major international banks" so as to "maintain[] the highest degree of liquidity."  See KVT-3 at 3.

16.     Misinformation regarding SIB's financial strength, profitability, capitalization, investment strategy, investment allocation, the value of its investment portfolio, and other matters, was regularly disseminated from Stanford, Davis, Holt and others working under them to Stanford financial advisors, for use in inducing potential investors to purchase SIB CDs.

17.     SIB CDs were marketed through financial advisors employed by other Stanford-owned entities.  The financial advisors were heavily incentivized by above-market commissions and bonuses to steer their clients to SIB CDs rather than other investments.

18.     At the inception of the U.S. Receivership on February 16, 2009, SIB's total obligation to CD holders was approximately $7.2 billion (U.S.), versus reported investments valued at $8.3 billion as of December 31, 2008.  Based on my analysis, the market value of all assets for all Stanford Entities (including SIB) combined total less than $1 billion.  At the time SIB was placed into receivership, SIB was insolvent (*i.e.*, its liabilities exceeded its assets) by more than $6 billion.

19.     Through analysis of SIB's financial records, FTI has determined that SIB was insolvent by at least 2004 and very likely before then.   SIB's reported assets consisted overwhelmingly of "financial assets" and cash.   The published balance sheets represented that "financial assets" were reported at "fair value."   Of course, cash, by definition, is stated at fair value (assuming correct reporting).   We know, however, from our investigation and review of internal SIB records, that each year, from 2004 forward, SIB's reported asset totals included, without disclosure to the public, notes receivable from Allen Stanford and certain assets with clearly inflated values.   When these amounts are deducted from the asset totals contained in SIB's published financial statements, it is apparent that, from at least 2004, SIB's liabilities exceeded its assets.   The inflated assets that I refer to were certain private equity stakes initially held by other Stanford Entities (although likely purchased with SIB CD proceeds). These interests were transferred to Allen Stanford, and then from Stanford to SIB, which recorded them on its books at much inflated values with no apparent economic gain having been achieved.   These transfers appear to have been booked for the purpose of giving SIB the false appearance of financial strength.   Assets other than private equity were also fictitious or overvalued, as we saw in our analysis of 2008 data.   Certainly, persons engaged in perpetuating a Ponzi scheme would have had no incentive to understate asset values; and, as we have seen, Stanford and his cohorts had a pattern of overstating asset values, ostensibly to induce more people to purchase "safe" SIB CDs.

20.     Through an analysis of cash flows for the period January 1, 2008 through February 17, 2009, we have verified that proceeds of CD sales were used to make purported interest and redemption payments on existing CDs.   That just confirmed what we knew had to be true anyway, as SIB's assets, reserves and investments were insufficient to fund its

redemption and interest payments.  SIB's CD transaction records indicate that approximately $2 billion was paid to investors for principal and interest from January 1, 2008 through February 17, 2009.  SIB's principal income-generating assets, which were managed in what was known as "Tier 2", never totaled more than $1 billion, even when the stock market was at a high and the economy was strong.  By the end of 2008, "Tier 2" had declined to less than $500 million, due to a combination of increasing redemptions and liquidations and falling market values.  Even if SIB had fully liquidated all investments in its portfolio, it would not have realized enough cash flow to cover just the redemptions in 2008 without the influx of new CD purchase money.  And in fact, when the market declined, we know that it took only 4 months for liquid assets to substantially deplete, even though $7.2 billion in CD obligations remained.  As a result of this decline, all actual gains earned since 2003 were lost.  Thus, although the SIB CD portfolio contained some legitimate investments, the earnings from those investments were negligible in comparison to and could not reasonably have been expected to cover SIB's total obligations to the CD holders.

21.     SIB necessarily used current CD proceeds to pay existing CD investors in previous years too.  Although SIB received some earnings on investments, those amounts were miniscule compared to its cash flow obligations.

22.     Based on FTI's analysis to date, I have concluded that from at least 2004 (and likely for much longer), SIB relied on proceeds from the sale of new CDs to make purported interest and principal payments to existing CD investors.  This is especially evident from the fact that, when CD sales faltered in 2008, SIB was immediately forced to sell off most of its assets that were readily available for liquidation just to maintain payments for a short time.  By using the proceeds of new CD sales to pay interest and redemptions to existing CD

holders, Stanford, Davis and their cohorts concealed their fraud and perpetuated the Ponzi scheme.

23.     CD sales proceeds not used to pay interest, redemptions, and current operating expenses (including commissions and other incentive payments to financial advisors) were either placed in speculative investments (many of them, such as real estate and private equity deals, illiquid), diverted to other Stanford Entities "on behalf of shareholder" (*i.e.*, for the benefit of Allen Stanford) or used to finance Allen Stanford's lavish lifestyle (*e.g.*, jet planes, a yacht, other pleasure craft, luxury cars, homes, travel, company credit card, *etc.*).

24.     A tipping point was reached in October 2008:  That month and every month thereafter, incoming funds from new investors were insufficient to offset outgoing payments to existing investors.  Continuing CD sales could no longer cover purported redemptions, interest payments and normal operating expenses.  This cash flow crisis caused a rapid depletion of liquid assets, which were inadequate to begin with to cover SIB's CD obligations.  By the time the U.S. Receivership was instituted, SIB had already suspended redemptions for certain investors and many Stanford Entities had stopped paying many obligations.  For example, SIB received negative publicity concerning its failure, in early February 2009, to fund a $28 million commitment to a Florida communications company named Elandia International Inc.

25.     Notwithstanding SIB's insolvency and the rapid liquidation of its investments during 2008 and into 2009, CD sales continued until February 16, 2009, when the SEC and the U.S. Court intervened.  These CD purchases were too small, however, to continue to cover for the lack of assets owned by SIB.

### WITHOUT CD PROCEEDS, STANFORD GROUP COMPANY WAS INSOLVENT

26.     SGC was another Stanford Entity, which operated as a U.S. broker dealer.  Its financial advisors sold thousands of SIB CDs.  SGC received commissions, or referral fees, for these sales.  SGC also performed "portfolio management"[1] and other services for SIB relating to the CD investment portfolio and for which it received fees from SIB.

27.     Without income related to SIB CDs, SGC would have been insolvent from at least 2004 forward (and likely before).  Referral fees and other CD related compensation paid by SIB to SGC constituted 71.65% of SGC's revenue for 2004, 63.62% for 2005, 65.01% for 2006, 50.8% for 2007 and 52.83% for 2008.  Even when this CD related compensation from SIB is considered along with other income received by SGC in the ordinary course of business, SGC showed negative cash flows from operations of $7,674,855 in 2004, $18,029,885 in 2005, $46,054,375 in 2006, $6,616,444 in 2007 and $35,102,135 as of November 30, 2008.[2]

28.     The only reason SGC's financial statements did not reflect negative cash flows between 2004 and 2008 is because SGC received millions of dollars in capital contributions from other Stanford Entities.  SGC received $10,000,000 in capital contributions in 2004, $21,000,000 in 2005, $51,500,000 in 2006, $41,750,000 in 2007 and $51,000,000 in 2008.  A chart detailing SGC's CD related compensation and capital contributions between 2004 and 2008 is attached hereto as exhibit **KVT-4.**  Capital contributions to SGC consisted primarily of SIB CD sale proceeds.

---

[1]     The portfolio at issue comprised the overvalued private equity assets of SIB.
[2]     The sources of this data are audited SGC statements, except for the 2008 figure, which comes from unaudited financial statements.

### THE STANFORD FINANCIAL ADVISORS IGNORED MULTIPLE WARNING SIGNS ABOUT THE FRAUDULENT NATURE OF THE SIB CD PROGRAM

29.     Based on FTI's investigation regarding the Stanford Ponzi scheme and the facts and circumstances leading up to its collapse in late 2008 and early 2009, there were a number of "warning signs" or "red flags" that should have prompted significant concerns and investigation by the financial advisors who sold SIB CDs regarding the nature and validity of the CDs and the underlying investment portfolio.   In light of these warning signs and red flags, and considering the FINRA rule requiring financial advisors to have "reasonable grounds for believing that [an investment] recommendation is suitable for [the] customer . . ." (FINRA Conduct Rule 2310(a)), the Stanford financial advisors should have become concerned and should have adequately investigated the CDs before selling them to SGC customers.

*SIB Was An International Bank in Antigua*

30.     The fact that the SIB CDs were being sold by an international bank in Antigua, alone, should have caused the Stanford financial advisors to perform further investigation regarding the CDs.  Because SIB was an international bank, the financial advisors would have known that there was no FDIC insurance coverage for the CDs or any other similar insurance protection.   That is one of the well known risks of investing with international banks. Moreover, Antigua, a country with a population today of approximately 85,000 people, is well known in the United States for its lack of adequate regulation of the financial services sector. In fact, there are only three bank examiners in the Financial Services Regulatory Commission of Antigua who are responsible for all of the banks in Antigua.  The entire country's gross domestic product for 2009 was $1.55 billion and its 2009 annual expenditures were $293 million (which put the country at a deficit), both amounts being small fractions of the value of

assets claimed to be deposited with SIB in Antigua during that same time period.  (*See*

https://www.cia.gov/library/publications/the-world-factbook/geos/ac.html.)  Had the financial

advisors reviewed similar publicly available information for prior to 2009, they would have

found that the GDP and annual budget for Antigua were comparable.  It is not surprising that

a government with such a lack of resources was unable to adequately oversee SIB along with

the many other banks operating on the island, and the Stanford financial advisors faced with

the same information should have investigated further regarding the adequacy of the oversight

of SIB and the validity of the CD program.

*SIB's Investment Returns Were Too Good To Be True*

31.     The high rates of return and consistent profitability of the SIB CD portfolio

that were reported by SIB, at a time when the world economy was in crisis, likewise should

have prompted the Stanford financial advisors to investigate exactly how the SIB CD

portfolio was invested and how it could achieve such results.  The historical performance of

SIB's CDs is extraordinary, to say the least.  SIB offered CD rates that were significantly

greater than those offered in the United States.  In its own marketing brochure, SIB included

the following comparison in the yields of SIB CDs versus average U.S. Bank CD yields

between 1997 and 2006:

|  | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|---|---|---|
| SIB Yield (%) | 10.13 | 9.25 | 8.71 | 9.625 | 9.13 | 7.17 | 6.38 | 6.21 | 6.52 | 7.13 |
| U.S. Yield (%) | 5.8 | 5.3 | 4.9 | 5.85 | 3.55 | 1.85 | 1.78 | 2.7 | 4.46 | 5.08 |

As mentioned above, at their worst, SIB CDs had a rate of return 140% greater and at their

best 388% greater than the average rate for U.S. Bank CDs.  Even more incredible were the

overall rates of return earned by the SIB CD investment portfolio between 1997 and 2007 --

*i.e.* the total amount earned by SIB, not just the amount paid to investors.  Specifically, according to internal company documents, the investment portfolio had a 14.9% overall rate of return in 1997, 14.8% in 1998, 14.2% in 1999, 14.1% in 2000, 14.3% in 2001, 14% in 2002, 11.7% in 2003, 11.9% in 2004, 12.1% in 2005, 12% in 2006 and 12.7% in 2007.  *See* SIB Return Chart, Ex. 18, Appx. 223-28.[3]  These internal documents were part of the training materials used to train SGC financial advisors.

32.    A comparison of SIB's claimed overall rate of return on its CD investment portfolio to well known index rates of return during the same years further highlights the disparity in performance between the SIB CD portfolio and the world financial markets in general.  Over the years, the performance of the SIB CD portfolio often exceeded many of the well-known index rates of return.  Even when it did not, however, the returns for SIB were remarkably consistent and steady from year to year, a result that is extremely rare in normal market conditions and even more so during the time period in question.  The below chart shows the major index returns for the years 1997 through 2007 as well as the amounts allegedly earned by SIB during those years, all as reflected in SIB's own documents that were provided to SGC financial advisors:

|  | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| SIB Yield (%) | 14.9 | 14.8 | 14.2 | 14.1 | 14.3 | 14 | 11.7 | 11.9 | 12.1 | 12 | 12.7 |
| Dow Jones Return | 22.64 | 16.10 | 25.22 | -6.18 | -7.10 | -16.76 | 25.32 | 3.15 | -0.61 | 16.29 | 6.43 |
| Dow Jones Stoxx 50 | 36.84 | 32.00 | 46.74 | -2.69 | -20.25 | -37.30 | 15.68 | 6.90 | 21.28 | 15.12 | 6.79 |

[3] Exhibit and appendix references herein, unless otherwise stated, are to exhibits and the appendix to the Receiver's Application for Temporary Restraining Order, Preliminary Injunction, and in the Alternative, Writ of Attachment, Concerning Accounts of Former Stanford Employees (Doc. 392).

15

**228**

| Return | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Nasdaq 100 Return | 20.63 | 85.31 | 101.95 | -36.84 | -32.65 | -37.58 | 49.12 | 10.44 | 1.49 | 6.79 | 18.67 |
| S&P 500 Return | 31.01 | 26.67 | 19.53 | -10.14 | -13.04 | -23.37 | 26.38 | 8.99 | 3.00 | 13.62 | 3.53 |

Of course, Stanford financial advisors also had ready access to this type of information publicly, and customers would have expected them to know the index rates of return.

33.     As the chart above reflects, the SIB CD returns were in excess of and/or more consistent than virtually every other stock, CD, fund or other investment to which SIB compared its CDs in its marketing materials.  The Stanford financial advisors faced with these facts at least should have investigated to ensure they had an understanding of what they were selling and the suitability of those products for their customers.

*SIB Commission Rate Structure Was Economically Unsustainable*

34.     Stanford financial advisors likewise were paid far above normal market commission rates to sell the SIB CDs, which is yet another factor that should have caused the financial advisors to investigate further, in particular regarding how SIB could afford to pay those rates.  SGC received a 3% commission (also called a "referral fee") on the initial sale of a SIB CD, and 3% annually for the life of the CD.  Financial advisors, in turn, received as much as an annual 1% commission on all amounts their customers had in CDs for that year and were eligible for commissions on the initial sale of CDs of 1% or more.  As the SEC pointed out in a September 2005 letter to Jay Comeaux as part of an SEC investigation, this commission structure would result in SGC receiving a referral fee of 15% of the amount invested on a SIB CD with a 60-month maturity, which the SEC said was more than any rate legally allowed.  *See* SEC Letter to Jay Comeaux, Ex. 11, Appx. 199-206.  SGC financial

statements, to which the Stanford financial advisors had access, referred to this letter in 2005, 2006, and 2007.  That means the financial advisor for that customer would receive 5% of the amount invested over the life of the CD.  Moreover, if the financial advisor sold over $2 million in SIB CDs in any given calendar quarter, they earned an additional 1% quarterly bonus on those sales.  By comparison, when an SGC broker sold a typical certificate of deposit issued by a U.S. bank (and insured by the FDIC), the commission to SGC was in the range of 0.05% to 0.125% of the initial amount invested, or roughly 150 times smaller than the normal commission SGC received on a SIB CD.  *See* Sales Credit Table, Ex. 19, Appx. 229.  The financial advisors of course were aware of this disparity.

35.     In addition to exceeding payments received for U.S. bank CD products, the SIB CD commission structure for financial advisors was unusual in other ways.  The financial advisors received a percentage each year of the amount their clients held in SIB CDs, regardless of whether the financial advisor sold new CDs that year.  The "trailing commission," as it was known, had the obvious impact of causing financial advisors to pressure customers into not redeeming their CDs -- *i.e.* into leaving their money with the bank.  In addition, the trailing commission was structured to incentivize financial advisors to continue selling new CDs by increasing     or decreasing     the percentage of their trailing commission depending on the volume of new CDs they sold     or did not sell     in a given year.

36.     Commission and bonus structures like that used by SIB are not typical, largely because they cannot be sustained economically -- *i.e.* the investments do not make enough to cover the stated CD rates of return, commissions and referral fees along with other applicable expenses.  Stanford financial advisors typically worked as financial advisors for other firms

before coming to Stanford and thus would have known that the SIB commission rates were unusual.  Concerns regarding whether SIB lacked the ability to pay the purported rates of return, commissions, referral fees and expenses should have caused the Stanford financial advisors to investigate the SIB CD program.

*Information Available To Financial Advisors*
*About SIB Investment Portfolio Was Inadequate*

37.    The NASD concluded as early as 2006 that SGC violated NASD rules through "unwarranted and misleading" assertions that SIB's portfolio investments were "prudent"   at a time when SGC admitted that "no one at SGC knows what the investments are."  *See* NASD Letter, Ex. 21, Appx. 231-33.  FTI's investigation confirms this conclusion.

38.    FTI's investigation has uncovered very little information available to the Stanford financial advisors about how SIB purportedly invested funds from the sale of CDs. It was commonly known throughout SGC that SIB was owned and controlled ultimately by Allen Stanford, that James Davis and Laura Pendergest-Holt had principal responsibility for the management of the SIB CD investment portfolio and that specific information regarding the investment portfolio was not readily available.

39.    On the few occasions where we have discovered that financial advisors actually inquired about SIB's investments, however, they received extremely limited and generic information, making it impossible for them to evaluate the suitability of the CDs for their customers.  They nonetheless continued to sell the SIB CDs to customers and were well paid to do so.

40.    For example, in August 2007, financial advisor Doug McDaniel wrote to Jim Davis, Laura Pendergest, and Juan Rodriguez-Tolentino: "I have only done $3,000,000 of my

clients' money (and my own) in the CD product.  I have the potential to do much more, but to do that, I would need to become even more comfortable with the product."  *See* McDaniel Email, Ex. 13, Appx. 209-12.  McDaniel attached a list of questions, noting "some of them may sound like an investigative reporter but I'd like to get as comfortable as I can with the bank."  At Davis's suggestion, McDaniel forwarded the questions to Rodriguez-Tolentino, the president of SIB, along with a  request for a phone call on the topic.  The attached questions included: "My understanding is that from 2000-2002, the Bank's portfolio returns were in the range [of 11% to 15%]. With S&P and EAFE negative for all of those years, and yet a tolerance of up to 50% equity for the bank, how was the bank's portfolio invested"; "What financial instruments and strategies are in place to guard against significant losses in the portfolio, particularly on the equity side? Does each of the managers hedge their own portfolios against loss or do you employ a separate manager to hedge the total bank portfolio."; and "There are many people involved on the investment committee of the Bank. How does this committee ensure that appropriate hedging is in place? This would seem to require some sophisticated calculations outside the expertise of most investment committees." FTI has located no evidence that Tolentino ever answered McDaniel's very basic questions. By late 2008, McDaniel nonetheless had increased his client SIB CD portfolio to over $13 million.   Between April 2006 and February 2009, he received $134,767 in SIB CD commissions, $84,359 in SIB quarterly bonuses, and $1,314,168 in loans.

41.     In March 2008, financial advisor Robert Ulloa wrote to Jason Green with a list of similar concerns regarding SIB.  *See* Ex. 8, Appx. 190-91:  Ulloa inquired as to: "SIB's funding sources other than CDs?"; "Which banks provide liquidity funding to SGC?"; "Liquidity funding, how SGC does it?"; "SIB's Equity Investments, what percentage is

private?"; "Have we reduced/increased our exposure to financials?"; "How leveraged is Stanford, is it 30 to 1 like most investment banks?"  Although Laura Pendergest-Holt suggested addressing Ulloa's questions on an upcoming all-financial advisor call, noting "I am sure if he has these questions others will as well," FTI has located no record of what, if any, answers were provided to the group.  By late 2008, Ulloa had increased his client SIB CD portfolio to over $165 million.  Between 2005 and 2009 he received $3,585,168 in SIB CD commissions and $987,973 in SIB quarterly bonuses.

42.     Also in March 2008, financial advisors Neal Clement, John Mark Holliday and Scot Thigpen discussed SIB and how to "have a good story to tell prospective clients . . . in these difficult markets."  *See* Ex. 4, Appx. 23-27.  Thigpen noted that it was "difficult . . . to show [SIB is] able to provide positive returns even in light of horrible market conditions."  Thigpen opined that "[a]ccredited investors are pretty savvy investors lots of times" and asked how one could show them the available SIB CD rates without showing them the underlying portfolio returns.  Clement responded: "If I have a client that has to see the [SIB] portfolio, the SIB is not for them!!!!!"  By 2008, Clement's client SIB CD portfolio exceeded $20 million and Holliday's exceeded $3 million.  Between April 2006 and February 2009, Clement received $270,347 in SIB CD commissions, $163,882 in SIB quarterly bonuses, and $639,506 in forgivable loans; and Holliday received $33,358 in SIB CD commissions and $597,503 in forgivable loans.

43.     Thus, the former Stanford financial advisors had insufficient information upon which to make recommendations to clients regarding the suitability of SIB CDs.  The NASD reached the same conclusion as part of a 2006 inquiry into the SIB CD program and SGC's sales practices.  Specifically, the NASD concluded that SGC had violated NASD rules

through "unwarranted and misleading" assertions that SIB's portfolio investments were "prudent"  at a time when SGC admitted that "no one at SGC knows what the investments are." *See* NASD Letter, Ex. 21, Appx. 231-33.  The Stanford financial advisors under these circumstances should have conducted a full investigation to determine the suitability of the investment for their customers.

*The Limited Information That Financial Advisors Did Have*
*Regarding The SIB CD Investment Portfolio*
*Should Have Caused Them To Investigate Further*

44.     Though the fact that information regarding the SIB CD investment portfolio was difficult to come by, alone, should have caused financial advisors to investigate further, the limited information they did have about the portfolio likewise should have put them on notice that the SIB CDs likely were not legitimate investment products.  The representations that SIB made about its investment strategy were not consistent with the purported investment returns.  Moreover, a review of SIB's financial statements shows that the SIB financial model was not sustainable without the influx of new CD money.

45.     The fact that the SIB investment portfolio was controlled by James Davis and Laura Pendergest-Holt should have been cause for concern that the portfolio was not being managed properly.  It is extremely unusual for such a small number of people to manage and control a multi-billion dollar investment portfolio.  Most financial institutions search for and recruit the top talent in the market to manage portfolios of that size.  Davis, on the other hand, was Stanford's college roommate who had worked with Stanford since college and had no investment management experience.   Likewise, Pendergest-Holt met Davis because their families were both from the same small Mississippi town.  She likewise started with Stanford right out of college and had no prior investment management experience.  Had the Stanford

financial advisors at least asked about Davis's and Pendergest-Holt's background, they would have found that Davis and Pendergest-Holt were not qualified to handle SIB's investments. *See* exhibits **KVT-9** at 1; **KVT-10** at 5, 12-13; and **KVT-11** at 3.  At best, the kind of success Pendergest-Holt and Davis claimed to have with the SIB CD investment portfolio could have been characterized as luck, something financial advisors should not rely upon in selling investment products to their customers.

46.     The extraordinary returns provided by the SIB CDs were particularly unusual considering SIB's representations regarding its conservative investment strategy and emphasis on guaranteed returns to its CD customers.  As a general rule, in order to achieve higher levels of returns, it is necessary to take on a higher level of investment risk.  Here, SIB in essence claimed to buck this trend by providing consistently high returns as well as the lowest level of consumer risk.  Moreover, SIB offered no substantive explanation as to how it was able to achieve these uncommon results.  In its 2007 Annual Report, SIB claimed to "focus on maintaining the highest degree of liquidity as a protective factor for our depositors…[by investing] in a well-diversified portfolio of highly marketable securities issued by stable governments, strong multinational companies and major international banks."  KVT-3 at 3. This is hardly an extraordinary investment strategy and indeed is one promoted by many financial institutions whose products lost money and/or were very volatile while SIB CDs were supposedly providing consistent and positive returns.  At a minimum, this apparent disconnect between a conservative investment strategy and consistent and/or above-market returns should have caused the Stanford financial advisors to investigate and resolve this apparent disconnect.

47.     SIB's claimed conservative investment strategy also did not square with the information SIB made available to the public about its portfolio.  For example, in its 2007 annual report, which was available to all of the financial advisors (and the public), SIB claimed that its investment portfolio at fair value consisted of 58.6% equity, 18.6% fixed income, 15.6% alternative investments (*i.e.* hedge funds) and 7.2% precious metals.  *See* exhibit **KVT-5.**  SIB's investment allocation for the years prior, going back to at least 2004, was very similar to this.  *See* exhibits **KVT-6, 7 and 8.**  Other than the fixed income, the performance of every component of this investment allocation was volatile and subject to significant risk, particularly in the 2004 through 2007 time period.  Even fixed income has risk.  The Stanford financial advisors faced with SIB's stated investment strategy and this information regarding its investment portfolio should have inquired further to understand exactly how the portfolio was invested.

48.     By reviewing SIB's financial statements, a basic exercise that Stanford financial advisors selling SIB CDs should have performed, the financial advisors likewise would have seen that SIB's apparent assets were volatile and subject to change and that even a small drop in market performance of SIB's portfolio would have caused the total reported assets to become insufficient to pay CD obligations.  For example, in 2007 a mere drop of 4.50% of the reported financial assets would have resulted in SIB's combined cash, cash equivalents and reported financial assets being less than their outstanding purported CD obligations.  Indeed, as discussed further below, non-Stanford CPAs advising SGC customers came to these conclusions based on presumably the same or even less information than was available to the Stanford financial advisors.

49.     When financial advisors have concerns or questions about an investment product, one obvious way for them to investigate the product is to review audit reports or contact the auditor directly.  Most multi-billion dollar investment funds go through rigorous audits by large and well-known audit firms and in fact switch auditors every few years to avoid even the appearance of impropriety.  This was not the case with SIB and the financial advisors were aware of this fact.  As reported in SIB's annual statements, from SIB's inception to its closing, its auditing firm was C.A.S. Hewlett & Co., Ltd., a very small local firm in Antigua.  The Hewlett firm lacked the apparent resources, credentials, reputation, and staff to audit a multi-billion dollar investment portfolio.  SIB used this firm even though at least 2 of the Big 4 audit firms and several other international firms had a presence on the island and all of the Big 4 had locations in the Caribbean.  The Stanford financial advisors should have investigated the adequacy of SIB's auditor faced with this information.

50.     When some financial advisors tried to obtain information about or expressed concern about SIB's auditor, they were unsuccessful.  Yet, they continued to sell CDs despite these concerns.  *See, e.g.,* Email from Bill Whitaker to Jason Green dated May 22, 2008, Ex. 27, Appx. 251  ("I met with a very wealthy prospect yesterday…and his first question concerned the auditors, C.A.S. Hewlett & Co. Ltd. in Antigua…He also said that he was surprised that a $7 Billion bank did not retain a Big 4 or an International Auditor.  Please let me know who could I talk to give me a better understanding of the SIB auditors…."  FTI and the Receiver have not located a response); Email from Mark Groesbeck to Mark Kuhrt dated September 25, 2007, Ex. 28, Appx. 252.  Just before the Receiver was appointed in February 2009, one of the financial advisors, Chuck Vollmer, acknowledged that he had been a proponent of hiring a "big name audit firm" for four years.  *See* Vollmer Email, Ex. 22, Appx.

234-35. Despite these concerns, his client CD portfolio in 2008 was over $29 million, and he earned at least $680,000 in commissions and bonuses directly tied to selling SIB CDs.

*Financial Advisors Were Aware of Negative Findings By the SEC*

51.     The Stanford financial advisors cannot credibly claim that they did not have sufficient notice of problems with SIB CDs to cause them to perform extensive additional investigation.  As the above examples of inquiries lodged by some financial advisors show, many financial advisors did have concerns, even if they ultimately failed to follow through on them.  Indeed, as early as 2002, another financial advisor, Leyla Basagoitia was fired, allegedly because of "her continued reluctance to push SIBL and its products".  *See In re Stanford Group Company and Basagoitia*, Docket No. 03-02025, 2004 WL 2191763, at *2 (N.A.S.D. Sept. 15, 2004).  In an arbitration following her termination, Basagoitia alleged that SGC was "engaged in Ponzi scheme to defraud its clients" and that the SIB CD was "risky in nature, unsuitable, and not the interest of her clients."  Had the Stanford financial advisors properly investigated, as they should have under these circumstances, they would have been led to the same inevitable conclusion or been thwarted in their efforts, which should have caused them to cease all sales of SIB CDs.

52.     Others who were not Stanford insiders raised such concerns, as the financial advisors were well aware.  For example, the SEC raised issues regarding SIB CDs and underlying investments in 2004 and 2005.  During the inquiry, the SEC observed a number of red flags and concluded that "SGC made material misstatements to investors concerning [SIB CDs and failed] to disclose material facts in connection with the sales."  *See* SEC Letter to Jay Comeaux, Ex. 11, Appx. 199-206.  In September 2005, the SEC wrote to Jay Comeaux, and related the SEC's finding that SGC's SIB CD marketing materials falsely "imply little or no

risk to the investor" and that those materials were "materially misleading as they inaccurately imply a safety of principal and the guaranteed receipt of interest of the principal."

53.     As part of the same inquiry, the SEC sent a detailed questionnaire to a number of SIB CD investors, clearly signaling concerns about the CDs, the makeup of the underlying investment portfolio, and misrepresentations that customer deposits were guaranteed or protected by insurance.  *See* SEC Questionnaire, Ex. 17, Appx. 219-22.  Questions included: "Did anyone tell you where Stanford was going to invest your funds in order to generate returns for CD Program Investors?"; "Did anyone tell you that funds invested in the CD Program were insured against loss?"; "Did anyone guarantee the return of your principal investment?"; and "Please describe in full what you were told, if anything, about the risk of this investment."  Notice of this questionnaire was sent to *all* financial advisors in May 2005. *See* Rep Poppell Email, Ex. 20, Appx. 230.

54.     Moreover, customers contacted their FAs to express concern caused by the inquiry and financial advisors discussed those concerns internally.  *See, e.g.,* Rep Poppell to Alvarado Email, Ex. 26, Appx. 250 ("Jay Comeaux phoned......his broker Doug Shaw has received a phone call from one of his clients. It seems the client has received a letter and subsequent request from the SEC regarding his respective purchase of a SIB CD from SGC. The letter is signed by Jennifer Brandt, SEC department of enforcement.  I am not aware of such letter and am attempting to contact SEC to inquire.  Jay is attempting to get a copy of this letter from the client.").  Also in June 2005, another Baton Rouge financial advisor wrote to Hank Mills to "find out how many of your clients received a letter from the SEC and *if there were any negative repercussions.*"  *See* Email to Hank Mills, Ex. 23, Appx. 236 (emphasis added).  In response to the questionnaire, Jay Comeaux and Mark Tidwell held an

all-hands meeting in Houston to discuss it in June 2005.  *See* Tidwell Meeting Invite, Ex. 24, Appx. 237-38.  The invitees to this meeting included several financial advisors, including George Arnold, Andrea Freedman, Nancy Brownlee, Susana Cisneros, Jay Comeaux, Jason LeBlanc, Trevor Ling, Manuel Malvaez, Donald Miller, Spencer Murchison, Lupe Northam, Tony Perez, Lou Perry, Sumeet Rai, Doug Shaw, Brent Simmons, Christopher Thomas, Al Trullenque, and David Whittemore.  These financial advisors have accounts currently frozen by the Court's orders in the aggregate amount of $7.3 million, representing nearly a third of the value of all former employee held accounts.

55.     The Stanford financial advisors who had knowledge of an inquiry by the SEC that questioned the SIB CD they were selling should have ceased selling the products until they were satisfied that the SEC's concerns were unfounded.

*Financial Advisors Were Aware of Customer Concerns*

56.     SIB customers were also raising concerns with their financial advisors that should have prompted further investigation.  In early 2007, a prospective SIB client produced an analysis and criticism of the SIB CD product and sent it to his financial advisor, Tim Vanderver.  *See* Billy Hall SIB CD Analysis, Ex. 9, Appx. 192-94.  The analysis essentially concluded that SIB was a Ponzi scheme  SIB was "susceptible to a dependence on new deposits and renewed certificates in order to continue paying investors the guaranteed CD interest and the principal of maturing CDs" because only a small drop in the equities markets would likely render its assets insufficient to meet its liabilities; and further that SIB's liabilities were already close to equaling or exceeding its assets.

57.     The Hall memo was circulated to multiple Stanford employees.  In addition to in-house counsel Glen Rigby, at least the following other employees received a copy of the

analysis: Maggie Schiffer; JC Bradham; Jason Green; Suzanne Hamm; Bernerd Young; and Lori Guyton.  Indeed, one of the financial advisors who has a held account, Tim Vanderver, was instrumental in creating a misleading and largely irrelevant response to the prospective customer, which emphasized, among other things, SIB's "well diversified" portfolio; the various insurance policies SIB maintains; and SIB's "strong cash flow", none of which Vanderver had a reasonable basis for asserting.  *See* Vanderver Response to Hall Analysis, Ex. 10, Appx. 195-98.  Despite having notice of the above facts and his own customer's concerns about SIB CDs, Vanderver increased his client SIB CD portfolio to $28 million by 2008.  Between January 2006 and February 2009, Vanderver received $510,819 in SIB CD commissions, $208,168 in SIB quarterly bonus, and $980,000 in forgivable loans.

58.     In 2008, a prospective SIB client's CPA sent an email to Jason Green and Chuck Vollmer that questioned SIB's suspiciously consistent investment returns and all but concluded that SIB and Allen Stanford were the next Madoff.  *See* Ex. 12, Appx. 207-08.  The CPA wrote "I'm not totally comfortable with Stanford International Bank", noting that SIB's audit firm was unknown to him, and concluding that SIB "just seems to good to be true."  He asked "How do I know . . . [SIB's] consistent growth in assets and remarkably steady financial performance . . . is real?  I know that seems like a rude question."  In the ensuing internal discussion, one financial advisor added: "More disclosure on the current firm as well as the regulatory bodies that certify our financial soundness would be helpful."

59.     The Stanford financial advisors faced with similar customer concerns should have ensured that the CDs they were selling were in fact legitimate and that there was no basis for their customer concerns.

*Financial Advisors Were Aware of Concerns Raised By Tidwell and Rawl*

60.    In July 2008, Bloomberg published an article stating that the SEC was "investigating sales of certificates of deposit by Stanford Group Company at its offshore bank, which has $6 billion in assets in Antigua."  The article also noted that the SEC had issued subpoenas to two former SGC financial advisors who were allegedly forced to resign in 2007 because they refused to participate in SGC's "illegal and unethical" marketing methods, Charles Rawl and Mark Tidwell.  The subpoenas sought information about the sale of SIB CDs and requested copies of training materials on SIB CD sales methods.  The article prompted much discussion among both Stanford employees and SIB CD investors, and led several investors to withdraw their funds from SIB.  *See, e.g.,* exhibit **KVT-12** at 1 (Ed Ventrice asked Scott Chaisson and Jason Green, "[W]hat's the deal with this, is this place a ticking time bomb?"); exhibit **KVT-13** at 1 (Michael MacDonald wrote the following to Brenda Bohs, Michael Bober, and Ed Ventrice: "'Oh the web we weave[.]'  Let's hope they are lying [a]nd sgc is not doing something underhanded"); Doug Shaw Email, Ex. 15, Appx. 215-16 (writing to Jay Comeaux: "Lost more $ from SIB due to the Tidwell article.  Have you had any issues with it?"); Robert Barrett Email, Ex. 16, Appx. 217-18 (notifying Jay Comeaux that a former client of Tidwell's had redeemed a CD prior to maturity, which "was most likely the result of the Bloomberg article").  In addition to being widely circulated within the company, the Bloomberg article was of course available to the public.  When faced with allegations of fraud such as these, the Stanford financial advisors should have refrained from selling the SIB CDs unless and until they had a full understanding of the Rawl and Tidwell allegations and determined that they were untrue.

CONCLUSION

61.     Based on FTI's investigation and the facts discussed herein, it is my opinion that the Stanford financial advisors were aware of information that should have caused them to investigate the SIB CD. Had they attempted to perform an adequate investigation, I believe they would have been thwarted in their efforts and would not have received adequate answers. In that event, the financial advisors should have suspected the SIB CD program was a fraud. Of course, had they inquired and received truthful answers, they would have known it was a fraud.

Executed this 24th day of May, 2010.

Karyl Van Tassel

30

243

# KVT-1

# Karyl M. Van Tassel, CPA

Senior Managing Director—Forensic and Litigation Consulting

Karyl.vantassel@fticonsulting.com

1001 Fannin
Suite 1400
First City Tower
Houston, TX 77002
Tel: (713) 353 5445
Fax: (713) 353 5459

**Certifications**

Certified Public Accountant

**Professional Affiliations**

American Institute of Certified
Public Accountants

Texas Society of Certified Public
Accountants

**Education**

B.S. in Business Administration,
Emphasis in Accounting,
University of Northern Colorado

Karyl Van Tassel is a senior managing director in the FTI Forensic and Litigation Consulting practice and is based in Houston. Ms. Van Tassel has twenty-five years of experience providing a variety of audit, accounting, tax, litigation, valuation and other financial advisory services. Ms. Van Tassel has been designated as an expert on valuations of closely held businesses, other economic damage claims and forensic accounting issues and has performed detailed financial analyses in a variety of litigation matters, including securities, intellectual property, breach of contract, antitrust, lender liability, fraud and wrongful terminations. She has also been retained by audit committees to assist in investigating allegations of accounting and financial improprieties.

Prior to joining FTI, Ms. Van Tassel was a partner in KPMG's Forensic Dispute Advisory Services practice. Prior to that she was a member of the litigation and bankruptcy consulting divisions of two national accounting firms as well as a regionally based firm, where she provided financial advisory services to the legal and insurance professions and private industry. She has also provided audit and tax services to auto dealerships, construction clients and governmental agencies. In addition, she has provided accounting services and investment analysis to a financial institution.

## Professional Experience

### Forensic Accounting

- Retained by court appointed receiver to investigate and track $85 million of funds embezzled by the CFO of a Texas energy company.  Searched the company records to determine the amount of the embezzled funds, and determine the various schemes used to remove the funds from the company.  After tracing the amount removed from the company, then traced assets through multiple shell companies and personal bank accounts, utilizing accounting information and electronic data obtained through email, hard drive and server sources.  Worked with receiver on monetizing assets recovered.

- Involved in various investigatory matters related to compliance with Foreign Corrupt Practices Act (FCPA), including assisting a monitor appointed under a deferred prosecution agreement of a company to analyze accounting and internal control procedures.  Prepared work plan for compliance testing and directed site visits, conducted interviews and assisted in preparing report of findings.  As a result of our work, have reported to head of enforcement at the Department of Justice.  With the three year term of the monitorship, have ongoing responsibilities for follow up with the company and oversight of responses to monitor's requests and reported findings, as well as follow up site visits for each year.

- Retained by audit committee of a drilling company to investigate issues related to potential FCPA violations.  One issue involved potential payments by the company to paramilitary groups in a Latin American country for protection of its rigs against attack.  Work involved determining whether payments were made by false invoices from an authorized vendor, the authenticity of the endorsements and bank accounts used for payments to these vendors,



## Karyl M. Van Tassel

and the background investigatory work to determine ultimate recipient of funds. Additionally, investigated payments made in a West African country to a freight handler and potential governmental authorities. Analyzed invoices and payments, traced cash used to fund payments to the various entities to determine source of the funds, determined completeness through general ledger testing, and compiled findings for reporting to the Department of Justice.

- Retained by the audit committee on matters related to allegations of round trip trading in the energy industry. Assisted in providing multidisciplinary teams to extract data, analyze trades, document risk management practices and analyze appropriate accounting treatment, including potential restatement. Reports provided to audit committees to assist them in responding to SEC inquiries and investigations.

- Retained by company to perform analysis of costs incurred for provider of energy in submitting a claim in the refund of overpayments related to the California power settlements. Reviewed regulatory filings to determine if costs and methodologies complied with FERC guidelines and state mandates. Analyzed source documents as well as documenting the methodology utilized for compiling the information.

- Retained by counsel for a special committee of a publicly traded software company to investigate allegations of potential backdating of stock options. Led a team of accounting and electronic evidence personnel to assist in acquiring and analyzing written and electronic information related to the stock option process and individuals involved. Worked extensively with counsel analyzing accounting issues related to measurement dates and the appropriate accounting of stock grants for new hires, new account acquisition, employee ranking, compensation in lieu of cash, and sales incentive plans. Analyzed appropriate accounting treatment and estimate of annual financial impact based upon alternative measurement dates. Reported results to Board of Directors and auditors of the company.

- Retained by the audit committee of an electronics company to investigate allegations by the SEC related to revenue recognition issues, overstatement of inventory and property, plant and equipment and self-dealing by top level executives. Company eventually settled with the SEC and announced restated financial statements

- Retained by the audit committee of Fortune 500 company to analyze historical accounting issues related to accounting for long-term construction contracts. Issued report and had meetings with the SEC to discuss findings and accounting issues.

- Analyzed historical rates of return for a variety of mutual funds and equity investments to determine the impact of various investing options related to the assets of a trust. Compared actual returns to several indices to determine the difference and the potential damages allegedly incurred by the trust.

- In a securities matter related to the mining industry, analyzed the impact of the accounting and financial disclosures on the stock of a company. Analyzed various returns on equity investments for guideline companies in the industry as well as equity indices to measure impact of announcements and disclosures on the company stock.

- Retained by a hospital chain to analyze billings to Medicaid and insurance providers to determine if billings were appropriate based upon contractual provisions and consistent with the patients file and diagnosis. Worked with multidisciplinary team to consisting of computer



Case 3:09-cv-00724-N   Document 444-2   Filed 05/24/10   Page 35 of 64   PageID 4481
Case 3:09-cv-00721-N-BQ   Document 115-3   Filed 12/05/11   Page 105 of 145   PageID 8193

Karyl M. Van Tassel

specialists to retrieve data, database specialists to analyze information and medical personnel to review medical files.

- Retained to analyze various factors and transactions in matters asserting alter ego claims. Involved in a variety of matters where we provided detailed analyses of corporate governance, financial operational and control factors to determine the extent to which the information would indicate the existence of separate entities.

- Involved in analyzing various complex financial and accounting transactions regarding alleged improprieties in a variety of industries, either for internal investigations or litigation.

- Analyzed accounting treatment of revenues and related party disclosures for a defendant in a securities matter. Software company allegedly had overstated revenues by inappropriate application of accounting principles and improperly disclosed various related party transactions.

- Analyzed and traced assets between various related and affiliated companies, which involved complex accounting treatments. Traced cash and other assets to offshore companies. Testified in hearing for contempt of court regarding the disposition of certain cash receipts subsequent to the issuance of a temporary restraining order that limited the transfer of assets.

- Analyzed the alleged fraudulent activities of two major auto body repair shops for an insurance company. Determined the overall profitability of the auto body repair shops compared to the industry as a whole. From a large production of documents, also determined the availability of financial documents from the body shops, and their relationship to and substantiation of the results of inspections performed on vehicles after the repairs were completed. Assisted the economist in regards to the total business conducted over a 15-year period and extrapolated sample results to the entire population.

- Reconstructed the trust accounts of a real estate company after a fire suspected to be caused by arson. Determined amounts had been misappropriated for the personal use of various brokers. Analysis used in criminal investigation.

- Analyzed the accounts of a real estate developer accused by a family trust of misappropriation of funds. Analysis included complex transactions between 22 related partnerships. Included database extractions of various computers and synthesizing thousands of records to determine ultimate disposition of proceeds from investments.

- Retained by a lender to the defendant in a case involving an alleged ponzi scheme in the computer hardware industry. Analysis included determining the flow of transactions in the company between actual business operations and alleged fraudulent activities. Utilized large-scale database application to track transactions within the company, to the bank and to the potential investors. Analyzed the companies banking transactions to determine if the bank had allowed a "float" on the account, which the trustee alleged to be an additional loan to the company from the bank. Engagement resulted in settlement with company trustee.

- Analyzed the billings of a construction company related to the renovation and partial construction of a residence. Analyzed application of percentage of completion in monthly billings to determine overcharges throughout a three-year construction period.

- Analyzed the costs of producing a compact product for shipping hazardous materials.



Case 3:09-cv-00724-N   Document 444-2   Filed 05/24/10   Page 36 of 64   PageID 4482
Case 3:09-cv-00721-N-BQ   Document 115-3   Filed 12/05/11   Page 106 of 145   PageID 8194

Karyl M. Van Tassel

Determined if improper allocations were made based upon cost accounting theories, resulting in overcharging to clients.

## Contract Disputes

- Analyzed the payments made under a treaty whereby client ceded obligations under a reinsurance agreement in the variable annuity business. The allegations involved whether the contract was wrongfully terminated if underpayment of premium had not been made by insurance company to reinsurer. The issues involved included obtaining an understanding of the payment terms for the reinsurance coverage over an extended period on reinsurance of the guaranteed minimum death benefit of variable annuity life insurance policies. Led a multidisciplinary team working with large volumes of transactions data. Team included data analysis and electronic discovery specialists for the extraction of data over an extended time period with millions of transactions. Also, worked with actuaries to understand variables assumed in their analysis of the book of business and with underwriters to understand policies and procedures. Testified in arbitration that client had not underpaid over the period of time at issue in the matter.

- Analyzed the economic damages in a breach of contract and tort matter between client insurance company and a third party administrator. Analyzed the damages alleged by plaintiff's damage expert and provided rebuttal analysis of damages. Issues in the damage calculation related to valuation of a book of business for dread disease policies and calculation of amounts owed under a contract.

- Analyzed the economic damages sustained by an investor in a failed joint venture in a urea plant in Columbia. Opinion included a valuation of the business enterprise as of the date of the alleged breach, involving various analyses of the urea market, the prospective operation results and ability to attract lenders.

- Analyzed the lost profits sustained by a petrochemical company related to an alleged breach of a joint venture/operations agreement. Issues related to imbalance in the manufacturing facility due to inappropriate levels of various feedstock to the plant. Inability to maintain contracted levels of product forced inefficient plant operations, decreasing profitability.

- Analyzed the lost profits to a large engineering firm related to the inability to complete the construction of a polystyrene plant in the Middle East due to the Gulf War. Analysis involved analyzing the percentage of completion methods and determining profit at time of invasion, compared to projected profit had the event not occurred. Claim was submitted to the neutral arbitrators in Switzerland.

- In a breach of contract dispute, analyzed the economic losses sustained by the creator and distributor of personal care products. Analysis included working with a marketing expert to determine effects of demographic differences of consumers on buying habits and its impact on the subject company's profits and long-term viability.

- Analyzed the economic damage claim of a producer of accounting software. Provided testimony with regard to the out-of-pocket costs incurred for an internally developed product, which was used to replace the component, which the defendant did not deliver. Also analyzed the lost profit damages under a first to market theory.

- Analyzed the lost profits of a used car dealership related to a breach of contract. Analyzed



Case 3:09-cv-00724-N   Document 444-2   Filed 05/24/10   Page 37 of 64   PageID 4483
Case 3:09-cv-00721-N-BQ   Document 115-3   Filed 12/05/11   Page 107 of 145   PageID 8195

Karyl M. Van Tassel

industry margins compared with subject and other market conditions.

- Analyzed the economic damages of an exclusive distributor of sporting good products due to product defects. Calculated the economic impact to the distributor over an eight-year period, including lost profits, carrying costs of inventory and other incremental costs. Project necessitated analyzing the performance of over forty products and determining the cause factors impacting the diminution of profits.

- Provided rebuttal analysis of a $20 million claim for lost profits in a construction claim for an Arkansas highway project. Addressed the issues of causation as well as analyzing the underlying assumptions of the lost profit claim. The indirect claim for lost profits was dismissed on summary judgment, in part based upon our financial analysis of the causation issue.

- Determined the lost profits allegedly sustained by a provider of programming to the hotel industry, related to a breach of the right of first refusal for a satellite transponder. Coordinated industry experts in various areas including hotel/motel management, advertising, consumer demands, economic trends, cable programming and venture capital availability to analyze the feasibility of the programmer's claim.

- Calculated the economic damages, including lost profits and incremental expenses, in the largest asbestos case in Colorado for a major suburban shopping mall.

- In a contract dispute, determined the value of the restaurant operations included as part of a major Colorado ski resort. Analyzed market trends and restaurant industry comparables for use in the valuation. Also used industry information to benchmark against actual results, to determine management effectiveness.

- Analyzed the value of a franchise fast food establishment related to a breach of contract. Engagement included analyzing various offering circulars for franchises to determine relevant value drivers for similar franchises. Analyzed demographic data related to California communities included in franchise agreement.

- Analyzed a lost profit claim related to a chain of fast food restaurants in a breach of contract matter. Analyzed store-by-store financial metrics to determine average store results compared to subject stores. Analyzed economic and demographic trends in areas adjacent to subject stores.

**Insurance Claims**

- Analyzed the claim by a hospital related to the flooding of the facility. Engagement involved detailed analysis of the impacted departments and the financial impact of substituting less profitable services for higher margin services due to inability to provide full service medical operations. Also analyzed specific incremental staff costs incurred during the flood and cleanup period.

- Analyzed and assisted in preparing the claim of a large food manufacturer related to an explosion and fire in its primary manufacturing facility. Claim exceeded $100 million, which was settled expeditiously.

- Assisted risk management officer in analyzing a claim related to a fire at a resort



## Karyl M. Van Tassel

community. Claim involved business interruption for a variety of resort functions as well as property losses.

- Assisted in preparing the claim for a large training facility related to computer outages from lightening strikes. Analyzed business interruption claim and collateral losses. Claim eventually was settled in litigation.

- Assisted in claim related to a power outage for several business related to extended power outages related to a major train derailment.

**Intellectual Property**

- Analyzed the economic damages sustained by a construction product manufacturer due to an alleged patent infringement. Also analyzed the lost profits of the defendant company in a counterclaim for breach of contract. Analyzed market potential for the product, impact of noninfringing substitutes, marketing and distribution channels and other factors impacting sales volume and expenses.

- Analyzed the economic damages sustained in a patent infringement matter by an inventor in the sporting goods industry. Detailed analysis including addressing Georgia Pacific factors related to determining a reasonable royalty. Opinion included market royalty rates, royalty rates on other company products, incremental gross profit on patented property, and profit split method.

- On a consulting basis, analyzed the damages of a producer and global marketer of rubber-based products. Allegations included patent infringement trademark infringement, copyright violations, theft of trade secrets and fraud. Claim for damages exceeded $1 billion. Working for the defendant, analysis included impact of market and distribution channels on lost profits as well as reasonable royalty calculation.

- Analyzed the economic damages of one of the largest software companies in the world related to a patent infringement case. Analysis included determining product gross profitability for those alleged to have infringed the property. Also assisted in analyzing the appropriate royalty rate and allocating the revenue to the patented and nonpatented features of the product. Case settled for $100,000,000 less than claim.

- Analyzed the damages in a patent infringement matter related to modular cells for prison units. Engagement included a detailed analysis of a reasonable royalty, based in part upon the Georgia Pacific factors. Reasonable royalty was based upon market derived data, established rates by licensor and licensee, prior licensing history between the parties and analytical analysis of various profit measures.

- Analyzed value of patented technology for various biomedical devices held by a company for a potential acquisition. Analyzed the patented and nonpatented products to determine synergies and purchase drivers between the products since only a portion of the portfolio of products was to be purchased. Also considered impact of governmental approval process on value of patented properties that were still in clinical trials. Determined range of values based upon reasonable royalties obtained in the market place and from other analytical measures.

- Analyzed the value of patented technology in a laser devise used for noninvasive surgeries and dental work for a transfer to an off-shore entity for tax purposes. Engagement included



Case 3:09-cv-00724-N   Document 444-2   Filed 05/24/10   Page 39 of 64   PageID 4485
Case 3:09-cv-00721-N-BQ   Document 115-3   Filed 12/05/11   Page 109 of 145   PageID 8197

Karyl M. Van Tassel

analyzing the profit stream from the laser device as well as market derived rates.

- Analyzed the range of reasonable royalty for physicians developing a drug for cancer treatment. Patented property was related to improving efficacy of radiation treatments. Using analytical data and market derived rates, assisted in negotiating license with a biotechnology company.

- Analyzed the economic losses in a matter involving the alleged infringement of trademarks for a line of personal beauty products. Testified for the defendant in deposition regarding the economic damages sustained as well as presented counter claim testimony. Issues included analyzing relevant markets for personal care products, product survey information regarding product characteristics influencing buyers decisions, internet advertising, and product distribution channels for impact on damage analysis. Case resolved in settlement.

- Analyzed the lost profits sustained by the developer of a sporting good product resulting from an alleged trademark infringement. The economic damages were calculated both as the lost profits of the developer of the product based upon its own historical results as well as analyzing the profits of the alleged infringing entity. Also analyzed damages related to the cost of corrective advertising in conjunction with an advertising expert.

- Testified for the defendant in an injunction hearing regarding the nature of the advertising revenue as the primary source of income, the overlap in advertising between the "webzine" and magazine and the potential impact on economic damages. Case related to an alleged trademark infringement by a "webzine" of a magazine title.

- Analyzed damages of plaintiff related to disparagement of Ameritech Corporation's management of the alarm company post-acquisition. The case related to the alleged infringement of a trademark for a burglar alarm company purchased by the plaintiffs. Analyzed detail records of clients for overlap caused by clients subscribing to the defendant company due to disparaging information supplied to Ameritech clients in violation of a noncompete agreement as well as infringing use of trademarks.

- Performed royalty examinations for a multinational software company. Supervised multilingual and disciplinary teams to perform royal "audits" in several countries and domestically. Developed regular maintenance program for ongoing audits of contracts on a scheduled basis. Resulted in recovery in excess of $10,000,000, and assisted in favorable renegotiations with joint venture partners.

- Performed a royalty examination in a dispute between a software producer and distributor. Calculated the economic damages allegedly sustained by the software producer due to the alleged under reporting of software sales. Testified in arbitration regarding the results of our findings.

- Performed royalty examinations of five different licensees under contract "audit" rights for a developer of software. Worked with clients and licensees to resolve disputes, recovery of more than $1,500,000, and renegotiation of contracts.

**Post Acquisition Disputes**

- In a post-acquisition dispute, analyzed the results of certain long-term contracts obtained as part of a purchase of an international engineering firm. Analyzed the accounting treatment and financial results of the contracts, both pre- and post-acquisition, and the impact on the



Case 3:09-cv-00724-N   Document 444-2   Filed 05/24/10   Page 40 of 64   PageID 4486
Case 3:09-cv-00721-N-BQ   Document 115-3   Filed 12/05/11   Page 110 of 145   PageID 8198

Karyl M. Van Tassel

valuation of the business.

- Analyzed the lost profits due to alleged fraudulent misrepresentations in a purchase of a restaurant chain. Analysis included store-by-store data of prospective revenue and profitability, compared to those actually achieved. Analyzed market and economic trends in regions in which the restaurants operated to determine impact on profitability and sales from issues unrelated to the alleged misrepresentations.

- Served as an arbitrator in a dispute involving the closing balance sheet working capital provisions of a purchase agreement. In the medical insurance industry, analyzed the proposed adjustments to working capital including accounts receivable, reserves for losses and contingent liabilities.

- Prepared a claim of working capital adjustment related to the closing-balance sheet provisions of a purchase agreement in the computer storage industry. Analysis included inventory accounting, accounts receivable and deferred revenue.

- Analyzed the propriety of accounts receivables included in the representations and warranties in the purchase of an environmental services company. Allegations involved intentional overstatement of accounts receivable later determined to be uncollectible by the purchaser.

**Telecommunications**

- Analyzed the economic damages of a company that terminates traffic for other telecommunications companies who provide a variety of services to end-users. In a contract dispute with one of its clients, analyzed the lost profits as well as the diminution in the value of the business. Analysis included determining network capabilities in regions covered by the agreement during peak and off-peak time periods to determine availability of volume due to switching constraints.

- Analyzed the economic damages asserted in a class action matter against a RBOC. Analysis included detailed records for thousands of customers asserting held order claims over a six-year time period. Downloaded data records related to customer orders, service delivery, billing and customer data. Analyzed relevant tranches of class participants and related damages.

- Analyzed payments made by a major telecommunications company to a switching vendor over a five-year period of time. Based upon contract terms, worked with the company's engineers to determine how the provisioned switching products impacted the billing requirements under the contract. Analysis related to whether charges made by switching vendors were in excess of contract terms. Analysis resulted in multi-million dollar settlement with vendor.

- Analyzed payments made by a major telecommunications company to a single source construction vendor. Issues related to the propriety of charges incurred compared to services delivered over a period of several years. Analysis was used for negotiating a new contract with the contractor.

- In a contract dispute assisted in analyzing the viability of a "C-Block" license holders' business plan and the reasonableness of the company valuation. Researched "C-Block"



Karyl M. Van Tassel

license auction values and results of operation of "C-Block" auction recipients.

- Oversaw an engagement in which 200 competitive local exchange carrier (CLEC) contracts were analyzed to extract compliance issues for billing and provisioning by a major telecommunications company. Results provided service representatives with information for communication with CLEC's.

**Miscellaneous**

- Prepared analyses of lost wage claims, lost profit claims and incremental costs incurred in various personal injury matters. Based upon the opinions of rehabilitation specialists and career counselors, prepared damage analysis based upon the estimated reduction in worklife expectancy, decreased earnings potential or incremental costs incurred related to the alleged injuries.

- Analyzed value of businesses conveyed in pre-bankruptcy transactions related to claims of fraudulent conveyance.

- Assisted in economic analyses related to wrongful termination matters, including lost wage and benefit claims.

- Valued the stock of closely held businesses in a dissenting shareholder action, lender liability matter, condemnation proceeding and various marital dissolutions.

- Valued the stock of a closely held chain of restaurants for the purpose of spinning off certain restaurants to form a new company.

- Valued the stock of the largest oyster processing company in the world for a Northwest financial institution. The bank had acquired the company through foreclosure and required the valuation as part of its internal procedures required to sell the entity to an outside party.

- Valued a 50 percent ownership interest in an alarm monitoring company for a buyout of the partial owner's interest.

**Speaking Engagements**

Addressed various state and local bar associations as well as other continuing legal education providers on the following matters:

- Valuation Intricacies

- Financial Statement Analysis and Presenting Financial Data at Trial

- Use of Economic Experts in Commercial Litigation and Case Management

- Valuation Issues in Fraudulent Conveyance Matters

- Valuation in a Cram Down Bankruptcy Proceeding

- Valuation of Businesses in Mergers and Acquisitions

- Valuation of Intellectual Property

- Valuation Issues for Biotechnology

**Publications**

- Coauthor of "Calculation of Economic Damages in Commercial Litigation," Totaltape



Case 3:09-cv-00724-N   Document 444-2   Filed 05/24/10   Page 42 of 64   PageID 4488
Case 3:09-cv-00721-N-BQ   Document 115-3   Filed 12/05/11   Page 112 of 145   PageID 8200

Karyl M. Van Tassel

Publishing Company, Tampa, Florida, 1990.

- "Valuing Intellectual Property: The Science and the Art," The Colorado Lawyer, August, 1997.

## Education

University of Northern Colorado—B.S. in Business Administration, emphasis in Accounting

## Summary of Testimony

| Case | Case Number | Type of Testimony | Law Firm Client | Year |
|------|-------------|-------------------|-----------------|------|
| *Edward Malo vs. Breckenridge Spa and William Benkelman* | U.S. District Court of Colorado 92-M-2537 | Deposition | Bradley Campbell Carney & Madsen | 1994 |
| *Asolo SpA, et al. vs. Giancarlo Tanzi* | U.S. District Court of Colorado 93-Z-1778 | Deposition, Trial | Hale & Dorr | 1995 |
| *LittleWing Co., Ltd. vs. Mesch & Associates d/b/a StarPlay Productions* | AAA Arbitration | Arbitration | Holme Roberts & Owen LLC | 1995 |
| *TLB, INC., an Ohio corporation, vs. Platinum Software, a California company* | U.S. District Court of Colorado 95-WY-621 | Deposition, Trial | Coghill & Goodspeed, P.C. | 1996 |
| *Primedia Intertec Corporation vs. Technology Marketing Corporation* | U.S. District Court of Kansas 98-2384-KHV | Trial | Locke Reynolds Boyd & Weisell Sonnenschein Nath & Rosenthal | 1998 |
| *Mountain Ocean, Ltd. d/b/a Everybody Ltd. vs. For Every Body, Inc.* | U.S. District Court Of Colorado | Deposition | Jones, Waldo, Holbrook & McDonough, P.C. | 1999 |
| *Prism Management Enterprises, Inc. vs. Crane Leake Casey Ehlers & Eggleston, P.C.* | District Court, La Plata County 97-CV-412 | Deposition, Arbitration | Jacobs Chase Frick Kleinkopf & Kelley, LLC | 1999 |

F T I

www.fticonsulting.com

**254**

Karyl M. Van Tassel

| | | | | |
|---|---|---|---|---|
| *Ameritech Corporation v. Jackson Burglar Alarm* | U.S. District Court of Colorado 98-N-2432 | Deposition | Holme Roberts & Owen | 1999 |
| *The Quizno's Corporation v. Robert W. Mitelhaus* | AAA Arbitration | Arbitration | Preeo, Silverman & Green | 1999 |
| *Gulf Communications, LLC v. Business Telecom, Inc., d/b/a BTI Telecommunications Services* | 398CV2444-6 U.S. District Court for Northern District of Texas, Dallas Division | Deposition | Kyle & Mathis | 1999 |
| *Southwest Recreation Industries, Inc. v. Fieldturf, Inc. and Fieldturf International, Inc.* | A-00CA063-SS U.S. District Court for the Western District of Texas, Austin Division | Deposition | Brown, Todd & Heyburn PLLC | 2000 |
| *Anthony G. Petrello and Cynthia Petrello v. Renaissance Builders, Inc. and Chandler Robinson* | 199-51358 The District Court of Harris County, Texas 270th Judicial District | Deposition | Fulbright & Jaworski LLP | 2001 |
| *Omagro De Columbia, L.D.C. vs. MCN Energy Enterprises, Inc., formerly named MCN Investment Corporation* | 67-180286-99 The District Court of Tarrant County, Texas 67th Judicial District | Deposition and Trial | Shannon, Gracey, Ratliff & Miller | 2001 |
| *Blitz Holdings Corp. v. Interamericas Financial Holdings Corp.* | Civil Action No. H-00-2247 United States District Court for the Southern District of Texas Houston Division | Contempt Hearing | Wilshire Scott & Dyer | 2001 |
| *Hartford Life Insurance Company And Hartford Life & Annuity Insurance Company v. Connecticut General Life Insurance Company* | Arbitration | Deposition, Trial | Akin, Gump, Strauss, Hauer & Feld L.L.P. | 2002 |

Karyl M. Van Tassel

| | | | | |
|---|---|---|---|---|
| *National Health Insurance Company vs. National Plan Administrators, Inc. Hartford Life Insurance Company, and CRS Marketing Agency, Inc.* | GN – 101679, In the District Court, Travis County, Texas 53rd Judicial District | Deposition, Trial | Akin, Gump, Strauss, Hauer & Feld L.L.P. | 2003 |
| *SOURCECORP, Incorporated, SOURCECORP DMS, Inc. and Information Management Services, Inc. v. Steve Shill, Rita Shill, Robin Meyer, and Mark Meyer* | No. 76Y1160016303ARN, American Arbitration Association | Testimony, Arbitration | Steptoe & Johnson, LLP | 2004 |
| *David Graben and Frank Strickler v. Western Reserve Life Assurance Company of Ohio; Intersecurities, Inc., and Timothy Hutton* | 03-08-648 The District Court of Wise County, Texas 271st Judicial District | Trial | Akin, Gump, Strauss, Hauer & Feld L.L.P. | 2005 |
| *Rodney Montello, et al v. Alcoa Inc., Reynolds Metals Company, Bon L. Campo and Tredegar Corporation* | The U.S. District Court of Southern District of Texas Victoria Division Civil Action No: V-02-84 | Deposition | Baker Botts LLP | 2006 |
| *Bencor, Inc. v. The Variable Annuity Life Insurance Company* | AAA Arbitration | Arbitration | Akin, Gump, Strauss, Hauer & Feld LLP | 2006 |
| *Highland Crusader Offshore Partners, L.P. et al v. Motient Corporation* | Cause No. 05-07996 In the District Court, Dallas County, Texas E-101st Judicial District | Deposition | Fulbright & Jaworksi LLP<br><br>Lackey Hershman L.L.P. | 2007 |
| *Gascoigne Melotte Holdings LLC (U.S.A.), Boumatic LLC (U.S.A.), Boumatic-Melotte SPRL (Belgium) v. Punch Technix N.V. (The Netherlands), et al* | In the International Chamber of Commerce Court of Arbitration | Arbitration | Baker Botts LLP | 2008 |



**256**

Karyl M. Van Tassel

| | | | | |
|---|---|---|---|---|
| *Fair Isaac Corporation vs Texas Mutual Insurance Company* | Civil Action No. 4:05-CV-03007 in the United States District Court for the Southern District of Texas Houston Division | Deposition | Baker Botts LLP | 2008 |
| *RCA Holdings, Ltd, et al., v. Commonwealth Insurance Company, et al.* | Cause No. 2004-02048 in the 61st Judicial District Court of Harris County Texas | Deposition | Akin, Gump, Strauss, Hauer & Feld L.L.P. | 2010 |
| *Arthur R. Hausmann; Arthur R. Hausmann P.C. Defined Benefit Pension Plan; and Arthur R. Hausmann P.C. Defined Benefit Pension Plan Trust v. Union Bank of California, N.A. Investment Services LLC; The Hartford Life and Annuity Insurance Company; Christopher Montagna; William Fortner; Economic Concepts, Inc. ("ECI"); and DOES 1-100* | Case Number:  SA CV 07-1436 AHS (MLGx) in the United States District Court , Central District of California | Deposition | Morrison Foerster LLP | 2010 |
| *Memorial Herman Healthcare system and The Health Professionals Insurance Company, Ltd. V. State Street Bank and Trust Company; Cambridge Financial Services, Inc., and Ernest A. Liebre* | Case No. 07-4089 in the United States District Court for the Southern District of Texas Houston Division | Deposition | Locke Lord Bissell & Liddell LLP | 2010 |
| *Ralph S. Janvey, in His Capacity as Court-Appointed Receiver for the Stanford International Ban, Ltd., et al vs. James R. Alguire, et al* | Case No. 3:09-CV-0724-N in the United States District Court for the Northern District of Texas Dallas Division | Deposition | Baker Botts LLP | 2010 |



# KVT-2

| Employee Name | Department | Location | Job Title | Business Card Title | Supervisor Name |
|---|---|---|---|---|---|
| Amadio, Henry | SFGC Accounting | US TX Houston | Accounting Mgr | Accounting Manager | Lopez, Gilbert |
| Lesi, Oscar | SFGC Accounting | US TX Houston | Supervisor Corporate Accounting | Supervisor Corporate Accounting | Amadio, Henry |
| Lopez, Gilbert | SFGC Accounting | US TX Houston | Chief Accounting Officer | Chief Accounting Officer | Davis, James M |
| Severtson, Anne M. | SFGC Accounting | US TX Houston | Business Systems Mgr | Business Systems Manager | Lopez, Gilbert |
| Ward, Pamela J. | SFGC Human Resources – North America | US TX Houston | Director | Director of Human Resources – North American Region | Bogar, Daniel T. |
| Qarkey, Johnson (John) | SFGC IT | US TX Houston | Chief Information Officer | Chief Information Officer | Bogar, Daniel T. |
| Collinsworth, Mark P | SFGC Research and Trading | US TN Memphis | Managing Director | Managing Director-Global Asset Allocation | Holt, Laura L |
| Holt, Laura L | SFGC Research and Trading | US TN Memphis | Chief Investment Officer | Chief Investment Officer | Davis, James M |
| Palmiano, Frederic A. | SFGC Research and Trading | US TN Memphis | Research Analyst | Senior Investment Officer – Western Europe | Weeden, Kenneth |
| Weeden, Kenneth | SFGC Research and Trading | US MS Tupelo | Managing Director/Research and nv | Managing Director – Global Regional Research and Investments | Holt, Laura L |
| Groves, Denise | SFGC Treasury | US TX Houston | Treasury Analyst | Treasury Analyst | Maldonado, Patricia C. |
| Maldonado, Patricia C. | SFGC Treasury | US TX Houston | Manager | Manager | Davis, James M |
| Patlan, Tarrie J. | SFGC Treasury | US TX Houston | Sr Treasury Analyst | Senior Treasury Analyst | Maldonado, Patricia C |
| Davis, Rhonda L. | SFGC Compliance | US TX Houston | Chief Compliance Officer | Chief Compliance Officer, SCM | Young, Bernard E. |
| Jackson, Kerry | SFGC Compliance | US TX Houston | SVP | Senior Vice President / Controller | Weiser, Charles M. |
| Weiser, Charles M. | SFGC Corporate Finance | US TX Houston | Executive VP | Chief Financial Officer | Bogar, Daniel T. |
| Pi, Osvaldo | SFGC Merchant BK | US FL Miami | Managing Director | Managing Director | Bogar, Daniel T. |
| Alvarado, Pablo M (Mauricio) | SFGC Legal | US FL Miami | General Counsel | General Counsel | Stanford, R Allen |
| Amir, rum | SFGC T | US TX Houston | Web Developer | Web Developer | Barrueco, Robert C. |
| Autry, Mickey F. | SFGC T – Shared Services | US TX Houston | Database Administrator | Senior SQL Database Administrator | Carlo, smael J. |
| Bhanushali, Arvindkumar R. | SFGC T | US TX Houston | Sr Sybase DBA | Sr. Sybase Database Administrator | Carlo, smael J. |
| Bonguric, Pierre-Yves Willy J. (Pierre-Yves) | SFGC T | US TX Houston | Odyssey Specialist | Odyssey Specialist | Carlo, smael J. |
| Brown, Marcus W. | SFGC Compliance | US TX Houston | Compliance Analyst | Compliance Analyst | Davis, Rhonda L. |
| Buena, Joseph N | SFGC T – Shared Services | US TX Houston | Web Team Lead | Team Lead, Web Team | Barrueco, Robert C. |
| Carlo, smael J. | SFGC T | US TX Houston | Director | Director of T Application Development | Varkey, Johnson (John) |
| Cross, Ted D. | SFGC T | US TX Houston | Project Mgr | Project Manager | Kamman, William C. (Bill) |
| Davis, Rodrick A. | SFGC Security – North America | US TX Houston | Security Mgr | Security Manager | Raffanello, Thomas W. |
| Duskin, Helen G. | SFGC Operations | US TX Houston | Director | Director of Operations Development | Fram, Frederick G. |
| Flores, Jose D | SFGC PCG | US TX Houston | Financial Planning Specialist | Financial Planning Specialist | Simmons, Edward T. |
| Fram, Frederick G. | SFGC Operations | US MS Jackson | Sr Director of Operations | Senior Director of Operations | Bogar, Daniel T. |
| Fullerton, Scott B. | SFGC Accounting | US TX Houston | Sr Accountant | Sr. Accountant | Leal, Oscar |
| Hoelting, Marcia K | SFGC S M | US TX Houston | Advisory Services Consultant | Advisory Services Consultant | Gifford, Michael D. |
| Johnson, Matthew K. | SFGC T | US TX Houston | T Support Specialist | T Support Specialist | Lacson, Emerson S. |
| Juarez, Felipe D. | SFGC T | US TX Houston | Business Systems Analyst | Business Systems Analyst | Severtson, Anne M. |
| Kamman, William C. (Bill) | SFGC T | US TX Houston | Manager | Program Manager | Carlo, smael J. |
| Shaw, Lawrence R | SFGC Compliance | US NY New York | Sr VP/Director Compliance | Senior Vice President/Director of Compliance | Young, Bernard E. |
| Lewis, Gareth (Euan) | SFGC Compliance | US NY New York | SVP | Manager T Security | Schwarberg, Larry R. Jr. |
| Littlejohn, John C. (Chris) | SFGC T | US TX Houston | Project Mgr | Project Manager | Varkey, Johnson (John) |
| Merchant, Sohil A. | SFGC T | US TX Houston | Systems Engineer | Application Desktop nfrastructure Manager | Varkey, Johnson (John) |
| Nagy, William K. | SFGC T – Shared Services | US TX Houston | Director – T Operations | Director, T Operations | Varkey, Johnson (John) |
| Pass, Trissy L. | SFGC Corporate Finance | US TX Houston | VP | Vice President, nstitutional Compliance | Poppell, Ralph Edward |
| Petty, Tiffany R | SFGC Accounting | US TX Houston | Payroll Supervisor | Manager, AP & Contract Administration | Liberato, Yolanda J. |
| Poppell, Ralph Edward | SFGC Compliance | US NY New York | Sr VP/Director Compliance | Payroll Supervisor | Lopez, Gilbert |
| Ray, Matthew B. | SFGC T | US TX Houston | Project Mgr | Senior Vice President/Director of Compliance | Young, Bernard E. |
| Sanchez, Orlando | SFGC Security – North America | US TX Houston | Security Supervisor | Project Manager | Kamman, William C. (Bill) |
| Sena, Nino Daniel (Anthony) | SFGC Compliance | US NY New York | Associate VP | Security Supervisor | Davis, Rodrick A. |
| Simmons, Edward T. | SFGC PCG | US MS Jackson | Vice President, Operations | Associate Vice President, Compliance | Poppell, Ralph Edward |
| Vallabhaneni, Ramagopal C. (Gopal) | SFGC T – Shared Services | US TX Houston | Oracle Applications Developer | Vice President, Operations | McDaniel, Douglas M. |
| Vidal-Pope, Shanna | SFGC Merchant BK | US FL Miami | Executive Asst | Oracle Applications Developer | Gu, Jian |
| Whitcomb, George S (Steve) | SFGC T – Shared Services | US TX Houston | Software Engineering Mgr | Executive Assistant | Pi, Osvaldo |
| Young, Vanessa Y. | SFGC T | US TX Houston | Data Management Engineer | Software Engineering Manager | Carlo, smael J. |
| Fortin, Barbara | SFGC Risk Management | US TX Houston | Manager | Data Management Engineer | Whitcomb, George S (Steve) |
| | | | | Corporate Risk Management | Davis, James M |

# KVT-3



## STANFORD FINANCIAL GROUP

*Stanford Financial Group is a privately held, wholly owned global group of independent financial services companies founded in 1932 by Lodis B. Stanford, grandfather to the current sole shareholder Sir Allen Stanford. Stanford's core businesses are private wealth management and investment banking for institutions and emerging growth companies. Stanford provides private and institutional investors with global expertise in asset allocation strategies, investment advisory services, equity research, international private banking and trust administration, commercial banking, investment banking, merchant banking, institutional sales and trading, real estate investment and insurance. Stanford serves clients from over 100 countries on six continents.*

*Stanford International Bank is a member of Stanford Financial Group.*

STANFORD INTERNATIONAL BANK LTD.

## S T A N F O R D   I N T E R N A T I O N A L   B A N K   L T D.



Stanford International Bank Ltd. conducts business with the world from its headquarters in Antigua. As a member of the Stanford Financial Group, the Bank adheres to business principles grounded in 75 years of proven financial success. Today, Stanford International Bank serves a worldwide community of affluent individuals and their families. Our unique private banking business model provides for the preservation of capital in an atmosphere of professionalism and trust.

Stanford International Bank offers the following advantages:

- Depositor security

- Higher interest rates on deposits

- Secure electronic account access

- Ancillary services

- Five-star personal service

- Innovative products

2

STANFORD INTERNATIONAL BANK LTD.



## Depositor Security

Our investment philosophy is anchored in time-proven conservative criteria, promoting stability in our certificate of deposit products. Our prudent approach and methodology translate into deposit security for our customers.

Key components of Stanford International Bank's investment criteria include:

*Liquidity.* We focus on maintaining the highest degree of liquidity as a protective factor for our depositors. The Bank's assets are invested in a well-diversified portfolio of highly marketable securities issued by stable governments, strong multinational companies and major international banks.

*Investment Time Horizons.* By continuously matching investment time horizons against terms of deposits we are able to ensure adequate liquidity to meet all customers' requirements.

3

52

**265**



4

## S T A N F O R D   I N T E R N A T I O N A L   B A N K   L T D.

**Global Investment Strategy.**\* Stanford International Bank's global investment strategy minimizes exposure to any one regional market by broadly distributing our investments across many geographic areas.

**No Credit Risk.**\*\* Stanford International Bank does not expose its customers to the risks associated with commercial loans. Our only form of lending is done on a cash-secured basis solely to existing customers.



**Insurance.** Stanford International Bank maintains a comprehensive insurance program with the following coverages:

- A depository insolvency policy insuring funds held in correspondent financial institutions

- A bankers' blanket bond

- A directors' and officers' liability policy

**Minimization of Currency and Market Risk.**\* While the values of international investments can be affected by changes in currency rates and market risk, we minimize these risks by adhering to our investment philosophy.

*"Stanford International Bank's global investment strategy minimizes exposure to any one regional market…"*

\* Investing in securities issued by international governments and corporations involves considerations and risks not typically associated with investing in obligations issued by the U.S. Government and U.S corporations. The values of international investments can be affected by changes in currency rates or exchange control regulations, application of international tax laws, changes in governmental administration or economic or monetary policy, or changed circumstances in dealings between nations. Forces of supply and demand on the foreign exchange markets determine international currency change rates. These forces are themselves affected by the international balance of payments and other economic and financial conditions, government intervention, speculation and other factors. Moreover, foreign currency exchange rates may be affected by the regulatory control of the exchanges in which the currencies trade. Investments in foreign markets can be affected by factors such as expropriation, confiscation, taxation, lack of uniform accounting and auditing standards, and potential difficulties in enforcing contractual obligations and investment policies, and may be affected by extended settlement periods.

\*\* Conservation of principal and interest rates on the CD deposits are dependent upon returns in our investment portfolios. Depending upon the climate in global investment markets, we utilize various investment strategies for the Bank's portfolios, which may include fixed income, equities and currencies. The returns on the Index-Linked CD will also be affected by the Market Index you choose. If the returns on the Bank's portfolios negatively affect our financial condition, then the same could negatively impact return of principal and interest on the CD.

5

S T A N F O R D    I N T E R N A T I O N A L    B A N K    L T D.



# HIGHER INTEREST RATES ON DEPOSITS

Stanford International Bank pays higher interest rates to depositors for the following reasons:

**Consistent Profitability.** Stanford International Bank has been consistently profitable since inception. Rather than pay dividends to shareholders on earnings, our business model was designed to use these resources to enhance interest rates to depositors.

**Global Investments.**\* Diversified global investments, not loans, are the primary source of Bank earnings. Interest rates paid to depositors are based on reasonable investment return expectations and are reviewed quarterly by the board of directors.

**Low Overhead.** We minimize operational costs and streamline administrative processes by staying true to our core competency—private banking. The Bank also benefits through operational synergies already in place within the Stanford Financial Group.

*"Interest rates paid to depositors are based on reasonable investment return expectations…"*

\* Investing in securities issued by international governments and corporations involves considerations and risks not typically associated with investing in obligations issued by the U.S. Government and U.S. corporations. The values of international investments can be affected by changes in currency rates or exchange control regulations, application of international tax laws, changes in governmental administration or economic or monetary policy, or changed circumstances in dealings between nations. Forces of supply and demand on the foreign exchange markets determine international currency exchange rates. These forces are themselves affected by the international balance of payments and other economic and financial conditions, government intervention, speculation and other factors. Moreover, foreign currency exchange rates may be affected by the regulatory control of the exchanges in which the currencies trade. Investments in foreign markets can be affected by factors such as expropriation, confiscation, taxation, lack of uniform accounting and auditing standards, and potential difficulties in enforcing contractual obligations and investment policies, and may be affected by extended settlement periods.

6

STANFORD INTERNATIONAL BANK LTD.



**Zero-Tax Jurisdiction.** Our domicile does not tax earnings. This results in more available profit for reinvestment and the enhancement of depositor yields.

**No Loan Losses.**<sup>*</sup> By making only cash-secured loans to its existing customers, the Bank eliminates credit risks and the negative impact on earnings due to loan losses.

**Greater Investable Assets.** More than 90% of the Bank's own equity position supplements investable assets, improving our income-producing capabilities.

\* Conservation of principal and interest rate on the CD deposits are dependent upon returns in our investment portfolio. Depending upon the climate in global investment markets, we utilize various investment strategies for the Bank's portfolios, which may include fixed income, equities and currencies. The returns on the Index-Linked CD will also be affected by the Market Index you choose. If the returns on the Bank's portfolios negatively affect our financial condition, then the same could negatively impact return of principal and interest on the CD.

## S T A N F O R D   I N T E R N A T I O N A L   B A N K   L T D.

### INTEREST RATES 1997 – 2006



| | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|---|---|---|
| SIB Yield (%)* | 10.13 | 9.25 | 8.71 | 9.625 | 9.13 | 7.17 | 6.38 | 6.21 | 6.52 | 7.13 |
| U.S. Yield (%)** | 5.8 | 5.3 | 4.9 | 5.85 | 3.55 | 1.85 | 1.78 | 2.7 | 4.46 | 5.08 |

Source: *Bloomberg L.P.*

▢ **Stanford International Bank CDs***
(not FDIC-Insured)

▢ **U.S. Bank CD Averages****
(FDIC-Insured)

*Over the past decade, Stanford International Bank CDs have outperformed U.S. bank CDs by an average of 3.9%*

### PERFORMANCE 1997 – 2006



The above graphics are based on a $1,000,000 deposit invested for 12 months and renewed annually. The information herein has been obtained from sources we believe to be reliable, but we do not offer guarantees as to its accuracy or completeness. Past performance is not a guarantee of future results. All information is subject to change without notice.

* Stanford International Bank Limited CDs are not FDIC-Insured and are not subject to regulation or oversight of any agency of the U.S. government, nor are they subject to any restrictions on how portfolios are invested.

** U.S. Bank CDs are FDIC-Insured and are subject to regulation by an agency of the U.S. government.

8

57

S T A N F O R D   I N T E R N A T I O N A L   B A N K   L T D.

## SECURE ELECTRONIC ACCOUNT ACCESS

Stanford International Bank offers customers access to their account
information 24 hours a day, 365 days a year through our private, password-
protected website. We continue to work toward making customer access
easier, while maintaining the optimum level of privacy and security.

Our customer-only site will always utilize the most advanced firewall software
and encryption technologies available in the financial services industry. This
helps ensure the privacy upon which Stanford International Bank has built
its reputation. We invite both existing and prospective customers to visit our
public website **stanfordinternationalbank.com**.



## ANCILLARY SERVICES

Our high-performance accounts and respect for customer privacy are
supplemented by a range of ancillary services available to depositors.
These include hold-mail and automatic bill paying, available upon request.

The Bank also issues some of the world's most respected payment
instruments: American Express® Gold Card*, Visa® Gold Card and
Gold MasterCard.®

*"… access to account
information 24 hours
a day, 365 days a year …"*

\* Offered only to non-U.S. residents.

9

S T A N F O R D   I N T E R N A T I O N A L   B A N K   L T D.



*"Your Stanford private wealth manager can help you diversify into a range of wealth management strategies…"*

## Five-Star Personal Service

Our Bank was established with a personal service perspective from the very beginning. Individualized attention and a true commitment to depositor needs are standard operating procedure at Stanford International Bank.

Integrity defines our environment, and a firm adherence to an elevated code of values is built into our customer service initiatives. Our private wealth managers speak your language, understand your concerns and discreetly execute your instructions.

Your Stanford private wealth manager can help you diversify into a range of wealth management strategies through our affiliation with the Stanford Financial Group. Expert planning is available in brokerage and investment advisory services, trust administration and insurance.

We invite you to contact us by calling (268) 480-3700.

10

S T A N F O R D   I N T E R N A T I O N A L   B A N K   L T D.

# INNOVATIVE PRODUCTS

| Account[1] | Currency | Withdrawals | Additional Deposits | Key Benefits |
|---|---|---|---|---|
| **FixedCD**[SM][2][3]<br>*fixed-rate term deposit*<br><br>3 months<br>6 months<br>12 months<br>18 months<br>24 months<br>36 months<br>48 months<br>60 months | U.S. dollars<br>Euros<br>Other international currencies | None allowed. Interest accumulates and is paid upon maturity[7]<br><br>Interest may be withdrawn[8] | None allowed | Attractive CD rates<br><br>If base rate goes up, eligible balances[7] receive the higher rate<br><br>If base rate goes down, clients receive the original base rate until maturity<br><br>Interest compounded daily<br><br>Automatic rollover |
| **FlexCD**[SM][3]<br>*fixed-rate term deposit*<br><br>3 months<br>6 months<br>12 months<br>18 months<br>24 months<br>36 months<br>48 months<br>60 months | U.S. dollars<br>Euros<br>Other international currencies | Up to 25% of principal with 5 banking days' notice, with a maximum of 4 withdrawals per calendar year[4] | Allowed (minimum amount required) | Attractive CD rates with added level of flexibility<br><br>If base rate goes up, eligible balances[7] receive the higher rate<br><br>If base rate goes down, clients receive the original base rate until maturity<br><br>Interest compounded daily<br><br>Automatic rollover |
| **Index-Linked CD**[SM][2][3]<br><br>3 years<br>4 years<br>5 years | U.S. dollars only | Not allowed for the first 12 months; thereafter, withdrawals allowed subject to penalties[5] | None allowed | Fixed attractive minimum return on investment[9]<br><br>High growth potential[9]<br><br>Preservation of capital |
| **Performance**[SM]<br>*adjustable-rate<br>open-term account* | U.S. dollars<br>Euros<br>Other international currencies | Any amount<br><br>Requires 15 calendar days' notice | Any amount, at any time | Adjustable rate of return with easy access to funds<br><br>Interest compounded daily |
| **Premium**[SM]<br>*adjustable-rate<br>open-term account* | U.S. dollars only | Any amount<br><br>Requires 15 calendar days' notice | Any amount, at any time | Adjustable rate of return with easy access to funds<br><br>Offers yields equivalent to the performance of selected U.S. Treasury bills and notes<br><br>Interest compounded daily |
| **Express**[SM]<br>*adjustable market-rate<br>open-term account (offered<br>as a supplementary<br>account to Stanford<br>International Bank clients)* | U.S. dollars<br>Euros<br>Other international currencies | Any amount<br><br>Within 24 hours of notification during regular banking days | Any amount, at any time | 24-hour access<br><br>Market-rate interest on qualifying balances[10]<br><br>Interest compounded daily |

*(1)  This information should not be considered an offer. Please contact your Stanford International Bank representative for current account terms and conditions.*

*(2)  For the U.S. Accredited Investor Program, a minimum opening balance of $50,000 is required.*

*(3)  These CD deposits are subject to restrictions on transferability and resale and, in the U.S., may not be transferred or resold except as permitted under the Securities Act of 1933, as amended, and the applicable state securities laws, pursuant to registration or exemption therefrom. Investors should be aware that they will be required to bear the financial risks of this investment for an indefinite period of time.*

*(4)  For the U.S. Accredited Investor Program, early withdrawal penalties can range from one to three month's interest, depending on the term of the CD. For the FlexCD, penalties will be assessed on withdrawals greater than 25%.*

*(5)  For the U.S. Accredited Investor Program, the redemption price is the current market value of the investment index calculation less a penalty of 10%.*

*(6)  Minimum balance required.*

*(7)  For the U.S. Accredited Investor Program, eligibility is based on a minimum balance of $250,000.*

*(8)  Interest is paid only at maturity, but may be subject to income taxes in the year it was earned but not received, depending on the tax laws in your jurisdiction.*

*(9)  Returns will be affected by the Market Index you choose and its volatility.*

*(10)  Or currency equivalent.*

11

*Stanford International Bank Limited ("SIB") is a private financial institution chartered under the laws of Antigua and Barbuda whose deposits are not covered by deposit insurance protection provided by the U.S. Federal Deposit Insurance Corporation.*

*SIB's products are ordinary bank deposit obligations and are not securities under U.S. federal or any state law.  Therefore, they are not subject to the reporting requirements of any jurisdiction outside of Antigua and Barbuda, nor are they covered by the investor protection or securities insurance laws of any jurisdiction such as the U.S. Securities Investor Protection Insurance Corporation or the bonding requirements thereunder. There is no guarantee investors will receive interest distributions or the return of their principal.*

*Stanford Group Company may offer SIB CDs to its clients and receive a referral fee from SIB. Referral fees paid do not reduce the principal amount of any CD deposits or any interest earned thereon. Investors who are residents of the U.S. must be accredited investors and may receive this material only when preceded or accompanied by the Disclosure Statement for SIB's U.S. Accredited Investor Certificate of Deposit Program which fully discloses the potential benefits and risks of the investment.*



**Stanford International Bank Ltd.
A member of the Stanford Financial Group.**

**Stanford Group Company
Member FINRA and a member of the Stanford Financial Group.**



Stanford International Bank Ltd.
No. 11 Pavilion Drive • St. John's, Antigua, West Indies
Tel. 208.480.3700 • Fax 268.480.3737

Stanford Group Company
Member FINRA
5050 Westheimer • Houston, Texas 77056
713.964.8300

stanfordfinancialgroup.com

Members of the Stanford Financial Group.

63

# KVT-4

SGC Percent of Revenue related to SIBL 2004 - 2008

| Year to Date | SGC Revenue-Total | SGC Revenue-SIBL CDs | SGC Revenue-SIBL PE Portfolio Advisory Services | SGC Revenue-SFGC/SFGGM Research Fees | SGC Rev-SIBL % of Total | | SGC Net Income/(Loss) | SGC Capital Contributions Received |
|---|---|---|---|---|---|---|---|---|
| | A | B | C | D | E = SUM(B,C,D) / A | | | |
| 12/31/2004 | $ 65,434,199 | $ 42,925,466 | $ 3,957,439 | $ - | 71.65% | | $ (3,628,184) | $ 10,000,000 |
| 12/31/2005 | 97,775,729 | 56,786,492 | 5,420,170 | - | 63.62% | | (19,866,431) | 21,000,000 |
| 12/31/2006 | 171,477,685 | 88,116,507 | 7,368,181 | 16,000,000 | 65.01% | | (20,509,297) | 51,500,000 |
| 12/31/2007 | 204,435,328 | 77,786,218 | 8,200,633 | 17,000,000 | 50.38% | | (27,384,103) | 41,750,000 |
| 12/31/2008 | 245,804,348 | 94,523,080 | 13,738,259 | 21,600,000 | 52.83% | | (22,752,483) | 51,000,000 |
| Total Rev 2004 - 2008 | $ 784,927,289 | $ 360,137,763 | $ 38,684,682 | $ 54,600,000 | 57.77% | | $ (94,140,498) | $ 175,250,000 |

# KVT-5



STANFORD

STANFORD INTERNATIONAL BANK    ANNUAL REPORT | *2007*

67

280



AT STANFORD INTERNATIONAL BANK, OUR INDIVIDUALIZED PERSONAL
SERVICE, client relationships and global investment strategy transcend
borders to preserve and grow our clients' capital, helping to provide
financial security in any economic climate.

HARD WORK. CLEAR VISION. VALUE FOR THE CLIENT.    *Preservation*

At Stanford International Bank, our forward thinking approach means
focusing on what we can achieve in the long term and uncovering new
and viable investment opportunities. Through meticulous research and
analysis, we strive to reach realistic goals when it comes to our return
on investment and preserving the wealth of our clients.

STANFORD INTERNATIONAL BANK

68

**281**



FINANCIAL HIGHLIGHTS
*(Expressed in United States dollars)*   YEAR ENDED 31ᵗ DECEMBER 2007

|  | 2007 | 2006 | 2005 |
|---|---|---|---|
| **RESULTS** | | | |
| TOTAL REVENUE (see Figure 1) | $   789,479 | $   565,677 | $   431,731 |
| Interest Paid to Clients | 437,193 | 310,635 | 220,792 |
| Fees and Operating Expenses | 308,667 | 226,193 | 175,028 |
| Total Expenses | 745,860 | 536,828 | 395,820 |
| **EARNINGS** | **$   43,619** | **$   28,849** | **$   35,911** |
| **CAPITAL** | | | |
| Shareholder's Equity | $   354,922 | $   311,303 | $   282,454 |
| Percent of Total Assets* | 5.03% | 5.83% | 6.96% |
| Percent of Total Client Deposits* | 5.31% | 6.21% | 7.51% |
| **YEAR-END BALANCES** | | | |
| **TOTAL ASSETS** (see Figure 2) | **$ 7,057,883** | **$ 5,336,317** | **$ 4,059,114** |
| **TOTAL DEPOSITS** (see Figure 2) | **$ 6,689,964** | **$ 5,010,084** | **$ 3,763,011** |

*Based on year-end equity as a percentage of year-end balances of assets and client deposits.

Figure 1   **REVENUES**
Dollars (in millions)

Figure 2.   **ASSETS AND DEPOSITS**
Dollars (in billions)

69



STANFORD INTERNATIONAL BANK'S INVESTMENT STRATEGY is designed to minimize systematic and unsystematic risk while maintaining liquidity, portfolio efficiency (highest yield/minimum risk), operational flexibility and absolute yields.

HARD WORK. CLEAR VISION. VALUE FOR THE CLIENT. | *Growth*

We prudently manage for absolute yields rather than index benchmarked yields because we believe having clear vision means that when the market is booming and everything is going our way, we stay focused on the bottom line   producing results. That strategy is responsible for the Bank's more than 20 years of consecutive growth, surpassing US$6 billion in total assets in mid 2007 and US$7 billion by year end. And that is how, with an unwavering focus on safety, security and peace of mind, we produce solid, consistent returns for our clients.

70 [2]





STANFORD INTERNATIONAL BANK goes beyond traditional banking and lending methodology and offers an enlightened, innovative approach   in essence, there is no such thing as dormant capital. We put capital to work by investing in what we believe will offer the greatest opportunities for our clients. As a privately held institution, ensuring value for our customers is our top priority. We never lose sight of what our clients expect of us; putting their interest premium return ahead of any other stakeholder.

HARD WORK. CLEAR VISION. VALUE FOR THE CLIENT.   |   *Security*

We believe value for clients means value for capital. Theirs and ours. That's why we zealously manage for a strong balance sheet, a strong cash flow and a strong return of equity. Further, our sole shareholder reinvests every dollar earned back into retained earnings; an act of foresight that has continuously strengthened our capital base for future growth. And that's why we are able to pay consistent returns to our clients, year after year, through market ups and market downs.

72   4



Dear Valued Clients and Friends,

On behalf of the Board of Directors, management and staff of Stanford International Bank, I am pleased to highlight the accomplishments and milestones achieved during the Bank's 22nd year of continuous operation.

In 2007 the Bank earned a record profit, generated more revenue than at any time in the Bank's history, and also set a new milestone at year end by growing total assets to more than $7 billion.

The year began with robust economic forecasts for a growing global economy. Few people realized the enormous amount of leverage and securitized debt that had been utilized and underwritten by some of the world's largest and most respected banks and investment firms in the U.S. market. The over expansion of credit and shortsighted investment decisions made in preceding years created a bubble that burst in June. Since then, there has been a continuous flow of negative news related to the U.S. economy. We have all read the stories of multi billion dollar write offs that these banks and brokerage firms have been forced to make due to the securitized mortgage debt meltdown. We have also seen a continuing exodus in top management and thousands of employees laid off at these industry giants. The ensuing global credit crisis resulted in central banks cutting interest rates and providing massive liquidity to strained financial markets.

Rumors and fears about what might come next produced tremendous swings in the world market indices. Chaos and confusion were, at times, the rule of the day. This combined with the U.S. single family housing market being flooded with foreclosures and tens of thousands of unsold units in



LETTER FROM THE CHAIRMAN | *Overview*

the high rise condo market; record high oil prices; the war in Iraq reaching its sixth year with a cost to the U.S. economy now measured in trillions of dollars; a growing imbalance of trade in the U.S. despite a sinking dollar; the adverse effects of global climate pattern changes; commodity prices that are completely out of sync; and unprecedented worldwide food price hikes with 89 nations deemed by the UN to be in full blown food crisis, it is clear that the United States may be on the road to a recession.

How long will it last, how severe will it be, and how will it impact the rest of the world? No one knows for certain. However, there are bright spots. Certainly, the world's petroleum based economies are enjoying levels of prosperity never seen before, and there are other market segments in emerging and developed economies that are performing well. But to know and understand these markets requires firsthand knowledge. You must roll up your sleeves and do the hard work necessary in order to make sound investment decisions by fully understanding the risk. There never has been, and there never will be, an easy way to make money. It requires discipline, knowledge, experience, hard work and plain common sense. When most in our industry were quick to jump on the easy path to perceived big profits in the securitized debt market, we decided not to follow. The reason Stanford International Bank did not get caught in the subprime debacle was very simple: since we could not clearly define the risk, the potential reward became irrelevant. Today, while others in our industry are fighting for their survival, we are growing our business. While others in our industry have seen a complete turnover in management and are grappling with how to develop a new business strategy, our core leadership team remains intact, and our investment philosophy of global diversification remains unchanged. While others in our industry, even the world's largest, have needed to take extreme steps to recapitalize their balance sheets, Stanford International Bank's overall liquidity and tier one capital are stronger today than at any time in our history.

Although our world is far different than the one in which my grandfather lived when the first Stanford company was founded back in 1932, and technology has dramatically changed the way we live and conduct business, the old saying that "the more things change, the more they remain the same" has never been more true. As a company founded in the midst of the Great Depression, a time of despair and negativity, we have a long proven understanding of how even the most severe down cycles can bring opportunities that yield significant benefits in the long run. This proven, well grounded approach, when making investment decisions and giving investment advice will benefit you, our clients, in these tumultuous times as never before.

74    6