April 18, 2010 (two visits between 8:30am and 3:00pm)
April 19, 2010 (three visits between 10:05am and 8:00pm)
April 20, 2010 (five visits between 9:05am and 7:05pm)
April 21, 2010 (four visits between 11:45am and 7:30pm)
April 22, 2010 (three visits between 10:13am and 5:00pm)
April 23, 2010 (six visits between 8:15am and 3:05pm)
April 24, 2010 (one visit between 11:20am and 12:44pm)
April 25, 2010 (three visits between 11:20am and 6:46pm)
April 26, 2010 (two visits between 8:30am and 8:02pm)
April 27, 2010 (seven visits between 11:10am and 7:38pm)
April 28, 2010 (four visits between 8:30am and 7:25pm)
April 29, 2010 (seven visits between 9:15am and 7:15pm)
April 30, 2010 (three visits between 9:25am and 3:00pm)
May 1, 2010 (two visits between 8:43am and 3:00pm)
May 2, 2010 (two visits between 9:10am and 9:00pm)
May 3, 2010 (five visits between 8:30am and 7:40pm)
May 4, 2010 (three visits between 9:00am and 6:44pm)
May 5, 2010 (four visits between 9:00am and 8:00pm)
May 6, 2010 (nine visits between 9:00am and 7:30pm)
May 7, 2010 (two visits between 9:00am and 12:20pm)
May 8, 2010 (one visit between 8:25am and 10:45am)
May 9, 2010 (two visits between 9:00am and 8:00pm)
May 10, 2010 (seven visits between 8:45am and 7:34pm)
May 11, 2010 (three visits between 9:15am and 6:45pm)
May 12, 2010 (four visits between 8:50am and 6:15pm)
May 13, 2010 (three visits between 9:15am and 12:05pm)
May 14, 2010 (four visits between 9:05am and 11:50am)
May 15, 2010 (three visits between 11:15am and 7:30pm)
May 16, 2010 (five visits between 12:26pm and 7:00pm)
May 17, 2010 (seven visits between 9:05am and 7:45pm)
May 18, 2010 (seven visits between 8:07am and 8:00pm)
May 19, 2010 (five visits between 9:00am and 7:38pm)
May 20, 2010 (nine visits between 8:13am and 8:00pm)
May 21, 2010 (three visits between 8:40am and 8:15pm)
May 22, 2010 (two visits between 11:30am and 7:30pm)
May 23, 2010 (six visits between 11:45am and 9:00pm)
May 24, 2010 (four visits between 5:45pm and 8:00pm)
May 25, 2010 (two visits between 4:50pm and 7:00pm)
May 26, 2010 (eight visits between 8:20am and 7:45pm)
May 27, 2010 (eleven visits between 8:40am and 7:22pm)
May 28, 2010 (five visits between 8:46am and 8:00pm)
May 29, 2010 (four visits between 10:48am and 8:00pm)
May 30, 2010 (one visit between 6:15pm and 8:00pm)

938

May 31, 2010 (four visits between 10:50am and 3:10pm)

13.    Inmate Stanford has requested, and has been approved for, extended legal

visitation on each instance in which his legal team has requested such a visit

within 24-hours of the requested visiting date and time.  Inmate Stanford has been

approved for extended legal visiting with all members of his legal team on the

following dates and times:

> Sunday, April 25, 2010 5pm until 8pm
> Sunday, May 2, 2010 6pm until 9pm
> Thursday, May 6, 2010 8pm until 10pm
> Friday, May 7, 2010 6pm until 9pm
> Sunday, May 9, 2010 6pm until 9pm
> Friday, May 14, 2010 6pm until 9pm
> Saturday, May 15, 2010 6pm until 9pm
> Sunday, May 16, 2010 6pm until 9pm
> Friday, May 21, 2010 6pm until 9pm
> Saturday, May 22, 2010 6pm until 9pm
> Sunday, May 23, 2010 6pm until 9pm
> Thursday, May 27, 2010 8pm until 11pm
> Friday, May 28, 2010 6pm until 9pm
> Saturday, May 29, 2010 6pm until 9pm
> Sunday, May 30, 2010 6pm until 9pm
> Tuesday, June 1, 2010 8pm until 10pm
> Wednesday, June 2, 2010 8pm until 10pm

14.    **Access to Legal Materials**:  When visiting with an inmate, attorneys and their

approved legal assistants may enter FDC Houston with boxes of legal materials to

review with their client.  At the end of the visit, legal visitors may provide the

inmate a limited amount of legal papers after informing the Visiting Room

Officer-in-Charge that they intend to do so.  For security reasons, documents to be

given to an inmate must be individualized sheets of paper without folders, clips,

939

or any other form of a binding with the exception of staples used to attach a minimal number of pages. As for the exchange of legal materials, FDC Houston policy permits inmates and their attorneys to exchange a reasonable amount of legal material during legal visits. After reviewing the needs of inmate Stanford, a a reasonable amount of legal material to be exchanged during each visit is considered to be the size of a ream of paper and staff at FDC Houston have been so advised. Given the voluminous nature of this case, I have also advised inmate Stanford's legal team that they may switch out legal material on a regular basis and that staff are available to assist with this upon their request. I have not yet received such a request. Attorneys and legal assistants may also leave legal documents for an inmate by utilizing the legal mailbox located in the entry area of the institution. This mailbox, which is only for legal mail, is also available for members of the legal community who are not partaking in legal visitation, but who wish to leave legal papers for an inmate. With respect to the amount of legal material an inmate may possess, inmates at FDC Houston are permitted to have up to three cubic feet of legal material in their cell. I have advised inmate Stanford's legal team that he may submit an Inmate Request to Staff Member, commonly referred to as a "cop-out," to Warden Driver to request additional legal material storage space in his cell in the event he requires more than the three cubic feet currently permitted. Warden Driver has not yet received such a request. Additionally, in order to assist inmate Stanford organize his legal materials, on April 19, 2010, I personally provided him with twelve expandable folders, which

Page 8 of 10

**940**

his legal team refers to as "red ropes," that Warden Driver issued to him. Similar folders are now available for inmate purchase in the Commissary. As for the request that inmate Stanford be given three-ring binders, alligator clips, paper clips and other such items, these metal objects pose serious security risks in a prison as they can be used to make weapons and tamper with security devices, such as handcuffs, so they are not permitted at FDC Houston.

15.  **Access to Electronic Data**: For many years, a computer has been available in the Inmate Visiting Room at FDC Houston for attorneys and approved legal assistants to review electronic media with their clients. Therefore, a computer has always been available to any member of inmate Stanford's legal team to use since his arrival at FDC Houston September 29, 2009. On several occasions, I have personally advised members of inmate Stanford's previous and current legal team of the availability of a computer for their use to review electronic media with their client and the location of the computer in the Inmate Visiting Room.

Additionally, on April 21, 2010, the same day as the first official written request by any member of inmate Stanford's legal team, FDC Houston granted their request to enter FDC Houston with a laptop computer, external hard drive, and/or a computer printer during each legal visit. On April 22, 2010, FDC Houston also placed two brand new computers in the Inmate Visiting Room, one of which is available at any time to inmate Stanford's legal team. Any request for Internet access was denied in light of the accommodations described above and based on reasons provided to this Court on March 12, 2010. A True and Correct Copy of

Page 9 of 10

941

the March 12, 2010, letter to Judge Hittner from Warden Driver is attached as Exhibit C.

16. **Access to the Inmate Law Library**: Inmates at FDC Houston, including inmate Stanford, have access to the electronic law library through computer terminals on each housing unit. The computers are available Monday through Friday during the following hours: 6:00am until 7:30am, 9:00am until 3:30pm, 6:00pm until 9:30pm. On Saturdays, Sundays and federal holidays, the computers are available from 6:00am until 9:30pm. Additionally, two days a week, Mr. Stanford's housing unit can visit the Inmate Law Library to access the computers and legal materials there. Inmate Stanford can also submit an Inmate Request to Staff Member to the Supervisor of Education to request additional time in the law library and he has been so advised.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed on this ___3⁴___ day of June, 2010.

Jennifer M. Hansen
Senior Attorney-Advisor
Federal Bureau of Prisons
CLC Houston

Page 10 of 10

942

# EXHIBIT A

```
   HOU4D          *ADMINISTRATIVE REMEDY GENERALIZED RETRIEVAL *        05-26-2010
   PAGE 001 OF                                                          14:38:37
        FUNCTION: L-P SCOPE: REG    EQ 35017-183    OUTPUT FORMAT: FULL
-------LIMITED TO SUBMISSIONS WHICH MATCH ALL LIMITATIONS KEYED BELOW----------
DT RCV: FROM _____ THRU _____ DT STS: FROM _____ THRU _____
DT STS: FROM ___ TO ___ DAYS BEFORE "OR" FROM ___ TO ___ DAYS AFTER DT RDU
DT TDU: FROM ___ TO ___ DAYS BEFORE "OR" FROM ___ TO ___ DAYS AFTER DT TRT
STS/REAS:
SUBJECTS:
EXTENDED: _ REMEDY LEVEL: _ _              RECEIPT: _ _ _ "OR" EXTENSION: _ _ _
RCV  OFC : EQ ____
TRACK:  DEPT:
         PERSON: ___
           TYPE: ___
EVNT FACL: EQ ___
RCV FACL.: EQ ___
RCV UN/LC: EQ
RCV QTR..: EQ
ORIG FACL: EQ
ORG UN/LC: EQ
ORIG QTR.: EQ
```

G0002      MORE PAGES TO FOLLOW . . .

```
  HOU4D          *ADMINISTRATIVE REMEDY GENERALIZED RETRIEVAL *        05-26-2010
PAGE 002 OF        *                FULL SCREEN FORMAT            *     14:38:37


REGNO: 35017-183 NAME: STANFORD, ROBERT
RSP OF...: HOU UNT/LOC/DST: 5 WEST                QTR.: E04-227L   RCV OFC: HOU
REMEDY ID: 562760-F1        SUB1: 21AM SUB2:      DATE RCV:   10-28-2009
UNT RCV..: 6 WEST        QTR RCV.: F03-111L       FACL RCV: HOU
UNT ORG..: 6 WEST        QTR ORG.: F03-111L       FACL ORG: HOU
EVT FACL.: HOU    ACC LEV:  HOU  2                     RESP DUE:
ABSTRACT.: REQUESTS INCIDENT REPORT AND UDC FINDINGS SET ASIDE
STATUS DT: 10-30-2009  STATUS CODE: REJ STATUS REASON: ONE RSF
INCRPTNO.: 1927127   RCT:   EXT:   DATE ENTD: 10-30-2009
REMARKS..:



REGNO: 35017-183 NAME: STANFORD, ROBERT
RSP OF...: HOU UNT/LOC/DST: 5 WEST                QTR.: E04-227L   RCV OFC: HOU
REMEDY ID: 562760-F2        SUB1: 21AM SUB2:      DATE RCV:   11-05-2009
UNT RCV..: 6 WEST        QTR RCV.: F03-111L       FACL RCV: HOU
UNT ORG..: 6 WEST        QTR ORG.: F03-111L       FACL ORG: HOU
EVT FACL.: HOU    ACC LEV:  HOU  2                     RESP DUE:  WED  11-25-2009
ABSTRACT.: REQUESTS INCIDENT REPORT AND UDC FINDINGS SET ASIDE
STATUS DT: 11-20-2009  STATUS CODE: CLD STATUS REASON: DNY
INCRPTNO.: 1927127   RCT: N EXT:   DATE ENTD: 11-05-2009
REMARKS..:


                   CURRENT INVESTIGATIVE AND RELIEF TRACKING DATA
DATE DUE         DEPARTMENT    TO    DATE ASSN     TRK TYPE     DATE RETURNED
THU 11-12-2009   UNT MGT       LE    11-05-2009    INV          11-20-2009




G0002      MORE PAGES TO FOLLOW . . .
```

945

```
   HOU4D         *ADMINISTRATIVE REMEDY GENERALIZED RETRIEVAL *      05-26-2010
 PAGE 003 OF 003 *              FULL SCREEN FORMAT             *      14:38:37


 REGNO: 35017-183 NAME: STANFORD, ROBERT
 RSP OF...: HOU UNT/LOC/DST: 5 WEST          QTR.: E04-227L    RCV OFC: SCR
 REMEDY ID: 562760-R1       SUB1: 21AM SUB2:    DATE RCV:   12-11-2009
 UNT RCV..: 6 WEST        QTR RCV.: F03-111L    FACL RCV: HOU
 UNT ORG..: 6 WEST        QTR ORG.: F03-111L    FACL ORG: HOU
 EVT FACL.: HOU     ACC LEV:  HOU  2             RESP DUE:
 ABSTRACT.: UDC HRNG 10-08-09, CODE 327A
 STATUS DT: 12-11-2009  STATUS CODE: REJ STATUS REASON: FRM RSA
 INCRPTNO.: 1927127    RCT:   EXT:   DATE ENTD: 12-23-2009
 REMARKS..: REGIONAL APPEALS MUST BE ON A YELLOW BP-10 FORM.




                    3 REMEDY SUBMISSION(S) SELECTED
 G0000        TRANSACTION SUCCESSFULLY COMPLETED
```

# EXHIBIT B

## U.S. Department of Justice

Federal Bureau of Prisons

# LEGAL GUIDE TO THE FEDERAL DETENTION CENTER HOUSTON, TEXAS



February 2010

# I.   INTRODUCTION

The Federal Detention Center at Houston, Texas (FDC Houston) is an administrative, multi-level facility in the heart of downtown Houston designed to meet the detention needs of adult male and female offenders appearing before the Federal Court in the Southern District of Texas. FDC Houston fosters the prompt movement of persons to and from the courts, and facilitates contact with court officials, attorneys, and families during periods of detention.

FDC Houston also incarcerates adult male and female offenders who have been sentenced by United States District Courts to serve sentences of a relatively short duration. These sentenced offenders are ordinarily from the south central United States. Offenders with longer terms of incarceration may also serve the latter portion of their sentence at this facility for the purpose of facilitating release to this area. FDC Houston also incarcerates adult male and female holdover status inmates who are awaiting sentencing, designation, or transportation to their designated institution.

The information contained in this Guide is meant to confer general guidance and is not all inclusive. We cannot envision every circumstance that could occur, and therefore, the Guide does not contain the answers to all questions. Furthermore, Bureau policy, from which this Guide derives, is subject to periodic change. Accordingly, readers should consult all applicable policy for any revisions that may have occurred. Please contact the Legal Department or appropriate staff with any questions. Also, special circumstances may arise where we will not follow normal procedures.

## A.   Address

Mailing address:          Inmate Mail/Parcels:

**INMATE NAME & REGISTER NUMBER**
FDC Houston
Federal Detention Center
P.O. Box 526255
Houston, TX 77052

Staff:

**STAFF NAME**
FDC Houston
Federal Detention Center
P.O. Box 526245
Houston, TX 77052

1

Physical Address:          1200 Texas Avenue
                           Houston, TX 77002

## B.     Telephone Numbers

Main Number:               (713) 221-5400

Legal Department:

Supervisory Attorney        (713) 229-4104      Fax - (713) 229-4232
FDC Houston Staff Attorney  (713) 229-4187      Fax - (713) 229-4200
Paralegal                   (713) 229-4186      Fax - (713) 229-4232
Paralegal                   (713) 229-4118      Fax - (713) 229-4232

Unit Teams:

Unit Managers               (713) 221-5400      Unit 3/4  Ext. - 3001
                                                Unit 5/6  Ext. - 6001

## C.     Bureau of Prisons' Web Addresses

Federal Bureau of Prisons:

http://www.bop.gov

Access to Inmate Locator, BOP Program Statements, procedures for requesting
documents under the Freedom of Information Act, etc.

Office of General Counsel

http://www.bop.gov/news/PDFs/legal_guide.pdf

Legal Guide to the Bureau of Prisons, including in-depth information regarding
evaluations of offender mental capacity, sentencing issues, post-conviction issues,
medical care, and contact information for all legal offices within the BOP.

FDC Houston:

http://www.bop.gov/locations/institutions/hou/index.jsp

Access to FDC Houston contact information and visitation regulations.

2

# II.   PRETRIAL DETENTION

FDC Houston staff are aware of and appreciate the importance of the institution's pretrial detention mission.  Appropriate courtesy and decorum are expected from all staff.  In turn, our staff appreciate the professionalism and courtesy expected from attorneys and other legal assistants.

## A.   Legal Visiting

### 1.   **Visiting Hours**

Legal visitation hours are as follows:

| | |
|---|---|
| Monday, Tuesday, Wednesday, Thursday | 8:00 a.m. - 8:00 p.m. |
| Friday, Saturday, Sunday, Holidays | 8:00 a.m. - 3:00 p.m. |

In order to minimize delays, attorneys should visit during these times.  Visiting at other times should only be in emergency situations and must be approved by the Warden on a case-by-case basis.  See Appendix, FDC Houston Institution Supplement 5267.08a, Visiting Regulations.  Requests for visitation outside of the designated hours for legal visitation will only be approved in compelling circumstances.  Requests for visitation beyond the designated hours should be directed to the inmate's Unit Team and, to ensure staff coverage for any such visit, must be made twenty-four (24) hours in advance whenever possible.

### 2.   **Attorney Processing**

Processing of legal visitors will begin thirty (30) minutes prior to scheduled visiting hours, and will end one hour prior to the end of the visitation period.  Tuesdays and Wednesdays are designated exclusively for legal visits.  There is no social visiting during those days.  There are inmate counts at 4:00 p.m. daily, and an additional count at 10:00 a.m. on weekends and federal holidays.  Additional unscheduled counts may also occur at any time.  **Attorney/visitor processing ceases thirty minutes prior to a count.**  Counts take approximately 30 to 40 minutes to clear.  During this time, all movement in the institution ceases.  Movement of legal visitors resumes upon verbal count confirmation, whereas the movement of social visitors and inmates resumes after written count confirmation.  Accordingly, visitors to FDC Houston should take this institution activity into consideration when planning to initiate and conclude visits.

Attorneys seeking a legal visit are responsible for indicating where they are actively licensed and how that fact may be verified.  Licensure may be satisfactorily demonstrated

3

951

through presentation of a current bar card. Attorneys from the Office of the Federal Public Defender may, in lieu of a bar card, present credentials of that office with their picture for entry into the institution. After completing the Notification to Visitor and Visiting Attorney Statement forms, and signing the bound ledger, attorneys will be processed through the metal detector and will have their hands stamped before being allowed entry into the institution. Attorneys and their representatives will generally be processed ahead of social visitors when possible. All legal materials and briefcases will be searched for contraband, and processed through the x-ray machine. Portable phones, pagers, personal digital assistants, and nonlegal materials, such as newspapers and magazines, gum, candy, highlighters, etc., are not permitted in the Visiting Room. All legal visitors must successfully clear a metal detector prior to entering FDC Houston.

Attorneys are ordinarily **not** permitted to bring material witnesses or a client's family members or friends into the Visiting Room. Prior approval to do so must be received from the Warden. Written requests for such approval should clearly outline the specific circumstances requiring this type of visit. Visits will not be approved if alternative arrangements are available to defense counsel.

**Official Visitors**: Federal employees, including Assistant U.S. Attorneys, law enforcement officers, U.S. Court officials. U.S. Probation Officers, and Assistant Federal Public Defenders, will be permitted to visit upon presentation of appropriate identification. All visitors must sign in and out of the bound ledger. All official visitors must successfully clear a metal detector, and their materials must clear an x-ray machine, prior to entering FDC Houston.

### 3. Visiting Rooms

To ensure a high degree of privacy, attorney-client visits will normally be conducted in one of the six (6) attorney-client rooms located in the visiting room. Attorney-client rooms are available on a first-come, first-serve basis. If all attorney-client rooms are occupied, and time permits, attorneys have the option of waiting until a room is available, visiting with their client in the open area of the Visiting Room, or returning another time.

### 4. Dress Code

Visitors are required to dress appropriately. This suggests clothing that is appropriate for a correctional setting or court room. Visitors will not be allowed to wear halter tops, see-through garments of any type, or any other types clothing which may be deemed provocative or inappropriate for a correctional setting. Additionally, for safety and sanitation reasons, no open toe shoes or sandals will be permitted. Those wearing questionable clothing will be referred to the Institution Duty Officer, or the Operations Lieutenant, in his/her absence. See Appendix. FDC Houston Institution Supplement 5267.08a, Visiting Regulations, for further guidance.

4

5.    **Legal Assistants**

Legal assistants such as law clerks, investigators, interpreters, paralegals, notaries, mitigation specialists, and mental health professionals must receive prior approval to participate in legal visitation, regardless of whether the legal assistant is accompanied by an attorney. Attorneys desiring a legal assistant's participation in legal visitation are responsible for submitting a completed Application to Enter Institution as a Legal Assistant form. See Attachment E to Appendix.

**Ordinarily, completed applications must be mailed to the appropriate Unit Manager. For sponsoring attorneys with last names beginning A through M, applications should be mailed to the Unit 3/4 Manager. For sponsoring attorneys with last names N through Z, applications should be mailed to the Unit 5/6 Manager. Original signatures for this form are required for processing. To ensure orderly delivery to the intended recipient, hand-delivered applications will not ordinarily be accepted.** For application requiring expedited processing, copies may be faxed to the FDC Houston Attorney at (713) 229-4200, but a hard copy of the application must still be mailed to the Unit Manager. Review of properly submitted applications will normally be completed within two business days excluding the date of submission. Unit Team staff will consult with the Legal Department prior to any denial of a legal assistant's request. See Appendix, FDC Houston Institution Supplement 5267.08a, Visiting Regulations, for further information.

Approved legal assistants who wish to engage in legal correspondence with an inmate, or conduct legal visits with an inmate while not in the presence of a sponsoring attorney, may submit a facsimile transmission of a Request for Expanded Legal Assistant Privileges form (See Attachment G to Appendix) to the respective Unit Manager. Requests for Expanded Legal Assistant Privileges forms will normally be processed within two business days, excluding the date received.

**Federal Court Contracted Interpreters:** Interpreters who contracted through the Office of the Chief Interpreter in the Southern District of Texas must submit an annual NCIC background check. This form should be mailed from the Office of Chief Interpreter to FDC Houston requesting approval for each contract interpreter. Once approved, these federal contract court interpreters may enter with a court official who possesses court credentials or with any actively licensed attorney.

6.    **Court Related Examinations/Depositions/Polygraphs**

Medical examinations by outside physicians require a court order. Arrangements must be made through the Medical Department after the Legal Department reviews the court order. Attorneys are required to contact the Legal Department with any questions regarding an inmate's medical condition or treatment. Federal Bureau of Prisons' staff are not authorized to release information about inmates without the express written consent of the subject inmate.

5

**953**

Psychological and other expert interviews may be conducted once the expert is approved as a legal representative (See Section 5 above).

**Polygraphs:** The Warden may permit polygraph tests in connection with a state or federal criminal felony investigations. See 28 C.F.R. § 551.71. Polygraph tests in connection with misdemeanor offenses, civil proceedings, or any other matters are generally disfavored, absent a federal court order. Id. Requests for polygraph examinations must be arranged through the Unit Manager after the order is reviewed by the Legal Department and approved in advance by the Warden. The written request should be forwarded to the Legal Department and must include at least the following information:

       (1) Inmate's name and Register Number;
       (2) Case caption, Case No. and nature of matter;
       (3) Requested date and time;
       (4) Expected length;
       (5) Name, title, and organization of each person
           attending;
       (6) List of all equipment to be used;
       (7) Indicate whether inmate consent has been obtained.

The Warden must be able to confirm the validity of the request and the inmate being examined must give written consent on a form provided for that purpose. Requesters are responsible for meeting all state and local requirements in administering the test.

**Depositions:** Depositions for inmates in federal civil and criminal cases require a court order. See Fed. R. Civ. P. 30(a)(2). Depositions for state matters, both civil and criminal, require advanced approval from the Warden, and must be arranged through the Unit Team after the Legal Department reviews the request. Written requests for depositions should be forwarded to the Legal Department. A court order may also be required. All deposition requests must be made in writing and include the following information:

       (1) Name and Register Number of the inmate being
           deposed;
       (2) Name, title, and organization of each person
           attending;
       (3) Requested date and time for the deposition;
       (4) Expected length of deposition;
       (5) List of all equipment to be used at the deposition;
       (6) Case caption, case number, and reason for taking
           deposition;
       (7) Attached court order, if applicable

Video, audio recorders or computers are not allowed inside the institution without the

954

permission of the Warden. Furthermore, all equipment is subject to inspection prior to entering the institution.

7.      **Legal Materials (Including Audio, Video and Electronic Medium)**

Attorneys and their approved legal assistants may enter the Visiting Room with legal materials, including legal video, audio tapes, and electronic discovery materials, such as CD-ROMs. Attorneys and their assistants are only permitted to use equipment provided by FDC Houston; personal electronic devices, such as computers, audio players, etc., are not permitted. The electronic equipment provided by FDC Houston is available on a first-come, first-serve basis.

Legal visitors may provide an inmate with whom they are visiting a limited amount of legal papers at the end of the visit after informing the Visiting Room Officer-in-Charge (OIC) that they intend to do so. Documents to be given to an inmate must be individualized sheets of paper without folders, clips, and any other form of a binding with the exception of staples used to attach a minimal number of pages. Prior to an inmate's return to his/her cell, all papers in an inmate's possession will be inspected to verify that the papers are limited to legal materials and contain no contraband. Any documents that are identified as being non-legal in nature must be sent to the inmate via regular correspondence.

Attorneys may also leave legal documents for an inmate by utilizing the legal mailbox located in the entry area of the institution. This mailbox, which is only for legal mail, is also available for members of the legal community who are not partaking in legal visitation, but who wish to leave legal papers for an inmate. All documents placed in this mailbox must have the inmate's name and register number, and have the following statement on the outside of the envelope, "SPECIAL MAIL - OPEN ONLY IN THE PRESENCE OF THE INMATE." The originating party's name must also be clearly identified on the envelope indicating that they are a licensed attorney or other individual approved for special mail privileges with the intended inmate recipient. Envelopes with insufficient markings will be treated as general correspondence and will be inspected and read. See Section C.1 below for further information.

For inmates with substantial discovery materials, please contact the Legal Department to discuss options for providing these voluminous materials to inmates incrementally, such as switching out the materials at scheduled intervals through the inmate's Unit Team.

Legal material, such as videos, CD-ROMs and audio tapes, may not be left in the Front Lobby legal mail box. In most circumstances, attorneys, or their authorized legal assistants, should review legal materials such as videos, CD-ROMs and audio tapes with inmates in the visiting room during established legal visiting times. The visiting room at FDC Houston has access to a stand-alone computer which is capable of reading audio and video CD-ROMs. The visiting room also has equipment available for the review of cassette tapes.

7

955

Legal video and audio tapes may only be mailed to an inmate with the permission of the Warden or an appropriate designee. Attorneys must make a written request, which may be sent to the inmate's Unit Manager, and should include the following:

> (1) Inmate's Name and Register Number;
> (2) Case Number;
> (3) Reason for sending tapes to inmate;
> (4) Length of time the tapes are expected to be in possession of the inmate;
> (5) Scheduled trial date and expected length of trial;
> (6) Prosecuting Assistant U.S. Attorney

In cases with multiple defendants, one set of video and/or audio tapes may be used by all defendants. Each defense attorney must send a written request for his/her client to review the video and/or audio tapes. Requests should be directed to the Warden. Defense attorneys have the responsibility of coordinating a schedule which ensures that each of their clients have adequate access to the materials. Audio and/or video tapes mailed to the institution must follow the legal mail procedures addressed in a separate section below. Program Statement 5265.11, Correspondence, contains further guidance. The outside of the package must specifically lists its contents. For example: "Contents: Videotapes." Once an inmate has finished using the audio and/or video tapes, the tapes must be either mailed out at the inmate's expense, picked-up by defense attorney, or they will be destroyed.

## 8.   **Separation Assignments**

FDC Houston houses inmates who require separation from each other; these individuals are commonly referred to as "separatees." Since these inmates must be separated from each other at all times, it is not possible for two separatees to be in the Visiting Room together. Visitation for inmates with separation assignments will be processed on a first-come, first-serve basis. The remaining visitors will be processed as soon as the Visiting Room Officer notifies the Front Lobby that the inmate and his or her visitors have departed. Absent compelling circumstances, attorneys will be asked to wait or reschedule the visit if their client has a separatee in the Visiting Room when they arrive at FDC Houston.

## 9.   **Co-Defendant Meetings**

Inmates who are charged in the same indictment and who are both housed at FDC Houston may be permitted to have co-defendant meetings with their attorneys in the Visiting Room. Attorneys must provide 24 hours advanced notice of a request for such a meeting. The attorney should fax the request indicating the time, date, names of all participants, and register numbers of the inmates, along with a copy of the PACER docket sheet, to the FDC Houston Staff Attorney at (713) 229-4200. The requesting attorney will be advised when approval has been granted.

8

**956**

Attorneys wishing to conduct co-defendant meetings must ensure there is not a separation assignment for the co-defendants. FDC Houston will not permit visits between inmates with separation assignments. Questions regarding a separation assignment should be directed to the inmate's Unit Team or Assistant United States Attorney assigned to the case.

10. **Social Visitors**

Pretrial inmates may only place immediate family members on their visiting lists. Immediate family members include mother, father, step-parents, foster parents, brothers, sisters, spouse, and children. For a pretrial inmate who does not have a legal spouse, but there is an individual with whom the inmate has been cohabiting, and there is evidence the relationship was similar to that of a spousal one, that individual will be approved for visiting. The *pre-existing* relationship *must be documented*, which may include names on a lease, birth certificates of children, common address on a driver's license, utility bills, etc. The individual is still subject to the normal screening procedures prior to being approved. See Program Statement 7331.04, Pretrial Inmates.

**Marriage** - The Warden shall approve an inmate's request to marry except where a legal restriction to the marriage exists, or where the proposed marriage presents a threat to the secure and orderly running of the institution. Also, the marriage may not pose a threat to the protection of the public. Marriage requests will be approved provided: (1) the inmate is legally eligible to marry; (2) the inmate is mentally competent; (3) the intended spouse has verified, ordinarily in writing, intention to marry the inmate; (and) (4) the marriage does not pose a threat to institution security or good order, or to the protection of the public. For pretrial inmates, staff will advise the court, U.S. Attorney's Office, and in the case of an alien, the U.S. Department of Homeland Security, of the marriage request and seek comments prior to making a decision. See Program Statement 5326.04, Marriage of Inmates.

# B.   Telephone Calls

1. **Inmate Telephone System (ITS)**

The Bureau of Prisons extends telephone privileges to inmates as part of its overall correctional management strategy. See 28 C.F.R. § 540.100, et seq., Subpart I - Telephone Regulations for Inmate; and Program Statement 5264.08, Telephone Regulations for Inmates. Telephone privileges are a supplemental means of maintaining community and family ties that will contribute to an inmate's personal development. An inmate may request to call a person of his or her choice outside the institution on a telephone provided for that purpose. However, limitations and conditions may be imposed upon an inmate's telephone privileges to ensure that these are consistent with other aspects of the BOP's correctional management responsibilities. Inmates are responsible for submitting a list of numbers they wish to be placed on their approved telephone list; inmates can only call numbers placed on their approved telephone list.

957

Upon arrival at FDC Houston, inmates are advised of the institution's telephone monitoring capability. See 28 C.F.R. § 540.102. A notice is posted next to each inmate telephone advising that calls are monitored. Id. Ordinarily, calls are paid for by the inmate, but an inmate may place a collect call. See 28 C.F.R. § 540.105. As mentioned above, third party, conference calls or use of two phones on the same number, or other alternative call arrangements are not permitted, thus limiting the opportunity for inmates to use the phones for criminal or other inappropriate purposes. Inmates who use the telephone improperly are subject to disciplinary actions which may result in the loss of telephone privileges, and in some cases criminal charges. All social calls are limited to 15 minutes in duration. In addition, inmates are limited to 300 minutes per calendar month for monitored phone calls, which is increased to 400 minutes in November and December.

Inmates may place attorneys on their approved telephone list. However, the calls are recorded and subject to monitoring. Such calls are not attorney-client privileged calls. Inmates seeking attorney-client privileged calls must request an unmonitored telephone call as described above in Section B.2.

### 2. **Unmonitored Telephone Calls**

Attorneys should rely on written communication or visitation to communicate with their clients. However, if an immediate need arises, inmates may place an unmonitored telephone call to their attorneys. See 28 C.F.R. §540.103; and Program Statement 5264.08, Telephone Regulations for Inmates. These unmonitored calls occur as individually-approved calls placed by a member of the inmate's Unit Team. Additionally, a direct line to the local Office of the Federal Public Defender is available in each housing unit for unmonitored calls by the inmates themselves. To ensure access to this phone line by inmates throughout the unit, each call is ordinarily limited to 15 minutes in length. Unit Team staff will facilitate all other legal calls.[1] Unit Team staff will coordinate legal calls of inmates housed in the Special Housing Unit (SHU). Inmates are not permitted to make three-way or third party calls, calls that are forwarded to other phone numbers, calls to voice messaging, conference calls, use another inmate's phone access code or phone list, or in any way attempt to circumvent approved person to person calls.

# C.  **Written Communication**

### 1. **Legal Mail**

Special care is taken to ensure that "special mail" (mail to or from courts, attorneys, and certain government officials) is kept confidential. See 28 C.F.R. § 540.18; and Program Statement 5265.11, Correspondence. Special mail must be marked "SPECIAL MAIL - OPEN

---

[1] Calls placed by FDC Houston staff using FDC Houston phones will normally be at the expense of the inmate requesting the legal phone call.

958

ONLY IN THE PRESENCE OF THE INMATE" and the sender must identify him or herself on the envelope as a person entitled to invoke the protections of special mail in order to avoid the correspondence being processed as general mail. For example, following their name, attorneys should put the words "Attorney" or "Assistant Federal Public Defender" or similar language to identify themselves as an attorney in the return address section. The use of "Esquire" does not sufficiently identify the sender as an attorney.

Incoming special mail is opened in the presence of the inmate and visually inspected for both contraband and qualification as "legal" mail. Staff do not read the content of "legal" mail. Inmates may seal outgoing special mail, but a BOP staff member must verify that the inmate has properly identified himself in the return address before the mail is sent out of the institution. Even though staff must verify the identity of the inmate, staff will at no time read the contents of an inmate's outgoing "special" or "legal" mail.

Attorneys may utilize the front lobby drop box for legal mail. Items placed in this depository must display the special mail markings specified above, in order for the item to receive special mail handling. Packages, audio and video cassette tapes or other electronic media may not be placed in this depository. See Section A.7 above.

**Stamps:** Other than through issuance from FDC Houston, or purchase from the commissary, inmates may not receive stamps from any other individual. See 28 C.F.R. § 540.21(j). Attorneys are permitted, however, to send self-addressed envelopes without affixed postage.

**Facsimiles:** Inmates may not receive facsimile transmissions at FDC Houston.

**Express Mail:** Inmates are not permitted the use of express mail services or hand-delivery service.

### 2. **Electronic Correspondence**

At FDC Houston, inmates are provided the opportunity to send and receive electronic messages using computers dedicated and outfitted for this limited purpose through a system called TRULINCS. Inmates have no access to the internet and no files can be attached to these electronic messages. As with traditional mail communication, all email messages are subject to staff monitoring. While the inmate and his/her community contacts benefit from this expanded method of communication, the major benefit of the program is increased institution security and public safety given the ease of monitoring, tracking and reviewing this electronic correspondence. Electronic message content is subject to the same restrictions as regular mail and any attorney communication through this method is subject to monitoring.

11

2.    **Medical Records**

Medical records may be obtained by attorneys with a signed authorization for release of information by the inmate. The inmate may also request a copy of his/her medical records by submitting an Inmate Request to Staff form to the Health Services Department and then provide the copy to his/her attorney. If the inmate is no longer in BOP custody, the requesting attorney must file a Freedom of Information Act (FOIA) request at the above FOIA request address or through the Internet at http://www.bop.gov/foia/submit.jsp.

3.    **Subpoenas**

The United States Department of Justice has promulgated regulations governing the procedure whenever a demand is made to employees to produce information obtained through their employment with the Department of Justice. These regulations, found at 28 C.F.R. §§ 16.21-16.29, require authorization from the United States before any such information may be provided. See United States ex rel Touhy v. Ragen, 340 U.S. 462 (1951). 28 C.F.R. § 16.22 sets forth the requirements in cases in which the United States is not a party. 28 C.F.R. § 16.23 sets forth the requirements in cases in which the United States is a party. 28 C.F.R. § 16.26 prohibits disclosures which would violate a statute, such as the Privacy Act. Requesters must comply with these regulations before information will be disclosed by FDC Houston staff.

Any questions regarding the release of information or access to BOP records should be directed to the Legal Department.

# E.    Medical Services

On-site emergency medical care is available 16 hours a day at FDC Houston. Staff provide pretrial inmates with the same level of basic medical, dental, pharmaceutical, psychiatric, and psychological care provided to convicted inmates. See 28 C.F.R. § 551.114. Inmates seeking medical examination or treatment can place their name on the sick call sign-up sheet and they will be scheduled for an appointment. Inmates may also submit a written request directly to Health Services staff if they have any concerns regarding their medical condition. **Health Services staff are not at liberty to discuss information with an inmate's attorney related to that inmate's medical condition.** Attorneys are encouraged to seek such information directly from their clients. See Release of Information section above for further information.

**Special Medical Concerns:** There are virtually no medical problems that the BOP's health care delivery system cannot respond to adequately, either within its institutions or by contracting with physicians and hospitals in the community. See Program Statement 6010.02, Health Services Administration. **Accordingly, attorneys should refrain from seeking court orders compelling the BOP to treat its inmates in a specific manner, including via a specific physician or by the prescription of specific medications.** Aside from infringing on the Bureau's expertise in managing its institutions, such orders may conflict with expressed Bureau

13

policy. The BOP recognizes that its duty to provide care to all inmates committed to federal custody under 18 U.S.C. § 4042 requires that conditions which cannot be evaluated and treated at the facility must be referred to outside resources which are equipped to provide suitable care.

# F.   Mental Illness

Title 18 U.S.C. §§ 4241-4248 sets for the judicial procedures which must take place when an offender appears to be or is suffering from a mental disease or defect. See also Program Statements 6010.02, Health Services Administration; 5310.12, Psychology Services Manual, Chapter 9; and 5310.13, Institution Management of Mental Ill Inmates. Forensic examinations to determine an individual's competency cannot be completed at FDC Houston. If a competency evaluation is ordered, the BOP must designate the defendant to a BOP facility in the United States which has the capability to conduct such examinations. Questions or concerns with regard to this process should be directed to Legal Department.

# G.   Inmate Discipline Process

Pursuant to 18 U.S.C. § 4042(3), the BOP has created a disciplinary process to ensure that inmates live in a safe and orderly environment. Only institution staff may take disciplinary action against inmates. Corporal punishment, as well as retaliatory and capricious disciplinary action, is not permitted under any circumstances. See 28 C.F.R. § 541.10; and Program Statement 5270.07, Inmate Discipline and Special Housing Units.

Pretrial inmates are also required to abide by BOP rules on inmate discipline, subject to the limitations of 28 C.F.R. § 551.116. See also Program Statement 7331.04, Pretrial Inmates. Pursuant to this policy, FDC Houston staff will advise the court of disruptive behavior by pretrial inmates. Staff will also advise the relevant Assistant United States Attorney and the United States Probation Office assigned to prepare the Presentence Report when a pretrial inmate violates Bureau of Prisons rules.

In Wolff v. McDonnell, 418 U.S. 539 (1974), the Supreme Court held that disciplinary proceedings must contain certain due-process protections if the proceeding could result in the prisoner losing good time credits. Accordingly, the BOP has fashioned its disciplinary process to incorporate the protections required by Wolff. See Program Statement 5270.07, Inmate Discipline and Special Housing Units and 28 C.F.R. § 541.10, et seq.

Prohibited acts are divided into categories based upon severity and apply uniformly in all BOP institutions. Immediately after arriving at a BOP facility, all inmates are advised, in writing, of their rights and responsibilities, the list of prohibited acts, and the disciplinary process. Violations of prohibited acts have sanctions corresponding to their seriousness including: disciplinary segregation, disallowance of good time credits, loss of privileges, and

14

verbal warning. See 28 C.F.R. § 541.13.

Each institution must follow the disciplinary process set forth in 28 C.F.R. § 541, beginning with the incident report and notice to the inmate, and continuing through appeal of the decision of the Unit Discipline Committee (UDC) or the Discipline Hearing Officer (DHO). 28 C.F.R. §§ 541.14-541.19. Inmates may appeal a decision by the UDC or the DHO through the Administrative Remedy Process. See 28 C.F.R. § 541.19.

# H.    Personal Property

Bureau of Prisons policy on inmate retention of personal property is found in Program Statement 5580.07, Inmate Personal Property. See also 28 C.F.R. Part 553. Inmates may possess only that property which by policy is authorized. See 28 C.F.R. § 553.10. These rules contribute to the management of inmate personal property in the institution, and contribute to a safe environment for staff and inmates by reducing fire hazards, security risk, and sanitation problems. Personal hygiene items are issued by the institution for indigent inmates. Inmates may also purchase personal property items from the institution commissary.

**Court Returns:** Inmates going out to court may bring legal material relevant to their current court proceedings. Inmates are not allowed to return from court with additional legal material. Attorneys wishing to provide inmates with additional legal material must either send such material in the mail, or place it in the legal drop box located in the Front Lobby of FDC Houston. Attorney may also provide an inmate with whom they are visiting in the Visiting Room with a limited amount of legal papers as described in Section A.7 above.

# I.    Law Library

In order to facilitate inmates' access to courts, the BOP provides inmates with inmate law libraries. The main inmate law library is located on the second floor of FDC Houston. There is also a basic law library in the Special Housing Unit (SHU). These libraries are maintained by the Education Department staff in accordance with Program Statement 1315.07, Inmate Legal Activities. The legal materials which are provided to the inmates are determined by the Central Office of the BOP and listed in this program statement.

In addition to the inmate law library, FDC Houston now has an electronic law library available for inmate use. Terminals for this electronic law library are located on each housing unit, in the SHU, and in the law library. The inventory of legal materials is the same as listed in Program Statement 1315.07, Inmate Legal Activities. These terminals are available daily from 8:00 a.m. until 10:00 p.m. for inmate use.

The main law library is available to all general population inmates according to the established schedule, which is twice a week, excluding federal holidays and institution needs. If

15

additional time is needed, the inmate must provide documentation of an imminent court deadline. If the inmate provides such documentation, additional time in the law library may be granted. At any time, the inmate may choose to utilize the electronic law library terminal available daily in his/her housing unit instead of reporting to the law library.

## J.     Administrative Remedy Program

The BOP's Administrative Remedy Program is a process through which inmates may seek formal review of an issue relating to virtually any aspect of their confinement, if informal procedures have not resolved the matter. See 28 C.F.R. Part 542 - Administrative Remedy; and Program Statement 1330.16, Administrative Remedy Program. This program applies to all inmates confined in institutions operated by the BOP, inmates designated to Residential Reentry Centers (RRCs) under BOP responsibility, and former inmates for issues that arose during their confinement. See C.F.R. § 542.10.

Inmates are obligated to attempt informal resolution of grievances prior to filing a formal request for administrative remedy. See 28 C.F.R. § 542.13. The deadline for completion of informal resolution and submission of a formal written Administrative Remedy Request, on the appropriate form, is 20 calendar days following the date on which the basis for the Request occurred.[2] See 28 C.F.R. § 542.14. Once an inmate has filed a formal grievance at the institution level (a "BP-9"), the Warden of that facility normally has 20 calendar days to investigate and provide the inmate a written response. See 28 C.F.R. § 542.18. If the inmate is not satisfied with the Warden's response, he/she has 20 calendar days to file a Regional Administrative Remedy Appeal ("BP-10"). See 28 C.F.R. § 542.15. Once received in the Regional Office, the Regional Director has 30 calendar days to investigate and provide the inmate a written response. See 28 C.F.R. § 542.18. If the inmate is not satisfied with the Regional Director's response, he/she has 30 calendar days to file a Central Office Administrative Remedy Appeal ("BP-11"). See 28 C.F.R. § 542.15. Once received in the Central Office, the Administrator, National Inmate Appeals, has 40 days to investigate and provide the inmate a written response.[3] 28 C.F.R. § 542.18. After receiving the Administrator's response, the inmate has exhausted the BOP's Administrative Remedy Program. The program provides for expedited investigations and responses in emergency situations, as well as providing extensions of time for both filing grievances and receiving responses. **At any level, an Administrative Remedy may be rejected if it does not fully comply with Program Statement 1330.16, Administrative Remedy Program.**

---

[2]    In limited circumstances, an inmate may be granted an extension on the filing time allowed if he can demonstrate a valid reason for his delay in filing. See 28 C.F.R. § 542.14(b).

[3]    If the time period for response to Administrative Remedy Requests or Appeals is insufficient to make an appropriate decision, the time for response may be extended once by 20 days at the institution level, 30 days at the regional level, or 20 days at the Central Office level. Staff will inform the inmate of this extension in writing. See 28 C.F.R. § 542.18.

16

963

If complaining about a sensitive issue, in the sense that the inmate's safety or well-being would be placed in danger if the request became known at the institution, the inmate may submit his/her administrative remedy directly to the appropriate Regional Director, marking "Sensitive" upon the request and explaining, in writing, the reason for not submitting the request at the institution. See Program Statement 1330.16, Sec 8(d)(1), Administrative Remedy Program. If the Regional Administrative Remedy Coordinator agrees that the request is sensitive, the request shall be accepted, investigated, and a response provided to the inmate. Otherwise, the request will be rejected, and the inmate shall be advised in writing of that determination, without return of the request. The inmate may then pursue the matter by submitting a request for Administrative Remedy locally to the Warden. The Warden shall allow a reasonable extension of time for such a resubmission. See 28 C.F.R. § 542.17.

Special procedures regarding the appeal of DHO actions may be found at 28 C.F.R. § 542.14(d)(2). Appeals from DHO actions shall be submitted initially to the Regional Director for the region where the inmate is currently located.

## K.    Service of Process

### 1.    Service of Inmates

Personal service of inmates will ordinarily be coordinated through the inmate's Unit Team. Only law enforcement personnel will be permitted to serve process on inmates. Normally, the personal service of inmates will occur within an area designated by FDC Houston staff. When contacted by law enforcement personnel, FDC Houston staff will coordinate the appropriate time and place for service to occur.

### 2.    Service of Staff

The personal service of staff members on institution property will ordinarily be limited to the service of legal documents which are related to the staff member's employment with the BOP. Certified mail may be sent to staff by utilizing the following address:

[Staff Member's Name and Title (if known)]
Federal Detention Center
P.O. Box 526245
Houston, TX 77052-6245

FDC Houston staff will not accept service on behalf of inmates or another staff member. Service by facsimile is not authorized. For additional information, please contact the Legal Department.

17

**964**

## L.   Additional Information

For additional information regarding inmate visitation at FDC Houston, please review the attachment, FDC Houston Institution Supplement 5267.08a, Visiting Regulations. For additional information regarding BOP legal matters, such as sentencing issues, designation determinations, mental health evaluations, and medical issues, please refer to the Legal Guide to the Bureau of Prisons on the internet at http://www.bop.gov/news/PDFs/legal_guide.pdf

965

U.S. Department of Justice
Federal Bureau of Prisons
FDC Houston, Texas

# Institution Supplement

**OPI: Correctional Services**
**NUMBER: HOU 5267.08a**
**DATE: November 23, 2009**
**SUBJECT: Visiting Regulations**

---

1.  **PURPOSE AND SCOPE:** To implement regulations and procedures pertaining to inmate visits. This should be read in conjunction with P.S. 5267.08, Visiting Regulations.

2.  **DIRECTIVES AFFECTED:**

    A.  Directive Rescinded:

        Institution Supplement 5267.08, Visiting Regulations dated 1/26/07.

    B.  Directive Referenced:

        Program Statement 1315.07, Legal Activities, Inmate
        Program Statement 5267.08, Visiting Regulations
        Program Statement 5360.09, Religious Beliefs and Practices
        Program Statement 5500.11, Correctional Services Manual
        Program Statement 5500.12, Correctional Services Procedures Manual
        Program Statement 5580.07, Personal Property, Inmate
        Program Statement 5510.12, Searching, Detaining, or Arresting Visitors
        Institution Supplement 1315.07e, Legal Activities, Inmate

3.  **IMPLEMENTATION:**

    A.  Visiting Area:

        All visits not requiring special security measures will be conducted in the institution Visiting Room. Separate rooms located in the visiting area are provided, subject to availability, for legal and diplomatic visits. These rooms will not be used for social visiting unless approved in advance by the Captain. When security concerns require a legal visit to occur elsewhere in the institution, Unit Team staff will, in consultation with the Operations Lieutenant, select an appropriate and available location, and supervise the visit.

        Inmates will not normally be permitted to use restroom facilities during social visits unless the visit exceeds one hour. Any inmate using the restroom shall be escorted and remain under constant visual staff supervision. Inmates requesting to depart the Visiting Room will not be readmitted. Visitors will immediately depart the Visiting Room after completion of their visit.

        NOTE: All inmates will be identified by picture card prior to the departure of their visitor(s) from the Visiting Room.

HOU 5267.08a
November 23, 2009
Page 2

B.   Visiting Hours:

(1) Social Visiting - As stated in Section 3.C. and depicted in Attachment A, social visiting occurs
     on a rotating basis, according to the unit to which the inmate is assigned.

| | | | |
|---|---|---|---|
| Sun. | 8:00 a.m. - 11:00 a.m.* | 12:00 p.m. - 3:00 p.m. | |
| Mon. | 8:00 a.m. - 11:00 a.m. | 12:00 p.m. - 3:00 p.m. | 5:00 p.m. - 8:00 p.m. |
| Tues | No Social Visiting | | |
| Wed. | No Social Visiting | | |
| Thurs. | 8:00 a.m. - 11:00 a.m. | 12:00 p.m. - 3:00 p.m. | 5:00 p.m. - 8:00 p.m. |
| Fri. | 8:00 a.m. - 11:00 a.m. | 12:00 p.m. - 3:00 p.m. | |
| Sat. | 8:00 a.m. - 11:00 a.m.* | 12:00 p.m. - 3:00 p.m. | |
| Holiday | 8:00 a.m. - 11:00 a.m.* | 12:00 p.m. - 3:00 p.m. | |

*Weekend and holiday visiting for work cadre and female inmates is one continuous
8:00 a.m. - 3:00 p.m. visiting session.*

(2) Legal Visiting:

| | |
|---|---|
| Sun. | 8:00 a.m. - 3:00 p.m. |
| Mon. | 8:00 a.m. - 8:00 p.m. |
| Tues. | 8:00 a.m. - 8:00 p.m. |
| Wed. | 8:00 a.m. - 8:00 p.m. |
| Thurs. | 8:00 a.m. - 8:00 p.m. |
| Fri. | 8:00 a.m. - 3:00 p.m. |
| Sat. | 8:00 a.m. - 3:00 p.m. |
| Holiday | 8:00 a.m. - 3:00 p.m. |

(3) Visitor Processing:

The processing of visitors will begin thirty minutes prior to the scheduled visiting
session except for weekends and holidays, when it will begin one hour prior to the
session. Visitor processing will end one hour before the end of the visitation period.
Scheduled inmate counts occur on a daily basis at 4:00 p.m., and at 10:00 a.m. on
weekends and federal holidays. During this time, all movement in the institution
ceases. The actual processing of visitors into and out of the Visiting Room will be
suspended 30 minutes prior to the count. Movement of legal visitors resumes upon
verbal count confirmation, whereas the movement of social visitors and inmates
resumes after written count confirmation. Counts require approximately 30-40 minutes
to complete. Accordingly, visitors must take this institution activity into consideration
when planning to initiate and conclude visits.

C.   Frequency and Number of Social Visitors:

Inmates will ordinarily be allowed a social visit within the three (3) hour session designated for the
inmate's assigned housing unit (Attachment A). These sessions will be rotated for appropriate
distribution of visiting days and hours between the inmate housing units. Normally, each inmate will
be allowed one visit per designated session. Each inmate is responsible for properly notifying their
visitors of the visiting sessions designated for the inmate's housing unit.

Case 4:09-cr-00342 Document 245-1 Filed in TXSD on 06/09/10 Page 101 of 158
Case 3:09-cv-00721-N-BQ Document 115-13 Filed 12/05/11 Page 31 of 150 PageID 8914
HOU 5267.08a
November 23, 2009
Page 3

Work cadre and designated short-term female inmates will be allowed to visit during their scheduled working hours. The weekend and holiday visiting for work cadre and female inmates is one continuous 8:00 a.m. - 3:00 p.m. session.

Inmates will be permitted to visit with a maximum of four (4) visitors at one time. Normally, only those children who will be reasonably expected to be occupying a seat in the Visiting Room will be considered as one of the four authorized visitors.

D.    Approved Social Visitors:

(1)    Visiting Lists for pretrial and holdover (except those in-transit) inmates are normally limited to immediate family (Attachment B). Immediate family includes mother, father, step-parents, foster parents, brothers, sisters, spouse, and children. Approval of the visiting list will normally be completed within seven days upon receipt of all required forms from the inmate.

For an inmate who does not have a legal spouse, but there is an individual with whom the inmate has been cohabitating, and there is evidence the relationship was similar to that of a spousal one, that individual will be approved for visiting. The preexisting relationship must be demonstrated using documentation such as a lease agreement, a birth certificate of a child, driver's licenses with common addresses, or shared utility bills. Approval for these individuals is subject to normal screening procedures.

(2)    In addition to immediate family members as listed above, work cadre and designated short-term female inmates may have other relatives or friends and associates added to their approved Visiting List (Attachment C). The visiting privilege is extended to friends and associates having an established relationship with the inmate prior to confinement, unless such visits could reasonably create a threat to the security and good order of the institution. Any exceptions to the prior relationship requirement, requires the Warden's approval. A maximum of ten (10) visitors, in addition to immediate family members, may be on the Visiting List for a work cadre or designated short-term female inmate.

(3)    The official list of approved visitors is maintained and updated by the inmate's Correctional Counselor. The approved visiting list will be electronically transferred to the Front Lobby computer. In addition, a computer generated approved visiting list will be completed by the Counselor, signed and forwarded to the Front Lobby, with copies to the inmate and central file. These hard copies are to be updated weekly. Subsequent additions or deletions will be processed in a timely manner. (All social visitors must be approved in advance by the Unit Team.) There is no limit on the frequency of changes made to the visiting list. The computer generated hard copy will be utilized during times the computer system goes down.

(4)    Visitors may not ordinarily be listed on more than one inmate's visiting list, except where inmates and visitors are of the same immediate family. Inmates who are members of the same immediate family, and who are being visited by members of their

Case 4:09-cr-00342 Document 245-1 Filed in TXSD on 06/09/10 Page 102 of 158
Case 3:09-cv-00721-N-BQ Document 115-13 Filed 12/05/11 Page 32 of 150 PageID 8915
HOC 3267.08a
November 23, 2009
Page 4

immediate family, will be allowed to visit at the same time unless there are security concerns.

(5)     A signature of a parent or guardian will be necessary to process the visitation request of individuals under eighteen (18) years of age. Visitors under the age of sixteen (16) must be accompanied by a parent or legal guardian.

(6)     The identity of each visitor over sixteen years of age must be verified prior to admission into the institution. This may be accomplished through use of driver's license or state or federal picture identification. Mexican consulate identification cards will not be allowed as identification.

(7)     An inmate will be provided written material on the institution's visiting procedures during the intake screening process, by the Unit Team. This information will be included in the institution A&O Handbook. Attachment I will be given to each inmate during this screening process. Each inmate will be responsible for sending a copy of this attachment to each of their requested visitors. At a minimum, the information will include the following;

        a.      Facility address/phone number, directions to the facility and information about local transportation.

        b.      Days and hours of visitation.

        c.      Approved dress code.

        d.      Identification requirements for visitors/items authorized in the visiting room.

        e.      Special Rules for children.

        f.      Authorized items that visitors may bring to the inmate, if applicable.

        g.      Special Visit requirements.

(8)     If results of proposed visitor background information (NCIC, Conviction Information, et cetera) reveal the proposed visitor would present security concerns or disrupt the orderly running of the institution, the proposed visitor will be denied visiting privileges.
        The effected inmate will be notified of the denial by his/her Unit Team, and the inmate will be responsible for notifying his/her proposed visitor of their denial.

E.     Visitor Attire:

       Visitors are required to dress appropriately. Adult visitors will not be allowed to wear revealing shorts or sun dresses, halter tops, bathing suits, see-through garments of any type, crop tops, low-cut blouses or dresses, leotards, spandex, miniskirts, backless tops, hats or caps, any sleeveless garment, any skirt approximately two (2) inches or more above the knee, any dress or skirt with a high cut split

Case 4:09-cr-00342 Document 245-1 Filed in TXSD on 06/09/10 Page 103 of 158
Case 3:09-cv-00721-N-BQ Document 115-13 Filed 12/05/11 Page 33 of 150 PageID 8916
HOU 3267.08a
November 23, 2009
Page 5

in the back or front or side, or any clothing similar to inmate clothing such as khaki or green military type clothing. Due to safety and health concerns, only closed toed shoes will be allowed by social visitors, in the Visiting Room. Due to Attorneys and Law Enforcement personnel being in a professional capacity, they are not held to the same dress code standards as social visitors in regards to khaki type slacks/clothing and footwear. Clothing that is questionable will be brought to the attention of the Operations Lieutenant or, in the event the Operations Lieutenant is unavailable, to the attention of the Institution Duty Officer (IDO).

F.     Visitor Denial:

The Operations Lieutenant has the primary authority to deny an inmate visitor entry into the institution for reasons related to institution security such as improper dress and identification. In the event a visitor wishes to contest the Operations Lieutenant's decision, the visitor will be referred to the IDO. When a visit is denied due to reasons of institution security, the Operations Lieutenant will submit an Inmate Visitor Denial form to the Captain (Attachment D). The IDO maintains final decision-making authority for visiting matters not related to institution security.

If an inmate visitor states they have been approved for visitation (and they do not appear on the inmate's approved visiting list), the Unit Team will be contacted to verify the visitor's statement. If members of the Unit Team are not available, the Operations Lieutenant and/or Duty Officer will be contacted for final determination. The Front Lobby Officer does not have the authority to approve a visit.

G.     Visitor's Personal Property:

Visitors will not be allowed to take any personal items into the Visiting Room except:

1)     Identification
2)     Money
3)     Infant care items consisting of one pacifier, two diapers, five diaper wipes, one clear see-through baby bottle with contents, and one infant size blanket, in a one gallon clear zip lock bag. No other bags are allowed. .
4)     Necessary medication such as asthma sprayer or nitroglycerin tablets.

In circumstances where a visitor must take medication into the visiting room, staff will ensure that the quantity of medication taken into the Visiting Room is only the amount necessary for the duration of the visit. An entry should be made on the visitor's "Notification to Visitors" form describing the medication. Any questions regarding the introduction of medication into the institution by a visitor should be referred to the Operations Lieutenant. Any questions as to the identification of medication, as well as its use, will be directed to medical staff. All medication should be left with the Visiting Room Officer in Charge (OIC).

Inmates are responsible for notifying prospective visitors of what property is allowed into the Visiting Room. A limited number of lockers are available for institution visitors with unauthorized property. These lockers are provided as a matter of convenience and are available on a first-come first-serve basis. Items not able to be stored in a locker must ordinarily be removed from institution grounds. Under no circumstances may staff accept responsibility for any visitor property. All items

Case 4:09-cr-00342   Document 245-1   Filed in TXSD on 06/09/10   Page 104 of 158
Case 3:09-cv-00721-N-BQ   Document 115-13   Filed 12/05/11   Page 34 of 150   PageID 8917
HOU 5267.08a
November 23, 2009
Page 6

of visitor property must be retrieved upon completion of the respective visitor's visit. FDC Houston is not responsible for any loss or damage of property not allowed into the Visiting Room.

H.   Visitor Documentation:

In addition to the "Notification to Visitor" form, each adult visitor will be required to sign the visiting log book prior to each visit. Each visitor will record their departure time in the visiting log book. The completed "Notification to Visitor" forms will be filed with the Special Investigative Supervisor's (SIS) Office for a period of one year.

I.   Inmate's Personal Property:

Inmates are only allowed to wear institution issued clothing and shoes in the Visiting Room. Underclothing is required. All clothing must be clean and neat in appearance. Inmates may enter the Visiting Room with one plain wedding band, one approved religious medallion, and one pair of prescription eyeglasses. Medication necessary for the preservation of the inmate's life will be allowed into the Visiting Room and will be maintained by the Visiting Room OIC. No other items will be allowed in the Visiting Room. Unauthorized items brought into or out of the Visiting Room will be confiscated and disposed of as outlined in Program Statement 5580.07, Inmate Personal Property.

J.   Inmate Processing:

The Visiting Room Shakedown Officer will identify all inmates as they enter and exit by using the inmate identification card or picture card. If the inmate has altered his appearance, it will be noted so that a new picture can be obtained. The Visiting Room Shakedown Officer will personally hand the inmate's identification card or picture card to the Visiting Room OIC, ensuring the Visiting Room OIC is aware of each inmate being admitted into the Visiting Room. All inmates entering the Visiting Room will be pat searched and screened with a handheld metal detector. All inmates departing the Visiting Room will be visually searched and scanned with the handheld metal detector. After completion of a visit, no further visitor contact will be permitted. Inmates will be positively identified with the picture cards prior to the departure of their visitor(s). Visitors entering and departing the Visiting Room will be escorted by staff. Five (5) visitors (excluding carried children) may be escorted per one (1) staff member. The departure of inmates will be supervised by the Visiting Room OIC.

K.   Counts in the Visiting Room:

Inmates present in the Visiting Room during official counts will be counted in the Visiting Room. The movement of visitors and inmates into and out of the Visiting Room will be suspended thirty minutes before the official count, at which time the Visiting Room OIC will prepare and submit an Out-Count Form to the Control Center. When conducting the count, Visiting Room staff will require all inmates to stand on one side of the Visiting Room, separated from the visitors. Visiting Room entry and exit will resume when the institution count has cleared.

L.   Conduct in the Visiting Room:

Case 4:09-cr-00342 Document 245-1 Filed in TXSD on 06/09/10 Page 105 of 158
Case 3:09-cv-00721-N-BQ Document 115-13 Filed 12/05/11 Page 35 of 150 PageID 8918

November 23, 2009
Page 7

Visits will be conducted as informally and as pleasantly as the physical conditions permit. Handshaking, brief embracing, and an exchange of a brief kiss are permitted at the beginning and end of the visit. The visiting room officers will ensure that all visits are conducted in a quiet, orderly and dignified manner. Placement of inmates and visitors will be at the Visiting Room OIC's discretion. All visitors will sit across from the inmate. Inmates are also permitted to hold their children during a visit. Any other physical contact will not be permitted and may be grounds for termination of the visit. Staff may limit physical contact to minimize the opportunity for the introduction of contraband and to maintain the orderly operation of the visiting area. The IDO and/or Operations Lieutenant will make decisions regarding termination of a visit for excessive physical contact. Children may watch television in the children's area. No inmates are allowed in this area.

M.    Passing of Articles:

(1)    It is not permissible for papers of any kind to be examined or signed during social visits, nor may social visitors receive from or give any items to the inmate. Such transactions must be handled through the mail correspondence procedures. Exceptions must be approved by the Warden or Administrative Duty Officer (ADO).

(2)    Visitors (social or legal) are expressly prohibited from passing money to an inmate in the Visiting Room. Visiting Room and other staff are not permitted to directly receive funds for deposit to an inmate's commissary account. All funds intended for an inmate's commissary account must be mailed to the lock box in Des Moines, IA, and be made payable to the inmate using the inmate's name and register number.

N.    Visit Termination:

The decision to terminate a visit for any reason will be made by the IDO or, when the IDO is not in the institution or is otherwise unavailable, by the Operations Lieutenant. When a visit is terminated for any reason other than overcrowding, the Operations Lieutenant will ensure a memorandum detailing the reason for the termination is prepared. The memorandum will be forwarded to the Captain.

O.    Overcrowding:

Social visiting may be curtailed when necessary to alleviate overcrowding in the Visiting Room. Should it become necessary to curtail visiting, the Operations Lieutenant shall consult with the IDO prior to terminating any visit. Prior to terminating a visit, volunteers will be sought to leave the Visiting Room. If the volunteer response is insufficient, visits will be terminated in the same order that they began.

P.    Legal Visits:

(1)    Legal Visiting Sessions - Inmates incarcerated at FDC Houston are afforded an opportunity to receive legal visits on a daily basis, at the times previously specified in Section 3.B.(2). The expansiveness of the hours of legal visitation, including scheduled evening hours, is intended to accommodate the needs of the inmate

Case 4:09-cr-00342   Document 245-1    Filed in TXSD on 06/09/10   Page 106 of 158
Case 3:09-cv-00721-N-BQ   Document 115-13   Filed 12/05/11   Page 36 of 150   PageID 8919

November 23, 2009
Page 8

population and their legal representatives without the disruption and consumption of staff resources associated with individually scheduled visits. Accordingly, requests for visitation outside of the designated hours for legal visitation will only be approved in compelling circumstances. Requests for visitation beyond the designated hours should be directed to the inmate's Unit Team and, to ensure staff coverage for any such visit, must be made twenty-four (24) hours in advance whenever possible.

(2)     Documentary Requirements for Attorneys - Attorneys seeking a legal visit are responsible for indicating where they are actively licensed and how that fact may be verified. Licensure may be satisfactorily demonstrated through presentation of a current bar card. Attorneys from the Office of the Federal Public Defender may, in lieu of a bar card, present credentials of that office with their picture for entry into the institution. If additional guidance is needed regarding Foreign Attorneys, consult local Legal Staff.

(3)     Legal Assistants Desiring to Accompany an Attorney - Legal assistants such as law clerks, investigators, interpreters, paralegals, notaries, and mental health professionals must receive prior approval to participate in legal visitation, regardless of whether the legal assistant is accompanied by an attorney. Attorneys desiring a legal assistant's participation in legal visitation are responsible for submitting a completed Application to Enter Institution as a Legal Assistant form (Attachment E). Ordinarily, completed applications must be mailed to the Unit Manager designated on the application. Original signatures for this form are required and hand-delivered applications will not ordinarily be accepted. Review of properly submitted applications will normally be completed within two business days, excluding the day of submission, and Unit Team staff will consult with the Legal Department prior to any denial of a legal assistant's request.

A computerized list of approved legal assistants and their corresponding sponsoring attorneys will be maintained by Unit Team staff. A legal assistant on this list may participate in legal visitation with any inmate so long as they are accompanied by a listed sponsoring attorney. A legal assistant may be sponsored by an unlimited number of attorneys so long as each request includes a fully completed application that, if approved, will be assigned an independent renewal date. Exceptions to the requirement that an approved legal assistant be sponsored by a specific, listed attorney must be approved by the Warden. Currently such exceptions are limited to circumstances involving the Federal Public Defender's Office, contract interpreters working with the United States District Court, and diplomatic representatives. See Section 3.Q. with regard to diplomatic representatives.

Unit Team staff assign a renewal date to each approved request of a legal assistant for accompanied legal visitation. The renewal date is generally one year in advance of the date on which the request is approved. If a legal assistant seeks to participate in a legal visit with their sponsoring attorney after the respective renewal date, Front Lobby staff will allow the visit after advising the legal assistant that they will need to submit another Application to Enter Institution as a Legal Assistant form (Attachment E) to ensure uninterrupted legal visitation privileges in the future.

Case 4:09-cr-00342 Document 245-1 Filed in TXSD on 06/09/10 Page 107 of 158
Case 3:09-cv-00721-N-BQ Document 115-13 Filed 12/05/11 Page 37 of 150 PageID 8920
HOU 5267.08a
November 23, 2009
Page 9

Front Lobby staff will document the permitted entry of a legal assistant in need of renewal on a Passage of Legal Assistant Renewal Date Memorandum (Attachment F). After receipt of a Passage of Legal Assistant Renewal Date Memorandum, Unit Team staff will remove the referenced the legal assistant authorization from the computer database if satisfactory renewal has not occurred within 10 days. Unit Team will also purge the computer database of all legal assistant authorizations that are more than one year beyond the renewal date. Front Lobby staff will, however, allow any properly accompanied legal assistant to participate in legal visitation so long as the authorization appears in the computerized database, irrespective of the assigned renewal date, and no other independent reason exists to deny entry.

(4)     Legal Assistants Not Accompanied by Their Sponsoring Attorney - A sponsoring attorney who desires that a legal assistant participate in legal visitation with a particular inmate in the attorney's absence, or engage in legal correspondence with a particular inmate, may submit a facsimile transmission of a Request for Expanded Legal Assistant Privileges form (Attachment G) to the respective inmate's Unit Manager. Facsimile transmissions regarding inmates assigned to Units 3 and 4 should be sent to (713) 229-4224; transmissions regarding inmates assigned to Units 5 and 6 should be sent to (713) 229-4225. Request for Expanded Legal Assistant Privileges forms will normally be processed within two business days. It is imperative that facsimile transmissions be limited to requests that concern a legal assistant already approved to participate in legal visitation with the attorney submitting the request for the additional privileges.

Unit Team staff will add legal assistants approved for expanded legal assistant privileges to the particular inmate's visiting list. Unit Team staff will assist mail room staff in identifying legal assistants with expanded privileges and who are, accordingly, authorized special mail privileges with individual inmates.

(5)     Legal Visitor Processing - The processing of legal visitors into the institution will begin thirty minutes prior to scheduled visiting hours and will cease one hour before the end of the visitation period. See Section 3.B.(3) regarding scheduled institution inmate count times.

Normally, due to the unique mission of a pretrial facility, the processing of legal visitors will receive priority over other visitors. As required for all visitors, legal visitors must present appropriate photo identification and complete the Notification of Visitor Form. Attorneys must also complete the Visiting Attorney Statement (Attachment H), which will be maintained with Notification of Visitor forms.

After prospective legal visitors satisfactorily complete necessary documentation, Front Lobby staff are responsible for attempting to initiate contact with one or more of the Unit Officers overseeing the inmates with whom the visitor desires to have a legal visit. The legal visitors will then be processed through the metal detector and will have their hand stamped before being allowed entry into the institution. All legal materials and briefcases will be searched for contraband and processed through the x-ray machine. Portable phones, pagers, personal digital assistants (PDAs), and nonlegal materials,

Case 4:09-cr-00342 Document 245-1 Filed in TXSD on 06/09/10 Page 108 of 158
Case 3:09-cv-00721-N-BQ Document 115-13 Filed 12/05/11 Page 38 of 150 PageID 8921
1100 5267.08a
November 23, 2009
Page 10

such as newspapers and magazines, gum, candy, et cetera, are not permitted in the Visiting Room.

(6)    Legal Materials - Inmates desiring to use legal materials from their cell during the course of a legal visit will be allowed to do so after staff examine the materials desired to be used to verify that they are limited to legal materials and include no prohibited items. Unauthorized property brought to the Visiting Room area will be treated as contraband and handled in accordance with Program Statement 5580.07, Personal Property, Inmate. During the course of a legal visit, inmates are permitted to give any or all of the possessed legal materials to their legal visitor(s).

Legal visitors may provide the inmate with whom they are visiting a limited amount of legal papers at the end of the visit after informing the Visiting Room OIC that they intend to do so. Documents to be given to an inmate must be individualized sheets of paper without folders, clips, and any other form of a binding with the exception of staples used to attach a minimal number of pages. Prior to an inmate's return to their cell, all papers in an inmate's possession will be inspected to verify that the papers are limited to legal materials and contain no contraband.

Attorneys may also leave legal documents for an inmate by utilizing a legal mailbox located in the entry area of the institution. This mailbox, which is only for legal mail, is also available for members of the legal community who are not partaking in legal visitation but who wish to leave legal papers for an inmate. All documents placed in this mailbox must be in an envelope which contains markings that state the contents constitute legal mail and that it is to be opened only in the presence of the inmate. The originating party's name must also be clearly identified on the envelope indicating that they are a licensed attorney or other individual approved for special mail privileges with the intended inmate recipient. Envelopes with insufficient markings will be treated as general correspondence and will be inspected and subject to being read.

(7)    Co-Defendant Meetings - Attorneys desiring to see more than one inmate simultaneously must provide a copy of an indictment which identifies the inmates as co-defendants. All co-defendant meetings will be schedule in advance by Unit Team staff after any necessary consultation with the Legal Department.

(8)    Material Witnesses - Attorneys are not ordinarily permitted to bring material witnesses into the Visiting Room without clearly defined special circumstances. Prior approval must be received from the Warden.

(9)    Electronic Discovery Materials - Legal visitors may take video and audiotapes received during criminal discovery into the Visiting Room. Institution playback equipment is provided, subject to availability, and may be reserved by contacting the inmate's Unit Team. No other audio or video playback equipment will be allowed into the institution. Attorneys desiring to review discovery material provided by prosecuting officials in the form of CD-ROM may utilize a computer maintained in the Visiting Room for that purpose.

Case 4:09-cr-00342  Document 245-1  Filed in TXSD on 06/09/10  Page 109 of 158
Case 3:09-cv-00721-N-BQ  Document 115-13  Filed 12/05/11  Page 39 of 150  PageID 8982
November 23, 2009
Page 11

(10)  Special Visits - The following days are considered special visits:

Non-Visiting Days: Limited visiting during non-visiting hours may be authorized in unusual circumstances, (i.e., persons traveling a long distance to visit, a person visiting a hospitalized inmate, et cetera) upon approval of the Warden. When this occurs, the Unit Manager shall be responsible for providing staff to process and supervise the visit.

(11)  Minister of Record, Clergy Visits - Clergy visits are not conducted as minister of record. See Program Statement 5360.09. An inmate wanting to receive visits from his minister of record must submit a written request to the Chaplain. Upon approval, the unit team will add the name and title (Minister of Record) to the inmate's visiting list (will not count as one of the allowed 10 visitors). An inmate will only have one minister of record in his visiting list at one time. These visits will take place during normal visiting hours.

Q.  Visits by Diplomatic Representatives:

Diplomatic representatives desiring to visit inmate foreign nationals of their country of citizenship may do so, after approval for entry into the institution, during legal visiting hours. Diplomatic representatives may obtain approval for entry into the institution by submitting a written request to the appropriate Unit Manager. Requests should be on the representative's respective letterhead and include a photocopy of their credentials and a telephone number and address at which additional information, if needed, may be obtained. Unit Team staff will add the names of approved representatives to the computerized database that also contains, among other things, the names of legal assistants approved to participate in legal visitation with their sponsoring attorney.

Approval of diplomatic representatives for entry into the institution will normally allow the representative to visit any inmate foreign national of their country of citizenship. This approval is subject to yearly renewal. Front Lobby staff will advise diplomatic representatives seeking entry after their renewal date that prompt re-submission of their request materials is necessary for uninterrupted future visiting privileges. Front Lobby staff allowing a diplomatic representative entry after their renewal date will provided computerized or written notification to the appropriate Unit Manager that the representative has been advised to seek renewed approval. After receipt of such notification, Unit Team staff will remove the referenced representative from the computerized database if satisfactory renewal has not occurred within 10 days. Unit Team will also purge the computerized database of all diplomatic representatives that are more than one year beyond the renewal date. Front Lobby staff will allow entry to any representative whose name appears on the computerized database, irrespective of the assigned renewal date, if denial is not otherwise required.

R.  Prisoner Visitation and Support Visitors:

FDC Houston espouses the efforts of the volunteer participants of the Prisoner Visitation and Support (PVS) program. The primary focus of these individuals is to visit and provide moral support to inmates who do not ordinarily receive visits from family and friends.

PVS National Visitors may engage in social visitation at FDC Houston by notifying the Warden of their desire to do so. Other PVS visitors may seek approval by having their request, along with

Case 4:09-cr-00342 Document 245-1 Filed in TXSD on 06/09/10 Page 110 of 158
Case 3:09-cv-00721-N-BQ Document 115-13 Filed 12/05/11 Page 40 of 150 PageID 8923
November 23, 2009
Page 12

pertinent biographical data, sent to the Warden by PVS staff. Prior to approval, PVS visitors are subject to local law enforcement checks and NCIC clearance. Volunteer training provided by FDC Houston staff will be afforded to PVS visitors. Renewal of PVS visitor status is conducted every five years.

PVS visitors desiring to partake in inmate social visitation at FDC Houston may do so by scheduling their visit to the facility in advance. Such visits will ordinarily occur in the Visiting Room during normal visitation hours. Although PVS visitors will generally identify the inmates with whom they wish to visit through prior correspondence, Religious Services staff will facilitate this process. PVS visitors may generally bring paper and writing implements into the Visiting Room.

S.  Special Housing Unit (SHU) Inmates:

Inmates housed in the SHU will be permitted to have visits in the same manner as other inmates unless restricted for security or discipline concerns. Inmates housed in the SHU will be seated in a designated area in the Visiting Room. SHU holdover inmates from other institution will be considered for social visiting during visiting sessions normally limited to legal visits.

Inmates housed in the SHU who the Warden determines are unable to have visitation in the Visiting Room due to security concerns will be considered for visitation in the SHU in the non-contact rooms. The Warden will identify the parameters of any visitation which occurs in the SHU on an individual basis. Visitors under the age of eighteen (18) years of age, however, are prohibited from visiting in the SHU under all circumstances.

T.  Violations of Regulations and/or Introduction of Contraband:
    If a visit is terminated because of an alleged violation of regulations, the officer identifying the violation will prepare and submit an incident report on the inmate(s) involved. The Operations Lieutenant will prepare a Temporary Restriction of Visitation memorandum and forward it to the Warden no later than two working days after the incident. Only the Warden may restrict visiting privileges pending final disposition of the Unit Disciplinary Committee or Disciplinary Hearing Officer. The Disciplinary Hearing Officer or Unit Disciplinary Committee should ordinarily impose the loss of visiting privileges as a sanction on inmates found to have committed prohibited act(s) involving violations of regulations and/or introduction of contraband.

The Bureau of Prisons may seek criminal prosecution against visitors who participate in criminal violations.

U.  Searching of Visitors:

        a.  Right of Refusal: Visitors who refuse any such search or procedure and elect to leave the institution, will not be permitted to return for a visit without prior approval of the Associate Warden of Programs. The Operations Lieutenant will prepare a memorandum through the Captain to the Associate Warden of Programs when a visitor is denied entrance due to objecting to a search.

November 23, 2009
Page 13

    b.   Metal Detectors: All visitors will be required to successfully clear the metal detector, prior to being allowed access into the institution. Personal effects will be searched. Any personal effects not allowed in the visiting room must remain in the visitor's vehicle or assigned lobby visitor locker. Occasionally, a visitor will be equipped with a prostheses containing metal. In such cases, a personal search will be conducted in the restroom located at the front entrance, including a through inspection of the prostheses device. Visitors may have surgically implanted pins and plates that will not clear the metal detector. After verification of an approved medical card, verifying the implant, the hand-held metal detector will be used to verify the location of the implant (if the visitor has a medical requirement not to be processed through a metal detector, a procedural memorandum will be in the Front Lobby files). Visitors with hairpins, et cetera, will be required to remove them to successfully clear the metal detector. Visitors will not be allowed to use personal wheel chairs in the visiting room. Depending upon the individual visitor's medical condition, there may be exceptions to their use of personal wheel chairs (memoranda will be placed in the Front Lobby files for all exceptions). If a wheel chair is necessary, one will be provided by the institution (maintained in the Control Center sallyport). At no time will a visual inspection be used in the visitor admittance process, unless authorized by the Warden, Acting Warden, or the Administrative Duty Officer.

    c.   Electronic Drug Detection: Staff shall randomly test visitors for traces of drugs during normal visiting hours by means of electronic drug detection unit in the Front Lobby. Only visitors (excluding attorneys) will be tested. Refer to the Institution Supplement on ION testing for further guidance.

V.    Visits to Inmates Under Strict Medical Care:

    (1)    Inmates admitted to local hospitals for medical treatment and who remain under the supervision of FDC Houston staff will not be allowed social visits unless authorized by the Warden. If authorized by the Warden, visitors will visit according to that medical facility's visiting times and visits will be limited to immediate family members only. These visits will not exceed one (1) hour in duration and will be done with direct staff supervision. Identification, search procedures, etc. that are applicable at the institution will be in effect.

    (2)    Visits may be prohibited or restricted for inmates under strict medical care, i.e., suffering from infectious disease, under psychiatric treatment, or who are suicidal, being physically restrained, in dry-cell status, or otherwise not in condition to see visitors. The IDO or Operations Lieutenant should carefully and sensitively explain why the requested visit is being prohibited or restricted. In doing so, however, staff must ensure that only public information is released. Protected information will only be released in writing and only after the affected inmate provides a written release allowing for the disclosure of specified information.

Case 4:09-cr-00342 Document 245-1 Filed in TXSD on 06/09/10 Page 112 of 158
Case 3:09-cv-00721-N-BQ Document 115-13 Filed 12/05/11 Page 42 of 150 PageID 8925
November 23, 2009
Page 14

W.    Media Visits

Media requests for visits will be coordinated through the Public Information Officer. A media representative who wishes to visit outside his or her official duties, however, must qualify as a regular visitor and, if applicable, a special visitor.

X.    Transportation Assistance:

The Warden shall ensure that directions for transportation to and from the institution are provided for the approved visitor. Directions for transportation to and from the institution and pay phone service, with commercial transportation phone numbers posted, are also made available at the institution to assist visitors.

Y.    Inmate Separatees:

In some circumstances, identified inmates will not be allowed to have contact with each other and must be separated at all times. Normally, inmates with separations will be processed into the Visiting Room in the order that their visitor(s) arrived in the institution Front Lobby. Once an inmate with a separation receives a visitor, all later arriving social visitors for that inmate's separatee(s) will be prohibited from being processed into the Visiting Room until the Visiting Room OIC notifies the Front Lobby that the originally processed inmate and their visitors have departed.

A social visit may be prematurely terminated in order to accommodate a requested social visit of inmate housed in the unit to whom that visiting session is primarily dedicated (i.e., the weekend social visit of a 3E inmate may be terminated to accommodate a social visit for a 4W inmate if the particular visiting session is primarily dedicated to 4W). As indicated in Section 3.A., separation concerns will not prevent a legal visit from taking place elsewhere in the institution.

4.    **RESPONSIBLE DEPARTMENT**: Correctional Services.

5.    **ATTACHMENTS:**

   A.    Visitation Rotation
   B.    Request for Visitor Approval "Pretrial and Holdover Inmates"
   C.    Request for Visitor Approval "Work Cadre and Designated Short-Term Female Inmates"
   D.    Inmate Visitor Denial Form
   E.    Application to Enter Institution as a Legal Assistant - Pages 1 - 5
   F.    Passage of Legal Assistant Renewal Date Memorandum
   G.    Request for Expanded Legal Assistant Privileges
   H.    Visiting Attorney Statement
   I.    Visitor Regulations

Note: Attachments may be updated as necessary.

_____
Joe D. Driver, Warden

November 23, 2009
Attachment A

## VISITATION ROTATION

| | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|---|
| Week 1 | Legal 8am - 3pm<br>* 8am -11am<br>* 12pm - 3pm | Legal 8am - 8pm<br>4E 8am -11am<br>4W 12pm - 3pm<br>* 5pm - 8pm | Legal 8am - 8pm | Legal 8am - 8pm | Legal 8am - 8pm<br>5E 8am -11am<br>5W 12pm - 3pm<br>* 5pm - 8pm | Legal 8am - 3pm<br>6E 8am -11am<br>6W 12pm - 3pm | Legal 8am - 3pm<br>* 8am -11am<br>* 12pm - 3pm |
| Week 2 | Legal 8am - 3pm<br>4E* 8am -11am<br>4W 12pm - 3pm | Legal 8am -8pm<br>5E 8am -11am<br>5W 12pm - 3pm<br>* 5pm - 8pm | Legal 8am - 8pm | Legal 8am - 8pm | Legal 8am - 8pm<br>6E 8am -11am<br>6W 12pm - 3pm<br>* 5pm - 8pm | Legal 8am - 3pm<br>3E 8am -11am<br>3W 12pm - 3pm | Legal 8am - 3pm<br>4E* 8am -11am<br>4W*12pm - 3pm |
| Week 3 | Legal 8am - 3pm<br>5E* 8am -11am<br>5W*12pm - 3pm | Legal 8am -8 pm<br>6E 8am -11am<br>6W 12pm - 3pm<br>* 5pm - 8pm | Legal 8am - 8pm | Legal 8am - 8pm | Legal 8am - 8pm<br>3E 8am -11am<br>3W 12pm - 3pm<br>* 5pm - 8pm | Legal 8am - 3pm<br>4E 8am -11am<br>4W 12pm - 3pm | Legal 8am - 3pm<br>5E* 8am -11am<br>5W*12pm - 3pm |
| Week 4 | Legal 8am - 3pm<br>6E * 8am -11am<br>6W*12pm - 3pm | Legal 8am -8 pm<br>3E 8am -11am<br>3W 12pm - 3pm<br>* 5pm - 8pm | Legal 8am - 8pm | Legal 8am - 8pm | Legal 8am - 8pm<br>4E 8am -11am<br>4W 12pm - 3pm<br>* 5pm - 8pm | Legal 8am - 3pm<br>5E 8am -11am<br>5W 12pm - 3pm | Legal 8am - 3pm<br>6E* 8am -11am<br>6W*12pm - 3pm |
| Week 5 | Legal 8am - 3pm<br>* 8am -11am<br>* 12pm - 3pm | Legal 8am -8 pm<br>4W 8am -11am<br>4E 12pm - 3pm<br>* 5pm - 8pm | Legal 8am - 8pm | Legal 8am - 8pm | Legal 8am - 8pm<br>5W 8am -11am<br>5E 12pm - 3pm<br>* 5pm - 8pm | Legal 8am - 3pm<br>6W 8am -11am<br>6E 12pm - 3pm | Legal 8am - 3pm<br>* 8am -11am<br>* 12pm - 3pm |
| Week 6 | Legal 8am - 3pm<br>4W * 8am -11am<br>4E 12pm - 3pm | Legal 8am -8 pm<br>5W 8am -11am<br>5E 12pm - 3pm<br>* 5pm - 8pm | Legal 8am - 8pm | Legal 8am - 8pm | Legal 8am - 8pm<br>6W 8am -11am<br>6E 12pm - 3pm<br>* 5pm - 8pm | Legal 8am - 3pm<br>3W 8am -11am<br>3E 12pm - 3pm | Legal 8am - 3pm<br>4W* 8am -11am<br>4E* 12pm - 3pm |
| Week 7 | Legal 8am - 3pm<br>5W* 8am -11am<br>5E* 12pm - 3pm | Legal 8am -8 pm<br>6W 8am -11am<br>6E 12pm - 3pm<br>* 5pm - 8pm | Legal 8am - 8pm | Legal 8am - 8pm | Legal 8am - 8pm<br>3W 8am -11am<br>3E 12pm - 3pm<br>* 5pm - 8pm | Legal 8am - 3pm<br>4W 8am -11am<br>4E 12pm - 3pm | Legal 8am - 3pm<br>5W* 8am -11am<br>5E* 12pm - 3pm |
| Week 8 | Legal 8am - 3pm<br>6W* 8am -11am<br>6E* 12pm - 3pm | Legal 8am -8 pm<br>3W 8am -11am<br>3E 12pm - 3pm<br>* 5pm - 8pm | Legal 8am - 8pm | Legal 8am - 8pm | Legal 8am - 8pm<br>4W 8am -11am<br>4E 12pm - 3pm<br>* 5pm - 8pm | Legal 8am - 3pm<br>5W 8am -11am<br>5E 12pm - 3pm | Legal 8am - 3pm<br>6W* 8am -11am<br>6E* 12pm - 3pm |

| | | | | | | |
|---|---|---|---|---|---|---|
| 01/03/10 | ****** | 04/18/10 | Week 1 | 08/01/10 | Week 8 | 11/14/10 | Week 7 |
| 01/10/10 | Week 3 | 04/25/10 | Week 2 | 08/08/10 | Week 1 | 11/21/10 | Week 8(h) |
| 01/17/10 | Week 4 (h) | 05/02/10 | Week 3 | 08/15/10 | Week 2 | 11/28/10 | Week 1 |
| 01/24/10 | Week 5 | 05/09/10 | Week 4 | 08/22/10 | Week 3 | 12/05/10 | Week 2 |
| 01/31/10 | Week 6 | 05/16/10 | Week 5 | 08/29/10 | Week 4 | 12/12/10 | Week 3 |
| 02/07/10 | Week 7 | 05/23/10 | Week 6 | 09/05/10 | Week 5 (h) | 12/19/10 | Week 4(h) |
| 02/14/10 | Week 8 (h) | 05/30/10 | Week 7 (h) | 09/12/10 | Week 6 | 12/26/10 | Week 5 |
| 02/21/10 | Week 1 | 06/06/10 | Week 8 | 09/19/10 | Week 7 | 01/02/11 | Week 6(h) |
| 02/28/10 | Week 2 | 06/13/10 | Week 1 | 09/26/10 | Week 8 | | |
| 03/07/10 | Week 3 | 06/20/10 | Week 2 | 10/03/10 | Week 1 | | |
| 03/14/10 | Week 4 | 06/27/10 | Week 3 | 10/10/10 | Week 2 (h) | | |
| 03/21/10 | Week 5 | 07/04/10 | Week 4 (h) | 10/17/10 | Week 3 | | |
| 03/28/10 | Week 6 | 07/11/10 | Week 5 | 10/24/10 | Week 4 | | |
| 04/04/10 | Week 7 | 07/18/10 | Week 6 | 10/31/10 | Week 5 | | |
| 04/11/10 | Week 8 | 07/25/10 | Week 7 | 11/07/10 | Week 6 (h) | | |

Legal   denotes times in which any inmate may receive a legal visit.

*   denotes visiting sessions available to work cadre and female inmates

(h)   denotes a week affected by the holiday schedule. As with the regular weekend schedule, visiting on federal holidays is from 8:00 a.m. - 3:00 p.m., and is available to work cadre and female inmates and inmates residing on units otherwise scheduled to visit during the respective morning and afternoon sessions. Each visiting week begins on Sunday.

HOU 5267.08n
**November 23, 2009**
Attachment B

## REQUEST FOR VISITOR APPROVAL
## PRETRIAL AND HOLDOVER INMATES

NAME: _____ **REGISTER NO.:** _____
       Last, First, Middle

Your social visiting is limited to visits by members of your immediate family. Any visitor with a criminal record must have prior written approval from the Warden.

| Name of Visitor | Relationship | Age | Full Address | Phone Number |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**I swear that the above information is true and accurate to the best of my knowledge.**

_____  _____  _____
**Inmate's Signature**      **Date Signed**     **Unit Staff Signature**

Date Received: _____

HOU 5267.08a
November 23, 2009
Attachment C

## REQUEST FOR VISITOR APPROVAL
## WORK CADRE AND DESIGNATED SHORT-TERM FEMALE INMATES

NAME: _____          REGISTER NO.: _____
           Last, First, Middle

Work cadre and designated short-term female inmates may have immediate family members, other relatives, and friends (verified) on their approved visiting list. A maximum of ten (10) visitors, excluding immediate family members, will be authorized on a work cadre or designated short-term female inmate's list of approved visitors. Any visitor with a criminal conviction must have prior written approval from the Warden.

| Name of Visitor | Relationship | Age | Full Address | Phone Number |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

I swear that the above information is true and accurate to the best of my knowledge.

_____   _____   _____
Inmate's Signature              Date Signed          Unit Staff Signature

Date Received: _____ . _____ _

HOU 5267.08a
November 23, 2009
Attachment D

### FDC HOUSTON, TEXAS
### INMATE VISITOR DENIAL FORM

On this date, _____ _____, _____, at _____ (a.m.) (p.m.), the following

inmate visitor, (Mr.) (Mrs.) (Ms.)_____ was denied entrance into the

institution. The visitor arrived at the institution to visit Inmate _____, whose register

number is _____.


The visit was denied for the following reason:

1.  Improper identification
2.  Improper dress
3.  Other: _____

COMMENTS:_____

_____

_____

_____

_____


PRIOR TO DENIAL.:

Operations Lieutenant notified:_____

Duty Officer notified if the individual requests to appeal the decision of the Operations Lieutenant:_____

HOU 5267.08a
November 23, 2009
Attachment E, Page 1

### APPLICATION TO ENTER INSTITUTION AS A LEGAL ASSISTANT
### FEDERAL DETENTION CENTER (FDC), HOUSTON, TEXAS
### GENERAL

This information is provided pursuant to 5 U.S.C. 552a, the Privacy Act of December 31, 1974.

### PURPOSE AND USES

The information you supply may be used as a basis for an investigation regarding your ability, as a non-attorney, to participate in legal visitation at FDC Houston with your sponsoring attorney. The supplied information may also be used in considering requests made by your sponsoring attorney for you to partake in unaccompanied legal visits or legal correspondence with one or more specified FDC Houston inmates. By signing below, you authorize a representative of the Federal Bureau of Prisons to obtain any information on your criminal background history. In the process of conducting the investigation, the Bureau of Prisons may disclose the information to federal, state, or local law enforcement agencies.

### EFFECTS OF NON-DISCLOSURE

You are not required to supply the information requested on the attached form. If you do not furnish the information requested, the processing of your request will be suspended, and you will receive no further consideration. If you furnish only part of the information required, the processing of your request will be attempted; however, it may be significantly delayed. If the information withheld is found to be essential to processing your request properly, you will be so informed, and your request will receive no further consideration unless you supply the missing information. Although no penalties are authorized for failure to supply the requested information, failure to supply the information could result in your not being considered for or allowed admittance to the institution.

### SUBMISSION OF APPLICATIONS

Completed applications should be mailed to one of the two Unit Managers at FDC Houston. Unless other arrangements have been made with Unit Team staff, sponsoring attorneys whose last name begins with the letters A-M should direct their submissions to the "Unit Manager for Floors 3&4" and sponsoring attorneys whose last name begins with the letters N-Z should direct their submissions to the "Unit Manager for Floors 5&6." **Original signatures are required for processing and, to ensure orderly delivery to the intended recipient, hand-delivered applications will not ordinarily be accepted.** The mailing address for FDC Houston is P.O. Box 526545, Houston, TX 77002-6545. In most cases the processing of properly submitted requests will be completed within two business days, excluding the day of receipt.

<u>APPLICATION TO ENTER INSTITUTION AS THE LEGAL ASSISTANT OF A LICENSED ATTORNEY</u>

This form has four parts, all of which must be completed for each sponsoring attorney the legal assistant seeks to accompany:

1. GENERAL

2. QUESTIONNAIRE: The questionnaire is to be completed by each paralegal, law clerk, investigator, interpreter, notary, mental health professional, court reporter, or other legal assistant who seeks to participate in legal visitation as the legal assistant of a licensed attorney.

3. CERTIFICATION: The legal assistant seeking to partake in legal visitation at FDC Houston must sign the certification which follows the questionnaire.

4. ATTORNEY'S STATEMENT: The licensed attorney must sign this statement.

**HOU 5267.08a**
**November 23, 2009**
**Attachment E, Page 2**

## 2. QUESTIONNAIRE

NOTE: Answer all questions, if a question does not apply to you, write "Not Applicable" in the space provided for the answer. Attach additional pages as necessary.

1.    Name (Last, First, Middle): _____

      Any alias or other name ever used:

      Name: _____ _____ When used: _____ _____

      Name: _____ _____ When used: _____ ___

2.    a. Date of Birth: _____ _____ b. Place of Birth: _____

3.    Social Security Number: ____ _____

4     a. Sex: _____ _____ ___    b. Race: _____ _____

c. Height: _____    d. Weight: _____

e. Color of Eyes: _____ _____    f. Color of Hair: _____ _____

5.    a. Present address: _____ _____ _____ _____ _____

            _____ _____ _____ _____
            City          State       County      Zip Code

      b. How long at this address? ____ _____ _____

      c. If less than 3 years, prior address: _____ _____ _____ _____

            City          State       County      Zip Code

6     a. Present place of employment: _____ _____ _____ _____

      b. What is your job title: ____ _____ _____

      c. Name of immediate supervisor: ____ _____ _____

      d. Employer's business address: ____ __ __ ___ __ ____ _____ ____

      e. Employer's business phone: _____ _____ ___

      f. How long have you worked for this employer? ___ _____ ___ ___

HOU 5267.08a
November 23, 2009
Attachment E, Page 3

7.  List all schools, universities, or other educational institutions attended since high school. This should include any and all legal training that you have received.

SCHOOL                ADDRESS                DEGREE/DATE RECEIVED

_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____

8.  Have you ever been convicted of ANY criminal offense? If so, complete the following. You may exclude any convictions for minor traffic violations (fine of $50 or less).

OFFENSE       DATE OF CONVICTION        NAME/LOCATION OF COURT

_____    _____    _____
_____    _____    _____

9.  Have you ever been confined in any jail, prison or penal institution? If so, complete the following:

TYPE OF INSTITUTION      LOCATION      DATES OF CONFINEMENT

_____    _____    _____
_____    _____    _____

10.  Are you currently under any form of supervision? If yes, please provide details.

_____
_____

11.  Have you ever been denied permission to visit or correspond with any inmate by an institution within the Federal Bureau of Prisons? _____

If so, which institutions, with which inmate, and when?

_____    _____    _____

12.  Are you a citizen of the United States? _____  _____  _____

If not, give the name of the country of which you are a citizen? _____  _____  _____

986

HOU 5267.08a
November 23, 2009
Attachment E, Page 4

### 3. CERTIFICATION

## STATEMENT OF APPLICANT SEEKING TO ENTER AN INSTITUTION TO VISIT FEDERAL PRISONERS AS THE LEGAL ASSISTANT OF A LICENSED ATTORNEY

I certify that I am authorized to act as a legal assistant of _____ __ __ _____ ____ .
a licensed member of the bar of the State of _____, and with whom I request that I be
allowed to accompany for the purpose of conducting legal visitation at FDC Houston. I am aware of my
responsibility as a representative of the above-named attorney and certify that I am able to meet this
responsibility. I am also aware of FDC Houston's policies concerning legal visitation and certify that I am able
to and will adhere to the requirements of these policies. I pledge to abide by Bureau of Prisons regulations and
institution guidelines with regard to all privileges extended to me by FDC Houston, both now and in the future.

I hereby certify that all of the information contained in this questionnaire is true and correct to the best of my
knowledge. I understand that all information contained in this questionnaire may be investigated and verified
through the use of federal, state, and local authorities. Furthermore, I hereby authorize a representative of the
Federal Bureau of Prisons to obtain information on my criminal history background.

Applicant's Printed Name: _____ __ _____ ____ _____ __

Applicant's Signature: _____ _____ __ ___ _____ _____

Date Completed: _____ __ __ _____ _____ __ _ _____

HOU 5267.08a
November 23, 2009
Attachment F, Page 5

## 4. STATEMENT OF SPONSORING ATTORNEY

My signature below certifies that I am a licensed member of the bar of the State of _____ and that I am utilizing the services of _____, a legal assistant I desire to be able to accompany me when I partake in legal visitation at FDC Houston. I further certify that the above-named legal assistant is aware of the responsibility of his/her role as my legal assistant and is able to meet this responsibility. I pledge that I will supervise my legal assistant's activities with regard to any privileges extended to him/her by FDC Houston and I accept personal and professional responsibility for all acts of my legal assistant which affect the institution, its inmates, or staff.

Sponsoring Attorney's Printed:

Printed Name: _____

Business Address _____

_____

Telephone Number _____

Sponsoring Attorney's Signature: _____

Date Completed: _____

HOU 5267.08a
November 23, 2009
Attachment F

**U.S. Department of Justice**
Federal Bureau of Prisons
Federal Detention Center
*1200 Texas Avenue*
*Houston, Texas 77002*

**DATE:** _____ _____, 20____

**REPLY TO**
**ATTN OF:** _____ , **Front Lobby Officer**

**SUBJECT:** **Passage of Legal Assistant Renewal Date**

**TO:** **Unit Manager for Floors** _____
(Indicate 3/4 when the sponsoring attorney's last name begins with the letters A-M and 5/6 when the sponsoring
attorney's last name begins with the letters N-Z)

On the above-indicated date, _____, a legal assistant previously

approved to participate in legal visitation, entered the institution. I advised the legal assistant that

their renewal date for their sponsorship by _____ had passed on

_____ _____, 200__ and that they would need to promptly send you a

completed Application to Enter Institution as Legal Assistant form. I provided the legal assistant

a copy of that document.


The legal assistant will continue to be allowed to participate in the previously approved legal

visitation unless the entry documenting that approval is removed from the database of approved

legal assistants.

**HOU 5267.08a**
**November 23, 2009**
**Attachment G**

## REQUEST FOR EXPANDED LEGAL ASSISTANT PRIVILEGES

I am a licensed member of the bar of the State of _____ and I am utilizing the services of _____, a legal assistant who completed an Application to Enter Institution as a Legal Assistant in order to be able to accompany me while I partake in legal visitation at FDC Houston. Through my signature below, I request that the above-named legal assistant additionally be allowed special correspondence and unaccompanied legal visitation privileges with _____, who is confined at FDC Houston and has been assigned Register Number _____ - _____.

Through my signature below, I once again certify that the above-named legal assistant is aware of the responsibility of his/her role as my representative and is able to meet this responsibility. I pledge that I will supervise my legal assistant's activities with regard to any privileges extended to him/her by FDC Houston and I accept personal and professional responsibility for all acts of my legal assistant which affect the institution, its inmates, or staff.

Sponsoring Attorney's Printed:

     Printed Name: _____

     Business Address _____

                       _____

     Telephone Number_____

Sponsoring Attorney's Signature: _____

Date Completed: _____

**Important Submission Note:**
     **If within the past year the sponsoring attorney has previously submitted all four questionnaire/certification pages of the Application to Enter Institution as a Legal Assistant, with original signatures, for the named legal assistant, this one-page document may be sent to the inmate's Unit Manager by facsimile transmission.** Please allow two business days for processing.

     Facsimile number for inmates assigned to Units 3 and 4 - (713) 229-4224
                                  Units 5 and 6 - (713) 229-4225

     To identify an inmate's Unit Manager or otherwise seek assistance, please call (713) 221-5400.

Application to Enter Institution as a Legal Assistant forms may not be submitted by facsimile transmission. Such documents must submitted with original signatures and, as explained on the informational page of the form, hand-delivered submissions will not normally be accepted.

HOU 5267.08a
November 23, 2009
Attachment II

## VISITING ATTORNEY STATEMENT

## FEDERAL DETENTION CENTER (FDC), HOUSTON, TEXAS

I, _____, a licensed attorney in the state(s) of _____

_____, with offices at _____

_____, on this day, _____ _____, 200_____, hereby certify that

my visit is for the purpose of facilitating the attorney-client or attorney-witness relationship and for

no other purpose. I certify that any documents exchanged during the course of my visit will be legal

in nature and for the exclusive purpose of benefitting the attorney-client or attorney-witness

relationship. I further certify that any tape-recording or other recording made during any portion of

this visit will be made after receiving the Warden's prior approval and will only be used to facilitate

the attorney-client or attorney-witness relationship. During this visit to FDC Houston, I desire to

conduct a legal visit with each of the following inmates:

| Inmate Name | Inmate Register Number |
|---|---|
| 1. _____ | _____ _____ - _____ |
| 2. _____ | _____ _____ - _____ |
| 3. _____ | _____ _____ - _____ |
| 4. _____ | _____ _____ - _____ |
| 5. _____ | _____ _____ - _____ |
| 6. _____ | _____ _____ - _____ |
| 7. _____ | _____ _____ - _____ |
| 8. _____ | _____ _____ - _____ |

_____
Signature of Visiting Attorney

**991**

HOU 5267.08a
November 23, 2009
**Attachment I, page 1**

### VISITOR REGULATIONS
### FEDERAL DETENTION CENTER
### HOUSTON, TEXAS

The following information is provided to describe our visiting schedule and program. We want you to understand our procedures so that your visiting experience will be as pleasant as possible.

The directions to the Federal Detention Center, Houston, is as follows: Take U.S. 45 south to Milam. Exit Milam and go to 1200 Texas Avenue and turn left. The Federal Detention Center is on the right side of the street. The telephone number to the institution is 713-221-5400.

1.      The regularly scheduled visiting hours are as follows:

   A. Social Visiting - As stated in Section 3.C and depicted in Attachment A, social visiting occurs on a rotating basis, according to the unit to which the inmate is assigned.

| | | | |
|---|---|---|---|
| Sun | 8:00 a.m. - 11:00 a.m.* | 12:00 p.m. - 3:00 p.m. | |
| Mon. | 8:00 a.m. - 11:00 a.m. | 12:00 p.m. - 3:00 p.m. | 5:00 p.m. - 11:00 p.m. |
| Tue. | No Social Visiting | | |
| Wed. | No Social Visiting | | |
| Thurs. | 8:00 a.m. - 11:00 a.m. | 12:00 p.m. - 3:00 p.m. | 5:00 p.m. - 11:00 p.m. |
| Fri. | 8:00 a.m. - 11:00 a.m. | 12:00 p.m. - 3:00 p.m. | |
| Sat. | 8:00 a.m. - 11:00 a.m.* | 12:00 p.m. - 3:00 p.m. | |

* Weekend and holiday visiting or work cadre and female inmates is one continuous 8:00 a.m. - 3:00 p.m. visiting session.

   B.  Legal Visiting

| | |
|---|---|
| Sun. | 8:00 a.m. - 3:00 p.m. |
| Mon. | 8:00 a.m. - 3:00 p.m. |
| Tue. | 8:00 a.m. - 3:00 p.m. |
| Wed. | 8:00 a.m. - 3:00 p.m. |
| Thu. | 8:00 a.m. - 3:00 p.m. |
| Fri. | 8:00 a.m. - 3:00 p.m. |
| Sat. | 8:00 a.m. - 3:00 p.m. |

2.      All adults must have a valid picture identification (i.e., Passport, Driver's License, State or Federal photo identification). This will be presented to the Front Lobby Officer at the time of processing. Children less than 16 years of age must be accompanied by an adult.

3.      The following items are the only personal property that is authorized to be taken into the visiting room.

   A.  Identification
   B.  Personal keys

4.      Infant Care items - one pacifier, two diapers, five diaper wipes, one clear see through baby bottle with contents and one infant sized blanket, in a one gallon clear zip lock bag. No other bags are allowed..

5.      Necessary medication such as asthma sprayer or nitroglycerin tablets. Medication for emergency needs such as asthma inhalants and nitroglycerin tablets are permitted in the Visiting Room. But must be declared to the front lobby officer. All medication should be left with the visiting room in charge (OIC).

6.      Coats and jackets

**992**

HOU 5267.08a
November 23, 2009
Attachment I, page 2

7.  All carry-in items such as coats and jackets will be searched prior to entering the visiting room.

8.  Visitors are not authorized to bring into the Visiting Room any type of weapon, ammunition, drug-narcotics, food items, chewing gum, newspaper, magazine, photo album, luggage, packages, tape player, tape recorder, camera, pager, palm pilot, cellular phone or cosmetics. Prescription medications (other the medically necessary) must be secured in your vehicle.

9.  Any individual with signs of alcohol on his/her breath, or appears to under the influence, will not be permitted to enter the institution.

10. You as a visitor **may not** give to or receive, anything from an inmate. Any item the inmate departs with shall be declared as contraband. The inmate will receive disciplinary action for this violation.

11. At no time will an inmate be allowed to visit other inmates, during social visiting. If this rule is violated, termination of his/her visit may occur.

12. Please ensure that you on the inmate's visiting list prior to planning a visit. Visitors who do not appear on an inmate's visiting list will not be permitted to visit.

13. Inmates will be allowed only four visitors at any given time. Normally, only those children who will be reasonably expected to be occupying a seat in the visiting room will be considered as one of the four authorized visitors.

14. Special Rules for Children:

    A.  Under no circumstances will a visitor be allowed to leave their children unattended inside the institution or on institutional grounds.

    B.  All visitors are required to directly supervise their children. A visit may be terminated if the visiting children are disruptive. Children may watch television in the children's area. No inmates are allowed in this area.

    C.  Children may not tamper with any of the fire / life-safety systems.

    D.  Children may not bring anything into the institution to be given to or received from an inmate. Any item the inmate departs with will be declared as contraband. The inmate may receive disciplinary action for this violation.

15. FDC Houston reserves the right to refuse admittance to anyone who fails to comply with our policies. Violation of these rules can result in suspension of the inmate's visiting privileges, as well as possible criminal prosecution of visitors who violate institution rules and Federal law.

16. Handshaking, embracing and kissing by visitors may be permitted within the bounds and good taste at the beginning and at the end of the visit. If unauthorized contact continues, termination of the visit will occur and the inmate may receive disciplinary action for this violation. Visitors will not visit with other inmates they are not signed in to visit.

17. Visitors will not be allowed to wear the following items:

    A.  See through garments, sleeveless garments, shorts, skirts or dresses which do not fall lower than two inches above the knee.

    B.  Short skirts or dresses with a high cut split above the knee in the front, back or side, sun dresses, halter tops, bathing suits.

Case 4:09-cr-00342   Document 245-1    Filed in TXSD on 06/09/10   Page 127 of 158
Case 3:09-cv-00721-N-BQ   Document 115-13   Filed 12/05/11   Page 57 of 150   PageID 8940

HOU 5267.08a
November 23, 2009
Attachment 1, page 3

C. Small crop top shirts, form fitting garments (i.e., leotards, spandex), miniskirts, strapless garments, backless tops, tank tops, tube tops, khaki or green military type clothing, sweat pants, hats or caps and any clothing that is questionable to a correctional setting.

D. Due to safety and health concerns, only closed-toed shoes will be permitted for entry into the visiting room.

18. Tobacco products are not permitted inside any Federal building.

19. Visitors are not allowed to take any unapproved item into the visiting room.

20. A visit may be terminated to maintain good order.

21. Local Transportation Service:

| | | |
|---|---|---|
| A. | Square Deal Cab Company | 713-659-5105 |
| B. | Fiesta Cab Company | 713-225-2666 |
| C. | Taxi Taxi | 713-528-5500 |
| D. | International Airport Houston (I.A.H.) | 218-230-3100 |
| E. | Hobby Airport | 713-640-3000 |
| F. | Grey Hound Bus Lines | 713-759-6565 |
| G. | Merlo's Limousines | 713-580-6898 |
| H. | Metro Rail | 713-807-8825 |
| I. | Metro Transit | 713-635-4000 |
| J. | Amtrak | 713-224-6489 |

# EXHIBIT C



**U.S. Department of Justice**

**Federal Bureau of Prisons**

**Federal Detention Center**

*1200 Texas Avenue*
*Houston, Texas 77002*

March 12, 2010

Hon. David Hittner
United States District Judge
Southern District of Texas
1515 Rusk Ave.
Houston, Texas 77002

Dear Judge Hittner,

I am writing in opposition to Defendant Robert Allen Stanford's "Motion for Access to Internet Discovery While Incarcerated in the Federal Detention Center." This motion was filed on March 10, 2010, without consultation with the Federal Detention Center (FDC).

As the Court is aware, the FDC is a secure high-rise facility located in downtown Houston. As of today, the FDC houses 911 diverse inmates, all of whom are in various stages of the criminal justice system. There is no Internet access available to inmates in the FDC. Nor is there any Wi-Fi signal of which I'm aware that is capable of transmitting a signal into the institution. Throughout the ten-year history of the FDC, no confined inmate has had Internet access. In addition, to the best of my knowledge, no inmate in any Bureau of Prisons (BOP) facility nationally has been granted Internet access. In the sound correctional judgment of the Bureau, such access strictly contravenes the safety and security with which we strive to provide inmates, staff and the public. In fact, the Bureau's opposition to inmate Internet access is reflected in Bureau of Prisons Program Statement 1237.013, <u>Information Security</u>, which states "inmates may not access . . . workstations attached to BOPnet, SENTRY, or the Internet." This policy is promulgated nationally and binding on all Bureau facilities.

Except for correspondence which qualifies as legal in nature, Bureau staff have the ability to monitor all incoming and outgoing content into our facility, whether written or telephonic. Inmates' access to the Internet, therefore, poses security concerns by allowing inmates an opportunity to circumvent the Bureau's ability to monitor and screen correspondence. Furthermore, even if these security concerns did not exist, any inmate that would have access

March 12, 2010
Letter to Judge Hittner
Page 2

must be closely monitored by staff. Also, because an inmate accessing the Internet could not, consistent with our security concerns, be in close proximity to another inmate, staff would be required to escort such inmate to and from the location designated for Internet access. Accordingly, in addition to security concerns, Internet access would severely strain staff resources and disrupt institution operations. Finally, granting Stanford's request for Internet access in this case may open the floodgates to numerous other requests for FDC inmates to have Internet access, which would pose a virtual security nightmare for the FDC's operation.

Notwithstanding our significant concerns, the FDC is mindful of the Court's interest in ensuring Stanford has the ability to access the discovery material in this case and assist with the preparation of his defense. To this end, the FDC has never opposed Stanford's ability to access discovery in electronic format, it only opposes such access via the Internet.

To be sure, from the outset of Stanford's arrival, the FDC has informed Defense Counsel they can bring in discovery material on CD or DVD, as numerous attorneys in the community do on a daily basis. For this purpose, the FDC has a computer available in the visiting room to ensure defendants' ability to review discovery with Counsel that is in electronic format. Although the computer designated for attorney use does not have Internet capability, it is equipped with CD and DVD access. If the discovery content is too voluminous to be reasonably reduced to disk, we would allow Defense Counsel to enter the institution with an external hard drive, which can be connected to the FDC's computer. To facilitate Stanford's review of the material, this external drive could even be equipped with a full text search function. While Stanford reviews this material, whether with Counsel or not, he can handwrite unlimited notes concerning the nature and relevance of the documents. Or, if Defense preferred, the FDC would consider allowing their entrance with their own laptop, which would contain the pre-installed discovery material Defense wishes to review with their client during that day's visiting session. Defense Counsel can install a suitable text search product of their choice. Upon proper request, the FDC would even entertain requests for additional opportunities to meet with Counsel, or access discovery materials. Finally, although the United States Marshal's Service (USMS) would probably like the opportunity to weigh in, the BOP would likely have no opposition to Stanford's periodic, temporary release from the FDC to the USMS, in whose custody Stanford could access the Internet during the day. If access to the discovery material is only capable via the Internet, this alternative would accommodate Stanford's access while preserving the internal security and operation of the FDC. In fact, the invocation of any of the above options would accommodate Stanford's access to discovery materials while not forcing the FDC to violate national policy prohibiting inmate access to the Internet.

In sum, it is the FDC's position that we have exceeded our obligation to accommodate Stanford's preparation for trial. Stanford, for instance, enjoys visiting opportunities with his attorneys seven days a week, the opportunity to visit the law library upon request, the ability to place telephone calls to his attorneys, and the ability to review discovery material on a virtually

March 12, 2010
Letter to Judge Hittner
Page 3

unlimited basis in his cell. Internet access, however, would present severe security concerns to the institution, severely disrupt institution operations and compel the Bureau's violation of its own policy, all while simultaneously encouraging similar requests by the FDC's 911 other inmates. Accordingly, the FDC opposes such access.

Should you have any questions regarding this matter, please feel free to call me at 713 221-5400, ext. 2000.

Sincerely,

Joe D. Driver
Warden
FDC Houston

3

**998**



## U.S. Department of Justice

### Federal Bureau of Prisons

### Federal Detention Center

*1200 Texas Avenue*
*Houston, Texas 77002*

March 12, 2010

Hon. David Hittner
United States District Judge
Southern District of Texas
1515 Rusk Ave.
Houston, Texas 77002

Dear Judge Hittner,

I am writing in opposition to Defendant Robert Allen Stanford's "Motion for Access to Internet Discovery While Incarcerated in the Federal Detention Center." This motion was filed on March 10, 2010, without consultation with the Federal Detention Center (FDC).

As the Court is aware, the FDC is a secure high-rise facility located in downtown Houston. As of today, the FDC houses 911 diverse inmates, all of whom are in various stages of the criminal justice system. There is no Internet access available to inmates in the FDC. Nor is there any Wi-Fi signal of which I'm aware that is capable of transmitting a signal into the institution. Throughout the ten-year history of the FDC, no confined inmate has had Internet access. In addition, to the best of my knowledge, no inmate in any Bureau of Prisons (BOP) facility nationally has been granted Internet access. In the sound correctional judgment of the Bureau, such access strictly contravenes the safety and security with which we strive to provide inmates, staff and the public. In fact, the Bureau's opposition to inmate Internet access is reflected in Bureau of Prisons Program Statement 1237.013, <u>Information Security</u>, which states "inmates may not access . . . workstations attached to BOPnet, SENTRY, or the Internet." This policy is promulgated nationally and binding on all Bureau facilities.

Except for correspondence which qualifies as legal in nature, Bureau staff have the ability to monitor all incoming and outgoing content into our facility, whether written or telephonic. Inmates' access to the Internet, therefore, poses security concerns by allowing inmates an opportunity to circumvent the Bureau's ability to monitor and screen correspondence. Furthermore, even if these security concerns did not exist, any inmate that would have access



GOVERNMENT'S
EXHIBIT
9

999

March 12, 2010
Letter to Judge Hittner
Page 2

must be closely monitored by staff. Also, because an inmate accessing the Internet could not, consistent with our security concerns, be in close proximity to another inmate, staff would be required to escort such inmate to and from the location designated for Internet access. Accordingly, in addition to security concerns, Internet access would severely strain staff resources and disrupt institution operations. Finally, granting Stanford's request for Internet access in this case may open the floodgates to numerous other requests for FDC inmates to have Internet access, which would pose a virtual security nightmare for the FDC's operation.

Notwithstanding our significant concerns, the FDC is mindful of the Court's interest in ensuring Stanford has the ability to access the discovery material in this case and assist with the preparation of his defense. To this end, the FDC has never opposed Stanford's ability to access discovery in electronic format, it only opposes such access via the Internet.

To be sure, from the outset of Stanford's arrival, the FDC has informed Defense Counsel they can bring in discovery material on CD or DVD, as numerous attorneys in the community do on a daily basis. For this purpose, the FDC has a computer available in the visiting room to ensure defendants' ability to review discovery with Counsel that is in electronic format. Although the computer designated for attorney use does not have Internet capability, it is equipped with CD and DVD access. If the discovery content is too voluminous to be reasonably reduced to disk, we would allow Defense Counsel to enter the institution with an external hard drive, which can be connected to the FDC's computer. To facilitate Stanford's review of the material, this external drive could even be equipped with a full text search function. While Stanford reviews this material, whether with Counsel or not, he can handwrite unlimited notes concerning the nature and relevance of the documents. Or, if Defense preferred, the FDC would consider allowing their entrance with their own laptop, which would contain the pre-installed discovery material Defense wishes to review with their client during that day's visiting session. Defense Counsel can install a suitable text search product of their choice. Upon proper request, the FDC would even entertain requests for additional opportunities to meet with Counsel, or access discovery materials. Finally, although the United States Marshal's Service (USMS) would probably like the opportunity to weigh in, the BOP would likely have no opposition to Stanford's periodic, temporary release from the FDC to the USMS, in whose custody Stanford could access the Internet during the day. If access to the discovery material is only capable via the Internet, this alternative would accommodate Stanford's access while preserving the internal security and operation of the FDC. In fact, the invocation of any of the above options would accommodate Stanford's access to discovery materials while not forcing the FDC to violate national policy prohibiting inmate access to the Internet.

In sum, it is the FDC's position that we have exceeded our obligation to accommodate Stanford's preparation for trial. Stanford, for instance, enjoys visiting opportunities with his attorneys seven days a week, the opportunity to visit the law library upon request, the ability to place telephone calls to his attorneys, and the ability to review discovery material on a virtually

March 12, 2010
Letter to Judge Hittner
Page 3

unlimited basis in his cell. Internet access, however, would present severe security concerns to the institution, severely disrupt institution operations and compel the Bureau's violation of its own policy, all while simultaneously encouraging similar requests by the FDC's 911 other inmates. Accordingly, the FDC opposes such access.

Should you have any questions regarding this matter, please feel free to call me at 713 221-5400, ext. 2000.

Sincerely,

Joe D. Driver
Warden
FDC Houston

3

1001



**Federal Bureau of Prisons**

*Federal Detention Center*

*P.O. Box 526245*
*Houston, TX 77052-6245*

April 9, 2010

Attorney Michael M. Essmyer
Essmyer, Tritico & Rainey, LLP
5111 Center Street
Houston, Texas 77007

Via Facsimile Only: (713) 869-8957

      Re:    Inmate Robert Stanford, Federal Register No. 35017-183

Dear Mr. Essmyer:

      This letter is in response to statements reported in the *Houston Chronicle* on April 8, 2010, in which you contend that your client, Robert Stanford, does not have access to his legal materials while at the Federal Detention Center in Houston, Texas (FDC Houston). As a frequent legal visitor for many years at FDC Houston, you should be well aware that FDC Houston provides numerous ways in which inmates and their attorneys can meet and review documents together. Additionally, you have previously been provided the *Legal Guide to FDC Houston,* which sets forth this information in detail. However, to clarify any issues for you and your legal team, I will reiterate this information.

      Attorneys and their approved legal assistants, which include law clerks, investigators, interpreters, paralegals, notaries, mitigation specialists, and mental health professionals, can visit with inmates at FDC Houston seven days a week. Legal visitation hours are: 8:00 a.m. until 8:00 p.m., Monday through Thursday, and 8:00 a.m. through 3:00 p.m., Friday through Sunday and federal holidays. Requests for legal visitation beyond these designated hours can be requested through the inmate's Unit Team. As you are aware, inmate Stanford has several approved legal assistants from your legal team who visit on a regular basis. His previous attorneys also had numerous approved legal assistants at FDC Houston.

      In addition to legal visiting, inmates have access to telephones and written communication to contact their attorneys. Inmates may place an attorney on their approved telephone list or can request an unmonitored legal call through their Unit Team. Inmates also have access to the electronic law library on their housing unit to conduct legal research.

      With respect to the review of electronic legal documents, attorneys and approved legal

Page 1 of 2

assistants may enter the Inmate Visiting Room with legal materials, including video, audio tapes, and electronic discovery materials, such as CD-ROMs and DVDs. FDC Houston provides equipment, such as a computer, audio player, and video player, on which attorneys and their approved legal assistants can review electronic medium with their clients. Upon request, FDC Houston will also consider permitting your legal team to bring in a laptop, external hard drive, or other electronic device, to assist in reviewing electronic documents with your client. As of today, no one from your legal team has made an official request to bring any such items.

When visiting with an inmate, attorneys and their approved legal assistants may enter FDC Houston with boxes of legal materials to review with their client. At the end of the visit, legal visitors may provide the inmate a limited amount of legal papers after informing the Visiting Room Officer-in-Charge that they intend to do so. For security reasons, documents to be given to an inmate must be individualized sheets of paper without folders, clips, or any other form of a binding with the exception of staples used to attach a minimal number of pages. Attorneys and legal assistants may also leave legal documents for an inmate by utilizing the legal mailbox located in the entry area of the institution. This mailbox, which is only for legal mail, is also available for members of the legal community who are not partaking in legal visitation, but who wish to leave legal papers for an inmate.

For inmates with substantial discovery materials, such as your client, options are available for providing these voluminous materials to inmates incrementally, such as switching out the materials at scheduled intervals through the inmate's Unit Team; FDC Houston has yet to receive such a request from inmate Stanford. Inmates at FDC Houston are permitted to have up to three cubic feet of legal material in their cell. Due to your client's voluminous discovery, I will consider approving additional space in his cell to store legal material upon his request. Additionally, in order to assist inmate Stanford organize his legal materials, I have agreed to provide him with folders from FDC Houston.

I trust a review of this information is helpful and will clarify the statements which were reported yesterday. If you have further questions, please contact me at (713) 229-4160 or Senior Staff Attorney, Jennifer Hansen, at (713) 229-4187. As advised previously, please make any requests for special privileges, such a the use of a personal laptop or external hard drive, in writing.

Sincerely,

Joe D. Driver
Warden

Cc:    The Honorable David Hittner
        Attorney Robert Bennett
        AUSA Greg Costa

U.S. Department of Justice

Federal Bureau of Prisons

*Consolidated Legal Center*

*Federal Detention Center*
*P.O. Box 526245*
*Houston, TX 77052-6245*

April 22, 2010

Attorney Michael M. Essmyer
Essmyer, Tritico & Rainey, LLP
5111 Center Street
Houston, Texas 77007

Via Facsimile Only: (713) 869-8957

Re: Inmate Robert Stanford, Federal Register No. 35017-183

Dear Mr. Essmyer:

Thank you and members of your legal team for meeting with me yesterday. This letter is to review what we discussed and set forth procedures in place at the Federal Detention Center in Houston, Texas (FDC Houston) to assist your legal team with issues concerning your client, Robert Stanford.

With respect to access to electronic discovery, and due to the specific needs of your client, FDC Houston will permit your legal team, including approved legal assistants, to enter FDC Houston with a laptop computer, external hard drive, and/or a computer printer during each legal visit. Additionally, FDC Houston has placed two new computers in the Inmate Visiting Room, one of which will be available at any time to your legal team. Your external hard drive and/or printer may be connected to this computer to assist in the review of electronic discovery materials with your client. A memorandum from Warden Driver, a copy of which is attached and which I provided yesterday, has been distributed to correctional staff to make them aware of these changes.

As for the request for Internet access for your client, this is denied in light of the accommodations described above. As we discussed yesterday, in the unlikely event that your legal team's laptop computer is able to receive WIFI access in the Inmate Visiting Room, this access must be disabled. You agreed and stated your understanding that no member of your legal team is permitted to access the Internet while inside FDC Houston. Any attempt to access the Internet by any member of your legal team could result in the limitation or denial of legal visits and correspondence pursuant to 28 C.F.R. Section 543.14.

Regarding legal visits, attorneys and their approved legal assistants, which include law

Page 1 of 3

**1004**

clerks, investigators, interpreters, paralegals, notaries, mitigation specialists, and mental health professionals, can visit with inmates at FDC Houston seven days a week. Legal visitation hours are: 8:00 a.m. until 8:00 p.m., Monday through Thursday, and 8:00 a.m. through 3:00 p.m., Friday through Sunday and federal holidays. Requests for legal visitation beyond these designated hours can be requested through the inmate's Unit Team. Although your legal team has not yet made any such requests, we discussed the ability for such expanded legal visits to be granted, but request a minimum of 24-hours notice to review such requests.

As for the exchange of legal materials with your client, FDC Houston policy permits inmates and their attorneys to exchange a reasonable amount of legal material during legal visits. As we discussed, in this case, a reasonable amount of legal material is considered to be the size of a ream of paper and staff at FDC Houston have been so advised. Given the voluminous nature of this case, you may also switch out legal material on a regular basis and our legal staff are available to assist upon your request. Mr. Stanford may also submit an Inmate Request to Staff Member, commonly referred to as a "cop-out," to Warden Driver to request additional legal material storage space in his cell in the event he requires more than the three cubic feet currently permitted. Warden Driver has not yet received such a request.

With respect to your client's access to the electronic law library, computer terminals on his housing unit are available from 8:00 a.m. until 10:00 p.m. which have access to the electronic law library. Additionally, two days a week, Mr. Stanford's housing unit can visit the Inmate Law Library to access the computers and legal materials there. Your client can also submit an Inmate Request to Staff Member to the Supervisor of Education to request additional time in the law library. Regarding your client's allegations that the typewriter on his housing unit is broken, the Supervisor of Education checked into this matter yesterday and found the typewriter to be working well. In fact during our meeting, I showed a copy of material that he typed on this machine yesterday.

Regarding your request that Mr. Stanford be provided with items to organize his legal materials, I advised that on April 19, 2010, I personally provided him with twelve expandable folders, which you refer to as "red ropes," that Warden Driver issued to him. Similar folders will now be available for inmate purchase in the Commissary. As for the request that Mr. Stanford be given three-ring binders, alligator clips, paper clips and other such items, these metal objects pose serious security risks in a prison as they can be used to make weapons and tamper with security devices, such as handcuffs, so they will not be permitted.

Finally, with respect to your request that your legal team be permitted to bring food into Mr. Stanford during legal visits, this request is denied. For both security and sanitation purposes, visitors to FDC Houston are not permitted to enter the Inmate Visiting Room with food items. However, in an effort to minimize delays during the lunch period when your client returns to his housing unit to eat, a bag lunch, which consists of two sandwiches, chips, fruit, and a beverage, can be provided to Mr. Stanford each morning to bring with him to the visiting room and eat during your meetings. I requested that you discuss this with your client. If Mr. Stanford decides

to utilize this option, he must send an Inmate Request to Staff Member to Warden Driver making this request himself.  Your legal team will not be permitted to bring in any food items or eat any of Mr. Stanford's food in the Inmate Visiting Room.

If you have further questions, or would like to discuss any of these issues in greater detail, please contact me at (713) 229-4187.  I look forward to continuing to work with you on this matter.

Sincerely,

Jennifer Hansen
Senior Staff Attorney
FDC Houston

Enclosure as noted

Cc:    The Honorable David Hittner
       Attorney Robert Bennett
       AUSA Greg Costa



# U.S. Department of Justice

Federal Bureau of Prisons

***Sensitive - But Unclassified***

*Federal Detention Center*
*Houston, Texas 77052*

April 21, 2010

MEMORANDUM FOR:   FRONT LOBBY
                  VISITING ROOM

THROUGH:          Captain Scott Fauver

FROM:             JOE D. DRIVER, WARDEN
                  FDC Houston

SUBJECT:          **Authorization to bring laptop computer and/or**
                  **external hard drive and printer into FDC**
                  **Houston for legal meetings with inmate Robert**
                  **Stanford #35017-183**

Effective immediately, inmate Robert Stanford's attorneys and
approved legal assistants are permitted to bring a laptop
computer, an external hard drive, and/or a computer printer into
FDC Houston's Inmate Visiting Room.  The attorneys and approved
legal assistants may attach the hard drive and/or the printer to
the computer available in the Inmate Visiting Room.

Additionally, inmate Stanford's approved legal visitors are
authorized access to one of the computers in the Inmate Visiting
Room at any time; there will be more than one computer available
for use in the Inmate Visiting Room to accommodate other legal
visitors.

Please retain a copy of this memo in the Front Lobby and Visiting
Room until further notice.  Please contact Senior Staff Attorney
Jennifer Hansen at Ext. 2003 with any questions.

cc:     Lt's Office



GOVERNMENT'S
EXHIBIT
11

May 21, 2010

Mr. R. Allen Stanford
Federal Detention Center
Houston, Texas

Honorable Judge Nancy Atlas
Southern District of the United States

### Re:    my case against Lloyds of London (Underwriters)

Dear Hon. Judge Atlas:

I am aware of your order allowing my former counsel in the coverage matter, Mr. Lee Shidlofsky, to withdraw from my representation. Because I now have no attorney representing me in this matter, I am writing this letter directly to you to request emergency relief.

Despite my constitutional and due process claims I have made in Judge Hittner's court (see attached), I have no choice at this time other than to represent myself pro se in the coverage matter. I have sought to engage new counsel to represent me, but any new counsel is reluctant to represent me due to the lack of payment from the Underwriters through Akin Gump.

Underwriters are withholding approval of my criminal team (despite Mr. Essmyer's motion to withdraw – see attached) and they are not getting compensated. Underwriters are only nominally paying, if at all, my attorneys working on the SEC civil matter. And yet, I find myself having to essentially put on a case pro se at this time, that is quasi-criminal in my defense, adjudicating the same elements as my actual criminal trial under a much lower burden of proof, in a civil proceeding, before my actual criminal trial, all the while the government gets to sit in the audience and watch; how this is possible under our constitution in our current judicial system is incredulous. I do not even have internet access to conduct the discovery necessary for any of my three trials.

I must represent myself pro se because I have no choice due to the Underwriters bad faith denials. However, to do so would be placing me in direct contempt of Judge Godbey's court. On 09/28/09 and again on 12/16/09, Judge Godbey enjoined me "and anyone acting in concert with [me], including his attorneys, from taking further steps to seek relief in any court other than this relating to the [D&O] policies...[I] and anyone acting in concert with [me] were [sic] not to take *any* further steps seeking relief in *any* other court relating to the [D&O] policies" (see attached).

Underwriters have thwarted my every attempt to obtain counsel of my choosing, as is my right under a duty to defend and for paying over 25 years in premiums to them. Underwriters are in breach of the policy. Underwriters have stated on record that they do not have the right to choose my attorneys or control my defense. Yet, Underwriters continually deny me the attorneys of my choosing and control my defense through their control and denial of payments through a "reasonable and necessary" shield. My question is: how do Underwriters know what's "reasonable and necessary"? Underwriters have never interviewed me; have never examined the charges against me to determine the best way to defend against them; have never reviewed the law applicable to the charges; have

never examined the evidence likely to be presented against me by the prosecution; have never examined the work of the experts likely to be called by the Government; have never analyzed the weaknesses in the work of those experts, or have never identified any legal defenses that may apply to the Government's case for my benefit. In essence, Underwriters are attempting to control the defense of the case by controlling the staffing of the case without any detailed analysis that would permit them to make a professional, or even an informed, decision for my benefit. *In doing so, arguably Underwriters and their counsel with Akin Gump have controlled my defense so much as to effectively become my criminal defense attorneys in fact.*

I wish to fight the indictment against me. I do not want to do that in your court in a civil case BEFORE my actual criminal case. I am pro se at this time in your court, but cannot even do that at the risk of being in contempt. I have no choice but to respectfully request your immediate and emergent intervention to order the Underwriters to approve and compensate my criminal attorneys and coverage attorneys of my choice. As Mr. Shidlofsky previously stated to you, his compensation is coming from payment through all the defendants' criminal attorneys with their support. I am no longer in that situation. I have no relief.

My co-defendants, through Mr. Shidlofsky, have sought your emergency relief today to have the co-defendants' criminal attorneys assist him in the coverage matter. Currently I have neither a coverage attorney nor any approved criminal attorneys, due to Underwriters' bad faith actions. Mr. Essmyer has filed a motion to withdraw from my criminal matter, and Mr. Bennett has not been approved by Underwriters. I have no relief as a result of Underwriters' effectively controlling my counsel selection and my defenses to all matters through their bad faith denial.

I am aware that you have shortened the case schedule to have the hearing at the end of July. How can I possibly be ready by July to put on a defense pro se (if I can even to that) in a matter of weeks? I DID NOT COMMIT MONEY LAUNDERING. I am at the untenable situation of not having coverage counsel, not having approved criminal counsel, and not being able to represent myself pro se at the risk of being held in contempt, all in a quasi-criminal proceeding with a lower burden of proof in a civil proceeding to take place in just a matter of weeks where I risk losing coverage and therefore full and effective criminal and civil representation, months before my actual criminal proceeding in January 2011, all the while the government can observe and strategize against me. I am sure you can appreciate how unconstitutional of a predicament I am placed and respectfully pray upon the court to provide me emergency relief.

Sincerely,

R Allen Stanford

R. Allen Stanford
Inmate #35017-183

June 2, 2010

Mr. R. Allen Stanford
Federal Detention Center
Houston, Texas

**Honorable Judge Nancy Atlas**
**Southern District of the United States**

Re:   **Prison Confinement, Attorney Payment, Insurance Fraud, and Other Issues**

Dear Hon. Judge Atlas:

Thank you for the opportunity to speak in Your Honor's court last week. Also
thank you for Your Honor's position considering my release on bail after 1-year of
pretrial incarceration. I hope and pray Your Honor's discussions with Judge Hittner
have been positive. I hope to be afforded the opportunity to begin the arduous task of
reviewing discovery and preparing for trial with my attorneys of choice, and to defend
myself in the three separate but overlapping proceedings that I imminently face.

Mr. Bennett and his team at the Bennett-Nguyen Joint Venture have brought me
the binders of invoices that Underwriters' have sent to their office along with additional
discovery materials related to the invoices. Being incarcerated in a high-security prison
under horrendous conditions, and despite my counsels' best efforts, I still was not able to
get much accomplished working every day (including the Memorial Day weekend) for
the maximum number of daily hours the FDC allows. For example, to simply review and
sign a document to get former counsel to release documents took over 1 ½ hours of lost
time, being strip searched twice, going through security checkpoints, and getting guards
to bring me to the attorney meeting room. As discussed in my Motion for Release that
Mr. Dershowitz and Mr. Weinberg mostly drafted, it is simply impossible for me to be
prepared for one, much less three simultaneous trials, under these conditions. I
respectfully plead for Your Honor's continued discussion with Judge Hittner for my
release on bail, so that at least I have a fighting chance at defending the allegations in a
coherent state.

I am also writing you this letter because, based upon the limited amount of
invoices and work product I reviewed, (a) I am still perplexed and unclear as to the
activities of Underwriters' in continuing to deny payment to my present criminal counsel
and request for Your Honor's immediate relief, and (b) I want to confirm my selection of
counsel.

**Letter to Judge Atlas re: Underwriters**                                    **Page | 1**

## Underwriters' Bad Faith

I understand that Judge Hittner ruled that Mr. Bennett is now my lead counsel and Mr. Essmyer is still on my criminal team as co-counsel. See "Exhibit A" attached. While this is not exactly what I wanted, that is what has been ordered. Akin Gump (as Underwriter's counsel) still refuses in bad faith to compensate either attorney or their staff for work performed on my case. This runs in direct contravention to Judge Hittner's order and the Fifth Circuit ruling. This also runs in direct opposition to Your Honor's fee schedule that was agreed upon.

As to Mr. Bennett and his staff, Mr. Bennett commented last week in court that he is willing to assist me on the coverage case as Your Honor has requested. This is similar as all the other co-defendants' criminal attorneys, even though I am *pro se*; but he can only do this if he is approved and compensated by Underwriters in the criminal case. The Bennett-Nguyen Joint Venture and their staff have been working on my criminal matter since February 2010 without any payment from Underwriters. They have incurred significant fees and expenses. They have exerted a significant amount of time and effort to advance my criminal defense. They have worked diligently with the hard work of Mr. Weinberg and Mr. Dershowitz on my recent Motion for Release. They have continually brought me documents and discovery to review, despite the limiting FDC rules and my not being allowed Internet access. As I stated in Your Honor's court, the efforts for Mr. Bennett's team has revived my hope that a legal defense team is now in place with the proper motivation on my behalf.

They have repeatedly requested to receive approval and reimbursement under my direction from Underwriters on at least three occasions, and have answered all objections from Underwriters. Even according to the schedule that Your Honor has ordered Underwriters to pay, Underwriters continue to deny their approval and payment in bad faith. To know the amount of work they have done and that they are being denied payment is very frustrating and disheartening to me.

Mr. Bennett has told me that his staff will need to be terminated June 4, 2010 without any immediate financial relief, including all contract attorneys. I trust Your Honor can understand that personnel can only work for a limited amount of time without any compensation that has been ordered to be paid. Thus, most, if not all of his staff working on my case will likely be terminated absent any reimbursement. Therefore I seek Your Honor's immediate relief to compel Underwriters to make payment to Mr. Bennett and his staff at the Bennett-Nguyen Joint Venture. If payment is not made, Mr. Bennett will have no choice but to seek financial relief from the CJA fund, leaving just

him and a secretary as the *ONLY* ones remaining to represent me on the criminal case. I pray that Your Honor will not let this happen.

Even Underwriters' most recent reimbursement denial letter on June 1, 2010 casts dispersions under "reasonable and necessary" shields based upon allegations of insurance fraud, counsel selection and others. See attached as "Exhibit B". These matters have already been placed in front of Judge Hittner, and he has ruled that Mr. Bennett is to be lead counsel. I am aware of Mr. Bennett's personal financial matters and his pending judgment. As was discussed in Your Honor's court, I have no issue with the appropriate sums of money being released as ordered by another court into a receiver's possession. If Mr. Bennett wishes to challenge that other court's order, I leave that up to him and I consent. I merely want my attorneys and staff to continue to vigorously work on my defense. Underwriters' withholding of approval and payment not merely affects Mr. Bennett (and therefore me), but it also affects all the attorneys, paralegals and assistants on his staff that have been so critical and helpful to me. I pray Your Honor consider the overarching impact of Underwriters' continued bad faith denials.

## Surprising Revelations Regarding Akin Gump

What further perplexes me is that I cannot understand how and why Akin Gump can represent Underwriters in this case against covering me and other executives, when Akin Gump has been retained to work on Stanford Financial Group matters over the past decade? Due to the stress and shock of imprisonment, it appears that I was not fully cogent under my mental and physical condition in prison. I therefore did not make the following connection. However, as was recently brought to my attention as a reminder, Mr. Bennett's staff recently came across documents demonstrating that Akin Gump was made and is currently intimately aware of the financial on-goings of Stanford Financial Group throughout the last decade, *serving as outside counsel to Stanford Financial Group, Stanford International Bank, Mr. James Davis (the former CFO), and even representing me*. In fact, from the incomplete records I have reviewed, for 2001-2003 Akin Gump was paid almost $500,000 from Stanford Financial Group and other Stanford companies. There are invoices paid to Akin Gump in 2008 and 2009 for approximately $100,000. Akin Gump were the lead attorneys on documenting, structuring, and closing large deals for Stanford Venture Capital and Stanford International Bank. As the records I reviewed are incomplete, I would guess that the total amount of money paid to Akin Gump for work on Stanford Financial Group was well above these amounts. I venture to say that it will ultimately be in the *millions of dollars*.

To remove any doubt, the limited documents that I reviewed show that Akin Gump worked on at least the following subject matters directly as counsel to Stanford Financial Group. See attached "Exhibits C":

| Akin Gump Attorneys | Representation Matter for Stanford or Stanford Financial Group Companies | Description |
|---|---|---|
| Lester Hewitt John Tang | Caribbean Sun Airline (February 2003) | An affiliated company of Stanford Financial Group, and classified as a tier 3 investment. Akin Gump helped with the Certificate of Incorporation for Caribbean Sun and other formation documentation, executed by James Davis and Yolanda Suarez. John Tang, an attorney from Akin Gump, filed two applications for trademarks for Caribbean Sun. |
| Roger Cepeda Joseph Tiano Rick Rubin Fadi Samman Erica McGrady Jason Tankel | TWS, Blue Sky, AST Roll Out (October 2000-September 2002) | A $3.5 billion telecom and media consolidation deal where Akin Gump represented Stanford and Stanford Venture Capital in the following: investor rights agreements, certificates of designation, affidavits for lost promissory notes, warrant, board resolutions for SFG and SIB, stock purchase agreements, line of credit agreements, general security agreement, LLC operating agreement, request for FCC ownership transfer approval, correspondence on behalf of Stanford to third parties, closed the deal in their office |
| Wynn Segall Tatman R. Savio | 20/20 Cricket and OFAC (November 2007-October 2008) | Stanford retained Akin Gump with a $25,000 retainer agreement on November 27, 2007. The $25,000 was wire transferred on November 30, 2007 to Akin Gump.. <br>• They advised Stanford employees regarding Cuba and their participation in the 20/20 cricket tournament. <br>• On 01/07/08, Stanford 20/20 sent a letter to OFAC and directed any concerns to their counsel Akin Gump. <br>• Mr. Segall sent Stanford 20/20's application to OFAC the same day. <br>• Based on the January 7, 2008 application, Mr. Segall obtained a license from the |

| | | |
|---|---|---|
| | | Department of the Treasury from the OFAC Regulations. This license was an authorization to manage the participation of a Cuban cricket team in the 2008 Stanford Cricket Tournament held in Antigua and Barbuda from approximately January 25- February 24, 2008.<br>• Billing from Akin Gump continued through the beginning of 2008. |
| Orrin Harrison<br>Mary O'Conner<br>Scott Banard<br>Michael Simmons<br>Michael Wilson<br>Barry Greenberg | Broker Solicitation Representation<br>(February 18,2009 – February 26, 2009) | The services that were offered to the brokers post as detailed in an email were:<br>• Gather names of brokers who want to be represented by Akin Gump<br>• Attend the hearing in early March 2009 but not file an appearance<br>• Terminate existing relationships with other associates and law firms elsewhere<br>• Charge a lump sum around $2500 per broker.<br>• If there is an appearance before the SEC they would charge an additional $2500 per person<br>• Determine E&O coverage availability in case they have to make an appearance before the SEC. |
| Michael Anthony "Tony" Nunes (while at Baker Botts originally, most recently with Akin Gump before leaving) | Set up Stanford Financial Group's corporate structure and CD program and Guardian Bank in Antigua (1980's to 2009) | Friend who set up Stanford's Corporate Structure and Stanford International Bank 1980's to 2009. He was originally an associate at Baker Botts then around May 2004 became a partner at Akin Gump's Houston Office. Throughout this time, he was in constant contact with Stanford in not only a social friendly relationship, but in a client counsel relationship. After the civil complaint, Tony Nunes, still a partner at Akin Gump, sent Stanford an email that said "hang in there, I'm in your corner." |

I am not an attorney and do not know the law as it relates to these things. But under The Texas Disciplinary Rules of Professional Conduct, Rules 105, 106 and 108, there appears to be a direct conflict of interest for Akin Gump to represent Underwriters

in a case of alleged money laundering to prevent me (and therefore my counsel) to obtain coverage to defend myself. Having worked on these matters (and probably many others), how can a firm with attorneys who have direct and intimate knowledge of my business, corporate and personal finances use that same confidential information against me to try and prove money laundering, and therefore deny me coverage? How can they even be representing Underwriters in this case? Clearly there must be some ethics issues presented here.

Incredibly, one of Akin Gump's recent attorneys, Mr. Tony Nunes, while he was formerly at Baker Botts, *advised and was instrumental in the formation of Stanford International Bank (formerly Guardian International Bank) and the CD investment program, which is now at the heart of the alleged fraud and money laundering. Even more incredulous is that Baker Botts is the law firm that the SEC receiver hired to liquidate my entire corporate and personal assets worldwide.* How can the very firm and very attorney that set up the entire company at the very beginning now both serve on firms that are trying to break me down and be completely adverse to me? I just cannot understand how this is possible. Even, as recent as February 2009 and throughout the four month period between the SEC action and my criminal indictment, Mr. Nunes even offered for me to stay at his house, constantly assuring me that everything will be okay. To further show their, what I would call "greed', attorneys at Akin Gump were initiating a plan in early 2009 to try and represent the very brokers who worked for Stanford Financial Group, once the SEC action came. Their plan was to charge each broker $2500 to represent them in the matter. The greed in this case by Akin Gump seems to have no bounds.

I really don't understand how something like this can happen. It is clear that this dual representation just cannot be right. On the surface this is very compromising to use my company funds on the one hand in representing me and my companies in our business dealings, while simultaneously using the other hand to try to avoid paying funds for counsel in my defense. *Who knows how much more will be revealed if I were out of prison and could dig deeper into the matter? Maybe this is why I'm still in prison?*

## Were Underwriters' Counsel and My Former Counsel Conspiring to Keep Me Incarcerated?

What's even more astonishing is that during this past week's review, I was able to read a phone conversation transcript between my former criminal counsel, Mr. Kent Schaffer, and Underwriter's counsel, Mr. Neel Lane. See transcript attached as "Exhibit D". I reviewed the transcript and what was astonishingly revealed was what appears to be an actual conspiracy to defraud Underwriters. The words spoken during that phone

**Letter to Judge Atlas re: Underwriters**                                    **Page | 6**

conversation are entirely unacceptable, and in my opinion unethical and borders on possibly being criminal. *The attorneys' focus on money and getting paid while I am rotting away in prison is absolutely disgusting.* Mr. Lane even suggested to Mr. Schaffer to file additional lawsuits against Underwriters for denial of payment. They even discussed bringing in Steve Susman, of the Houston firm Susman and Godfrey (who appears related to Mr. Schaffer) to bring the a lawsuit against Underwriters from "kingdom come" following a "heartfelt f*ck you letter" from Mr. Schaffer to Underwriters' at the direction of Mr. Lane, Underwriters' counsel. *The transcript even suggests that Mr. Schaffer should stop working after the payments from Underwriters cease, leaving me to sit in prison. This is absolutely incredible!*

This conversation, as I imagine like many others, took place entirely without my knowledge. What happened to the attorneys' fiduciary duty and responsibility to the client – in both cases, Mr. Lane to the Underwriters and Mr. Schaffer to me? What is further astonishing to me is that nowhere in this transcript is there any discussion by Mr. Schaffer, my then counsel, as to how he was helping in my defense or trying to get me out of prison. I would respectfully request that the Honorable Court immediately review this and provide whatever relief I am entitled.

### Underwriters' Misrepresentation to Your Honor's Court

During the hearing last week, Mr. Chasnoff misled the Court when he stated that he never was notified that he should present invoices for my approval. In fact, Mr. Mike Sydow, while he was my attorney on July 31, 2009 and again on September 2, 2009 sent letters on my behalf to Akin Gump requesting that I review and approve all invoices submitted by my attorneys. See Exhibit "E". To now state to Your Honor that they were unaware that they should have the attorneys' invoices approved is entirely inaccurate.

Akin Gump had every opportunity to allow me to review invoices; but simply chose not to. Due to their own mistake and admission of not allowing me to review the invoices, almost $7 million has gone out the door to attorneys which have not helped advance my defense. Since I never approved any of the invoices that were paid out by Akin Gump in my defense, I would argue that all past payments should not be applied to my policy limits. Akin Gump is now laying blame for their mistake on me for rotating attorneys and running up the attorneys' fees, when it is entirely their fault for not allowing me to approve invoices before they were paid as requested in my notice to them.

This consistent behavior of greed, misdirection, and mischaracterization has been a constant battle for me against the Underwriters, and this directly affects my ability to defend myself due to the affect their non-payment has had on my prior and current

**Letter to Judge Atlas re: Underwriters**                                    **Page | 7**

counsel. *All I want is my constitutional right to effective assistance of counsel, attorneys and support staff willing to fight for me, and I want them to be fairly compensated as is my right under the D&O policy. I do not want the issue to be about who got paid, how much and for what. If the work is legitimate as I approve of it, I trust Your Honor will require Underwriters to pay.*

### Who I Want to Defend Me

As to my current choice of counsel, what is clear is that Underwriters do not wish to approve *any new counsel* coming to my criminal defense. As recently as May 28, 2010, in direct contravention of Your Honor's scheduling order, Underwriters denied payment to both Mr. Bennett and his team, and Mr. Essmyer and his team, for whatever "reasonable and necessary" excuse they can base their denial. I continue to not have approved criminal counsel. Even after Judge Hittner's ruling on lead counsel on June 1, based on a conversation between Mr. Barry Chasnoff at Akin Gump and Mr. Bennett, Underwriters still will not provide payment. *If this is not bad faith, I am not sure what bad faith means.*

I wish for the opportunity to clarify why I have had so many attorneys on my case, but I suggest to Your Court that the main reason has to do with Underwriters' bad faith denials through their attorneys at Akin Gump. Akin Gump appears to have in fact become my attorneys due to their controlling the work on my defense and number and type of attorneys that can help me by continuing to deny payment to the attorneys I choose and paying the attorneys that I am not even aware are doing. They continue to do so with full knowledge of my companies and personal finances due to their past representation. How is this possibly fair and allowable under the Texas State Bar? As a matter of public policy, how can a person pay years of high premiums to an insurance company for coverage but only be denied the benefit when requested? If that is the precedent, why do we even have insurance?

I would like to confirm to the Court my desires for counsel. As stated in a letter sent directly to Akin Gump on May 10, 2010 at their request, a copy which was submitted to Your Court in my prior letter, I would like to have Mr. David Chesnoff, as recommended by Mr. Dershowitz, be my lead trial attorney. He will be supported by Mr. Bob Bennett and Mr. Nguyen, along with Mr. Weinberg and Mr. Dershowitz. Mr. Bennett has already accepted the role of lead counsel with Judge Hittner. Mr. Essmyer, while on record as co-counsel will not be playing any active role. I know of no other way to be clearer to Underwriters on whom I want on my criminal defense. These attorneys have proven their value to me and these are the attorneys I want. Underwriters' constant bad faith denials are causing me considerable and irreparable harm in the face of the

**Letter to Judge Atlas re: Underwriters**                                    **Page | 8**

the amount of time left for me to mount a defense. I pray to Your Honor for relief in this matter.

I understand that much of this letter is out of the scope of the hearing and I wish for the continued opportunity to work with Your Honor's Court to sort out the "burn rate" on my defense. As I have stated to Your Honor, I believe the amount spent has been obscene relative to the results produced in actually advancing my case. I impress upon the Court that the most that has been done has been in the last 2-3 months since the Bennett-Nguyen team came on board. And while some of this letter is outside of the scope of Your Honor's court, I consider these to such serious issues that I respectfully pray that Your Honor may review and rule in accordance.


Respectfully submitted,

*R. Allen Stanford* (signature)

R. Allen Stanford
Inmate #35017-183

1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF TEXAS
2                   HOUSTON DIVISION

3

4   UNITED STATES OF AMERICA        ★      G-CR-06-4
                                    ★      Houston, Texas
5   VS.                             ★
                                    ★      September 26, 2008
6   DANIEL YEH                      ★      4:23 p.m.

7                  EXCERPT SENTENCING HEARING

8

     BEFORE THE HONORABLE MELINDA HARMON
9           UNITED STATES DISTRICT JUDGE

10
    **APPEARANCES:**
11
    **FOR THE GOVERNMENT:**
12  Gregg Jeffrey Costa
    P.O. Box 61129
13  Houston, Texas 77208-1129
    713.567.9345
14

15   ·

    **FOR THE DEFENDANT:**
16  Robert S. Bennett
    **THE BENNETT LAW FIRM**
17  515 Louisiana, Suite 200
    Houston, Texas 77002
18  713.225.6000

19   ·

    Court Reporter:
20  Johnny C. Sanchez, RPR, RMR, CRR
    515 Rusk, #8016
21  Houston, Texas 77002
    713.250.5581

22

23
    Proceedings recorded by mechanical stenography. Transcript
24  produced by computer-assisted transcription.

25

GOVERNMENT'S
EXHIBIT
12

*Johnny C. Sanchez, RMR, CRR - jcscourtreporter@a...*

1 the offense level, criminal history category. And I've

2 already dealt with that issue, so I'm going to overrule

3 that objection to Paragraph 86.

4                       Paragraph 94 -- well, that's just an

04:34:30PM 5 allocution issue, and we'll -- you can address that during

6 the allocution. I don't think that's properly an

7 objection.

8                       And paragraph 98, 101, 102 and 103 talks

9 about the additional restitution, which I agree should not

04:34:47PM 10 be paid; and, therefore, I will sustain your objection to

11 those.

12                       Now we get to factors that may warrant --

13 let me just -- before we do that, let me just go ahead and

14 adopt -- to the extent I have sustained your objections and

04:35:00PM 15 made any corrections, if I have not done that to those

16 paragraphs, the other paragraphs and the whole report and

17 the addendum I adopt the presentence report as my own

18 findings of fact and the application of the guidelines to

19 the facts, find a total offense of 19, criminal history

04:35:21PM 20 category of 1, which gives a guideline provision range of

21 30 to 37 months.

22                       All right. Now we get to factors that may

23 warrant departure.

24                       All right. Mr. Bennett?

04:35:31PM 25                 MR. BENNETT: Your Honor, I think we did set

*Johnny C. Sanchez, RMR, CRR - jcscourtreporter@aol.com*

**1020**

1 those out, and those are diminished capacity, aberrant

2 behavior, the super acceptance of responsibility, the

3 postoffense remorse, rehabilitation, family ties and, of

4 course, you've seen numerous letters that have been sent

04:35:50PM 5 and attached to this.

6                    I think, more importantly, there's been no

7 contradiction to the -- first of all, the physical

8 anatomical damage that's done to Daniel Yeh's brain.

9 There's nothing to refute the numerous operations, the

04:36:07PM 10 radiation, all the problems that he had. There's been

11 nothing to refute the testing that was done by Dr. Mosnik,

12 nor has there been anything to refute Dr. Scarano and his

13 assessment that, during this time, this specific time,

14 there was significant diminished capacity having to do with

04:36:22PM 15 his executive function that explains why Mr. Brown said he

16 was like a child with a cookie or a child reaches in a

17 cookie jar. He didn't have the ability to keep from doing

18 that.

19                    And I think those are reasons,

04:36:35PM 20 justifications for the Court to depart from the sentencing

21 guidelines and to allow him to be on probation.

22                    THE COURT: All right; Mr. Costa?

23                    MR. COSTA: It's obviously unfortunate that

24 Dr. Yeh's had had these tumors. Fortunately, they've been

04:36:52PM 25 benign.

 1 | correct.

 2 |                     But the experts that I've heard and the
 3 | reports that I've read indicate that the experts have not
 4 | said and they really cannot say that he had a significantly
04:51:01PM   5 | reduced mental capacity that contributed substantially to
 6 | the commission of the offense.  They indicate that, in
 7 | essence, the -- there were cognitive impairments he may
 8 | have had, and there was some lessening of his impulse
 9 | controls and loss of reasoning ability.  And I don't feel
04:51:20PM 10 | capable of summarizing exactly what they did say.  But,
11 | obviously, there is some brain damage.  Obviously, there is
12 | some things that Mr. Yeh cannot do as well as he could do
13 | before they discovered his tumor back in 1994.

14 |                     Although Mr. Yeh has pled guilty to the
04:51:42PM 15 | crime, took responsibility for it, one of his doctors said,
16 | "The fact that the tumor was growing in his brain during
17 | that time period and may certainly have contributed to his
18 | impaired judgment and decision-making capabilities, this
19 | cognitive impairment could certainly have" -- "could
04:51:58PM 20 | certainly have resulted in diminished capacity at the time
21 | of the offense and contributed significantly to the
22 | commission of the offense."

23 |                     I believe that this doctor's opinion
24 | suffers from an omission of a discussion of what the crime
04:52:15PM 25 | was.  It was a crime that relied upon high-level cognitive

1 reasoning, planning, communication and judgment. And the
2 fact that he committed the crime is, to me, evidence that
3 he was not cognitively impaired as is envisioned by the
4 sentencing guidelines and the diminished capacity
04:52:44PM 5 departure; rather, it demonstrates he was operating at a
6 rather high mental capacity.

7                     And the next sentence in the opinion.
8 Doctor reveals upon what it's based. "It is my belief that
9 the defendant would not have engaged in the behaviors that
04:53:01PM 10 led to the offense if, in fact, he had not had a giant
11 meningioma growing in his frontal parietal lobe, reducing
12 his mental capacity."

13                     Let me just add that, at the time he
14 committed the crime, the giant tumor had been removed.  It
04:53:18PM 15 was growing again for the second time, but it was not yet
16 to the size of the gigantic one that was first removed in
17 1994.

18                     And the report continues: "At the time of
19 the cognitive testing, the patient stated that he did not
04:53:31PM 20 believe that what he was doing was wrong.  He did not
21 understand the wrongfulness of his actions, that he did not
22 demonstrate an intention to defraud.  His thinking and
23 decision-making at the time of the alleged offense were
24 perseverative and inflexible in nature despite reported
04:53:50PM 25 attempts by his manager to convince him that his actions

Case 4:09-cr-00342 Document 245-1 Filed in TXSD on 06/09/10 Page 157 of 158
Case 3:09-cv-00721-N-BQ Document 115-13 Filed 12/05/11 Page 87 of 150 PageID 8970

25

 1 were wrong, consistent with the presence of executive
 2 dysfunction."

 3                  Now, it's my opinion that the good doctor
 4 sincerely based the opinion on the fact that Mr. Yeh told
 5 her that he didn't think he was doing anything wrong.
 6 There is no evidence that he didn't think what he was doing
 7 was wrong, except for the statement that he made to the
 8 doctor; yet, there is evidence that exhibits that he did.

 9                  First of all, look at the crime.  He was
10 not a man led by someone else.  He was in charge.  This was
11 a fraud.  This was lying.  This was free money, easy to
12 acquire.  And it's not logical to say he did not know it
13 was wrong because he had a brain tumor, even though he was
14 told by an employee, Look, somebody's going to the
15 penitentiary for this.

16                  To reason -- and the way that the doctors
17 are reasoning in this case, I think, is getting in the
18 realm of Lewis Carroll and *Alice in Wonderland*.  And, also,
19 the doctor who said he was like a kid with his hand in the
20 candy jar and couldn't let go, and that that indicated this
21 was somehow -- this was the forensic psychiatrist -- that
22 somehow that indicated that he had -- that his brain damage
23 had contributed to his not being able to stop himself.

24                  It makes -- it makes Mr. Yeh and the crime
25 into kind of a cartoon.  It's like Lex Luther and Superman.

 1 I mean, the way that you get there is simply too -- it's
 2 too fanciful. And I just don't believe that this is good
 3 evidence that would establish that, at the time the crime
 4 was committed, fall of 2005, whatever he had going on in
 5 his brain, prevented him or diminished his ability to know
 6 what he was doing was wrong. It just does not -- it does
 7 not -- it does not make any sense. I don't think that's
 8 good science, and it does not convince me that he has a
 9 diminished capacity.

10              Also significant is the fact that he told
11 Annabelle DuPont, who was one of his employees, that the
12 FEMA program was a lifesaver for him. I don't think that
13 that -- that evidences any mental diminishment of mental
14 capacity. He knew what he was doing. He knew he was
15 getting easy money. He was greedy. That doesn't mean he's
16 not on whole a good person. That doesn't mean that he
17 doesn't have brain damage. But he knew what he was doing.

18              Most of the letters that I've read in his
19 report evidence a disbelief that the defendant could have
20 committed a crime and also indicated that they didn't know
21 what the crime was. They repeatedly used the word
22 "alleged" or "he was supposed to have done." This is after
23 he had pled guilty to this crime.

24              In September of 2005, the Flagship Hotel
25 in Galveston, Texas, began accepting hurricane evacuees.

# KVT-24

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

CLERK, U. S. DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
F I L E D
8/20/09
MICHAEL N. MILBY, CLERK
BY DEPUTY

| | |
|---|---|
| **UNITED STATES OF AMERICA** § | |
| § | |
| v. § | **Criminal No. H-09-335** |
| § | |
| **JAMES M. DAVIS** § | |
| § | |

## PLEA AGREEMENT

The United States of America, by and through its United States Attorney for the Southern District of Texas and the Fraud Section of the Criminal Division of the Department of Justice, the defendant, James M. Davis, and the defendant's counsel, David Finn, have entered into the following plea agreement (the "Agreement") pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure:

### The Defendant's Agreement

1.     (a)     The defendant agrees to plead guilty to Counts One, Two and Three of the Information. Count One charges the defendant with conspiracy to commit wire, mail and securities fraud, in violation of 18 United States Code, Section 371. Count Two charges the defendant with mail fraud, in violation of 18 United States Code, Section 1341. Count Three charges the defendant with conspiracy to obstruct an SEC proceeding, in violation of 18 U.S.C. § 371. By entering this

Agreement, the defendant waives any right to have the facts that the law makes essential to the punishment of Counts One, Two or Three either charged in the Information, proved to a jury or proven beyond a reasonable doubt.

(b)     The defendant agrees that the facts of this case support the following Sentencing Guidelines calculation:

| | |
|---|---|
| Section 2B1.1(a) – Base offense level for wire fraud: | 7 |
| Section 2B1.1(b)(1)(K) – Loss of more than $400 million | 30 |
| Section 2B1.1(b)(2)(B)– More than 250 victims | 6 |
| Section 2B1.1(b)(9)(C, D) – Substantial part of scheme committed outside United States and otherwise used sophisticated means | 2 |
| Section 2B1.1(b)(14)(B) – Affecting safety and soundness of financial institution and endangering solvency or financial security of 100 or more victims | 4 |
| Section 3B1.3 – Abuse of position of trust | 2 |
| Section 2B1.1(b)(14)(C) – Combination of enhancement for more than 250 victims and enhancement for safety and soundness of financial institution and endangering the solvency or security of 100 or more victims, equals 10, therefore reduced to 8 | -2 |
| Section 3E1.1(a, b) – Acceptance of responsibility | -3 |
| Total Offense Level – Adjusted | 46 |

(c)     The defendant further agrees to recommend at the time of sentencing that the Sentencing Guidelines provide a fair and just resolution based on the facts of this case, and that no downward departure or variances are appropriate other than the reduction for acceptance of responsibility discussed in Paragraph

2

Thirteen and the potential for a downward departure based on substantial assistance pursuant to U.S.S.G. § 5K1.1 as discussed in Paragraph Seven.

## Punishment Range

2.     The statutory penalty for the violation of Title 18, United States Code, Section 371, in Counts One and Three, is not more than five years imprisonment and/or a fine of up to $250,000.00. The statutory penalty for the violation of Title 18, United States Code, Section 1341, in Count Two, is not more than twenty years imprisonment and/or a fine of up to $250,000.00. Additionally, on all three counts, the defendant may receive a term of supervised release after imprisonment of up to three (3) years.   Title 18 U.S.C. §§ 3559(a)(4) and 3583(b)(2).   Defendant acknowledges and understands that if he should violate the conditions of any period of supervised release which may be imposed as part of his sentences, then defendant may be imprisoned for the entire term of supervised release, not to exceed two years, without credit for time already served on the term of supervised release prior to such violation. Title 18 U.S.C. §§ 3559(a)(4) and 3583(e)(3).   Defendant understands that he cannot have the imposition or execution of the sentence suspended, nor is he eligible for parole.

## Mandatory Special Assessment

3.      Pursuant to 18 U.S.C. § 3013(a)(2)(A), immediately after sentencing the defendant will pay to the Clerk of the United States District Court a special assessment in the amount of $100.00 per count of conviction.  The payment will be by cashier's check or money order payable to the Clerk of the United States District Court, c/o District Clerk's Office, P.O. Box 61010, Houston, Texas 77208, Attention: Finance.

## Fine and Reimbursement

4.      The defendant understands that under the *United States Sentencing Commission Guidelines Manual* (hereafter referred to as "*Sentencing Guidelines*" or "U.S.S.G."), the Court is permitted to order the defendant to pay a fine that is sufficient to reimburse the United States for the costs of any imprisonment or term of supervised release, if any is ordered.

5.      The defendant agrees that becaue the offenses of conviction occurred after April 24, 1996, restitution is mandatory without regard to Davis's ability to pay and that the Court must order Davis to pay restitution for the full loss caused by his criminal conduct pursuant to Title 18, United States Code, Section 3663A, provided, however, that the United States agrees that the value of any property returned to victims through the forfeiture and remission process shall be credited against any

4

1030

order of restitution.

6.     The defendant agrees to make complete financial disclosure by truthfully executing a sworn financial statement (Form OBD-500) prior to sentencing if he is requested to do so. In the event that the Court imposes a fine or orders the payment of restitution as part of the defendant's sentence, the defendant shall make complete financial disclosure by truthfully executing a sworn financial statement immediately following his sentencing.

## Cooperation

7.     The parties understand that the Agreement carries the potential for a motion for departure pursuant to U.S.S.G. § 5K1.1.  The defendant understands and agrees that whether such a motion is filed will be determined solely by the United States. Should the defendant's cooperation, in the sole judgment and discretion of the United States, amount to "substantial assistance," the United States reserves the sole right to file a motion for departure pursuant to U.S.S.G. § 5K1.1.  The defendant agrees to persist in his guilty plea through sentencing and to cooperate fully with the United States. The defendant understands and agrees that the United States will request that sentencing be deferred until his cooperation is complete.

8.     The defendant understands and agrees that the term "fully cooperate" as used in this Agreement includes providing all information relating to any criminal activity known to the defendant.  The defendant understands that such information

includes both state and federal offenses arising therefrom. In that regard:

(a) The defendant agrees that this Agreement binds only the United States Attorney for the Southern District of Texas, the Fraud Section of the Criminal Division of the Department of Justice and the defendant; it does not bind any other United States Attorney or any other component of the Department of Justice.

(b) The defendant agrees to testify truthfully as a witness before a grand jury or in any other judicial or administrative proceeding when called upon to do so by the United States.

(c) The defendant agrees to voluntarily attend any interviews and conferences as the United States may request.

(d) The defendant agrees to provide truthful, complete, and accurate information and testimony; and he understands that any false statements he makes to the Grand Jury, at any court proceeding (criminal or civil), or to a government agent or attorney, can and will be prosecuted under the appropriate perjury, false statement, or obstruction statutes.

(e) The defendant agrees to provide to the United States all documents in his possession or under his control relating to all areas of inquiry and investigation.

(f) Should the recommended departure, if any, not meet the defendant's expectations, the defendant understands that he remains bound by the terms of this Agreement and cannot, for that reason alone, withdraw his plea.

### Waiver of Appellate Rights

9.    The defendant is aware that 18 U.S.C. § 3742 affords a defendant the right to appeal the sentence imposed. The defendant agrees to waive the right to appeal the sentence imposed or the manner in which it was determined on all other

6

**1032**

grounds set forth in 18 U.S.C. § 3742 except he reserves the right to appeal a sentence above the statutory maximum.  Additionally, the defendant is aware that 28 U.S.C. § 2255 affords the right to contest or "collaterally attack" a conviction or sentence after the conviction or sentence has become final.  The defendant waives the right to contest his conviction or sentence by means of any post-conviction proceeding, including but not limited to proceedings authorized by 28 U.S.C. § 2255.  If at any time the defendant instructs his attorney to file a notice of appeal on grounds other than those specified above, the United States will seek specific performance of this provision.

10.    In exchange for this Agreement with the United States, the defendant waives all defenses based on venue, speedy trial under the Constitution and Speedy Trial Act, and the statute of limitations with respect to any prosecution that is not time-barred on the date that this Agreement is signed, in the event that (a) the defendant's conviction is later vacated for any reason, (b) the defendant violates any provision of this Agreement, or (c) the defendant's plea is later withdrawn.

11.    In agreeing to these waivers, the defendant is aware that a sentence has not yet been determined by the Court. The defendant is also aware that any estimate of the possible sentencing range under the *Sentencing Guidelines* that he may have received from his counsel, the United States, or the Probation Office is a prediction,

7

not a promise, did not induce his guilty plea, and is not binding on the United States, the Probation Office, or the Court. The United States does not make any promise or representation concerning what sentence the defendant will receive. The defendant further understands and agrees that the *Sentencing Guidelines* are "effectively advisory" to the Court. *United States v. Booker*, 125 S.Ct. 738 (2005). Accordingly, the defendant understands that, although the Court must consult the *Sentencing Guidelines* and must take them into account when sentencing him, the Court is bound neither to follow the *Sentencing Guidelines* nor to sentence the defendant within the guideline range calculated by use of the *Sentencing Guidelines*.

12.    The defendant understands and agrees that each and all of his waivers contained in this Agreement are made in exchange for the corresponding concessions and undertakings to which this Agreement binds the United States.

### The United States' Agreements

13.    The United States agrees to each of the following:

(a)    At the time of sentencing, the United States agrees not to oppose the defendant's anticipated request to the Court and the United States Probation Office that he receive a two level downward adjustment pursuant to U.S.S.G. § 3E1.1(a) should the defendant accept responsibility as contemplated by the *Sentencing Guidelines*. The United States is not required to make this recommendation if Davis (1) fails or refuses to timely entire his plea and make a full, accurate and complete disclosure to the United States and the Probation Department of the circumstances surrounding the relevant offense conduct and his present financial condition; (2) is found to have misrepresented facts to

8

**1034**

the United States prior to entering this Agreement; or (3) commits any misconduct after entering into this Agreement, including but not limited to committing a state or federal offense, violating any term of release, or making false statements or misrepresentations to any governmental entity or official.

(b)    If the defendant qualifies for an adjustment under U.S.S.G. Section 3E1.1(a), the United States agrees to file a motion for an additional one level departure based on the timeliness of the plea or the expeditious manner in which the defendant provided complete information regarding his/her role in the offense if the defendant's offense level is 16 or greater.

(c)    The United States agrees that the appropriate Guidelines calculation in this case is the calculation described in Paragraph 1(b) above.

## United States' Non-Waiver of Appeal

14.    The United States reserves the right to carry out its responsibilities under the *Sentencing Guidelines*. Specifically, the United States reserves the right:

(a)    to bring its version of the facts of this case, including its evidence file and any investigative files, to the attention of the Probation Office in connection with that office's preparation of a presentence report;

(b)    to set forth or dispute sentencing factors or facts material to sentencing;

(c)    to seek resolution of such factors or facts in conference with the defendant's counsel and the Probation Office;

(d)    to file a pleading relating to these issues, in accordance with U.S.S.G. § 6A1.2 and 18 U.S.C. § 3553(a); and

(e)    to appeal the sentence imposed or the manner in which it was determined. If the United States appeals Davis's sentence, then Davis shall be released from his waiver of appellate rights.

9

## Sentence Determination

15.     The defendant is aware that the sentence will be imposed by the Court after consideration of the *Sentencing Guidelines*, which are only advisory, as well as the provisions of 18 U.S.C. § 3553(a). The defendant nonetheless acknowledges and agrees that the Court has authority to impose any sentence up to and including the statutory maximum set for the offense(s) to which the defendant pleads guilty, and that the sentence to be imposed is within the sole discretion of the sentencing judge after the Court has consulted the applicable *Sentencing Guidelines*. The defendant understands and agrees that the parties' positions regarding the application of the *Sentencing Guidelines* do not bind the Court and that the sentence imposed is within the discretion of the sentencing judge. If the Court should impose any sentence up to the maximum established by statute, the defendant cannot, for that reason alone, withdraw a guilty plea, and he will remain bound to fulfill all of his obligations under this Agreement.

## Rights at Trial

16.     The defendant represents to the Court that he is satisfied that his attorney has rendered effective assistance. The defendant understands that by entering into this Agreement, he surrenders certain rights as provided herein. The defendant understands that the rights of a defendant include the following:

10

**1036**

(a)    If the defendant persisted in a plea of not guilty to the charges, the defendant would have the right to a speedy jury trial with the assistance of counsel. The trial may be conducted by a judge sitting without a jury if the defendant, the United States, and the Court all agree.

(b)    At a trial, the United States would be required to present witnesses and other evidence against the defendant. The defendant would have the opportunity to confront those witnesses and his attorney would be allowed to cross-examine them. In turn, the defendant could, but would not be required to, present witnesses and other evidence on his own behalf. If the witnesses for the defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court.

(c)    At a trial, the defendant could rely on a privilege against self-incrimination and decline to testify, and no inference of guilt could be drawn from such refusal to testify. However, if the defendant desired to do so, he could testify on his own behalf.

**Factual Basis for Guilty Plea**

17.    If this case were to proceed to trial, the United States could prove each element of the offense beyond a reasonable doubt. The following facts, among others, would be offered to establish the defendant's guilt:

(a)    Beginning in at least 1988, **JAMES M. DAVIS (DAVIS)** began serving as Controller of Guardian International Bank, Ltd (Guardian), a bank chartered in Montserrat and owned by Robert Allen Stanford (Stanford).   Soon after **DAVIS** became Controller, Stanford requested that, in order to show fictitious quarterly and annual profits, DAVIS make false entries into the general ledger for the purpose of reporting false revenues and false investment portfolio balances to the banking regulators. In late 1989, Stanford closed Guardian in Montserrat due, in part, because of his concern with the heightened scrutiny being imposed upon Guardian by bank regulators in Montserrat.

11

(b)    In early 1990, Stanford moved Guardian's banking operations to Antigua under the name Stanford International Bank, Ltd. (SIBL), of which he was the sole shareholder and for which **DAVIS** continued to serve as Controller through approximately 1992, when **DAVIS** became Chief Financial Officer of Stanford Financial Group (SFG).  SFG was the parent company of SIBL and a web of other affiliated financial services entities, including Stanford Group Company (SGC) and Stanford Capital Management (SCM).

(c)    SIBL's primary investment product was referred to as a Certificate of Deposit (CD) which SIBL would solicit to potential investors in the United States and elsewhere through SFG broker-dealers, sometimes referred to as "Financial Advisors" (FAs).  By 2008, SIBL had sold CDs resulting in liabilities totaling over $7 billion to investors in the United States and elsewhere.  Stanford, **DAVIS**, and their conspirators promoted SIBL's investments as being well-managed, safe and secure, claimed that SIBL's investment strategy was to minimize risk and achieve liquidity, and falsely touted in SIBL's Annual Reports beginning in at least 1999 an almost year-by-year percentage and dollar increase in the purported value of SIBL's earnings, revenue and assets.

(d)    Prior to purchasing SIBL CDs, potential investors were required to provide their basic biographical and financial information in the form of a Subscription Agreement.  Subscription Agreements regarding the investors were routinely sent from Stanford Group Company in Houston, Texas to SIBL in Antigua.  CDs and account statements regarding the CDs were also routinely sent by mail to investors, including an account statement driven by the false investment and revenue values for an investor (identified as "Investor TA" in Count 2 of the Information) which on November 30, 2008 was sent and delivered via United States Postal Service to Investor TA's address in Spring, Texas.

(e)    Stanford, **DAVIS** and their conspirators further promoted the sale of SIBL's CDs by representing to investors that SIBL's operations and financial condition were being scrutinized by Antigua's bank regulator, the Financial Services Regulatory Commission (FSRC), and that SIBL's financial statements were subject to annual examination and inspections by the FSRC and audits by an independent outside auditor.

(f)    Stanford, **DAVIS**, Chief Investment Officer Laura Pendergest-Holt (Holt) and other conspirators created and perpetuated the false impression to investors, potential investors, and the majority of SFG employees that Holt was responsible for overseeing and monitoring SIBL's entire portfolio of non-cash assets and that she managed all of those assets through a global network of money managers. In order to continue to effectuate the scheme, on December 7, 2005, Stanford and others, appointed Holt to the SIBL "Investment Committee." The purpose of this appointment was to continue to dupe the CD investors into falsely believing that Holt understood and "managed" SIBL's entire investment portfolio.

(g)    Unknown to investors, Stanford, **DAVIS**, Holt and other conspirators internally segregated SIBL's investment portfolio into three investment tiers: (a) cash and cash equivalents ("Tier I"); (b) investments with "outside money managers," sometimes also referred to as "outside portfolio managers" ("Tier II"); and (c) other assets ("Tier III"). In actuality, Holt's management of SIBL's assets was confined to those assets contained in Tier II which, by 2008 made up only 10% of SIBL's entire portfolio. In fact, by 2008, approximately 80% of SIBL's investment portfolio was made up of illiquid investments, including grossly overvalued real and personal property that SIBL had acquired from Stanford-controlled entities at falsely inflated prices. At least $2 billion dollars of undisclosed, unsecured personal loans from SIBL to Stanford were concealed and disguised in SIBL's financial statements as "investments."

(h)    At Stanford's direction and assisted by SFG's Chief Accounting Officer, Gilberto Lopez (Lopez), and the Global Controller for an affiliate of SFG, Mark Kuhrt (Kuhrt), **DAVIS** regularly created false books and records in which the value of the investment portfolio was further fraudulently adjusted by percentage increases to produce false investment and revenue values. As a result, SIBL's values for revenue and investments were falsified on a routine basis.

(i)    From at least 2002, **DAVIS**, at the request of Stanford, would prepare with the assistance of Lopez and Kuhrt, fictitious SIBL investment reports, which were provided to the Antiguan FSRC on a quarterly basis, again falsely inflating the value of SIBL's investments. These false forms continued to be provided to the FSRC on a quarterly basis until at least September 2008. Kuhrt would send the false documents to SIBL in Antigua. SIBL Executive A would then execute the documents and provide them to the FSRC.

**1039**

(j)     Stanford was insistent that SIBL appear to show a profit each year. Stanford and **DAVIS** would collaborate to select a false revenue number. **DAVIS** would then send the collaborative false revenue numbers to Lopez and Kuhrt.

(k)     To create the falsely inflated values for SIBL's assets, **DAVIS** would extrapolate from the values attributed to a portion of SIBL's investment portfolio which was monitored by Holt and managed by money managers. **DAVIS**, at Stanford's urging, would multiply those actual values by artificial percentage factors necessary to equal the value for depositor liabilities. By email or personal delivery, **DAVIS** would send the false investment valuation report to Kuhrt, who then sent it to SIBL.

(l)     Initially, **DAVIS** did the calculations manually, but later a computer spreadsheet was created which was useful in generating the bogus revenue numbers. Every year, SIBL would prepare a budget projecting growth. Stanford, **DAVIS**, Lopez, Kuhrt and other conspirators would then use the "budgeted" numbers to develop falsely inflated revenue numbers which would be claimed as the "actual" revenue numbers to generate the desired Return on Investment (ROI). At Kuhrt's direction, subordinate employees in SFG's accounting group would be given a secret instruction sheet informing them as to how to make the changes to generate the false adjusted revenue figures, including the steps necessary to obtain approval by Lopez and **DAVIS**. After "backing into" or "reverse engineering" the numbers to match the "budgeted" numbers, Kuhrt would then transmit the inflated revenue numbers from Houston initially, and later from St. Croix when Kuhrt's accounting group moved to St. Croix, to Lopez in Houston, Texas and to **DAVIS** in Mississippi for **DAVIS'** approval. **DAVIS** often would further adjust the already bogus numbers to reach a desired ROI and would transmit to Kuhrt and Lopez the changes to be made.

(m)    Kuhrt and Kuhrt's employees in the accounting group would prepare the false financial statements published in SIBL's annual reports, which Stanford, Lopez and **DAVIS** would review prior to publishing and sending out to investors.

(n)     This continued routine false reporting by Stanford, **DAVIS**, Lopez, Kuhrt and their conspirators, upon which CD investors routinely relied in making their investment decisions, in effect, created an ever-widening hole between reported assets and actual liabilities, causing the creation of a massive Ponzi scheme whereby CD redemptions ultimately could only be accomplished with new infusions of investor funds. Stanford, **DAVIS**, Lopez, Kuhrt and their conspirators fraudulently claimed in SIBL's Annual Reports an increase in assets from approximately $1.2

14

billion in 2001 to approximately $8.5 billion reported in SIBL's Monthly Report for December 2008. By the end of 2008, Stanford, **DAVIS** and their conspirators falsely represented in SIBL's December monthly report that it held over $7 billion in assets, when in truth and in fact, SIBL actually held less than $2 billion in assets.

(o)    By at least 2002, Stanford had introduced **DAVIS** to Leroy King, a bank auditor for the FSRC, a former Ambassador to the United States from Antigua and a former executive at Bank of America in New York.  King became Administrator and the Chief Executive Officer (CEO) of the FSRC in approximately 2003.

(p)    Sometime in 2003, Stanford performed a "blood oath" brotherhood ceremony with King and another employee of the FSRC, each of whom participated in the FSRC's regulatory oversight of SIBL.  This brotherhood oath was undertaken in order to extract an agreement from both King and the other FSRC employee that they, in exchange for regular cash bribe payments by Stanford to King and the other FSRC employee, would ensure that the Antiguan bank regulators would not "kill the business" of SIBL.  During the course of the fraud scheme King routinely referred to Stanford as "Brother" or "Big Brother."  In the regular preparation of the false SIBL investment reports for submission to the FSRC, Stanford, **DAVIS**, and other conspirators relied upon the assurances that King and the other FSRC employee, because of the bribes, would ensure that the FSRC would not actually examine the validity of the investments of SIBL as set forth in those investment reports.

(q)    When Stanford needed cash to make these bribe payments, he generally would instruct **DAVIS** to debit funds from a secret numbered Swiss bank account at Society General Bank (SocGen account #108731) and to wire those funds to an SFG account at Bank of Antigua, from which the cash in United States dollars would be withdrawn.  This secret SocGen account #108731 was funded by CD investor funds and was also used to make regular bribe payments, via wire transfer, to SIBL's outside auditor in Antigua, C.A.S. Hewlett & Co. Ltd.  The cash bribe payments by Stanford to King ultimately exceeded $200,000.

(r)    Sometime in approximately 2003, Stanford and SIBL Executive A complained to King that two FSRC examiners were becoming aggressive and suspicious in their examination of SIBL's financial statements.  Stanford reassured **DAVIS** and SIBL Executive A that, because of their brotherhood oath and the bribe payments, King would assist in removing the two FSRC employees from the regulatory oversight function of SIBL.  Both FSRC employees soon thereafter were reassigned or replaced.

15

**1041**

(s)     In January 2004, Stanford also continued his bribery scheme with Leroy King by paying $8000 for tickets to the Super Bowl game in Houston and by corruptly giving those tickets to King and his girlfriend to attend the game.

(t)     In June of 2005, King provided to Stanford a confidential letter that King had received from the United States Securities and Exchange Commission (SEC) in his capacity as Administrator and CEO of the FSRC wherein the SEC sought information and records regarding SIBL's CD investment portfolio.   In the confidential letter, the SEC maintained that it was investigating SIBL's sales practices with respect to its CD program and sought from the FSRC details and records of SIBL's investments because the SEC stated that it had evidence to suggest that SIBL was engaged in a "possible Ponzi scheme."   Stanford and SIBL Executive A then assisted King in drafting a false and misleading response by the FSRC to this confidential SEC letter.

(u)     By August of 2005, Stanford had retained an outside counsel to represent the interests of SIBL in the SEC inquiry of SIBL's sales practices (hereafter Outside Attorney A).  During that month, Outside Attorney A traveled to the SIBL facility in Antigua where he met with Stanford, **DAVIS**, SIBL Executive A, Leroy King and others to familiarize himself with the operations and finances of SIBL.  Outside Attorney A further reviewed SIBL's disclosures to investors in its CD program.

(v)     On July 30, 2006, Leroy King transmitted to SFG Attorney A in Houston, Texas, a letter dated July 11, 2006 from the Director of the Bank Supervision Department at the Eastern Caribbean Central Bank ("ECCB") to the FSRC in Antigua concerning, inter alia, the affiliate relationship of SIBL to the Bank of Antigua. Similarly, on August 1, 2006, King again faxed to SFG Attorney A in Houston, Texas, a proposed response to the ECCB letter which sought the input of SFG Attorney A in crafting a response by the FSRC calculated to mislead the ECCB as to the financial bona fides of SIBL to prevent legitimate scrutiny of SIBL by the Eastern Carribean bank regulator.   Recognizing that he had already been paid through cash bribe payments from Stanford, King concluded the August 1, 2006 facsimile transmission with the following handwritten words: "Please do not bill me (laugh),  Thanks a million, Lee."

(w)     On September 25, 2006, King provided to Stanford, SFG Attorney A, and SIBL Executive A another confidential letter he had received from the SEC wherein the SEC again sought records and information regarding SIBL's CD investment

16

portfolio. Stanford, **DAVIS**, SIBL Executive A, and SFG Attorney A would then propose various responses designed to mislead the SEC that King would be requested to insert into the FSRC's response to the SEC's confidential letter.

(x)      In late September of 2006, Outside Attorney A contacted the SEC and represented that he had "heard through the grapevine" that the FSRC had not been provided with an appropriate request from the SEC for documents; that the SEC should "go to Antigua" to review the SIBL examination reports; that the SEC had "no basis" to request documents regarding SIBL's investment portfolio from SIBL; that he (Outside Attorney A) had spent 15 years investigating fraud for the SEC and was "well-equipped" to recognize the "hallmarks of fraud"; that he (Outside Attorney A) found SIBL to be credible in all their business dealings; and that, based upon his review of the situation and personal visit to SIBL, Outside Attorney A found SIBL to be an "incredible institution."

(y)      In late 2008, Outside Attorney A was informed that SIBL's CD investment portfolio included a previously undisclosed third tier of investments (Tier III) that was not "managed" by Holt. Subsequently, in early January 2009, Outside Attorney A was informed that this third tier included real estate investments and private equity. Outside Attorney A, through his prior review of SIBL's disclosures knew and understood that this third tier of investments, including the real estate investments, had not been disclosed to investors. In early January of 2009 Outside Attorney A further learned that this undisclosed third tier of investments constituted approximately 80% of SIBL's investment portfolio or approximately $6 billion.

(z)      During the course of the fraud conspiracy, Holt supervised a group of research analysts at SFG's offices in Memphis, Tennessee, who were primarily responsible for researching and trading investments in the Tier II segment of SIBL's portfolio. These research analysts were aware that Tier II represented a small segment of SIBL's entire portfolio and that the vast majority of SIBL's purported assets were in Tier III of SIBL's portfolio. Occasionally, Holt's research analysts would question her regarding Holt's knowledge of SIBL's Tier III assets. Holt would often dismiss such inquiries and would explain that she knew the details of the assets in Tier III and the research analysts "did not need to concern themselves" with Tier III.

(aa)     From 2005 through at least February of 2009, Stanford, **DAVIS**, Holt, SIBL Executive A and others would attend investor conferences and other meetings with FAs called "Top Producer Club" or "TPC" meetings where they would falsely tout the assets and earnings of SIBL's investments, falsely tout SIBL's investment

17

**1043**

strategy and deceive both the investors and FAs as to the role Holt played in the "management" of SIBL's investment portfolio.

(bb)   In December 2008, Holt's research analysts began to make further inquiry of Holt regarding the quantity and the quality of the assets that made up SIBL's Tier III. During that same month, Holt led several meetings with her research analysts wherein she would purport to inform the analysts as to some of the content of SIBL's Tier III. Specifically, Holt explained the evolution of Tier III from a segment of SIBL's portfolio in the 1990s that contained mostly futures, options and currencies, to its current content which was purportedly geared toward larger holdings of real estate and private equity. Holt explained that Tier III was composed of 30-40% private equity and real estate and 10-12% cash. She further explained that SIBL had conducted private equity and real estate deals that had been "very profitable." In fact, she cited one transaction involving "two islands and one club" that Stanford had acquired and "got a very good deal." Because of this, Holt explained, Tier III was "up 7% mid-year." Holt told her research analysts that "we are restructuring Tier III and that will happen as early as January 2009."

(c)   In mid-2008, Stanford, **DAVIS** and other conspirators were desperately seeking a fraudulent mechanism whereby they could artificially inflate SIBL's assets and thereby further conceal the fact that, undisclosed to investors, Stanford had made approximately $2 billion in loans to himself; that many if not all of private equity investments in Tier III were either insolvent or losing money badly, and that the touted returns on investment had been fictitious. As such, Stanford, **DAVIS**, Lopez, Kuhrt and other conspirators designed a real estate transaction wherein they would falsely inflate and convert an approximate $65 million dollar real estate transaction in Antigua into a purported $3.2 billion dollar asset of SIBL merely through a series of related party property flips through business entities controlled by Stanford. From approximately May 2008 through November 2008, Stanford, **DAVIS**, Lopez, Kuhrt,SIBL Executive A, SFG Attorney A and other conspirators participated in documenting elements of this bogus real estate in the books and records of SIBL designed to fraudulently add billions of dollars in value to SIBL's financial statements.

(dd)   On January 14, 2009, the SEC served, through Outside Attorney A, investigatory subpoenas to **DAVIS** and Holt seeking testimony and documents related to SIBL's investment portfolio. Stanford also was served an SEC subpoena through Outside Attorney A. Outside Attorney A understood that the SEC inquiry would require the subpoenaed individuals to make a complete and transparent presentation to the SEC regarding all of the assets related to SIBL's CD program.

(ee)   On January 21, 2009, Outside Attorney A met at the SIBL airplane hangar in Miami, Florida, to discuss the SEC investigation with Stanford, **DAVIS**, Holt, SIBL Executive A, SFG Attorney A and others to discuss who could make the presentation to the SEC. At that meeting, despite the knowledge that Stanford and **DAVIS** were in the best position to disclose the assets in the Tier III portfolio, Stanford, **DAVIS**, Holt, Outside Attorney A, SIBL Executive A and SFG Attorney A all agreed that Outside Attorney A would seek to convince the SEC that Holt and SIBL Executive A were the best individuals to present testimony and evidence to the SEC as to SIBL's entire investment portfolio. The participants also agreed to participate in a series of meetings in Miami, Florida during the week of February 2, 2009, to bring Holt and SIBL Executive A "up to speed on Tier 3" before the SEC presentation.

(ff)   On January 22, 2008, Outside Attorney A met in Houston, Texas with several SEC attorneys in Houston, Texas to discuss issues related to the SEC investigation. The SEC attorneys reiterated that their investigation was seeking to determine where and how the entire portfolio of SIBL assets were invested and managed. Outside Attorney A falsely maintained that Stanford and **DAVIS** did not "micro-manage" the portfolio but that Holt and SIBL Executive A were the "better people to explain the details" about SIBL's entire portfolio. As a result of Outside Attorney A's misleading statements, the SEC attorneys agreed to postpone the testimony of Stanford and **DAVIS** and to take the testimony of SIBL Executive A and Holt on February 9-10, 2009, respectively. Outside Attorney A also falsely informed the SEC attorneys at this meeting that SIBL was "not a criminal enterprise."

(gg)   In the last week of January 2009, **DAVIS** met with King in Antigua. By that time, SIBL was facing increasing regulatory scrutiny from the SEC, and Stanford, Holt and **DAVIS**, had received subpoenas from the SEC. King appeared very stressed. King related that he had again been contacted by the SEC. King asked **DAVIS** if "we were going to make it?" which meant whether the fraud they had been engaged in was going to be exposed. **DAVIS** informed King that he thought they were going to be ok.

(hh)   On January 27, 2009, Outside Attorney A contacted **DAVIS**, Holt and SIBL Executive A and informed them when Holt and SIBL Executive A responded to the SEC inquiry they would be required to present "positive proof" regarding all of the assets of SIBL including the three tiers, that they needed to "rise to the occasion," and that "our livelihood depends on it."

(ii)   On February 3, 4, 5 and 6, 2009, **DAVIS** met with Holt, SFG Attorney A, SIBL Executive A, Outside Attorney A, and ultimately, Stanford on February 5,

and others, at SFG's office in Miami, Florida to discuss the testimony that Holt and SIBL Executive A would provide to the SEC during the week of February 9, 2009. During these meetings Holt disclosed that the value of the assets she actually managed in Tier II totaled approximately $350 million, down from $850 million in June of 2008. At these meetings **DAVIS** further revealed that the purported value of Tier III of SIBL's investment portfolio was made up of: real estate valued at in excess of $3 billion which allegedly had been acquired earlier that year by SIBL for less than $90 million; $1.6 billion in "loans" to Stanford; and various other private equity investments. Several of the Miami meeting participants acknowledged that if this disclosure was accurate, then the bank was insolvent. During the February 5, 2009 session, Stanford falsely informed the participants that despite what they had just been told, SIBL had "at least $850 million more in assets than liabilities."

(jj)   Later in the day of February 5, 2009, Stanford, **DAVIS** and Outside Attorney A attended a separate meeting where Stanford acknowledged that SIBL's assets and financial health had been misrepresented to investors, and were overstated in SIBL's financials.

(kk)   On the morning of February 10, 2009, prior to Holt's testimony before the SEC in Fort Worth, Texas, in an effort to continue to obstruct the SEC investigation, **DAVIS** spoke with Holt by telephone and told her to only disclose to SEC investigators her knowledge of Tier II investments.

(ll)   During her testimony to the SEC on February 10, 2009, in addition to failing to disclose the Miami meetings and participants which had occurred the prior week, Holt falsely stated in her SEC testimony that she was unaware of the assets and allocations of assets in Tier III of SIBL's portfolio.

## Breach of Plea Agreement

18.   If the defendant fails in any way to fulfill completely all of his obligations under this Agreement, the United States will be released from its obligations hereunder, and the defendant's plea and sentence will stand. If at any time the defendant retains, conceals, or disposes of assets in violation of this Agreement, or if the defendant knowingly withholds evidence or is otherwise not completely truthful

1046

with the United States, then the United States may ask the Court to set aside his guilty plea and reinstate prosecution. Any information and documents that have been disclosed by the defendant, whether prior to or subsequent to execution of this Agreement, and all leads derived therefrom, will be used against the defendant in any prosecution.

## Forfeiture

19.   Defendant agrees to forfeit all property which constitutes or is derived from proceeds traceable to the violations charged in Counts One and Two of the information. Defendant stipulates and agrees that the factual basis for his guilty plea supports the forfeiture of at least $1,000,000,000 (one billion dollars). Defendant agrees to a personal money judgment for $1,000,000,000 (one billion dollars) against him and in favor of the United States of America. Defendant represents that he will make a full and complete disclosure of all assets over which he exercises direct or indirect control, or in which he has any financial interest. Defendant stipulates and admits that one or more of the conditions set forth in 21 U.S.C. § 853(p) exists. Defendant agrees to forfeit any of Defendant's property, or Defendant's interest in any property, up to the value of any unpaid portion of the money judgment, until the money judgment is fully satisfied. Defendant agrees to take all steps necessary to pass clear title to forfeitable and substitute assets to the United States, including but not limited to surrendering title, signing a consent decree, stipulating facts regarding the

transfer of title and basis for the forfeiture, and signing any other documents necessary to effectuate such transfer.

20.    Defendant agrees to the entry of a preliminary order of forfeiture and consents to the preliminary order of forfeiture becoming final as to the Defendant immediately following this guilty plea pursuant to Fed.R.Crim.P. 32.2(b)(3). Defendant waives the right to challenge the forfeiture of property in any manner, including by direct appeal or in a collateral proceeding.

## Complete Agreement

21.    This Agreement, consisting of 23 pages, together with the attached letter agreement dated April 21, 2009, constitutes the complete plea agreement between the United States, the defendant, and his counsel. No promises or representations have been made by the United States except as set forth in writing in this Agreement. The defendant acknowledges that no threats have been made against him and that he is pleading guilty freely and voluntarily because he is guilty.

1048

22.   Any modification of this Agreement must be in writing and signed by all

parties.

Filed at Houston, Texas, on August 27, 2009.

James M. Davis
Defendant

Subscribed and sworn to before me on August 27, 2009.

By: _____
Deputy United States District Clerk

APPROVED:

Tim Johnson
United States Attorney

By: _____        _____
Gregg Costa                                  David Finn
Assistant U.S. Attorney                      Attorney for Defendant

Steven A. Tyrrell
Chief
Fraud Section, Criminal Division
Department of Justice

BY: _____
Paul E. Pelletier
Principal Deputy Chief
Jack B. Patrick
Senior Litigation Counsel
Matthew Klecka
Trial Attorney

23

**1049**

**U.S. Department of Justice**

*1400 New York Avenue*
*Washington, D.C. 20530*
*(202) 353-7693*

April 21, 2009

**VIA FEDEX and EMAIL**
David Finn, Esq.
Milner & Finn
2828 North Harwood Street
Suite 1950, Lock Box 9
Dallas, TX 75201

  Re:  Davis Plea Agreement

Dear Mr. Finn:

  This letter sets forth the terms of the plea agreement between your client, James Davis, and the United States, by and through the Fraud Section of the Criminal Division of the Department of Justice and the United States Attorney's Office for the Southern District of Texas (hereinafter referred to as the "United States"), regarding your client's involvement with Stanford Group, Inc., Stanford International Bank, Ltd., and related entities including the predecessor bank, Guardian Trust, from at least 1989 through the present. The terms of this "Agreement" are as follows:

  1.  Davis agrees to waive prosecution by indictment and to plead guilty to three counts of a Criminal Information, charging Davis: in Count 1 with conspiracy to violate the following laws: Securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5; wire fraud, in violation of Title 18, United States Code, Section 1343; mail fraud, in violation of Title 18, United States Code, Section 1341; and obstruction of a proceeding before the Securities and Exchange Commission, in violation of Title 18, United States Code, Section 1505; all in violation of Title 18, United States Code, Section 371; in Count 2 with mail fraud, in violation of Title 18, United States Code, Sections 1341 and 2; and in Count 3 with obstruction of a proceeding before the Securities and Exchange Commission, in violation of Title 18, United States Code, Sections 1505 and 2. The Criminal Information also includes a forfeiture allegation, as further discussed herein.

  2.  Davis is aware that his sentence will be imposed by the Court. Davis understands and agrees that federal sentencing law requires the Court to impose a sentence that is reasonable and that the Court must consider the United States Sentencing Guidelines and Policy Statements (hereinafter "Sentencing Guidelines") in effect at the time of the sentencing in determining that reasonable sentence. Davis acknowledges and understands that the Court will compute an advisory sentence under the United States Sentencing Guidelines and that the applicable

guidelines will be determined by the Court relying in part on the results of a Pre-Sentence Investigation by the Court's Probation Department, which investigation will commence after the guilty plea has been entered. Davis is also aware that, under certain circumstances, the Court may depart from the advisory sentencing guideline range that it has computed, and may raise or lower that advisory sentence under the Sentencing Guidelines. Davis is further aware and understands that while the Court is required to consider the advisory guideline range determined under the Sentencing Guidelines, it is not bound to impose a sentence within that range. Davis understands that the facts that determine the offense level will be found by the Court at the time of sentencing and that in making those determinations the Court may consider any reliable evidence, including hearsay, as well as the provisions or stipulations in this Agreement. The United States and Davis agree to recommend that the Sentencing Guidelines should apply and that pursuant to United States v. Booker, the Guidelines provide a fair and just resolution based on the facts of this case, and that no downward departures or variances are appropriate other than the reduction for acceptance of responsibility noted in paragraph 12 and the potential for a reduction under the terms set forth in paragraph 9. The Court is permitted to tailor the ultimate sentence in light of other statutory concerns, and such sentence may be either more severe or less severe than the Sentencing Guidelines' advisory sentence. Knowing these facts, Davis understands and acknowledges that the Court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offenses identified in paragraph 1 and that Davis may not withdraw the plea solely as a result of the sentence imposed.

3.   Davis also understands and acknowledges that as to Count 1, the Court may impose a statutory maximum term of imprisonment of up to five (5) years. Davis understands and acknowledges that as to Count 2, the Court may impose a statutory maximum term of imprisonment of up to twenty (20) years. Davis understands and acknowledges that as to Count 3, the Court may impose a statutory maximum term of imprisonment of up to five (5) years. In addition to any period of imprisonment as reflected above, the Court may also impose a period of supervised release of up to three (3) years to commence at the conclusion of the period of imprisonment. In addition to a term of imprisonment and supervised release, the Court may impose a fine of up to the greater of $250,000, or twice the gross pecuniary gain or loss pursuant to 18 U.S.C. § 3571(d).

4.   Davis further understands and acknowledges that, in addition to any sentence imposed under paragraph 3 of this Agreement, a special assessment in the total amount of $300 will be imposed on Davis. Davis agrees that any special assessment imposed shall be paid immediately after sentencing.

5.   Davis further understands and acknowledges that he (a) shall truthfully and completely disclose all information with respect to the activities of himself and others concerning all matters about which the United States inquires of him, which information can be used for any purpose; (b) shall cooperate fully with the United States and any other law enforcement agency designated by the United States; (c) shall attend all meetings at which the United States requests his presence; (d) shall provide to the United States, upon request, any document, record, or other

1051

tangible evidence relating to matters about which the United States or any designated law enforcement agency inquires of him; (e) shall truthfully testify before the grand jury and at any trial and other court proceeding with respect to any matters about which the United States may request his testimony; (f) shall bring to the attention of the United States all crimes which he has committed, and all administrative, civil, or criminal proceedings, investigations, or prosecutions in which he has been or is a subject, target, party, or witness; and, (g) shall commit no further crimes whatsoever. Moreover, any assistance Davis may provide to federal criminal investigators shall be pursuant to the specific instructions and control of the United States and designated investigators. In carrying out his obligations under this paragraph, Davis shall neither minimize his own involvement nor fabricate, minimize or exaggerate the involvement of others.

6.      Davis shall provide, when requested, the Probation Department and counsel for the United States with a full, complete and accurate personal financial statement listing all assets under his direct or indirect control, including any assets he may have transferred or placed in the control of others within the 10 year period prior to execution of this Agreement. If Davis provides incomplete or untruthful statements in his personal financial statement, his action shall be deemed a material breach of this Agreement and the United States shall be free to pursue all appropriate charges against him notwithstanding any agreements to forbear from bringing additional charges otherwise set forth in this Agreement.

7.      Provided that Davis commits no new criminal offenses and provided he continues to demonstrate an affirmative recognition and affirmative acceptance of personal responsibility for his criminal conduct, the United States agrees that it will recommend at sentencing that Davis receive a three-level reduction for acceptance of responsibility pursuant to Section 3E1.1 of the Sentencing Guidelines, based upon Davis' recognition and affirmative and timely acceptance of personal responsibility. The United States, however, will not be required to make this sentencing recommendation if Davis: (1) fails or refuses to timely enter his guilty plea and to make a full, accurate and complete disclosure to the United States and the Probation Department of the circumstances surrounding the relevant offense conduct and his present financial condition; (2) is found to have misrepresented facts to the United States prior to entering this Agreement; or (3) commits any misconduct after entering into this Agreement, including but not limited to committing a state or federal offense, violating any term of release, or making false statements or misrepresentations to any governmental entity or official.

8.      The United States reserves the right to inform the Court and the Probation Department of all facts pertinent to the sentencing process, including all relevant information concerning the offenses committed, whether charged or not, as well as concerning Davis and Davis' background. Subject only to the express terms of any agreed-upon sentencing recommendations contained in this Agreement, the United States further reserves the right to make any recommendation as to the quality and quantity of punishment.

9.      The United States reserves the right to evaluate the nature and extent of Davis' cooperation and to make Davis' cooperation, or lack thereof, known to the Court at the time of

sentencing. If, in the sole and unreviewable judgment of the United States, Davis' cooperation is of such quality and significance to the investigation or prosecution of other criminal matters as to warrant the Court's downward departure from the sentence required by the Sentencing Guidelines, the United States may, at or before sentencing make, a motion pursuant to Title18, United States Code, Section 3553(e), Section 5K1.1 of the Sentencing Guidelines, or subsequent to sentencing by motion pursuant to Rule 35 of the Federal Rules of Criminal Procedure, reflecting that Davis has provided substantial assistance and recommending a sentence reduction. Davis acknowledges and agrees, however, that nothing in this Agreement may be construed to require the United States to file such a motion and that the United States' assessment of the nature, value, truthfulness, completeness, and accuracy of Davis' cooperation shall be binding on Davis.

10.    Davis understands and acknowledges that the Court is under no obligation to grant a motion by the United States pursuant to Title 18, United States Code, Section 3553(e), 5K1.1 of the Sentencing Guidelines or Rule 35 of the Federal Rules of Criminal Procedure, as referred to in paragraph 9 of this Agreement, should the United States exercise its discretion to file such a motion.

11.    Davis admits and acknowledges that the following facts are true and that the United States could prove them at trial beyond a reasonable doubt:

    a.    That Davis' participation in the conspiracy and scheme and artifice resulted in a loss of more than $400,000,000;
    b.    That Davis' offense involved more than two-hundred fifty (250) victims;
    c.    That a substantial part of Davis' fraudulent scheme was committed from outside the United States and otherwise involved sophisticated means;
    d.    That Davis' offense affected the safety and soundness of a financial institution and endangered the solvency or financial security of 100 or more victims; and
    e.    That Davis abused a position of trust as Chief Financial Officer of Stanford Group, Inc., and Stanford International Bank, Ltd.

12.    Based on the foregoing, the United States and Davis agree that although not binding on the Probation Department or the Court, the applicable Sentencing Guidelines adjusted offense level is as follows:

| | | |
|---|---|---|
| a. | Section 2B1.1(a) - Base offense level for wire fraud offense | 7 |
| b. | Section 2B1.1(b)(1)(K) - Loss of more than $400,000,000 | 30 |
| c. | Section 2B1.1(b)(2)(B) - More than 250 victims | 6 |
| d. | Section 2B1.1(b)(9)(C) & (D)- Substantial part of scheme committed outside the United States and otherwise used sophisticated means | 2 |
| e. | Section 2B1.1(b)(14)(B) - Affecting safety and soundness | |

4

|   |   |   |
|---|---|---|
| | of a financial institution and endangering the solvency or financial security of 100 or more victims | 4 |
| f. | Section 3B1.3 - Abuse of position of trust | 2 |
| g. | Section 2B1.1(b)(14)(C) - Combination of enhancement for more than 250 victims (+6) and enhancement for safety and soundness of a financial institution and endangering the solvency or financial security of 100 or more victims (+4) equals 10, therefore reduced to 8 | -2 |
| h. | Sections 3E1.1(a) and 3E1.1(b) Acceptance of Responsibility (if applicable) | -3 |

TOTAL OFFENSE LEVEL - ADJUSTED                    <u>46</u>

13.      Davis agrees to forfeiture of all property, real or personal, which constitutes or is derived from proceeds traceable to the violations of 18 U.S.C. § 371 (conspiracy to commit wire and mail fraud) and 18 U.S.C. § 1343 (wire fraud).  Davis agrees that all such property is subject to criminal forfeiture pursuant to 28 U.S.C. § 2461(c) (incorporating 18 U.S.C. § 981(a)(1)(C)), as property constituting, or derived from, proceeds obtained, directly or indirectly, as the result of the conspiracy (Count 1) and mail fraud scheme (Count 2).  In order to effectuate the forfeiture, Davis agrees to the entry of a Consent Order of Forfeiture, in the form of a money judgment, of $1,000,000,000.00 (one billion dollars).  Davis acknowledges that the money judgment is subject to forfeiture as proceeds of illegal conduct or substitute assets for property otherwise subject to forfeiture.

14.      Davis also agrees that he shall assist the United States in all proceedings, whether administrative or judicial, involving the forfeiture to the United States of all rights, title, and interest, regardless of their nature or form, in the assets which Davis has agreed to forfeit, and any other assets, including real and personal property, cash and other monetary instruments, wherever located, which Davis or others to his knowledge have accumulated as a result of illegal activities. Such assistance shall include Davis' consent to the entry of any order deemed by the United States as necessary to effectuate said forfeitures.  In addition, Davis agrees to identify as being subject to forfeiture and/or restitution all such assets, and to assist in the transfer of such property to the United States by delivering to the United States upon the United States' request, all necessary and appropriate documentation with respect to said assets, including consents to forfeiture, quit claim deeds and any and all other documents necessary to deliver good and marketable title to said property.  To the extent the assets are no longer within the possession and control or name of Davis, Davis agrees that the United States may seek substitute assets within the meaning of 21 U.S.C. § 853.  Davis further agrees to assist the United States in recovering all victim assets, wherever located, including but not limited to, executing requests for repatriation of said assets, wherever located, and facilitating the entry of court orders or treaty requests regarding said assets, wherever located. Davis further agrees not to alienate, transfer or encumber any asset over which he has direct or indirect control unless otherwise agreed to by the United

1054

States or permitted by order of the Court. Failure to comply with the terms of this paragraph will constitute a material breach of this agreement.

15.     Davis knowingly and voluntarily agrees to waive any claim or defenses he may have under the Eighth Amendment to the United States Constitution, including any claim of excessive fine or penalty with respect to the forfeited assets or victim restitution. Davis further knowingly and voluntarily waives his right to a jury trial on the forfeiture of said assets, waives any statute of limitations with respect to the forfeiture of said assets, and waives any notice of forfeiture proceedings, whether administrative or judicial, against the forfeited assets. Davis waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. Davis acknowledges that he understands that the forfeiture of assets is part of the sentence that may be imposed in this case and waives any failure by the court to advise him of this, pursuant to Rule 11(b)(1)(J), at the time his guilty plea is accepted.

16.     Davis acknowledges that because the offenses of conviction occurred after April 24, 1996, restitution is mandatory without regard to the Davis' ability to pay and that the Court must order Davis to pay restitution for the full loss caused by his criminal conduct pursuant to Title 18, United States Code, Section 3663A, provided, however, that the United States agrees that the value of any property returned to victims through the forfeiture and remission process shall be credited against any order of restitution due to victims.

17.     Davis is aware that the sentence has not yet been determined by the Court. Davis is also aware that any estimate of the probable sentencing range or sentence that Davis may receive, whether that estimate comes from Davis' attorney, the United States, or the Probation Department, is a prediction, not a promise, and is not binding on the United States, the Probation Department or the Court. Davis further understands that any recommendation that the United States makes to the Court as to sentencing, whether pursuant to this Agreement or otherwise, is not binding on the Court and the Court may disregard the recommendation in its entirety. Davis understands and acknowledges, as previously acknowledged in paragraph 2 above, that Davis may not withdraw his plea based upon the Court's decision not to accept a sentencing recommendation made by Davis, the United States, or a recommendation made jointly by both Davis and the United States.

18.     Davis is aware that Title 18, United States Code, Section 3742 affords Davis the right to appeal the sentence imposed in this case. Acknowledging this, in exchange for the undertakings made by the United States in this Agreement, Davis hereby waives all rights conferred by Section 3742 to appeal any sentence imposed, including any forfeiture or restitution ordered, or to appeal the manner in which the sentence was imposed, unless the sentence exceeds the maximum permitted by statute. Davis further understands that nothing in this Agreement shall affect the right of the United States and/or its duty to appeal as set forth in Title 18, United States Code, Section 3742(b). If the United States appeals Davis' sentence pursuant to Section

1055

3742(b), however, Davis shall be released from this waiver of appellate rights.  By executing this Agreement, Davis acknowledges that he has discussed the appeal waiver set forth in this Agreement with his attorney.  Davis further agrees, together with the United States, to request that the district Court enter a specific finding that the Davis' waiver of his right to appeal the sentence to be imposed in this case was knowing and voluntary.

19.    Davis acknowledges that he has accepted this Agreement and decided to plead guilty because he is in fact guilty.  By entering this plea of guilty, the defendant waives any and all right to withdraw his plea or to attack his conviction, either on direct appeal or collaterally, on the ground that the Government has failed to produce any discovery material, *Jencks* Act material, exculpatory material pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), other than information establishing the factual innocence of the defendant, and impeachment material pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), that has not already been produced as of the date of the signing of this Agreement.

20.    For purposes of criminal prosecution, this Agreement shall be binding and enforceable upon the Fraud Section of the Criminal Division of the United States Department of Justice and the United States Attorney's Office for the Southern District of Texas.  The United States does not release Davis from any claims under Title 26, United States Code.  Further, this Agreement in no way limits, binds, or otherwise affects the rights, powers or duties of any state or local law enforcement agency or any administrative or regulatory authority.

21.    In the event that Davis does not plead guilty or if Davis breaches this Agreement by failing to comply with any terms hereto, Davis agrees and understands that he thereby waives any protection afforded by Section 1B1.8(a) of the Sentencing Guidelines and Rule 11(f) of the Federal Rules of Criminal Procedure, and that any statements made by him as part of his cooperation with the United States, or otherwise, both prior or subsequent to signing this Agreement, will be admissible against him without any limitation in any civil or criminal proceeding and Davis shall assert no claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, or any other federal rule that such statements or any leads therefrom should be suppressed.  By entering into this Agreement, Davis intends to waive all rights in the foregoing respects.

22.    This Agreement is the entire agreement and understanding between the United States and Davis.  There are no other agreements, promises, representations or understandings.

Respectfully submitted,

STEVEN A. TYRRELL, CHIEF
U.S. DEPARTMENT OF JUSTICE
CRIMINAL DIVISION, FRAUD SECTION

By: _____

PAUL E. PELLETIER, Principal Deputy Chief
U.S. DEPARTMENT OF JUSTICE
CRIMINAL DIVISION, FRAUD SECTION


TIMOTHY JOHNSON
ACTING UNITED STATES ATTORNEY

By: _____

GREGG COSTA
ASSISTANT UNITED STATES ATTORNEY


_____

JAMES DAVIS
DEFENDANT
Date: _____


_____

DAVID FINN
COUNSEL FOR JAMES DAVIS
Date: _____

8

# KVT-25

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK, LTD., ET AL. | § § § § | |
| Plaintiff, | § § | Case No. 03:09-CV-0724-N |
| v. | § § | |
| JAMES R. ALGUIRE, ET AL. | § § | |
| Defendants. | § § | |

---

**DECLARATION OF**
**KARYL VAN TASSEL**

---

I, Karyl Van Tassel of 1001 Fannin, Suite 1400, Houston, TX 77002 state on oath as follows:

### EXPERIENCE, EXPERTISE, WORK IN THIS CASE

1.     A copy of my resume is attached as exhibit **KVT-1**.  It summarizes my education and relevant work experience.  As it states, I am a Certified Public Accountant in the State of Texas, USA, and a Senior Managing Director of FTI Consulting, Inc.  I have 25 years of experience providing a variety of audit, accounting, tax, litigation, valuation and other financial advisory services.  I have performed detailed financial analyses for a variety of litigation matters, including securities, intellectual property, breach of contract, antitrust, lender liability, fraud and wrongful terminations.  In the litigation context, I have acted as an

expert on a variety of economic damage claims and forensic accounting issues. In several cases alleging fraud and other wrongdoing, I have traced funds for potential recovery. I have also been retained by audit committees to assist in investigating allegations of accounting and financial improprieties.

2.     The statements made in this declaration are true and correct based on the knowledge I have gained from the many documents I have reviewed and other work I and my team have performed in the course of FTI's investigation on behalf of the Receiver.

3.     I use the following acronyms or short-hand terms to refer to certain entities in this declaration:

- Stanford Entities     all legal entities owned, directly or indirectly, by the named Defendants in the SEC action as of the date the U.S. Receivership was instituted.

- SIB     Stanford International Bank, Limited.

- STCL     Stanford Trust Company Limited, an Antigua trust company.

- SFG     Stanford Financial Group, the name given to Allen Stanford's "global network of financial companies."

- SFGC -- Stanford Financial Group Company, which provided shared services, including Treasury and Investment services, to SIB and other companies within SFG.

- SGC     Stanford Group Company, a U.S. broker-dealer entity incorporated in Texas.

### SEC ACTION AND FTI'S INVESTIGATION

4.     On February 16, 2009, the United States District Court for the Northern District of Texas appointed Ralph S. Janvey the Receiver for SIB and the rest of the Stanford Entities. On the same day, the Receiver retained FTI to perform a variety of services, including assisting in the capture and safeguarding of electronic accounting and other records

of the Stanford Entities and forensic accounting analyses of those records, including cash tracing.  I oversee, and am personally involved in, FTI's forensic accounting and cash tracing activities.  The purposes of FTI's work have been, in part, to (a) determine the roles that the various Stanford Entities played in the fraud alleged by the SEC and specifically in the sale and redemption of SIB certificates of deposit ("CDs"); (b) identify the source(s) of income and cash flows of the various Stanford Entities; (c) trace funds to determine how they were allocated and disbursed throughout the Stanford Entities; and (d) review the circumstances relating to the sale of SIB CDs.

5.      As part of our work, we have interviewed numerous present and former Stanford Entity employees.  These include, but are not limited to, the persons whose names (as well as employer, title, and supervisor) are listed in exhibit **KVT-2**.  In addition, we have examined the available accounting and other records (including email files of certain former Stanford employees) relating to the Stanford Entities located in and/or gathered from Houston, Texas; Tupelo, Mississippi; Baldwyn, Mississippi; Memphis, Tennessee; Miami, Florida; St. Croix, United States Virgin Islands; Antigua; Barbuda; and other Stanford locations within and outside the U.S.  We have also reviewed extensive SIB customer records, including but not limited to paper and electronic records documenting SIB CD purchases, interest payments and redemptions.

6.      FTI has also obtained and analyzed paper and electronic files from third-party financial institutions where bank accounts of various Stanford Entities are or were located. These financial institutions include Toronto Dominion Bank in Canada, Trustmark National Bank and the Bank of Houston.  In addition, FTI has gathered and reviewed electronic and other data from Pershing, LLC and JP Morgan Clearing Corp., both of which have held or

currently hold SGC customer and former employee accounts, and SEI, which held STC accounts.

7.     FTI's analyses of the records of SIB and other Stanford Entities were conducted using reliable practices and methodologies that are standard in the fields of accounting and finance.  The findings and conclusions set forth herein are based on these analyses.

### SIB WAS A PONZI SCHEME

8.     The SEC alleges in its Second Amended Complaint in Case No. 03-CV-0298-N that the Stanford Entities constitute "a massive Ponzi scheme" involving "misappropriate[ion of] billions of dollars of investor funds."  Likewise, James Davis, Chief Financial Officer for both SIB (according to SIB's published financial statements) and SFGC and a long-time business associate and confidant of Allen Stanford, has pled guilty to charges that he conspired with Allen Stanford and others in running a Ponzi scheme in violation of federal securities laws.  In connection with his guilty plea, Davis admitted that SIB was a "massive Ponzi scheme whereby CD redemptions ultimately could only be accomplished with new infusions of investor funds."  As explained in more detail below, my findings are consistent with the SEC's allegations and Davis's admission.  SIB was insolvent (*i.e.*, its liabilities exceeded its assets) from at least 2004 and probably for much longer, yet it continued selling CDs to the end.  It induced investors to buy CDs by offering substantially above-market rates, issuing financial statements and other data that significantly overstated its earnings and assets, and misrepresenting its business model, investment strategy, financial strength, the safety and nature of its investments and other facts important to investors.  SIB incentivized Stanford-affiliated financial advisors to convince their clients to purchase SIB

CDs over other kinds of investments by paying the financial advisors above-market commissions and other compensation tied to CD sales.  SIB's actual (as opposed to reported) earnings and assets, however, were insufficient to meet its CD payment obligations.  SIB could only keep the scheme going by selling yet more CDs and using the proceeds to pay redemptions, interest and operating expenses. Significant sums were also diverted to finance Allen Stanford's opulent life style of yachts, jet planes, travel, multiple homes, company credit cards, *etc.*  Davis, Holt and other insiders were paid handsomely for their complicity.

9.      Allen Stanford was sole owner, directly or indirectly, of more than 130 separate entities, including SIB and STC.  These entities comprised a single commonly-owned financial services network called the "Stanford Financial Group," which was headquartered in Houston.

10.      Stanford, along with a close band of confidantes, controlled SFG (of which SIB was a part).  These confidants included Jim Davis, CFO of both SFGC and SIB, and Laura Pendergest Holt, Chief Investment Officer for SFGC.

11.      SIB was nothing like a typical commercial bank.  It did not offer checking accounts and did not make loans (other than to CD investors up to 80% of their CD balance).  It had one principal product line  certificates of deposit  and one principal source of funds  customer deposits from CD purchases.  The terms of some SIB CDs permitted partial redemptions before maturity upon customer demand.

12.      SIB offered CD rates that were significantly greater than those offered in the United States.  A SIB 2007 marketing brochure (attached as exhibit **KVT-3**) tracks SIB's historic CD yield against average US CD yields.  SIB's yield ranged from a high of 388% of the US yield in 2002 to a low of 140% of the US yield in 2006.  According to the brochure,

SIB was able to pay high CD rates by investing in "a well-diversified portfolio of highly marketable securities issued by stable governments, strong multinational companies and major international banks."  As a result, the brochure continues, "[SIB] has been consistently profitable since inception."  In other words, SIB purported to function like a hedge fund but, unlike a hedge fund, its customers were guaranteed (by SIB) a specified return regardless of the fund's performance.  SIB's reported returns were remarkably steady, fluctuating from only 11.7% to 14.9% between 1997 and 2007.  SIB showed a profit in good times and in bad.  The one exception was the second half of 2008, when financial sector businesses across the globe were struggling for survival and many feared we were on the brink of financial collapse.  Even then, SIB's accounting records reflected positive investment earnings, but a small overall loss--just 2% of total (purported) financial assets--after deductions for CD interest and other expenses.  What to some appeared to be too good to be true was indeed untrue.  As Stanford himself said at an October 2008 financial advisor conference: "We're about, as of early October, down about four percent, I guess. . . . I'm not happy with that [but] in this market I guess it's astounding."

13.     The most significant numbers on SIB's financial statements--revenues and asset values--were fictitious.  Davis states in his plea agreement that assets were inflated to offset CD obligations and that revenues were "reverse-engineered" to arrive at desired levels.  My findings are consistent with those admissions.

14.     We found within SIB's accounting records worksheets used to derive fictitious SIB revenues back to 2004.  The Ponzi scheme conspirators would simply determine what level of revenues SIB needed to report in order to both look good to investors and regulators and to purport to cover CD obligations and other expenses.  They would then back into that

total amount by assigning equally fictitious revenue amounts to each category (equity, fixed income, precious metals, alternative) of a fictitious investment allocation.

15. The returns were fictitious, and they were based on fictitious asset totals.

(a) SIB's records reflected that, as of December 31, 2008, it held $8.3 billion in "financial assets" -- presumably actively traded securities and metals, as SIB represented to the public. The reality was much different. As of the end of 2008, SIB held less than $500 million in securities, or less than 7% of the total CD obligations.

(b) FTI also discovered that $3.174 billion of SIB's claimed 2008 assets consisted of two real estate holding entities that had been purchased that same year for only $63.5 million and whose only assets were tracts of undeveloped Antiguan real estate. The value of those assets was inflated 50 times the purchase price through a series of paper transactions involving other Stanford-owned entities. These repetitive flips had no apparent economic substance and appear to have been engaged in solely to grossly overstate the value of the assets so as to prop up SIB's balance sheet.

(c) FTI found that another $1.8 billion in SIB assets consisted of notes receivable from Allen Stanford. To my knowledge, however, Stanford had no significant assets apart from the various Stanford Entities, which collectively owed billions of dollars more than they had in assets.

(d) Other assets were similarly overstated. Private equity investments, for example, were recorded on SIB's books at amounts that the Receiver's subsequent sales efforts have revealed to be many times greater than their

realizable value.  These were valued at $1.2 billion as of June 30, 2008, but it is expected that the Receivership may realize as little as $25 million from such assets.

(e)     Moreover, the fact that many of SIB's assets consisted of real estate, unsecured notes from Allen Stanford, and private equity investments was contrary to SIB's assurances to customers that its investments consisted of "highly marketable securities issued by stable governments, strong multinational companies and major international banks" so as to "maintain[] the highest degree of liquidity."  See KVT-3 at 3.

16.     Misinformation regarding SIB's financial strength, profitability, capitalization, investment strategy, investment allocation, the value of its investment portfolio, and other matters, was regularly disseminated from Stanford, Davis, Holt and others working under them to Stanford financial advisors, for use in inducing potential investors to purchase SIB CDs.

17.     SIB CDs were marketed through financial advisors employed by other Stanford-owned entities.  The financial advisors were heavily incentivized by above-market commissions and bonuses to steer their clients to SIB CDs rather than other investments.

18.     At the inception of the U.S. Receivership on February 16, 2009, SIB's total obligation to CD holders was approximately $7.2 billion (U.S.), versus reported investments valued at $8.3 billion as of December 31, 2008.  Based on my analysis, the market value of all assets for all Stanford Entities (including SIB) combined total less than $1 billion.  At the time SIB was placed into receivership, SIB was insolvent (*i.e.*, its liabilities exceeded its assets) by more than $6 billion.

19.     Through analysis of SIB's financial records, FTI has determined that SIB was insolvent by at least 2004 and very likely before then.  SIB's reported assets consisted overwhelmingly of "financial assets" and cash.  The published balance sheets represented that "financial assets" were reported at "fair value."  Of course, cash, by definition, is stated at fair value (assuming correct reporting).  We know, however, from our investigation and review of internal SIB records, that each year, from 2004 forward, SIB's reported asset totals included, without disclosure to the public, notes receivable from Allen Stanford and certain assets with clearly inflated values.  When these amounts are deducted from the asset totals contained in SIB's published financial statements, it is apparent that, from at least 2004, SIB's liabilities exceeded its assets.  The inflated assets that I refer to were certain private equity stakes initially held by other Stanford Entities (although likely purchased with SIB CD proceeds).  These interests were transferred to Allen Stanford, and then from Stanford to SIB, which recorded them on its books at much inflated values with no apparent economic gain having been achieved.  These transfers appear to have been booked for the purpose of giving SIB the false appearance of financial strength.  Assets other than private equity were also fictitious or overvalued, as we saw in our analysis of 2008 data.  Certainly, persons engaged in perpetuating a Ponzi scheme would have had no incentive to understate asset values; and, as we have seen, Stanford and his cohorts had a pattern of overstating asset values, ostensibly to induce more people to purchase "safe" SIB CDs.

20.     Through an analysis of cash flows for the period January 1, 2008 through February 17, 2009, we have verified that proceeds of CD sales were used to make purported interest and redemption payments on existing CDs.  That just confirmed what we knew had to be true anyway, as SIB's assets, reserves and investments were insufficient to fund its

redemption and interest payments.  SIB's CD transaction records indicate that approximately $2 billion was paid to investors for principal and interest from January 1, 2008 through February 17, 2009.  SIB's principal income-generating assets, which were managed in what was known as "Tier 2", never totaled more than $1 billion, even when the stock market was at a high and the economy was strong.  By the end of 2008, "Tier 2" had declined to less than $500 million, due to a combination of increasing redemptions and liquidations and falling market values.  Even if SIB had fully liquidated all investments in its portfolio, it would not have realized enough cash flow to cover just the redemptions in 2008 without the influx of new CD purchase money.  And in fact, when the market declined, we know that it took only 4 months for liquid assets to substantially deplete, even though $7.2 billion in CD obligations remained.  As a result of this decline, all actual gains earned since 2003 were lost.  Thus, although the SIB CD portfolio contained some legitimate investments, the earnings from those investments were negligible in comparison to and could not reasonably have been expected to cover SIB's total obligations to the CD holders.

21.     SIB necessarily used current CD proceeds to pay existing CD investors in previous years too.  Although SIB received some earnings on investments, those amounts were miniscule compared to its cash flow obligations.

22.     Based on FTI's analysis to date, I have concluded that from at least 2004 (and likely for much longer), SIB relied on proceeds from the sale of new CDs to make purported interest and principal payments to existing CD investors.  This is especially evident from the fact that, when CD sales faltered in 2008, SIB was immediately forced to sell off most of its assets that were readily available for liquidation just to maintain payments for a short time. By using the proceeds of new CD sales to pay interest and redemptions to existing CD

holders, Stanford, Davis and their cohorts concealed their fraud and perpetuated the Ponzi scheme.

23.     CD sales proceeds not used to pay interest, redemptions, and current operating expenses (including commissions and other incentive payments to financial advisors) were either placed in speculative investments (many of them, such as real estate and private equity deals, illiquid), diverted to other Stanford Entities "on behalf of shareholder" (*i.e.*, for the benefit of Allen Stanford) or used to finance Allen Stanford's lavish lifestyle (*e.g.*, jet planes, a yacht, other pleasure craft, luxury cars, homes, travel, company credit card, *etc.*).

24.     A tipping point was reached in October 2008:  That month and every month thereafter, incoming funds from new investors were insufficient to offset outgoing payments to existing investors.  Continuing CD sales could no longer cover purported redemptions, interest payments and normal operating expenses.  This cash flow crisis caused a rapid depletion of liquid assets, which were inadequate to begin with to cover SIB's CD obligations.  By the time the U.S. Receivership was instituted, SIB had already suspended redemptions for certain investors and many Stanford Entities had stopped paying many obligations.  For example, SIB received negative publicity concerning its failure, in early February 2009, to fund a $28 million commitment to a Florida communications company named Elandia International Inc.

25.     Notwithstanding SIB's insolvency and the rapid liquidation of its investments during 2008 and into 2009, CD sales continued until February 16, 2009, when the SEC and the U.S. Court intervened.  These CD purchases were too small, however, to continue to cover for the lack of assets owned by SIB.

### WITHOUT CD PROCEEDS, STANFORD GROUP COMPANY WAS INSOLVENT

26.     SGC was another Stanford Entity, which operated as a U.S. broker dealer.  Its financial advisors sold thousands of SIB CDs.  SGC received commissions, or referral fees, for these sales.  SGC also performed "portfolio management"[1] and other services for SIB relating to the CD investment portfolio and for which it received fees from SIB.

27.     Without income related to SIB CDs, SGC would have been insolvent from at least 2004 forward (and likely before).  Referral fees and other CD related compensation paid by SIB to SGC constituted 71.65% of SGC's revenue for 2004, 63.62% for 2005, 65.01% for 2006, 50.8% for 2007 and 52.83% for 2008.  Even when this CD related compensation from SIB is considered along with other income received by SGC in the ordinary course of business, SGC showed negative cash flows from operations of $7,674,855 in 2004, $18,029,885 in 2005, $46,054,375 in 2006, $6,616,444 in 2007 and $35,102,135 as of November 30, 2008.[2]

28.     The only reason SGC's financial statements did not reflect negative cash flows between 2004 and 2008 is because SGC received millions of dollars in capital contributions from other Stanford Entities.  SGC received $10,000,000 in capital contributions in 2004, $21,000,000 in 2005, $51,500,000 in 2006, $41,750,000 in 2007 and $51,000,000 in 2008.  A chart detailing SGC's CD related compensation and capital contributions between 2004 and 2008 is attached hereto as exhibit **KVT-4.**  Capital contributions to SGC consisted primarily of SIB CD sale proceeds.

---

[1]     The portfolio at issue comprised the overvalued private equity assets of SIB.

[2]     The sources of this data are audited SGC statements, except for the 2008 figure, which comes from unaudited financial statements.

### THE STANFORD FINANCIAL ADVISORS IGNORED MULTIPLE WARNING SIGNS ABOUT THE FRAUDULENT NATURE OF THE SIB CD PROGRAM

29.     Based on FTI's investigation regarding the Stanford Ponzi scheme and the facts and circumstances leading up to its collapse in late 2008 and early 2009, there were a number of "warning signs" or "red flags" that should have prompted significant concerns and investigation by the financial advisors who sold SIB CDs regarding the nature and validity of the CDs and the underlying investment portfolio.  In light of these warning signs and red flags, and considering the FINRA rule requiring financial advisors to have "reasonable grounds for believing that [an investment] recommendation is suitable for [the] customer . . ." (FINRA Conduct Rule 2310(a)), the Stanford financial advisors should have become concerned and should have adequately investigated the CDs before selling them to SGC customers.

*SIB Was An International Bank in Antigua*

30.     The fact that the SIB CDs were being sold by an international bank in Antigua, alone, should have caused the Stanford financial advisors to perform further investigation regarding the CDs.  Because SIB was an international bank, the financial advisors would have known that there was no FDIC insurance coverage for the CDs or any other similar insurance protection.  That is one of the well known risks of investing with international banks.  Moreover, Antigua, a country with a population today of approximately 85,000 people, is well known in the United States for its lack of adequate regulation of the financial services sector.  In fact, there are only three bank examiners in the Financial Services Regulatory Commission of Antigua who are responsible for all of the banks in Antigua.  The entire country's gross domestic product for 2009 was $1.55 billion and its 2009 annual expenditures were $293 million (which put the country at a deficit), both amounts being small fractions of the value of

assets claimed to be deposited with SIB in Antigua during that same time period.  (*See* https://www.cia.gov/library/publications/the-world-factbook/geos/ac.html.)  Had the financial advisors reviewed similar publicly available information for prior to 2009, they would have found that the GDP and annual budget for Antigua were comparable.  It is not surprising that a government with such a lack of resources was unable to adequately oversee SIB along with the many other banks operating on the island, and the Stanford financial advisors faced with the same information should have investigated further regarding the adequacy of the oversight of SIB and the validity of the CD program.

*SIB's Investment Returns Were Too Good To Be True*

31.     The high rates of return and consistent profitability of the SIB CD portfolio that were reported by SIB, at a time when the world economy was in crisis, likewise should have prompted the Stanford financial advisors to investigate exactly how the SIB CD portfolio was invested and how it could achieve such results.  The historical performance of SIB's CDs is extraordinary, to say the least.  SIB offered CD rates that were significantly greater than those offered in the United States.  In its own marketing brochure, SIB included the following comparison in the yields of SIB CDs versus average U.S. Bank CD yields between 1997 and 2006:

|  | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|---|---|---|
| SIB Yield (%) | 10.13 | 9.25 | 8.71 | 9.625 | 9.13 | 7.17 | 6.38 | 6.21 | 6.52 | 7.13 |
| U.S. Yield (%) | 5.8 | 5.3 | 4.9 | 5.85 | 3.55 | 1.85 | 1.78 | 2.7 | 4.46 | 5.08 |

As mentioned above, at their worst, SIB CDs had a rate of return 140% greater and at their best 388% greater than the average rate for U.S. Bank CDs.  Even more incredible were the overall rates of return earned by the SIB CD investment portfolio between 1997 and 2007 --

*i.e.* the total amount earned by SIB, not just the amount paid to investors. Specifically, according to internal company documents, the investment portfolio had a 14.9% overall rate of return in 1997, 14.8% in 1998, 14.2% in 1999, 14.1% in 2000, 14.3% in 2001, 14% in 2002, 11.7% in 2003, 11.9% in 2004, 12.1% in 2005, 12% in 2006 and 12.7% in 2007. *See* SIB Return Chart, Ex. 18, Appx. 223-28.[3] These internal documents were part of the training materials used to train SGC financial advisors.

32. A comparison of SIB's claimed overall rate of return on its CD investment portfolio to well known index rates of return during the same years further highlights the disparity in performance between the SIB CD portfolio and the world financial markets in general. Over the years, the performance of the SIB CD portfolio often exceeded many of the well-known index rates of return. Even when it did not, however, the returns for SIB were remarkably consistent and steady from year to year, a result that is extremely rare in normal market conditions and even more so during the time period in question. The below chart shows the major index returns for the years 1997 through 2007 as well as the amounts allegedly earned by SIB during those years, all as reflected in SIB's own documents that were provided to SGC financial advisors:

|  | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| SIB Yield (%) | 14.9 | 14.8 | 14.2 | 14.1 | 14.3 | 14 | 11.7 | 11.9 | 12.1 | 12 | 12.7 |
| Dow Jones Return | 22.64 | 16.10 | 25.22 | -6.18 | -7.10 | -16.76 | 25.32 | 3.15 | -0.61 | 16.29 | 6.43 |
| Dow Jones Stoxx 50 | 36.84 | 32.00 | 46.74 | -2.69 | -20.25 | -37.30 | 15.68 | 6.90 | 21.28 | 15.12 | 6.79 |

---

[3] Exhibit and appendix references herein, unless otherwise stated, are to exhibits and the appendix to the Receiver's Application for Temporary Restraining Order, Preliminary Injunction, and in the Alternative, Writ of Attachment, Concerning Accounts of Former Stanford Employees (Doc. 392).

| Return | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Nasdaq 100 Return | 20.63 | 85.31 | 101.95 | -36.84 | -32.65 | -37.58 | 49.12 | 10.44 | 1.49 | 6.79 | 18.67 |
| S&P 500 Return | 31.01 | 26.67 | 19.53 | -10.14 | -13.04 | -23.37 | 26.38 | 8.99 | 3.00 | 13.62 | 3.53 |

Of course, Stanford financial advisors also had ready access to this type of information publicly, and customers would have expected them to know the index rates of return.

33.   As the chart above reflects, the SIB CD returns were in excess of and/or more consistent than virtually every other stock, CD, fund or other investment to which SIB compared its CDs in its marketing materials.  The Stanford financial advisors faced with these facts at least should have investigated to ensure they had an understanding of what they were selling and the suitability of those products for their customers.

*SIB Commission Rate Structure Was Economically Unsustainable*

34.   Stanford financial advisors likewise were paid far above normal market commission rates to sell the SIB CDs, which is yet another factor that should have caused the financial advisors to investigate further, in particular regarding how SIB could afford to pay those rates.  SGC received a 3% commission (also called a "referral fee") on the initial sale of a SIB CD, and 3% annually for the life of the CD.  Financial advisors, in turn, received as much as an annual 1% commission on all amounts their customers had in CDs for that year and were eligible for commissions on the initial sale of CDs of 1% or more.  As the SEC pointed out in a September 2005 letter to Jay Comeaux as part of an SEC investigation, this commission structure would result in SGC receiving a referral fee of 15% of the amount invested on a SIB CD with a 60-month maturity, which the SEC said was more than any rate legally allowed.  *See* SEC Letter to Jay Comeaux, Ex. 11, Appx. 199-206.  SGC financial

statements, to which the Stanford financial advisors had access, referred to this letter in 2005, 2006, and 2007.  That means the financial advisor for that customer would receive 5% of the amount invested over the life of the CD.  Moreover, if the financial advisor sold over $2 million in SIB CDs in any given calendar quarter, they earned an additional 1% quarterly bonus on those sales.  By comparison, when an SGC broker sold a typical certificate of deposit issued by a U.S. bank (and insured by the FDIC), the commission to SGC was in the range of 0.05% to 0.125% of the initial amount invested, or roughly 150 times smaller than the normal commission SGC received on a SIB CD.  *See* Sales Credit Table, Ex. 19, Appx. 229.  The financial advisors of course were aware of this disparity.

35.     In addition to exceeding payments received for U.S. bank CD products, the SIB CD commission structure for financial advisors was unusual in other ways.  The financial advisors received a percentage each year of the amount their clients held in SIB CDs, regardless of whether the financial advisor sold new CDs that year.  The "trailing commission," as it was known, had the obvious impact of causing financial advisors to pressure customers into not redeeming their CDs -- *i.e.* into leaving their money with the bank.  In addition, the trailing commission was structured to incentivize financial advisors to continue selling new CDs by increasing     or decreasing     the percentage of their trailing commission depending on the volume of new CDs they sold     or did not sell     in a given year.

36.     Commission and bonus structures like that used by SIB are not typical, largely because they cannot be sustained economically -- *i.e.* the investments do not make enough to cover the stated CD rates of return, commissions and referral fees along with other applicable expenses.  Stanford financial advisors typically worked as financial advisors for other firms

before coming to Stanford and thus would have known that the SIB commission rates were unusual.  Concerns regarding whether SIB lacked the ability to pay the purported rates of return, commissions, referral fees and expenses should have caused the Stanford financial advisors to investigate the SIB CD program.

*Information Available To Financial Advisors*
*About SIB Investment Portfolio Was Inadequate*

37.     The NASD concluded as early as 2006 that SGC violated NASD rules through "unwarranted and misleading" assertions that SIB's portfolio investments were "prudent"   at a time when SGC admitted that "no one at SGC knows what the investments are."  *See* NASD Letter, Ex. 21, Appx. 231-33.  FTI's investigation confirms this conclusion.

38.     FTI's investigation has uncovered very little information available to the Stanford financial advisors about how SIB purportedly invested funds from the sale of CDs. It was commonly known throughout SGC that SIB was owned and controlled ultimately by Allen Stanford, that James Davis and Laura Pendergest-Holt had principal responsibility for the management of the SIB CD investment portfolio and that specific information regarding the investment portfolio was not readily available.

39.     On the few occasions where we have discovered that financial advisors actually inquired about SIB's investments, however, they received extremely limited and generic information, making it impossible for them to evaluate the suitability of the CDs for their customers.  They nonetheless continued to sell the SIB CDs to customers and were well paid to do so.

40.     For example, in August 2007, financial advisor Doug McDaniel wrote to Jim Davis, Laura Pendergest, and Juan Rodriguez-Tolentino: "I have only done $3,000,000 of my

clients' money (and my own) in the CD product.  I have the potential to do much more, but to do that, I would need to become even more comfortable with the product."  *See* McDaniel Email, Ex. 13, Appx. 209-12.  McDaniel attached a list of questions, noting "some of them may sound like an investigative reporter but I'd like to get as comfortable as I can with the bank."  At Davis's suggestion, McDaniel forwarded the questions to Rodriguez-Tolentino, the president of SIB, along with a  request for a phone call on the topic.  The attached questions included: "My understanding is that from 2000-2002, the Bank's portfolio returns were in the range [of 11% to 15%]. With S&P and EAFE negative for all of those years, and yet a tolerance of up to 50% equity for the bank, how was the bank's portfolio invested"; "What financial instruments and strategies are in place to guard against significant losses in the portfolio, particularly on the equity side? Does each of the managers hedge their own portfolios against loss or do you employ a separate manager to hedge the total bank portfolio."; and "There are many people involved on the investment committee of the Bank. How does this committee ensure that appropriate hedging is in place? This would seem to require some sophisticated calculations outside the expertise of most investment committees." FTI has located no evidence that Tolentino ever answered McDaniel's very basic questions. By late 2008, McDaniel nonetheless had increased his client SIB CD portfolio to over $13 million.   Between  April 2006 and February 2009, he received $134,767 in SIB CD commissions, $84,359 in SIB quarterly bonuses, and $1,314,168 in loans.

41.    In March 2008, financial advisor Robert Ulloa wrote to Jason Green with a list of similar concerns regarding SIB.  *See* Ex. 8, Appx. 190-91:  Ulloa inquired as to: "SIB's funding sources other than CDs?"; "Which banks provide liquidity funding to SGC?"; "Liquidity funding, how SGC does it?"; "SIB's Equity Investments, what percentage is

private?"; "Have we reduced/increased our exposure to financials?"; "How leveraged is Stanford, is it 30 to 1 like most investment banks?"   Although Laura Pendergest-Holt suggested addressing Ulloa's questions on an upcoming all-financial advisor call, noting "I am sure if he has these questions others will as well," FTI has located no record of what, if any, answers were provided to the group.   By late 2008, Ulloa had increased his client SIB CD portfolio to over $165 million.   Between 2005 and 2009 he received $3,585,168 in SIB CD commissions and $987,973 in SIB quarterly bonuses.

42.     Also in March 2008, financial advisors Neal Clement, John Mark Holliday and Scot Thigpen discussed SIB and how to "have a good story to tell prospective clients . . . in these difficult markets."   *See* Ex. 4, Appx. 23-27.  Thigpen noted that it was "difficult . . . to show [SIB is] able to provide positive returns even in light of horrible market conditions." Thigpen opined that "[a]ccredited investors are pretty savvy investors lots of times" and asked how one could show them the available SIB CD rates without showing them the underlying portfolio returns.   Clement responded: "If I have a client that has to see the [SIB] portfolio, the SIB is not for them!!!!!"   By 2008, Clement's client SIB CD portfolio exceeded $20 million and Holliday's exceeded $3 million.   Between April 2006 and February 2009, Clement received $270,347 in SIB CD commissions, $163,882 in SIB quarterly bonuses, and $639,506 in forgivable loans; and Holliday received $33,358 in SIB CD commissions and $597,503 in forgivable loans.

43.     Thus, the former Stanford financial advisors had insufficient information upon which to make recommendations to clients regarding the suitability of SIB CDs.  The NASD reached the same conclusion as part of a 2006 inquiry into the SIB CD program and SGC's sales practices.   Specifically, the NASD concluded that SGC had violated NASD rules

through "unwarranted and misleading" assertions that SIB's portfolio investments were "prudent" at a time when SGC admitted that "no one at SGC knows what the investments are." *See* NASD Letter, Ex. 21, Appx. 231-33. The Stanford financial advisors under these circumstances should have conducted a full investigation to determine the suitability of the investment for their customers.

*The Limited Information That Financial Advisors Did Have*
*Regarding The SIB CD Investment Portfolio*
*Should Have Caused Them To Investigate Further*

44.     Though the fact that information regarding the SIB CD investment portfolio was difficult to come by, alone, should have caused financial advisors to investigate further, the limited information they did have about the portfolio likewise should have put them on notice that the SIB CDs likely were not legitimate investment products. The representations that SIB made about its investment strategy were not consistent with the purported investment returns. Moreover, a review of SIB's financial statements shows that the SIB financial model was not sustainable without the influx of new CD money.

45.     The fact that the SIB investment portfolio was controlled by James Davis and Laura Pendergest-Holt should have been cause for concern that the portfolio was not being managed properly. It is extremely unusual for such a small number of people to manage and control a multi-billion dollar investment portfolio. Most financial institutions search for and recruit the top talent in the market to manage portfolios of that size. Davis, on the other hand, was Stanford's college roommate who had worked with Stanford since college and had no investment management experience. Likewise, Pendergest-Holt met Davis because their families were both from the same small Mississippi town. She likewise started with Stanford right out of college and had no prior investment management experience. Had the Stanford

financial advisors at least asked about Davis's and Pendergest-Holt's background, they would have found that Davis and Pendergest-Holt were not qualified to handle SIB's investments. *See* exhibits **KVT-9** at 1; **KVT-10** at 5, 12-13; and **KVT-11** at 3. At best, the kind of success Pendergest-Holt and Davis claimed to have with the SIB CD investment portfolio could have been characterized as luck, something financial advisors should not rely upon in selling investment products to their customers.

46.     The extraordinary returns provided by the SIB CDs were particularly unusual considering SIB's representations regarding its conservative investment strategy and emphasis on guaranteed returns to its CD customers. As a general rule, in order to achieve higher levels of returns, it is necessary to take on a higher level of investment risk. Here, SIB in essence claimed to buck this trend by providing consistently high returns as well as the lowest level of consumer risk. Moreover, SIB offered no substantive explanation as to how it was able to achieve these uncommon results. In its 2007 Annual Report, SIB claimed to "focus on maintaining the highest degree of liquidity as a protective factor for our depositors...[by investing] in a well-diversified portfolio of highly marketable securities issued by stable governments, strong multinational companies and major international banks." KVT-3 at 3. This is hardly an extraordinary investment strategy and indeed is one promoted by many financial institutions whose products lost money and/or were very volatile while SIB CDs were supposedly providing consistent and positive returns. At a minimum, this apparent disconnect between a conservative investment strategy and consistent and/or above-market returns should have caused the Stanford financial advisors to investigate and resolve this apparent disconnect.

47.     SIB's claimed conservative investment strategy also did not square with the information SIB made available to the public about its portfolio.  For example, in its 2007 annual report, which was available to all of the financial advisors (and the public), SIB claimed that its investment portfolio at fair value consisted of 58.6% equity, 18.6% fixed income, 15.6% alternative investments (*i.e.* hedge funds) and 7.2% precious metals.  *See* exhibit **KVT-5.**  SIB's investment allocation for the years prior, going back to at least 2004, was very similar to this.  *See* exhibits **KVT-6, 7 and 8.**  Other than the fixed income, the performance of every component of this investment allocation was volatile and subject to significant risk, particularly in the 2004 through 2007 time period.  Even fixed income has risk.  The Stanford financial advisors faced with SIB's stated investment strategy and this information regarding its investment portfolio should have inquired further to understand exactly how the portfolio was invested.

48.     By reviewing SIB's financial statements, a basic exercise that Stanford financial advisors selling SIB CDs should have performed, the financial advisors likewise would have seen that SIB's apparent assets were volatile and subject to change and that even a small drop in market performance of SIB's portfolio would have caused the total reported assets to become insufficient to pay CD obligations.  For example, in 2007 a mere drop of 4.50% of the reported financial assets would have resulted in SIB's combined cash, cash equivalents and reported financial assets being less than their outstanding purported CD obligations.  Indeed, as discussed further below, non-Stanford CPAs advising SGC customers came to these conclusions based on presumably the same or even less information than was available to the Stanford financial advisors.

49.     When financial advisors have concerns or questions about an investment product, one obvious way for them to investigate the product is to review audit reports or contact the auditor directly.  Most multi-billion dollar investment funds go through rigorous audits by large and well-known audit firms and in fact switch auditors every few years to avoid even the appearance of impropriety.  This was not the case with SIB and the financial advisors were aware of this fact.  As reported in SIB's annual statements, from SIB's inception to its closing, its auditing firm was C.A.S. Hewlett & Co., Ltd., a very small local firm in Antigua.  The Hewlett firm lacked the apparent resources, credentials, reputation, and staff to audit a multi-billion dollar investment portfolio.  SIB used this firm even though at least 2 of the Big 4 audit firms and several other international firms had a presence on the island and all of the Big 4 had locations in the Caribbean.  The Stanford financial advisors should have investigated the adequacy of SIB's auditor faced with this information.

50.     When some financial advisors tried to obtain information about or expressed concern about SIB's auditor, they were unsuccessful.  Yet, they continued to sell CDs despite these concerns.  *See, e.g.,* Email from Bill Whitaker to Jason Green dated May 22, 2008, Ex. 27, Appx. 251  ("I met with a very wealthy prospect yesterday…and his first question concerned the auditors, C.A.S. Hewlett & Co. Ltd. in Antigua…He also said that he was surprised that a $7 Billion bank did not retain a Big 4 or an International Auditor.  Please let me know who could I talk to give me a better understanding of the SIB auditors….")  FTI and the Receiver have not located a response); Email from Mark Groesbeck to Mark Kuhrt dated September 25, 2007, Ex. 28, Appx. 252.  Just before the Receiver was appointed in February 2009, one of the financial advisors, Chuck Vollmer, acknowledged that he had been a proponent of hiring a "big name audit firm" for four years.  *See* Vollmer Email, Ex. 22, Appx.

234-35.  Despite these concerns, his client CD portfolio in 2008 was over $29 million, and he earned at least $680,000 in commissions and bonuses directly tied to selling SIB CDs.

*Financial Advisors Were Aware of Negative Findings By the SEC*

51.     The Stanford financial advisors cannot credibly claim that they did not have sufficient notice of problems with SIB CDs to cause them to perform extensive additional investigation.  As the above examples of inquiries lodged by some financial advisors show, many financial advisors did have concerns, even if they ultimately failed to follow through on them.  Indeed, as early as 2002, another financial advisor, Leyla Basagoitia was fired, allegedly because of "her continued reluctance to push SIBL and its products".  *See In re Stanford Group Company and Basagoitia*, Docket No. 03-02025, 2004 WL 2191763, at *2 (N.A.S.D. Sept. 15, 2004).  In an arbitration following her termination, Basagoitia alleged that SGC was "engaged in Ponzi scheme to defraud its clients" and that the SIB CD was "risky in nature, unsuitable, and not the interest of her clients."  Had the Stanford financial advisors properly investigated, as they should have under these circumstances, they would have been led to the same inevitable conclusion or been thwarted in their efforts, which should have caused them to cease all sales of SIB CDs.

52.     Others who were not Stanford insiders raised such concerns, as the financial advisors were well aware.  For example, the SEC raised issues regarding SIB CDs and underlying investments in 2004 and 2005.  During the inquiry, the SEC observed a number of red flags and concluded that "SGC made material misstatements to investors concerning [SIB CDs and failed] to disclose material facts in connection with the sales."  *See* SEC Letter to Jay Comeaux, Ex. 11, Appx. 199-206.   In September 2005, the SEC wrote to Jay Comeaux, and related the SEC's finding that SGC's SIB CD marketing materials falsely "imply little or no

risk to the investor" and that those materials were "materially misleading as they inaccurately imply a safety of principal and the guaranteed receipt of interest of the principal."

53.     As part of the same inquiry, the SEC sent a detailed questionnaire to a number of SIB CD investors, clearly signaling concerns about the CDs, the makeup of the underlying investment portfolio, and misrepresentations that customer deposits were guaranteed or protected by insurance. *See* SEC Questionnaire, Ex. 17, Appx. 219-22. Questions included: "Did anyone tell you where Stanford was going to invest your funds in order to generate returns for CD Program Investors?"; "Did anyone tell you that funds invested in the CD Program were insured against loss?"; "Did anyone guarantee the return of your principal investment?"; and "Please describe in full what you were told, if anything, about the risk of this investment." Notice of this questionnaire was sent to *all* financial advisors in May 2005. *See* Rep Poppell Email, Ex. 20, Appx. 230.

54.     Moreover, customers contacted their FAs to express concern caused by the inquiry and financial advisors discussed those concerns internally. *See, e.g.,* Rep Poppell to Alvarado Email, Ex. 26, Appx. 250 ("Jay Comeaux phoned......his broker Doug Shaw has received a phone call from one of his clients. It seems the client has received a letter and subsequent request from the SEC regarding his respective purchase of a SIB CD from SGC. The letter is signed by Jennifer Brandt, SEC department of enforcement. I am not aware of such letter and am attempting to contact SEC to inquire. Jay is attempting to get a copy of this letter from the client."). Also in June 2005, another Baton Rouge financial advisor wrote to Hank Mills to "find out how many of your clients received a letter from the SEC and *if there were any negative repercussions*." *See* Email to Hank Mills, Ex. 23, Appx. 236 (emphasis added). In response to the questionnaire, Jay Comeaux and Mark Tidwell held an

all-hands meeting in Houston to discuss it in June 2005. *See* Tidwell Meeting Invite, Ex. 24, Appx. 237-38. The invitees to this meeting included several financial advisors, including George Arnold, Andrea Freedman, Nancy Brownlee, Susana Cisneros, Jay Comeaux, Jason LeBlanc, Trevor Ling, Manuel Malvaez, Donald Miller, Spencer Murchison, Lupe Northam, Tony Perez, Lou Perry, Sumeet Rai, Doug Shaw, Brent Simmons, Christopher Thomas, Al Trullenque, and David Whittemore. These financial advisors have accounts currently frozen by the Court's orders in the aggregate amount of $7.3 million, representing nearly a third of the value of all former employee held accounts.

55. The Stanford financial advisors who had knowledge of an inquiry by the SEC that questioned the SIB CD they were selling should have ceased selling the products until they were satisfied that the SEC's concerns were unfounded.

*Financial Advisors Were Aware of Customer Concerns*

56. SIB customers were also raising concerns with their financial advisors that should have prompted further investigation. In early 2007, a prospective SIB client produced an analysis and criticism of the SIB CD product and sent it to his financial advisor, Tim Vanderver. *See* Billy Hall SIB CD Analysis, Ex. 9, Appx. 192-94. The analysis essentially concluded that SIB was a Ponzi scheme SIB was "susceptible to a dependence on new deposits and renewed certificates in order to continue paying investors the guaranteed CD interest and the principal of maturing CDs" because only a small drop in the equities markets would likely render its assets insufficient to meet its liabilities; and further that SIB's liabilities were already close to equaling or exceeding its assets.

57. The Hall memo was circulated to multiple Stanford employees. In addition to in-house counsel Glen Rigby, at least the following other employees received a copy of the

analysis: Maggie Schiffer; JC Bradham; Jason Green; Suzanne Hamm; Bernerd Young; and Lori Guyton. Indeed, one of the financial advisors who has a held account, Tim Vanderver, was instrumental in creating a misleading and largely irrelevant response to the prospective customer, which emphasized, among other things, SIB's "well diversified" portfolio; the various insurance policies SIB maintains; and SIB's "strong cash flow", none of which Vanderver had a reasonable basis for asserting. *See* Vanderver Response to Hall Analysis, Ex. 10, Appx. 195-98. Despite having notice of the above facts and his own customer's concerns about SIB CDs, Vanderver increased his client SIB CD portfolio to $28 million by 2008. Between January 2006 and February 2009, Vanderver received $510,819 in SIB CD commissions, $208,168 in SIB quarterly bonus, and $980,000 in forgivable loans.

58.     In 2008, a prospective SIB client's CPA sent an email to Jason Green and Chuck Vollmer that questioned SIB's suspiciously consistent investment returns and all but concluded that SIB and Allen Stanford were the next Madoff. *See* Ex. 12, Appx. 207-08. The CPA wrote "I'm not totally comfortable with Stanford International Bank", noting that SIB's audit firm was unknown to him, and concluding that SIB "just seems to good to be true." He asked "How do I know . . . [SIB's] consistent growth in assets and remarkably steady financial performance . . . is real? I know that seems like a rude question." In the ensuing internal discussion, one financial advisor added: "More disclosure on the current firm as well as the regulatory bodies that certify our financial soundness would be helpful."

59.     The Stanford financial advisors faced with similar customer concerns should have ensured that the CDs they were selling were in fact legitimate and that there was no basis for their customer concerns.

*Financial Advisors Were Aware of Concerns Raised By Tidwell and Rawl*

60.    In July 2008, Bloomberg published an article stating that the SEC was "investigating sales of certificates of deposit by Stanford Group Company at its offshore bank, which has $6 billion in assets in Antigua."  The article also noted that the SEC had issued subpoenas to two former SGC financial advisors who were allegedly forced to resign in 2007 because they refused to participate in SGC's "illegal and unethical" marketing methods, Charles Rawl and Mark Tidwell.  The subpoenas sought information about the sale of SIB CDs and requested copies of training materials on SIB CD sales methods.  The article prompted much discussion among both Stanford employees and SIB CD investors, and led several investors to withdraw their funds from SIB.  *See, e.g.,* exhibit **KVT-12** at 1 (Ed Ventrice asked Scott Chaisson and Jason Green, "[W]hat's the deal with this, is this place a ticking time bomb?"); exhibit **KVT-13** at 1 (Michael MacDonald wrote the following to Brenda Bohs, Michael Bober, and Ed Ventrice: "'Oh the web we weave[.]'  Let's hope they are lying [a]nd sgc is not doing something underhanded"); Doug Shaw Email, Ex. 15, Appx. 215-16 (writing to Jay Comeaux: "Lost more $ from SIB due to the Tidwell article.  Have you had any issues with it?"); Robert Barrett Email, Ex. 16, Appx. 217-18 (notifying Jay Comeaux that a former client of Tidwell's had redeemed a CD prior to maturity, which "was most likely the result of the Bloomberg article").  In addition to being widely circulated within the company, the Bloomberg article was of course available to the public.  When faced with allegations of fraud such as these, the Stanford financial advisors should have refrained from selling the SIB CDs unless and until they had a full understanding of the Rawl and Tidwell allegations and determined that they were untrue.