Background

SGC claims that SIB CDs are not securities. In keeping with that claim, SGC purports that it does not actually "sell" the CDs, but only refers potential investors to SIB. Furthermore, SGC does not refer to its receipt of transaction-based compensation for its sales of CDs as commissions, but rather as "referral fees". And, although SGC locates investors, collects their funds and forwards those funds to SIB, SGC claims that those investors are not their customers, but rather are customers of SIB. The staff initially found SGC's claims confusing, but ultimately realized that no matter what terms the firm was using it did not change the essence of the transactions being reviewed: SGC is a registered broker-dealer receiving transaction based compensation for the sale of securities, and is therefore fully subject to the federal securities laws.

SGC's primary business activity is centered on marketing SIB CDs. SGC typically hires RRs who are already well-established and then encourages the RRs to sell the SIB CDs to their existing customers. SGC does not make cold calls to expressly offer the SIB CDs, but instead makes cold calls for the opening of new brokerage accounts and, upon establishment of an account, encourages customers to purchase the product. Based on a sample of emails sent to its customers, SGC appears to market the securities as a high-yielding safe alternative to investing in the markets or in U.S. bank CDs.

SGC markets to both foreign and U.S. customers; however, approximately 90% of its sales are to Latin Americans. Nearly 70% of SGC's $44 million 2004 revenues were from commissions for selling the product. SGC is not the only entity which sells the CDs. Approximately one-third of SIB CDs are sold by SGC. The remaining sales are made by SIB itself and foreign affiliates of SIB. U.S. citizens currently hold $227 million out of $1.5 billion in SIB CDs.

SGC sells all three types of SIB CDs: the FixedCD, the FlexCD, and the Index-Linked CD. Each has a $50,000 minimum investment.

- The FixedCD has a term from three to sixty months, and the initial interest rate may increase if interest rates go up during the designated term. If interest rates fall during the term, customers are guaranteed the original rate until maturity. No withdrawals are allowed during its term.
- The FlexCD has the same features as the FixedCD, but additional purchases of $2,500 or more may be added at any time during its term.[2] Investors may withdraw up to 25% of the principal amount plus accrued interest with five days prior notice (with a maximum of four withdrawals per year allowed).
- The Index-Linked CD is sold with terms of three, four or five years only. It yields the greater of a minimum "guaranteed" interest rate or a rate linked to the performance of a specified equity market index. No withdrawals are allowed during the first year.[3]

---

[2] Additional investments earn interest at the initial interest rate.

[3] After the first year, withdrawals are allowed, but are subject to penalties.

4

1238

Superficially, the SIB CDs are very similar to a conventional certificate of deposit. They are issued by what appears to be a bank, have minimum investment amounts, and have guarantees on either fixed or minimum interest rates; however, upon closer inspection, it becomes apparent that they are not CDs at all and, if the funds are invested as SIB claims, are securities subject to federal regulation.

### SIB is Not a Bank

Conventional certificates of deposit are not considered securities and are not subject to the SEC's purview because banks and other similar institutions that issue them are subject to stringent regulatory oversight within the U.S. Part of that stringent regulatory oversight includes ensuring that banking institutions are not engaged in activities that would subject their customer deposits to risk. Under federal law, there are strict limitations as to the types and risk level of securities in which banking institutions may invest customer funds and also limitations on the risk levels of the types of loans that can be made with those funds. Federal law also requires that banks establish reserves to ensure that banking institutions will be able to meet obligations to customers, including both interest and principal payments on CDs. And, in case regulatory oversight fails, deposits are insured (subject to some limitations) by the Federal Deposit Insurance Corporation ("FDIC"). In foreign countries that have similar stringent banking regulations, U.S. Courts have held that certificates of deposit issued by banking institutions in those countries are also not securities.[4] The staff doubts that Antiguan banking laws offer the same protection to customers offered within the U.S. Whether or not there is a similar regulatory structure within Antigua, it does not appear to be applied to SIB because SIB claims to invest the majority of its customers' deposits into investment vehicles that are subject to significant risk and loss including equities, corporate debt, precious metals, and foreign currencies. Furthermore, SIB has not established any significant reserves to cover any potential losses. Approximately a five per cent loss in its portfolio of investments would eliminate all liquid reserves. And, finally, deposits into the bank are not insured by FDIC or any similar depository insurance program.[5]

SIB does not seem to have a legitimate reason to be chartered as or referred to as a bank as it does not even engage in most traditional banking activities such as making commercial loans or offering checking accounts. SIB performs few other functions besides simply taking investor deposits and investing those deposits. Other than calling itself a bank, the Staff could find little else that would suggest that SIB is a banking institution.

### Use and Risk of Funds Deposited With SIB

Per SIB's 2003 annual report, SIB pools the proceeds from its CDs and invests those funds into an international portfolio of bonds (42%), equities (39%), cash and fiduciary[6] (11%),

---

[4] For example, *Wolfe v Banco Nacional de Mexico*, 739 F.2d 1458 (1984).

[5] SIB notes that it does have several types of insurance. Any deposits it holds in U.S. banks have FDIC coverage. SIB also carries a bankers' blanket bond and a liability policy for the benefit of its directors and officers.

[6] It is unclear as to what "fiduciary" means in this context.

5

**1239**

and precious metals (8%). In other SIB marketing materials and disclosure documents, SIB also claims to engage in arbitrage activities and to use leverage as it deems appropriate.[7]

Obviously, unlike a traditional certificate of deposit, SIB CDs are subject to risk. In fact, an SIB disclosure document makes the statements that "the ability of SIB to repay principal and interest on the CD Deposits is dependent on our ability to successfully operate by continuing to make consistently profitable investment decisions" and "You may lose your entire investment (principal and interest)....."

The Staff could discern no legitimate reason to refer to these investments as CDs. Instead, they appear to be referred to as CDs to lull investors into believing that the product offers the safety of a conventional certificate of deposit and to circumvent U.S. federal securities laws requiring registration.

### SIB CDs are not registered

SIB has not registered the CDs although they appear to be an investment contract. In a disclosure statement to customers, SIB defends its decision not to register the CDs with the following simple claims: "The CD deposits are ordinary deposit obligations of SIB. We believe that the CD deposits and the CD certificates are not securities as such term is defined under U.S. federal and state securities laws." As discussed above, SIB's claim lacks merit. SIB is a bank in name only and thus any securities it issues and sells to U.S. investors are subject to federal securities laws including registration requirements unless the securities qualify for an exemption. It may be possible that the securities qualify for an exemption under Regulation D Rule 506. SIB, despite its claim that its CDs are not subject to registration requirements, has filed for just such an exemption from registration. Rule 506 prohibits a general solicitation and places a limitation upon the number of unaccredited investors. It appears that SIB and SGC have complied with those two requirements – at least in terms of U.S. investors. In terms of foreign investors, SIB and SGC do not make an effort to determine if investors are accredited or non-accredited. It is unclear as to whether or not the offering is still in compliance with Regulation D Rule 506 under this circumstance.[8]

It could also be argued that SIB should be registered as an investment company. It pools investor's funds and invests those funds into other securities. SIB does not appear to comply with any of the exemptions from registration as an investment company. It has more than 100 investors and it does not verify that its customers are qualified investors (defined has having at least $2.5 million in assets). And, according to its own disclosure documents, SIB fails to meet

---

[7] A March 2003 SIB newsletter, which contained information concerning SIB's arbitrage activities, indicated that they were the "hallmark" of what differentiated SIB's investment strategy from others. The newsletter indicated that SIB's arbitrage activities included fixed income convertible arbitrage, futures/derivatives arbitrage, event arbitrage, and long/short equity strategies.

[8] It is possible that under these circumstances that the U.S. portion qualifies for an exemption from registration under Regulation D while the foreign portion of the offering qualifies for an exemption under Regulation S. Regulation S has its own unique set of circumstances in that it does not apply to sales to foreign investors if the sale occurs within the United States. Making a determination of where these sales occurred seemed impractical on an examination basis.

**1240**

the definition of, and therefore the exemption for, a foreign bank per the Investment Company Act of 1940.[9]

### SIB CDs appear to be a fraud

Regardless of whether SIB CDs are eligible for exemption from registration, the securities are subject to the anti-fraud provisions of the federal securities laws and the securities being offered have the earmarks of a fraud: SIB pays excessive commissions; it sponsors aggressive sales contests at SGC; it promises returns too high to be legitimate; it claims to have made significant returns in each of the last ten years, no matter how poorly the international markets have performed; and perhaps most importantly, it refuses to provide details as to its investment portfolio not only currently, but for any point in history. Finally, Allen Stanford enjoys not only significant wealth, but also appears to enjoy special privileges from the Antiguan government, which he may use to mask a fraudulent scheme.

- Excessive Commissions[10]: For every CD sold, SGC receives a three percent recurring annual trailing commission, paid pro-rata on a quarterly basis, based on the amount invested for as long as the customer holds the CD.[11] Since many CDs are sold with a five-year term, the three percent annual trailing commission is equivalent to 15% of a customer's investment. Then, if the CD is renewed, the trailing commission continue.[12] Not only do these commission payments violate NASD Rules (as further discussed below), they are indicative of fraudulent activity. Historically, high commission rates are often associated with fraudulent activity as they may be offered as an incentive to RRs to push a perhaps otherwise unsavory product. The practice of paying a high commission rate on an indefinite, on-going basis further provides the RRs with an incentive to keep investors from withdrawing their funds, another hallmark of questionable activity. Finally, high commission rates suggest that a significant portion of investor funds are used to pay the commission because it would be difficult to legitimately pay such a high commission rate out of earnings – especially in this case where the issuer claims to be investing the funds based on "time-proven conservative criteria".

- Aggressive Sales Contests: Prizes offered include trips to Antigua and expensive automobiles.[13]

---

[9] Under Rule 270.3a-6(b)(1) foreign banks are excepted from the definition of an investment company if they are engaged substantially in commercial banking activity and are not operated for purposes of evading the Act.
[10] The payment made for sales of the CDs as described by SIB appears to be a trailing concession; however, since we do not believe we can rely on SIB's disclosures, and for purposes of this report, the difference between commissions and concessions is strictly semantic, all payments for sales of the CDs will be referred to generically as commissions.
[11] SGC makes a spurious claim that they do not "sell" the CDs but refer customers to SIB and that SIB pays SGC "referral fees" rather than commissions.
[12] The commission rate is in excess of NASD limits. Offerings made pursuant to Regulation D Rule 506 are limited to paying an upfront commission of a maximum of 12% in upfront and in continuing compensation. See NASD Rule 2810. Mutual funds are limited to a maximum of 8.5% in upfront and continuing compensation. See NASD Rule 2830.
[13] Conversely, one RR stated that she was fired for refusing to sell SIB CDs.

7

1241

- High "Interest" Rates: In keeping with the appearance that the SIB CDs are similar to conventional certificates of deposit, SIB refers to its distributions to investors as "interest" payments as opposed to a return on investment or a dividend. The "interest" payments are far in excess of what a conservative, low-risk investment would return. SIB paid average "interest" rates of 9.63% in 2000, 9.13% in 2001, and 7.17% in 2002. This is even more incredible when one considers that SIB paid another 3% in commissions. In regard to its Index-Linked CD the "interest" rates paid are even more incredible. October 2004 sales literature indicated that the Index-Linked CD had a five-year annualized return ranging from *9.25% to 47.34%*. SIB paid these rates based on a formula that pays the greater of 3.5% or a percentage of the S&P 500 return. The percentage of the return of the S&P 500 is at SIB's discretion, but one of its marketing materials stated that an example of the return paid would be *125%* of the return of the S&P 500. The Staff is unaware of any legitimate short-term investment that not only guarantees a return significantly higher than a CD, but allows you to participate up to 125% of equity market returns.

- High Returns Every Year: SIB claims that it has consistently been profitable every year over the last ten years. For example, from 2000 through 2002, SIB reported earnings on investments between approximately 12.4% and 13.3%.[14] This return seems remarkable when you consider that during this same time period, SIB supposedly invested at least 40% of its customers' assets into the global equity market. Ten of twelve global equity market indices were down *substantially* during the same time period. The indices we reviewed were down by an average of 11.05% in 2000, 15.22% in 2001 and 25.87% in 2002. It is unlikely that the portion of the portfolio invested into debt instruments (approximately 60%) could make up the expected losses in the equity portion of the portfolio. For example, in 2002, when the global indices were down 25%, the debt portion of the portfolio would have to generate an approximate 35% to 40% return for SIB to generate the 12.4% overall return it claimed.

- SIB will not Disclose Its Portfolio: Most troubling of all, SIB refuses to disclose any of its specific uses of customer funds. SIB first claimed (through SGC) that Antiguan banking secrecy laws prohibited the disclosure of such information. The Staff suggested that Antiguan secrecy laws probably applied to keeping secret the identities of bank account holders rather than the use of investor proceeds. At that point in time SIB changed its claim, indicating it's refusal was a matter of keeping Chinese Walls between itself and its affiliate, SGC. Chinese Walls are generally perceived by the Commission as a barrier between investment bankers and research analysts, both of which may have inside information, from trading activity at a firm. This situation does not appear to merit the need for Chinese Walls. Furthermore, even if it did, it would not preclude SIB from disclosing the details of its use of investor proceeds from earlier time periods. Based on the totality of the situation, the Staff believes that SIB will not disclose its underlying investments because the funds cannot possibly be invested as SIB claims.

---

[14] This extrapolation is based upon two premises. First, that the year end revenues were generated from returns on SIB's portfolio, and that customer deposits were the exclusive source funding the portfolio. Second, that customer deposits remained constant throughout the year.

8

- Allen Stanford: Allen Stanford is a very wealthy man. He owns significant real estate holdings on Antigua and has both loaned and/or given significant sums of money to the Antiguan government. In exchange it appears that he has been granted special privileges. For example, Allen Stanford has his own terminal/gate at the Antiguan Capital's airport and is allowed to fly in and out of the country without going through customs. This situation raises the obvious concern that Allen Stanford may be participating in money laundering. It also raises concerns that he is allowed to use investor funds without any oversight and that some of those investor funds are being used to support his real estate holdings.

Without the underlying records it may be impossible to determine whether or not the offering is a fraud. Regardless, whether it can be proved that the offering is a fraud, SGC is violating many SEC and NASD Rules in their sales of SIB CDs.

## VI.   VIOLATIONS AND DEFICIENCIES

### A.   Misrepresentations and Omissions – Rule 10b-5

The Staff's review found that SGC may have made material misstatements to investors concerning the SIB CDs, as well as failing to disclose material facts in connection with the sales. The type of disclosures provided to investors purchasing SIB CDs is dependant upon whether the investor is a U.S. citizen or a foreign national. U.S. citizens receive far more disclosure than foreign investors.

#### a.   U.S. Investors

The disclosure materials SGC provides to investors are a confusing mosaic regarding the risk of the investment. Prospective U.S. investors are given a short, user-friendly sales brochure that makes the offering seem similar to a CD and clearly guarantees investors a minimum interest rate or return. Along with the sales brochure, U.S. investors are also given a separate small type-face, 20-page disclosure document entitled "Disclosure Statement U.S. Accredited Investor Certificate of Deposit Program" ("Disclosure Statement"). The Disclosure Statement provides a hodge-podge of conflicting information. It identifies the issued security as a certificate of deposit issued by a chartered bank of Antigua and Barbuda. The Disclosure Statement goes on to say that "At maturity of the CD Deposit, we will provide you the principal amount in the CD Deposit plus any accrued and unpaid interest." Another section of the Disclosure Statement is entitled "Guaranteed Rate of Return". These statements imply a safety of principal and the guarantee of receipt of interest on the principal. In stark contrast, on other pages, the Disclosure Statement explains that the funds will be used to invest in bonds and securities (which are subject to volatility) and declares that there are significant risks: "….the ability of SIB to repay principal and interest on the CD Deposits is dependent on our ability to successfully operate by continuing to make consistently profitable investment decisions", and "You may lose your entire investment (principal and interest) under circumstances where we may be financially unable to repay these amounts."

9

In light of the confusing written information investors are given, the Staff suspects that investors are forced to rely on statements made by SGC's RRs to make their investment decisions. We reviewed a sample of emails to determine what types of statements were being made to investors and noted several which clearly undermined any sense of risk associated with the CDs. For example:

"Income is your primary concern (our last conversation). Consider This: A fixed CD for 5yers-rate 7.4% for amts between 500m-999,999....Their (sic) are numerous terms for varying amts and maturities....This is at The Stanford International bank....It is a decent interest rate with peace of mind.(no volatility)."

And,

"Considering the not very bright prospects of the market and the high cost of maintaining this account I would like you to cancel the account and transfer the cash back to our deposit in order to be invested in the safe and stable CDs."[15]

b. Foreign Investors

In marked contrast to the risk disclosures made to U.S. investors, foreign investors receive only assurances of the safety and security of the product. SGC does not send to its foreign customers the Disclosure Statement described above, but only a marketing brochure which repeatedly compares the SIB CDs to conventional U.S. certificates of deposit, thereby implying safety and security. One illustration compares the growth of a $1,000,000 investment in a SIB CD for ten years to the growth of a U.S. bank CD. Another compares interest rates on SIB CDs versus U.S. bank CDs over a ten-year period along with the notation that "Over the past decade, Stanford International Bank CDs have outperformed U.S. bank CDs by an average of 4.6%." Specific statements regarding the lack of risk are contained throughout the document. In a listing of the advantages of the product, the first item is "Depositor security" described as "Our investment philosophy is anchored in time-proven conservative criteria, promoting stability in our certificate of deposit products. Our prudent approach and methodology translate into deposit security for our customers." "Key Benefits" include multiple references to the "guarantee" of minimum interest rates. The marketing brochure does note, however, that the funds are invested into "a portfolio of highly marketable securities", but even this indirect allusion to risk is downplayed by statements which claim that such a strategy is in the best interest of SIB investors because it results in "No Credit Risk" (because it is not making commercial or unsecured loans) and in "No Loan Losses" (for the same reason).

B.     Making Unsuitable Recommendations – NASD Rule 2310

The NASD requires that in recommending to a customer the purchase of any security, the member firm shall have reasonable grounds for believing that the recommendation is suitable as to the customer's financial situation and needs. Since SGC and its representatives do not have

---

[15] On a practical basis, it was impossible to determine if the recipients of the emails were U.S. or foreign investors, but we do not have any reason to believe that RRs make different claims to their U.S. investors than to their foreign customers.

10

the information available to determine the actual investments made with the investors' funds and the risk level of the SIB CDs, it cannot know if the product is suitable as to its customer's needs. Furthermore, not only is there no specific information available, the information that is available is highly suggestive of a fraudulent offering which would be inherently unsuitable for any investor.

## C. Failure to prepare or obtain confirmations for SIB CD transactions - NASD Rule 2230, SEC Rule 10b-10, SEC Rule 17a-3(a)(8), and SEC Rule 17a-4(b)(1)

The firm failed to prepare, obtain or maintain confirmations of SIB CD transactions effected through the firm. The firm does not independently prepare confirmations of the transactions, but rather relies on SIB to send confirmations to investors. Without copies of confirmations it is unclear if investors receive any notice regarding the commissions paid to SGC for sales of the CDs. On page nine of the Disclosure Statement given to U.S. investors a section entitled "Referral Fees" states that SIB has entered into a referral agreement with SGC and refers the reader to a section entitled "Affiliate Transactions" for further detail. Under the Affiliate Transactions section, the fourth paragraph states that "The fees paid pursuant to the referral fee agreement with SGC are a percentage of SGC's managed client portfolio of SIB deposits, and are currently up to three percent, negotiated annually."[16] It is not clear that the three per cent referral fee is paid as long as the funds are on deposit, nor is it clear how SIB is funding the fees. As for sales to foreign investors, there is no discussion regarding commissions in any of the materials SGC distributes to those investors.

SGC also failed to disclose to its customers any information regarding the compensation that registered representatives may earn in sales contests sponsored by SIB.

## D. Charging excessive commissions – NASD Rule 2440, NASD Rule 2810, and NASD Rule 2830

SGC failed to abide by limitations imposed by the NASD regarding the amount of commissions that can be charged on any one transaction. As noted earlier, SGC receives three per cent annually on all investments made with SIB. In the case of SIB CDs with a 60-month maturity, the commission rate is equivalent to 15%. Since 15% is in excess of an allowable commission for any kind of securities, the commission on the 60-month CDs clearly violates NASD Rule 2440 regarding Fair Prices and Commissions. NASD Rules further define the maximum commission for several other securities including Direct Participation Programs ("DPP") (NASD Rule 2810) and Investment Companies (NASD Rule 2830). DPPs are limited to a maximum of 12% commission in upfront and ongoing commissions (trail fees, as in this case) and investment companies are limited to a maximum of 8.5%.

## E. Failure to establish, maintain and enforce written supervisory procedures - NASD Rule 3010(b)(1)

---

[16] The verbiage certainly is odd. SGC does not manage a client portfolio. We assume, however, that it was written in this form because SGC and SIB are very careful to claim that SGC does not make any sales (which would suggest the CDs were a security as opposed to ordinary certificates of deposit), but only makes referrals.

11

The firm did not have any WSP designed to ensure that customer accounts purchasing SIB CDs were reviewed on a periodic basis and to ensure that transactions in the accounts of foreign investors were suitable.

F.   Failure to conduct a periodic review of customer account activity in SIB CDs - NASD Rule 3010(c)

The firm failed to conduct a periodic review of customer activity in SIB CDs. The firm failed to conduct a periodic review of SIB CD activity in customer accounts because it maintains that the CDs are not securities and, therefore, it has no supervisory responsibilities regarding the products. In addition, given the records regarding SIB CD transactions currently maintained by the firm, the firm would be unable to conduct such reviews should it decide to do so.

G.   Failure to develop and implement an adequate AML program - NASD Rule 3011

Inadequate AML procedures

- The firm's AML procedures require managing directors and administrative personnel in its branch offices to conduct reviews for possible money laundering. The procedures also require the firm's compliance department to review all money received and disbursed on a daily basis. The procedures for branch office reviews do not provide enough detail regarding how reviews will be conducted, the records to be utilized during the review process, and how reviews will be documented. The procedures for the firm's compliance department reviews are also not specific enough as to how reviews will be conducted, the records to be utilized during the review process, and how reviews will be documented. In addition, the firm has not specifically identified the individual responsible for conducting compliance department reviews.

- The firm's procedures failed to contain examples of money laundering "red flags" to be used by firm employees to detect possible money laundering. Such "red flag" information should be incorporated into the firm's procedures.

- The firm had no procedure discussing continued monitoring of customer accounts that it determines are engaged in "suspicious" activity.

- The firm had no procedure to ensure compliance with the Treasury Department's "Travel rule" when facilitating customer requests to wire funds from their customer accounts at Bear Stearns to their accounts or accounts of unrelated third parties. The Staff noted that the while the firm had no such procedures, it was providing the required information to Bear Stearns.

- The firm had no written procedures regarding obtaining information concerning the source of its customers' net worth and income and how a customer's account would be utilized (i.e. anticipated types of trading and trading patterns so that the firm would be able to detect future deviations from expected patterns). The Staff

**1246**

noted that in practice, the firm obtains information regarding the source of its customers' net worth and income, but does not obtain and record information regarding the proposed use of the customers' accounts. None of the account information forms for 25 accounts reviewed by the Staff contained any information regarding the intended use of the accounts.

• The firm's procedures do not require firm personnel to obtain secondary documentary information to verify the identity of U.S. customers (either business entities or individuals). The Staff is unaware of any difference between documentation that should be obtained from non-U.S. customers versus U.S. customers.

• The firm failed to promptly update its AML procedures to designate its current AML officer, although that officer had been functioning in that capacity for approximately two months at the time of the Staff's examination. The firm's AML procedures designated Lea Stinson as its AML officer, when the officer was actually (b)(6), (b)(7)c .

• The firm had no procedure in place designed to ensure that there was no collusion between firm employees and customers with respect to money laundering.

• The firm's policies and procedures generally prohibit the receipt of currency, traveler's checks, and money orders for stock purchases or to be credited to customer accounts; however, the policies and procedures do not designate an individual to be responsible for determining whether cashiering department employees either intentionally or inadvertently receive such instruments. The procedures also do not discuss any reviews to detect the receipt of such instruments or how such reviews would be documented.

• The firm has no written procedure requiring the reporting of any financial interest in an account in a foreign financial institution. The firm's procedures do not address the use of Treasury Form 90-22.1 to report such financial interests and do not designate an individual as responsible for making the filings. The procedures also do not discuss how the firm will ensure that filings are made by the required filing date or what evidence the firm will maintain of the filings.

Failure to Adequately Implement AML Procedures

• The firm failed to implement written procedures that required it to categorize customer accounts based on degree of risk of money laundering. The firm's procedures required that all accounts be classified as Tier I, II, or III (I representing the lowest risk and III representing the highest risk) and that the frequency of account monitoring be commensurate with the account's risk level. The firm failed to categorize accounts as required by its procedures, and maintained no readily producible list of accounts by risk level. One of the account information forms utilized by the firm contained a section in which firm

13

personnel could indicate the account's risk level, but there was no evidence the section was being completed.

• While the firm's procedures require that firm personnel obtain primary documentary information from all customers opening accounts, the firm failed to implement its procedure in that it failed to obtain documents containing a photograph or similar safeguard for all of its U.S. customers. In addition, the firm did not obtain primary identification for any of its institutional accounts. Specifically, in two instances, the firm failed to obtain documentary information from individual U.S. customers. Such documentation is readily available in the form of driver's licenses. In nine other instances, the firm failed to obtain primary documentary information for business entities, such as articles of incorporation, partnership agreements, or business licenses. One of the nine accounts was a charitable organization which the firm's procedures identified as a Level II customer in terms of risk. One of the nine accounts had produced articles of incorporation, but the document was in Spanish and had not been translated into English.

• The firm's procedures required that it obtain secondary documentary information from non-U.S. individuals opening accounts; however, the firm failed to implement its procedures in this regard. Specifically, in three instances, the firm failed to obtain secondary documentation from non-U.S. customers. In another 13 instances, the firm failed to obtain secondary documentary information from U.S. customers, or non-U.S. business entities opening accounts. The Staff believes that based on the composition of the firm's clientele, it should obtain two forms of documentary identification from all customers.

## H.   Failure to file Treasury Form 90-22.1 - Bank Secrecy Act Section 103.24

SGC failed to provide documentation that it had reported financial accounts held at SIB during the 2003 calendar year within the time frames set forth in the Treasury's rules. Specifically, the firm was required to file Treasury Form 90-22.1 reflecting its financial interest in a SIB bank account and FlexCD by June 30, 2004. While the firm provided the Staff with a copy of the form and stated that the form had been filed as required by the rule, the firm did not maintain any documentation reflecting the date the form was filed and the form itself was undated. In addition, the firm was under the mistaken impression that it was not required to file the form for its 2004 holdings in 2005. The form is required to be filed by June 30th of the year following any year in which the firm has any interest in foreign financial accounts.

## I.   Failure to deliver the firm's privacy policy to all customers - Regulation S-P

The firm failed to produce evidence that it had delivered its privacy policy to all new customers upon opening accounts or effecting a securities transaction through the firm. Specifically, there was no evidence that six of 25 customer accounts reviewed by the Staff had received a copy of the firm's privacy policy upon opening their accounts. All of the customers were located in the firm's Miami branch office. The firm was only able to provide a document

containing a list of new accounts opened at the Miami office along with the initials of Miami branch office principals. The Staff noted that the document did not contain any specific evidence that the privacy policy had been delivered and that the principal's initials next to customer account numbers did not document delivery. Finally, the documentation provided by the firm as evidence that the privacy policy was delivered was not consistent with the evidence of delivery required to be maintained as discussed in the firm's WSP. The WSP require that a registered principal specifically note that the privacy policy was mailed by writing "PP" (for privacy policy), writing the date the policy was mailed, and initialing the line on the account information form entitled "Have you sent forms to customer?"

### J. Failure to enforce WSP with regard to delivery of the firm's Privacy Policy to customers - NASD Rule 3010(b)(1)

The firm failed to enforce its WSP with respect to documenting the delivery of its privacy policy to new customers. The firm's WSP contained a requirement that a registered principal initial a line on the new account form indicating that the firm's privacy policy was mailed to the customer and include the date of the mailing. There was no evidence that principals in the firm's Miami office were following the procedure.

### K. Failure to maintain accurate financial ledgers - SEC Rule 17a-3(a)(2)

The firm failed to record all liabilities to its general ledger. The firm maintains several Demand Deposit Accounts ("DDA") at Morgan Chase National bank. As of August 31, 2004, the firm was overdrawn on four accounts. The balances from these accounts were combined with other bank accounts at Morgan Chase instead of being properly recorded as liabilities. The amount of checks drawn in excess of bank balances per the records of a broker-dealer must be included in aggregate indebtedness, unless the broker-dealer carries two or more accounts at the same bank that are separated for the purposes immaterial to SEC Rule 15c3-3 and has an agreement with the bank stipulating that: except for bookkeeping and statement purposes, all such accounts are considered as one; the bank is authorized and agrees to treat these accounts as a single account and to apply balances in any one or more accounts to any debits in any other accounts without further advice or instruction by the firm; in the opinion of the bank's independent outside counsel, the agreement allows the bank to take the above action and is legally binding under banking, bankruptcy and other applicable federal and state laws.

### L. Failure to meet continuing education requirements - NASD Conduct Rule 1120

The Staff reviewed SGC's continuing education plan for 2003 and found that eighteen covered registered persons failed to complete the firm's continuing education training program for that year.[17] All covered registered persons included in a member's plan must take all appropriate and reasonable steps to participate in continuing education programs as required by the firm.

---

[17] The term "covered registered person" shall apply to any registered person with a broker/dealer who has direct contact with customers in the conduct of the broker/dealer's securities sales, trading and investment banking activities, research analyst and immediate supervisors of such persons.

## IX.   ITEMS OF CONCERN:

### SGC May be Offering Fraudulent Securities – Rule 10b-5

As discussed above, the Staff is concerned that the offering of the SIB CDs may in fact be a very large ponzi scheme, designed and marketed by SIB's and SGC's to lull investors into a false sense of security by their claims that the SIB products are similar to traditional U.S. bank CDs.

### SGC May be Participating in a Distribution of Unregistered Securities – Section 5, SEC Act of 1933

As noted above, it is unclear as to whether or not the securities should be registered. If so, than SGC would be in violation of the above Act.

### SGC's Subordinated Loan – Rule 15c3-1

The Staff is concerned that SGC's subordinated loan is invalid. On August 8, 2000, the NASD approved an equity subordinated loan between SGC and Stanford Financial Group Building, Inc. ("Stanford Building"). The loan amount was $4,000,000 with a maturity date of May 31, 2010. Stanford Building has never been a stockholder of SGC and therefore the loan should not have been approved as an equity subordinated loan. The proper classification of this loan would not place the firm in a net capital deficit.

## X.   EXIT INTERVIEW COMMENTS

On December 2, 2004 (b)(6), (b)(7)c and (b)(6), (b)(7)c discussed the deficiencies noted during our examination via a telephone conference call with SGC personnel. Jane Bates, (b)(6), (b)(7)c and (b)(6), (b)(7)c represented the firm during the call. During the exit interview, we discussed our concerns regarding the firm's sales of SIB CDs, WSP deficiencies, books and records deficiencies, AML deficiencies, Regulation S-P deficiencies, and deficiencies related to the firm's financial records.

## XI.   RECOMMENDED ACTION

The Staff will refer the Items of Concern, violations, and deficiencies discussed above to the FWDO Enforcement Division for their consideration and any appropriate action. Pending discussions with the Enforcement Staff, we will send a deficiency letter to the firm citing the violations and deficiencies noted in this report.

We will also request that the NASD explain why it approved the subordinated loan for SGC.

## XII.   SIGNIFICANT FINDINGS

A. Significant Findings – Yes. See below
B. Does the Exam Indicate Any Industry Trends – No.
C. Were any Novel, Unique or Emerging Issues Noted in the Exam - Yes. See below.

D. Potential New Rules to be Suggested as a Result of the Exam – No.

E. Any Issues/Findings That the Current Rules Were Inadequate to Address – No.

The broker-dealer is actively engaged in the distribution of an apparently fraudulent security offered by a foreign affiliate. The offering appears to be a Ponzi and/or a money laundering scheme, but because the affiliate making the offering is located in Antigua the Staff has been unable to gain access to the records which could either allay or prove our concerns. The broker-dealer, meanwhile, has violated several securities laws and rules including making misrepresentations and omissions, making unsuitable sales, failing to disclose its compensation, and charging excessive commission rates.

### XIII.  SUPERVISORY REVIEW & APPROVAL

Examiners:                    b)(6), (b)(7)c

Reviewing Supervisor:    b)(6), (b)(7)c

Approving Official:       Julie Preuitt

1251

# KVT-38

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No.: 3-09-CV-0298-N |
| | § | |
| STANFORD INTERNATIONAL BANK, LTD., | § | |
| STANFORD GROUP COMPANY, | § | |
| STANFORD CAPITAL MANAGEMENT, LLC, | § | |
| R. ALLEN STANFORD, JAMES M. DAVIS, and | § | |
| LAURA PENDERGEST-HOLT, | § | |
| | § | |
| Defendants. | § | |

_____

**APPENDIX IN SUPPORT OF**
**RECEIVER'S REPLY TO DEFENDANT R. ALLEN STANFORD'S OPPOSITION TO**
**RECEIVER'S MOTION TO APPROVE PROCEDURES FOR THE SALE OF THE**
**VESSEL "SEA EAGLE" AND SALE OF THE VESSEL PURSUANT TO**
**THOSE PROCEDURES**
_____

APPENDIX IN SUPPORT OF
RECEIVER'S REPLY TO DEFENDANT R. ALLEN STANFORD'S OPPOSITION TO
RECEIVER'S MOTION TO APPROVE PROCEDURES FOR THE SALE OF THE
VESSEL "SEA EAGLE" AND SALE OF THE VESSEL PURSUANT TO
THOSE PROCEDURES

1253

## CERTIFICATE OF SERVICE

On October 28, 2009, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.   I hereby certify that I have served the Court-appointed Examiner, all counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).


/s/ Kevin M. Sadler
Kevin M. Sadler

APPENDIX IN SUPPORT OF
RECEIVER'S REPLY TO DEFENDANT R. ALLEN STANFORD'S OPPOSITION TO
RECEIVER'S MOTION TO APPROVE PROCEDURES FOR THE SALE OF THE
VESSEL "SEA EAGLE" AND SALE OF THE VESSEL PURSUANT TO
THOSE PROCEDURES

1254

## DECLARATION OF CRAIG CADWALADER

My name is Craig Cadwalader; I am over the age of 18 years and am fully competent to make this Declaration. The facts set forth in this Declaration are within my personal knowledge and are true and correct.

I graduated from college in 1963 and immediately joined the Ardell Yacht Brokerage Company in Newport Beach, California. Prior to joining Ardell, I had by the age of 20 twice sailed across the Pacific Ocean and had logged thousands of miles of ocean sail racing.

I stayed at Ardell in California for ten years and moved to the Fort Lauderdale, Florida, Ardell office to assume its management in approximately 1973. I became President of Ardell in 1979 and have served in that capacity since that time. Ardell is one of the world's leading yacht brokerage companies, having gone into business in 1958. Extensive information regarding Ardell and the yachts we are currently brokering can be found on our website, www.ardell.com.

Ardell and its brokers are very knowledgeable regarding motor and sail yachts and knowledgeable of the worldwide and local marketplace. Ardell has previously brokered the "Sea Eagle" on two occasions. I was personally involved in the original sale of the "Sea Eagle" to R. Allen Stanford, which closed on November 18, 2002 for a purchase price of $3.9 million.

The Receiver for the Stanford companies, Ralph Janvey, signed a brokerage agreement with Ardell to broker the "Sea Eagle." This vessel is currently docked at Roscioli Marina in Fort Lauderdale. This is an excellent marina and has the advantage of being approximately five miles inland on the New River, providing some additional protection from hurricanes. The approximately $9,100 in monthly fees to dock the "Sea Eagle" at Roscioli are

1255

comparable to those of other marinas in the Fort Lauderdale area, especially considering this additional protection from hurricanes.

In the Fort Lauderdale marketplace, the following boats, which are large sport fisherman model boats like the "Sea Eagle," are being offered for sale at the listed asking prices:

1. "Seacall" 1991 asking $4.95 million

2. "Odyssey" 2004 asking $5.9 million

These two yachts are the closest in comparison to the "Sea Eagle," which is a 1988 112-foot Yacht Fisherman. I do not believe that the above-listed boats will sell quickly and certainly not at their asking price. In the current market, buyers are very aggressive and substantial price reductions are common. In my opinion, based upon my experience in the current market conditions, the above-listed boats will sell for only approximately 70% of their current asking price.

We have received a $2.5 million offer to purchase the "Sea Eagle." The offer is from Neil Helliwell, who has agreed to purchase the "Sea Eagle" "as-is, where-is" pursuant to a "Stalking Horse" agreement.

Between 2003 and 2005, the "Sea Eagle" was refitted and refurbished in such a way as to substantially reduce its resale value as compared to the other similar yachts. For example, the Yacht was renovated to reduce — not increase — the number of staterooms onboard. And because the "Sea Eagle" is older than the two above-described yachts, its value is also comparatively lower. Additionally, the market is quite poor right now with few sales and banks not readily lending for boat purchases except under special circumstances.

For these reasons, $2.5 million is an appropriate starting price for the "Sea Eagle" under a "Stalking Horse" arrangement.

DECLARATION OF CRAIG CADWALADER                 2

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the **27** day of _Oct._ 2009.

_Craig Cadwalader_
Craig Cadwalader

## DECLARATION OF JEANETTE DAY

My name is Jeanette Day; I am over the age of 18 years and am fully competent to make this Declaration. The facts set forth in this Declaration are within my personal knowledge and are true and correct to the best of my knowledge. I am a Director with FTI Consulting, which has been retained by Receiver Ralph. S. Janvey in this matter to provide consulting services. In particular, I have been retained to review expenses and financial information related to the Stanford entities, to assist in cash-flow analysis, and to process Receivership Estate invoices. It is in this capacity that I am making this Declaration.

I have reviewed several Hakvoort invoices or copies of invoices relating to the refitting and refurbishment of the "Sea Eagle" between 2003 and 2005 that were kept in the regular course of Stanford's business. Attached as Exhibit A are true and correct copies of those documents. Per the available information, the "Sea Eagle" has a total cost basis of at least $23.7 million. This amount comprises the 2002 $3.9 million purchase price and the following costs to refit and refurbish the "Sea Eagle" between June 30, 2003 and February 28, 2005:

| Invoice Type | Invoice Date | Invoice Amount | USD Amount (approximate)[1] |
|---|---|---|---|
| Refitting/Refurbishment | 6/30/2003 | € 7,299,846 | $10,949,769 |
| Refitting | 12/2/2003 | € 424,725 | $637,087 |
| Refitting credit | 1/21/2004 | (€ 6,000) | ($9,000) |
| Refitting | 1/21/2004 | € 83,108 | $124,662 |
| Refitting | 2/12/2004 | € 1,137,330 | $1,705,995 |
| Refitting | 3/19/2004 | € 393,554 | $590,331 |
| Refitting | 3/19/2004 | € 78,100 | $117,150 |
| Refitting | 4/15/2004 | € 125,872 | $188,808 |
| Refitting | 5/11/2004 | € 333,313 | $499,970 |
| Refitting | 6/7/2004 | € 341,080 | $511,620 |
| Refitting | 7/9/2004 | € 336,414 | $504,621 |
| Refitting | 9/2/2004 | € 278,907 | $418,360 |
| Refitting | 9/15/2004 | € 194,038 | $291,057 |
| Refitting | 9/15/2004 | € 260,521 | $390,782 |

---

[1] The USD Amounts were calculated using a foreign exchange rate of 1.5.

DECLARATION OF JEANETTE DAY                    1

| | | | |
|---|---|---|---|
| Refitting | 11/2/2004 | € 552,005 | $828,008 |
| Refitting | 12/3/2004 | € 350,410 | $525,615 |
| Refitting | 1/20/2005 | € 643,386 | $965,079 |
| Refitting | 2/28/2005 | € 362,958 | $544,437 |
| | **TOTAL** | **€ 13,189,567** | **$19,784,351** |

From the inception of the Receivership through the end of September 2009, the Receivership Estate has spent $472,541 on dockage, insurance, maintenance, and other necessary expenses related to the "Sea Eagle." These expenses are further detailed below:

| Expense Type | Total Expenses through September 2009 | Monthly Forecast for Remainder of 2009 |
|---|---|---|
| Dockage | $150,861 | $9,100 |
| Insurance | $41,895 | n/a |
| Maintenance and Other (Per Diem, etc.) | $42,130 | $8,000 |
| Engineer and/or Deck Hand | $28,971 | $2,600 |
| Transport or Sea Trial | $105,929 | $5,000 |
| Crew Salaries | $102,755 | $10,740 |
| **TOTAL** | **$472,541** | **$35,440** |

As shown above and to the best of my knowledge, I expect the Receivership Estate to expend a minimum of $35,440 per month through the remainder of 2009 on expenses for the "Sea Eagle." This monthly projection is based on past expenses and current arrangements with vendors. As a result, from the inception of the Receivership through the end of 2009, the "Sea Eagle" is likely to cost the Receivership Estate over $578,000.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 28 day of October 2009.

Jeanette Day

# Exhibit A

Project number:
Date: June 30 2003
Client:  Mr A Stanford

Type of ship: Semi displacement
Dimensions (in meters)
| | |
|---|---|
| Length over all | 31.5 |
| Beam | 8.2 |
| Draft | 1.5 |
| Hourly rate in € | € 50.00 |
| Labour hull (hours per tonne): | 900 |
| Labour superstructure (hours per tonne): | 900 |
| Material price per KG aluminium: | € 4.30 |
| Material price per KG steel: | |
| Weight of hull (ton): | 1.3 |
| Weight of superstructure (ton): | 0.8 |
| Weight of mast (ton): | 0.5 |
| Hull multiplyer factor | |
| Hull material (1=aluminium, 0=steel) | 1 |
| Superstructure material (1=aluminium, 0=steel) | 1 |

COSTING SHEET HAKVOORT SHIPYARD
10 HULL
This section includes only metalwork

| | | |
|---|---|---|
| Gross weight | | € 6,708.00 |
| Electrodes,gas and welding wire | | € 0.00 |
| Gas en oxygen | | € 872.04 |
| Labour hull | 1170 | € 58,500.00 |
| Labour clean tanks, gas free certificates | 120 | € 6,000.00 |
| Labour to pressure test the tanks after hotworks | 40 | € 2,000.00 |
| Etching fluid | | € 760.00 |
| Ceramic weld strip | | € 380.00 |
| Mould foil | | € 380.00 |
| X-rays | | € 570.00 |
| Cut stern | 200 | € 15,000.00 |
| Price per KG material | | |
| 2 x L shaped cockpit sofa in aluminium | | € 15,500.00 |
| Material cockpit sofa's | | € 1,800.00 |
| Bowsprit brackets | | € 2,800.00 |

11 SUPERSTRUCTURE
This section includes only metalwork

| | | |
|---|---|---|
| Material (aluminium) | | € 4,128.00 |
| Gas en welding wire (aluminium) | | € 536.64 |
| Labour | 720 | € 36,000.00 |
| E.R. entrance hatch custom build | | € 12,000.00 |
| Handrailing SS. 58 meter maindeck sides | | |
| Price per Kg | | |
| Install window flanges 23 x 16 hr per window | | € 18,400.00 |
| Handrailing 40 meter large x € 400,-- / M | | |
| Railing struts | | |

1261

Renew dashboard                                                € 18,000.00
Handrailing 24 meter lenx € 250,-- / M
Extend sofa FB                                                 € 6,500.00

### 00 GENERAL
| | | |
|---|---|---|
| LABOUR: project manager | 600 | € 30,000.00 |
| LABOUR: garbage removal and cleaning | 500 | € 25,000.00 |
| UREN: loading and unloading | 200 | € 10,000.00 |

### 12 Mast and funnel
This section includes metalwork only

| | | |
|---|---|---|
| Material | | € 2,580.00 |
| Gas and welding wire | | € 335.40 |
| Labour | 250 | € 12,500.00 |
| Price per KG | | |

### 13 RUDDERS
Not applicable

### 14 SMALL PARTS IN SS
| | | |
|---|---|---|
| Bollards, fairleads, eyes material | | € 1,200.00 |
| Labour | 200 | € 10,000.00 |
| Fender if in SS | | € 500.00 |
| Labour to cut off existing fender | 120 | € 6,000.00 |
| Names | | € 4,500.00 |
| stainless storage box | | € 1,500.00 |
| Belmast light deflector | | € 450.00 |
| Pop up cleats 2 | | € 2,000.00 |

### 15 PAINTJOB AND RELATED
| | | |
|---|---|---|
| Paintjob subcontracted  (Klaver) | | € 282,174.00 |
| Labour Klaver assistance by shipyard (scaffoldi | 600 | € 30,000.00 |
| Cathodic protection (zincs) | | € 950.00 |
| Labour | 10 | € 500.00 |
| Sandblast grey and black water tanks | | € 7,600.00 |
| Interior varnish work 181,5 m2 stain and varnish | | |
| Paintwork crew 45 m2 x € 700,-- / m2 | | |

### 16 ANKER & VERHAALGEREI
| | | |
|---|---|---|
| Stainless steel Bruce anchor | | € 7,100.00 |
| Labour to disassemble and assemble capstans | 45 | € 2,250.00 |

### 17 STEERING
Not applicable

### 18 INTERIOR WOODWORK
The following accomodation spaces:
VIP cabin, galley, master stateroom, salon/dining
wheelhouse and upperlounge
181,5 m2 total x 150 hr / m2