# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| STANFORD INTERNATIONAL BANK, | § | Civil Action No. 3:09-CV-0721-N |
| LTD., | § | |
| | § | |
| *Debtor in a Foreign Proceeding* | § | |

---

## APPENDIX IN SUPPORT OF JOINT LIQUIDATORS' EMERGENCY MOTION FOR LEAVE TO PURSUE PROFESSIONAL NEGLIGENCE CLAIMS

---

**REID COLLINS & TSAI LLP**

William T. Reid IV (00788817)
P. Jason Collins (24040711)
Nathaniel J. Palmer (24065864)
4301 Westbank Dr., Suite B230
Austin, Texas 78746
Tel.: 512-647-6100
Fax: 512-647-6129
wreid@rctlegal.com
jcollins@rctlegal.com
npalmer@rctlegal.com

**MUNSCH HARDT KOPF & HARR P.C.**

Joseph J. Wielebinski (21432400)
Lee J. Pannier (24066705)
3800 Lincoln Plaza
500 N. Akard Street
Dallas, Texas 75201
Tel.: 214-855-7500
Fax: 214-855-7584
jwielebinski@munsch.com
lpannier@munsch.com

COME NOW Hugh Dickson and Marcus Wide, the duly-appointed liquidators of Stanford International Bank, Ltd., in SIB's liquidation proceeding pending before the High Court of Antigua and Barbuda in Antigua, and file their *Appendix in Support of Joint Liquidators' Emergency Motion for Leave to Pursue Professional Negligence Claims*.

<u>**Contents of Appendix**</u>

| Description | Page Numbering |
|---|---|
| Letter from David Jimenez-Ekman, Esq., to Edward H. Davis, Jr., Esq., dated October 25, 2011. | APP000001-05 |
| In the Matter of Stanford International Bank Limited, High Court of Antigua and Barbuda, Order [Appointment of New Liquidators] dated May 13, 2011. | APP000006-23 |
| Plea Agreement of James M. Davis [Dkt. #30], *U.S. v. Davis*, Case No. 4:09-cr-00335 (S.D.T.X. Aug. 27, 2009). | APP000024-54 |

Dated:  January 13, 2012                Respectfully submitted,

**REID COLLINS & TSAI LLP**

By: /s/ *William T. Reid IV*

William T. Reid IV (0078817)
P. Jason Collins (24040711)
Nathaniel J. Palmer (24065864)
4301 Westbank Dr., Suite B230
Austin, Texas 78746
Tel.:  512-647-6100
Fax:  512-647-6129
wreid@rctlegal.com
jcollins@rctlegal.com
npalmer@rctlegal.com

**MUNSCH HARDT KOPF & HARR P.C.**

Joseph J. Wielebinski (21432400)
Lee J. Pannier (24066705)
3800 Lincoln Plaza
500 N. Akard Street
Dallas, Texas 75201
Tel.: 214-855-7500
Fax: 214-855-7584
jwielebinski@munsch.com
lpannier@munsch.com

**COUNSEL FOR HUGH DICKSON AND MARCUS WIDE, JOINT LIQUIDATORS OF STANFORD INTERNATIONAL BANK, LTD.**

# JENNER&BLOCK

October 25, 2011

Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654-3456
Tel 312 222-9350
www.jenner.com

Chicago
Los Angeles
New York
Washington, DC

**BY E-MAIL & U.S. MAIL**

Edward H. Davis, Jr.
ASTIGARRAGA DAVIS
701 Brickell Avenue
16th Floor
Miami, Florida  33131-2847

David Jiménez-Ekman
Tel  312 923-2683
Fax 312 840-7643
djimenez-ekman@jenner.com

**Re: Stanford Receivership**

Dear Edward:

Our client, Hunton & Williams LLP ("Hunton"), forwarded us your letter of September 30, 2011 requesting, on behalf of your clients, the liquidators for Stanford International Bank, Ltd. ("SIBL"), that Hunton produce its files and other materials and documents related to any legal services Hunton provided to SIBL.  Hunton has been and remains fully committed to cooperating with your client's efforts to the extent permitted by its legal and ethical obligations to its former clients.  However, for the reasons described below, Hunton is not able to comply with your request absent agreement from the U.S. Receiver or a further order from the U.S. court that appointed him.

Counsel for the predecessors to the current Joint Liquidators of SIBL, referred to for purposes of this letter as the former Antiguan liquidators, made a request similar to your client's in 2009, after the U.S. Receiver for the Stanford entities, Ralph Janvey, asked Hunton for its Stanford-related files, including files related to SIBL.  In 2009 and in 2010, Hunton engaged in a dialogue with counsel for the former Antiguan liquidators, as well as counsel to the Receiver, regarding the proper recipient of Hunton's SIBL-related files.  For your information, we briefly recount the relevant aspects of this dialogue here, and have enclosed copies of the key correspondence for your convenience:

- On March 24, 2009, the Receiver moved to compel Hunton to produce files related to its representation of SIBL and other foreign Stanford entities.  *See* Receiver's Motion to Compel, *SEC v. Stanford Int'l Bank, Ltd.*, No. 3:09-cv-00298-N (N.D. Tex. Mar. 24, 2009) [No. 220].  Before the motion to compel was filed, Hunton produced its files related to its representation of Stanford entities based in the United States.  However, Hunton believed there was a question whether the receivership court had jurisdiction over the property of the non-U.S. Stanford entities.  As a result, the parties asked the Court to resolve that issue.

- On March 31, 2009, Hunton's deputy general counsel, Stacy Colvin, sent a letter to the former Antiguan liquidators, asking them for their position on the Receiver's motion to

Edward H. Davis, Jr.
October 25, 2011
Page 2

compel. In response to that letter, counsel for the former Antiguan liquidators requested Hunton produce its SIBL-related files to the Antiguan liquidators.

- Further correspondence and dialogue occurred, and on April 8, 2009, counsel for the former Antiguan liquidators proposed that Hunton produce its files to both the Receiver and the former Antiguan liquidators. Hunton's general counsel, Robert Rolfe, shared this proposal with the Receiver's counsel.

- On April 17, 2009, in connection with his reply in support of the motion to compel, the Receiver asked the Court to enjoin Hunton from providing the files to any party other than the Receiver (including foreign liquidators). *See* Receiver's Motion to Compel, *SEC v. Stanford Int'l Bank, Ltd.*, No. 3:09-cv-00298-N (N.D. Tex. Apr. 17, 2009) [No. 315].

- On April 22, 2009, the former Antiguan liquidators filed a partial opposition to the Receiver's motion to compel, objecting to the Receiver's request that Hunton be enjoined from providing Stanford-related information to foreign liquidators or courts. *See* Liquidators' Notice of Partial Opposition to the U.S. Receiver's Motion to Compel, *SEC v. Stanford Int'l Bank, Ltd.*, No. 3:09-cv-00298-N (N.D. Tex. Apr. 22, 2009) [No. 322].

- On March 1, 2010, Judge Godbey granted the Receiver's motion to compel but did not rule on the Receiver's request to enjoin Hunton from producing the files to other parties. *See* Order, *SEC v. Stanford Int'l Bank, Ltd.*, No. 3:09-cv-00298-N (N.D. Tex. Mar. 1, 2010) [No. 1026].

- On March 2, 2010, Mr. Rolfe notified counsel for the former Antiguan liquidators of the Court's order on the motion to compel and indicated that Hunton intended to comply with the order unless the former Antiguan liquidators intended to take prompt action to stay the order.

- Further discussion occurred, and counsel for the former Antiguan liquidators took the position that Hunton was free to produce SIBL-related documents to them because the Court did not rule on the Receiver's requested injunction. On March 6, 2010, Sue Ayers of Baker Botts informed Mr. Rolfe that Hunton could not do so because "[t]he Receiver possesses the privilege now and objects to your production of the legal files to anyone else." Mr. Rolfe informed counsel for the former Antiguan liquidators of the Receiver's position but received no response. As you know, not long thereafter, in June 2010, the Antiguan court removed the former Antiguan liquidators from their position.

Hunton intends to act consistent with its legal and professional obligations to maintain client confidences and the attorney-client privilege with SIBL and its other former Stanford-related clients. Despite the previous dialogue on the subject of the holder of the attorney-client privilege for SIBL, Hunton believes it remains unclear whether the Receiver, your clients, or both control the attorney-client privilege with respect to SIBL. Nevertheless, in 2010, Hunton received clear instructions from the Receiver that Hunton is not to produce SIBL-related files to the former Antiguan liquidators.

Edward H. Davis, Jr.
October 25, 2011
Page 3

We do not know whether the Receiver's position on this issue has changed.  We have sent a letter to the Receiver enclosing your September 30, 2011 request and seeking the Receiver's response.  Unless and until this issue is resolved by agreement or a court of competent jurisdiction, we do not believe Hunton can produce SIBL-related files to the new Antiguan Joint Liquidators consistent with its professional obligations as to former-client confidences.

Please direct all future correspondence on this subject or any others related to Hunton's representation of SIBL or other Stanford entities to me.  Please do not hesitate to contact me with any questions.  We will advise you once we have heard back from the Receiver's counsel in response to our letter.

Best personal regards.

Sincerely,

David Jiménez-Ekman

Enclosures

cc:     David Arlington (Baker Botts LLP)
        Jeffrey D. Colman (Jenner & Block LLP)
        April A. Otterberg (Jenner & Block LLP)
        Robert Rolfe (Hunton & Williams LLP)
        Stacy Colvin (Hunton & Williams LLP)

APP000003

# JENNER&BLOCK

October 25, 2011

Jenner & Block LLP                Chicago
353 N. Clark Street               Los Angeles
Chicago, IL 60654-3456            New York
Tel 312 222-9350                  Washington, DC
www.jenner.com

**BY E-MAIL & U.S. MAIL**

David Arlington                   David Jiménez-Ekman
BAKER BOTTS LLP                   Tel 312 923-2683
1500 San Jacinto Center          Fax 312 840-7643
98 San Jacinto Blvd.             djimenez-ekman@jenner.com
Austin, Texas 78701-4078
Tel. (512) 322-2500

### Re: Stanford Receivership

Dear David:

I enclose a September 30, 2011 letter that our client, Hunton & Williams LLP ("Hunton"), received from counsel for the new Antiguan Joint Liquidators of Stanford International Bank Limited ("SIBL"). As you will see, the liquidators have asked Hunton to produce its files and other materials and documents related to any legal services provided by Hunton to SIBL. I also enclose our response to the new joint liquidators, which recounts the history of this issue.

We are sending you this request because, in the past, the Receiver has claimed to own the attorney-client privilege with respect to SIBL and has objected to a prior request that Hunton produce its SIBL-related files to the previous Antiguan liquidators. We ask you to advise us of your current position on the request made by the new Antiguan Joint Liquidators.

Hunton has been and remains fully committed to cooperating with the efforts of your client and the liquidators consistent with its legal and professional obligations to maintain client confidences and the attorney-client privilege with SIBL and its other former Stanford-related clients. Despite the previous dialogue on the subject of the holder of the attorney-client privilege for SIBL, Hunton believes it remains unclear whether the Receiver, the new Antiguan liquidators, or both controls the attorney-client privilege with respect to SIBL. We will not produce SIBL-related files to the new Antiguan liquidators unless and until this issue is resolved by agreement or a court of competent jurisdiction.

We are available at any mutually convenient time to answer any questions or further discuss any of these issues.

David Arlington
October 25, 2011
Page 2

Best personal regards.

Sincerely,

David Jiménez-Ekman

Enclosures

cc:    Edward H. Davis, Jr. (Astigarraga Davis)
       Jeffrey D. Colman (Jenner & Block LLP)
       April A. Otterberg (Jenner & Block LLP)
       Robert Rolfe (Hunton & Williams LLP)
       Stacy Colvin (Hunton & Williams LLP)

THE EASTERN CARIBBEAN SUPREME COURT

THE HIGH COURT OF JUSTICE

ANTIGUA AND BARBUDA

Claim No. ANUHCV 2009/0149

In the Matter of Stanford International Bank Limited (In Liquidation)

-and-

In the Matter of the International Business Corporations Act, Cap 222 of the
Laws of Antigua and Barbuda

-and-

In the Matter of an Application for the Removal of the Joint Liquidators

ORDER
[Appointment of New Liquidator(s)]

BEFORE THE HONOURABLE JUSTICE MARIO MICHEL IN CHAMBERS

DATED: 12 May, 2011.

ENTERED: [ 13th ] May, 2011.

<u>PENAL NOTICE</u>

IF YOU, STANFORD INTERNATIONAL BANK LIMITED, OR YOUR DIRECTORS, DISOBEY THIS ORDER, YOUR DIRECTORS MAY BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE THEIR ASSETS SEIZED; AND YOU, AS A COMPANY, MAY BE FINED AND HAVE YOUR ASSETS SEIZED.

ANY OTHER PERSON WHO KNOWS OF THIS ORDER AND DOES ANYTHING WHICH HELPS, PERMITS OR CONSTITUTES ANY BREACH OF ANY OF THE TERMS OF THIS ORDER, MAY ALSO BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE THEIR ASSETS SEIZED.

1

**UPON** consideration of the Order and Judgment of Thomas, J of this Court dated 8th June 2010 (the "Removal Order") where this Court removed Nigel Hamilton-Smith and Peter Wastell as Joint Liquidators of Stanford International Bank Limited ("S.I.B." or the "Bank"),

**AND UPON READING** (a) the Second Affidavit of Marcus A. Wide of 15 April, 2011, (b) the Second Affidavit of Hugh Dickson of 15 April, 2011, (c) the Second Affidavit of William Tacon of 16 April, 2011 of Zolfo Cooper (BVI) Ltd., (d) the Affidavits of Craig L. Waterman sworn on 12 April, 2011 and of James A. Pomeroy of PricewaterhouseCoopers sworn on 15 April, 2011, together with (e) the Second Amended Notice of Application dated 18 April, 2011 to Appoint Replacement Liquidators of Alexander M. Fundora (the "Applicant"), a creditor of the estate of S.I.B.,

**AND UPON HEARING**
Anthony Astaphan S.C., Counsel for the Applicant; K. Kentish Counsel for the Outgoing Officeholders,

**THE APPLICATION HEREIN** having been heard on 12 May, 2011,

**THIS COURT** having previously determined that in the circumstances it was just and convenient that S.I.B. be liquidated and dissolved under the supervision of the Court pursuant to the International Business Corporations Act, Cap 222 of the Laws of Antigua and Barbuda (as amended) (the "IBC Act"), and having appointed Mr. Hamilton-Smith and Mr. Wastell as Joint Official Liquidators of S.I.B. (in liquidation) all by Order of this Court dated 15 April 2009 and entered on 17 April 2009,

**AND UPON THIS COURT HAVING** removed Nigel Hamilton-Smith and Peter Wastell (the "Outgoing Officeholders") as Joint Liquidators upon the Application of the Applicant and by the terms of the Removal Order dated 8th June 2010; and without in any way altering or affecting the legal rights of the estate of S.I.B. or of its past, present or future Liquidators in any thing of value, including but not limited to (i) the right to marshal into the estate or obtain control over any assets wheresoever such assets may be found in the world; (ii) any form of recognition as the foreign insolvency office holders of S.I.B. by any foreign court, administrative agency or tribunal; or (iii) the rights of the Outgoing Officeholders to seek Court approval of their reasonable fees and reasonable costs and expenses incurred whilst they were receiver-managers and/or

2

liquidators of S.I.B., from the estate of S.I.B. (subject to the terms of this order set out below); the Outgoing Officeholders' powers and authority under the Order of this Court dated 15 April 2009 and entered on 17 April 2009 are hereby terminated.

**AND UPON THE APPLICANT HAVING SUBMITTED** the names of three alternative pairs of suitably qualified and experienced insolvency practitioners pursuant to paragraph 9 of the Order of Thomas, J appearing at page 84 of his Judgment dated 8th June 2010 as candidates for the office of the new joint liquidators of S.I.B.,

**AND UPON** being advised of the filing of the Consents to Act of (i) Craig L. Waterman of PricewaterhouseCoopers (Barbados) and James A. Pomeroy of PricewaterhouseCoopers LLP (Halifax, Nova Scotia, Canada) (ii) Mr. Hugh Dickson of Grant Thornton (Cayman) Limited and Marcus A. Wide of Grant Thornton (British Virgin Islands) Limited; and (iii) Mr. William R. Tacon of Zolfo Cooper (BVI) Limited and Richard Edgar Lewis Fogerty of Zolfo Cooper (Cayman) Limited to act as the new joint liquidators of S.I.B.;

**IT IS HEREBY ORDERED THAT:**

**APPOINTMENT OF NEW OFFICEHOLDER**

1.     MARCUS A. WIDE of Grant Thornton (British Virgin Islands) and HUGH DICKSON of Grant Thornton (Cayman Island) are hereby appointed joint liquidators (the "Liquidators" or "New Officeholders") of the Bank, with all the powers and duties of a liquidator as contained in the International Business Corporations Act, Cap. 222, as amended (the "Act") of the Laws of Antigua and Barbuda or any other legislation or rules of law related thereto or deriving therefrom and with such further duties and responsibilities as conferred by this Order.

**NOTIFICATION OF APPOINTMENT.**

2.     The Liquidators shall forthwith give notice of their appointment to office to each known claimant and creditor of the Bank and all other interested persons by publishing a notice in the Official Gazette and in a newspaper with national circulation in Antigua and Barbuda and otherwise give notice in every jurisdiction where the Bank had a place of business in such manner as they shall consider appropriate.

3

**TAKING POSSESSION OF ASSETS OF S.I.B.**

3.      The Liquidators shall take possession of, gather in and realise all the present and future assets and property of the Bank, including without limitation, any real and personal property, cash, choses-in-action, negotiable instruments, security granted or assigned to the Bank by third parties including property held in trust or for the benefit of the Bank, and rights, tangible or intangible, wheresoever situate and to take such steps as are necessary or appropriate to verify the existence and location of all the assets of the Bank, or any assets formerly held by, whether directly or indirectly, or to the order of, or for the benefit of, the Bank or any present or former subsidiary or company associated with, or owned by, the Bank. The aforementioned assets and property shall include the terms of all agreements or other arrangements relating thereto, whether written or oral, the existence or assertion of any lien, charge, encumbrance or security interest thereon, and any other matters which in the opinion of the Liquidators may affect the extent, value, existence, preservation, and liquidation of the assets and property of the Bank. The title to all assets of S.I.B. shall vest in the New Officeholders as successors to and in substitution for the Outgoing Officeholders. For greater certainty, such vesting in the New Officeholders shall be deemed to have effect as of the date of the original appointment of the Outgoing Officeholders of 15th April 2009.

**BANK ACCOUNTS.**

4.      The Liquidators shall open and maintain a bank account either in their names as Liquidators or in the Bank's name (in liquidation), in this jurisdiction and deposit therein the funds gathered and realised pursuant to his appointment. Notwithstanding the foregoing, the Liquidators shall have the power to open and maintain foreign bank accounts or to establish client account(s) at the bank(s) of his solicitors, attorneys-at-law or other legal counsel in foreign jurisdictions, and receive and hold all or any portion of the proceeds from the sale, recovery or realisation of the Bank's assets and property in foreign jurisdictions, in such foreign bank accounts. (All bank accounts maintained by the Liquidators are collectively referred to as the "Account").

**DISTRIBUTION OF PROCEEDS OF LIQUIDATION OF GENERAL ASSETS OF S.I.B. - FEES AND EXPENSES.**

5.    (a)    Subject to the repayment of any and all indebtedness that may be incurred by the Liquidators under clause 14 below, the general assets of the Bank are, from the date hereof, to be held for the benefit of the depositors and creditors of the Bank as their interests appear in accordance with the laws of Antigua and Barbuda, subject to the payment of the fees, expenses and costs of the liquidation which shall be paid in the order of priority required by section 289 of the IBC Act.

     (b)    This Court confirms that, in addition to their own fees (aa) the fees and expenses of the New Officeholders shall include fees and expenses of foreign or domestic legal counsel, and agents, accountants, investigators, forensic analysts or other experts engaged by the New Officeholders to assist them in the discharge of their duties and responsibilities (the "Costs"); and (bb) the fees and expenses (including any foreign or domestic solicitors, attorneys, legal counsel and agents) of the Outgoing Officeholders, once assessed and approved by the Court shall be paid on a pro rata basis with any then outstanding fees and expenses of the New Officeholders (including any Costs) and shall be paid out of the general assets of the Bank, but subject to the obligation to repay any loan or financing obtained by the New Officeholders pursuant to clause 14 below; as well as the effect of any security or charge against the assets of the estate of the Bank pledged to secure any such loan or finance. Should the New Officeholders borrow money under clause 14, they may be paid their ongoing fees and expenses on a monthly basis from the proceeds of such funding.

**REQUEST FOR JUDICIAL ASSISTANCE ABROAD - UNCITRAL DECLARATIONS.**

6.    The purpose of this clause 6 is to set out a specific request for judicial assistance to all foreign Courts where assets or Papers of S.I.B. may be found or where the Liquidators seek any form of judicial assistance.  This request is made pursuant to the notions of curial deference, comity and mutual respect which endures between all Courts.  This

5

Court requests, to the extent that such recognition has not already occurred, that this proceeding be recognised as a foreign main proceeding taking place in Antigua where S.I.B. has the centre of its main interests as that term is defined in Article 2 (b) of the UNCITRAL Model Law on Cross-Border Insolvency with Guide to Enactment; and in fulfilment of the requirement for recognition as a foreign main proceeding in Article 17 subsection 2 (a) of the UNCITRAL Model Law on Cross-Border Insolvency with Guide to Enactment. The place of incorporation and domicile of S.I.B. is Antigua. The place of the head office and "nerve centre" S.I.B. is also Antigua. This Court declares that this is a collective judicial proceeding in which the assets and affairs of the debtor are subject to the control or supervision by this Court of Antigua and Barbuda for the purpose of the liquidation of the assets of S.I.B. pursuant to Article 2 (a) of the UNCITRAL Model Law on Cross-Border Insolvency with Guide to Enactment.

7.  This Court declares that the Liquidators are authorised to act in any foreign state on behalf of S.I.B. as may be permitted by any applicable foreign law and/or by Article 5 of the UNCITRAL Model Law on Cross-Border Insolvency with Guide to Enactment. This Court declares that the Liquidators are persons authorised in the present insolvency proceedings of Antigua and Barbuda to administer S.I.B.'s assets and affairs wheresoever they may be found in the world, and to act as foreign representatives of a foreign proceeding as prescribed by Article 2 (d) of the UNCITRAL Model Law on Cross-Border Insolvency with Guide to Enactment.

8.  This Court declares that this is a collective insolvency proceeding intended to marshal in and recover all assets and value owned by, or owed to, the Bank wheresoever in the world such assets or value may be located or realised upon. All creditors, depositors and investors in the Bank shall have the right to seek to prove in the estate of the Bank no matter where such parties are resident or located in the world. This Court finds that the Bank is insolvent and declares these proceedings to be in respect of an insolvent liquidation of the Bank.

6

**SECURITY FOR PAYMENT OF LIQUIDATORS' FEES.**

9.      Subject to the repayment of any and all indebtedness that may be incurred by the Liquidators under clause 14 below and to any super priority mortgage, security interest or charge which the said borrowings may require and that this Court may approve (the "Lender's Super Priority Security Interest"), the New Officeholders shall have a security interest in the assets and property of the Bank superior to all other persons as security for their fees, expenses and costs.  For the avoidance of any doubt, the New Officeholders shall share on an equal footing their security interest contemplated herein by this clause 9 with the security interest held by the Outgoing Officeholders for their fees and expenses (as may be assessed and approved by the Court) claimed for work carried out to date, but always subject to any borrowing by S.I.B.

**TURN-OVER OF ASSETS AND PAPERS.**

10.     Subject always (in the case of the Outgoing Liquidators, and their managers, employees, agents, accountants, holders of powers of attorney, legal counsel and shareholders and all persons acting on their instructions or behalf) to the terms and conditions of the Transitional Arrangements Order (the "TAO") of even date herewith, the Bank and any person holding, or reasonably believed to have in his or their possession or power, any assets, property or information of the Bank including, without limitation, information evidenced on any computer records, electronic records, programs, disks, documents, books of account, corporate records, minutes, correspondence, opinions rendered to the Bank, documents of title, whether in an electronic medium or otherwise (collectively called "Papers"), relating in whole or in part to the Bank (or to any person, dealings, or property showing that that person is indebted to the Bank), may be required by the Liquidators to produce or deliver over such property or Papers as soon as may be practicable to the Liquidators, subject to the Liquidators tendering to pay (such person or body all reasonable disbursements incurred in relation thereto (once S.I.B. has funds available to pay for the same), notwithstanding any claim or lien that such person may have or claim on such assets, property or Papers, and the Liquidators shall have full and complete possession and control of such assets, property and Papers of the Bank including its premises. In the event of a *bona fide* dispute over ownership or any legal

7

entitlement to such property or Papers, the Liquidators shall be permitted to take away copies of such Papers.

## EXAMINATION OF WITNESSES.

11.     The Liquidators shall be at liberty, without the necessity of any further order, to summon before the High Court for examination under oath, subject to the Liquidators tendering to pay such person or body all reasonable disbursements incurred in relation thereto(once S.I.B. has funds available to pay for the same), any person reasonably thought by him to have knowledge of the affairs of the Bank or any person who is or has been an Outgoing Officeholder or a director, officer, employee, agent, shareholder, accountant of the Bank, or such other person believed to be knowledgeable of the affairs of the Bank and to order such person(s) so liable to be examined to produce any books, documents, correspondence or Papers in his or her possession, custody or power relating in whole or in part to the Bank, its dealings, property and assets and the Liquidator is authorised to issue writs of subpoena *ad testificandum* and *duces tecum* for the compulsory attendance of any of the persons aforesaid required for such examination.

## DISCLOSURE OF INFORMATION.

12.     Further, and without limiting the generality of any other provision contained in this Order and subject always (in the case of the Outgoing Liquidators, and their managers, employees, agents, accountants, holders of powers of attorney, legal counsel and shareholders and all persons acting on their instructions or behalf) to the terms and conditions of the TAO of even date herewith:

(a)     (i) The Bank; (ii) the Outgoing Officeholders; (iii) all of its current and former directors, officers, managers, employees, agents, accountants, holders of powers of attorney, legal counsel and shareholders, and all other persons acting on its instructions or behalf; and (iv) all other individuals, firms, corporations, governmental bodies or agencies, or other entities having notice of this Order (all of the foregoing, collectively, being "Persons" and each being a "Person") shall as soon as reasonably practicable advise the Liquidators of the existence of any

8

assets and property in such Person's possession, power, control or knowledge, and shall grant immediate and continued access to the said assets and property to the Liquidators, and shall, upon a written request (to include e-mail), deliver, subject to the Liquidators undertaking to pay such person or body all reasonable disbursements incurred in relation thereto (once S.I.B. has funds available to pay for the same), all such assets and property to the Liquidators upon the Liquidators' request, subject only to any privilege attaching to solicitor-client communications or statutory provisions prohibiting such disclosure;

(b)     All Persons shall as soon as reasonably practicable advise the Liquidators of the existence of and grant access to and, upon a written request (to include e-mail), deliver, subject to the Liquidators undertaking to pay such person or body all reasonable disbursements incurred in relation thereto (once S.I.B. has funds available to pay for the same), the Liquidators or to such agent or agents he may appoint, any books, documents, securities, contracts, orders, corporation and accounting records, and any other papers, records and information of any kind related to the business or affairs of the Bank, and any computer programmes, computer tapes, computer disks, or other data storage media containing any such information (the foregoing, collectively, the "Records") in that Person's possession or control, and shall, subject to the Liquidators undertaking to pay such person or body all reasonable disbursements incurred in relation thereto (once S.I.B. has funds available to pay for the same), provide to the Liquidators, or permit the Liquidators to make, retain and take away copies thereof, and grant to the Liquidators unfettered access to and use of accounting, computer, software and physical facilities relating thereto, subject only to any privilege attaching to solicitor-client communications or statutory provisions prohibiting disclosure;

(c)     If any Records are stored or otherwise contained on a computer or other electronic system of information storage, whether by independent service provider or otherwise, all Persons in possession or control of such Records shall, subject to the Liquidators undertaking to pay such person or body all reasonable disbursements incurred in relation thereto (once S.I.B. has funds available to pay

9

for the same), as soon as reasonably practicable give all reasonable access to the Liquidators for the purpose of allowing the Liquidators to recover and fully copy all of the information contained therein whether by way of printing the information onto paper or making copies of computer disks or such other manner of retrieving and copying the information as the Liquidators in their discretion deems expedient, and shall not alter, erase or destroy any Records without the prior written consent of the Liquidators.  Further, for the purposes of this sub-paragraph, all Persons shall, subject to the Liquidators undertaking to pay such person or body all reasonable disbursements incurred in relation thereto (once S.I.B. has funds available to pay for the same), , provide the Liquidators with all such assistance in gaining access as soon as practicable to the information in the Records as the Liquidators may in their discretion require including providing the Liquidators with instructions on the use of any computer or other system and providing the Liquidators with any and all access codes, account names and account numbers that may be required to gain access to the information; and

(d)     The Persons are hereby restrained and enjoined from disturbing or interfering with the Liquidators and with the exercise of the powers and authority of the Liquidators conferred hereunder.

**AUTHORITY TO EXECUTE INSTRUMENTS.**

13.     The New Officeholders are authorized in their own name or on behalf of the Bank as Liquidators to join in and execute, assign, issue and endorse such transfers, conveyances, contracts, instruments of termination of any contracts, leases, deeds, bills of sale, cheques, bills of lading or exchange or other documents of whatever nature in respect of any assets, property or Papers of the Bank as may be required to carry out their duties including the realisation and liquidation of the assets of the Bank, or the collection of any Papers of the Bank, or for any other purpose pursuant to this Order.

10

**BORROWINGS.**

14. In the light of the limited measure or scarcity of liquid assets currently available to S.I.B., this Court acknowledges the need for S.I.B.'s estate to be placed into a financial condition which shall permit it to function properly. The New Officeholders are hereby empowered under section 308 (1) (f) of the IBC Act and authorised by virtue of this Order to (a) borrow a principal sum (in such amount as the Court may approve) as they may consider necessary or desirable including any monies borrowed or to be borrowed for fees and expenses incurred (or to be incurred) by the New Officeholders while operating by virtue of their appointment hereunder, and (b) pledge or mortgage by way of a first charge in super priority ranking to all other claims or charges, any one, more or all of the present or contingent assets of the Bank as security for such borrowings. The terms and conditions governing any loan agreement or pledge or mortgage of assets of S.I.B. as collateral security therefor may be agreed upon by the New Officeholders provided that such terms of finance or funding shall be consistent with this Order, the TAO and subject to the further approval of this Court. Any such first charge or mortgage shall specifically be deemed to be in priority to any other claim to a charge or lien in and to such assets or rights, including but not limited to any right or claim created by the order of this Court dated 15 April, 2009 provided that before this provision shall affect or alter any rights of the Outgoing Officeholders, they shall be given at least fourteen (14) days notice of any hearing listed on the application of the Liquidators to approve the terms of any proposed borrowing or finance to be procured by the Liquidators under this Clause 14.

**PAYMENT OF FEES AND EXPENSES.**

15. The remuneration of the Liquidators and their expenses or disbursements including legal costs or fees, may be drawn and paid on account of the total on a monthly basis from the assets of the Bank or from borrowings obtained under clause 14, including cash and deposits on hand, on the basis of the time expended by the Liquidators and their staff or the staff of the professional services firm they are associated with at their usual hourly or daily rates for such work subject to such amounts being taxed from time to time as the Court may direct.

11

**ENGAGEMENT OF EXPERTS AND PROFESSIONALS.**

16.     The Liquidators may engage agents, appraisers, auctioneers, brokers, or any other experts as may be required to assist them with the liquidation process and determining claims in the liquidation.  The Liquidators may also engage the professional services firm with which they are associated, to provide services to S.I.B. in accordance with the hourly rates set forth in their Consents to Act or Affidavits filed with this court in April 2011.

**ENGAGEMENT OF LEGAL PROFESSIONALS.**

17.     The Liquidators may retain independent legal advice and engage solicitors, legal Counsel or other professional advisors or consultants, both inside and outside Antigua and Barbuda and elsewhere to assist them as Liquidators to discharge their duties hereunder. The Liquidators may also retain the services of private investigators, forensic analysts, accountants or other service providers who are within or without the jurisdiction of this Court, to further their investigations and work in respect of the Bank or otherwise.  The Liquidators are empowered to use the funds of the Bank to pay the fees and disbursements of such service providers at their regular hourly rates and on a monthly basis.

**REPORTING.**

18.     The Liquidators shall provide a report to this Honourable Court within 90 days of their appointment with respect to the liquidation and their preliminary determination of the assets to be realised, the likely recoveries and the extent to which the claims of creditors, depositors, and investors in the Bank may be met.  The Liquidators shall further report to the Court as they or the Court determines is appropriate, but shall in any event report no less frequently than six months from the date of their last report.

**INDEMNIFICATION OF NEW OFFICEHOLDERS.**

19.     The New Officeholders and their respective officers, employees, legal counsel, solicitors, agents, and such other persons retained by them in the performance of their duties

12

hereunder are hereby granted indemnity from the assets of the Bank for their fees, expenses and actions taken, including indemnity for any litigation or other claims, actions or demands whatsoever in respect of any debts, costs, claims, liabilities, acts, matters, or things done or due to be done or omitted by the New Officeholders and their officers, employees, legal counsel, solicitors, agents and such other persons retained by them except where there is a finding by the Court of willful misconduct in the performance of his and/or of their respective duties.

## STAY.

20.   All actions, proceedings and any claims whatsoever and wheresoever initiated against the Bank, its assets and property or the Bank's direct or indirect subsidiaries, are hereby stayed and no person, which shall include a body corporate, shall bring or continue with a claim or proceeding against the Liquidators, the Bank or the Bank's direct or indirect subsidiaries, without leave of this Honourable Court.

21.   All persons having oral or written agreements with the Bank or statutory or regulatory mandates for the supply of goods and/or services including, without limitation, all computer software, communication and other data services, centralised banking services, payroll services, insurance, transportation and freight services, utility or other services to the Bank are hereby restrained until further order of this Honourable Court from discontinuing, altering, interfering with or terminating the supply of such goods or services as may be required by the Liquidators, and that the Liquidators shall be entitled to the continued use of the Bank's current telephone numbers, facsimile numbers, Internet addresses and domain names, provided in each case that the normal prices or charges for all such goods or services received after the date of this Order are paid by the Liquidators in accordance with normal payment practices of the Bank or such other practices as may be agreed upon by the supplier or service provider and the Liquidators, or as may be ordered by this Honourable Court.

## DIRECTIONS – URGENCY.

22.   The Liquidators in the carrying out of their duties and responsibilities may apply for directions and guidance from this Honourable Court from time to time including any

13

application as may be required for the amendment of this Order. In light of the number and complexity of the urgent matters facing the administration of the SIB Estate, the Registry is directed to seek to list any application by the Liquidators for directions or Court approval urgently and to the extent that the Liquidators file a certificate of Urgency with any Notice of Application which they file. The Registry shall list a hearing for two hours duration for Monday 11 July, 2011 (or for whatever day may be convenient and which is near to such date provided that 14 days notice of any such hearing is given to the Outgoing Officeholders), to hear the New Officeholders' prospective Application for Court approval of the terms under which they may borrow monies for the funding of the liquidation under clause 14 hereof (and any ancillary or related applications). This direction shall not preclude the New Officeholders from seeking an earlier date for such hearing (provided that 14 days notice of any such hearing is given to the Outgoing Officeholders).

## CONTRACTS.

23.    No person shall discontinue, fail to honour, alter, interfere with, repudiate, terminate or cease to perform any right, renewal right, contract, agreement, licence or permit in favour of or held by the Bank without written consent of the Liquidators or leave of this Honourable Court.

## APPROVALS.

24.    The Liquidators, in their name or in the name of the Bank, shall be at liberty to apply for any permits, licenses, approvals or permissions as they may be advised by their counsel are required by or deemed necessary pursuant to any laws, governmental or regulatory authority, in the pursuit or performance of their duties hereunder.

## AUTHORITY TO ACT.

25.    The Liquidators shall have the authority as officers of this Honourable Court to act in Antigua and Barbuda or any foreign jurisdiction where they believe assets, property or Papers of the Bank may be situate or traced at equity or otherwise, and they shall have the right to bring any proceeding or actions in Antigua and Barbuda and any foreign

14

jurisdiction for the purpose of fulfilling their duties and obligations under this Order and the Act and to seek the assistance of any Court of a foreign jurisdiction in the carrying out of the provisions of this Order or any subsequent order in this proceeding, including without limitation, subject to the Liquidators tendering to pay such person or body all reasonable disbursements incurred in relation thereto (once S.I.B. has funds available to pay for the same),, an order of examination of persons believed to be knowledgeable of the affairs, assets and property of the Bank and to assist the Liquidators in the recovery of the assets and property of the Bank or to trace such assets into the hands of others.

26.   The Liquidators are hereby constituted as foreign representatives for the purposes of any proceedings with respect to the Bank that may be commenced or taken under any applicable law outside Antigua and Barbuda, including but not limited to any foreign bankruptcy, trust, insolvency, company or other applicable law.

27.   Subject always (in the case of the Outgoing Liquidators, and their managers, employees, agents, accountants, holders of powers of attorney, legal counsel and shareholders and all persons acting on their instructions or behalf) to the terms and conditions of the TAO of even date herewith, the Liquidators shall be at liberty and are hereby authorised and empowered to apply, upon such notice as they may consider necessary or desirable, to any other Court or administrative body in any other jurisdiction, whether in Antigua and Barbuda or elsewhere, without limitation, for orders recognising the appointment of the Liquidators by this Honourable Court and confirming the powers of the Liquidators in such other jurisdictions, and requesting the further aid, assistance or recognition of any Court, tribunal, governmental and administrative body or other judicial authority, howsoever styled or constituted, to assist in carrying out the terms of this Order and the duties and responsibilities of the Liquidators hereunder, including but not limited to, and on the basis of:

(a)   all applicable foreign corporate, insolvency or other statutory provisions or customary practices that permit the recognition of foreign representatives of an insolvent estate; and/or

(b)   the doctrines of curial deference and comity, including but not limited to:

15

(i)     recognising the Liquidators as having the equivalent powers of a liquidator or of an insolvency office holder within any foreign jurisdiction(s) and to investigate the affairs of the Bank, take evidence thereof and identify, trace, arrest, seize, freeze, detain, secure, recover, receive, control, preserve and protect the Bank's assets, property and Papers and administer such property, assets and Papers, howsoever characterised, pursuant to this Order;

(ii)    granting extraordinary relief to the Liquidators to identify, trace, arrest, seize, freeze, detain, secure, recover, receive, control, preserve and protect the Bank's assets, property and Papers and compel disclosure of information and documents to the fullest extent otherwise permitted, in aid of the Liquidators' authority hereunder to discover assets, property and Papers under the dominion or control of the Bank, to trace the movement and conversion, past and present, of the Bank's property, assets or Papers and to learn fully of the activities of the Bank with regard thereto;

(iii)   compelling disclosure of the identities of all known or unknown wrongdoers, facilitators and all other persons or entities who have acted, knowingly or unknowingly, in concert with the Bank in any fashion whatsoever; and

(iv)    compelling for examination under oath, by the Liquidators or other authorised person, any person reasonably thought to have knowledge of the affairs of the Bank, or any person who is or has been an agent, banker, clerk, employee, contractor, servant, officer, director, nominee, trustee, fiduciary, auditor, accountant, shareholder, lawyer, attorney, solicitor, advocate or advisor to the Bank, regarding the Bank, their dealings or the Bank's assets, property or Papers; and ordering any person liable to be so examined to produce any books, documents, correspondence, reports or papers in his possession or power relating in

16

whole or in part to the Bank, or in respect of his dealings with either the Bank or with the Bank's assets, property or Papers.

## COSTS.

28.    The Applicant be awarded all his reasonable costs and disbursements incurred in, and arising out of, the Removal Application, the related appeals litigation and the instant new appointment application (such costs to include the costs and disbursements of the Applicant's overseas Solicitors and/or Attorneys retained to instruct his counsel herein) (the "Applicant's Costs"). The Applicants Costs shall be paid from either any loan advanced to the estate of S.I.B by a third party under clause 14 or from the assets of the estate of S.I.B. within 28 days of the entering of this Order, such costs to be assessed if not agreed upon by the New Officeholders and the Applicant.

## REQUEST.

29.    This Honourable Court requests the aid, assistance and recognition of any foreign Court, tribunal, governmental body or other judicial authority howsoever styled or constituted, in any other jurisdiction where property, assets or Papers of the Bank may be found (or traced to), to assist in carrying out the terms of this Order and the duties and responsibilities of the Liquidators hereunder and to act in aid of, and to be complementary to, this Court in carrying out the terms of this Order.

## INTERPRETATION.

30.    To the extent of any conflict or inconsistency between the contents of this Order and the contents of the Order of this Court dated 15th April, 2009 (and which appointed the Outgoing Officeholders, Nigel Hamilton-Smith and Peter Wastell to office), the contents of this Order shall prevail otherwise the terms of the 15 April 2009 Order shall continue to subsist and endure.

17

31.   The Court notes the agreement of the Outgoing Officeholders to co-operate with the Liquidators in providing all reasonably assistance in connection with matters arising in the estate of S.I.B. and in the handover of the liquidation, such co-operation being in accordance with the terms of a Transitional Arrangements Order of equal date herewith. All reasonable costs incurred by the Outgoing Officeholders in providing assistance (including of legal advisors) in the transition of the Estate from the Outgoing Officeholders to the New Office Holders be costs in the estate and payable from any borrowings obtained under clause 14 to a limit of US$250,000 unless approved by the Court. The Liquidators shall not be required to post security in respect of their appointment.

32.   The Liquidators act solely in their capacity as Liquidators and without personal liability if they rely in good faith upon the financial statements or records of the Bank or upon an opinion, report or statement of any professional advisor retained by them.

BY THE COURT

Registrar

18

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

CLERK, U. S. DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
FILED
8/27/09
MICHAEL N. MILBY, CLERK
BY DEPUTY

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| v. | § | **Criminal No. H-09-335** |
| | § | |
| **JAMES M. DAVIS** | § | |
| | § | |

## PLEA AGREEMENT

The United States of America, by and through its United States Attorney for the Southern District of Texas and the Fraud Section of the Criminal Division of the Department of Justice, the defendant, James M. Davis, and the defendant's counsel, David Finn, have entered into the following plea agreement (the "Agreement") pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure:

### The Defendant's Agreement

1.    (a)    The defendant agrees to plead guilty to Counts One, Two and Three of the Information.  Count One charges the defendant with conspiracy to commit wire, mail and securities fraud, in violation of 18 United States Code, Section 371.  Count Two charges the defendant with mail fraud, in violation of 18 United States Code, Section 1341.  Count Three charges the defendant with conspiracy to obstruct an SEC proceeding, in violation of 18 U.S.C. § 371.  By entering this

Agreement, the defendant waives any right to have the facts that the law makes essential to the punishment of Counts One, Two or Three either charged in the Information, proved to a jury or proven beyond a reasonable doubt.

(b)     The defendant agrees that the facts of this case support the following Sentencing Guidelines calculation:

| | |
|---|---|
| Section 2B1.1(a) – Base offense level for wire fraud: | 7 |
| Section 2B1.1(b)(1)(K) – Loss of more than $400 million | 30 |
| Section 2B1.1(b)(2)(B)– More than 250 victims | 6 |
| Section 2B1.1(b)(9)(C, D) – Substantial part of scheme committed outside United States and otherwise used sophisticated means | 2 |
| Section 2B1.1(b)(14)(B) – Affecting safety and soundness of financial institution and endangering solvency or financial security of 100 or more victims | 4 |
| Section 3B1.3 – Abuse of position of trust | 2 |
| Section 2B1.1(b)(14)(C) – Combination of enhancement for more than 250 victims and enhancement for safety and soundness of financial institution and endangering the solvency or security of 100 or more victims, equals 10, therefore reduced to 8 | -2 |
| Section 3E1.1(a, b) – Acceptance of responsibility | -3 |
| Total Offense Level – Adjusted | 46 |

(c)     The defendant further agrees to recommend at the time of sentencing that the Sentencing Guidelines provide a fair and just resolution based on the facts of this case, and that no downward departure or variances are appropriate other than the reduction for acceptance of responsibility discussed in Paragraph

2

Thirteen and the potential for a downward departure based on substantial assistance pursuant to U.S.S.G. § 5K1.1 as discussed in Paragraph Seven.

## Punishment Range

2.     The statutory penalty for the violation of Title 18, United States Code, Section 371, in Counts One and Three, is not more than five years imprisonment and/or a fine of up to $250,000.00. The statutory penalty for the violation of Title 18, United States Code, Section 1341, in Count Two, is not more than twenty years imprisonment and/or a fine of up to $250,000.00. Additionally, on all three counts, the defendant may receive a term of supervised release after imprisonment of up to three (3) years.    Title 18 U.S.C. §§ 3559(a)(4) and 3583(b)(2).    Defendant acknowledges and understands that if he should violate the conditions of any period of supervised release which may be imposed as part of his sentences, then defendant may be imprisoned for the entire term of supervised release, not to exceed two years, without credit for time already served on the term of supervised release prior to such violation. Title 18 U.S.C. §§ 3559(a)(4) and 3583(e)(3).  Defendant understands that he cannot have the imposition or execution of the sentence suspended, nor is he eligible for parole.

3

APP000026

## Mandatory Special Assessment

3.     Pursuant to 18 U.S.C. § 3013(a)(2)(A), immediately after sentencing the defendant will pay to the Clerk of the United States District Court a special assessment in the amount of $100.00 per count of conviction. The payment will be by cashier's check or money order payable to the Clerk of the United States District Court, c/o District Clerk's Office, P.O. Box 61010, Houston, Texas 77208, Attention: Finance.

## Fine and Reimbursement

4.     The defendant understands that under the *United States Sentencing Commission Guidelines Manual* (hereafter referred to as "*Sentencing Guidelines*" or "U.S.S.G."), the Court is permitted to order the defendant to pay a fine that is sufficient to reimburse the United States for the costs of any imprisonment or term of supervised release, if any is ordered.

5.     The defendant agrees that becaue the offenses of conviction occurred after April 24, 1996, restitution is mandatory without regard to Davis's ability to pay and that the Court must order Davis to pay restitution for the full loss caused by his criminal conduct pursuant to Title 18, United States Code, Section 3663A, provided, however, that the United States agrees that the value of any property returned to victims through the forfeiture and remission process shall be credited against any

4

order of restitution.

6.     The defendant agrees to make complete financial disclosure by truthfully executing a sworn financial statement (Form OBD-500) prior to sentencing if he is requested to do so. In the event that the Court imposes a fine or orders the payment of restitution as part of the defendant's sentence, the defendant shall make complete financial disclosure by truthfully executing a sworn financial statement immediately following his sentencing.

### Cooperation

7.     The parties understand that the Agreement carries the potential for a motion for departure pursuant to U.S.S.G. § 5K1.1. The defendant understands and agrees that whether such a motion is filed will be determined solely by the United States. Should the defendant's cooperation, in the sole judgment and discretion of the United States, amount to "substantial assistance," the United States reserves the sole right to file a motion for departure pursuant to U.S.S.G. § 5K1.1. The defendant agrees to persist in his guilty plea through sentencing and to cooperate fully with the United States. The defendant understands and agrees that the United States will request that sentencing be deferred until his cooperation is complete.

8.     The defendant understands and agrees that the term "fully cooperate" as used in this Agreement includes providing all information relating to any criminal activity known to the defendant. The defendant understands that such information

5

includes both state and federal offenses arising therefrom. In that regard:

(a) The defendant agrees that this Agreement binds only the United States Attorney for the Southern District of Texas, the Fraud Section of the Criminal Division of the Department of Justice and the defendant; it does not bind any other United States Attorney or any other component of the Department of Justice.

(b) The defendant agrees to testify truthfully as a witness before a grand jury or in any other judicial or administrative proceeding when called upon to do so by the United States.

(c) The defendant agrees to voluntarily attend any interviews and conferences as the United States may request.

(d) The defendant agrees to provide truthful, complete, and accurate information and testimony; and he understands that any false statements he makes to the Grand Jury, at any court proceeding (criminal or civil), or to a government agent or attorney, can and will be prosecuted under the appropriate perjury, false statement, or obstruction statutes.

(e) The defendant agrees to provide to the United States all documents in his possession or under his control relating to all areas of inquiry and investigation.

(f) Should the recommended departure, if any, not meet the defendant's expectations, the defendant understands that he remains bound by the terms of this Agreement and cannot, for that reason alone, withdraw his plea.

### Waiver of Appellate Rights

9.    The defendant is aware that 18 U.S.C. § 3742 affords a defendant the right to appeal the sentence imposed. The defendant agrees to waive the right to appeal the sentence imposed or the manner in which it was determined on all other

APP000029

grounds set forth in 18 U.S.C. § 3742 except he reserves the right to appeal a sentence above the statutory maximum. Additionally, the defendant is aware that 28 U.S.C. § 2255 affords the right to contest or "collaterally attack" a conviction or sentence after the conviction or sentence has become final. The defendant waives the right to contest his conviction or sentence by means of any post-conviction proceeding, including but not limited to proceedings authorized by 28 U.S.C. § 2255. If at any time the defendant instructs his attorney to file a notice of appeal on grounds other than those specified above, the United States will seek specific performance of this provision.

10.   In exchange for this Agreement with the United States, the defendant waives all defenses based on venue, speedy trial under the Constitution and Speedy Trial Act, and the statute of limitations with respect to any prosecution that is not time-barred on the date that this Agreement is signed, in the event that (a) the defendant's conviction is later vacated for any reason, (b) the defendant violates any provision of this Agreement, or (c) the defendant's plea is later withdrawn.

11.   In agreeing to these waivers, the defendant is aware that a sentence has not yet been determined by the Court. The defendant is also aware that any estimate of the possible sentencing range under the *Sentencing Guidelines* that he may have received from his counsel, the United States, or the Probation Office is a prediction,

7

not a promise, did not induce his guilty plea, and is not binding on the United States, the Probation Office, or the Court. The United States does not make any promise or representation concerning what sentence the defendant will receive. The defendant further understands and agrees that the *Sentencing Guidelines* are "effectively advisory" to the Court. *United States v. Booker*, 125 S.Ct. 738 (2005). Accordingly, the defendant understands that, although the Court must consult the *Sentencing Guidelines* and must take them into account when sentencing him, the Court is bound neither to follow the *Sentencing Guidelines* nor to sentence the defendant within the guideline range calculated by use of the *Sentencing Guidelines*.

12.     The defendant understands and agrees that each and all of his waivers contained in this Agreement are made in exchange for the corresponding concessions and undertakings to which this Agreement binds the United States.

### The United States' Agreements

13.     The United States agrees to each of the following:

(a)     At the time of sentencing, the United States agrees not to oppose the defendant's anticipated request to the Court and the United States Probation Office that he receive a two level downward adjustment pursuant to U.S.S.G. § 3E1.1(a) should the defendant accept responsibility as contemplated by the *Sentencing Guidelines*. The United States is not required to make this recommendation if Davis (1) fails or refuses to timely entire his plea and make a full, accurate and complete disclosure to the United States and the Probation Department of the circumstances surrounding the relevant offense conduct and his present financial condition; (2) is found to have misrepresented facts to

8

the United States prior to entering this Agreement; or (3) commits any misconduct after entering into this Agreement, including but not limited to committing a state or federal offense, violating any term of release, or making false statements or misrepresentations to any governmental entity or official.

(b)     If the defendant qualifies for an adjustment under U.S.S.G. Section 3E1.1(a), the United States agrees to file a motion for an additional one level departure based on the timeliness of the plea or the expeditious manner in which the defendant provided complete information regarding his/her role in the offense if the defendant's offense level is 16 or greater.

(c)     The United States agrees that the appropriate Guidelines calculation in this case is the calculation described in Paragraph 1(b) above.

### United States' Non-Waiver of Appeal

14.     The United States reserves the right to carry out its responsibilities under the *Sentencing Guidelines*. Specifically, the United States reserves the right:

(a)     to bring its version of the facts of this case, including its evidence file and any investigative files, to the attention of the Probation Office in connection with that office's preparation of a presentence report;

(b)     to set forth or dispute sentencing factors or facts material to sentencing;

(c)     to seek resolution of such factors or facts in conference with the defendant's counsel and the Probation Office;

(d)     to file a pleading relating to these issues, in accordance with U.S.S.G. § 6A1.2 and 18 U.S.C. § 3553(a); and

(e)     to appeal the sentence imposed or the manner in which it was determined. If the United States appeals Davis's sentence, then Davis shall be released from his waiver of appellate rights.

APP000032

## Sentence Determination

15.     The defendant is aware that the sentence will be imposed by the Court after consideration of the *Sentencing Guidelines*, which are only advisory, as well as the provisions of 18 U.S.C. § 3553(a). The defendant nonetheless acknowledges and agrees that the Court has authority to impose any sentence up to and including the statutory maximum set for the offense(s) to which the defendant pleads guilty, and that the sentence to be imposed is within the sole discretion of the sentencing judge after the Court has consulted the applicable *Sentencing Guidelines*. The defendant understands and agrees that the parties' positions regarding the application of the *Sentencing Guidelines* do not bind the Court and that the sentence imposed is within the discretion of the sentencing judge. If the Court should impose any sentence up to the maximum established by statute, the defendant cannot, for that reason alone, withdraw a guilty plea, and he will remain bound to fulfill all of his obligations under this Agreement.

## Rights at Trial

16.     The defendant represents to the Court that he is satisfied that his attorney has rendered effective assistance. The defendant understands that by entering into this Agreement, he surrenders certain rights as provided herein. The defendant understands that the rights of a defendant include the following:

10

(a)     If the defendant persisted in a plea of not guilty to the charges, the defendant would have the right to a speedy jury trial with the assistance of counsel. The trial may be conducted by a judge sitting without a jury if the defendant, the United States, and the Court all agree.

(b)     At a trial, the United States would be required to present witnesses and other evidence against the defendant. The defendant would have the opportunity to confront those witnesses and his attorney would be allowed to cross-examine them. In turn, the defendant could, but would not be required to, present witnesses and other evidence on his own behalf. If the witnesses for the defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court.

(c)     At a trial, the defendant could rely on a privilege against self-incrimination and decline to testify, and no inference of guilt could be drawn from such refusal to testify. However, if the defendant desired to do so, he could testify on his own behalf.

**Factual Basis for Guilty Plea**

17.     If this case were to proceed to trial, the United States could prove each element of the offense beyond a reasonable doubt. The following facts, among others, would be offered to establish the defendant's guilt:

(a)     Beginning in at least 1988, **JAMES M. DAVIS (DAVIS)** began serving as Controller of Guardian International Bank, Ltd (Guardian), a bank chartered in Montserrat and owned by Robert Allen Stanford (Stanford).   Soon after **DAVIS** became Controller, Stanford requested that, in order to show fictitious quarterly and annual profits, DAVIS make false entries into the general ledger for the purpose of reporting false revenues and false investment portfolio balances to the banking regulators. In late 1989, Stanford closed Guardian in Montserrat due, in part, because of his concern with the heightened scrutiny being imposed upon Guardian by bank regulators in Montserrat.

11

APP000034

(b)   In early 1990, Stanford moved Guardian's banking operations to Antigua under the name Stanford International Bank, Ltd. (SIBL), of which he was the sole shareholder and for which **DAVIS** continued to serve as Controller through approximately 1992, when **DAVIS** became Chief Financial Officer of Stanford Financial Group (SFG). SFG was the parent company of SIBL and a web of other affiliated financial services entities, including Stanford Group Company (SGC) and Stanford Capital Management (SCM).

(c)   SIBL's primary investment product was referred to as a Certificate of Deposit (CD) which SIBL would solicit to potential investors in the United States and elsewhere through SFG broker-dealers, sometimes referred to as "Financial Advisors" (FAs). By 2008, SIBL had sold CDs resulting in liabilities totaling over $7 billion to investors in the United States and elsewhere. Stanford, **DAVIS**, and their conspirators promoted SIBL's investments as being well-managed, safe and secure, claimed that SIBL's investment strategy was to minimize risk and achieve liquidity, and falsely touted in SIBL's Annual Reports beginning in at least 1999 an almost year-by-year percentage and dollar increase in the purported value of SIBL's earnings, revenue and assets.

(d)   Prior to purchasing SIBL CDs, potential investors were required to provide their basic biographical and financial information in the form of a Subscription Agreement. Subscription Agreements regarding the investors were routinely sent from Stanford Group Company in Houston, Texas to SIBL in Antigua. CDs and account statements regarding the CDs were also routinely sent by mail to investors, including an account statement driven by the false investment and revenue values for an investor (identified as "Investor TA" in Count 2 of the Information) which on November 30, 2008 was sent and delivered via United States Postal Service to Investor TA's address in Spring, Texas.

(e)   Stanford, **DAVIS** and their conspirators further promoted the sale of SIBL's CDs by representing to investors that SIBL's operations and financial condition were being scrutinized by Antigua's bank regulator, the Financial Services Regulatory Commission (FSRC), and that SIBL's financial statements were subject to annual examination and inspections by the FSRC and audits by an independent outside auditor.

12

(f)     Stanford, **DAVIS**, Chief Investment Officer Laura Pendergest-Holt (Holt) and other conspirators created and perpetuated the false impression to investors, potential investors, and the majority of SFG employees that Holt was responsible for overseeing and monitoring SIBL's entire portfolio of non-cash assets and that she managed all of those assets through a global network of money managers.   In order to continue to effectuate the scheme, on December 7, 2005, Stanford and others, appointed Holt to the SIBL "Investment Committee."   The purpose of this appointment was to continue to dupe the CD investors into falsely believing that Holt understood and "managed" SIBL's entire investment portfolio.

(g)     Unknown to investors, Stanford, **DAVIS**, Holt and other conspirators internally segregated SIBL's investment portfolio into three investment tiers: (a) cash and cash equivalents ("Tier I"); (b) investments with "outside money managers," sometimes also referred to as "outside portfolio managers" ("Tier II"); and (c) other assets ("Tier III").   In actuality, Holt's management of SIBL's assets was confined to those assets contained in Tier II which, by 2008 made up only 10% of SIBL's entire portfolio.   In fact, by 2008, approximately 80% of SIBL's investment portfolio was made up of illiquid investments, including grossly overvalued real and personal property that SIBL had acquired from Stanford-controlled entities at falsely inflated prices.   At least $2 billion dollars of undisclosed, unsecured personal loans from SIBL to Stanford were concealed and disguised in SIBL's financial statements as "investments."

(h)     At Stanford's direction and assisted by SFG's Chief Accounting Officer, Gilberto Lopez (Lopez), and the Global Controller for an affiliate of SFG, Mark Kuhrt (Kuhrt), **DAVIS** regularly created false books and records in which the value of the investment portfolio was further fraudulently adjusted by percentage increases to produce false investment and revenue values.   As a result, SIBL's values for revenue and investments were falsified on a routine basis.

(i)     From at least 2002, **DAVIS**, at the request of Stanford, would prepare with the assistance of Lopez and Kuhrt, fictitious SIBL investment reports, which were provided to the Antiguan FSRC on a quarterly basis, again falsely inflating the value of SIBL's investments.   These false forms continued to be provided to the FSRC on a quarterly basis until at least September 2008.   Kuhrt would send the false documents to SIBL in Antigua. SIBL Executive A would then execute the documents and provide them to the FSRC.

APP000036

(j)     Stanford was insistent that SIBL appear to show a profit each year. Stanford and **DAVIS** would collaborate to select a false revenue number. **DAVIS** would then send the collaborative false revenue numbers to Lopez and Kuhrt.

(k)     To create the falsely inflated values for SIBL's assets, **DAVIS** would extrapolate from the values attributed to a portion of SIBL's investment portfolio which was monitored by Holt and managed by money managers. **DAVIS**, at Stanford's urging, would multiply those actual values by artificial percentage factors necessary to equal the value for depositor liabilities. By email or personal delivery, **DAVIS** would send the false investment valuation report to Kuhrt, who then sent it to SIBL.

(l)     Initially, **DAVIS** did the calculations manually, but later a computer spreadsheet was created which was useful in generating the bogus revenue numbers. Every year, SIBL would prepare a budget projecting growth. Stanford, **DAVIS**, Lopez, Kuhrt and other conspirators would then use the "budgeted" numbers to develop falsely inflated revenue numbers which would be claimed as the "actual" revenue numbers to generate the desired Return on Investment (ROI). At Kuhrt's direction, subordinate employees in SFG's accounting group would be given a secret instruction sheet informing them as to how to make the changes to generate the false adjusted revenue figures, including the steps necessary to obtain approval by Lopez and **DAVIS**. After "backing into" or "reverse engineering" the numbers to match the "budgeted" numbers, Kuhrt would then transmit the inflated revenue numbers from Houston initially, and later from St. Croix when Kuhrt's accounting group moved to St. Croix, to Lopez in Houston, Texas and to **DAVIS** in Mississippi for **DAVIS'** approval. **DAVIS** often would further adjust the already bogus numbers to reach a desired ROI and would transmit to Kuhrt and Lopez the changes to be made.

(m)     Kuhrt and Kuhrt's employees in the accounting group would prepare the false financial statements published in SIBL's annual reports, which Stanford, Lopez and **DAVIS** would review prior to publishing and sending out to investors.

(n)     This continued routine false reporting by Stanford, **DAVIS**, Lopez, Kuhrt and their conspirators, upon which CD investors routinely relied in making their investment decisions, in effect, created an ever-widening hole between reported assets and actual liabilities, causing the creation of a massive Ponzi scheme whereby CD redemptions ultimately could only be accomplished with new infusions of investor funds. Stanford, **DAVIS**, Lopez, Kuhrt and their conspirators fraudulently claimed in SIBL's Annual Reports an increase in assets from approximately $1.2

APP000037

billion in 2001 to approximately $8.5 billion reported in SIBL's Monthly Report for December 2008. By the end of 2008, Stanford, **DAVIS** and their conspirators falsely represented in SIBL's December monthly report that it held over $7 billion in assets, when in truth and in fact, SIBL actually held less than $2 billion in assets.

(o)   By at least 2002, Stanford had introduced **DAVIS** to Leroy King, a bank auditor for the FSRC, a former Ambassador to the United States from Antigua and a former executive at Bank of America in New York. King became Administrator and the Chief Executive Officer (CEO) of the FSRC in approximately 2003.

(p)   Sometime in 2003, Stanford performed a "blood oath" brotherhood ceremony with King and another employee of the FSRC, each of whom participated in the FSRC's regulatory oversight of SIBL. This brotherhood oath was undertaken in order to extract an agreement from both King and the other FSRC employee that they, in exchange for regular cash bribe payments by Stanford to King and the other FSRC employee, would ensure that the Antiguan bank regulators would not "kill the business" of SIBL. During the course of the fraud scheme King routinely referred to Stanford as "Brother" or "Big Brother." In the regular preparation of the false SIBL investment reports for submission to the FSRC, Stanford, **DAVIS**, and other conspirators relied upon the assurances that King and the other FSRC employee, because of the bribes, would ensure that the FSRC would not actually examine the validity of the investments of SIBL as set forth in those investment reports.

(q)   When Stanford needed cash to make these bribe payments, he generally would instruct **DAVIS** to debit funds from a secret numbered Swiss bank account at Society General Bank (SocGen account #108731) and to wire those funds to an SFG account at Bank of Antigua, from which the cash in United States dollars would be withdrawn. This secret SocGen account #108731 was funded by CD investor funds and was also used to make regular bribe payments, via wire transfer, to SIBL's outside auditor in Antigua, C.A.S. Hewlett & Co. Ltd. The cash bribe payments by Stanford to King ultimately exceeded $200,000.

(r)   Sometime in approximately 2003, Stanford and SIBL Executive A complained to King that two FSRC examiners were becoming aggressive and suspicious in their examination of SIBL's financial statements. Stanford reassured **DAVIS** and SIBL Executive A that, because of their brotherhood oath and the bribe payments, King would assist in removing the two FSRC employees from the regulatory oversight function of SIBL. Both FSRC employees soon thereafter were reassigned or replaced.

APP000038

(s)    In January 2004, Stanford also continued his bribery scheme with Leroy King by paying $8000 for tickets to the Super Bowl game in Houston and by corruptly giving those tickets to King and his girlfriend to attend the game.

(t)    In June of 2005, King provided to Stanford a confidential letter that King had received from the United States Securities and Exchange Commission (SEC) in his capacity as Administrator and CEO of the FSRC wherein the SEC sought information and records regarding SIBL's CD investment portfolio.    In the confidential letter, the SEC maintained that it was investigating SIBL's sales practices with respect to its CD program and sought from the FSRC details and records of SIBL's investments because the SEC stated that it had evidence to suggest that SIBL was engaged in a "possible Ponzi scheme."    Stanford and SIBL Executive A then assisted King in drafting a false and misleading response by the FSRC to this confidential SEC letter.

(u)    By August of 2005, Stanford had retained an outside counsel to represent the interests of SIBL in the SEC inquiry of SIBL's sales practices (hereafter Outside Attorney A).    During that month, Outside Attorney A traveled to the SIBL facility in Antigua where he met with Stanford, **DAVIS**, SIBL Executive A, Leroy King and others to familiarize himself with the operations and finances of SIBL.    Outside Attorney A further reviewed SIBL's disclosures to investors in its CD program.

(v)    On July 30, 2006, Leroy King transmitted to SFG Attorney A in Houston, Texas, a letter dated July 11, 2006 from the Director of the Bank Supervision Department at the Eastern Caribbean Central Bank ("ECCB") to the FSRC in Antigua concerning, inter alia, the affiliate relationship of SIBL to the Bank of Antigua. Similarly, on August 1, 2006, King again faxed to SFG Attorney A in Houston, Texas, a proposed response to the ECCB letter which sought the input of SFG Attorney A in crafting a response by the FSRC calculated to mislead the ECCB as to the financial bona fides of SIBL to prevent legitimate scrutiny of SIBL by the Eastern Carribean bank regulator.    Recognizing that he had already been paid through cash bribe payments from Stanford, King concluded the August 1, 2006 facsimile transmission with the following handwritten words: "Please do not bill me (laugh),  Thanks a million, Lee."

(w)    On September 25, 2006, King provided to Stanford, SFG Attorney A, and SIBL Executive A another confidential letter he had received from the SEC wherein the SEC again sought records and information regarding SIBL's CD investment

APP000039

portfolio. Stanford, **DAVIS**, SIBL Executive A, and SFG Attorney A would then propose various responses designed to mislead the SEC that King would be requested to insert into the FSRC's response to the SEC's confidential letter.

(x)   In late September of 2006, Outside Attorney A contacted the SEC and represented that he had "heard through the grapevine" that the FSRC had not been provided with an appropriate request from the SEC for documents; that the SEC should "go to Antigua" to review the SIBL examination reports; that the SEC had "no basis" to request documents regarding SIBL's investment portfolio from SIBL; that he (Outside Attorney A) had spent 15 years investigating fraud for the SEC and was "well-equipped" to recognize the "hallmarks of fraud"; that he (Outside Attorney A) found SIBL to be credible in all their business dealings; and that, based upon his review of the situation and personal visit to SIBL, Outside Attorney A found SIBL to be an "incredible institution."

(y)   In late 2008, Outside Attorney A was informed that SIBL's CD investment portfolio included a previously undisclosed third tier of investments (Tier III) that was not "managed" by Holt. Subsequently, in early January 2009, Outside Attorney A was informed that this third tier included real estate investments and private equity. Outside Attorney A, through his prior review of SIBL's disclosures knew and understood that this third tier of investments, including the real estate investments, had not been disclosed to investors. In early January of 2009 Outside Attorney A further learned that this undisclosed third tier of investments constituted approximately 80% of SIBL's investment portfolio or approximately $6 billion.

(z)   During the course of the fraud conspiracy, Holt supervised a group of research analysts at SFG's offices in Memphis, Tennessee, who were primarily responsible for researching and trading investments in the Tier II segment of SIBL's portfolio. These research analysts were aware that Tier II represented a small segment of SIBL's entire portfolio and that the vast majority of SIBL's purported assets were in Tier III of SIBL's portfolio. Occasionally, Holt's research analysts would question her regarding Holt's knowledge of SIBL's Tier III assets. Holt would often dismiss such inquiries and would explain that she knew the details of the assets in Tier III and the research analysts "did not need to concern themselves" with Tier III.

(aa)   From 2005 through at least February of 2009, Stanford, **DAVIS**, Holt, SIBL Executive A and others would attend investor conferences and other meetings with FAs called "Top Producer Club" or "TPC" meetings where they would falsely tout the assets and earnings of SIBL's investments, falsely tout SIBL's investment

strategy and deceive both the investors and FAs as to the role Holt played in the "management" of SIBL's investment portfolio.

(bb)   In December 2008, Holt's research analysts began to make further inquiry of Holt regarding the quantity and the quality of the assets that made up SIBL's Tier III. During that same month, Holt led several meetings with her research analysts wherein she would purport to inform the analysts as to some of the content of SIBL's Tier III. Specifically, Holt explained the evolution of Tier III from a segment of SIBL's portfolio in the 1990s that contained mostly futures, options and currencies, to its current content which was purportedly geared toward larger holdings of real estate and private equity. Holt explained that Tier III was composed of 30-40% private equity and real estate and 10-12% cash. She further explained that SIBL had conducted private equity and real estate deals that had been "very profitable." In fact, she cited one transaction involving "two islands and one club" that Stanford had acquired and "got a very good deal." Because of this, Holt explained, Tier III was "up 7% mid-year." Holt told her research analysts that "we are restructuring Tier III and that will happen as early as January 2009."

(c)   In mid-2008, Stanford, **DAVIS** and other conspirators were desperately seeking a fraudulent mechanism whereby they could artificially inflate SIBL's assets and thereby further conceal the fact that, undisclosed to investors, Stanford had made approximately $2 billion in loans to himself; that many if not all of private equity investments in Tier III were either insolvent or losing money badly, and that the touted returns on investment had been fictitious. As such, Stanford, **DAVIS**, Lopez, Kuhrt and other conspirators designed a real estate transaction wherein they would falsely inflate and convert an approximate $65 million dollar real estate transaction in Antigua into a purported $3.2 billion dollar asset of SIBL merely through a series of related party property flips through business entities controlled by Stanford. From approximately May 2008 through November 2008, Stanford, **DAVIS**, Lopez, Kuhrt, SIBL Executive A, SFG Attorney A and other conspirators participated in documenting elements of this bogus real estate in the books and records of SIBL designed to fraudulently add billions of dollars in value to SIBL's financial statements.

(dd)   On January 14, 2009, the SEC served, through Outside Attorney A, investigatory subpoenas to **DAVIS** and Holt seeking testimony and documents related to SIBL's investment portfolio. Stanford also was served an SEC subpoena through Outside Attorney A. Outside Attorney A understood that the SEC inquiry would require the subpoenaed individuals to make a complete and transparent presentation to the SEC regarding all of the assets related to SIBL's CD program.

APP000041

(ee)   On January 21, 2009, Outside Attorney A met at the SIBL airplane hangar in Miami, Florida, to discuss the SEC investigation with Stanford, **DAVIS**, Holt, SIBL Executive A, SFG Attorney A and others to discuss who could make the presentation to the SEC.  At that meeting, despite the knowledge that Stanford and **DAVIS** were in the best position to disclose the assets in the Tier III portfolio, Stanford, **DAVIS**, Holt, Outside Attorney A, SIBL Executive A and SFG Attorney A all agreed that Outside Attorney A would seek to convince the SEC that Holt and SIBL Executive A were the best individuals to present testimony and evidence to the SEC as to SIBL's entire investment portfolio.  The participants also agreed to participate in a series of meetings in Miami, Florida during the week of February 2, 2009, to bring Holt and SIBL Executive A "up to speed on Tier 3" before the SEC presentation.

(ff)   On January 22, 2008, Outside Attorney A met in Houston, Texas with several SEC attorneys in Houston, Texas to discuss issues related to the SEC investigation.  The SEC attorneys reiterated that their investigation was seeking to determine where and how the entire portfolio of SIBL assets were invested and managed.  Outside Attorney A falsely maintained that Stanford and **DAVIS** did not "micro-manage" the portfolio but that Holt and SIBL Executive A were the "better people to explain the details" about SIBL's entire portfolio.  As a result of Outside Attorney A's misleading statements, the SEC attorneys agreed to postpone the testimony of Stanford and **DAVIS** and to take the testimony of SIBL Executive A and Holt on February 9-10, 2009, respectively.  Outside Attorney A also falsely informed the SEC attorneys at this meeting that SIBL was "not a criminal enterprise."

(gg)   In the last week of January 2009, **DAVIS** met with King in Antigua.  By that time, SIBL was facing increasing regulatory scrutiny from the SEC, and Stanford, Holt and **DAVIS**, had received subpoenas from the SEC.  King appeared very stressed. King related that he had again been contacted by the SEC.  King asked **DAVIS** if "we were going to make it?" which meant whether the fraud they had been engaged in was going to be exposed.  **DAVIS** informed King that he thought they were going to be ok.

(hh)   On January 27, 2009, Outside Attorney A contacted **DAVIS**, Holt and SIBL Executive A and informed them when Holt and SIBL Executive A responded to the SEC inquiry they would be required to present "positive proof" regarding all of the assets of SIBL including the three tiers, that they needed to "rise to the occasion," and that "our livelihood depends on it."

(ii)   On February 3, 4, 5 and 6, 2009, **DAVIS** met with Holt, SFG Attorney A, SIBL Executive A, Outside Attorney A, and ultimately, Stanford on February 5,

APP000042

and others, at SFG's office in Miami, Florida to discuss the testimony that Holt and SIBL Executive A would provide to the SEC during the week of February 9, 2009. During these meetings Holt disclosed that the value of the assets she actually managed in Tier II totaled approximately $350 million, down from $850 million in June of 2008. At these meetings **DAVIS** further revealed that the purported value of Tier III of SIBL's investment portfolio was made up of: real estate valued at in excess of $3 billion which allegedly had been acquired earlier that year by SIBL for less than $90 million; $1.6 billion in "loans" to Stanford; and various other private equity investments. Several of the Miami meeting participants acknowledged that if this disclosure was accurate, then the bank was insolvent. During the February 5, 2009 session, Stanford falsely informed the participants that despite what they had just been told, SIBL had "at least $850 million more in assets than liabilities."

(jj)   Later in the day of February 5, 2009, Stanford, **DAVIS** and Outside Attorney A attended a separate meeting where Stanford acknowledged that SIBL's assets and financial health had been misrepresented to investors, and were overstated in SIBL's financials.

(kk)   On the morning of February 10, 2009, prior to Holt's testimony before the SEC in Fort Worth, Texas, in an effort to continue to obstruct the SEC investigation, **DAVIS** spoke with Holt by telephone and told her to only disclose to SEC investigators her knowledge of Tier II investments.

(ll)   During her testimony to the SEC on February 10, 2009, in addition to failing to disclose the Miami meetings and participants which had occurred the prior week, Holt falsely stated in her SEC testimony that she was unaware of the assets and allocations of assets in Tier III of SIBL's portfolio.

### Breach of Plea Agreement

18.   If the defendant fails in any way to fulfill completely all of his obligations under this Agreement, the United States will be released from its obligations hereunder, and the defendant's plea and sentence will stand. If at any time the defendant retains, conceals, or disposes of assets in violation of this Agreement, or if the defendant knowingly withholds evidence or is otherwise not completely truthful

APP000043

with the United States, then the United States may ask the Court to set aside his guilty plea and reinstate prosecution. Any information and documents that have been disclosed by the defendant, whether prior to or subsequent to execution of this Agreement, and all leads derived therefrom, will be used against the defendant in any prosecution.

### Forfeiture

19.    Defendant agrees to forfeit all property which constitutes or is derived from proceeds traceable to the violations charged in Counts One and Two of the information. Defendant stipulates and agrees that the factual basis for his guilty plea supports the forfeiture of at least $1,000,000,000 (one billion dollars). Defendant agrees to a personal money judgment for $1,000,000,000 (one billion dollars) against him and in favor of the United States of America. Defendant represents that he will make a full and complete disclosure of all assets over which he exercises direct or indirect control, or in which he has any financial interest. Defendant stipulates and admits that one or more of the conditions set forth in 21 U.S.C. § 853(p) exists. Defendant agrees to forfeit any of Defendant's property, or Defendant's interest in any property, up to the value of any unpaid portion of the money judgment, until the money judgment is fully satisfied. Defendant agrees to take all steps necessary to pass clear title to forfeitable and substitute assets to the United States, including but not limited to surrendering title, signing a consent decree, stipulating facts regarding the

21

APP000044

transfer of title and basis for the forfeiture, and signing any other documents necessary to effectuate such transfer.

20.    Defendant agrees to the entry of a preliminary order of forfeiture and consents to the preliminary order of forfeiture becoming final as to the Defendant immediately following this guilty plea pursuant to Fed.R.Crim.P. 32.2(b)(3). Defendant waives the right to challenge the forfeiture of property in any manner, including by direct appeal or in a collateral proceeding.

### Complete Agreement

21.    This Agreement, consisting of 23 pages, together with the attached letter agreement dated April 21, 2009, constitutes the complete plea agreement between the United States, the defendant, and his counsel. No promises or representations have been made by the United States except as set forth in writing in this Agreement. The defendant acknowledges that no threats have been made against him and that he is pleading guilty freely and voluntarily because he is guilty.

APP000045

22.    Any modification of this Agreement must be in writing and signed by all

parties.

Filed at Houston, Texas, on August 27, 2009.

_____
James M. Davis
Defendant

Subscribed and sworn to before me on August 27, 2009.

By:    _____
Deputy United States District Clerk

APPROVED:

Tim Johnson
United States Attorney

By:    _____                _____
Gregg Costa                                            David Finn
Assistant U.S. Attorney                                Attorney for Defendant

Steven A. Tyrrell
Chief
Fraud Section, Criminal Division
Department of Justice

BY:    _____
Paul E. Pelletier
Principal Deputy Chief
Jack B. Patrick
Senior Litigation Counsel
Matthew Klecka
Trial Attorney

23

**U.S. Department of Justice**

*1400 New York Avenue*
*Washington, D.C.  20530*
*(202) 353-7693*

April 21, 2009

**VIA FEDEX and EMAIL**

David Finn, Esq.
Milner & Finn
2828 North Harwood Street
Suite 1950, Lock Box 9
Dallas, TX  75201

     Re:    <u>Davis Plea Agreement</u>

Dear Mr. Finn:

       This letter sets forth the terms of the plea agreement between your client, James Davis, and the United States, by and through the Fraud Section of the Criminal Division of the Department of Justice and the United States Attorney's Office for the Southern District of Texas (hereinafter referred to as the "United States"), regarding your client's involvement with Stanford Group, Inc., Stanford International Bank, Ltd., and related entities including the predecessor bank, Guardian Trust, from at least 1989 through the present.  The terms of this "Agreement" are as follows:

       1.     Davis agrees to waive prosecution by indictment and to plead guilty to three counts of a Criminal Information, charging Davis:  in Count 1 with conspiracy to violate the following laws:  Securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5; wire fraud, in violation of Title 18, United States Code, Section 1343; mail fraud, in violation of Title 18, United States Code, Section 1341; and obstruction of a proceeding before the Securities and Exchange Commission, in violation of Title 18, United States Code, Section 1505; all in violation of Title 18, United States Code, Section 371; in Count 2 with mail fraud, in violation of Title 18, United States Code, Sections 1341 and 2; and in Count 3 with obstruction of a proceeding before the Securities and Exchange Commission, in violation of Title 18, United States Code, Sections 1505 and 2.  The Criminal Information also includes a forfeiture allegation, as further discussed herein.

       2.     Davis is aware that his sentence will be imposed by the Court.  Davis understands and agrees that federal sentencing law requires the Court to impose a sentence that is reasonable and that the Court must consider the United States Sentencing Guidelines and Policy Statements (hereinafter "Sentencing Guidelines") in effect at the time of the sentencing in determining that reasonable sentence.  Davis acknowledges and understands that the Court will compute an advisory sentence under the United States Sentencing Guidelines and that the applicable

guidelines will be determined by the Court relying in part on the results of a Pre-Sentence Investigation by the Court's Probation Department, which investigation will commence after the guilty plea has been entered. Davis is also aware that, under certain circumstances, the Court may depart from the advisory sentencing guideline range that it has computed, and may raise or lower that advisory sentence under the Sentencing Guidelines. Davis is further aware and understands that while the Court is required to consider the advisory guideline range determined under the Sentencing Guidelines, it is not bound to impose a sentence within that range. Davis understands that the facts that determine the offense level will be found by the Court at the time of sentencing and that in making those determinations the Court may consider any reliable evidence, including hearsay, as well as the provisions or stipulations in this Agreement. The United States and Davis agree to recommend that the Sentencing Guidelines should apply and that pursuant to United States v. Booker, the Guidelines provide a fair and just resolution based on the facts of this case, and that no downward departures or variances are appropriate other than the reduction for acceptance of responsibility noted in paragraph 12 and the potential for a reduction under the terms set forth in paragraph 9. The Court is permitted to tailor the ultimate sentence in light of other statutory concerns, and such sentence may be either more severe or less severe than the Sentencing Guidelines' advisory sentence. Knowing these facts, Davis understands and acknowledges that the Court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offenses identified in paragraph 1 and that Davis may not withdraw the plea solely as a result of the sentence imposed.

3. Davis also understands and acknowledges that as to Count 1, the Court may impose a statutory maximum term of imprisonment of up to five (5) years. Davis understands and acknowledges that as to Count 2, the Court may impose a statutory maximum term of imprisonment of up to twenty (20) years. Davis understands and acknowledges that as to Count 3, the Court may impose a statutory maximum term of imprisonment of up to five (5) years. In addition to any period of imprisonment as reflected above, the Court may also impose a period of supervised release of up to three (3) years to commence at the conclusion of the period of imprisonment. In addition to a term of imprisonment and supervised release, the Court may impose a fine of up to the greater of $250,000, or twice the gross pecuniary gain or loss pursuant to 18 U.S.C. § 3571(d).

4. Davis further understands and acknowledges that, in addition to any sentence imposed under paragraph 3 of this Agreement, a special assessment in the total amount of $300 will be imposed on Davis. Davis agrees that any special assessment imposed shall be paid immediately after sentencing.

5. Davis further understands and acknowledges that he (a) shall truthfully and completely disclose all information with respect to the activities of himself and others concerning all matters about which the United States inquires of him, which information can be used for any purpose; (b) shall cooperate fully with the United States and any other law enforcement agency designated by the United States; (c) shall attend all meetings at which the United States requests his presence; (d) shall provide to the United States, upon request, any document, record, or other

2

tangible evidence relating to matters about which the United States or any designated law enforcement agency inquires of him; (e) shall truthfully testify before the grand jury and at any trial and other court proceeding with respect to any matters about which the United States may request his testimony; (f) shall bring to the attention of the United States all crimes which he has committed, and all administrative, civil, or criminal proceedings, investigations, or prosecutions in which he has been or is a subject, target, party, or witness; and, (g) shall commit no further crimes whatsoever. Moreover, any assistance Davis may provide to federal criminal investigators shall be pursuant to the specific instructions and control of the United States and designated investigators. In carrying out his obligations under this paragraph, Davis shall neither minimize his own involvement nor fabricate, minimize or exaggerate the involvement of others.

6.      Davis shall provide, when requested, the Probation Department and counsel for the United States with a full, complete and accurate personal financial statement listing all assets under his direct or indirect control, including any assets he may have transferred or placed in the control of others within the 10 year period prior to execution of this Agreement. If Davis provides incomplete or untruthful statements in his personal financial statement, his action shall be deemed a material breach of this Agreement and the United States shall be free to pursue all appropriate charges against him notwithstanding any agreements to forbear from bringing additional charges otherwise set forth in this Agreement.

7.      Provided that Davis commits no new criminal offenses and provided he continues to demonstrate an affirmative recognition and affirmative acceptance of personal responsibility for his criminal conduct, the United States agrees that it will recommend at sentencing that Davis receive a three-level reduction for acceptance of responsibility pursuant to Section 3E1.1 of the Sentencing Guidelines, based upon Davis' recognition and affirmative and timely acceptance of personal responsibility. The United States, however, will not be required to make this sentencing recommendation if Davis: (1) fails or refuses to timely enter his guilty plea and to make a full, accurate and complete disclosure to the United States and the Probation Department of the circumstances surrounding the relevant offense conduct and his present financial condition; (2) is found to have misrepresented facts to the United States prior to entering this Agreement; or (3) commits any misconduct after entering into this Agreement, including but not limited to committing a state or federal offense, violating any term of release, or making false statements or misrepresentations to any governmental entity or official.

8.      The United States reserves the right to inform the Court and the Probation Department of all facts pertinent to the sentencing process, including all relevant information concerning the offenses committed, whether charged or not, as well as concerning Davis and Davis' background. Subject only to the express terms of any agreed-upon sentencing recommendations contained in this Agreement, the United States further reserves the right to make any recommendation as to the quality and quantity of punishment.

9.      The United States reserves the right to evaluate the nature and extent of Davis' cooperation and to make Davis' cooperation, or lack thereof, known to the Court at the time of

sentencing. If, in the sole and unreviewable judgment of the United States, Davis' cooperation is of such quality and significance to the investigation or prosecution of other criminal matters as to warrant the Court's downward departure from the sentence required by the Sentencing Guidelines, the United States may, at or before sentencing make, a motion pursuant to Title18, United States Code, Section 3553(e), Section 5K1.1 of the Sentencing Guidelines, or subsequent to sentencing by motion pursuant to Rule 35 of the Federal Rules of Criminal Procedure, reflecting that Davis has provided substantial assistance and recommending a sentence reduction. Davis acknowledges and agrees, however, that nothing in this Agreement may be construed to require the United States to file such a motion and that the United States' assessment of the nature, value, truthfulness, completeness, and accuracy of Davis' cooperation shall be binding on Davis.

10.    Davis understands and acknowledges that the Court is under no obligation to grant a motion by the United States pursuant to Title 18, United States Code, Section 3553(e), 5K1.1 of the Sentencing Guidelines or Rule 35 of the Federal Rules of Criminal Procedure, as referred to in paragraph 9 of this Agreement, should the United States exercise its discretion to file such a motion.

11.    Davis admits and acknowledges that the following facts are true and that the United States could prove them at trial beyond a reasonable doubt:

    a.    That Davis' participation in the conspiracy and scheme and artifice resulted in a loss of more than $400,000,000;

    b.    That Davis' offense involved more than two-hundred fifty (250) victims;

    c.    That a substantial part of Davis' fraudulent scheme was committed from outside the United States and otherwise involved sophisticated means;

    d.    That Davis' offense affected the safety and soundness of a financial institution and endangered the solvency or financial security of 100 or more victims; and

    e.    That Davis abused a position of trust as Chief Financial Officer of Stanford Group, Inc., and Stanford International Bank, Ltd.

12.    Based on the foregoing, the United States and Davis agree that although not binding on the Probation Department or the Court, the applicable Sentencing Guidelines adjusted offense level is as follows:

| | | |
|---|---|---|
| a. | Section 2B1.1(a) - Base offense level for wire fraud offense | 7 |
| b. | Section 2B1.1(b)(1)(K) - Loss of more than $400,000,000 | 30 |
| c. | Section 2B1.1(b)(2)(B) - More than 250 victims | 6 |
| d. | Section 2B1.1(b)(9)(C) & (D)- Substantial part of scheme committed outside the United States and otherwise used sophisticated means | 2 |
| e. | Section 2B1.1(b)(14)(B) - Affecting safety and soundness | |

4

|   |   |   |
|---|---|---|
| | of a financial institution and endangering the solvency or financial security of 100 or more victims | 4 |
| f. | Section 3B1.3 - Abuse of position of trust | 2 |
| g. | Section 2B1.1(b)(14)(C) - Combination of enhancement for more than 250 victims (+6) and enhancement for safety and soundness of a financial institution and endangering the solvency or financial security of 100 or more victims (+4) equals 10, therefore reduced to 8 | -2 |
| h. | Sections 3E1.1(a) and 3E1.1(b) Acceptance of Responsibility (if applicable) | -3 |

TOTAL OFFENSE LEVEL - ADJUSTED      <u>46</u>

13.    Davis agrees to forfeiture of all property, real or personal, which constitutes or is derived from proceeds traceable to the violations of 18 U.S.C. § 371 (conspiracy to commit wire and mail fraud) and 18 U.S.C. § 1343 (wire fraud). Davis agrees that all such property is subject to criminal forfeiture pursuant to 28 U.S.C. § 2461(c) (incorporating 18 U.S.C. § 981(a)(1)(C)), as property constituting, or derived from, proceeds obtained, directly or indirectly, as the result of the conspiracy (Count 1) and mail fraud scheme (Count 2). In order to effectuate the forfeiture, Davis agrees to the entry of a Consent Order of Forfeiture, in the form of a money judgment, of $1,000,000,000.00 (one billion dollars). Davis acknowledges that the money judgment is subject to forfeiture as proceeds of illegal conduct or substitute assets for property otherwise subject to forfeiture.

14.    Davis also agrees that he shall assist the United States in all proceedings, whether administrative or judicial, involving the forfeiture to the United States of all rights, title, and interest, regardless of their nature or form, in the assets which Davis has agreed to forfeit, and any other assets, including real and personal property, cash and other monetary instruments, wherever located, which Davis or others to his knowledge have accumulated as a result of illegal activities. Such assistance shall include Davis' consent to the entry of any order deemed by the United States as necessary to effectuate said forfeitures. In addition, Davis agrees to identify as being subject to forfeiture and/or restitution all such assets, and to assist in the transfer of such property to the United States by delivering to the United States upon the United States' request, all necessary and appropriate documentation with respect to said assets, including consents to forfeiture, quit claim deeds and any and all other documents necessary to deliver good and marketable title to said property. To the extent the assets are no longer within the possession and control or name of Davis, Davis agrees that the United States may seek substitute assets within the meaning of 21 U.S.C. § 853. Davis further agrees to assist the United States in recovering all victim assets, wherever located, including but not limited to, executing requests for repatriation of said assets, wherever located, and facilitating the entry of court orders or treaty requests regarding said assets, wherever located. Davis further agrees not to alienate, transfer or encumber any asset over which he has direct or indirect control unless otherwise agreed to by the United

5

States or permitted by order of the Court. Failure to comply with the terms of this paragraph will constitute a material breach of this agreement.

15. Davis knowingly and voluntarily agrees to waive any claim or defenses he may have under the Eighth Amendment to the United States Constitution, including any claim of excessive fine or penalty with respect to the forfeited assets or victim restitution. Davis further knowingly and voluntarily waives his right to a jury trial on the forfeiture of said assets, waives any statute of limitations with respect to the forfeiture of said assets, and waives any notice of forfeiture proceedings, whether administrative or judicial, against the forfeited assets. Davis waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. Davis acknowledges that he understands that the forfeiture of assets is part of the sentence that may be imposed in this case and waives any failure by the court to advise him of this, pursuant to Rule 11(b)(1)(J), at the time his guilty plea is accepted.

16. Davis acknowledges that because the offenses of conviction occurred after April 24, 1996, restitution is mandatory without regard to the Davis' ability to pay and that the Court must order Davis to pay restitution for the full loss caused by his criminal conduct pursuant to Title 18, United States Code, Section 3663A, provided, however, that the United States agrees that the value of any property returned to victims through the forfeiture and remission process shall be credited against any order of restitution due to victims.

17. Davis is aware that the sentence has not yet been determined by the Court. Davis is also aware that any estimate of the probable sentencing range or sentence that Davis may receive, whether that estimate comes from Davis' attorney, the United States, or the Probation Department, is a prediction, not a promise, and is not binding on the United States, the Probation Department or the Court. Davis further understands that any recommendation that the United States makes to the Court as to sentencing, whether pursuant to this Agreement or otherwise, is not binding on the Court and the Court may disregard the recommendation in its entirety. Davis understands and acknowledges, as previously acknowledged in paragraph 2 above, that Davis may not withdraw his plea based upon the Court's decision not to accept a sentencing recommendation made by Davis, the United States, or a recommendation made jointly by both Davis and the United States.

18. Davis is aware that Title 18, United States Code, Section 3742 affords Davis the right to appeal the sentence imposed in this case. Acknowledging this, in exchange for the undertakings made by the United States in this Agreement, Davis hereby waives all rights conferred by Section 3742 to appeal any sentence imposed, including any forfeiture or restitution ordered, or to appeal the manner in which the sentence was imposed, unless the sentence exceeds the maximum permitted by statute. Davis further understands that nothing in this Agreement shall affect the right of the United States and/or its duty to appeal as set forth in Title 18, United States Code, Section 3742(b). If the United States appeals Davis' sentence pursuant to Section

6

3742(b), however, Davis shall be released from this waiver of appellate rights. By executing this Agreement, Davis acknowledges that he has discussed the appeal waiver set forth in this Agreement with his attorney. Davis further agrees, together with the United States, to request that the district Court enter a specific finding that the Davis' waiver of his right to appeal the sentence to be imposed in this case was knowing and voluntary.

19.     Davis acknowledges that he has accepted this Agreement and decided to plead guilty because he is in fact guilty. By entering this plea of guilty, the defendant waives any and all right to withdraw his plea or to attack his conviction, either on direct appeal or collaterally, on the ground that the Government has failed to produce any discovery material, *Jencks* Act material, exculpatory material pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), other than information establishing the factual innocence of the defendant, and impeachment material pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), that has not already been produced as of the date of the signing of this Agreement.

20.     For purposes of criminal prosecution, this Agreement shall be binding and enforceable upon the Fraud Section of the Criminal Division of the United States Department of Justice and the United States Attorney's Office for the Southern District of Texas. The United States does not release Davis from any claims under Title 26, United States Code. Further, this Agreement in no way limits, binds, or otherwise affects the rights, powers or duties of any state or local law enforcement agency or any administrative or regulatory authority.

21.     In the event that Davis does not plead guilty or if Davis breaches this Agreement by failing to comply with any terms hereto, Davis agrees and understands that he thereby waives any protection afforded by Section 1B1.8(a) of the Sentencing Guidelines and Rule 11(f) of the Federal Rules of Criminal Procedure, and that any statements made by him as part of his cooperation with the United States, or otherwise, both prior or subsequent to signing this Agreement, will be admissible against him without any limitation in any civil or criminal proceeding and Davis shall assert no claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, or any other federal rule that such statements or any leads therefrom should be suppressed. By entering into this Agreement, Davis intends to waive all rights in the foregoing respects.

7

22.     This Agreement is the entire agreement and understanding between the United States and Davis.  There are no other agreements, promises, representations or understandings.

Respectfully submitted,

STEVEN A. TYRRELL, CHIEF
U.S. DEPARTMENT OF JUSTICE
CRIMINAL DIVISION, FRAUD SECTION

By: _____
PAUL E. PELLETIER, Principal Deputy Chief
U.S. DEPARTMENT OF JUSTICE
CRIMINAL DIVISION, FRAUD SECTION


TIMOTHY JOHNSON
ACTING UNITED STATES ATTORNEY

By: _____
GREGG COSTA
ASSISTANT UNITED STATES ATTORNEY


_____
JAMES DAVIS
DEFENDANT
Date: _____

_____
DAVID FINN
COUNSEL FOR JAMES DAVIS
Date: _____

8