```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN  DISTRICT OF TEXAS
 2                      DALLAS  DIVISION
 3    IN RE:                     )          CIVIL ACTION NO.
                                 )          3:09-CV-0721-N
 4    STANFORD INTERNATIONAL BANK, )
      LTD.,                       )          DALLAS, TEXAS
 5                                )
      Debtor in a Foreign Proceeding. )     DECEMBER 21, 2011
 6
 7
 8              TRANSCRIPT OF EVIDENTIARY PROCEEDINGS
               BEFORE THE HONORABLE DAVID C. GODBEY
 9                  UNITED STATES DISTRICT JUDGE
10
11    APPEARANCES:
12    For the Receiver,      MR. KEVIN M. SADLER
      Ralph S. Janvey:       MR. SCOTT D. POWERS
13                           MR. DAVID T. ARLINGTON
                             Baker Botts, LLP
14                           1600 San Jacinto Center
                             98 San Jacinto Boulevard
15                           Austin, Texas  78701-4039
                             (512) 322-2589
16
17    For the Examiner,      MR. JOHN J. LITTLE
      John J. Little:        Little Pedersen Fankhauser, LLP
18                           901 Main Street, Suite 4110
                             Dallas, Texas  75202
19                           (214) 573-2300
20
21    For Plaintiff SEC:     UNITED STATES SECURITIES AND
                             EXCHANGE COMMISSION
22                           BY:  MR. DAVID B. REECE
                             Burnett Plaza, Suite 1900
23                           801 Cherry Street, Unit #18
                             Fort Worth, Texas  76102-6882
24                           (817) 978-6476
25
```

025147ba-a31c-4457-b73e-de48d28d06e2

Page 2

```
 1    APPEARANCES CONTINUED:
 2
 3    For Bank Plaintiffs,      MR. PETER D. MORGENSTERN
      Antigua Litigation        Morgenstern & Blue, LLC
 4    Plaintiffs, and the       885 Third Avenue
      Investors Committee:      New York, New York  10022
 5                              (212) 750-6776
 6    For Antiguan Joint        MR. JOSEPH WIELEBINSKI
      Liquidators:              Munsch Hardt Kopf & Harr
 7                              3800 Lincoln Plaza
                                500 N. Akard Street
 8                              Dallas, Texas  75201
                                (214) 855-7561
 9
                                MR. GREGORY S. GROSSMAN
10                              MR. EDWARD H. DAVIS, JR.
                                Astigarraga Davis
11                              701 Brickell Avenue, 16th Floor
                                Miami, Florida  33131
12                              (305) 372-8282
13                              MR. CHRISTOPHER T. REDMOND
                                Husch Blackwell, LLP
14                              4801 Main Street, Suite 1000
                                Kansas City, Missouri  64112
15                              (816) 983-8000
16
17    Court Reporter:           Linda J. Langford, CSR, RDR, CRR
                                U.S. District Court Reporter
18                              Chambers of Judge David C. Godbey
                                1100 Commerce St., 15th Fl., #1504
19                              Dallas, Texas  75242
                                (214) 748-8068
20
21
22    Proceedings reported by mechanical stenography, transcript
23    produced by computer.
24
25
```

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

1              P R O C E E D I N G S

2                   DECEMBER 21, 2011

3          THE COURT:  Be seated.  Good morning.

4          MR. SADLER:  Good morning.

5          MR. POWERS:  Good morning, Your Honor.

6          THE COURT:  We have a commuting interpreter.  So

7    to expedite your role today, I'm going to go ahead and swear

8    you in.  This is the short form.

9        (Interpreter Michael Mahler sworn by the Court.)

10         THE COURT:  Thank you very much.  And feel free to

11   come and go as you need to.

12         THE INTERPRETER:  Yes, sir.

13         THE COURT:  Apparently at some point I told you-

14   all four hours per side.  Is that your recollection as well?

15         MR. SADLER:  Yes, sir.

16         MR. GROSSMAN:  Yes, sir.

17         THE COURT:  That's going to take us until about 7

18   o'clock tonight.  Do you actually need four hours per side?

19   Can we do this in three hours per side?

20         MR. SADLER:  For our side, Your Honor, we will

21   work as hard and as fast as we can to bring it in under

22   four hours.

23         MR. GROSSMAN:  Same on our side, Your Honor.

24         THE COURT:  I'm sorry?

25         MR. GROSSMAN:  The same on our side.  We'll try

025147ba-a31c-4457-b73e-de48d28d06e2

Page 4

1    and move it quickly.

2              THE COURT:  Okay.  Can we do it in three?  Can I

3    give you three hours per side and know that we'll be done

4    by 5:00?

5              MR. GROSSMAN:  I hate to quibble with the Court.

6    Can we have three and a half?  Because I think that's where

7    we have sort of timed out.

8              THE COURT:  Okay.  Sure.  Three and a half.

9              MR. GROSSMAN:  Thank you, Your Honor.

10             THE COURT:  Six is better than seven.

11             MR. SADLER:  That's fine, yes.  Thank you,

12   Your Honor.

13             THE COURT:  Okay.  Good.  I've been in a bench

14   trial the last seven days.  And I think my comprehension

15   for that hour between 6:00 and 7:00 would be so low, it

16   probably wouldn't do anyone any good.

17        So here's what I contemplate doing:  giving everyone,

18   if they want, a chance to make a short opening, though the

19   matter has been briefed extensively and I've read maybe

20   not every word that you've written but most of the words

21   you've written.  So I pretty well know your general

22   positions on that, my point being, I don't know that you

23   need a big, long opening, but I'll let you do one if you

24   want to.  And, of course, it will come out of your

25   three-and-a-half-hour budget.

025147ba-a31c-4457-b73e-de48d28d06e2

1          The Joint Liquidators, as I understand, have the burden

2     of proof, so I think they probably go first.  This is a

3     little bit of an odd procedure because the direct is in

4     writing.  But I would contemplate you would tender the

5     direct of your witnesses in whatever order you choose, that

6     the other side would then have the opportunity to cross

7     them.

8          What I'm thinking I will do is we've got the direct in

9     writing.  I'll permit a round of cross, a round of redirect,

10    and a round of recross, and done.  You don't have to do all

11    those if you don't want to.  But if you think you should

12    need them, I'll let you have essentially up to two rounds

13    per side, and then the other side will have the same

14    sequence, and then closings.

15         And the openings and closings and your examination of

16    the witnesses will all come out of your respective time

17    budgets.

18         We'll take a break for lunch at about 12:30, morning

19    break about halfway through the morning, afternoon break

20    about halfway through the afternoon for probably 15 or 20

21    minutes.

22         So I was sad to hear that the mediation didn't work.

23    I'm even sadder that all of the resources that are going

24    into this, including attorney time and money, are not going

25    towards trying to actually compensate victims.  But that

1    apparently is where we are.  So --

2              MR. SADLER:  Your Honor, if I may address the

3    Court about one procedural issue?

4              THE COURT:  Oh, so shortly.

5              MR. SADLER:  Yes, sir.  With the direct testimony

6    being filed, exhibits already being filed with the Court,

7    our view is that all of the exhibits are in the record.

8    Your Honor is to consider them in the Rules of Evidence and

9    give them what weight, if any.  And we would not like to

10   spend time arguing about specific objections over specific

11   documents.  It will -- it will really waste the Court's

12   time.

13        There are some objections that were filed by the Joint

14   Liquidators that we got last night.  And my proposal, as

15   I've -- I've made to them, is that all the paper that we've

16   dumped on the Court ought to just go in the record and the

17   Court can rely on whatever it wants.

18        But if they want to proceed with the 45 or so objec-

19   tions they have, my view is that ought to come out of their

20   time and we ought to go ahead and get that out of the way up

21   front rather than interrupting the testimony as we go along.

22             THE COURT:  Don't care.  If they want to take time

23   and argue them, that's fine.  If you want to address them on

24   the fly, that's fine.  If you want to do them on the papers

25   post hearing, that's fine, too.

Linda J. Langford, CSR, RDR, CRR

Page 7

1      I just want the record to be closed at some point so
2  we can resolve this and move on.  So whatever is the most
3  expeditious way to do that is fine with me.
4      So are the Joint Liquidators ready to proceed?
5          MR. GROSSMAN:  Yes, Your Honor.
6          THE COURT:  All right.
7          MR. GROSSMAN:  May it please the Court, I am Greg
8  Grossman for the Joint Liquidators.
9      Your Honor, before I launch into what the evidence will
10 show during this trial, I wanted to take a step back and
11 give the Court our perspective on why the Joint Liquidators
12 are requesting recognition for the Antiguan proceeding and
13 how we've tried to go about the process.
14     In our view, Chapter 15 is a tool for the use of the
15 benefit of creditors.  Months ago the Joint Liquidators pro-
16 posed a comprehensive cross-border protocol to address the
17 main issues that happen in international insolvencies and
18 to address specific issues that have been raised in this
19 case.  The protocol is in our exhibit book, and it was also
20 attached to our brief.
21     We tried to avoid this hearing altogether.  In
22 rereading the transcript from the status conference, it
23 became -- it reminded me that the Receiver advised the
24 Court that he has largely completed his work in closing
25 up the corporations, in liquidating the noncash assets,

025147ba-a31c-4457-b73e-de48d28d06e2

1   and really what is left to be done is clawback litigation

2   and the claims process to manage.

3       The transcript also reminds that the Committee and

4   the Receiver asked this Court or notified this Court of

5   its need for information from the Antiguan proceedings and

6   a hope to have the distribution process and claims process

7   coordinated with that proceeding.

8       With those very issues in mind, sections of the

9   protocol that we propose address each of those in turn.

10  Unfortunately, for reasons that are still frankly mystifying

11  on our side, we have not been able to reach a cooperative

12  protocol.

13      Turning to today's event, Your Honor, the Joint

14  Liquidators are asking for recognition for the Antiguan

15  proceeding to obtain tools for the benefit of creditors.

16  Firstly, some tools have nothing to do with litigation in

17  the United States or assets in the United States.  One of

18  the tools that is given in a Chapter 15, once recognition

19  is granted, is the ability to obtain discovery throughout

20  the United States.

21      Since it's a, quote, bankruptcy case, it has nationwide

22  jurisdiction; service of process is nationwide; and under

23  the bankruptcy rules, which will be the Federal Rules of

24  Bankruptcy Procedure, Rule 2004, which, for the bankruptcy

25  lawyers in the room, is a court-sanctioned fishing expedi-

Linda J. Langford, CSR, RDR, CRR

Page 9

1    tion to find assets, to investigate claims, and to support

2    claims that you intend to bring.

3         These claims I'm talking about, Judge, are not claims

4    necessarily to be brought in the United States.  For

5    instance, if the Joint Liquidators needed to file suit

6    against someone outside of the United States, but there

7    is information from third party witnesses somewhere in

8    the United States, granting recognition will allow us to

9    subpoena through a Rule 2004 examination to obtain that

10   information.

11        Turning to the items within the United States,

12   specifically the clawback litigation, it is no secret that

13   the clawback defendants have raised whether the Receiver

14   has standing to bring those claims.  I understand the Court

15   has ruled, adopting the then withdrawn portion of the Fifth

16   Circuit, and now that issue of standing is back up to the

17   Fifth Circuit.

18        It's obviously fairly controversial because the Uniform

19   Fraudulent Transfer Act talks about creditors bringing

20   claims.  The Receiver, as I read the Court's decision, was

21   given status as the representative of the creditors.  The

22   Joint Liquidators have no standing issue.  If the Joint --

23   if the Antiguan proceeding is granted foreign main recog-

24   nition, we believe Antiguan law would govern that clawback

25   litigation, and under Antiguan law Joint Liquidators have

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 10

1    the rights of creditors and can bring those claims.

2         By the way, in the U.S., Congress solved this problem

3    for bankruptcy trustees by enacting a section of the Bank-

4    ruptcy Code, 544, giving the bankruptcy trustee the power

5    to bring those claims as an unsecured creditor.

6         The notion here, Judge, is a plan B.  What if the

7    Fifth Circuit reverses course and says the Receiver does not

8    have standing?  Those clawback cases could be lost forever.

9    Our proposal in the joint protocol was to stand with the

10   Receiver, intervene in clawback litigations as a party

11   plaintiff, stand next to the Receiver and tell the clawback

12   defendants, if you win on standing as to the Receiver, you

13   won't win against the Joint Liquidators, so you ought to

14   get real and settle your case.

15        Similarly, Judge, statute of limitations.  The statute

16   of limitations, the four-year plus the one-year discovery

17   rule, I understand the Court has said that that discovery

18   rule begins when it was reasonably -- when it could be

19   reasonably found of the fraudulent nature of the trans-

20   action, that's also not an uncontroversial decision.

21   Florida is exactly the opposite.  Knowledge of the transfer,

22   irrespective of knowledge of its avoidability, starts the

23   clock.

24        Again, the Joint Liquidators have no issues.  We have

25   a six-year statute of limitations under Antigua law.  And

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

1   if granted recognition for the foreign proceeding under 108

2   of the Bankruptcy Code, we get an additional two years to

3   bring the claim.  Again, the notion here is to stand with

4   the Receiver and tell the clawback litigants to settle

5   their cases expeditiously.

6       Though the Receiver has not yet brought liability

7   claims, if such a liability -- I want to talk about a

8   liability claim, talking about an aiding and abetting claim,

9   aiding and abetting of fraud, aiding and abetting a breach

10  of fiduciary duty, or a professional negligence claim.

11      If that claim was to be brought here in the United

12  States by the Receiver, we all know that there's going to

13  be an in pari delicto defense raised, meaning the Receiver

14  steps into the dirty shoes of the entity under receivership.

15  And that case law suggests that you can't escape that and

16  those defendants will raise that issue.

17      In our view, and you'll hear the testimony, Antiguan

18  law, which is based on UK common law, doesn't have the same

19  notion of in pari delicto for circumstances like we have

20  here, again a benefit we believe that we can provide if

21  the Antiguan proceeding is granted recognition.  Moreover,

22  Judge, circling back, granting recognition to the foreign

23  proceeding allows a protocol to be put in place so that

24  the claims process and the distribution schemes can be

25  coordinated.

025147ba-a31c-4457-b73e-de48d28d06e2

Page 12

1          Turning to what the evidence is going to show today,

2     Judge, we've got two sets of ministerial issues that we have

3     to satisfy.  And, again, unfortunately we were not able to

4     obtain a stipulation as to these ministerial issues.  So

5     let me do them.

6          Are we a foreign proceeding?  We believe the evidence

7     will show that the proceeding is collective, it's judicial,

8     it's pending in a foreign country, it's under an insolvency

9     law, it's under supervision of a foreign court, and it's for

10    the purposes of liquidation.  That would be the definition

11    of foreign proceeding.

12         Under 1515 and 1517 of the Bankruptcy Code, we believe

13    we meet the other ministerial requirements.  The Joint

14    Liquidators are persons.  They have -- there is a petition

15    for Chapter 15 relief requested, copies of the appointment

16    orders and the petition -- I'm sorry, of the foreign

17    commencement have been filed, and a statement identifying

18    the foreign proceedings is in the record.

19         But, Judge, let me talk about a couple of things that

20    I think are going to be highlighted here in the trial.

21         The Liquidators are asking for recognition of the

22    Antiguan proceedings as to SIB.  That's the only entity

23    that's in liquidation in Antigua that we're talking about

24    here.  The other Stanford entities in our view are simply

25    irrelevant for Chapter 15 purposes.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

1        And why do I say that?  Well, I say that because the

2    Fifth Circuit has said so.  We have In re Condor and we

3    have In re Ran, the two Fifth Circuit cases on Chapter 15.

4    In In re Ran, the Fifth Circuit teaches us that when you

5    look to the statutory language and it is clear, it's both

6    the beginning of the analysis and the end of the analysis.

7        In this situation -- in the Ran situation, the Fifth

8    Circuit said the fact that Chapter 15 speaks in present

9    tense was controlling to their decision.  We believe,

10   similarly, the fact that Chapter 15 speaks of a single

11   entity, it talks about a foreign proceeding being the

12   subject of a debtor.  And a debtor is itself defined as

13   an entity.

14       So if the tense of a verb in Chapter 15 matters, we

15   believe the singular versus the plural also matters.

16   Accordingly, we don't believe that the other Stanford

17   entities are really relevant for the COMI analysis.

18       Now, what is the COMI analysis?  And you say, Judge,

19   we have two very different views, the two sides, of what

20   you're supposed to look at.  We believe the Fifth Circuit

21   has already spoken to this.  In the In re Ran case, they

22   said, it is important that the COMI be ascertainable by

23   third parties.  And it explains the rationale of that

24   view.  It then goes on to apply that very principle.

25       The Receiver, however, takes the opposite view and

Linda J. Langford, CSR, RDR, CRR

1   says that this Court should be guided by the Hertz decision,

2   which is obviously not a COMI decision.  It's a principal

3   place of business decision, and it's entered in 2010 to

4   resolve a split amongst the Circuits.

5        So from their perspective, they're asking this Court

6   to apply principal place of business as the yardstick for

7   COMI and then apply the Supreme Court's change of the law,

8   because if you read Hertz, you'll see the Circuits had a

9   multifactored test to determine what principal place of

10  business is.

11       From our view, that ignores 1508.  1508 says the Court

12  is to be guided by the international origins of Chapter 15

13  and interpreted consistent with other courts in other parts

14  of the world who have similar statutes.

15       The issues involved in Hertz involved whether or not

16  someone could bring their claim in federal court.  But the

17  result, if they are unsuccessful, is they have their suit

18  in state court.

19       The issues in COMI of whether or not you're going to

20  get foreign main recognition is international in scope and

21  far more significant than which forum you would be able to

22  bring the claim.  It has to do with whether the courthouse

23  door will be even open.

24       We believe the Fifth Circuit has now mandated that the

25  evidence of COMI has to be viewed through the eyes of third

1    parties, ascertainable by third parties, objective criteria

2    ascertainable by third parties.

3         Now, who are these third parties?  It's CD depositors

4    and trade creditors.  And what was ascertainable by them?

5    Well, Judge, the main marketing brochure for Stanford

6    International Bank couldn't be any clearer, quote:  Stanford

7    International Bank, Ltd., conducts business with the world

8    from its headquarters in Antigua.  That's the brochure.

9         The other marketing materials also highlight Antigua.

10   It's a zero tax jurisdiction, if you look at the materials.

11   It has a map of where Antigua is in the Caribbean, and it

12   references the fact that the Antiguan regulatory authorities

13   are the ones in control.

14        The evidence is going to show that U.S. residents

15   were required to sign a subscription agreement.  And that

16   subscription agreement says that Antigua law governs, and

17   those American depositors got a disclosure statement which

18   told them, your deposit is not insured by the FDIC; the

19   SEC and the FDIC are not regulating this investment.

20        It's also pretty clear, and you'll hear from the testi-

21   mony, that the CD holders--again, the third parties--did

22   not ascertain where Stanford International Bank's assets

23   were being invested.  The evidence is going to show that

24   the operational banking activities took place in Antigua.

25        What am I talking about here?  Customer service, credit

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 16

1    card administration, loan administration, letters of credit,

2    letters of guaranty.  There was a 30,000-square-foot

3    building in Antigua with 90 employees operating the bank,

4    doing those banking operation functions I referred to.

5         The evidence is also going to show the extensive

6    records that are in Antigua.  Importantly, the customer

7    information is Antiguan.  The documents necessary to do

8    the claims process and the distribution are in Antigua,

9    customer by customer, folder by folder.

10        The other issue for today, Your Honor, is public

11   policy.  Frankly, Judge, we do not believe that any evidence

12   here is going to support the notion that recognition of the

13   Antiguan proceedings is manifestly contrary to the public

14   policy of the United States.

15        First, the Liquidators are not an arm of the Antiguan

16   government.

17             THE COURT:  If I can interrupt --

18             MR. GROSSMAN:  Yes, sir.

19             THE COURT:  -- for just one second.  I got a

20   letter yesterday from the Department of Justice that

21   appeared to be copied to everybody else.  Did all of you

22   guys get that?

23             MR. SADLER:  Yes, sir.  Yes, Your Honor.

24             MR. GROSSMAN:  We did, Your Honor.

25             MR. SADLER:  We'll be offering that as an exhibit.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

1          THE COURT:  Okay.  Sorry.

2          MR. GROSSMAN:  Fine, Your Honor.

3       First, Judge, the Joint Liquidators are not an arm of

4    the Antiguan government.  They are agents of the Court,

5    much like Mr. Janvey is a Receiver, he reports to the Court.

6    The fact that he was appointed at the behest of the SEC

7    doesn't make him a government actor.  Similarly, the Joint

8    Liquidators are not under the control of the Antiguan

9    executive branch nor the regulators in Antigua.  You're

10   going to have no evidence that the Antiguan judge is some-

11   how corrupt or corruptible.

12      The Joint Liquidators have stated time and time again

13   that if there are claims against the Antiguan government,

14   the claims will be brought.  As of this point, there is

15   no loan -- despite an allegation made in the brief by the --

16   by the Committee, there is no loan on the books that shows

17   Stanford International Bank making a loan to the Antiguan

18   government.  But if there's a traceable claim to the

19   Antiguan government, the Joint Liquidators will bring it.

20      With respect to what's highlighted in the brief

21   regarding Mr. Fundora, Mr. Fundora asked to put Stanford

22   International Bank into liquidation and that request was

23   denied by the Antiguan judge.  That was 2009, and nobody

24   told this Court that Mr. Fundora acted inappropriately or

25   in contravention of this Court's order.  We put in our

025147ba-a31c-4457-b73e-de48d28d06e2

Page 18

1   brief the response to that notion, that he was not acting

2   in violation of this Court's order.

3       Two years later, when he asked to remove the former

4   Joint Liquidators and appoint new ones, he was also not

5   acting in violation of this Court's order.  The analogy the

6   Receiver tries to draw from the Gold & Honey case is simply

7   not apt.  In that particular case, the creditor went and

8   seized property in a foreign country despite an automatic

9   stay, not commencing a collective proceeding.

10      Judge, another issue here is the timing, when do you

11  decide the COMI?  Do you decide the COMI back when the

12  foreign proceeding was commenced?  Do you decide it when

13  the Chapter 15 was filed?  Well, fortunately, the Fifth

14  Circuit has already told us the answer to that in In re Ran.

15  It is the time in which the Chapter 15 petition was filed.

16      The Receiver takes a contrary view to that case and

17  says that you should look to the date in which the new

18  Joint Liquidators reinvigorated the proceedings here.

19      First, Judge, obviously the Fifth Circuit has spoken

20  and that's that.

21      Second, the analysis that we should restart the clock

22  when the new Joint Liquidators come forward, fails to

23  understand that, under Chapter 15, courts don't recognize

24  foreign representatives.  You recognize foreign proceedings.

25  The proceeding was filed.  The Chapter 15 was filed.  The

Linda J. Langford, CSR, RDR, CRR

Page 19

1    fact that the representatives change is not relevant.

2        And that's for a very practical purpose.  If a

3    liquidator was appointed in another country and dies or

4    resigns or withdraws, you don't start the clock to the

5    detriment of the creditors and parties in interest in the

6    Antiguan proceeding.

7        Last, Judge, in our brief, we told you that when you

8    substitute a party plaintiff, it relates back to the date

9    of the filing.

10       In sum, Judge, the Joint Liquidators very much wanted

11   to avoid today; have a cooperative protocol, a respectful

12   one, one that understands we're dealing with two courts

13   in sovereign jurisdictions; try to find a balance with

14   appropriate limitations that was geared specifically to

15   enhance the rights of the creditors.  And we hope that

16   that will still be the result.

17       Thank you, Your Honor.

18           MR. SADLER:  Thank you, Your Honor.  Good morning.

19       I think there are two why questions that hang over

20   these proceedings this morning, Your Honor.  First of all,

21   why are we, all of us, here today.  And then the second

22   question is, why are these Joint Liquidators here today.

23       The answer to the first question, why are we all here

24   today, is because of them.  Your Honor had the opportunity,

25   was ready, we were all ready, to decide this issue almost

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

1    two years ago in January of 2010.  But because of things

2    they did, which we will highlight, all of that came to a

3    stop, the whole liquidation proceeding in Antigua died for

4    almost a year, and now we're reinventing the wheel all

5    over again.

6         The answer to the why are they here, it's not about

7    protocols.  It's not about cooperation and everyone getting

8    along.  It's about controlling the bank.  Because their view

9    is if they control the bank, they control everything they

10   see related to the bank, which is every dime that exists on

11   the planet related to Stanford, the frozen funds overseas,

12   the funds in Mr. Janvey's bank account, and that's why they

13   are here is to get control of the bank.

14        The evidence, and we briefed it to death, is there is

15   no COMI in Antigua.  There is no economic establishment in

16   Antigua.  So foreign main, foreign nonmain, they cannot

17   prove it.  And it doesn't matter whether you dignify the

18   fraud, which is what he just asked you to do, acknowledge

19   the window dressing, acknowledge the paper pushers,

20   acknowledge the pretty building down in Antigua and treat

21   that as if it were real instead of window dressing, we

22   all know it was.  And there's nothing in Chapter 15 that

23   suggests that you should dignify the fraud.

24        But if you look at it the other way and look at the

25   actual evidence about what was ascertainable, it was

Linda J. Langford, CSR, RDR, CRR

Page 21

 1    disclosed in SIBL's public statements that they had

 2    outsourced virtually everything, everything, to other

 3    Stanford entities.  If you look at the COMI factors, no

 4    assets in Antigua, no creditors in Antigua.  It is -- it

 5    is impossible for them to carry the burden under either

 6    main or nonmain.

 7         Now, the other problem they have which they are trying

 8    to totally skate by is they don't have a petition on file.

 9    Chapter 15 says the human beings who want to be recognized

10    have to have a petition on file.  They don't.  The only

11    petition on file is the one Vantis filed, and they're

12    trying to disown everything that Vantis did except they

13    want the benefit of Vantis's filing.

14         But this appointment order that they filed as an

15    attachment to a motion for summary judgment that they asked

16    you to let them file and you denied, that's not a petition

17    for recognition.  They have got a serious problem that

18    they have chosen not to try to fix with perhaps an amended

19    petition for recognition.  They just haven't done it.

20    And so the petition they have on file is fundamentally

21    defective.

22         There was a mention of Mr. Fundora, and there's going

23    to be talk about that because I think the Gold & Honey case

24    really is instructive on the kind of litigation gamesmanship

25    that went on that brought us here to today.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 22

1        As I said, we would have had this issue decided two

2    years ago.  We had an agreement with Vantis that was pre-

3    sented to this Court, presented to the Antiguan court, and

4    they torpedoed it.

5        And you're going to see in black and white in writing

6    why they torpedoed it, why it was so urgent to get Mr. Wide

7    in at the behest of Mr. Fundora.  And it was all about

8    fighting Mr. Janvey and taking control of assets before this

9    Court took control of them, because they realized, once this

10   Court had the control of assets, they weren't going to be

11   able to be moved to Antigua.

12       And that was the point of it, getting assets down to

13   Antigua, just like they've done and they're doing, fighting

14   the DOJ with the funds frozen overseas.  And rewarding that

15   kind of litigation tactic which at a minimum has cost this

16   Receivership thousands upon thousands of dollars to re-

17   litigate this Chapter 15 issue when it was resolved two

18   years ago isn't something that should be rewarded.

19       And, last, they talk about this protocol.  And you're

20   going to see it.  I mean, they attached it to their brief,

21   but we're going to go over it.  And the best way to describe

22   that protocol is they stand ready to agree to anything that

23   gives them everything they want.  That's the protocol.  And

24   that is inconsistent with Mr. Janvey's duties under his

25   appointment order and, of course, we wouldn't agree to that.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 23

1    Of course we wouldn't.  And you'll see -- you'll see very

2    plainly why.

3         But the fundamental problem with any kind of recog-

4    nition under these circumstances is the last thing this

5    Receivership needs, the last thing the investors need, is

6    two representatives of the bank here in the United States.

7         For the last three years, the bank has had a repre-

8    sentative in the United States.  He didn't take a year off,

9    didn't take a sabbatical, didn't set down the Receivership.

10   There has been a representative.  And to put a second

11   representative in the case is unneeded, unwarranted, and

12   I think would prove unwise and unhelpful to investors.

13        Your Honor recently was presented with intervenors who

14   wanted to come in and they wanted to be part of this and

15   they wanted to file motions and they wanted to get on the

16   Investor Committee because they didn't agree with how things

17   were being run.  And they made a case for intervention under

18   the federal rules.

19        But Your Honor, I think correctly and wisely, said, the

20   last thing this thing needs is another set of people coming

21   in to duplicate work that's already been done.

22        And the only pitch I heard this morning is that somehow

23   these folks think they have some theory under foreign law

24   that's never been tried, never been tested, never been

25   litigated in U.S. courts, to come over here and file more

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 24

1    lawsuits.

2        You have got people already filing hundreds of law-

3    suits.  I don't see how filing more lawsuits in United

4    States courts is going to help anybody.  It will provide

5    income to lawyers.  That we can all understand.  But it is

6    not a reason to reward these petitioners with Chapter 15

7    recognition.

8        Thank you, Your Honor.

9            THE COURT:  Anyone else on that side of the

10   courtroom?

11           MR. LITTLE:  Your Honor, I was not going to make

12   an opening, but I want to take 30 seconds to point out a

13   very significant omission from Mr. Grossman's opening.

14       He talked about the business of the bank being con-

15   ducted in Antigua.  The one thing he didn't mention when he

16   ran through the business was the sale of CDs.  He didn't say

17   those words because the bank in Antigua didn't sell any CDs.

18   Those were sold out of the United States and in other places

19   in the world, but not out of Antigua.  And that's the

20   business of the bank.

21           THE COURT:  Anybody else?

22           MR. REECE:  Your Honor, nothing from the

23   Commission, no.

24           THE COURT:  Okay.  Joint Liquidators can proceed.

25           MR. GROSSMAN:  Thank you, Your Honor.  Your Honor,

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 25

1    the Joint Liquidators call Nicolette Doherty to the stand.

2            THE COURT:  Could you raise your right hand,

3    please?

4        (The witness was sworn by the Court.)

5                    NICOLETTE DOHERTY, SWORN,

6                        DIRECT EXAMINATION

7    By Mr. Grossman:

8    Q.   Good morning, Ms. Doherty.  Could you please state your

9    full name?

10   A.   Nicolette Margaret Doherty.

11   Q.   Ms. Doherty --

12           THE COURT:  If I can inquire.  What I contemplated

13   is the direct is already written?

14           MR. GROSSMAN:  I'm going to submit it right now.

15           THE COURT:  We can dispense with the name and all

16   that and just go straight to the cross then.

17           MR. GROSSMAN:  Thank you, Your Honor.  Your Honor,

18   we would move to admit Ms. Doherty's sworn written direct

19   testimony in lieu of live testimony and move the documents

20   attached to that direct testimony into evidence and tender

21   the witness.

22           THE COURT:  Okay.  Cross?

23           MR. SADLER:  Yes, Your Honor.  Given that we

24   understand that Ms. Doherty is litigation counsel for the

25   Joint Liquidators in Antigua, we have no questions for this

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 26

1    witness.  She's just their lawyer.

2              THE COURT:  Okay.  Thank you, ma'am.  You may step

3    down.

4              MR. WIELEBINSKI:  Good morning, Your Honor.  I'm

5    Joe Wielebinski.  I'm with Munsch Hardt.  I'm going to be

6    handling Justice Gordon.  I'd like to call to the stand

7    Justice Michael Gordon.

8              THE COURT:  Go ahead and have a seat, please, sir.

9              THE WITNESS:  Thank you.

10             THE COURT:  Could you raise your right hand,

11   please?

12        (The witness was sworn by the Court.)

13             MICHAEL BRUCE GARNET GORDON, SWORN,

14                  DIRECT EXAMINATION

15   By Mr. Wielebinski:

16   Q.   Good morning, Justice Gordon.  Can you state your name

17   for the record?

18   A.   Michael Bruce Garnet Gordon.

19   Q.   Thank you very much.

20             MR. WIELEBINSKI:  Your Honor, we hereby move to

21   admit Justice Gordon's written direct examination and the

22   accompanying exhibits.

23             THE COURT:  All right.  Cross?

24             MR. SADLER:  Your Honor, thank you.  We very much

25   appreciate Justice Gordon being here, but we don't think his

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 27

1    testimony really relates to the Chapter 15 issue, so we do

2    not have any questions for him.

3          But thank you for coming, sir.

4                THE COURT:  All right.  Thank you, sir.  You may

5    step down.

6                MR. DAVIS:  Your Honor, good morning.  Edward

7    Davis for the Joint Liquidators with Astigarraga Davis.

8    Your Honor, we call Mr. Augusto Corrales to the stand with

9    the -- with the interpreter.

10                THE COURT:  Could you raise your right hand,

11    please, sir?

12          (The witness was sworn by the Court.)

13                THE WITNESS:  Yes, I swear.

14                      AUGUSTO CORRALES, SWORN,

15                       DIRECT EXAMINATION

16    By Mr. Davis:

17    Q.   Can you state your name for the record, please?

18    A.   Augusto Corrales.

19                MR. DAVIS:  Your Honor, we hereby move the

20    testimony and exhibits attached to the written direct

21    testimony of Mr. Corrales into evidence.

22                THE COURT:  All right.  Any cross?

23                MR. LITTLE:  Your Honor, I'll be handling the

24    cross for the Receiver and the Investors Committee and

25    the Examiner.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 28

1                         CROSS EXAMINATION

2    By Mr. Little:

3    Q.    Mr. Corrales, good morning.  My name is John Little.

4    I'm the Examiner appointed by the Court in this case.

5    A.    My pleasure, sir.

6    Q.    Now, when you purchased Stanford International Bank

7    CDs, you did so through a financial advisor.  Correct?

8    A.    Correct.

9    Q.    And that financial advisor was located in Venezuela.

10   Correct?

11   A.    Yes, he was located in Venezuela.

12   Q.    And when -- and you understood he was employed by a

13   Stanford entity in Venezuela.  Correct?

14   A.    The gentleman was a financial advisor.

15   Q.    And he was employed in Venezuela.

16   A.    He worked in Venezuela as a financial advisor.

17   Q.    Okay.  Thank you.  Now, when -- you understood that

18   the bank was in difficulty in February of 2009.

19   A.    Several days before, on the 17th of February of 2009.

20   Q.    Okay.  And at that point, the person you contacted was

21   your financial advisor in Venezuela.  Correct?

22   A.    I did more things.  I contacted the financial advisor

23   in Venezuela, and I went to Antigua.

24   Q.    But so that we're clear, the first thing that you did

25   was contact your financial advisor.  Correct?

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 29

1    A.   The first thing I did was to send a letter requesting

2    the early redemption of the CDs.

3    Q.   And that was sent to your financial advisor.

4    A.   No.  It was sent to Ms. Sonia Davies at the Stanford

5    International Bank in Antigua where I had it and where I

6    had been earlier.

7    Q.   Mr. Corrales, let me show you what was Exhibit 5 to

8    your direct testimony.

9    A.   My pleasure.

10   Q.   Do you recognize this, Mr. Corrales, as the letter

11   you're referring to?

12   A.   That's correct.  Yes, this is.  And it is addressed

13   to Ms. Sonia Davies, Senior Supervisor of Client Services

14   at Stanford International Bank in Antigua.

15   Q.   And so that we're clear, Mr. Corrales, this letter

16   says, "I have informed your bank through Mr. Antonio

17   Tepedino and Miss. Maria E. Mendez, via e-mail and by

18   hand delivery of the needed documents, my decision to call

19   for the early redemption of all Fixed CDs belonging to my

20   company Inversiones, 7000, A.C., C.A., as well as, my

21   personal's ones."

22        That's what it says.

23   A.   Yes.  I first contacted both of them at the same time,

24   Mr. Antonio Tepedino and Senorita Maria Mendez, and sent

25   the letter at the same time.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 30

1    Q.    And Mr. Tepedino was your financial advisor.

2    A.    That is correct.

3          MR. LITTLE:  I pass the witness.

4                     REDIRECT EXAMINATION

5    By Mr. Davis:

6    Q.    Mr. Corrales, why did you go to Antigua in February of

7    2009?

8    A.    Well, perhaps I should say that I had been in Antigua

9    before.  I was there in October.  There were employees of

10   mine that they're in Grenada in 2007, and I also was in

11   Antigua in October of 2008 and on business at Stanford

12   International Bank in Antigua.

13         MR. LITTLE:  Your Honor, I move to strike all of

14   this, none of it responsive to the question that was asked

15   on redirect, which is, why did you go in February.

16         THE COURT:  Sustained.

17   Q.    (BY MR. DAVIS)  Tell us why you went in February first,

18   and then I'll follow that up.

19   A.    I was there in February attempting to obtain the money

20   because I had requested the redemption of the CDs.  And I

21   understood that it should have been done within 72 hours.

22   And I had a CD that was coming due on the 19th or the 20th,

23   that I had the right to receive that money on that date.

24         And on the 20th when I was there, I spoke with Ms.

25   Sonia Davies who told me that the persons were named by

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 31

```
 1    the authorities of Antigua to intervene in the bank, and
 2    therefore she could not satisfy my request.
 3    Q.   Did you go anywhere else to try to collect your money
 4    besides Antigua?
 5    A.   No.  The money was in Antigua.  It had been deposited
 6    there at the bank there in Antigua.
 7    Q.   And why did you go to Antigua to visit the bank in
 8    October of 2008?
 9    A.   I was performing some construction work for a company,
10    an English company in Grenada.  And when the construction
11    crisis occurred, they couldn't pay me and I needed money.
12    And I went to Antigua, to Grenada, to request a loan of
13    $250,000 that would be guaranteed by my CDs.
14    Q.   And what entity provided you that loan?
15    A.   Stanford International Bank in Antigua.
16    Q.   And who did you meet with Antigua to obtain that loan?
17    A.   I met with the president of Stanford International Bank,
18    Mr. Juan Rodriguez-Tolentino.
19             MR. DAVIS:  Thank you, Your Honor.  No more
20    questions.
21             MR. LITTLE:  Nothing further, Your Honor.
22             THE COURT:  Thank you, sir.  You may step down.
23             THE WITNESS:  Thank you very much.
24             MR. REDMOND:  Your Honor, my name is Christopher
25    Redmond.  I'm with Husch Blackwell and counsel of one of
```

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 32

1    the -- for the Joint Liquidators also.  We would call to

2    the stand Ricardo Enrique Aguirre Rodriguez.

3              THE COURT:  Could you raise your right hand,

4    please?

5         (The witness was sworn by the Court.)

6              RICARDO ENRIQUE AGUIRRE RODRIGUEZ, SWORN,

7                        DIRECT EXAMINATION

8    By Mr. Redmond:

9    Q.   Please state your name for the record.

10   A.   Ricardo Aguirre Rodriguez.

11             MR. REDMOND:  Your Honor, we would move to admit

12   his written evidence -- or written statement into evidence

13   and the exhibit that was tendered.

14             THE COURT:  All right.  Cross?

15                        CROSS EXAMINATION

16   By Mr. Little:

17   Q.   Good morning, Mr. Rodriguez.

18   A.   Good morning.

19   Q.   In your direct testimony, you talk about investments

20   that are made in these CDs by a company named Clapham

21   Luxembourg.  Correct?

22   A.   Yes.

23   Q.   Did you personally invest any money in Stanford

24   International Bank CDs?

25   A.   Yes.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 33

1    Q.   You did.  How much?

2    A.   Perhaps around $300,000.

3    Q.   And did you redeem those CDs or are you victimized as

4    well by this fraud?

5    A.   The money is in the bank.  I didn't take anything out.

6    Q.   Okay.  And through whom did you buy your CDs?

7    A.   Through a financial advisor in the city of Monterrey,

8    Mexico.

9    Q.   And what was his -- what was his or her name?

10   A.   The financial advisor's name is Oscar Correa.

11   Q.   And that's the same financial advisor that the Clapham

12   entity bought through.  Correct?

13   A.   Yes.

14            MR. LITTLE:  Pass the witness, Your Honor.

15                    REDIRECT EXAMINATION

16   By Mr. Redmond:

17   Q.   Mr. Rodriguez, when the problems occurred with Stanford

18   International Bank, did you go to Antigua?  Did you travel

19   to Antigua?

20   A.   I traveled to Antigua in February of 2009.

21            MR. LITTLE:  Your Honor, redirect is usually

22   limited to the scope of the cross.  I don't recall asking

23   anything about this gentleman's travels to Antigua ever.

24            THE COURT:  Response?

25            MR. REDMOND:  That is correct, Your Honor.  I mean,

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 34

1    the -- there was -- there was no -- the direct examination

2    was in regard to the acquisition of the -- of the CDs.  I'll

3    limit my questions to that -- to that area, Your Honor.

4              THE COURT:  Okay.

5    Q.   (BY MR. REDMOND)  When you purchased the CDs, did you

6    travel to Antigua?

7    A.   I personally didn't, but people from my company did

8    prior to making the investment there.

9    Q.   And why did they go to Antigua?

10             MR. LITTLE:  Your Honor, now we're going to get

11   into hearsay when we're talking about why other people went

12   to Antigua to make purchases.

13             MR. REDMOND:  Your Honor, this is a company that

14   Mr. Aguirre Rodriguez was involved in.  So he can testify

15   what he directed individuals in his company to do.  I am

16   just asking why -- why he did that.

17             MR. LITTLE:  Your Honor, the direct addresses the

18   purchase of the CDs by this Clapham entity.  I didn't ask

19   any questions about the purchase of CDs by the Clapham

20   entity.  I don't understand why we have to go back through

21   the direct that's already in the record during redirect.

22             MR. REDMOND:  I'm just -- I'm just trying to

23   clarify the background.  There was questions about buying

24   through a financial advisor, and I was trying to clarify

25   the situation of how it actually occurred and -- and what

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 35

1    the background issues were for the Court's benefit.

2              THE COURT:   Okay.   I'm going to overrule the scope

3    objection.   With regard to the activities in Antigua, if you

4    could just clarify that the witness has personal knowledge

5    and is not relying on what someone else told him.

6    Q.   (BY MR. REDMOND)   Mr. Aguirre Rodriguez, do you have

7    personal knowledge of the actions that took place in Antigua

8    at or about the time the CDs were purchased by Clapham?

9    A.   Can you repeat the question?

10   Q.   Yes.   Do you have personal knowledge when the CDs were

11   being purchased of the activities that were occurring in

12   Antigua regarding the purchase of the CDs?

13   A.   What I knew was that the Monterrey advisor was more

14   or less an intermediary of the bank in Antigua.   And my

15   experience was all by mail, normal mail, and that after the

16   investment through Monterrey, I received mail directly from

17   Antigua.   And 30 days later, I received the Certificate of

18   Deposit that came from Antigua.

19   Q.   During this period of time in which the CDs were

20   being acquired, did you always view that the Stanford

21   International Bank was the entity that you were dealing

22   with in Antigua?

23   A.   Yes.   Aside from that, the advisor in Monterrey, Mr.

24   Correa, always advised us that the bank was in Antigua and

25   that all of its activities were governed by the Commission

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 36

1   in Antigua.

2   Q.   And, Mr. Aguirre Rodriguez, did you believe that Stan-

3   ford International Bank during the time period you were

4   obtaining the CDs operated anywhere except in Antigua?

5   A.   Well, I went to Panama to an office of the bank in

6   Panama and in Antigua.  I just knew that.

7   Q.   Okay.  Did you believe that the principal operations

8   of the Stanford International Bank at the time you purchased

9   the CDs was in Antigua?

10  A.   Certainly I thought it was all in Antigua.  I thought

11  it was in Antigua.

12          MR. REDMOND:  Thank you, Your Honor.  We have no

13  other questions.

14          MR. LITTLE:  Nothing further, Your Honor.

15          THE COURT:  Thank you, sir.  You may step down.

16          MR. WIELEBINSKI:  Your Honor, I'd like to call

17  Marcus Wide to the stand.

18          THE COURT:  Go ahead and have a seat, please, sir.

19  Could you raise your right hand, please?

20      (The witness was sworn by the Court.)

21              MARCUS ALLEN WIDE, SWORN,

22              DIRECT EXAMINATION

23  By Mr. Wielebinski:

24  Q.   Mr. Wide, can you state your name for the record?

25  A.   Marcus Allendor Wide.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 37

1    Q.   And, Mr. Wide --

2              MR. WIELEBINSKI:  Well, with that, Your Honor,

3    I'd like to move to admit Mr. Wide's written statement as

4    well as the exhibits accompanying same.

5              THE COURT:  All right.  Cross?

6              MR. WIELEBINSKI:  Your Honor, if I may--I'm sorry,

7    Mr. Sadler--one of the documents we had was a videotape.  It

8    was in the form of computer information.  Has the Court had

9    an opportunity to review that video?

10             THE COURT:  No.

11             MR. WIELEBINSKI:  Your Honor, with your

12   permission, we'd like to play that video now.

13             THE COURT:  I'll review it later.

14             MR. WIELEBINSKI:  Fair enough.  Thank you, Your

15   Honor.

16                    CROSS EXAMINATION

17   By Mr. Sadler:

18   Q.   Mr. Wide, I have a notebook for you and some documents

19   I'm going to be asking you questions about.

20             MR. SADLER:  I have given counsel copies, and I

21   have three for the Court.

22        (Documents proffered to the Court.)

23             MR. SADLER:  May I proceed?

24             THE COURT:  Please.

25   Q.   (BY MR. SADLER)  Mr. Wide, good morning.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 38

1  A.    Good morning.

2  Q.    You agree, do you not, sir, that Stanford International

3  Bank operated a business model which was in fact a Ponzi

4  scheme?  You agree with that, don't you?

5  A.    No.

6  Q.    You do not agree with that.

7  A.    No.

8  Q.    All right.  If I could direct your attention to tab 1

9  in the notebook I have put in front of you.  And tell me

10  when you have that first document.  It's entitled Statement

11  of Claim, dated August 12, 2011 --

12  A.    Yes, sir.

13  Q.    -- under tab 1.  And, sir, you recognize this as a

14  statement of claim that you filed very recently in litiga-

15  tion proceedings that you're pursuing in Antigua.  Right,

16  sir?

17  A.    That was filed on August the 11th --

18  Q.    Right.

19  A.    -- 2011, yes.

20  Q.    And if we go to the very -- almost the last page of

21  that document, it's actually signed by you certifying it's

22  true.

23  A.    Yes.

24  Q.    All right.  And if you will then turn to the second

25  page of that document under the heading, paragraph 5,

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 39

1    Background, do you not say in this statement that SIB

2    operated a business model which was a Ponzi scheme?

3    A.    That was the statement then, yes.

4    Q.    And that was your statement, certified as true, to the

5    Antiguan court.

6    A.    That's right.

7    Q.    All right.  Now, you agree also, sir, that Stanford

8    International Bank really didn't do domestic business in

9    Antigua.  Right?

10   A.    As an offshore bank, it did not do business with

11   residents -- with, sorry, Antiguan citizens --

12   Q.    Right.

13   A.    -- to be precise, yes.

14   Q.    It, for example, could not accept deposits from

15   Antiguan citizens.  Right?

16   A.    That's right.

17   Q.    Could not make loans to Antiguan citizens.  Right?

18   A.    Without permission of government, yes.

19   Q.    And it did not really operate as a traditional bank

20   in the sense of making loans to customers and that kind of

21   thing in Antigua.

22   A.    It was not an Antiguan domestic bank, no.

23   Q.    Right, sir.  Didn't make loans to local businesses, for

24   example.

25   A.    No.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 40

1    Q.    All right.  And, in fact, sir, I think you have also,

2    since you've been appointed, you have been unable to find

3    any evidence of any genuine, underlying, profitable activity

4    that would support the bank's purported assets that it put

5    in its reports and balance sheets.  Right, sir?

6    A.    Yes, that's right.

7    Q.    And, in fact, I think, since you have been appointed,

8    you have found in interviewing employees of the bank who are

9    still around, that financial transactions, money was moved

10   between accounts from the bank to other Stanford entities.

11   You found that to be the case.  Right, sir?

12   A.    Yes.

13   Q.    Routine, I think you described them at one point?

14   A.    Yes.

15   Q.    And, in fact, sir, haven't you concluded that with

16   regard to Stanford International Bank's balance sheet, that

17   the accounts that they say made up that were basically made

18   up, were part of a charade?  Isn't that how you've described

19   it?

20   A.    The balances were fraudulently stated, yes.

21   Q.    Right.

22   A.    They were inaccurate.

23   Q.    And, in fact, you have described SIB as a charade.

24   Right?

25   A.    I don't remember using that word.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 41

1   Q.   Well, sir, turn to tab 2 in your notebook.  Let me know

2   when you have that.  And tab 2 is an affidavit of Marcus

3   Wide--that's you--and it's dated in July 2011.  Right?

4   A.   Uh-huh, yes.

5   Q.   And you have seen this before and you signed it?

6   A.   Sorry.  Might I just have a look at it?  Tab 2 is the

7   document I signed and swore on the 15th of day of July 2011,

8   yes.

9   Q.   All right.  And if we turn to page 18 of this affidavit

10  that you gave --

11  A.   Yes.

12  Q.   -- and in paragraph 22, don't you state that "I infer

13  that these accounts," meaning the accounts of Stanford

14  International Bank, "were made up and were part of the super-

15  structure to the SIB-based charade which RAS supervised."

16  A.   Yep.  I apparently did use the word "charade."

17  Q.   And RAS is Robert Allen Stanford.

18  A.   Yes.

19  Q.   And, in fact, you have described in one of your

20  lawsuits down in Antigua that you've brought against

21  Mr. Stanford is he was the controlling mind of Stanford

22  International Bank.  That's -- that's something you're

23  familiar with.  Right?

24  A.   That sounds right, yes.

25  Q.   All right.  And isn't -- you are probably familiar, I

U.S. District Court

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 42

1    take it, with statements by the government of Antigua where

2    they take the position that the business of Stanford Inter-

3    national Bank was run from Houston, Texas?  Are you

4    familiar with government --

5    A.    I -- I -- I don't know anything what the -- what the --

6    about what the government has said, no.

7    Q.    You're not familiar with statements by the government

8    where the government of Antigua has said the business of

9    Stanford International Bank was run from Houston, Texas?

10   A.    I may have seen some press clippings to that effect,

11   whatever they are.

12   Q.    And turn to tab 4 of your notebook, sir.  And this is

13   a statement from the government of Antigua and Barbuda in

14   March 2010 in about the fourth paragraph down --

15   A.    Uh-huh.

16   Q.    -- doesn't the statement say the business of Stanford

17   International Bank was run from Houston, Texas?

18              MR. WIELEBINSKI:  Objection, Your Honor.  This is

19   hearsay.

20              MR. SADLER:  I asked the gentleman --

21              MR. WIELEBINSKI:  Foundation, also.

22              MR. SADLER:  I asked the gentleman if he was

23   familiar with the statement.  He said he may have been.  I'm

24   now showing him the statement.  I have a follow-up question

25   which closes the loop.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 43

1          THE WITNESS:  Well, this is the first time I've

2     seen this.

3     Q.  (BY MR. SADLER)  All right.  And my question to you,

4     sir, do you agree with the statement by the government

5     that Stanford International Bank's business was run from

6     Houston, Texas?

7     A.   No.

8          MR. WIELEBINSKI:  Same objection, Your Honor.

9          THE COURT:  Overruled.

10    Q.  (BY MR. SADLER)  And if you turn to tab 5, sir, you see

11    another statement, this one by the prime minister, and I have

12    highlighted it for you there on the second page, where the

13    prime minister of Antigua and Barbuda --

14         THE COURT:  I'm sorry.

15         MR. SADLER:  Yes, sir.

16         THE COURT:  I did not -- I thought I might have

17    heard an answer to the question of does he agree with the

18    statement in that piece of paper.

19         MR. SADLER:  I believe the witness's answer was,

20    no, he does not agree.

21         THE WITNESS:  It -- it was me.  I'm sorry.  It was

22    no, Your Honor.

23         THE COURT:  Okay.  Thank you.

24         THE WITNESS:  Yes.  Sorry.

25         THE COURT:  I just wasn't quite clear if I heard

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 44

1    you correctly.  Thank you.

2    Q.   (BY MR. SADLER)  So I take it, sir, that the prime

3    minister of Antigua's statement here, the business of

4    Stanford International Bank was run from Houston, you

5    disagree with that as well.

6    A.   I do.

7    Q.   Fair enough.  Now, in your direct testimony, you talked

8    about the various contracts that Stanford International Bank

9    had with other Stanford entities.  You discussed that in

10   your direct testimony?

11   A.   Yes.

12   Q.   And these were outsourcing contracts where certain

13   functions like treasury, marketing, advertising, things

14   like that, were outsourced by the bank to other Stanford

15   entities.  Right?

16   A.   Yes.

17   Q.   And I assume you would agree that these contracts were

18   not arm's length, commercially reasonable contracts between

19   two parties of equal bargaining power.  You don't think

20   those were the kinds of contracts they were, do you?

21   A.   I don't know whether the term is "commercially

22   reasonable." They certainly weren't between arm's length

23   parties.  They were certainly related parties, yes.

24   Q.   Well, and weren't these contracts simply the paper to

25   cover over the money being transferred among the various

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 45

1    entities?  You have figured that out.  Right?

2    A.    Yeah.  I would agree they were a mechanism for charging

3    SIB fees and therefore removing money from the bank.

4    Q.    And, in fact, you have looked, have you not, at the

5    records of how much Stanford International Bank was paying

6    its Antiguan employees versus how much it was paying in

7    these fees to other Stanford entities?  You have seen those

8    figures.  Right?

9    A.    Yes.

10   Q.    And -- and you know, sir, don't you, that the amount

11   of money that Stanford International Bank was paying its

12   employees was a tiny fraction of the millions and millions

13   it was paying to these other Stanford entities.  Right?

14   A.    Yes.

15   Q.    Now, you also talked briefly in your direct testimony

16   that there were FSRC audits of Stanford International Bank.

17   A.    Yes.

18   Q.    All right.  And -- and have you looked at, for example,

19   the audit -- excuse me, have you looked, for example, at

20   the report, quarterly report, that Stanford International

21   Bank submitted in September 2008, submitted to the FSRC?

22   A.    Yes, I have.

23   Q.    And, in fact, that's attached as an exhibit to the

24   direct testimony of Mr. Omari Osbourne.  Right?

25   A.    Probably.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 46

1    Q.    And Mr. Osbourne was the finance manager of the bank.

2    A.    He was the chief accountant at that time, yes.

3    Q.    All right.  And -- and you know from -- from your --

4    A.    I'm sorry.  2008?  I can't remember whether he was

5    specifically the chief accountant at that time or whether

6    Mr. Persaud was.

7    Q.    Okay.

8    A.    I'm sorry.

9    Q.    But you know Mr. Osbourne submitted that statement to

10   the FSRC.

11   A.    Yeah.  It was attached to his evidence, yes.

12   Q.    Okay.  And in your -- based on your experience as -- as

13   someone who has dealt with bank frauds and bank collapses,

14   in looking at that report to the FSRC, wasn't it obvious

15   to you, sir, that the information in there was suspicious,

16   raised red flags, the kind of information that was being

17   reported?

18   A.    On its face, no.

19   Q.    Really?

20   A.    No.  I think on its face, no.

21   Q.    So, for example, if the FSRC report from September 2008

22   of Stanford International Bank was telling FSRC that part of

23   its assets were $487 million in gold, that -- that wouldn't

24   raise a question in your mind?

25   A.    It -- it -- it might raise an audit question, but on

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 47

1   it's face there's nothing wrong with it.  I mean, I'm -- I'm

2   speaking without the information in front of me.  Can I have

3   a look at it, please?

4   Q.   Your lawyer can show you it on redirect.  I'm just

5   asking you -- you've said you've seen it, so I'm asking you

6   questions about it.

7   A.   Well, I've seen it, but I don't have any recollection

8   of it, Mr. Sadler.

9   Q.   All right.  And so my question --

10  A.   I meant that's a problem.

11  Q.   My question is, if that report told the FSRC that Stan-

12  ford International Bank had among its assets $487 million in

13  gold, would that be something in your experience would raise

14  a question, raise suspicion?

15  A.   It would raise a question in my mind, yes.  Certainly

16  something to verify along with all the other balance sheet

17  items.

18  Q.   All right.  And if it said that -- if Stanford Inter-

19  national Bank was telling the FSRC it had $106 million in

20  silver as assets, would that raise a question?

21  A.   It might.  On the other hand, Mr. Sadler, I have had

22  banks that have had gold bullion as part of their assets.

23  So, I mean, they do exist.

24  Q.   And -- and you may have to kind of go with me on this,

25  but if -- if gold was going for a thousand dollars an ounce

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 48

1    in September of 2008, do you know how much physical gold

2    $487 million translates to?

3    A.    I -- I have no idea, Mr. Sadler.

4    Q.    If I told you it was also 17-and-a-half metric tons,

5    would that sound about right?

6    A.    I have no idea.

7    Q.    And if I told you that $106 million in silver

8    translated to almost 268 metric tons, would that sound

9    about right to you?

10   A.    I have no idea, Mr. Sadler.  You're asking questions

11   I can't answer.  I have no idea what a pound of gold looks

12   like or a ton of silver.

13   Q.    All right.  And you've been down to the Stanford

14   International Bank.  Right, sir?  The building.

15   A.    Yes.

16   Q.    And that building was not owned by the bank.  Right?

17   It was owned by another Stanford entity?

18   A.    It was owned by another Stanford entity, yes.

19   Q.    Did you notice any physical storage facilities that

20   you think would hold as much as 17 metric tons of gold and

21   268 metric tons of silver?  Did you see any such facility?

22   A.    No.

23   Q.    Is it your view that these audits that you talked

24   about in your direct testimony, these audits by the FSRC,

25   is it your view that they were merely incompetent or they

U.S. District Court

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 49

1    were corrupt?

2    A.    I -- I have no way of judging what the FSRC did or

3    what its motives were.

4    Q.    Do you think they did a good job auditing the bank?

5    A.    I would say no.

6    Q.    All right.  Now, from the beginning when Vantis took

7    over back in 2009, from that point forward, the Antigua

8    liquidation has always been in a position where it had

9    very little cash.  Isn't that right?

10   A.    That's right.

11   Q.    And that was the situation you found it when you

12   finally were appointed in 2011.

13   A.    That's right.

14   Q.    And so your first order of business, I assume, was to

15   find cash, wasn't it?

16   A.    To find funding for the Estate, yes.

17   Q.    And I think you probably fairly quickly became aware

18   that there were two sources of available cash.  One were

19   these frozen funds overseas that the DOJ requested to

20   be held in the UK, Switzerland, and Canada.  You quickly

21   became aware of those funds.  Right?

22   A.    Yes.

23   Q.    And you became aware that the U.S. Receiver also had

24   cash.  Right?

25   A.    Yes.  But there were other sources of funding as well.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 50

1    Q.    Right.  I think at one --

2    A.    We -- we had -- we had negotiated a commercial loan for

3    funding the Estate.

4    Q.    You were considering getting a loan from a hedge fund.

5    A.    That we -- we had negotiated the terms of one, yes.

6    Q.    And -- and the idea was they would loan you money in

7    return for a percentage of whatever you recovered.

8    A.    Exactly right.

9    Q.    Okay.  But you ended up getting cash from a different

10   source.  Right?

11   A.    Yes.

12   Q.    You went to the UK and, over the objection of the

13   DOJ and the Serious Fraud Office, you obtained access to

14   $20 million from the funds already frozen in the UK.

15   A.    Yes.

16   Q.    Okay.  And that $20 million, that was not -- you didn't

17   get that in order to distribute it to investors.  Right?

18   A.    No.

19   Q.    You got it to fund your operation.

20   A.    Yes.

21   Q.    And I think you said -- you hosted a webinar recently

22   for investors.  Right?

23   A.    Yes.

24   Q.    And I think you -- you told the investors at this

25   webinar that, since getting this funding in August of 2011,

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 51

1   you've already drawn down 10 million.

2   A.   Yes.

3   Q.   Okay.  And so perhaps you're thinking that, at your

4   current burn rate, you might be out of cash again sometime

5   in the spring?

6   A.   No.

7   Q.   There are other sources of cash that you're currently

8   pursuing.

9   A.   No.  I think our burn rate is declining rapidly.  We

10  did a bunch of work up front as we had to in order to get

11  control of the Estate, and that was a fairly high burn rate.

12  We are now past that stage now, and I expect the burn rate

13  will be dramatically less.

14  Q.   Okay.  Another thing you talked about in this -- in

15  this webinar is the idea that as -- as you looked at the

16  world, there was about $500 million in cash between what Mr.

17  Janvey had and what was frozen overseas in rough figures.

18  A.   Yes.

19  Q.   And -- and you also talked about the idea that, again,

20  it would probably vary, but probably somewhere in the range

21  of 4-and-a-half to $5 billion of net dollars actually put in

22  the bank.

23  A.   Yes.

24  Q.   And so I think you equated that to roughly about if --

25  if that 500 million could be just sort of instantly gathered

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

1    together and distributed pro rata, it's about 11 cents on

2    the dollar.  About that.  Right?

3    A.    Yeah.  I -- I think by the time the claims end, it will

4    be more somewhere between 8 and 12 is what I'm suggesting,

5    yeah.

6    Q.    Okay.  It's in that range.

7    A.    In that range certainly.

8    Q.    And -- and you talked about that in the webinar that

9    you hosted for the investors.

10   A.    Yes.

11   Q.    Okay.  And I think one of the things you pointed out to

12   the investors is that there might be an alternative to this

13   distributing the 500 million that might generate 11 cents on

14   the dollar, that you could -- you could hold back about two

15   cents on the dollar and use that to fund litigation.

16   A.    Yes.

17   Q.    And -- and if we're doing the math right, if -- if --

18   if 500 million, 11 cents on the dollar, if we peel off

19   two cents on the dollar, that's about $100 million for

20   litigation?

21   A.    As a reserve against litigation costs, yeah.

22   Q.    Okay.

23   A.    That is not going to be spent on litigation, I wouldn't

24   expect.  But that was the fund I think we need to have if

25   you're going to take on significant targets.  People who

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 53

1   have deep pockets, you need to have reserves so that you

2   can face them down and not run out of cash while you're

3   litigating, which is the worst outcome.

4   Q.    Absolutely.

5   A.    Yes.

6   Q.    So you were talking about $100 million fund for this

7   litigation you have just described.

8   A.    That's right.

9   Q.    All right.  But currently you don't control that $500

10  million that you were talking about.  Right?

11  A.    No.

12  Q.    Part of that is under the control of Mr. Janvey and

13  part of that is under the control of the various criminal

14  authorities in those jurisdictions.  Right?

15  A.    Yes.

16  Q.    Okay.  But I assume that, if you need to, you will go

17  back to the UK and try to get more money if you need it.

18  Right?

19  A.    There are a number of things we might do to try and

20  get more money, if we need it.

21  Q.    But that's certainly one of them, isn't it?

22  A.    That -- that is certainly a possibility, yeah.

23  Q.    Okay.  And the other thing you might do is press

24  forward in Canada and try to get control of the money

25  that's up in Canada.  Right?

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 54

1   A.   That's one --

2            MR. WIELEBINSKI:  Objection, Your Honor.  Calls

3   for speculation.

4            THE COURT:  Overruled.

5   Q.   (BY MR. SADLER)  Because you know there's about 20

6   million or so dollars that are frozen up in Canada.  Right?

7   A.   That's another possible source, certainly.

8   Q.   All right.  And -- and you don't control that, but

9   you'd like to take control of that, wouldn't you?

10  A.   Not necessarily for that motive, but certainly, yes.

11  Q.   Okay.  And, in fact, you are currently -- you have

12  lawyers in Canada pursuing an appeal, an appeal of the

13  order that recognized Mr. Janvey.  Right?

14  A.   Yes.

15  Q.   Okay.  And pursuing that appeal is currently part of

16  your operation.  Right?

17  A.   Yes.

18  Q.   And pursuing this Chapter 15 business that we're here

19  about today, that's also part of your operation.

20  A.   It is.

21  Q.   And so the $20 million that you got from the UK, part

22  of that money goes to fund this -- this operation that we're

23  here about today.

24  A.   It does, yes.

25  Q.   Okay.  Now, you know, do you not, that there came a

025147ba-a31c-4457-b73e-de48d28d06e2

1    time in 2010 that the Receiver and Vantis reached an agree-

2    ment concerning this Chapter 15 fight?  You're aware of

3    that.

4    A.   Yes.

5    Q.   And -- and you're aware that part of that agreement was

6    that Vantis would give up its appeal in Canada and just let

7    Mr. Janvey go about doing his business with the Canadian

8    Receivership.  Right?

9    A.   Yes.

10   Q.   But you see it in your interest to try to overturn that

11   order.  Right?

12   A.   I see it in the Estate's interest, the creditors'

13   interest, not -- not my interest, no.

14   Q.   And you say it's in the creditors' interest for you to

15   get control of the money in Canada.

16   A.   No, that's not the only reason for proceeding in

17   Canada.

18   Q.   And this idea of getting control of money before other

19   authorities can get control of it, that's really something

20   that goes back to the very beginning of the efforts to get

21   you appointed, wasn't it?

22   A.   I'm sorry.  I don't know what you mean by that.

23   Q.   Okay.  Well, let's talk about that.  You know the

24   gentleman whose name has already been mentioned, Mr. Alex

25   Fundora.  You know him.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 56

1    A.    Yes.

2    Q.    You have met him on a number of occasions, I assume?

3    A.    I have met him twice, I think.

4    Q.    Okay.  Talked to him.

5    A.    Sorry, yes.  He's a member of our creditors' committee,

6    so I have spoken to him on our creditors' committee several

7    times.  But meeting him personally, I think twice.

8    Q.    Okay.  And -- and going back to 2009, you know, Mr.

9    Fundora, after the SEC filed the lawsuit, the Receivership

10   order was put in place in the United States, Mr. Fundora --

11   well, let me -- let me back up.

12         Mr. Fundora lives in Miami.  Right?

13   A.    So I understand, yes.

14   Q.    Yeah.  And Mr. Fundora has been represented by Mr.

15   Davis' law firm, the same law firm that represents you.

16   A.    Yes.

17   Q.    And Mr. Fundora has been represented by Mr. Martin

18   Kenney's firm, the law firm that also represents you.

19   A.    I believe that's right, yes.

20   Q.    Okay.  So back to Mr. Fundora.  So Mr. Fundora, who's

21   in Miami in 2009, he files papers in Antigua to nominate

22   you to be the liquidator of the bank.

23   A.    Yes.

24   Q.    And I assume you talked to him before he did that.

25   Right?

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 57

1   A.    Briefly, yes.

2   Q.    Okay.  And so you agreed with him.  He wanted to get a

3   liquidator appointed and you agreed to serve.

4   A.    Yes.

5   Q.    Okay.  And you became familiar, I assume, in that

6   time frame with the papers he was filing trying to get you

7   appointed.

8   A.    Yes.

9   Q.    Okay.  And -- and you know in those papers, Mr. Fundora

10  acknowledged that there was already a receivership order in

11  place in the United States.

12  A.    Yes.

13  Q.    And you know also that Mr. Fundora was pointing out

14  in his papers that an Antiguan liquidator needed to come in

15  and compete with the U.S. Receiver for control of assets.

16  A.    I -- I -- I don't know whether it was framed as compete

17  with or not.  I -- I don't have it in front of me.  I'm

18  afraid you're asking me to speculate on something I don't

19  see.

20  Q.    Okay.  Turn to tab 10-B in your book.  And tab 10-B is

21  a pleading filed April 2009 by Mr. Fundora.  It's his brief

22  to try to get you appointed.  I assume you saw this in that

23  time frame, didn't you?

24  A.    Yes.

25  Q.    Okay.  And -- and, in fact, if -- if you look, first

025147ba-a31c-4457-b73e-de48d28d06e2

1    let's turn to -- and it's probably page 13 of the document,

2    and the page numbers are at the top.  Tell me when you have

3    page 13 of the document.

4        And you see there's a section, is there not, on page 13

5    that talks about your credentials?  So he's talking about --

6    A.    Yeah.

7    Q.    -- laying out the case for you.  Right?

8    A.    Yes.

9    Q.    Okay.  So this is talking about getting you appointed.

10   And then if I could have you turn back to page 3 of the

11   document for me, you see, don't you, that in paragraph 15

12   on page 3, Mr. Fundora acknowledges there's already a

13   receivership order in place in the United States?  Right,

14   sir?

15   A.    That's what it says, yes.

16   Q.    Okay.  But he's trying -- through this document and

17   other filings, he's trying to get you appointed.  And so

18   let's go back to page 13 where you were a few moments ago

19   where it's talking about your credentials, and I want to

20   direct your attention to paragraph 66.

21   A.    Yes.

22   Q.    Do you have that?  So in paragraph 66 he's talking

23   about your credentials to serve, and one of the things he

24   says is you have significant experience in U.S. Bankruptcy

25   Code, Chapter 15.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 59

1    A.    Yes.

2    Q.    And I take it he got that information from you.  Right?

3    A.    He would have read my resume, yes.

4    Q.    Okay.  And you see there, he's talking at the bottom

5    about he's wanting to get you to have U.S. foreign recogni-

6    tion because that includes competing for assets being wrong-

7    fully claimed by an SEC Receiver in another case.  Do you

8    see that?

9    A.    His words, I guess, yes.  Not mine.

10   Q.    And he's talking about Mr. Janvey, isn't he?

11   A.    I presume he's talking about Mr. Janvey.  These are his

12   words, not mine.

13   Q.    Okay.  But these were arguments he was making to try to

14   get you appointed to serve as you had agreed to do.  Right?

15   A.    That's what it says, yes.

16   Q.    Okay.  Now, at this stage, however, Mr. Fundora was

17   unsuccessful in getting you appointed, was he not?  Someone

18   else got appointed.

19   A.    Someone else was appointed, yes.

20   Q.    Vantis got appointed.

21   A.    Yes.

22   Q.    And there was actually a decision by the Court down

23   there that rejected not only Mr. Fundora's application but

24   rejected the effort of Mr. Janvey to try to get recognized.

25   You're aware of that.

025147ba-a31c-4457-b73e-de48d28d06e2

1    A.    I'm aware of that, yes.

2    Q.    And you're aware Mr. Fundora, of course, because he was

3    trying to get you recognized, he opposed Mr. Janvey being

4    recognized.

5    A.    Yes.

6    Q.    Okay.  So let's look if you can then at 10-C.  I want

7    to ask you a couple of questions about the court's order.

8         Now, if you'd look at paragraph 41 of this order, and

9    I'm sure you have seen it before --

10   A.    Just -- just a second, please.

11   Q.    Yes, sir.

12   A.    Let me see what it is.  (Reviews document)  Okay.

13   Q.    Now, you see there the court rules that the U.S.

14   Receiver's interest in these proceedings is based on an un-

15   enforceable order.  That's what the court ruled down there.

16   A.    I'm sorry.  Where are you?

17   Q.    Paragraph 41, sir, on page 10.  Right?  You understood

18   that when you -- in that time frame the court had ruled

19   that Mr. Janvey was trying to get recognized based on what

20   the Antiguan court said was an unenforceable order.  You

21   understood that?

22   A.    Well, I -- I don't know whether I understood it.  I

23   mean, I probably read it.  I was not appointed so I didn't

24   really care one way or the other, to be honest.

25   Q.    Okay.  And then if you -- if you turn over, it's really

Linda J. Langford, CSR, RDR, CRR

Page 61

1    at the top of page 11, the court notes that Antigua has not

2    enacted the U-N-C-I-T-R-A-L, UNCITRAL, model rules.  You

3    see that?

4    A.   Yes.

5    Q.   Now, you're an experienced insolvency practitioner in

6    the Caribbean.  Right?

7    A.   Yes.

8    Q.   Is this correct?  Does Antigua follow the UNCITRAL

9    model rules?

10   A.   Not on my understanding, no.

11   Q.   Okay.  And you see there in paragraph 42, the judge

12   says that he doesn't believe that the U.S. proceedings are

13   fundamentally about preserving creditor interests.  Do you

14   see that in paragraph 42?

15   A.   That's what it says.

16   Q.   Is that your view, too, sir?  Do you think that this

17   Receivership is not about preserving creditor interests?

18   A.   No.

19   Q.   So you would disagree with the court's finding.

20   A.   I would say the Receivership is intended to preserve

21   assets, yeah.

22   Q.   Sure.  And we see there at the end that the Antiguan

23   court says that Mr. Janvey has no legal entitlement to

24   standing.  Right, sir?

25   A.   I'm sorry.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 62

1    Q.    In paragraph 43.

2    A.    43.   That's what it says.

3    Q.    All right.   But this didn't end it.   There came a time

4    later in 2009 when Mr. Fundora renewed his effort to get

5    you appointed, didn't he?

6    A.    Yes.

7    Q.    And that was in November of 2009.   If you want to look

8    on tab 10-D, Mr. Fundora filed a petition not just to get

9    you appointed but to remove Vantis.   Right?

10   A.    Yes.

11   Q.    And not just to remove Vantis, but specifically to

12   appoint you.

13   A.    Yes.

14   Q.    Okay.   And, again, Mr. Fundora I'm sure consulted with

15   you before he renominated you, didn't he?

16   A.    He certainly had my consent to act.

17   Q.    Sure.   Okay.   And so you were aware that he was making

18   this effort to get you appointed, were you not?

19   A.    Yes.

20   Q.    All right.   Now, Mr. Fundora again filed a number

21   of papers making arguments about why Vantis needed to be

22   removed and why you needed to be appointed, and I need to

23   ask you about that.

24         Now, first of all, do you know a Mr. Robert -- Andrew

25   Robert Gilliland?   Do you know who he is?

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 63

1    A.    Yes.

2    Q.    Okay.  He works for Martin Kenney.

3    A.    Yes.

4    Q.    He's a lawyer.

5    A.    Yes.

6    Q.    And Mr. Martin Kenney represents you.

7    A.    Yes.

8    Q.    Okay.  And represented Mr. Fundora.

9    A.    Yes.

10   Q.    Okay.  So there are some things that Mr. Gilliland, on

11   behalf of Mr. Fundora trying to get you appointed, said to

12   the Antiguan court in December of 2009 I need to ask you

13   about.

14         Now, first of all, Mr. Gilliland's affidavit, which is

15   at 10-E in front of you -- have you -- surely you have seen

16   that before, haven't you?

17   A.    I'm sorry?

18   Q.    Mr. Gilliland's affidavit, you have seen this before,

19   haven't you?

20   A.    I'm sure I have.

21   Q.    Okay.  Now, I want to direct your attention to para-

22   graph 19 of this affidavit.  Oh, and by the way, Mr.

23   Gilliland still works for Martin Kenney, doesn't he?

24   A.    I believe so.

25   Q.    Okay.  Now, in paragraph 19, Mr. Gilliland, on behalf

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 64

1    of Mr. Fundora who is trying to get you appointed, says

2    that "unless the Joint Liquidators are removed quickly,

3    this will mean that assets which would otherwise come into

4    the Antiguan Estate will continue to be lost, alongside

5    the $20 million likely to be lost from the Canadian

6    jurisdiction."  Do you see that?

7    A.    Yes.

8    Q.    Is the 20 million he's talking about the funds that

9    are frozen up in Canada?

10   A.    I don't know what was in his mind.

11   Q.    Well, do you know of another $20 million --

12   A.    No.

13   Q.    Okay, sir.  And -- and is -- is he expressing a view

14   that you agree with, that is, that unless Vantis were

15   removed quickly, that other authorities, including this

16   Receiver, would take control of assets that otherwise

17   would come to Antigua?

18   A.    I'm sorry.  Can you point that out to me again?  My

19   brain hopped somewhere else for a moment.

20   Q.    Yes, sir.  Is he expressing a view that you agree with,

21   that if other authorities like Mr. Janvey or the Department

22   of Justice take control of assets, you will not be able to

23   get those down to Antigua?

24   A.    That would be true.

25   Q.    And then if we look on paragraph 22, which is just on

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 65

1    the other page, there's a paragraph that starts, Competition

2    from the U.S. Receiver.  Do you see that?

3    A.   Yes.

4    Q.   And he's commenting about there is fierce competition

5    from the U.S. Receiver who has taken a speedy approach to

6    recovering assets.  You see that?

7    A.   Yes.

8    Q.   Now, right below that I need to ask you about that.  He

9    says once those assets have been taken into the jurisdiction

10   of the U.S. court, they will be extremely difficult to

11   regain.  Do you see that?

12   A.   Yes.

13   Q.   And regain means bring them to Antigua under the

14   control of the Antiguan proceeding.  Right?

15   A.   I would assume that is what was meant, yeah.

16   Q.   Okay.

17   A.   I mean, I don't know.

18   Q.   All right.  And you understood that Mr. Fundora was

19   pursuing the removal of Vantis in December of 2009 on an

20   urgent basis.

21   A.   Yes.

22   Q.   And you knew that the urgency was that there was going

23   to be a hearing in this Court to decide the Chapter 15

24   petition that Vantis had filed.  Right?

25   A.   I don't know whether I knew that at the time or not.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 66

1    Q.   You didn't know that Mr. Fundora was trying to get

2    the application to remove Vantis and appoint you heard and

3    decided before the Chapter 15 hearing?

4    A.   I --

5              MR. WIELEBINSKI:  Objection, Your Honor.  He's

6    getting close to badgering.  He's already answered the

7    question.  He didn't know.

8              THE COURT:  Sustained.

9    Q.   (BY MR. SADLER)  Well, then let me ask you about this

10   because paragraph 26 describes this.  So paragraph 26--do

11   you have it in front of you--talks about a major hearing to

12   take place.  Right?  You see that?

13   A.   Yes.

14   Q.   Okay.  And so in this time frame, you knew that a

15   Chapter 15 hearing was going to take place in the United

16   States.  Did you know that?

17   A.   I -- I don't know that I did know, Mr. Sadler.

18   Although I provided consent to act, in all honesty, I did

19   not follow the proceedings particularly closely except to

20   find out when I could expect an appointment if it were to

21   come.

22   Q.   Well, you knew you would never be appointed until

23   Vantis was removed.  Right?

24   A.   Yes.

25   Q.   Okay.  And you knew Mr. Fundora was trying to get

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

1    Vantis removed.

2    A.    Yes, I knew that.

3    Q.    All right.  And -- and this affidavit goes on to say

4    basically if the Antiguan Estate is recognized as the COMI,

5    then the battle is over, y'all win.  That's the point of

6    view Mr. Gilliland is putting forth, isn't he?

7    A.    Just let me read it.

8    Q.    Sure.

9    A.    (Reviews document)  That's what it says.

10   Q.    All right, sir.  And -- and that was important because,

11   as he says, the value represented by all assets of SIB will

12   ultimately need to be moved to Antigua and all claims of

13   creditors of SIB will need to be filed in Antigua.  That's

14   what he said and you agree with that, don't you?

15   A.    The Liquidators' job is to gather any assets of

16   the bank and bring them to Antigua for distribution to

17   creditors.  I agree with that, yes.

18   Q.    Okay.  And that's what he's saying here --

19   A.    Yes.

20   Q.    -- is the value of all the assets of SIB needs to come

21   to Antigua.

22   A.    Yes.

23   Q.    And your understanding, based on your appointment

24   order, is that everything related to Stanford International

25   Bank, all of its assets, all the money that ever went into

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

1    any account, all claims, all -- everything related to the

2    bank, belongs to you as the representative.  Right?

3    A.    All the assets of the bank are part of the Antiguan

4    Estate, I say yes --

5    Q.    Okay.

6    A.    -- as that's the appointment I -- I ultimately got,

7    yes.

8    Q.    And so would you agree, sir, that the whole point of

9    getting you in place instead of Vantis was for you to be

10   in a better position to fight the Chapter 15 fight and win

11   it to accomplish what Mr. Gilliland is talking about?

12   A.    I -- I -- I can't answer that because I -- I wasn't

13   involved in the proceeding at the time.

14   Q.    Okay.  So you know there came a time that Vantis was

15   ordered removed.  Right?

16   A.    Yes.

17   Q.    And that was in June -- about June of 2010, wasn't it?

18   A.    I thought it was -- I thought the hearing was in March

19   and the decision was in October, as I recall, the 5th of

20   October or something like that?  Is that right?  I -- I --

21   I don't have the paper in front of me.

22   Q.    Well, let's -- let's go with June.  And if -- if I'm

23   wrong, I know there are a bunch of lawyers behind me who

24   are going to correct me.  But isn't it true, sir, that from

25   June, if that's the right date, of 2010 --

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 69

1    A.    Well, why don't we look it up, because the order is

2    around somewhere, isn't it, and the decision?

3    Q.    Okay.  Well --

4    A.    So why don't we just get the date right.  Then we're

5    both not speculating.

6    Q.    Well, how about focus on my question first.

7    A.    Well, how about we get the date right.

8    Q.    How about from the time period that Vantis was removed,

9    whenever that was --

10   A.    Yes.

11   Q.    -- to the time you were appointed, whenever that was --

12   A.    Yes.

13   Q.    -- the Antiguan proceeding was basically at a stop,

14   wasn't it?

15   A.    That's true, yes.

16   Q.    I think your lawyers have used the term "mothballed" in

17   some of their pleadings.  Is that a fair description?

18   A.    That's what we found out subsequently, yes.

19   Q.    Okay.  Nothing going on of any substance.  Right?

20   A.    That's right.

21   Q.    Until you came on.

22   A.    Yes.

23   Q.    Now, you're asking this Court to make you the main

24   representative of the bank.  And is it true that one of the

25   reasons you think you should be placed in charge of the bank

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 70

1    is you're worried about claims related to Allen Stanford

2    and other Stanford entities diluting the claims of CD

3    depositors?  Is that one of your concerns?

4                MR. WIELEBINSKI:  Objection, Your Honor.  I think

5    the question mischaracterizes Mr. Wide's direct testimony.

6    He never said that he was going to be recognized.  It was

7    the proceeding itself.

8                THE COURT:  Overruled.

9    Q.   (BY MR. SADLER)  I'll ask it again.

10   A.   Please.

11   Q.   Sure.  I'm just wanting to understand your position

12   since you're asking this Court for recognition.

13        Is it your view that one of the reasons you needed to

14   be recognized as the representative of the bank and to take

15   control of the bank and its assets is because you were

16   concerned that if it's left with Mr. Janvey and all the

17   other Stanford entities, that a claim by, say, the Internal

18   Revenue Service might dilute the claims of CD investors?

19   A.   I am concerned that the assets of SIB not be used to

20   pay liabilities of other entities that are not SIB.  I

21   don't know that Chapter 15 turns on that or not.

22   Q.   Well, that's right, sir.  So I wanted to ask you about

23   this idea of you taking control of the bank.  If the IRS has

24   a claim, you taking control of the bank really doesn't have

25   anything to do with that, does it?

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 71

1    A.    If the IRS have a claim against the bank, then they

2    could file the claim in the Antiguan proceedings, certainly.

3    Q.    Sure.  And, in fact, under your waterfall in Antigua,

4    switching gears just a little bit, claims by the govern-

5    ment of Antigua are recognized under the waterfall of

6    distribution.  Right?

7    A.    Yes.

8    Q.    And they have a higher priority than claims by CD

9    investors, don't they?

10   A.    That's right.

11   Q.    And if the government -- I understand they haven't done

12   it yet, but the government of Antigua could file claims.  If

13   they think the country has been damaged by Stanford, if they

14   think he owes back taxes or whatever, they could file claims,

15   and if those claims were approved, they would have a higher

16   priority than CD investors under your waterfall.

17   A.    With the ifs you put in there, yes.

18   Q.    Sure.  And -- and you are not able to say now whether

19   the government of Antigua will either never file a claim or

20   file claim for hundreds of millions of dollars.  You just

21   don't know, do you?

22   A.    We've had discussions with the government of Antigua

23   on a number of things.  They have never raised that

24   possibility, but they could.

25   Q.    Sure.  All right.  I need to finally turn --

025147ba-a31c-4457-b73e-de48d28d06e2

Page 72

1          MR. SADLER:  Is this a good time for a break,

2     Your Honor?

3          THE COURT:  That's what I was going to inquire.

4          MR. SADLER:  Yes.  This would be a good time for

5     a break for me as well.

6          THE COURT:  How much longer do you think you have?

7          MR. SADLER:  I think probably about 20 or 25

8     minutes.

9          THE COURT:  Okay.  Let's break for 15 minutes

10    which will have us back at 10 till 11:00 by the big clock

11    on the wall.

12         MR. SADLER:  10 till 11:00, Your Honor?

13         THE COURT:  10 till 11:00.

14         MR. SADLER:  Thank you.

15       (Brief recess taken.)

16         THE COURT:  Be seated.  Receiver may proceed.

17         MR. SADLER:  Thank you, Your Honor.

18    Q.  (BY MR. SADLER)  Mr. Wide, I now want to turn to this --

19    I think you and I may need to both do the same thing, get

20    the microphones a little closer to us so the court reporter

21    can hear us.

22        I want to now turn to this protocol that your lawyer

23    spoke about this morning.

24        Now, first, we talked about the fact that in 2010,

25    there was an agreement reached between the Receiver and

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 73

1    Vantis, but I take it it's your position that you -- you

2    are not interested in that agreement, you totally reject

3    that agreement.  Do I understand you right?

4    A.    I think we can do better for the creditors, yes.

5    Q.    Okay.  So you reject that agreement.

6    A.    Yes.

7    Q.    All right.  Now, then the things that were agreed to

8    there--for example, the Receiver would not interfere in

9    jurisdictions where Vantis was recognized, Vantis would

10   not interfere in jurisdictions where the Receiver is

11   recognized--you reject that agreement.

12   A.    Well, the agreement in its entirety is not one that

13   I would want to enter into -- the Joint Liquidators don't

14   want to enter into, yes.

15   Q.    And one of the things that that agreement did not

16   accomplish, it didn't transfer control of any funds or

17   assets directly to Vantis.  Right?

18   A.    No.

19   Q.    Now, let's talk about the protocol that was attached to

20   the recent brief that your lawyers filed.  And I'm going to

21   hand you this notebook because it's my notebook of pleadings

22   so that you have a copy of it and keep that out because I'm

23   going to ask you about it.  Keep both those notebooks out.

24        So I'm sure you're familiar, sir, that your lawyers

25   filed a brief on the 14th of December and attached to it a

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 74

1    copy of a protocol that was proposed to the Receiver and --

2    and others back in September.  You know what I'm talking

3    about.

4    A.    Yes.

5    Q.    All right.  And this protocol was originally trans-

6    mitted to the Receiver and others via letter from your

7    lawyer.  Right?

8    A.    Yes.

9    Q.    And -- and I'm sure in that same time frame you got a

10   copy from your lawyer that showed that they had sent it.

11   Right, sir?

12   A.    I'm sure that's right, yes.

13   Q.    Sure.  And so if you would turn, if you would, to tab

14   14, not of the pleading notebook but your other notebook,

15   tab 14, and tell me when you have it.

16   A.    Yes.

17   Q.    All right.  And -- and sir, I know this -- this is a

18   lengthy document, but you recognize this as, first, the

19   cover e-mail from your lawyer to me, Mr. Little, Mr.

20   Morgenstern, and others, and it's transmitting a cover

21   letter and it's transmitting the draft protocol.  Right?

22   A.    Yes.

23   Q.    And this was on or about 30 September of this year.

24   A.    That's what it says, yes.

25   Q.    Okay.  And you notice in -- and Mr. Davis is the one

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

1    that transmitted it.  Right?

2    A.   Yes.

3    Q.   And -- and he's your lawyer?

4    A.   Yes.

5    Q.   And you'll note Mr. Davis says on the cover e-mail,

6    he's got the words "privileged settlement communication."

7    Do you see that?

8    A.   I see that.

9    Q.   And if you turn over to the protocol itself, it's got

10   words in bold, all caps, at the top, Settlement Negotiation

11   Draft Pursuant to FRE 408.  Do you see that?

12   A.   I'm sorry.  Where have you got to?  When I changed --

13   Q.   It's -- you go from the e-mail to the cover letter --

14   A.   Page 14, there's a letter from Mr. Davis or letter from

15   Astigarraga Davis.

16   Q.   And then right behind that is the protocol.

17   A.   Okay.  Yeah.

18   Q.   Okay.  And so this is the protocol that was transmitted

19   to us, and you see it has on the top Settlement Negotiation

20   Draft Pursuant to FRE 408.  You see those words?

21   A.   Just hang on a second.  Let me just look at the total

22   document, if you don't mind.  Okay.

23   Q.   Do you have the document now?

24   A.   Yes.

25   Q.   And does it say at the top, Settlement Negotiation

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 76

1    Draft Pursuant to FRE 408?

2    A.    Yes.

3    Q.    Do you know what FRE 408 is?

4    A.    No.

5    Q.    You don't have any awareness of the evidentiary

6    privilege for settlement communications not supposed to

7    be talked about in court?

8    A.    No.

9    Q.    Okay.  But you authorized your lawyer to make this

10   transmittal to us, did you not?

11   A.    Yes.

12   Q.    Okay.  And so if we look now at the copy of the proto-

13   col that was attached to the court document which is in that

14   notebook to your left -- you have the protocol there?  Just

15   grab that red tab.  That's where it is.

16   A.    Uh-huh.

17   Q.    Do you have the protocol in front of you?

18   A.    Yes.

19   Q.    Now, this is the same protocol, but it's -- it's

20   different on the first page, isn't it?  You see the

21   difference?

22   A.    Yes.

23   Q.    And the difference is somebody has taken off the one

24   that was filed, Settlement Negotiation Draft Pursuant to

25   FRE 408, somebody has removed those words.  Right?

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 77

```
 1   A.   Well, it's not there.

 2   Q.   Right.  Do you know who removed them?

 3   A.   I know it's not there.  I have no idea how that came

 4   about.

 5   Q.   Did you authorize anyone to remove them?

 6   A.   Not that I'm aware of, no.

 7   Q.   Okay.  All right.  Nevertheless, it's -- it's now out

 8   in the open, so let's talk about it.

 9        Now, this is your proposal to the Receiver, Investor

10   Committee, and Examiner for a cooperation protocol.

11   A.   Yes.

12   Q.   Right?  It expresses your idea of a cooperation,

13   doesn't it?

14   A.   Yes.  It was our offer, yes.

15   Q.   Sure.  And -- and I want to ask you about a few things

16   in it.  So, first of all, if we turn to paragraph 1.4, one

17   of the things that you wanted the Receiver to agree to and

18   to acknowledge is that the JLs' powers currently extend over

19   the assets and affairs of SIB.  Do you see that in paragraph

20   1.4?

21   A.   Yes.

22   Q.   Do you see that, sir?

23   A.   Yes.

24   Q.   Okay.  But, of course, that's not true in the United

25   States and Canada.  Right now your powers don't extend over
```

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 78

1    the assets and affairs of SIB in those two countries, do

2    they?

3    A.    In that we are not recognized, no.

4    Q.    Okay.

5    A.    Well, the limited recognition in Canada.  Let's be

6    clear about that.

7    Q.    Okay.  Well, let's -- actually let's do be clear about

8    that, this whole Canadian thing.  So you recall that there

9    came a time when your lawyers approached us and said that

10   you needed to file a proceeding in Canada.  Right?

11   A.    Yes.

12   Q.    And you're also aware, I'm sure, that your lawyers were

13   told the Receiver would consent to you filing a proceeding.

14   Right?

15   A.    I'm not sure that that was the message I got.

16   Q.    Really.  So what happened was there --

17   A.    Unless there were conditions attached that I'm --

18   I -- I don't -- I don't know the answer to that one.  That

19   doesn't sound correct.

20   Q.    Okay.  So you -- you were never told that the Receiver

21   had said, fine, we have the power under the Receivership

22   order in Canada to consent; we will consent to your filing

23   that proceeding.  You were never told that?

24   A.    I'm -- I'm not sure -- I -- I'm not exactly sure of

25   the legal context in which we were seeking to file -- say

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 79

1    file an order or file a proceeding?

2    Q.   Proceeding.

3    A.   I am not sure of the legal niceties under which we got

4    there --

5    Q.   Okay.

6    A.   -- certainly.

7    Q.   But the way we got there is lawyers for you and lawyers

8    for the Receiver ended up having to go and argue in front of

9    a judge.  You're aware of that.

10   A.   Yes.  We argued in front of a judge, certainly.

11   Q.   And your lawyers argued to the judge that you needed

12   two things:  You needed the recognition order that Mr.

13   Janvey had in place amended and --

14   A.   Yes.

15   Q.   -- you needed permission to file the proceeding.

16   A.   Yes.

17   Q.   But you didn't get the recognition order amended.  You

18   got permission to file the proceeding.  Right?

19   A.   That sounds right.

20   Q.   Yeah.  Which is what you were offered from the

21   beginning.

22   A.   (Indicating.)

23   Q.   You're just not aware of that, I guess.  Right?

24   A.   I don't have a full recollection of exactly how that

25   came about, no.

025147ba-a31c-4457-b73e-de48d28d06e2

Page 80

1    Q.   Okay.  All right.  Now, let's turn to the next thing in

2    this protocol I want to ask you about.  If you would go over

3    to page 23, now --

4    A.   I'm sorry.  Of the protocol we're talking about?

5    Q.   Yes.  We're talking --

6    A.   Yeah.

7    Q.   -- about the protocol --

8    A.   Okay.

9    Q.   -- page 23, under heading Chapter 15 Recognition.

10   A.   Yes.

11   Q.   So you were proposing as part of this cooperation

12   proposal that the Receiver agree that you be recognized

13   and recognized as the foreign main proceeding.

14   A.   Yes.

15   Q.   And that was your proposal for cooperation on that

16   issue.  Right?

17   A.    To be recognized as a foreign main proceeding is what

18   it says.

19   Q.   Okay.  And -- and, of course, that's what you're asking

20   the Court to give you -- over our objection, you're asking

21   the Court to give you recognition as the foreign main

22   proceeding.

23   A.   Yes.

24   Q.   All right.  And then the next thing I want to ask you

25   about, if you'd turn over to page 27 under -- there's a

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

1    special heading for Canadian Proceedings.  You're proposing

2    in this cooperation protocol that Mr. Janvey resign, quit,

3    leave Canada, and turn it over to you.  Right?  Paragraph

4    15.1?

5    A.    Yes.  Yes.

6    Q.    Okay.  And -- and that was part of your proposal for

7    cooperation, that Mr. Janvey resign and give you Canada.

8    Right?

9    A.    So that we could act as we saw fit in Canada, yes.

10   Q.    Act as you saw fit --

11   A.    Yeah.

12   Q.    -- in Canada.

13   A.    Yes.

14   Q.    And one of the things you want to do in Canada is

15   oppose the criminal forfeiture of the $20 million that's

16   in process.  Right?

17   A.    That would be one of the things we did, yes.

18   Q.    And, of course, oppose it so that you could take

19   control of those funds.  Yes?

20   A.    We think they're SIB assets and should be in the SIB

21   Estate, yes.

22   Q.    Sure.  And then the next thing I want to ask you

23   about, if you'd go to page 20, and page 20 is -- is the

24   whole subject of the distribution protocol.  Right?

25   A.    Yes.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 82

1   Q.   And this is -- this isn't word for word, but this is

2   basically the priority scheme under the so-called waterfall

3   statute in Antigua.  Right?

4   A.   The waterfall section, yes.

5   Q.   Sure.  And what you're asking the Receiver to agree to

6   is that's how distribution is going to work, we're going to

7   follow the Antiguan process.  Right?

8   A.   That was our proposal, yeah.

9   Q.   Yeah, sure.

10  A.   If it's a, you know -- doesn't matter what.

11  Q.   And you wanted us to cooperate by agreeing to that?

12  A.   Yes.

13  Q.   Oh, okay.  And -- and, of course, it is in this

14  waterfall section that, as we talked about, any claims by

15  the government have -- would have priority over investors.

16  Right?

17  A.   Yes.

18  Q.   Employees' severance claims have priority over

19  investors.  Right?

20  A.   Yes.

21  Q.   And then there's a whole category of people who get

22  paid a hundred cents on the dollar, regardless of what

23  anyone else gets.  Right?  The category for people who

24  have claims under a certain amount, they get a hundred --

25  A.   Oh, yeah.  Sorry.  Yeah, yeah, yes.  The -- the --

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 83

1    Q.   Yeah.  They get a hundred cents on the dollar.

2    A.   Yes.

3    Q.   Right.  Okay.  And then that's something else you

4    wanted us to agree to.  Right?

5    A.   We would have liked to have had that agreement, yes.

6    Q.   Sure.  Okay.  Now, let's look at paragraph 8, which is

7    about information sharing, and it's several pages about how

8    we're going to share information and so forth.  And I want

9    to ask you about that.

10            MR. WIELEBINSKI:  What page, counsel?  I'm sorry.

11            MR. SADLER:  It's page 8, and it runs from page 11

12   all the way to page 16.

13   Q.   (BY MR. SADLER)  But let me direct your attention

14   specifically to paragraph 8.14 and 8.15.  And tell me when

15   you have that in front of you.  Have you got it, Mr. Wide,

16   8.14 on page 15?

17   A.   Oh, I see 8.14, yes.  Sorry.  Yeah.

18   Q.   Yeah.  8.14, right.

19   A.   Yeah.

20   Q.   Now, what you were proposing here is that in order for

21   you to share information with the Receiver, there had to be

22   this process where you would go to the court in Antigua and

23   get permission from the court to have Mr. Janvey designated

24   as -- as an agent of the bank.  Is that the gist of it?

25   A.   Ummm -- excuse me while I read it.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 84

1   Q.   Sure.  Is that the gist of it, Mr. Wide?

2   A.   Well, what it says is there's a -- there's a statutory

3   prohibition against people receiving information and the

4   only person who might receive information under the

5   prohibitions oath says it may be disclosed to a third party

6   by an agent of SIB.

7   Q.   Okay.  And so the -- the issue that you're raising here

8   is there are these bank secrecy laws in Antigua.  Right?

9   A.   Confidentiality laws --

10  Q.   Okay.

11  A.   -- might be a nicer phrase.

12  Q.   Bank confidentiality laws.

13  A.   Sure.

14  Q.   And in order to get around those, if you will, you're

15  proposing that there be this process to go to the Court,

16  get permission for Mr. Janvey to be designated an agent,

17  and then if the Court agrees, then he'll be in a position

18  to receive information and not run afoul of the prohibition.

19  Is that the gist of it?

20  A.   I'm not sure that's quite right.  I think we -- we ask

21  the Court for a declaration the JLs and the Receiver are

22  both agents for the purposes, yes.

23  Q.   Oh, okay.  But -- but you know, sir, that others

24  recently have gotten access to all of your records that you

25  have of the bank in Antigua, and there was no requirement

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 85

1    of making them an agent.  You know that's happened.

2    A.    To what do you refer?

3    Q.    Well, sir, aren't you aware that very recently lawyers

4    for Allen Stanford obtained a court order allowing them

5    access to virtually everything --

6    A.    Yes.

7    Q.    -- that you've got?

8    A.    I'm -- I'm aware that they went up -- went to court

9    and got an order allowing them access to the records of the

10   bank, yes.

11   Q.    Sure.  And, in fact, we have a copy of that order, if

12   you'll turn to tab 15.  And it's very short.  There's not

13   much to it.

14   A.    Yeah.

15   Q.    But, sir, this is the order, isn't it, that allowed

16   Allen Stanford's lawyers to obtain access to a long list

17   of records, payment information, money transfers, income

18   statements, balance sheets, documentation of investments,

19   any documents they determine relevant?  They got access to

20   that, didn't they?

21   A.    From this order, yes.

22   Q.    Sure.  And -- and there's nothing in this order about

23   appointing them an agent, is there?

24   A.    I'm not sure this order gets them around the problem

25   of the statutory prohibition which we may have to have

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 86

1   clarified.

2   Q.   Oh, I see.  Well, so let me ask you that.  Is there

3   any restriction in this order on how they can use that

4   information?  I don't see one.  Do you see one?

5   A.   I -- I don't see one, no.

6   Q.   Sure.

7   A.   But that's -- that's an issue that we are concerned

8   about.

9   Q.   Sure.

10  A.   They have not yet asked for access, and when they do,

11  we will raise these issues.

12  Q.   So is Allen Stanford, is he still an agent of the bank

13  under Antiguan law?

14  A.   Not that I'm aware of.

15  Q.   Okay.  And in terms of agents of the bank, I need to

16  ask you something from your direct testimony.  You mentioned

17  in your direct testimony that, after you were appointed, you

18  found some bank records at the law offices of Cort & Cort.

19  Do you know what I'm talking about?

20  A.   Yes.

21  Q.   And Cort & Cort is a law firm in Antigua.  Right?

22  A.   Yes.

23  Q.   And Errol Cort is one of the Corts of Cort & Cort.

24  A.   Yes.

25  Q.   And -- and just tell the Court, who is Errol Cort?

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 87

1    A.    Mr. Cort is a lawyer in Antigua.  He's also been a

2    politician, and from time to time I think he has been

3    probably Attorney General and, as I understand, the

4    Minister of Finance.

5    Q.    Right.  He currently holds some position in the

6    government, does he not?

7    A.    I believe so.  I'm not sure.

8    Q.    And -- and what you were saying in your direct

9    testimony is you found that, at Mr. Cort's law office,

10   they had records of Stanford International Bank.  Right?

11   A.    Yes.

12   Q.    And to the best of your knowledge, they have been

13   there since February 2009?

14   A.    I have no idea how long they've been there.

15   Q.    And do you know that Mr. Cort's law office was the --

16   the registered office for Stanford International Bank

17   for a --

18   A.    Yes.

19   Q.    -- long time?

20   A.    Yes.

21   Q.    Do you have any idea why Mr. Cort, who's been sued by

22   the Investors Committee here in the United States, why he

23   would have Stanford International Bank records in his law

24   office?

25   A.    No, I don't.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 88

1   Q.   Okay.  All right.  And, finally, on this protocol, if

2   I could ask you to turn to paragraph 7.2.

3   A.   I'm sorry, I was flipping to something else.  That

4   order --

5   Q.   Yeah, paragraph 7.2 --

6   A.   -- where was it again?  Sorry.  Was it section -- tab

7   14, was it?

8   Q.   At tab 14, paragraph 7.2, which is on page 10.

9   A.   Yes.

10  Q.   Do you have it, sir?

11  A.   Yes.

12  Q.   And -- and this is the last thing on this protocol I

13  want to ask you about.  This is your proposal, that we will

14  cooperate with you in fighting all the various criminal

15  asset forfeiture actions going on, and which means Canada,

16  the UK, and Switzerland.

17  A.   Yeah.

18  Q.   That's what's being talked about.

19  A.   Yes.

20  Q.   And you asked us to agree to actually join you to fight

21  those.  Right?

22  A.   We thought it would be a good thing to recover the

23  assets of SIB for SIB's creditors, yeah, whether it was you

24  or whether it was us.

25  Q.   And -- and in -- and, in fact, you also proposed that

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

1    if we don't feel like joining you, that we agree it's okay

2    if you do it anyway.

3    A.   Yes.

4    Q.   Okay.  Now, last, sir, you were familiar -- we talked

5    earlier about these FSRC reports made by the bank.

6    A.   Yes.

7    Q.   Now, I'm sure you're aware that it -- it is a crime

8    under Antiguan law for anyone to submit or assist someone

9    to submit a false statement about a regulated bank to the

10   FSRC.  You know that.

11   A.   Well, I'm -- I'm sure it is.  I haven't seen the

12   section, but I'm -- it would make sense if it were, yes.

13   Q.   It would make sense.  Now, in the six-and-a-half,

14   seven months that you have been working on this matter,

15   are you aware of any charge, any indictment, any

16   prosecution, any effort of the Antiguan government to

17   prosecute anyone in Antigua, any of the 90 employees

18   down there, for violating the law by submitting false

19   statements to the FSRC?

20   A.   No.

21   Q.   But you know, don't you, sir, that Stanford Inter-

22   national Bank repeatedly submitted to the FSRC false

23   information about its assets and liabilities?

24   A.   Yes, I do.

25           MR. SADLER:  No further questions.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 90

1                        REDIRECT EXAMINATION

2    By Mr. Wielebinski:

3    Q.   Mr. Wide, one of the first questions that Mr. Sadler

4    asked you about was in Exhibit 1.  Can you turn to Exhibit

5    1, please?  I think it was on page 2 of Exhibit 1.

6    A.   In -- in his book?

7    Q.   Yes, sir.

8    A.   Yes.

9    Q.   Paragraph 5 --

10   A.   Yes.

11   Q.   -- you saw that -- that statement.  You said you didn't

12   agree with that currently.  Can you tell the Court why?

13   A.   Yes.  As our investigations have continued and we've

14   tracked the flow of funds and we've looked at how money

15   was removed from control of the depositor, if you like, it

16   became clear to me that the funds were being stripped out of

17   SIB, partly through those contracts that were spoken about

18   earlier and partly by simply removing them, putting them

19   into other Stanford entities and then onwards for the

20   benefit of either Mr. Stanford or other persons unknown.

21   Q.   And how is that different than a Ponzi scheme?  Why

22   did you make that distinction?

23   A.   From our view, it looked like the bank's money was

24   being stolen rather the bank was running a Ponzi itself.

25   Q.   Did the bank have legitimate banking operations --

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 91

1   A.   Yes, it did.

2   Q.   -- in your opinion?

3   A.   Yes, it did.

4   Q.   One of the things that was mentioned was outsource

5   contracts.  Now, you -- do you remember that testimony?

6   A.   Yes.

7   Q.   You have substantial experience dealing with offshore

8   financial institutions, do you not?

9   A.   Yes.

10  Q.   And is it typical to find outsource contracts in off-

11  shore financial institutions?

12  A.   It is certainly not unusual.

13  Q.   And you gave a statement that the -- the amount of

14  the funds that were paid to employees of SIB were -- were

15  small as compared to the -- the other assets that -- that

16  were -- were -- were involved.  Is that correct?

17  A.   Yes.

18  Q.   All right.  But you're not demeaning or belittling the

19  fact that there were 91 employees at the bank.

20  A.   No.

21           MR. SADLER:  Your Honor, could I just ask that

22  counsel not lead his own witness, please?  And I object to

23  the leading.

24           THE COURT:  All right.  Let's not lead.

25  Q.   (BY MR. WIELEBINSKI)  Did Stanford International Bank

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 92

1    in your opinion operate as a typical offshore bank similar

2    to -- well, strike that.  Just as a -- did it operate as a

3    typical offshore bank in your experience?

4    A.    Yes, as far as its customers were concerned.

5    Q.    Did it have banking operations --

6    A.    Yes.

7    Q.    -- the ones that Mr. Grossman pointed out and that you

8    point out in your opening -- or in your direct testimony?

9    A.    Yes.

10   Q.    And can you run through the -- through what those

11   operations were again for the Court?

12   A.    Well, not only taking money on deposit through CDs, it

13   offered credit card services.  It offered loan services.

14   It offered bill payment services, regular wire transfers.

15   Those are the principal ones.  They are listed in my direct.

16   Q.    Mr. Wide, if -- if you own gold, do you have to have

17   physical possession of it to own the gold?

18   A.    No.

19   Q.    And why is that?  How can you own it otherwise?

20   A.    You can -- you can hold gold certificates which is held

21   somewhere else.  And the bank I referred to when Mr. Sadler

22   asked me the question had $40 million worth of gold.  It was

23   stored in a bank as it happens in Houston.

24   Q.    Now, did you understand that Mr. Fundora's primary

25   reason to remove Vantis was because of their lack of getting

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

1    anything done or incompetency or inappropriate actions or

2    lack of actions?

3    A.    I understood it to be lack of action.  They weren't

4    getting anywhere with the Estate.

5    Q.    Okay.  And these same people were the ones that

6    entered into the stipulation that Mr. Sadler was talking

7    about that he was asking why didn't you go forward with

8    that stipulation.  Do you recall that?

9    A.    Yes.

10   Q.    Okay.  And you had some questions about that

11   stipulation, did you not?

12   A.    I didn't believe it was in the best interests of the

13   creditors of the bank.

14   Q.    Okay.  You looked at it, though, and you looked at it

15   closely.

16   A.    Yes.

17   Q.    Is that a fair statement?

18   A.    Yes.

19   Q.    You didn't simply throw it aside just because Vantis

20   was involved in it.

21   A.    No.  I -- I felt we had a useful role to play in the

22   United States.

23   Q.    And you decided that there was a -- a different

24   proposal that should be made.

25   A.    Yes.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 94

1           MR. SADLER:  Your Honor, could I please ask

2    counsel not to lead his own witness.  I object to it.

3           THE COURT:  I'll sustain leading.

4    Q.   (BY MR. WIELEBINSKI)  Now, you're not saying to the --

5    are you saying to the Court that you agree with the actions

6    that were taken by Vantis in this case?

7    A.   No.

8    Q.   As a matter of fact, you disagree with a lot of their

9    actions, do you not?

10   A.   Indeed.

11   Q.   Is it fair to say or can you tell me, do you feel that

12   you have, however, stepped into the situation they created?

13   A.   Absolutely, yes.

14   Q.   Okay.  And that includes the Chapter 15 petition, does

15   it not?

16   A.   Yes.

17   Q.   Okay.  And other contracts they may have entered into.

18   A.   Yes.

19   Q.   You have an obligation, do you not, by statute and

20   pursuant to the court order to perform your duties?  Is

21   that correct?

22   A.   Yes.

23   Q.   And there was some mention made about $20 million that

24   was obtained through the court in the UK of funds that

25   were subject to an asserted right to forfeiture.  Is that

025147ba-a31c-4457-b73e-de48d28d06e2

Page 95

1    correct?

2    A.    Yes.

3    Q.    Did you get the -- what was the reason you went to get

4    those monies and asked permission from the Court?

5    A.    We were looking for the best way to fund the Estate.

6    The alternative funding we had been offered by a private

7    equity fund was extremely expensive, brutally so, to be

8    honest, and it appeared to us that the bank had assets which

9    could be put to work for the benefit of creditors and to

10   run the Estate, and that this money would be obtainable

11   reasonably cheaply if ordered by the court in England.

12        And indeed the Court has ordered that we can draw down

13   $20 million.  It is repayable to the fund if the forfeiture

14   is successful, and we are paying a rate of interest on that

15   money.

16   Q.    So the money is not free.  It's not like the monies

17   that Mr. Janvey has recovered where he can just pay his

18   professionals.  You -- you actually have an obligation to

19   repay.  Correct?

20   A.    We have an obligation to repay, yes, through --

21   through the English court, yes.

22   Q.    All right.  And did you go in on an ex parte basis to

23   get that money?  In other words, did you just go to the

24   court without telling anybody else that you were going to

25   ask for the money?

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

1   A.   No.   Indeed we had fairly lengthy negotiations with the

2   Serious Fraud Office and we actually thought we were going

3   to have a consent order with respect to those monies.

4   Q.   The Serious Fraud Office is the -- the office in the

5   UK that --

6   A.   -- that is responsible for bringing the criminal

7   prosecution at the request of the DOJ.

8   Q.   But it was a request of -- of the Department of

9   Justice.   Correct?

10  A.   Yes.

11  Q.   And so they were present at the contested hearing that

12  was held before the court on whether you should get the

13  $20 million.   Correct?

14  A.   Yes, they were.

15  Q.   And the court heard all the arguments of the parties.

16  Correct?

17  A.   Yes.

18  Q.   And the court nevertheless felt what?

19  A.   It -- it felt that this was a good use of those funds

20  for the benefit of creditors.

21  Q.   And thought it was appropriate that you -- you have

22  those funds to fund your efforts to perform your duties.

23  A.   Yes.

24  Q.   Is that a fair statement?

25  A.   Yes.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 97

1        MR. SADLER:  Excuse me, Your Honor.  I object to

2   the leading.  There's a proper way to ask questions.  This

3   isn't it.

4        THE COURT:  All you have to do is say, objection,

5   leading, and I'll know just exactly what you mean.

6        MR. SADLER:  Yes, sir.

7        THE COURT:  Sustained.

8   Q.   (BY MR. WIELEBINSKI)  You mentioned the rate of

9   expenditure that you're incurring.

10  A.   Yes.

11  Q.   Correct?  Is it your -- can you tell me, are the --

12  is -- is that burn rate now being reduced?

13  A.   Yes.

14  Q.   Is it typical or not typical to have a significant

15  burn rate in the beginning of a representation?

16  A.   It is, yes.

17  Q.   And would it be normal to do that in a case like this

18  where you came in as a replacement for prior liquidators, or

19  is that unusual?

20  A.   First, it's not usual to be a replacement role.  But in

21  this case we had significant difficulty trying to find out

22  and examine what the previous Joint Liquidators had done.

23  We had to assess their efforts and whether they were useful

24  and appropriate.

25        We then had to review all the claims that they had

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 98

1    initiated or had not initiated.

2         We had to look for other issues like jurisdictions

3    where dates might be expiring -- dates for filing might

4    be expiring, which we found in Canada, for example.

5         They had done no real review of the records of the bank

6    at all in terms of trying to track down where all the money

7    went, if there were further pockets of cash.  And we had to

8    build an electronic platform onto which to upload the data,

9    and we have just completed that.  We are starting to now

10   discover that to find out where all the cash went.

11        So there are significant upfront costs in any pro-

12   ceeding, and they were almost higher in this one because

13   we had to sort through what had been done by Janvis (sic)

14   and decide what was worthwhile, what was useful, and what

15   was not.

16   Q.   Do you or do you not have to spend in your opinion

17   monies on professionals in order to satisfy your statutory

18   obligations to the court in Antigua?

19   A.   Indeed, I do.

20   Q.   Does Mr. Janvey have to do the same thing with respect

21   to his obligations to the U.S.?

22   A.   Yes.

23   Q.   Has Mr. Janvey spent a significant amount of money in

24   your opinion?

25   A.   Yes.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 99

1    Q.    Okay.  Are you able to recover monies -- do you believe

2    you'll be able to recover monies to repay the $20 million?

3    A.    Yes.

4    Q.    And can you explain to the Court who, if anyone, you

5    have to report to for the expenditures you make from the

6    $20 million?  Is it just the Antiguan court or do you have

7    to go anywhere else?

8    A.    No.  The -- the court has created in the Serious Fraud

9    Office a watchdog over our expenditures, and we have to

10   report to them monthly on our -- how we spend the money.

11        And they have a right, if they think we are spending

12   it imprudently to return to court and ask for the court's

13   assessment of those, whether our fees are reasonable,

14   whether the work we're doing is sensible.  And I understand

15   from the court that, if -- if we're not prudent, they would

16   restrict further draws.

17   Q.    With respect to the filing of the Chapter 15, in your

18   own words, can you explain to the judge what it is you're

19   trying to achieve through the Chapter 15?

20   A.    We are in fact trying to create a cooperative environ-

21   ment.  It is absolutely not our intention to take over any

22   part of the U.S. proceeding or Estate.  It's our belief

23   that through the use of Chapter 15, and foreign main in

24   particular, we can bring additional rights and remedies to

25   the U.S., some of which are helpful to us in examination and

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

1   discovery of -- of information that we might need to sue

2   elsewhere.

3        And, secondly, we believe we can, by joining arms with

4   the Receiver here, support some of the actions that are --

5   that are ongoing here.  And Mr. Grossman made comment about

6   some of the clawback claims which are defended on the basis

7   of lack of standing.  Our view is if we stood shoulder to

8   shoulder with Mr. Janvey and said, we're both here now, you

9   have to deal with both of us, why don't we get on with life,

10  that adds value, we thought, to the U.S. proceeding.

11       Similarly, there are actions that we thought were worth

12  looking at to determine where the best place was and which

13  of us had the best chance of success.  And rather than

14  duplicate activity, we would try and determine between us

15  who had the best chance of winning money for the defrauded

16  depositors.

17       We had hoped within that, then we would lead on to it

18  to a common claims protocol.  We have a statutory one which

19  is slightly inflexible.  We hope that we might be able to

20  find a way to cover those inflexibilities and match that

21  with what this Court might order.

22       Similarly, on information exchange, we believe that

23  would be much easier to coordinate under a Chapter 15.

24       The other advantage is that, under Chapter 15, I

25  believe the two courts can speak to each other as provided

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 101

1    for as part of that process.  And, again, we hope that that

2    might lead to, rather than us competing because we weren't

3    coordinating activities, to the courts coordinating both

4    activities, because at the end of the day I have to say, in

5    all honesty for the Joint Liquidators, we don't really care

6    which pot it goes into as long as the money is raised.

7          And the worst thing that would happen, if a claim

8    failed for want of standing, for time limits expiring, those

9    sorts of things, and by joining under Chapter 15, we believe

10   that we would be bringing those things to the table and --

11   and enable the Estate to maximize -- and I say the Estate

12   meaning both Estates, to maximize recoveries for the benefit

13   of the depositors.

14   Q.   Are you trying to grab the funds that Mr. Janvey has

15   in his possession?

16   A.   No.

17   Q.   Are you trying to take over all of the litigation

18   that's been initiated by Mr. Janvey?

19   A.   No.

20   Q.   Are you trying to do that with respect to the

21   litigation initiated by the Official Investors Committee?

22   A.   I'm not trying to take over any litigation.  What we

23   want to make sure is, by collective discussion about who has

24   the best right and the best standing and the best chance of

25   success, that that's the party that goes forward or both

Linda J. Langford, CSR, RDR, CRR

Page 102

1    parties together.

2    Q.   Are you -- do you feel you have -- does Antigua have

3    a statutory provision that requires a certain waterfall of

4    distribution?

5    A.   Yes, it does.

6    Q.   And you feel like you're obligated to comply with that

7    to perform your duties?

8    A.   It's -- it's a statutory provision to the extent -- I

9    don't know to what extent a court would be prepared to find

10   modifications to it, but I'm -- I'm willing to negotiate

11   that and see if we can find a way to -- to reconcile what

12   this Court might want and what our court might be mandated.

13   Q.   With respect to that statutory waterfall, you've

14   proposed, have you not, to do it on a cooperative basis

15   with Mr. Janvey?  Correct?

16   A.   Yes.

17   Q.   You don't intend to take the money from Mr. Janvey

18   to have to bring it to Antigua in order to make that

19   distribution --

20   A.   No.

21   Q.   -- do you?

22   A.   No.

23   Q.   It -- it can come out of a joint bank account, can it

24   not?

25   A.   Yes.

Page 103

1   Q.   You are prepared to turn over the documents to Mr.

2   Janvey -- remember the ones that he said he really needed or

3   his counsel said he really needed at the status conference?

4   If you've got those documents, you're going to find a way to

5   try to get them to Mr. Janvey.  Is that a fair statement?

6   A.   With a -- with a protocol like this, yes.

7   Q.   Okay.  And this protocol will be subject to Judge

8   Godbey's approval.  Correct?

9   A.   Absolutely.

10          MR. SADLER:  Object to the leading, Your Honor.

11          THE COURT:  Sustained.

12   Q.   (BY MR. WIELEBINSKI)  Is there any court approval that

13   will be required if the protocol is accepted?

14   A.   I would assume both courts would have to approve the

15   protocol.

16   Q.   And if -- if Judge Godbey granted you foreign main

17   recognition and you were to just look at the provisions of

18   the Bankruptcy Code, would you have to do all of the things

19   you propose to do in the protocol or not?

20   A.   No.  We could do that by agreement.

21   Q.   But if you didn't have an agreement, you wouldn't have

22   to do all these things.  Correct?

23   A.   That's right.

24   Q.   Nevertheless, three-and-a-half months ago, did you

25   feel like you were willing to make these concessions and

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 104

1    agreements and put it on paper and send it to the other

2    side?

3    A.    Yeah.  We were willing to work on a negotiation of

4    a protocol.  This was our first offer for negotiation.

5    Q.    And you did negotiate on a protocol.  Correct?

6    A.    Yeah.  Yes.

7    Q.    Okay.  I don't want to get into the specifics of what

8    was negotiated, but did you get any kind of line-by-line

9    markup or change that said, here's our issues, here's what

10   we need to do, in order to try to move this forward?

11   A.    No.

12   Q.    Did you get any response?  Don't tell me the specifics

13   of it.  I just want to know if you got a response.

14   A.    I think there was a letter primarily rejecting it.

15   Q.    If Mr. Janvey or his counsel came back and said, I

16   really have a problem with this particular provision where

17   it appears I may be being appointed an agent for Stanford

18   International Bank, can we work around that somehow, is

19   that something you'd be willing to consider or talk about?

20   A.    I think all the terms of that protocol were open to

21   discussion.

22   Q.    Okay.  Did you ever hear about that provision being

23   offensive to them?

24   A.    No.

25   Q.    Now, part of the protocol that you've proposed is to

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 105

1    allow this judge to speak to his counterpart in Antigua

2    about how the protocol is implemented.  Is that a fair

3    statement?

4    A.   Yes.

5    Q.   Is that what the protocol reflects?

6    A.   Yes.

7    Q.   Is that fairly typical in protocols to have the courts

8    coordinating their efforts and --

9    A.   I -- I think it --

10   Q.   -- making sure things are running well?

11   A.   I think it's specifically contemplated under these --

12   under the UNCITRAL model law arrangement.

13   Q.   If we can, let's talk for a minute about the funds that

14   the DOJ has attempted to forfeit.  It hasn't yet succeeded

15   in that effort, has it?

16   A.   No.

17   Q.   All right.  And those funds are in how many

18   jurisdictions?

19   A.   Three.

20   Q.   And can you tell the Court which jurisdictions?

21   A.   Canada, the UK, and Switzerland.

22   Q.   And with respect to the last two jurisdictions, do

23   you have any recognition in those countries?

24   A.   We -- the proceeding has recognition in the UK and

25   also in Switzerland.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 106

1    Q.    All right.    And can you tell the Court why you're

2    pursuing the recovery of those monies rather than letting

3    the DOJ attempt to forfeit them?

4    A.    Certainly.    The issue for us is, one, we think these

5    are the bank's assets and should be paid over to the bank

6    through the Liquidators for distribution.

7         Secondly, had we been able to have these funds paid

8    over to us some time ago, we could have distributed them by

9    now.  They would be available for distribution in our hands,

10   and we could have run a claims process and distributed the

11   bulk of them.

12        We like the nature of the claims process in Antigua.

13   It's -- it's certain.  It's there.  It's not one generated

14   by the DOJ.

15        It's not an application for remission.  We also had

16   concerns that a number of the Latin American investors might

17   be reluctant to approach the U.S. government for remission,

18   like making a claim for remission, and would find it easier,

19   frankly, to make a claim through our liquidation proceeding.

20   Q.    Are those monies in -- in your opinion a prime source

21   for an immediate distribution if they were freed up or --

22   or turned over collectively to the Receiver and the Joint

23   Liquidators?  Would they be available to distribute to the

24   creditors?

25   A.    Yes.  We have indicated that, in our webinar, if those

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

1    funds were freed up tomorrow, we could have a distribution

2    in the first quarter of 2012.

3    Q.    And the Department of Justice under its forfeiture

4    proceeding, it can't make those distributions currently,

5    can it?

6    A.    No.  My understanding it has to have a final conviction

7    of Mr. Stanford before it can move forward with its

8    forfeiture.

9    Q.    And it's been how many years that that criminal matter

10   has been ongoing?  Do you know?

11   A.    I don't know when the first claims were made or when

12   Mr. Stanford was first charged, but it was back in the

13   early part of this proceeding.

14   Q.    And when is it -- when is the criminal proceeding going

15   to get wrapped up?

16   A.    I think there's hearings on it now, but I have no idea

17   when it's going to end.

18   Q.    You have no idea when it's going to end.

19   A.    I have no idea when it's going to end.

20   Q.    So you have no idea, if that's a condition -- getting

21   the criminal proceedings finalized, if that's a condition to

22   distributing the money, you have no idea when the DOJ might

23   be able to make a distribution.

24   A.    No.

25            MR. SADLER:  Object to the leading, Your Honor.

Linda J. Langford, CSR, RDR, CRR

1              THE COURT:  Sustained.

2              MR. WIELEBINSKI:  I'll try to rephrase it.

3    Q.  (BY MR. WIELEBINSKI)  Assuming that the wrapping up

4    of the criminal matter is a condition to the forfeiture --

5    forfeited funds being distributed, you don't know when

6    that -- or do you know when that might occur?

7    A.   No.

8    Q.   Are you able to account for all the depositors' funds

9    received and all funds paid out to depositors and identify

10   the funds diverted from Stanford International?

11   A.   We have the information to do so.  We haven't completed

12   that analysis yet.

13   Q.   Okay.  And you haven't done it because -- is there a

14   reason?

15   A.   Funding was one.  It's an expensive process to load up

16   the platform for the electronic discovery.  We now have that

17   and we have started that process and are already starting to

18   find little pockets of -- of money or value hidden away.

19   Q.   Let me go back.  We talked about Switzerland and the

20   UK and you explained why you are pursuing those funds and

21   how you're hoping that those monies might be available to

22   distribute to creditors quicker than through a forfeiture

23   proceeding.  And you're doing that in court --

24   A.   Yes.

25   Q.   -- or are you doing that in court?

025147ba-a31c-4457-b73e-de48d28d06e2

Page 109

1          MR. SADLER:  I object to the leading, Your Honor.

2          MR. WIELEBINSKI:  I tried to change it, Your

3    Honor, and catch it.

4    Q.   (BY MR. WIELEBINSKI)  Are you doing that through a

5    court process?

6    A.   We are.

7    Q.   And in Canada, are there any efforts there that you're

8    taking to pursue any funds set aside by any governmental

9    authorities?

10   A.   Yes.  We -- we are seeking to recover the $20 million

11   that is frozen there.  I believe it's going to be slightly

12   less by the time other claims are dealt with, but we are

13   seeking to return that to the Antiguan Estate.

14   Q.   Mr. Sadler raised some questions about that.  Is -- is

15   Mr. Janvey seeking to get those funds or is anybody else on

16   behalf of the Receivership Estate trying to get those funds?

17   A.   No.

18   Q.   Well, what are they doing with the funds?

19   A.   Presently they are just being held for forfeiture.  I

20   don't believe there's any other efforts apart from ours to

21   recover them for the Estate.

22   Q.   And can you explain why they are not doing anything on

23   those funds?

24   A.   I believe they determined that they are not going to

25   proceed.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 110

1    Q.    They are going to -- do you know if they are going to

2    just allow the forfeiture process to take place?

3    A.    That's my understanding.

4    Q.    And so those $20 million of funds might not be

5    available for a long period of time?  Would that be a

6    conclusion that you could reach?

7    A.    Until they could be forfeited.

8    Q.    Under the protocol, if you recovered any assets in the

9    United States that the court allowed you to recover and you

10   wanted to sell those, which court would be deciding what to

11   do with those -- with that asset?

12   A.    Under the Chapter 15?

13   Q.    Yes, sir?

14   A.    If we had a Chapter 15 agreement?  It would be the U.S.

15   court, Judge Godbey, I imagine.

16   Q.    And if he allowed to you sell the assets, would you

17   also have to come to him to get permission to disburse the

18   assets?  Do you know?

19   A.    I would imagine so, yes.

20   Q.    And do you have a problem with that?

21   A.    No.

22   Q.    Would you be willing to agree to that in a protocol if

23   that was required?

24   A.    Certainly.

25   Q.    Okay.

025147ba-a31c-4457-b73e-de48d28d06e2

1          MR. WIELEBINSKI:  Judge, may I have one minute?

2      (Conference between counsel off the record.)

3  Q.  (BY MR. WIELEBINSKI)  I just have a few more questions

4  going back to the protocol.

5      Do you recall if under the terms of the protocol we

6  would do what we could and attempt to get standing for

7  Mr. Janvey in Antigua?  Can you speak to that?

8  A.  I believe that was the proposal, yes.

9  Q.  Does he currently have standing in Antigua?

10  A.  No, he does not.

11  Q.  And you'd be willing to continue to do that or would

12  you be willing to continue to seek standing for Mr. Janvey

13  in Antigua?

14  A.  Yes, certainly.

15  Q.  And do you know if the protocol addressed the issue

16  of protections and immunities from suit or legal process

17  in Antigua, the same as -- as those under the laws of the

18  United States?

19      In other words, if Mr. Janvey came down to Antigua,

20  he'd be -- we'd ask the Court to protect him and make him

21  immune from any liabilities down there?

22  A.  I don't specifically recall, but it -- it might.

23  Q.  If I told you that was in there, would you have a

24  reason to disagree?

25  A.  No.  I -- I would think that would be right.

1  Q.    And you -- would you have any problem with trying to

2  do that if the court in Antigua would approve that?

3  A.    No problem at all.

4  Q.    What about nonpublic information?  Would you make that

5  available?

6  A.    I'm not sure what you mean by nonpublic information.

7  Such as?

8  Q.    For example, anything that's not in the public record.

9  So I would state for -- give you an example of customer

10 accounts.

11 A.    Sure.  We can find a way to comply with the

12 confidentiality provisions.

13 Q.    And if I understand you, if -- if part of getting

14 access to that information created an issue, such as being

15 an agent of Stanford International Bank, if that was

16 something you thought was required but it's -- it's a real

17 problem for the other side, will you attempt to find other

18 ways to get that information?

19 A.    We're willing to work on any way to make this protocol

20 work.  I mean, I think that's the answer to that.

21 Q.    You're willing to do a joint bank account?

22 A.    Yes.

23 Q.    I'm sorry?

24 A.    Yes.  I'm sorry, that's for distribution purposes.

25 Q.    Yes.

Linda J. Langford, CSR, RDR, CRR

Page 113

1    A.    Sure.  Sure.

2    Q.    And I think, but you can tell me if you're right --

3    if I'm right on this, what about claims against the

4    various Stanford entities?  Would you be pursuing those

5    claims if the protocol was approved and you got foreign

6    main recognition?

7    A.    Not to disturb the Receivership.  I mean, if we had

8    to make a claim through a company to get to some other

9    asset that otherwise is not being pursued, we would do

10   that, but certainly with no intention of disturbing the

11   Receivership.

12   Q.    And to the extent you're able to get these monies in

13   these foreign jurisdictions outside of this -- this forge

14   picture process, it's going to benefit all the same

15   creditors, is it not, that Mr. Janvey is trying to get

16   distributions to?

17   A.    Yes.

18   Q.    You're working together essentially.

19   A.    The Estates essentially overlap, and I think 97 point --

20   99.7 percent of the claims in our Estate are depositors, and

21   it's only slightly less I believe in the Receivership of

22   SIB.

23   Q.    Remember the question Mr. Sadler asked you about some

24   access to documents that Mr. Cort got?  It was at the end

25   of his cross-examination.

Linda J. Langford, CSR, RDR, CRR

Page 114

1    A.   Yes.

2    Q.   Those documents haven't been released, have they?

3    A.   No.

4    Q.   And to the extent that they requested those documents,

5    you're going to visit the issues he's raised before you

6    release any of those documents?

7    A.   Yes.

8              MR. WIELEBINSKI:  Pass the witness.

9              MR. SADLER:  Very briefly, Your Honor.

10                      RECROSS EXAMINATION

11   By Mr. Sadler:

12   Q.   We need to go back to where -- where we started with

13   this Ponzi scheme.

14   A.   Uh-huh.

15   Q.   Are you telling this Court that since August of 2011

16   when you signed a claim saying SIB was run under a business

17   model that was a Ponzi scheme, you have changed your mind

18   and come to a different conclusion in the last 90 days and

19   it's -- and concluded it's not a Ponzi scheme?

20   A.   I'm concluding there was a fraud committed, yes.  And

21   I'm concluding that, for SIB's point of view, its money was

22   stolen through these variety of contracts and sometimes

23   just outright stolen by Mr. Stanford, yes, or his other

24   companies.

25   Q.   Have you taken any steps to withdraw or amend your

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 115

1    statement under oath to the Antiguan court stating that

2    SIB operated a business model that was a Ponzi scheme?

3    A.    Not as yet, no.

4    Q.    Now, you would agree with me, sir, that during the

5    time Stanford operated this bank, control of where the

6    CD investors' money went, where it was held, all of that

7    was controlled by people outside of Antigua, wasn't it?

8    A.    Yes.

9    Q.    Now, you said something to your lawyer about when

10   you stepped into Vantis's place, you stepped into their

11   contracts, and I want to be clear.  You're saying you --

12   you assumed all the contracts Vantis agreed to except you

13   did not assume and you reject the agreement they reached

14   with the Receiver.  Right?

15              MR. WIELEBINSKI:  Objection, Your Honor.  I think

16   that mischaracterizes the testimony.

17              THE COURT:  Overruled.

18              THE WITNESS:  I don't see that as being a

19   contract.  The contracts that Vantis had entered into,

20   signed agreements for, are either approved or unapproved

21   by the Court.  That one seemed to me contrary to the

22   interests of the Estate and, no, we did not go ahead with

23   it.

24   Q.    (BY MR. SADLER)  In April 2009, you agree with me

25   that Stanford International Bank was shut down, was not

U.S. District Court

Linda J. Langford, CSR, RDR, CRR

Page 116

1    operating.   Correct?

2    A.    It wasn't dealing with its -- its depositors' interest,

3    no.   It wasn't -- wasn't handing out money or doing those

4    things that a bank would otherwise do, yeah.

5    Q.    It -- it was not sending out statements, it was not

6    dealing with customers, it was shut down in April 2009.

7    Right?

8    A.    Yeah.

9    Q.    And certainly --

10   A.    From a trading point of view, it was shut, yes.

11   Q.    And certainly by August 2011 Stanford International

12   Bank was not in the banking business, it was shut down,

13   wasn't it?

14   A.    It is not trading.

15   Q.    And there was a question about selling assets and --

16   and so forth, and I need to ask you:  You're aware, are you

17   not, that for the last two-and-a-half, maybe almost three

18   years, that this Receiver has been liquidating Stanford

19   assets via a process of motion with court approval?  You

20   know that's been going on.

21   A.    Yes.

22   Q.    You know that this Receiver has liquidated many, many

23   assets of the Stanford enterprises.  Right?

24   A.    Yes.

25   Q.    And that's one of the things you understand that

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

1    receivers are supposed to do --

2    A.    Yes.

3    Q.    -- liquidate assets.

4    A.    Yes.

5    Q.    And they're liquidating assets to hold them for

6    distribution to claimants.  Right?

7    A.    That's my mandated task, yes.  I'm not sure what the

8    process is for a receiver.

9    Q.    My question to you is, is it your understanding that

10   Mr. Janvey has been liquidating these assets and holding

11   those funds for the purpose of distribution to claimants?

12   A.    I -- I presume that's the purpose.  That's what I

13   presume his application for distribution approval from the

14   Court is for, yes.

15   Q.    Okay.  And you understand that's what receivers do.

16   Right?

17   A.    Yes.

18            MR. SADLER:  No further questions.

19            THE COURT:  Thank you, sir.  You may step down.

20            THE WITNESS:  Thank you.

21            MR. REDMOND:  Your Honor, we would call Hugh

22   Dickson to the stand.

23            THE COURT:  Could you raise your right hand,

24   please, sir?

25        (The witness was sworn by the Court.)

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 118

1                    HUGH DICKSON, SWORN,

2                    DIRECT EXAMINATION

3    By Mr. Redmond:

4    Q.   Would you please state your name for the record?

5    A.   Hugh Dickson.

6               MR. REDMOND:  Your Honor, before I move for the

7    admission of the direct testimony and the exhibits, we do

8    have a supplemental statement that I provided to Mr. Sadler

9    and other counsel.  And if I could approach the clerk, I

10   could provide a copy of that to Your Honor.

11              THE COURT:  All right.

12        (Document proffered to the Court.)

13              MR. REDMOND:  Your Honor, very briefly, the

14   SIB, which we're here on the Chapter 15 proceedings today,

15   there's another Antiguan entity called Stanford Trust

16   Company, generally referred to as STC.  Mr. Wide and

17   Mr. Dickson have been appointed as Receiver Managers in

18   Antigua over that entity on November 4th, 2011.

19        STC, or Stanford Trust Company, was an entity that held

20   a number of CDs on behalf of different depositors.  And the

21   additional statement that's been worked on by Mr. Dickson

22   and Mr. Wide since their appointment has Receiver Managers,

23   that work is not complete, but this provides updated

24   information as to the allocation as to how the CDs within

25   STC were -- were held.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 119

1      And this information was only recently completed in the

2  last 24 hours.  And that's the reason we put the statement

3  together and provided the background information.

4      So with that, Your Honor, we would move to admit into

5  evidence the Joint Liquidators' direct examination, the

6  supplemental examination we provided, and the two exhibits

7  that accompany Mr. Dickson's direct examination.

8          MR. SADLER:  There is no objection from the

9  Receiver.

10         THE COURT:  All right.  Then let's proceed with

11  cross.

12         MR. LITTLE:  Thank you, Your Honor.

13                  CROSS EXAMINATION

14  By Mr. Little:

15  Q.   Good morning, Mr. Dickson.

16  A.   Good morning.

17  Q.   It's good to see you.  I don't think we have actually

18  had the pleasure of meeting and this is the first time I

19  think you've actually been in one of our sessions.

20  A.   I've met you once briefly, Mr. Little.  I obviously

21  didn't make a big impression.

22  Q.   Okay.  Well, I'm sorry.

23         MR. LITTLE:  Your Honor, the Court will be happy

24  to know that this supplemental stuff actually takes some of

25  my cross away.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 120

1          THE COURT:  I'm happy.

2     Q.   (BY MR. LITTLE)  Now, you've testified on direct that

3     SIB had 21,738 customers as of February 2009.  Is that

4     right?

5     A.   That's correct, yes.

6     Q.   Okay.  Now, is a customer a CD holder or simply a

7     holder of some form of account?

8     A.   It would largely be a CD holder.  There are various

9     different types of CDs.  They may also have loans, credit

10    cards, but those would be parasitical on having a CD in

11    the first place.

12         THE COURT:  Mr. Dickson, I'm having a little

13    trouble hearing you.  If you could either pull the mic

14    closer or speak up a little bit, that would help.  Thank

15    you.

16    Q.   (BY MR. LITTLE)  So is it fair for -- for all of us

17    to assume that all of these customers had at least one CD

18    issued by Stanford International Bank?

19    A.   I -- the reason I'm hesitating is that there is a very

20    small number of depositors, including bank employees, have

21    quite small balances.  I'm not sure if those were in the

22    form of CDs or not --

23    Q.   Okay.

24    A.   -- but largely yes.

25    Q.   So -- so there may be a couple of folks at the very

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 121

1   margin who don't have CDs --

2   A.   The vast majority would be CD holders, yes.

3   Q.   Okay.  Now, of the 21,738, you identify 4,212 customers

4   as being in the Caribbean.  Is that correct?

5   A.   Could I see a copy of my testimony for the detail?

6   Q.   Sure.

7          MR. LITTLE:  Have you got -- oh, sorry.  I've got

8   his -- I've got his old note.  I've got his stuff here.

9   Q.   (BY MR. LITTLE)  Let me see if I can find that for you.

10  A.   It would be helpful if I could have both, Mr. Little,

11  actually since I'm sure you're going to ask me about the

12  revised numbers.

13  Q.   I had actually assumed that your lawyers would give

14  you your testimony, a silly assumption on my part.  I think

15  you'll find that at page 12 of your testimony, sir.

16  A.   Sorry.  Could you repeat the question, Mr. Little?

17  Q.   Yeah.  You identify that there are 4,212 customers,

18  quote, in the Caribbean, close quote.  And that's at page 12

19  of your testimony, is it not?

20  A.   I do.

21  Q.   Okay.  And when you say in the Caribbean, you exclude

22  Puerto Rico and the U.S. Virgin Islands from the Caribbean.

23  Correct?

24  A.   Correct.  Those are included in the U.S. figures.

25  Q.   Okay.  Now, you agree, do you not, that Stanford

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 122

1    International Bank was not permitted to accept deposits

2    from Antiguan residents.  Correct?

3    A.    Largely, yes.  I think -- I believe there are some

4    minor dispensations for employees of the bank.

5    Q.    Okay.  And this new testimony you have provided tells

6    us that, in total, there were 31 individual residents of

7    Antigua who had accounts at Stanford International Bank.

8    Correct?

9    A.    That is correct.  Those would be a combination of

10   employees and foreigners, not Antiguans, living in Antigua.

11   Q.    Okay.  So what we might call expatriots?

12   A.    Indeed.

13   Q.    Okay.  So roughly one-tenth of a percent of the

14   depositors were Antiguan by residence.

15   A.    Yes, albeit you'll see from the rest of my testimony

16   there were also a number of Antiguan entities shown as

17   customers of the bank.

18   Q.    And those are mostly trusts, are they not?

19   A.    They are indeed.

20   Q.    And those are trusts that you have not yet been able

21   to determine the location of vis-a-vis their beneficiaries.

22   A.    Indeed.  There's approximately 3,100-and-something

23   trust entities.  We have managed to now identify the

24   ultimate beneficiaries of the majority of those.  We still

25   have some 540-odd I believe, my recollection, still we have

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 123

1   not managed to complete that process.

2   Q.    Okay.  So out of 21,000 customers and roughly 3500

3   trust accounts, you've managed to identify 31 Antiguan

4   residents who are account holders and there's an outside

5   chance that there are a few other Antiguan residents in

6   those 500 trusts that you have not yet been able to get

7   inside of.  Correct?

8   A.    That is correct.  And that would be entirely consistent

9   with it being an IBC in Antigua.

10  Q.    Okay.  Now, when you talk about the location of these

11  customers, how is it that you're determining location?

12  A.    We determined the location by examining the bank's

13  accounting system and client records.  Those contain

14  various elements of information about the identity of the

15  depositors.

16       The primary sort we use for identifying the point of

17  origin, if you like, of the customer was the country flagged

18  within the database attached to it.  And that is largely

19  determined by the client information the bank obtained

20  when it did its Know-Your-Client process to identify clients

21  properly.

22       So it would effectively be their physical residence as

23  evidenced by the client when they opened the account.

24  Q.    Okay.  So you're not attributing an Antiguan location,

25  for example, to folks who had their mail held at the bank.

U.S. District Court

025147ba-a31c-4457-b73e-de48d28d06e2

Page 124

1    A.    No.

2    Q.    Okay.  Let me turn my attention for a second to the --

3    to the other side of the coin.  We've talked a little bit

4    about where the account holders are located in the world.

5         And your direct on that issue is that there are

6    approximately 20 -- 15 to 20 percent of the account holders

7    are in the U.S.  Correct?

8    A.    Approximately, yes, by -- from recollection, by head

9    count and possibly 22 percent by value.

10   Q.    Okay.  And I want to turn now to the question of how

11   the CDs were sold.  Now, predominantly, the Stanford Inter-

12   national Bank CDs were sold via financial advisors.

13   Correct?

14   A.    That is my understanding, yes.

15   Q.    Okay.  And those financial advisors were employed by

16   a variety of different Stanford entities around the world.

17   Correct?

18   A.    Indeed.  I also understand that there was some direct

19   agreements as well independent of other Stanford financial

20   entities.

21   Q.    Have you investigated how many of those are, sir?

22   A.    No, I have not.

23   Q.    Okay.  It's a minuscule number, don't you think?

24   A.    Well, as a -- I'm an investigator.  I can't decisively

25   comment, Mr. Little, but I assume the majority would be

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

1    through Stanford entities, yes.

2    Q.   Well, you know that very few customers actually came to

3    the bank in the process of purchasing their CDs, do you not?

4    A.   I understand that's the case, yes.

5    Q.   Yeah.  Maybe a couple hundred a year?

6    A.   I couldn't comment.

7    Q.   Okay.  You have not reviewed the various declarations

8    submitted in this case by your predecessor --

9    A.   I have not.

10   Q.   -- Mr. Hamilton-Smith?  Okay.

11   A.   I have not.

12   Q.   Well, those are in the record.  The Court can look at

13   those.

14        Going back to the sales, Stanford Group Company here in

15   the United States was one of the entities that was selling

16   the Stanford International Bank CD.  Correct?

17   A.   I believe so.  I understand that there are agreements

18   with a number of Stanford entities --

19   Q.   Okay.

20   A.   -- and beneath those Stanford entities were financial

21   advisors.

22   Q.   Mr. Dickson, this is going to go a lot easier if you

23   just answer the question that I ask --

24   A.   I'll try to be --

25   Q.   -- and wait for my next one.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 126

1   A.    I'll try to be compliant, Mr. Little.

2   Q.    Thank you.  Because, see, you're getting ahead of me

3   because that's the next place I was going.

4         Stanford Group Company was a broker-dealer registered

5   here in the United States selling CDs for Stanford

6   International Bank.  Correct?

7   A.    I believe so, yes.

8   Q.    Yes.  And the CDs were also sold by financial advisors

9   employed by Stanford entities in Colombia.  Correct?

10  A.    I believe so, yes.

11  Q.    Venezuela?

12  A.    Yes.

13  Q.    Mexico?

14  A.    Yes.

15  Q.    Panama?

16  A.    Yes.

17  Q.    Other jurisdictions around the world?

18  A.    Other jurisdictions around the world, yes.

19  Q.    Now, have you and Mr. Wide done any investigation

20  concerning how these various entities and the financial

21  advisors who worked for them ranked in terms of sales of

22  Stanford International Bank CDs?

23  A.    We have not.  However, I would assume, given the

24  records I have seen, that, by and large, the financial

25  advisor selling the CD would be in the country of the

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 127

1    depositor that then bought the CD.  That would be typical.

2    Q.    You have not investigated that, though.

3    A.    I have not investigated it, no.

4    Q.    Okay.  Are you aware that Stanford International Bank

5    apparently kept scorecards tracking the sales of individual

6    financial advisors?

7    A.    Yes, I am.

8    Q.    Okay.  And you have not done a study of those

9    scorecards, I take it?

10   A.    I have not, no.

11   Q.    Okay.  Now, have you reviewed any of the testimony

12   that has been offered in this proceeding by the Receiver's

13   witnesses?

14   A.    I have not.

15   Q.    Okay.  So you have not seen Ms. Van --

16   A.    Sorry, sorry.  Correction, Mr. Little.  I read some

17   testimony from a Ms. Van Tassel yesterday.

18   Q.    Okay.  Well, that's exactly the person I was going

19   to ask you about because Ms. Van Tassel has -- has done

20   an investigation into the source of CD sales.  And her

21   conclusion, you may recall, is that financial advisors

22   employed by the United States broker-dealer Stanford Group

23   Company were responsible for 42 to 48 percent of the

24   Stanford International Bank CD sales during 2007 and 2008.

25         Do you recall seeing that testimony in her direct?

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 128

1    A.    I do.

2    Q.    And you have not done any investigation that would

3    permit you to comment one way or the other upon the accuracy

4    of her testimony.

5    A.    Correct.  It would be speculation if I did.

6    Q.    Okay.  And you understand, of course, that her

7    investigation was based on tracking back the commissions

8    on those sales paid to those financial advisors.

9    A.    I understand that, yes.  How exactly she did it and

10   whether -- the degree to which she tracked the commission

11   down to the individual versus the company, I am not aware

12   of.

13   Q.    Okay.  And you have done no -- just to be clear, you

14   have done nothing to contradict or call into question her

15   numbers on sales.

16   A.    No.

17   Q.    Okay.  Now, attached to your testimony as an exhibit

18   is a spreadsheet that summarizes various sums paid by

19   Stanford International Bank to various other Stanford

20   entities from 2000 to 2008.  Is that right?

21   A.    That's correct, yes.

22   Q.    Would you turn to that for me, now, please?

23   A.    I have done it.

24   Q.    Okay.  Now, the sums are paid out for management and

25   administrative fees, sales commission, and referral fees.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 129

1    Correct?  Those are the three big categories?

2    A.   That and, as you will see further down, interest

3    expense as well.

4    Q.   Okay.  Now, interest expense, though, was that not paid

5    primarily to CD holders on their CDs?

6    A.   I would assume so.  I would also assume there would be

7    some leverage issues as well to the extent there was any

8    bank borrowing or --

9    Q.   Okay.

10   A.   -- brokerage arrangement.

11   Q.   Okay.  So -- so there may in fact be some dollars

12   transferred to other Stanford entities in that interest

13   line; we just don't know for sure.

14   A.   We do not.

15   Q.   Okay.  Now, the management fees were paid to different

16   Stanford entities over the different years, were they not?

17   A.   They were.

18   Q.   Okay.  2007-2008, they were paid to Stanford Financial

19   Group Global Management, LLC.  Is that right?

20   A.   I couldn't comment positively on that.

21   Q.   Okay.  Let me --

22          MR. LITTLE:  I didn't bring enough notebooks.  All

23   the black notebooks in town were sold already.

24          (Documents proffered to the witness's counsel.)

25   Q.   (BY MR. LITTLE)  Mr. Dickson, what I have handed you is

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 130

1    Exhibit Number 1 from the testimony that has been submitted

2    by the Joint Liquidators from Ms. Beverly Jacobs.  And that

3    is a 2007 report from Stanford International Bank, is it

4    not?

5    A.   It is indeed.

6    Q.   Okay.  If you would turn in that document to page -- I

7    think it's 26.  Do you have that?

8    A.   Page 26, note 10, general and administrative expenses.

9    Q.   Right.  And if you look down there in the text, it

10   says, "Management fees consist of expenses related to the

11   marketing and service agreement in place with Stanford

12   Financial Group Global --"

13             THE COURT:  Mr. Little, you need to slow down when

14   you're reading, please.

15             MR. LITTLE:  I'm sorry.  I do tend to do that when

16   I read.

17   Q.   (BY MR. LITTLE)  The text there says, "Management fees

18   consist of expenses related to the marketing and service

19   agreement in place with Stanford Financial Group Global

20   Management, LLC."  Correct?

21   A.   It does.

22   Q.   And so that was the entity to which management fees

23   were being paid in '07.  Correct?

24   A.   According to this document, yes.

25   Q.   Do you have any reason to believe that that's not the

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

1   entity that was getting the management fees?

2   A.    No, I have no reasons to believe that, no.

3   Q.    Okay.  And those management fees were for apparently

4   "treasury-related functions, establishing and implementing

5   trading policy, client communications, research, marketing

6   and branding, government and public relations, technology

7   and other related administrative costs."

8         Did I read that correctly?

9   A.    Yes, you did.

10  Q.    Okay.  Client communications, clients are the CD

11  holders.  Right?

12  A.    Yes.

13  Q.    Okay.  In prior years, prior to '07, these management

14  fees were paid to either Stanford Group Company or Stanford

15  Financial Group.  Correct?

16  A.    I believe so, yes.

17  Q.    Okay.  Both of those were based in Houston, were they

18  not?

19  A.    You're challenging my recollection, Mr. Little.  I

20  think it was either -- one was certainly Houston.  I'm not

21  sure whether the other was Houston or St. Croix, but I think

22  you may be correct.

23  Q.    Okay.  I think actually Stanford Financial Group Global

24  Management was in the U.S. Virgin Islands.  Correct?

25  A.    That would make sense, yes.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 132

1    Q.    Okay.  Now, according to your exhibit, in 2008 the

2    management fees paid to Stanford Financial Group Global

3    Management, LLC, was $178,204,567.  Correct?

4    A.    That accords with my records, yes.

5    Q.    Yes.  In the prior year, that number was $142,699,711.

6    Correct?

7    A.    Correct.

8    Q.    Okay.  Now, SIB also paid referral fees relating to

9    the sales of the CDs, did it not?

10   A.    It did.

11   Q.    And those are also reflected on your exhibit, aren't

12   they?

13   A.    They are.

14   Q.    And in 2008 the bank paid referral fees, according to

15   your exhibit, of $157,744,094.  Is that right?

16   A.    That's not correct.  It's $157,744,904.

17   Q.    Okay.  I get a little dyslexic on the last couple

18   numbers here.  And in '07, the number was $149,025,410.

19   Correct?

20   A.    That's correct.

21   Q.    Okay.  So if my math in right, in 2008 Stanford

22   International Bank paid more than $335 million in management

23   fees and referral fees to Stanford entities based in the

24   United States.  Correct?

25   A.    Correct.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 133

1    Q.    For that same year, SIB's payroll expense was about

2    $3.5 million.   Correct?

3    A.    That'd be about right, yes.

4    Q.    So basically 1 percent of what it was paying in these

5    referral and management fees.

6    A.    That would be about correct.   I think the exhibit

7    shows the remaining expenses which should include payroll

8    were 2 percent.

9    Q.    Okay.   Now, there was a bunch of back and forth with

10   your colleague, Mr. Wide, about the dollars that have been

11   drawn down in the UK -- out of the UK and how all that's

12   working.

13        And so we all understand, thus far you and Mr. Wide

14   have drawn $10 million of the $20 million that has been

15   authorized by the court in the UK.   Correct?

16   A.    I believe that's correct, yes.

17   Q.    Okay.   Now, Mr. Wide talked a little bit about this

18   Serious Fraud Office watchdog that is supposed to be

19   monitoring your expenses.   How often do you-all submit

20   expense reports to the Serious Fraud Office?

21   A.    I'm not sure what you mean by expense reports,

22   Mr. Little.   Perhaps you would clarify.

23   Q.    Well, I'm not sure what I mean, either, because I'm

24   just going on what I heard from Mr. Wide.   But -- but I

25   heard from him for the first time that there is somebody at

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 134

1    the Serious Fraud Office who is looking at your expenses.

2    Is that correct?

3    A.   Yes.  At the risk of perhaps overanswering, we have

4    an obligation to report to the court and the Serious Fraud

5    Office on how we consume the money that we draw down.  So we

6    have to periodically report back on how that money is being

7    expended.  I believe that report is on a monthly basis.

8         And certainly prior to drawing down further increments

9    of money, we have to account for the monies already drawn.

10   Q.   Okay.  So as we sit here today, have you and Mr. Wide

11   submitted any of these reports to the Serious Fraud Office

12   and to the UK court with respect to what you have spent

13   this money on?

14   A.   I don't deal with that aspect of the case myself

15   directly, but I believe I have seen recently a communication

16   through our UK lawyers doing exactly that, Mr. Little, yes.

17   Q.   Okay.  Do you know what period of time the report was

18   for?

19   A.   I -- I couldn't comment without checking.  Sorry.

20   Q.   Okay.  To date, you and Mr. Wide have not filed any

21   applications with the Antiguan court for approval of any

22   of your fees or expenses, have you?

23   A.   We have not.

24   Q.   Okay.  Are you required to?

25   A.   I'm not sure to be honest as a matter of Antiguan law,

025147ba-a31c-4457-b73e-de48d28d06e2

Page 135

1   but we would certainly do so as a matter of policy.

2   Q.   Okay.  You understand that this Receiver, before he can

3   pay Mr. Sadler or any of his other professionals, files an

4   application in this Court, subject to scrutiny and objection

5   from all sorts of folks, myself included, and then subject

6   ultimately to the Court's approval before he can pay a dime.

7   You understand that that's how it works here.

8   A.   I believe that is the case in the United States, yes.

9   Q.   Now, y'all are not subject to that kind of approval

10  process, are you?

11  A.   I do not believe so in Antigua, no.

12  Q.   Okay.  You have in fact been paying legal fees to

13  Mr. Davis's firm and Mr. Kenney's firm and all these other

14  firms.  Correct?

15  A.   Indeed.

16  Q.   And you've in fact been paying fees to your firm, Grant

17  Thornton.

18  A.   Yes.  We've drawn payments on account against our fees.

19  Q.   Okay.  And how much has Grant Thornton been paid to

20  date?

21  A.   I would have to check, Mr. Little.  I believe it would

22  be approximately a million dollars.

23  Q.   Okay.  And how much is unpaid but owed?

24  A.   I -- I couldn't comment on that.

25  Q.   Okay.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

1   A.   I'd have to check my records.

2   Q.   Well, we heard some testimony earlier about burn rate.

3   What's your monthly burn rate right now?

4   A.   I couldn't tell you.

5   Q.   You have no idea?

6   A.   I have no idea.

7   Q.   Would Mr. Wide know that answer?

8   A.   Mr. Wide would know that answer, yes.

9   Q.   Okay.  I guess we should have asked him.

10      Are you ever required to seek the Antiguan court's

11  approval of your fees and expenses?  Or is it just done

12  in a backward-looking reporting sort of way?

13  A.   I -- I have to tell you I'm not -- I'm not familiar

14  with the fee approval process in Antigua.  I'd have to ask

15  my Antiguan counsel.  What I can tell you is that my firm as

16  a matter of policy always gets court approval for its fees.

17  Q.   But you haven't gotten approval for anything you've

18  been paid so far.

19  A.   No.  That's true.

20  Q.   So when do you -- when do you seek this approval?

21  A.   Periodically, Mr. Little.  There's no point in going

22  to court every five minutes to get approval for fees.

23  Q.   How about every three or four months?

24  A.   All I can do is contrast that with practice in other

25  jurisdictions I operate in the Caribbean where six months

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 137

1    to a -- to a year is more typical for a -- for an interim

2    period or, alternatively, when you feel you have drawn a

3    significant volume of fees.

4    Q.    Okay.  Okay.  Let's kind of switch gears now to the --

5    to the customer claims and how you-all are -- are dealing

6    with those or propose to deal with those.

7         You say in your direct testimony, I believe it's at

8    page 12, that the total amounts supposedly on deposit at the

9    bank in February of 2009 was approximately $7.25 billion.

10   Correct?

11   A.    Indeed.

12   Q.    Okay.  Now, you further say on that same page that

13   there's accrued interest included in that amount and that

14   that accrued interest has to be backed out.  Correct?

15   A.    Yes.

16   Q.    Okay.  And that interest is not recoverable by the

17   bank's investors.  Correct?

18   A.    We do not believe so, no.

19   Q.    Okay.  And -- and it's -- it's not recoverable because

20   it was fictitious.  Correct?

21   A.    We believe there was no basis for paying it, that's

22   correct.

23   Q.    And that's because there was a Ponzi scheme going on.

24   Correct?

25   A.    We're going to go into the definition of a Ponzi scheme

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 138

1    again.  I believe Ponzi scheme is an indefinite term.  I

2    think there's no dispute that there's a fraud going on.

3    Q.   Well, we've accomplished that.  Do you -- from your

4    investigation, have you determined that interest in

5    redemptions of CDs were being paid with new CD money?

6    A.   It's highly likely they were, Mr. Little, because

7    there's very little alternative income generated by the

8    Estate.  That's not to say there is none, which should be

9    the hallmark of a perfect Ponzi scheme, there's no external

10   income.  There are investments made by the company in

11   variety of assets which are being congenerative.  There's

12   obviously a considerable volume of fictitious assets as

13   well.

14   Q.   Yes.

15   A.   But, by and large, I would say it is true that people

16   who were repaid by the bank were repaid largely using other

17   people's money.

18   Q.   Right.  And that is what most folks view as a Ponzi

19   scheme, is it not?

20   A.   It is.

21   Q.   Okay.  I just want to be -- I want us all to be clear

22   here because I heard Mr. Wide say two very different things.

23   In August, the bank was a Ponzi scheme.  Today I heard him

24   say what I understood to be that the bank was a perfectly

25   fine little bank that was just getting its money stolen.

025147ba-a31c-4457-b73e-de48d28d06e2

1    Which is it?

2            MR. REDMOND:   We object.   That's a misstatement of

3    the prior testimony.

4            THE COURT:   Overruled.   The Court will recall the

5    prior testimony rather than Mr. Little's characterization.

6    Q.   (BY MR. LITTLE)   So was the bank part and parcel --

7    I'll rephrase the question.   Was this bank part and parcel

8    of a Ponzi scheme or is it a perfectly legitimate little

9    bank that was just having all its money stolen?

10   A.   I think the problem Mr. Wide is -- is having in

11   differentiating between Ponzi and fraud--I'm speaking for

12   Mr. Wide; I'm speculating, I suppose--is that -- is to draw

13   a distinction between whether or not there's any normal

14   banking activity versus simple wholesale Ponzi straight-

15   forward theft.   I mean, that's the problem.

16          I think neither myself nor Mr. Wide contest that this

17   is a fraudulent endeavor.

18   Q.   Okay.   There wasn't a whole heck of a lot of banking

19   activity outside of the CD sales in terms of dollar value,

20   was there?

21   A.   On the customer side, clearly there's a fair amount

22   of banking activity because there has to be an operation

23   to take money from all these depositors.

24          On the asset investment side, we are somewhat

25   handicapped by the fact that we can see the money leaving

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 140

1    the bank and going into Stanford Guaranty Company and

2    others, but whereforth it goes from there, we have yet to

3    complete our investigations into that.

4    Q.   That wasn't really my question so I'm going to try

5    again.

6    A.   I'm sorry if I misunderstood.

7    Q.   I wasn't trying to -- to contrast the taking of

8    deposits versus the management of the money once the bank

9    got it.  What I was trying to contrast was the amount of

10   business represented by the CD sales, which I understand

11   to be north of $5 billion.  Correct?

12   A.   I'm not entirely sure I understand your question.

13   Perhaps you can rephrase it.

14   Q.   Well, let -- let me go at this another way.  I believe

15   in your direct testimony or maybe it's in Mr. Wide's, one

16   or the other of you says that, over the course of a number

17   of years, some $10 billion float into this bank.

18   A.   Yes.  It's in my testimony, Mr. Little.

19   Q.   Okay.  I knew I -- I knew I read it somewhere.  Okay.

20   So of that $10 billion, that was almost entirely CD money,

21   was it not?

22   A.   Correct.

23   Q.   Okay.  Now, the amount of loans made as compared to

24   $10 billion in CD money was marginal, was it not?

25   A.   Yes, it was.

Linda J. Langford, CSR, RDR, CRR

Page 141

1    Q.    The amount of credit card transactions was marginal,

2    was it not?

3    A.    It would be a proportion of that, small proportion of

4    that.

5    Q.    A tiny little proportion.  Correct?

6    A.    Correct.

7    Q.    And the amount of accounts that were not CD accounts,

8    the dollars in those accounts, tiny proportion again.

9    Correct?

10   A.    Correct.

11   Q.    Okay.  And so all this other banking activity is really

12   just minuscule compared to the $10 billion that came in via

13   CD dollars.  Correct?

14   A.    That is correct.  I suppose you could also say, though,

15   that of the real assets that have been identified by both

16   Estates, we're probably looking at something in the region

17   of $550 million worth of realizable value which represents

18   real assets and investments made by the bank.

19         This comes back to my point about whether it's a pure

20   Ponzi scheme in which money is simply taken from people and

21   stolen --

22   Q.    Or a 99 percent one?

23   A.    Or 90 percent I think you would find is a more accurate

24   reflection.

25   Q.    Okay.  So this was at least 90 percent a Ponzi scheme.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 142

1    That's your testimony.

2    A.    Again, I hesitate to use the word "Ponzi scheme" simply

3    because I don't think it's a defined term.  I've already

4    agreed that the vast majority of -- of the activity appears

5    to be fraudulent and new monies are used to pay existing

6    depositors.

7    Q.    Okay.  And that's at least 90 percent of the business

8    of the bank.

9    A.    Yes.

10              MR. LITTLE:  Pass the witness.

11                      REDIRECT EXAMINATION

12   By Mr. Redmond:

13   Q.    Mr. Dickson, Mr. Little asked you in regard to your

14   investigation in regard to the CDs and other related

15   information at Stanford International Bank.  How long have

16   you been appointed as a Joint Liquidator at this point?

17   A.    Joint Liquidator, I was appointed in May 13th, I

18   believe.

19   Q.    And you took over for prior Joint Liquidators, Vantis,

20   that were removed, were -- were you not?

21   A.    That's correct, yes.

22   Q.    As part of your investigation in looking at the assets

23   of Stanford International Bank, were you able to -- did you

24   have substantial data from the prior liquidators that was a

25   benefit to you?

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

1   A.   Very little.

2   Q.   And why -- why was that?

3   A.   We didn't find any evidence of systematic investigatory

4   activity by them or wholesale actions to track down and

5   recover assets.

6   Q.   Mr. Dickson, when you are appointed liquidator in an

7   international cross-border fraud such as we have here, in

8   order to effectuate an accounting and recovery of assets,

9   is that a complex process?

10  A.   It can --

11              MR. LITTLE:  Leading.

12              THE COURT:  Overruled.

13              THE WITNESS:  It can be an extremely complex

14  process, yes.

15  Q.   (BY MR. REDMOND)  And how long have you been engaging

16  in this type of activities as a liquidator working on -- on

17  complex cases?

18  A.   In terms of offshore-orientated entities, six years.

19  Q.   In regard to determining the basic financial

20  information in regard to Stanford Bank -- Stanford Inter-

21  national Bank, what activities since your appointment have

22  you undertaken to try to reconcile the information in regard

23  to Stanford International Bank, such as the total CDs that

24  were bought, the total money paid out, and then effectuating

25  a tracing of the money that's unaccounted for?

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 144

1   A.   Well, we've utilized the bank's existing records

2   and gone through those and cleaned them up to provide an

3   accurate analysis of the customer and depositor base.

4        We have commissioned a forensic team to come and take

5   proper images of the -- of the bank's electronic records

6   and prepare a -- a forensic examination of the same.

7        And we've started going through the records of the bank

8   to try and identify the cash that's transmitted out of the

9   bank.  And to date I think we've, as I've indicated in my

10  testimony, identified some $10 billion coming in, 5.6 going

11  out, and we're now looking for the missing 4.4, if you like.

12  Q.   Mr. Dickson, have you conducted operations like this

13  before, trying to account and reconcile cases like this that

14  involve fraud?

15  A.   Indeed.  I'm currently involved in another very large

16  multibillion-dollar case in the Caymans with similar aspects

17  of missing assets and cross-border tracing involving in that

18  case, I think, some 11 jurisdictions.

19  Q.   Can you describe to the Court why you're undertaking

20  the investigation in regard to identification of the assets

21  that were -- excuse me, the CDs that were acquired, the

22  funds were paid out?

23  A.   I'm not sure I understand the question.

24  Q.   When you're appointed as a liquidator, do you try

25  to go through and construct a -- an accounting and a

025147ba-a31c-4457-b73e-de48d28d06e2

Page 145

1    reconciliation of what occurred as part of the -- the

2    fraud scheme?

3    A.   Yes.  I think we -- the reasons for our exercise is

4    twofold.  Firstly, we have to properly establish who the

5    creditors of the bank are because at some point in time

6    we'll have to run a claims process and deal with them

7    properly.

8         And the second aspect is to -- obviously to track down,

9    identify, and recover assets to maximize the Estate for the

10   benefit of those creditors.

11   Q.   And, Mr. Dickson, at this point, since your appointment,

12   you've been able to reconcile the gross sale of CDs.  Is

13   that correct?

14   A.   That is correct, yes.

15   Q.   And you've also been able, since your appointment,

16   to reconcile the amount paid out to CD holders.  Is that

17   correct?

18   A.   That is correct, yes.

19   Q.   And so you've got a delta then you've identified

20   between those two factors, the money going in and the

21   money legitimately going out.  Is that correct?

22   A.   Yes, and that's approximately $4.4 billion.

23   Q.   And so what kind of investigation are you undertaking

24   in regard to the $4.4 billion?

25   A.   We've identified some 65 banker's boxes of -- of

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 146

1   records relating to the swift transfer of monies out of

2   the bank, and we've started an examination exercise of

3   those records.

4        We're also running a forensic examination both of the

5   bank's electronic records, indeed its transfer records, to

6   better identify where the -- where that 4.4 billion went.

7   Q.   And, Mr. Dickson, do you think you have the records

8   available to conduct and determine where the 4.4 billion

9   went to?

10  A.   I couldn't say that with any complete confidence

11  because whilst we have the transaction records for all the

12  money leaving the bank and leaving the bank accounts in --

13  in Canada and the UK, we are somewhat handicapped by not

14  having the detailed access to records we believe held by

15  the SEC Receiver dealing with the investment of the monies

16  that were misappropriated from the bank.

17  Q.   So is the benefit of the protocol that may be

18  established between the Receiver and the Joint Liquidators

19  to share this information, to put the information together

20  to reconcile and obtain a complete accounting of where the

21  funds went?

22  A.   I think that's absolutely essential, yes, on -- on both

23  counts.  Firstly, we clearly have, I believe, far better

24  access to records on who the claimants are, the creditors

25  are, to deal with the claims process.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

1          Secondly, whilst we can identify some $4.4 billion of

2     monies leaving the bank, which includes the 1.3 billion

3     in management fees and referral fees, we don't have the

4     comprehensive records to track down where that money went.

5     And clearly it's either been expended legitimately, lost

6     in trading activities or speculation, or stolen.

7          And -- and to recover the -- to maximize the Estate

8     for the benefit of the creditors, we have to determine

9     where the money went.

10    Q.   Okay.  To the extent that your investigation of the

11    4.4 billion is completed, may that show the source of other

12    funds that are held by third parties and may be able to be

13    recovered for the benefit of victims?

14    A.   Potentially, yes.  We have already during the limited

15    period we have been in office managed to track down some

16    monies in Panama, for example, and recovered those sums.

17    Q.   And what's your estimation of, if you have one,

18    as to how long this process will take to effectuate a

19    reconciliation of the overall funds that went through

20    Stanford International Bank?

21    A.   That's an extremely difficult question to answer

22    without having a complete population of records.  But

23    it's going to be a lengthy process, and that's for sure.

24    Q.   Would six months to a year be a reasonable time period

25    at least to --

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 148

1    A.    At least, with access to records and the ability to

2    interrogate those records in a sensible and coherent form.

3    We're talking about a considerable volume of transactions

4    after all with $4.4 billion.

5    Q.    Mr. Little addressed the issue of -- of how different

6    accounts were held at Stanford International Bank in regard

7    to residents' address, et cetera.  Can you explain what

8    your investigation has shown about how the information was

9    kept at Stanford International Bank to identify who the

10   depositors are and where their primary location is?

11   A.    Yes.  The bank's -- the bank's records contain fairly

12   comprehensive in banking parlance Know Your Client, KYC,

13   records, which will identify individuals and ultimate

14   beneficiaries of the accounts right down to copies of

15   identification documentation, such as passports, IDs, that

16   sort of thing.

17        And the individual customer records, therefore,

18   contains details not only of the identity of the customer,

19   but they will contain additional information relevant to

20   that customer, such as the financial advisor that sold him

21   the CD and indeed mailing addresses, contact details, that

22   sort of thing.

23        And on top of that, we'll have the transaction records

24   for -- for each client, and so you can go back and look at

25   the client's balance, what monies they paid in, what monies

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

 1   they received.

 2   Q.    Is there a file for each depositor?

 3   A.    There is.

 4   Q.    And in the United States, Know Your Customer isn't a

 5   familiar term.  Is that legislation generally in the British

 6   jurisdiction?

 7   A.    I'm not sure it's generally in the British jurisdiction.

 8   It's extremely common in offshore jurisdictions.  It forms

 9   part of anti-money laundering laws common to I think just

10   about every jurisdiction these days.

11   Q.    Were you able to determine in your investigation

12   whether Stanford International Bank complied with the

13   Know-Your-Customer regulations?

14   A.    As far as we can see, yes, it did.

15   Q.    And you've personally reviewed some of the depositor

16   files to understand the scope and the makeup of how that's

17   structured?

18   A.    A small selection.  Clearly I don't look at 21,738

19   files, but we have a very large filing room in the bank

20   which for each customer has a sling or a document folder in

21   that -- in that room.  And picking some at random and going

22   through them, they seem to be fairly comprehensively

23   completed.

24         On top of that, we have a database of all the customers

25   which can be interrogated.  And if you access that at

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 150

1    random, you'll see fairly given customer all the necessary

2    information you need to identify their identities is there.

3        I think, as I commented on my revised testimony, we

4    have some hiccups in that process in relation to deposits

5    that are held through corporate entities or trusts.  But we

6    have now managed to resolve most of those problems.

7        We're now down to some 500-odd accounts that we can't

8    positively yet identify the ultimate beneficiary without

9    going back to the manual record.  If we identify the manual

10   records, I'm sure we'll get that.

11   Q.   In your supplemental affidavit, you address Stanford

12   Trust Company.  Can you describe for the Court what Stanford

13   Trust Company was and what purpose it served in regard to

14   Stanford International Bank?

15   A.   Stanford Trust Company is a company that sets up and

16   managed, if you like, trusts for customers who wanted to

17   make investments via a -- a trust.  So it is a company

18   management company, if you like, supervising the activities

19   or overseeing or acting as trustee on a large number of

20   trustee accounts opened by depositors.

21   Q.   And going through those individual files will allow

22   you to determine who the principal in regard to that trust

23   is and their principal location.  Is that correct?

24   A.   That is correct.  In fact, that's the reason for the

25   revisions to my testimony.  We recently completed, within

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 151

1    the last 24 hours in fact, an analysis on exactly those

2    lines where we managed to identify ultimate customers who

3    were largely Latin American-based.

4    Q.    In your -- in your investigation of the database of

5    CD holders, has your investigation produced any results

6    in which CD -- existing CD holders or actually CD holders

7    were actually shown to have a zero balance?

8    A.    Indeed, and we have found some negative balances as

9    well, perhaps surprisingly enough.

10   Q.    And do you have any estimation for the Court of how

11   many individuals either had a zero balance or negative

12   balance?

13   A.    I'd have to go back to my records, but from -- from

14   recollection, it's approximately 4- or 5,000 accounts fell

15   into that category.

16   Q.    And as a result of your review at this point from the

17   books and the records of Stanford International Bank, you

18   and Mr. Wide, will you be able to establish a -- an accurate

19   and valid claims base of -- of what depositors are owed by

20   Stanford International Bank?

21   A.    We believe so, yes.  The difficult element is going to

22   be reversing out the interest.  That's going to be quite a

23   complex accounting exercise which might take some time.  But

24   we are absolutely confident we can identify the claimants.

25   Q.    Okay.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 152

1        THE COURT:  We are right at lunchtime.  How are

2    you looking at time?

3        MR. REDMOND:  It would probably be appropriate

4    to -- to recess at this point, Your Honor.

5        THE COURT:  Okay.  My quick back-of-the-envelope

6    accounting here shows the Joint Liquidators using 82 minutes

7    and the other side--I'm not quite sure what to call them

8    all--the other side, using 108 minutes.  And if it's three

9    and a half hours per side, that's a budget of 210 total.

10   So we're more or less where you'd expect to be.

11       So we'll see you-all back at 1:30.

12       MR. REDMOND:  Thank you.

13       (Lunch recess taken.)

14       THE COURT:  Be seated.

15       Mr. Dickson, come on up, please.

16       I think we'll take a short break around 3:00 and then

17   a little bit of a longer break around 4:30, 4:30-ish,

18   3:00-ish, but somewhere in that vicinity.  But I don't think

19   I can go the whole stretch with just one break.  So we'll

20   try to do a shorter one and then a longer one.

21   Q.   (BY MR. REDMOND)  Mr. Dickson, when we were -- we

22   broke, we were discussing your investigation in regard to

23   Stanford International Bank.

24       In tracing and trying to account for assets that have

25   been unaccounted for at this point, is one of the aspects

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 153

1    that can be accomplished with that is also identification

2    of different causes of action that may arise because of the

3    investigation that you conduct?

4    A.    Indeed.  It'd be fairly typical in a case involving

5    fraud or embezzlement to look for potential causes of action

6    against parties who may have aided or abetted the fraud.

7    Q.    And who -- as an example from your experience, what --

8    what individuals or activities would that encompass?

9    A.    Well, typically in the offshore financial services

10   industry, you'd be looking at the auditors and the admini-

11   strators or managers of the fund, and sometimes also the

12   bankers that handle the cash.

13   Q.    If those causes of action would arise outside the

14   United States, would a U.S. Receiver be able to initiate

15   actions in the overseas jurisdictions?

16   A.    Well, I can't --

17          MR. LITTLE:  Your Honor, this sounds a whole lot

18   like legal expert testimony as to what a receiver can do

19   in an unidentified foreign jurisdiction.  I object.

20          THE COURT:  Sustained.

21   Q.    (BY MR. REDMOND)  As a Joint Liquidator to bring these

22   actions, do you have standing?

23   A.    I believe we have standing in Switzerland, United

24   Kingdom.  We're seeking standing in Canada.  At the moment

25   we have limited recognition in Canada.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 154

1    Q.    And have you been involved in prior proceedings in

2    obtaining recognition as a joint liquidator?

3    A.    Other than this case?

4    Q.    No, in other cases.

5    A.    Yes, in a number of cases.

6    Q.    And you understand the procedure to effectuate that

7    process?

8    A.    I do.  I think I'm currently recognized in about six

9    jurisdictions.

10   Q.    And insolvency practitioners, it's a requisite,

11   provisions are set out, can be recognized in -- in foreign

12   jurisdictions.

13   A.    I'm sorry.  Could you repeat that question?

14   Q.    Yes.  Yes.  Joint liquidators in insolvency

15   proceedings, is it generally possible to be recognized

16   in different jurisdictions?

17   A.    It depends on the jurisdiction, but by and large, yes.

18   Q.    As part of your investigation in regard to Stanford

19   International Bank, did you go back and determine how long

20   the bank had actually been operating in Antigua?

21   A.    We did.  To be honest, I can't remember the exact date.

22   It was sometime in the nineties when the bank transferred

23   to Antigua from Montserrat where it had been previously

24   established.

25   Q.    So the bank itself was operating for approximately

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 155

1   18 years before all these -- 18, 19 years before the events

2   regarding the shutdown occurred?

3   A.   As I said before, I can't remember the exact date, but

4   it's certainly in excess of ten years, yes.

5   Q.   And during that period was it always known as Stanford

6   International Bank?

7   A.   I believe it was originally known as Guardian Bank, and

8   it changed its name to Stanford International Bank at some

9   point.

10  Q.   And during that 19 period -- 19-year period, was

11  it located -- was Stanford International Bank or its

12  predecessor Guardian Bank located in Antigua?

13  A.   I'm not sure I understand that question, either.  I'm

14  sorry.

15  Q.   I'm sorry.  I'll be glad to restate it.  During the 19

16  years, 18, 19 years that the bank was operating either as

17  Guardian Bank or as Stanford International Bank, were its

18  headquarters always in Antigua?

19  A.   As I said, I can't remember the exact date it relocated

20  from Montserrat to Antigua, but it had been in the early

21  nineties.  So your time estimate, I would presume, is

22  correct or very nearly correct.

23  Q.   Is there any indication that the bank was engaged in

24  any kind of fraud scheme during the entire 18-year period?

25  A.   If you look at the pattern of activity of the bank's

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 156

1    accounting, there seems to be a substantial uptick in the

2    volume level of the activity towards '99, 2000, 2001.

3         When we decided to do our cost-back exercise, look

4    at how much money had been extracted -- extracted from

5    depositors, we chose to go back as far as 2001.  Prior

6    to that point in time wasn't nearly the same volume of

7    activity going on.

8    Q.   And so there may have been a period of time that

9    Stanford International Bank was operating as a fully

10   legitimate bank.  Is that correct?

11   A.   It's possible.  I couldn't possibly comment on it.

12   Q.   Okay.  And you won't be able to really make that

13   evaluation until you complete your investigation?

14   A.   To make that evaluation, I would have to go back and

15   look at the records dating back 19 years activity and

16   look at the evidence of assets and the -- the pattern of

17   activity that far back.  We haven't done that so far.

18        I'm not entirely sure how it's germane to our duties

19   to engather the Estate and deal with the creditors that we

20   currently have, frankly.

21   Q.   Mr. Little provided you with a copy of Exhibit BJ-1,

22   and do you have that still in front of you?

23   A.   I do.

24   Q.   Can you identify what that document is?

25   A.   The cover states that it's the Stanford International

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

1    Bank Annual Report for 2007.

2    Q.   Did Stanford International Bank from your investigation

3    prepare reports on an annual basis?

4    A.   It did, yes.

5    Q.   And from your investigation, were these reports

6    submitted to the CD holders?

7    A.   I'm not aware of whether they were or not.  I assume

8    they would be, however.

9    Q.   Okay.  And what's the purpose of an annual report

10   being issued by a financial institution?

11   A.   The annual report obviously is meant to show the

12   financial position of the bank and then its -- and its

13   performance.  It has a variety of uses, one of which would

14   be to reassure its customers that it was a solvent institu-

15   tion and was performing and capable of, you know, repaying

16   them their money, frankly.

17   Q.   And what's the scope of information that an annual

18   report is supposed to -- supposed to convey either to the

19   bank's creditors or the depositors?

20   A.   Well, there will be regulatory restriction on what an

21   annual report should contain.  Depending on jurisdiction,

22   there'd be varying requirements for disclosure of informa-

23   tion, but typically at a minimum you'd be required to show

24   the financial position which would be the balance sheet

25   showing the assets and liabilities of the bank in summary

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

1    form, its cash flow and its profitability, its profit and

2    loss account or its income statement.

3         There would generally be then some detailed notes to

4    the accounts which would indicate amongst other things

5    the accounting policies and the nature of the assets and

6    particular accounting entries and then usually a descrip-

7    tion of the operations of the bank, what the bank, you

8    know, basically did as a business and how it proceeded

9    during the year.

10   Q.   If a depositor or a CD holder wanted to have one

11   document the bank issues on a yearly basis to determine

12   its financial condition, would the annual report be such

13   a document?

14   A.   Yes.

15   Q.   Could you turn to page 16 of Exhibit BJ-1, which

16   there's two numbers at the bottom of the page.  It's

17   either 16 is the report itself or it shows BJQ&A 57.

18   A.   I'm looking at page 16 of the exhibit.

19   Q.   And is that the note 3, risk financial -- or note 3,

20   Financial Risk Management?

21   A.   No, it is not.  Page 16 of the exhibit has note 2.6,

22   and it's marked BJQ&A 54.

23   Q.   Okay.  Let's go to page 57 at the bottom, Q&A.

24   A.   Sorry.  Which was the note number you're looking for?

25   Q.   3.3.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 159

1    A.    Yes, that's on the bottom of page 19 of the exhibit.

2    Q.    Okay.  And could you read the second paragraph of what

3    note 3.3 says?

4    A.    "Antigua and Barbuda, West Indies, is the Bank's domi-

5    cile.  The Bank has also maintained a representative office

6    in Montreal, Canada, since December 2004.  The Bank has in

7    excess of 50,000 depositors and clients from more than one

8    hundred countries around the world.  The Bank's certificates

9    of deposit and other investment accounts are primarily

10   denominated in U.S. dollars, British pounds/sterling, euros,

11   and Canadian dollars."

12   Q.    Would such a note as 3.3 be contained in each of the

13   annual reports for the various years?

14   A.    I can't say I have read every single annual statement,

15   but I assume so, yes.

16   Q.    Okay.

17   A.    I should add to that comment that I see the note is

18   headed Geographical Concentrations of Assets, Liabilities,

19   and Off-Balance Sheet Items.  As such, this is disclosure

20   note on -- and would be a typical recurring disclosure

21   notes in a set of financial statements.

22   Q.    Okay.  So these are the typical information that

23   is provided to depositors and CD holders in a financial

24   statement such as this?

25   A.    Yeah.  Amongst others, yes.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 160

1   Q.   Okay.  Mr. Dickson, you related earlier that, in regard

2   to your evaluation of Stanford Trust Company, that you're

3   able to identify the holders and residences, the primary

4   address, of the individuals who had the Stanford Trust

5   Company structures.  Is that correct?

6   A.   Yes.

7   Q.   And were you able to determine how many holders or

8   what percentage of holders were from the United States in

9   regard to Stanford Trust Company?

10  A.   From recollection, there were none.

11  Q.   I'm sorry?

12  A.   None.

13  Q.   And in evaluating the CD holders of Stanford Inter-

14  national Bank with this additional information, did you

15  then factor in the -- the Stanford Trust Company factors

16  to look at those two in a joint fashion?

17  A.   Yes, I did.  I was conscious that my original written

18  direct testimony showed a significant proportion of Antiguan-

19  based creditors which were based on allocating Antigua as

20  the domicile or point of origin of Antiguan trusts shown

21  under STC.  There were some 2,600 accounts.

22       So I determined that it would be appropriate, using

23  the new information available, to reallocate those to the

24  appropriate jurisdictions in which the customers were

25  actually based.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 161

1   Q.   What did that information, that consolidated informa-

2   tion that you recently prepared, show in regard to holders

3   of accounts in the United States?

4   A.   There were no holders in the United States of STC-

5   related Antiguan trusts at all.  In going through the STC

6   records, we did detect a few errors in the -- the SIB

7   records.  And so in adjusting the numbers, we actually

8   marginally reduced the number of American depositors, but

9   it was by a small amount, less -- certainly less than one

10  percent of the distribution.

11  Q.   Okay.  So if you reduced the amount of individuals

12  from Antigua and Barbuda, where -- where do those -- where

13  do those accretions go if -- if Antigua was reduced?

14  A.   The vast majority of them turned out to be Venezuelan,

15  Mexican, or Colombian depositors.

16  Q.   Okay.  And so the percentages the United States made

17  about the same then with these additional calculations?

18  A.   Yes.  As seen on the -- in my additional testimony,

19  that the percentages by -- by head count and by deposit

20  value of the United States reduced marginally.

21       The percentages for Latin American countries increased

22  significantly.  From recollection, without looking at my --

23  my testimony, I believe there was an 11 percent movement

24  in head count from Caribbean area to Latin America and a

25  16 percent value movement.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 162

1        So, for example, again speaking from memory, I believe

2    the -- the original testimony indicates some 43 percent

3    of the depositor value is originally thought to be Latin

4    American and that it went up to some 59 percent.

5    Q.    So 59 percent of all CD holders were from Latin

6    America?

7    A.    Indeed.

8    Q.    And what was the percentage from the United States?

9    A.    From recollection, approximately 15 percent by value --

10   sorry, by -- by head count and 22 percent by -- by number.

11   Q.    Okay.

12        MR. REDMOND:  Your Honor, I have no further

13   cross-examination at this time.  For the record, though, I

14   would like to make sure that the prior exhibits that we've

15   tendered and the testimony we've tendered has actually been

16   admitted into evidence.  I'm not sure if the Court has made

17   a specific ruling on that issue.

18        THE COURT:  The testimony, yes.  The exhibits I

19   think we probably want to chat a bit about.  If both sides

20   are going to accept the other's wholesale, that's fine.  If

21   you-all think you need an opportunity to file objections

22   and have me rule on them, that's fine, too.  I just need to

23   get a clear understanding of collectively what the ground

24   rules are.

25        MR. REDMOND:  Yes.

Linda J. Langford, CSR, RDR, CRR

Page 163

1        MR. SADLER:  And our view is we're willing to

2   accept all the paper that they want to offer obviously if

3   it's reciprocal so that we don't bog down the Court with

4   exhibit objections.  That's how we'd be happy to proceed.

5        MR. REDMOND:  Well, Your Honor, we have made

6   offers to admit the various exhibits into evidence from

7   each of the parties.  And if the Receiver has an objection,

8   it would be appropriate to hear that so we could then

9   address those.

10        THE COURT:  I think I'll probably -- if you want

11   to do objections, I'll deal with those after the fact.

12        MR. REDMOND:  Okay.

13        MR. SADLER:  Thank you, Your Honor.

14        MR. REDMOND:  Thank you, Your Honor.  Pass the

15   witness, Your Honor.

16        MR. DAVIS:  Your Honor, we call Beverly -- oh,

17   I'm sorry.  I'm sorry, John.

18        MR. LITTLE:  That's fine.  I don't sneak up

19   anywhere, really.  I'm not very good at sneaking up.

20                    RECROSS EXAMINATION

21   By Mr. Little:

22   Q.   Mr. Dickson, just a new final questions.  First,

23   Mr. Redmond asked you about whether you were aware of any

24   evidence that Stanford International Bank was involved in

25   a fraud or illegal activity going back to when it first

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 164

1   moved over to Antigua.  Do you recall his question?

2   A.   I do.

3   Q.   You're aware, are you not, that Mr. James Davis has

4   pled guilty in the criminal proceedings against him in

5   this case?

6   A.   I am.

7   Q.   Have you seen his guilty plea?

8   A.   I have not.

9   Q.   Okay.  Mr. James Davis was the CFO of Stanford

10  International Bank.  Correct?

11  A.   I understand that's the case, yes.

12  Q.   Okay.  And you understand that he has said in his

13  guilty plea that the bank was a Ponzi scheme from day one,

14  do you not?

15  A.   I have not seen his guilty plea.

16  Q.   Okay.  Let me ask you to look back at that -- that

17  exhibit that Mr. Redmond was just asking you about, the

18  BJ-1, and go right back to that page 19 that y'all were

19  looking at.  This is the 2007 statement of Stanford

20  International Bank.  Correct?

21  A.   Yes.

22  Q.   The entire thing is a lie, is it not?

23  A.   I'm not sure you could say the entire thing is a lie.

24  Clearly, there's a massive misrepresentation of the finan-

25  cial position of the bank.

025147ba-a31c-4457-b73e-de48d28d06e2

Page 165

1   Q.   Well, let's start with Financial Risk Management, the

2   first thing they say.   "The strategy of the Bank is to

3   efficiently manage its assets and liabilities.   In this

4   process, assets primarily consist of securities and, to a

5   lesser degree, client credits that are matched in premium

6   and timing."

7        That's a lie.   Right?   Your investigation tells you

8   that's a lie.

9   A.   Yes.   Certainly the bank did have some securities and

10  investments, but I saw no evidence of matching --

11  Q.   Let's go to the next paragraph.

12  A.   -- of assets to clients, and indeed we believe that the

13  assets are overstated.   So there is no inherent matching.

14  Q.   Let's go to the next paragraph.   "The Bank's investment

15  portfolio maintains a stable and well-balanced structure

16  due to a high proportion of fixed-income investments and

17  a diversified investment advisory network resulting in an

18  optimum diversification process."

19       That, too, is a lie, is it not?

20  A.   Yes.

21  Q.   But we're supposed to believe the little bit down here

22  about domicile and everything else when the whole page is a

23  lie.   Right?   That's your testimony.

24  A.   I think it's quite one thing to point to individual

25  items and say whether or not they are lies.   You can't

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 166

1    extrapolate from that to say the entirety of the document

2    is necessarily a lie.  And the point of its domicile is a

3    matter of fact, not a matter of invention.

4    Q.    Turn over to page 21, if you would.  Either you or

5    Mr. Wide has said in your direct, I don't recall which one,

6    but you have talked some about the outstanding loans the

7    bank had to Mr. Stanford.  You're aware of those.  Right?

8    A.    I understand that the Receiver believes it's some

9    1.8 billion of loans.  I have seen no evidence of that.

10   Q.    You have seen no evidence of those loans?

11   A.    No, because we have very limited information at the SIB

12   level of what STC did with the money that it extracted from

13   the bank.

14   Q.    Oh.  So you think Mr. Stanford borrowed the money via

15   STC, is what you're saying?

16   A.    No.  I'm saying I have no direct evidence and am not

17   in a position to comment on whether Mr. Stanford borrowed

18   any money or not.

19   Q.    Okay.  If you'd look at the Concentration of Assets,

20   Liabilities, and Off-Balance Sheet Items--it's up there at

21   page 21 of 27--do you see that?

22   A.    Sorry.  Whereabouts are you on the page?

23   Q.    The chart there, Concentration of Assets, Liabilities,

24   and Off-Balance Sheet Items?

25   A.    The table, yes, I have that.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 167

1   Q.   That entire chart is a fabrication, is it not?

2   A.   Not in its entirety, no.

3   Q.   Okay.  Tell me what part of it isn't.

4   A.   There is cash and deposits with other banks.  We

5   have -- clearly we have some $350 million of assorted assets

6   across a variety of jurisdictions.  Those would include

7   cash, financial securities in forms of equities, and hedge

8   fund investments, and investments in land, amongst --

9   amongst others.

10  Q.   Okay.  How about that 4,755,000,000 number in financial

11  instruments at fair value?  That's a lie, isn't it?

12  A.   Again, we would have some financial instruments but

13  nowhere near that -- that quantity, no.  The true --

14  Q.   Not even within 90 percent of that quantity.  Correct?

15  A.   Not even within 90 percent of the quantity, correct.

16  Q.   Let me close with a couple of -- you talked a little

17  bit with Mr. Redmond about the protocol that the Joint

18  Liquidators proposed.  Is there any reason today that Mr.

19  Janvey couldn't agree simply to let the Joint Liquidators

20  have access to information that he has available without

21  Chapter 15 recognition?

22  A.   Well, that would be for Mr. Janvey.  I know of no

23  reason why he shouldn't provide that information, no.

24  Q.   As far as you know, he can do that.

25  A.   As far as I'm aware, he could, yes.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 168

1    Q.   Okay.  Is there any reason today that you and

2    Mr. Wide can't go to the court in Antigua and ask that

3    court to allow you to give Mr. Janvey information without

4    Chapter 15 recognition?

5    A.   I believe that would be possible, yes.

6    Q.   Okay.  Now, the protocol talks about the courts talking

7    to each other and all this.  There's kind of a problem with

8    that, though, isn't there?  Antigua doesn't recognize the

9    Model Law on Cross-Border Insolvency, does it?

10   A.   It does not.

11   Q.   It doesn't have UNCITRAL rules.

12            MR. REDMOND:  Your Honor, the UNCITRAL Model Law

13   is a legal document.  This calls for a legal conclusion on

14   the part of this witness.

15            THE COURT:  Sustained.

16   Q.   (BY MR. LITTLE)  You have been practicing in the area

17   of insolvency in the Caribbean for the last how many years?

18   A.   Six.

19   Q.   Okay.  And you are familiar with the various juris-

20   dictions and how they approach the Model Law and the

21   UNCITRAL rules.

22   A.   A number of them, yes.  Not all of them, of course,

23   approach the Model Law UNCITRAL, and I think I have a

24   fairly good understanding of how they approach the concept

25   of recognition, however.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 169

1    Q.    And the fact is, in the original order rejecting Mr.

2    Fundora's petition to appoint Mr. Wide and rejecting Mr.

3    Janvey's attempt to get recognized, the Antigua court says

4    Antigua does not recognize the UNCITRAL rules and we do not

5    have an equivalent to Chapter 15 recognition.  Isn't that

6    correct?

7    A.    I have not seen that order.

8    Q.    Okay.

9              MR. LITTLE:  Nothing else, Your Honor.

10             THE COURT:  Thank you, sir.  You may step down.

11             MR. DAVIS:  Now, Your Honor, we would like to call

12   Beverly Jacobs to the stand.  And, Your Honor, we will not

13   be calling Omari Osbourne to the stand.

14             THE COURT:  Could you raise your right hand,

15   please?

16        (The witness was sworn by the Court.)

17             BEVERLY MARIA ANN JACOBS, SWORN,

18                  DIRECT EXAMINATION

19   By Mr. Davis:

20   Q.    Can you state your name for the Court, please?

21   A.    Beverly Maria Ann Jacobs.

22             MR. DAVIS:  Your Honor, we hereby move Ms. Jacobs'

23   direct testimony and all the exhibits attached thereto into

24   evidence and tender her for cross-examination.

25             THE COURT:  All right.

025147ba-a31c-4457-b73e-de48d28d06e2

Page 170

1                         CROSS EXAMINATION

2    By Mr. Little:

3    Q.   Ms. Jacobs, tell the Court what your last job was

4    before the bank closed down.

5    A.   I was Vice President of Customer Support.

6    Q.   And customers are the -- the depositors, the CD

7    holders. Correct?

8    A.   Correct.

9    Q.   Okay.  Now, typically new customers would be presented

10   to the bank through a financial advisor.  Correct?

11   A.   Correct.

12   Q.   Okay.  And that financial advisor was the person

13   who would meet with the customer, prepare the necessary

14   paperwork, and forward that paperwork to the bank for

15   processing.  Right?

16   A.   Correct.

17   Q.   Okay.  If you would turn to tab 1 in that notebook.

18   That's an account application form.  Correct?

19   A.   Yes, it is.

20   Q.   Okay.  And that is an example of the form that a

21   financial advisor would fill out with a new customer in

22   order to start the process of opening an account at the

23   bank.  Correct?

24   A.   That is right.

25   Q.   Okay.  The next tab, tab 2, your Exhibit 5, that's a

Linda J. Langford, CSR, RDR, CRR

Page 171

1    signature card from the bank.

2    A.   Yes, it is.

3    Q.   Uh-huh.  And that signature card is another document

4    that a new customer, sitting with his financial advisor in

5    the United States or Venezuela or Colombia or Mexico or

6    Panama or somewhere, would fill out and the financial

7    advisor would send it on to the bank.  Correct?

8    A.   Yes.

9    Q.   Okay.  At tab 3, if you'd look at that, please, there

10   are three different forms in there that are titled due

11   diligence reports of varying kinds.  Correct?

12   A.   Yes.

13   Q.   And I know you were sitting here while Mr. Dickson was

14   testifying.  He talked some about Know Your Customer forms?

15   A.   Yes.

16   Q.   Did you hear that?

17   A.   Yes.

18   Q.   This due diligence report is that Know Your Customer

19   form, is it not?

20   A.   Yes, it is.

21   Q.   Okay.  And this form was to be completed by the

22   financial advisor.  Correct?

23   A.   Yes, having interviewed the -- the client.

24   Q.   Right.

25   A.   Uh-huh.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 172

1    Q.   But he didn't just hand this to the client.  The actual

2    financial advisor filled this thing out and sent it into the

3    bank.  Correct?

4    A.   Yes, he would have.

5    Q.   Uh-huh.  Okay.  Now, let's look now over to tab 4, your

6    Exhibit 8.  This is titled SIBL Addendum.  SIBL is Stanford

7    International Bank, Ltd.  Correct?

8    A.   Yes, it is.

9    Q.   Okay.  This is yet another form that the financial

10   advisor would fill out with respect to a new customer in

11   order to process the paperwork and send it on to the bank.

12   A.   Correct.

13   Q.   Okay.  Let me ask you to turn to tab 5.  I want to

14   spend a little bit more time on that form than we have

15   on these other ones.  This is an online access service

16   application for the bank.  Correct?

17   A.   That is right.

18   Q.   And this is a form that would be filled out so that

19   a customer could access their account information via

20   internet.  Right?

21   A.   Correct.

22   Q.   Okay.  And in your direct testimony, you highlight

23   for the Court, and you can -- you can follow along with

24   me, it's page 31 of your direct testimony --

25   A.   Uh-huh.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 173

1    Q.   -- you highlight for the Court the fact that there is a

2    client service telephone number in Antigua that a customer

3    could call if they have technical difficulties with their

4    online access.  Is that right?

5    A.   That is right.

6    Q.   Okay.  Now, let's look at a couple other aspects of

7    this form.  First, at the very top, it makes it clear where

8    it says "to apply," are you with me there on the first page

9    of the form, to apply?

10   A.   Not there yet.

11   Q.   Let me see if I can help you out here.

12   A.   Yes, I'm here.  Uh-huh.

13   Q.   Here we go.  To apply, the investor needs to provide

14   the information requested and return the executed form to

15   the bank via the financial advisor.  Correct?

16   A.   Yes.

17   Q.   Couldn't send it straight to the bank.  Had to go to

18   the financial advisor.

19   A.   No, not necessarily.  You could have sent it directly

20   to the bank as well.

21   Q.   Okay.  But the instruction says give it to the --

22   A.   Yes.

23   Q.   -- financial advisor.  Okay.  Now, it says again, I

24   think a little later down in the document, that you need to

25   give the document to the financial advisor, right there at

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 174

1   the bottom, "This Agreement contains terms and conditions

2   that apply and constitute an agreement regarding your

3   participation in SIB-Direct.  By executing this Agreement

4   and sending it to your financial advisor, you agree...."

5        Do you see where I'm reading from?

6   A.   I see that, yes.

7   Q.   Okay.  Now, if we turn to the top of the second page,

8   you talk about -- your direct talks about needing technical

9   assistance.  But here on the second page, the customer is

10  instructed to "contact your Financial Advisor immediately

11  if you suspect an unauthorized person has knowledge of

12  your online password, or if you think your account has been

13  compromised in another manner."  Correct?

14  A.   I see that, yes.

15  Q.   It goes on to say that you not only have to telephone

16  your financial advisor, but you have to immediately send

17  the financial advisor a letter about this problem.  Correct?

18  A.   Yes, that's -- that's right.

19  Q.   It doesn't say bank.  It says financial advisor.

20  A.   Yes, correct.

21  Q.   Okay.  Now, moving down a little bit further, the

22  heading User ID and Password --

23  A.   Yes.

24  Q.   -- the form says, "Upon receipt and validation of this

25  executed Agreement, your Financial Advisor will provide you

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 175

1    with the website address."  So the bank doesn't even send

2    the customer the web address.  The financial advisor does

3    that.  Correct?

4    A.   That's what it says here, yes.

5    Q.   And that's how it worked.  Right?  It not only says

6    that, but that's how it actually worked.

7    A.   Not entirely so upon my recollection.  Once a customer

8    submitted -- and I'm not trying to get ahead of you, but

9    once this form came in and signature was verified and it was

10   appropriate to go ahead and -- and process the application,

11   then the password would have been sent via e-mail directly

12   to the client.

13   Q.   The password would have been sent.

14   A.   Yes.

15   Q.   But not the web address.

16   A.   I cannot recall completely if the web address was

17   included --

18   Q.   Okay.

19   A.   -- in that e-mail.

20   Q.   The form tells us --

21   A.   It may have been, but --

22   Q.   -- the answer to that.

23   A.   Okay.

24   Q.   The form tells us the financial advisor is getting

25   that.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 176

1   A.    Sure.

2   Q.    Okay.  And then, finally, on the bottom of page 3, of

3   course, we require the financial advisor to sign off on the

4   form, do we not?

5   A.    Yes.

6   Q.    Okay.  Now, let's turn to, if you would, to tab 6,

7   which is your Exhibit 16.  And this isn't a very good copy

8   that I have.

9   A.    Okay.

10  Q.    But down at the bottom, I see what appears to be a

11  signature line for the financial advisor.

12  A.    Yes.

13  Q.    Okay.  So the financial advisor has to sign off on the

14  loan request.

15  A.    Not necessarily.  It's there as an acknowledgment that

16  the financial advisor is aware that the referral is asking

17  for a loan.

18  Q.    Okay.  And typically when clients and customers asked

19  for loans, did they typically go through their financial

20  advisor?

21  A.    Yes, their request would have been -- well, could have

22  been sent via the financial advisor.

23  Q.    Okay.  Okay.  Let's talk a little bit about the extent

24  to which actual CD customers had contact with the bank.

25  From year to year, some folks did actually come to the bank

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 177

1    to transact business.  Correct?

2    A.   Yes.

3    Q.   Okay.  And if I recall your direct correctly, when the

4    bank was first put into I guess -- when the bank proceeding

5    was first started, Mr. Hamilton-Smith, Mr. Wastell were

6    appointed, you went from an employee of the bank to an

7    employee of those fellows.

8    A.   Well, an employee of Stanford International Bank in

9    liquidation.

10   Q.   Okay.  The bank in liquidation being run by those guys.

11   A.   They were the liquidators.

12   Q.   Okay.  And I take it that you worked with Mr. Hamilton-

13   Smith to help him get up to speed on the bank's customer

14   base and how the bank operated.  Correct?

15   A.   Yes, in a limited way.

16   Q.   Okay.  Are you aware that Mr. Hamilton-Smith has

17   testified in some things he's filed in this case about the

18   numbers of folks who came to visit the bank in any given

19   year?

20   A.   No.  I'm not aware.

21   Q.   Okay.  He testified in one of his declarations that

22   some 240 clients visited the bank during 2007.  Does that

23   sound about right?

24   A.   I couldn't answer that.

25   Q.   Okay.  Well, let me ask you to look at tab 8, I

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 178

1    believe it is, at page 12 of that tab.  And if I have done

2    this right, there should there be some testimony from Mr.

3    Hamilton-Smith about visitors -- no, I'm on the wrong page.

4    All right.  I've lost that.  We're just going to skip that.

5         Moving to another issue, when money came into the bank,

6    it was then shipped out predominantly to the United States

7    and it was managed there.  Correct?

8    A.   Are you referring to check deposits or wire transfers?

9    Q.   CD deposits, the money came in and went out to the

10   United States for management by Mr. Davis's group.  Correct?

11   A.   If it was a wire transfer that came in, it would have

12   been sent to a corresponding bank.  If it was in U.S.

13   dollars, the Toronto Dominion Bank.

14   Q.   Okay.  And I'm not really -- I'm not talking so much

15   about the deposit side.

16   A.   Uh-huh.

17   Q.   I'm talking now about the money management side --

18   A.   Okay.

19   Q.   -- about what -- how the bank's money was invested.

20   A.   Okay.

21   Q.   The investment function, the treasury function was

22   handled in the United States by Mr. Davis's group, was it

23   not?

24   A.   Yes.

25   Q.   And that was Mr. Davis and Ms. Pendergest and their

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 179

1    staffs.

2    A.    Yes.

3    Q.    Okay.  And the treasury folks in Houston were

4    responsible for seeing that the bank had sufficient money

5    on hand to cover maturing CDs and projected withdrawals.

6    Right?

7    A.    Yes.

8    Q.    Okay.  And those same folks working for Mr. Davis and

9    Ms. Pendergest were responsible for investing the bank's

10   funds.  Correct?

11   A.    Yes.

12   Q.    And the bank, as I understand your direct, received

13   statements from these various investment accounts that

14   were being managed by Mr. Davis's group.  Right?

15   A.    From my understanding, they did come, although they

16   were, I guess, held for them and not available to staff of

17   the bank.

18   Q.    Okay.  So you anticipated my next question.  Nobody --

19   A.    Sorry.

20   Q.    Nobody on the bank staff -- no, that's okay.  Nobody on

21   the bank staff in Antigua actually reviewed the investment

22   account statements.  Correct?

23   A.    I don't know that anybody did.

24   Q.    Okay.  They were held for Mr. Davis's group.

25   A.    As far as I'm aware.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 180

1    Q.    Yeah.   And I think your testimony was that they were

2    filed away and further reviewed and processed by SFG.

3    Correct?

4    A.    Yes.

5    Q.    And SFG is Stanford Financial Group.

6    A.    Yes.

7    Q.    And that's the folks in Houston.

8    A.    Yes.

9    Q.    Okay.   I want to spend a few minutes with you talking

10   about your testimony about the events that occurred in

11   February of 2009, really starting late 2008 into February

12   of 2009.

13   A.    Uh-huh.

14   Q.    You described the late 2008 stretch as a run on the

15   bank.   Is that correct?

16   A.    Yes.   Correct.

17   Q.    Okay.   People were getting nervous about the bank and

18   their money.

19   A.    Yes, and they were making withdrawals.

20   Q.    Yeah.

21   A.    Uh-huh.

22   Q.    And you further testified that there was a backlog of

23   approximately $100 million in customer withdrawal requests.

24   A.    Yes.

25   Q.    Okay.   And you said the bank had made numerous requests

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 181

1    for additional money to Mr. Davis and the people handling

2    the treasury function for the bank's investments.  Is that

3    correct?

4    A.   Yes.

5    Q.   And Mr. Davis is James Davis, the CFO.

6    A.   Yes.

7    Q.   And all those folks were in the United States.

8    A.   Correct.

9    Q.   So is it correct that no one located in Antigua had

10   the ability to free up the bank's money to meet the backlog

11   of customer demand for their money?

12   A.   I believe that would be a fair statement.

13   Q.   Okay.

14   A.   The treasury function was handled by SFG.

15   Q.   Okay.  Mr. Tolentino couldn't free up the money.

16   A.   I don't believe he could.

17   Q.   Okay.  Now, during that run on the bank and when you

18   had that backlog --

19   A.   Uh-huh.

20   Q.   -- were you able to distribute some funds to some

21   folks?

22   A.   From my recollection, yes.

23   Q.   Okay.  Did you get any instruction from Houston as to

24   which of those customers should get their money back and

25   which ones shouldn't?

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 182

1    A.    No.

2    Q.    How did you decide which folks got their money back

3    and which ones didn't?

4    A.    It was a matter of the value date of the transaction.

5    So, for example, if there was a withdrawal that was

6    scheduled for the 25th of December and another that was

7    scheduled for the 27th of December, then the 25th would

8    take precedence.

9    Q.    So it was strictly chronological.

10   A.    It was a value dating, yes.

11   Q.    Okay.  Do you recall your testimony as to the scene at

12   the bank on or around February 17th of 2009?

13   A.    I do.

14   Q.    I think you used the word "madhouse."  Correct?

15   A.    It was.

16   Q.    Okay.  You said there were approximately 150 folks

17   who showed up personally over the course of a few days?

18   A.    Correct.

19   Q.    Okay.  And at any point during those couple of days,

20   did you go out and speak to those customers?

21   A.    Not as a group, but I did speak with individuals, yes.

22   Q.    Okay.  Do you recall Sascha Mercer going out and

23   speaking to the customers as a group?

24   A.    Yes, I do.

25   Q.    Ms. Mercer was the senior protocol officer --

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 183

1   A.   Yes.

2   Q.   -- for the bank.  Correct?

3   A.   She was.

4   Q.   And her job was to promote and maintain the company's

5   image.  Right?

6   A.   Yes.

7   Q.   Okay.  Do you remember Ms. Mercer telling those

8   assembled customers that the bank was waiting for Houston

9   and the SEC to tell it what it was supposed to do?

10             MR. DAVIS:  Objection, hearsay, Your Honor.

11             MR. LITTLE:  I don't know how it's hearsay, Your

12   Honor, if it's an employee of the bank making a statement.

13             THE COURT:  Overruled.

14             THE WITNESS:  No, I don't, because I -- I am aware

15   that she would have made some sort of statement to the

16   customers.  I did not hear it myself.

17   Q.   (BY MR. LITTLE)  Would you be surprised if what she

18   said was, we're waiting for Houston and the SEC to tell us

19   what to do?

20   A.   Yeah, I would have been surprised about that.

21   Q.   Okay.  The bank never got any answers or any money from

22   Houston in February of 2009 to satisfy these customers, did

23   it?

24   A.   No.

25   Q.   Okay.  In fact, none of the customers who came to the

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 184

1    bank on February 17th, 2009, were able to withdraw their

2    money, were they?

3    A.    No, they were not.

4    Q.    Okay.  And, in fact, there have not been any

5    withdrawals from the bank since prior to February 17th

6    of 2009.  Correct?

7    A.    Prior to February 17th?

8    Q.    Yes.

9    A.    I believe there would have been some withdrawals at

10   some point in time prior to February.

11   Q.    So maybe the 16th, 15th?

12   A.    No.  I don't think that late in the game --

13   Q.    Okay.

14   A.    -- there were any withdrawals.

15   Q.    So certainly at some point early in February,

16   withdrawals stopped.

17   A.    Yes, that's fair to say.

18   Q.    The bank hasn't received any new deposits since

19   February 17th of 2009, has it?

20   A.    No.

21   Q.    Has the bank issued any new credit cards to customers

22   since February 17th, 2009?

23   A.    No, we haven't.  No.

24   Q.    Have you made any new loans to customers since

25   February 17th, 2009?

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

1   A.   No.

2   Q.   Have you issued any letters of credit or letters of

3   guarantees since February 17th, 2009?

4   A.   The bank operations have ceased since February 17th.

5   So --

6   Q.   The bank was shut down on February 17th, 2009.

7   A.   Yes.  So --

8   Q.   It has ceased to be a bank.

9   A.   There were no further transactions.

10  Q.   It -- it was out of business.

11  A.   Operations did cease.

12          MR. LITTLE:  No further questions, Your Honor.

13                   REDIRECT EXAMINATION

14  By Mr. Davis:

15  Q.   Ms. Jacobs, when a customer purchased a CD, Mr. Little

16  pointed out that many of them went through financial

17  advisors.  Right?

18  A.   Correct.

19  Q.   Okay.  How did -- did they communicate those documents

20  or send those documents to the bank through the financial

21  advisor?

22  A.   Yes, through the financial advisor and his office with

23  which he was employed which was a Stanford entity.

24  Q.   How about the payment in order to make the deposit?

25  Did that go through the financial advisor?

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 186

1    A.    No, that would not have.  That would have had to

2    have gone directly to the bank's corresponding bank

3    account.

4    Q.    So if I was to make a deposit and buy a CD in U.S.

5    dollars --

6    A.    Uh-huh.

7    Q.    -- how would that be transmitted?  Where would it

8    go?

9    A.    If it were a wire transfer in U.S. dollars, the

10   customer would have had to instruct his bank to send the

11   funds to SIB's corresponding bank, which was Toronto

12   Dominion Bank for U.S. dollars.

13         If it was a check deposit, that check could have

14   been delivered to the financial advisor's office and

15   they, in turn, would have sent the instrument to Stanford

16   International Bank in Antigua.

17   Q.    What did you do with the check when you got it?

18   A.    Once it was received, it was endorsed and then put

19   together in a cash letter that we would have then sent

20   off to our correspondent bank.

21   Q.    And who was your correspondent bank for checks?

22   A.    That would have been Trustmark National Bank.

23   Q.    And what if I was to buy a CD and I was depositing

24   Euros or British Pounds, where would that money go?

25   A.    Again, if you were sending a wire transfer, you would

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 187

1    have sent it to our Euro or British Pound correspondent

2    bank, which was HSBC in London.

3         If it was a check deposit, that item would have been

4    again sent to Antigua and then put together in a cash

5    letter and sent for negotiation to HSBC --

6    Q.   In London?

7    A.   -- in London.  Yes.

8    Q.   And that would have been at the SIB or Stanford

9    International Bank account in -- at HSBC in London.

10   A.   Correct.

11   Q.   The same is true as with regard to TD bank in -- in

12   Toronto.

13   A.   That is right.

14   Q.   Okay.  And the account that was at Trustmark Bank was

15   also an SIB-correspondent banking account.

16   A.   That is correct.

17   Q.   Okay.

18            MR. DAVIS:  One second, Your Honor.

19       (Brief conference off the record.)

20   Q.   (BY MR. DAVIS)  After February 19th, what was the

21   role of Mr. Hamilton-Smith, the gentleman that Mr. Little

22   referred to?

23   A.   They were appointed as Receivers for Stanford Inter-

24   national Bank when they came in.  Subsequent to that, they

25   were appointed as Liquidators of the bank.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 188

1    Q.    And were the employees still working at the bank?

2    A.    Up until around April of '09, most of the employees

3    were still there.  At that point in time, the majority

4    were let go.

5    Q.    But since then, have there still been employees working

6    at the bank?

7    A.    Yes, there are employees there.

8    Q.    How many?

9    A.    There are four employees for Stanford International

10   Bank.

11   Q.    And do you still get calls from customers?

12   A.    Yes, we do.

13   Q.    Okay.  How many on average, say, a week?

14   A.    In a week, perhaps 20.

15   Q.    And do those calls come in primarily in English or

16   primarily in Spanish?

17   A.    Primarily in -- in Spanish.

18   Q.    The other --

19   A.    I mean -- and I know this because we share the

20   functions because there are that, you know, limited number

21   of us.  And once they come in -- we have a Spanish speaker

22   on staff still.  And the majority of the times, you have

23   to transfer the call to the person who speaks Spanish.

24   Q.    Okay.

25         MR. DAVIS:  No further questions.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 189

 1                    RECROSS EXAMINATION

 2   By Mr. Little:

 3   Q.    Trustmark Bank, that's in Houston.   Right?

 4   A.    Yes, it is.

 5   Q.    Okay.   When U.S. customers -- U.S. customers bought

 6   exclusively through Stanford Group Company financial

 7   advisors.   Correct?

 8   A.    Once they were U.S. residents, yes, they had to come

 9   through that program.

10   Q.    And when they were transferring funds, those transfers

11   typically were handled by the financial advisor using the

12   customer's SGC account, were they not?

13   A.    I don't know.   I'm not sure.

14   Q.    You don't have any idea one way or the other?

15   A.    I'm not saying that is not possible because some

16   clients did have brokerage accounts.   The customer would

17   have had to provide instruction to transfer those funds

18   to SIB.

19   Q.    Well, in fact, virtually all the U.S. customers

20   had brokerage accounts because they had to go through a

21   Stanford Group Company broker to buy a CD, did they not?

22   A.    Okay.

23                 MR. DAVIS:   Objection.   Counsel is testifying.

24                 MR. LITTLE:   It's cross-examination.

25                 THE COURT:   Overruled.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 190

1            THE WITNESS:  Yes.  I mean, they had to -- the

2    customers who were U.S. Accredited Investors had to go

3    through Stanford Group Company.

4    Q.   (BY MR. LITTLE)  Right.

5    A.   That is -- that is correct.

6    Q.   And in order to go through Stanford Group Company, they

7    had to have an account at Stanford Group Company.  Correct?

8    A.   That I don't know.

9    Q.   Okay.  And Stanford Group Company was the U.S.

10   broker-dealer?

11   A.   Yes.

12   Q.   Okay.  And Stanford Group Company would -- would

13   transfer funds from the client's account at Stanford Group

14   Company to SIB, would it not?

15   A.   That is possible.

16   Q.   Okay.

17            MR. LITTLE:  Nothing else, Your Honor.

18            THE COURT:  Thank you, ma'am.  You may step down.

19            MR. DAVIS:  Your Honor, we just have one house-

20   keeping matter to deal with, some documents to be moved in,

21   and I think that's -- that's it.

22            MR. GROSSMAN:  Your Honor, there's a number

23   of exhibits that were not -- that were in our exhibit

24   submissions that were not attached to the direct written

25   testimony of the witnesses.  At this time we would like to

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 191

1    move those exhibits into evidence.

2              THE COURT:  Okay.

3              MR. GROSSMAN:  You said you were going to do it

4    after, so we will provide a scorecard at the end of today

5    listing all of the exhibits that we have sought to move

6    in.  Specifically, it is JL-1 through JL-17.  JL-1 through

7    JL-17.  I just wanted to identify them for the Court.  We

8    would seek to move them into evidence.

9              THE COURT:  Okay.

10             MR. GROSSMAN:  Your Honor, an additional

11   housekeeping matter.  With respect to Mr. Wide's testimony,

12   attached to it were copies of the particular appointment

13   papers, the commencement of the proceeding.  We have the

14   original apostille documents.  I don't want to have any

15   issue about an objection with respect to legalization.

16        We have the originals and we're willing to tender them

17   if necessary.  Perhaps I should just keep custody and see

18   if there is going to be an objection as to originals.

19             THE COURT:  Is that agreeable to submit --

20             MR. SADLER:  Certainly if he's just talking --

21             THE COURT:  -- copies to the Court?

22             MR. SADLER:  Yes.  Yes.

23             MR. DAVIS:  We've got them here to look at them

24   if the Court wants to see them, fully apostille.  We've got

25   them for counsel to look at as well.

U.S. District Court

Linda J. Langford, CSR, RDR, CRR

Page 192

1          THE COURT:  Okay.  I'm willing to accept on face

2    value, unless someone tells me differently, that the copies

3    I have gotten are accurate.

4          MR. SADLER:  Sure.  That's fine.  That's fine

5    with the Receiver.

6          MR. GROSSMAN:  Your Honor, there are two other

7    documents that were referred to in our brief that we would

8    like to move into evidence, and we put it on the end of

9    our exhibit list.  They are the ruling by the judge in the

10   Stanford criminal case with respect to a bond application

11   by Mr. Stanford, the ruling by the Court with its findings

12   of fact and the affirmance of that ruling by the Fifth

13   Circuit.  That would be one exhibit.

14      And the other exhibit was attached to our brief which

15   was a -- this is articles written by Mr. Janvey and others

16   at a conference with respect to where Ponzi scheme and

17   forfeiture laws interact.

18      We would move those into evidence, and we would add

19   them to the back of our exhibit book, Your Honor.

20          THE COURT:  All right.

21          MR. GROSSMAN:  I'm sorry, Your Honor.  If I could

22   have just one moment.

23      (Off the record.)

24          MR. GROSSMAN:  I know this a long time, but can

25   we have one minute to confer with our client?

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 193

1          THE COURT:  You can have as much as you want.

2     Just be cognizant the clock is running.

3          (Off the record.)

4          MR. GROSSMAN:  Thank you, Your Honor, for that

5     moment.

6          Your Honor, because the issue was raised this morning,

7     on behalf of the Joint Liquidators we would move ore tenus

8     to substitute officially as the party plaintiff for whatever

9     reason that would need to be happening.

10         It was only because it was raised this morning.  We

11    think we are the party plaintiff, but to the extent this

12    Court needs a motion to substitute us as the party plaintiff

13    for purposes of a petition, we so move.

14         THE COURT:  Okay.

15         MR. SADLER:  And I don't think it's necessary to

16    respond now.  I think they need to file a pleading.  Then

17    we can respond on the pleadings that are filed, Your Honor.

18         THE COURT:  Okay.  Why don't you follow that up

19    with a written motion just so that it's in the record.

20         MR. GROSSMAN:  Thank you, Your Honor.

21         THE COURT:  But I note you've made that request

22    orally here in open court.

23         MR. GROSSMAN:  Thank you, Your Honor.  Your Honor,

24    on behalf of the Joint Liquidators, we rest.

25         THE COURT:  All right.

025147ba-a31c-4457-b73e-de48d28d06e2

Page 194

1           MR. SADLER:  Your Honor, we're ready to proceed

2    with our first witness.

3           THE COURT:  Please do.

4           MR. SADLER:  Mr. John Wade.

5           MR. MORGENSTERN:  Good afternoon, Your Honor.

6    Peter Morgenstern for the Investors Committee and our group.

7           THE COURT:  I was wondering if you got a speaking

8    role.

9           MR. MORGENSTERN:  You know, you have to fight for

10   these things, but --

11          THE COURT:  Understood.

12      Could you raise your right hand, please?

13      (The witness was sworn by the Court.)

14          MR. MORGENSTERN:  Thank you.

15                   JOHN WADE, SWORN,

16                   DIRECT EXAMINATION

17   By Mr. Morgenstern:

18   Q.   Would you state your name for the record, please?

19   A.   John Wade.

20   Q.   And is it Dr. John Wade?

21   A.   Dr. John Wade, veterinarian.

22   Q.   Thank you.

23          MR. MORGENSTERN:  Your Honor, I hereby move

24   to admit Dr. Wade's written testimony which has been

25   submitted.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 195

 1              MR. WIELEBINSKI:  Your Honor, we filed some

 2     objections, evidentiary objections, to his statements.

 3     Essentially they boil down to hearsay with respect to

 4     pages 3611 and 3612, certain paragraphs that we point out

 5     in our objection as well as a best evidence rule.  There's

 6     a document that he refers to in his declaration.

 7              THE COURT:  Okay.  I'm going to reserve ruling

 8     on those.

 9              MR. WIELEBINSKI:  Fair enough, Your Honor.

10     Thank you very much.

11              MR. MORGENSTERN:  Okay.  Thank you, Judge.

12                        CROSS EXAMINATION

13     By Mr. Wielebinski:

14     Q.   Good afternoon, Dr. Wade.  My name is Joe Wielebinski.

15     I'm going to be asking you some questions.

16     A.   Okay.

17     Q.   I first want to start by telling you that you're now

18     the third investor I've met in the Stanford debacle, and I

19     empathize with your predicament.  You -- you, based on your

20     statement, invested quite a lot of money, did you not?

21     A.   I did.

22     Q.   Well, I'm sorry that you did that and I hope that we

23     can collectively work to get some return on that monies.

24     A.   Thank you.

25     Q.   You have a doctorate degree.  Correct?

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

1    A.    That's correct.

2    Q.    And it's a doctor in veterinary science?  Is that --

3    A.    Veterinary medicine, correct.

4    Q.    And you practiced as a veterinarian for a number of

5    years?

6    A.    Yes.

7    Q.    Twelve years, I believe?

8    A.    Yes, I did.  Yes.  In a private practice that I owned,

9    yes.

10   Q.    But you don't practice now.

11   A.    No.  I still work, but I don't practice.

12   Q.    And your work is with respect to this microchip company

13   that you were the founder of and you continue to work there?

14   A.    That's correct.  I manufacture or have manufactured

15   microchips for identification in animals.

16   Q.    And you invested in the Stanford CDs for a number of

17   reasons, I assume.  But you did it both personally and for

18   your company's ERISA account.  Is that right?

19   A.    That's correct, yes, sir.

20   Q.    And the benefits, I assume, that you perceived you were

21   getting would be a higher rate of return than you might get

22   at other financial institutions?

23   A.    No.  I didn't get -- I got probably a percent higher

24   than I would have had at other institutions, but the real

25   reason that I invested in the Stanford CD program is

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 197

1   because I just kept everything at Stanford.  I had

2   brokerage accounts there as well.

3   Q.   I see.  Was one of the -- the benefits of investing

4   in Stanford the tax benefits since you were investing in

5   CDs at an international bank?

6   A.   I'm not aware of any tax benefits.

7   Q.   And Mr. Tim Parsons was your financial advisor.  Is

8   that correct?

9   A.   That's correct.

10   Q.   And a friend introduced you to Mr. Parsons?

11   A.   That's correct.

12   Q.   Did you interact with anyone else at Stanford Inter-

13   national Bank other than Mr. Tim Parsons?

14   A.   No, not initially.  Ultimately, just on a cursory level,

15   I had some dealings with his secretary.  I think her name

16   was Barbara.

17   Q.   But you never -- did you ever interact with anybody in

18   Antigua?

19   A.   No.

20   Q.   Not at all?

21   A.   No.  I was told that that was off limits.

22        MR. WIELEBINSKI:  I'd move to strike, Your Honor.

23   The answer no would probably suffice.

24        THE COURT:  Overruled.

25   Q.   (BY MR. WIELEBINSKI)  But your testimony is that you

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 198

1    never contacted or visited anybody in Antigua?

2    A.    That is correct.  I -- I made one attempt after the

3    collapse.  I could not reach Tim Parsons.  I made the effort

4    to abide by protocol to try to get something written to get

5    my money redeemed, and I couldn't reach Tim.

6         So I tried to call the bank and got no answer.  And

7    so obviously that failed and then ended up I actually got

8    Houston, got somebody in Houston.  They said to speak to

9    Tim, and I finally found Tim.

10   Q.    When you said you called the bank, you called the bank

11   in Antigua?

12   A.    That's correct.

13   Q.    Okay.  You called an international number and you

14   couldn't get through.

15   A.    That's correct.

16   Q.    And you couldn't get through?

17   A.    That's correct.

18   Q.    Or actually it was nobody -- nobody answered?  Is

19   that --

20   A.    Nobody answered.

21   Q.    Did you ever send a letter to anyone in Antigua in the

22   bank?

23   A.    You know, I'm not -- I'm not certain if I did.  At the

24   end when I could not reach anybody and I was watching my

25   future on TV, I recognized that something had to be done.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 199

1   So I ended up typing up a number of redemption requests for

2   myself, my company's pension plan, and my business partner

3   also had an account and had CDs.

4       So with the three of those, when I couldn't reach

5   anybody, I wrote up those, signed them, went to Google,

6   found Tim Parsons' house, drove to his house, and was

7   able to get him to sign those redemption requests.

8       And I don't remember if I sent one to Antigua.  I don't

9   think I did, but I -- I did go through Tim Parsons then.

10  Q.   Sir, when you first decided that you were going to

11  invest in Stanford, you may have heard the testimony of

12  Beverly Jacobs about the number of forms that had to be

13  prepared --

14  A.   Yes.

15  Q.   -- in order to purchase the CD.

16  A.   Right.

17  Q.   Do you remember preparing any of those forms?

18  A.   Sure.

19  Q.   Do you remember signing them?

20  A.   Yes.

21  Q.   If I told you one of them was something called a sub-

22  scription agreement, would that refresh your recollection?

23  A.   Yes, sure.

24  Q.   Do you remember signing that agreement?

25  A.   Yes, I do.  Right.

025147ba-a31c-4457-b73e-de48d28d06e2

Page 200

1          MR. WIELEBINSKI:  May I approach the witness?

2          THE COURT:  Yes.

3    Q.  (BY MR. WIELEBINSKI)  I'm handing you a document marked

4    Exhibit 1.  Can you take a look at that document for me,

5    Dr. Wade?

6    A.  Yes, sir.

7    Q.  Have you seen that before?

8    A.  Yes, sir.

9    Q.  Is that the subscription agreement?

10   A.  Yes.

11   Q.  All right.  And that's your signature there, is it not?

12   A.  It is, yes.

13   Q.  It seems that -- I just notice you seem to always sign

14   your name with a DVM at the end.  Is that something you do?

15   A.  Most of the time, yeah.

16   Q.  All right.  And that's your doctorate -- doctorate

17   designation?

18   A.  Yes, correct.

19   Q.  Okay.  And you remember signing this document, do you

20   not?

21   A.  I do.

22   Q.  And it says right above your signature that you

23   intended to be legally bound by this document.  Correct?

24   Doesn't it say that there?

25   A.  On the last -- on which signature page?

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 201

1    Q.    Well, on the first signature, sir.  Right above the

2    first signature, it says, in witness whereof?

3    A.    Yes.

4    Q.    It says the depositors have executed this subscription

5    agreement intending to be legally bound?

6    A.    Yes.

7    Q.    And that was your intent in signing it, correct, to --

8    to enter into a contract with Stanford to buy a CD?

9    A.    That's correct.

10   Q.    All right.  Now, when you signed it -- can you look at

11   paragraph K for me, please, of this subscription agreement

12   so we're on the same page?  Can you read that for me?

13   A.    I think I may need it.  That's pretty small.

14   Q.    Sir, do you want me to read it to you and see if you

15   can acknowledge it?

16   A.    "You understand that this subscription agreement shall

17   be construed in accordance with and governed exclusively

18   by the laws of Antigua and Barbuda and you consent to the

19   exclusive jurisdiction of the courts in Antigua and Barbuda

20   in relation to any action or proceeding arising under this

21   subscription agreement."

22   Q.    And, sir, do you mind reading the first item under

23   depositor representations?  It's item A.  Just the first

24   sentence.

25   A.    "You have received a disclosure statement and other

U.S. District Court

025147ba-a31c-4457-b73e-de48d28d06e2

Page 202

1   relevant offering documents related to the U.S. Accredited

2   Investor CD prior to remitting the minimum balance or such

3   other amount in excess of the minimum balance."

4   Q.   And the next sentence, sir?

5   A.   "You have read and you understand the offering

6   documents, particularly the discussion of the risks

7   associated with the U.S. Accredited Investor --"

8   Q.   CD?

9   A.   Oh, CD, right.

10   Q.   Prior to accepting your subscription.  Correct?

11   A.   I don't think that says that here, but -- but --

12   Q.   Oh, okay.  I'm on the prior paragraph.  I apologize

13   for that.

14   A.   Okay.

15   Q.   Sir, do you remember reading and reviewing the --

16   the disclosure agreements that you said that you signed

17   off and said you did read and review and understand?

18   A.   What I did with these is I went through -- when I

19   opened the account, I -- I was opening three accounts--my

20   partner, my -- my business account, and myself.  And so

21   it was -- it was analogous to like a real estate closing:

22   there were a number of documents lined up on a table.

23        And so what I did is I got my financial advisor to take

24   each one of these documents and go through the document with

25   me.  So I didn't read everything word for word.  I went

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 203

1    through it with my financial advisor.

2    Q.   But you did sign the document that said you read it,

3    you reviewed it, you understood it.

4    A.   Yes.

5    Q.   Okay.  And you did it with the intent to be legally

6    bound.  Correct?

7    A.   I did.

8    Q.   All right.

9    A.   I did.  But just so you understand, can I read another

10   one of these?

11            MR. WIELEBINSKI:  Your Honor, I asked a yes or no

12   question, and he can --

13            THE WITNESS:  That's okay.

14            MR. WIELEBINSKI:  -- reask questions on redirect.

15   Q.   (BY MR. WIELEBINSKI)  Now, the disclosure statement --

16   and I can get you a copy if you'd like to look at it, but

17   the disclosure statement on page 3 says that it was being

18   prepared and furnished to you by SIB, Stanford International

19   Bank, a bank chartered in Antigua and Barbuda under the

20   International Business Corporations Act.

21        Do you have any reason to doubt that's in the

22   disclosure statement?

23   A.   No, sir, I don't.

24   Q.   And page 4 -- I'm sorry, on the disclosure statement

25   at 4, it says, SIB has operated in Antigua since 1990.

Linda J. Langford, CSR, RDR, CRR

Page 204

1    Any reason to doubt that?

2    A.    No, sir.

3    Q.    And that same page, it says that SIB's offices were

4    located solely in Antigua.  Do you have any reason to doubt

5    that?

6    A.    No, I don't.  No.  I was told that, too.

7    Q.    And also it says, "SIB is not generally subject to

8    securities or banking regulations by any governmental

9    authority outside of Antigua except for certain U.S.

10   antifraud securities laws by virtue of making an offering

11   in the United States."

12          Any reason to doubt that?

13   A.    I don't doubt that it's in there.  I was told that by

14   my financial advisor, and I was told that it -- it operated

15   under the laws of the U.S. securities laws.

16   Q.    Did he also tell you that the commencement day for the

17   CD was the first business day in St. John's, Antigua, and

18   Barbuda or the last calendar day of the month in St. John's,

19   Antigua, and Barbuda?

20   A.    No, sir.

21   Q.    Okay.  Did he tell you that SIB was a private financial

22   institution chartered under the laws of Antigua and Barbuda,

23   which is disclosed on page 10 of the disclosure statement?

24   A.    Yes, he did, but that it was all run out of the United

25   States.

025147ba-a31c-4457-b73e-de48d28d06e2

Page 205

1  Q.   Okay.  And did he tell you --

2           MR. WIELEBINSKI:  Move to strike, Your Honor.  I

3  asked a yes or no question.

4           THE COURT:  Overruled.

5           MR. WIELEBINSKI:  Thank you, Your Honor.

6  Q.   (BY MR. WIELEBINSKI)  Did he tell you that there was

7  an entire section of the disclosure statement describing

8  Antigua and Barbuda, the nation itself?

9  A.   Yes, he did.

10  Q.   And did he tell you that SIB authorized certain

11  entities, such as Stanford Group Company, to make the U.S.

12  Accredited Investor CD offering?

13  A.   Not in those terms, no.

14  Q.   Okay.  And did he tell you that the disclosure state-

15  ment specifically said that SIB had not authorized anyone to

16  give information or to make any representations other than

17  those contained in the offering documents themselves?

18  A.   No, sir.  He made many representations.

19  Q.   Okay.  And, sir, did he tell you that the disclosure

20  statement at page 17 said no other information or representa-

21  tions may be relied upon as having been authorized by SIB?

22  A.   No, sir.

23  Q.   Looking back at it, does it appear that Mr. Parsons

24  was at a minimum misleading you or not giving you complete

25  information?

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 206

1    A.    Yes, and this document as well.  This document is worth

2    less than the paper that it's written on.  I think what

3    you're doing is you're going through here and picking and

4    choosing things.  If you want to go review some of the other

5    statements in there or some of the things that are missing,

6    you will find that those are totally inaccurate, which to me

7    renders the whole document worthless.

8         My suggestion is somebody take this subscription thing

9    back and get everybody their money back.

10   Q.    That's a fair observation, sir.  Sir, you mentioned

11   in your testimony that you had some kind of welcome letter,

12   but you didn't attach it to your testimony.  Do you have

13   the welcome letter?

14   A.    I do.  I don't have it with me up here.

15   Q.    Oh, I see.

16   A.    I've got it in -- right on the first bench there if

17   you'd like me to get it.

18   Q.    Well, was there a reason you didn't include it on

19   your -- on your witness statement?

20   A.    No, sir.  An oversight, I suppose, but I've got it.  It

21   was a welcome letter from Zack Parish from the home office

22   in Houston.

23   Q.    But nobody instructed you not to attach it, did they?

24   A.    No, no, heavens no.

25   Q.    Fair enough.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 207

1    A.    I'll be glad to get it for you.

2    Q.    And did you invest in U.S. dollars?

3    A.    Yes.

4    Q.    And when you invested, where did you send the money

5    that was used to open the account?

6    A.    It -- it depends.  Some of the money was wired that was

7    wired through TD Bank in -- in Canada.  And I was told it

8    would come back to the United States to then be invested.

9          Sometimes on some occasions, I wrote a check and

10   that was written to Stanford International Bank that was

11   deposited here in the United States.

12   Q.    All right.  Sir, can you look at the first page of

13   this subscription agreement?

14   A.    The -- I've got it, uh-huh.

15   Q.    Do you see the -- the sentence, it's pretty much right

16   under the first paragraph?  It says, "All documents to be

17   delivered by mail to SIB."  Do you see that?

18   A.    Yes, I do.

19   Q.    And where does it tell you to send it?  You don't have

20   to read the entire address but what -- what country?

21   A.    No.  It says Antigua, but this is completely contrary

22   what I was told to do.

23   Q.    Okay.

24   A.    I was told to give it to my financial advisor.

25   Q.    And do you also see the -- the reference down there at

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 208

1    the bottom where it says checks?

2    A.   I do --

3    Q.   You do.

4    A.   -- which is completely contrary to what I was

5    instructed to do.

6    Q.   Where -- where does it tell you to -- to send the --

7    the personal or cashier's checks?

8    A.   To Antigua, which I was told not to do.

9    Q.   Sir, I happen to have your -- your file.  You know,

10   there's a customer file at --

11   A.   Uh-huh.

12   Q.   -- in Antigua for all of the customers.  I went through

13   it.  There was a letter addressed To Whom It May Concern?

14   A.   Uh-huh.

15   Q.   Do you recall sending that letter?

16   A.   I don't.  If you would tell me the content of it, I can

17   probably help you out.  I've written a lot of letters in my

18   day.

19   Q.   You wanted to change the -- the period of time for your

20   CD renewal.  Does that ring a bell?

21   A.   Vaguely.

22   Q.   All right.

23          MR. WIELEBINSKI:  Pass the witness.

24       Thank you, Doctor.

25          THE WITNESS:  Uh-huh.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 209

1                    REDIRECT EXAMINATION

2  By Mr. Morgenstern:

3  Q.   Dr. Wade, just one question.  Did you have something

4  else that you wanted to read into the record when you were

5  being questioned?

6  A.   I wanted to -- you know, there -- there are a number

7  of things actually.  And I think I made my point.  If you --

8  you take these documents and you start selecting things out

9  of them and act like this is just the sole truth and that

10  everything should revolve around these statements and there

11  are actually statements in there that -- that say where this

12  money was going and how it was going to be managed, what

13  things that the -- that the -- what instruments -- this

14  money was going to be invested in gold, it was going to --

15  or precious metals, it was going to be invested in bonds

16  and securities.

17      And so there are a number of statements in these -- in

18  these same documents that are just absolutely false.  And so

19  it just disturbs me that you come in here and try to select

20  certain ones that fit to try to make them fit your goal

21  and -- when in fact I think if there's any one thing in

22  here that's false, you have to discard the whole thing.

23  So --

24             THE COURT:  You know, you have just hurt the

25  feelings of all the lawyers in the room because that's

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 210

1    what they do.

2              MR. MORGENSTERN:  At least all the ones that

3    draft documents like that.

4    Q.   (BY MR. MORGENSTERN)  I thank you, Dr. Wade.

5    A.   Okay.

6              MR. MORGENSTERN:  I have no further questions.

7              MR. WIELEBINSKI:  Nothing further, Your Honor.

8              THE COURT:  Thank you, sir.  You may step down.

9              MR. SADLER:  Your Honor, we're going to call Karyl

10   Van Tassel.  Could Your Honor remind -- you wanted to take a

11   break, and I just lost track of when that was.

12             THE COURT:  Yeah.  I said around 3:00.

13             MR. SADLER:  Do you want to do it now?

14             THE COURT:  Yeah, let's go ahead and do it now --

15             MR. SADLER:  Sure.

16             THE COURT:  -- and not break her testimony up.  So

17   let's take about 10 minutes and see you-all back at 5 till.

18             MR. SADLER:  All right.  Thank you.

19             MR. DAVIS:  Thank you, Judge.

20        (Brief recess taken.)

21             THE COURT:  All set?

22             MR. SADLER:  Yes, sir.

23             THE COURT:  Could you raise your right hand,

24   please, ma'am?

25        (The witness was sworn by the Court.)

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 211

1                  KARYL VAN TASSEL, SWORN,

2                  DIRECT EXAMINATION

3   By Mr. Arlington:

4   Q.   Good afternoon.  Would you state your name for the

5   record, please?

6   A.   Karyl Van Tassel.

7            MR. ARLINGTON:  Your Honor, the Receiver would

8   move to admit Ms. Van Tassel's direct testimony previously

9   filed along with the exhibits thereto.

10           THE COURT:  All right.

11           MR. DAVIS:  Your Honor, I have -- bad habit of

12  talking before I get to the microphone.  I apologize to the

13  court reporter.

14        Your Honor, we do have a set of objections that we

15  filed with regard to some of these.  I know you're -- as you

16  said with the last witness, you're going to take them under

17  advisement --

18           THE COURT:  Correct.

19           MR. DAVIS:  -- and rule on them after.  But I just

20  wanted to point out to you that some in that -- there's --

21  there's eight or nine documents or partial documents that

22  we've objected to, not to the testimony, just to the actual

23  documents.

24           THE COURT:  All right.

25           MR. DAVIS:  Thank you.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 212

1                    CROSS EXAMINATION

2  By Mr. Davis:

3  Q.    Good afternoon, Ms. Van Tassel.  How are you?

4  A.    Good afternoon.

5  Q.    My name is Edward Davis, and I represent the Joint

6  Liquidators, and I'll be asking you a few questions today.

7  A.    Okay.

8  Q.    I have read all 20 of your -- of your witness

9  statements.  You are one of the most prolific experts

10  I've ever had to deal with, so I commend you for that.

11         Can you tell us about -- the Court about your

12  experience in prior Ponzi scheme cases?

13  A.    I have a great deal of experience in various kinds of

14  frauds but specifically in Ponzi schemes, one that involved

15  a computer business that had started out as providing

16  service offerings and then turned into a Ponzi scheme,

17  and then one was a real estate development.

18  Q.    So those two?

19  A.    Those two that were specifically Ponzi scheme, though

20  many that have been fraud.

21  Q.    Just other kinds of fraud?

22  A.    That's correct.

23  Q.    Great.  Thank you.  Can you tell the Court about your

24  experience in prior cases involving -- or in the Caribbean?

25  A.    I've had various cases that had issues revolving

U.S. District Court

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 213

1    around the Caribbean because of money that was sent there.

2    Specifically, there were some that had notes that had been

3    issued by Curacao and what happened to those and movement of

4    money from Curacao to various islands.

5    Q.   Okay.  And can you tell the Court about your experience

6    in Chapter 15 proceedings?

7    A.   I have not been involved in a Chapter 15 proceeding

8    previously.

9    Q.   Can you tell the Court about your prior experience in

10   bank liquidations?

11   A.   Actually, I have quite a bit of experience in that

12   area.  I worked at one point with various firms related to

13   shutdowns in both banks and savings and loans.

14   Q.   Okay.  I asked because it's not detailed in your very

15   lengthy resume.  So is that from a prior life where you

16   were not a forensic accountant or was that when you were a

17   forensic accountant?

18   A.   That is when I was a forensic accountant.

19   Q.   Okay.  Thank you.  And can you tell the Court about

20   your prior experience with regard to offshore banks before

21   this case?

22   A.   Again, because I do a lot of work in the area of issues

23   related to embezzlement and financial reporting problems,

24   those kinds of issues, there's many times that we're working

25   on issues related to funds that go through international

U.S. District Court

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 214

1    banks and tracing those monies through.

2    Q.   Have you specifically dealt with the liquidation of an

3    offshore bank before?

4    A.   No, I have not.

5    Q.   Have you ever had the pleasure of serving as an expert

6    for Mr. Sadler or Mr. Janvey in the past before this case?

7    A.   No, I have not.

8    Q.   Okay.  Have you ever served as a trustee in bankruptcy?

9    A.   No, I have not.

10   Q.   I think your resume said you served as a receiver.  I

11   saw one on there.  Is that right?  Have you ever served as a

12   receiver before?

13   A.   I -- I worked for a receiver.

14   Q.   But you've never actually been a receiver.

15   A.   I have not been a receiver, no.

16   Q.   Okay.  Have you ever -- so you've never rendered an

17   opinion in a Chapter 15 proceeding before.

18   A.   I have not, no.

19   Q.   Have you ever opined on the topic of center of main

20   interest before?

21   A.   No.  I have not.

22   Q.   Before this case?

23   A.   Not before this case.

24   Q.   Are you actually giving an opinion here today as to

25   what the center of main interest of SIB is?

025147ba-a31c-4457-b73e-de48d28d06e2

Page 215

1    A.    I am giving my opinion as to the factors that I think

2    relate to that that lead to that conclusion.

3    Q.    But you're not.  You're not actually opining on the --

4    on what the -- the center of main interest is.  That's an

5    issue for the Court to decide.  You would --

6    A.    Oh, correct, yes.

7    Q.    You'd agree with me on that.

8    A.    Yes.  I'm -- I'm -- my opinion relates to the various

9    factors that I believe to be relevant and the information

10   that I've had in my last two-and-a-half, almost three years

11   of investigations.

12   Q.    And so if -- to the extent that you're -- any place

13   in your witness statement where it might inadvertently say

14   things along the lines of the center of main interest of the

15   bank is X, or I believe the center of main interest of the

16   bank is Y, that was inadvertent.  You're not attempting at

17   any point to -- to do anything other than provide evidence

18   for the Court to make the determination of that issue.

19   A.    That's correct.  I'm not making a legal conclusion.  I

20   am stating that from the factors that I've looked at under

21   the parameters that's set forth.  That's -- that's what I

22   believe those factors illustrate.

23   Q.    Thank you.  I appreciate that.  Have you ever been to

24   Antigua?

25   A.    I have not, no.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 216

1   Q.   Have you ever been to the SIB headquarters building in

2   Antigua?

3   A.   No, I have not.

4   Q.   Have you -- you did meet Mr. Rodriguez-Tolentino.

5   Right?

6   A.   I have talked to him, yes.

7   Q.   Okay.  Other than Mr. Rodriguez-Tolentino, have you

8   interviewed any of the other 91 employees of Stanford

9   International Bank?

10  A.   Have I interviewed them?

11  Q.   Yes.

12  A.   No.

13  Q.   Have you met them, talked to them?

14  A.   No.  Just seen a lot of documentation and

15  correspondence involving them.

16  Q.   You have not attended any depositions of those people?

17  A.   No, I have not.

18  Q.   Okay.  Thank you.  Have you had a chance to review the

19  resumes of Mr. Wide and Mr. Dickson in this case?

20  A.   I did, yes.

21  Q.   Great.  And in your professional opinion and based on

22  your extensive experience, you would agree with me that they

23  have extensive experience in the liquidation of banks and

24  financial institutions in the Caribbean, wouldn't you?

25  A.   You know, I looked at their general credentials in that

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 217

1    they had been involved in various liquidations.  I really

2    didn't focus on what they did in financial institutions

3    specifically.

4    Q.    Would that same answer apply with regard to Ponzi

5    schemes?  Did you look at their resumes with regard to their

6    prior handling of Ponzi schemes?

7    A.    I think that there was information noted in there --

8    Q.    Right.

9    A.    -- about them.

10   Q.    Do you have any reason, based upon your professional

11   career, to doubt their credentials or their experience in

12   the area of insolvency or forensics?

13   A.    No.  But I haven't really looked at it particularly.

14   Q.    But you haven't come up or passed or touched upon

15   information that gives rise to any doubts in your mind

16   about their credentials, have you?

17   A.    No, I have not.

18   Q.    Do you have any reason to believe that they are

19   motivated, just as you are, to try to get as much money

20   for the victims as possible in this case?

21   A.    No.  I don't have any knowledge one way or the other.

22   Q.    If Judge Godbey were to grant recognition in this case,

23   do you see any problem in having a working relationship

24   with Mr. Wide or Mr. Dickson and their staff?

25   A.    No.  If asked by a court and by my client, we'll do

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 218

1    whatever makes sense from that perspective.

2    Q.    But as you sit here today, you don't -- do you envision

3    that there would be any problem?

4    A.    No.  As long as, again, what the Court -- that was

5    something that the Court envisioned and indicated was

6    appropriate, no.

7    Q.    Thank you.  Thank you for that.  I want to go to the

8    back of your -- the very back of your witness statement,

9    the very end of it, if you will.

10        Can you turn to pages 45 and 46 of your statement?

11   It's Roman numeral 18.

12   A.    Okay.

13   Q.    You see that section?

14   A.    I do, yes.

15   Q.    The section is entitled -- I'm sorry.  I went the wrong

16   direction.  The section that deals with where you state, I

17   believe that all the Stanford entities should be aggregated

18   for the purposes of liquidation.  Are we -- am I in the

19   right section?

20   A.    Yes, that's --

21   Q.    Page 45?

22   A.    -- stated there.  From an economic standpoint, I believe

23   all of Stanford entities should be aggregated for purpose of

24   liquidation.

25   Q.    What you call aggregation, have you come to learn that

U.S. District Court

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

1    that's also called substantive consolidation?

2    A.    I've heard that term.

3    Q.    Okay.  Have you ever rendered an opinion before to

4    support a substantive consolidation of a group of companies?

5    A.    Not specifically.  I have certainly looked at economic

6    factors in a variety of different kind of matters to

7    determine what the impact would be of various roads that

8    might be taken in a litigation.

9    Q.    Are you aware of the factors that are applied for a

10   court to consider substantively consolidating companies in

11   a bankruptcy case?

12   A.    No.  I have not gone through those.

13   Q.    So if I asked you, you did not apply the factors of the

14   elements test in the In re Vecco Construction Industries case

15   in your analysis -- you did not apply or seek to determine

16   the elements test in the In re Vecco Construction Industries

17   case, did you?

18   A.    No.  I think it's -- from my standpoint, I was really

19   looking at it from an economic view of the costs knowing

20   what I do about the case and the proceedings in general.

21   Q.    I don't want to -- I'm not trying to pick a fight with

22   you.  I just want to know if -- if you've applied these

23   tests.  And I have two more to go just so we know.  It

24   will save me a lot of time if you have -- if you haven't.

25        Have you applied the factors in the balancing test in

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 220

1    the In re Permian Producers Drilling case?

2    A.   Not specifically.  I haven't read it.

3    Q.   Okay.

4    A.   Whether those are economic factors that are considered,

5    they -- I might be utilizing some of those, but not having

6    read that and doing it specifically.

7    Q.   Have you ever heard of that test before?

8    A.   No, I have not.

9    Q.   And have you ever heard of the elements test that I

10   mentioned before?

11   A.   No.

12   Q.   And have you ever heard of the simplified balancing

13   test set forth in the Augie/Restivo Baking Company test --

14   or case?

15   A.   No, I have not.

16   Q.   You didn't apply those factors, either.

17   A.   Again, only to the extent if they are based upon the

18   economic viewpoint, I could have applied some of those same

19   kinds of issues and factors but not specifically related

20   from those cases.

21   Q.   Okay.  So notwithstanding that you haven't applied

22   those tests or opined on this issue before, you believe

23   that the entities should be aggregated into one for the

24   purposes of liquidation?

25   A.   Based upon my economic view of the costs related to

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 221

1   that issue.

2   Q.   Well, actually that's -- I'm glad you brought that up.

3   You say in your statement in those two -- in those two

4   paragraphs there on 45 and that bleed over onto page 46 of

5   your witness statement, you say that there are two benefits

6   that arise from some form of -- of aggregation.  You call

7   it aggregation; I call it substantive consolidation.

8   A.   Okay.

9   Q.   You say, one, it will cost less.  Right?  We agree on

10  that --

11  A.   Yes.

12  Q.   -- the first bullet point.  And second bullet point

13  says the presence of other Stanford entities is unlikely

14  to have a significant dilutative effect on distributions

15  to SIB claimants.  That's your second reason.  Right?

16  Or not reasons, but I don't know if that's a reason to do

17  it or that's something that won't happen if you do it.  I'm

18  not sure I understand.

19  A.   Are you on the last page, on 46?

20  Q.   Yeah.  I'm looking at the second bullet point on

21  page 46.

22  A.   Okay.

23  Q.   Do you see that?  Do you see where you say that the

24  aggregation will not -- is unlikely to have a significant

25  dilutative effect on distributions to SIB claimants?

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 222

1    A.    Knowing what I know about the issues in this case,

2    yes, that's my opinion.

3    Q.    Okay.  All right.  Well, let's take the first one

4    first, lower cost issue.  Mr. Sadler--and I don't think

5    it was this courtroom but another courtroom here in this

6    building--said on October 13th, quote, at the status

7    conference, We're basically out of the liquid -- when he

8    was addressing Judge Godbey, "We're basically out of the

9    liquidation business.  We're basically out of the winding

10   up of the company business.  We've got lawsuits that will

11   probably go on for years.  We have some cash but not enough

12   in our judgment to distribute now in light of the costs."

13        But you're saying that if there wasn't some form of

14   aggregation, that you'll have to spend a lot more money?

15   Is that what I understand?  That it will cost less if you

16   aggregate?

17   A.    What I'm saying is if it's not aggregated and that

18   there are additional litigation issues that have to be

19   addressed because of that, and from both sides, that that

20   will cost more than it will if that isn't true.

21   Q.    What's left to be -- I don't understand.  I don't

22   understand what's left to be done forensically.  What do you

23   have left to do forensically in this case?  What's not done?

24   A.    Well, obviously as any information comes up, we will be

25   looking at it if there's additional information that comes

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 223

1    out.  And as Mr. Sadler said, there is ongoing litigation,

2    and my testimony is part of that.

3    Q.   Fair enough, and I accept that.  And so putting your

4    testimony and litigation to the side because assuming you've

5    done that work already essentially or you might have to get

6    ready for like you would for today, but independent of that,

7    the forensic work to analyze the data that's at your

8    disposal, are you finished with that?

9    A.   There is always more that we could do, and as different

10   issues come up, I -- we will probably do additional work.

11   Q.   But for now you're done.

12   A.   For the most part, yes.

13   Q.   Okay.  Now, how much has -- you just joined

14   PricewaterhouseCoopers, which is the firm that Mr. Wide

15   was at for 28 years as an insolvency practitioner, right,

16   just in the last month or two?

17   A.   I just joined PWC.  I'm not sure how long he was there.

18   Q.   You don't know.  Okay.

19   A.   I saw that in his resume.

20   Q.   Okay.  How much has the Estate or on the -- the SEC

21   Receiver paid FTI and Pricewaterhouse so far--and I'm not

22   looking for to the penny, but a rough -- a round number--for

23   the forensic work that it's done or for all the work that

24   it's done?

25   A.   And that was going to be one of my questions.  Some of

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 224

1    our work is technologically-based and -- just everything

2    paid to --

3    Q.    Let's do it together, and then we can always break it

4    apart.

5    A.    I -- gosh, I haven't looked at it since leaving FTI

6    obviously, and there's always a delay in what gets paid and

7    what gets billed.

8    Q.    Right, uh-huh.

9    A.    I think it's probably somewhere around 18 million.

10   Q.    U.S. dollars?

11   A.    Correct.

12   Q.    Okay.  So you're not saying, if I understand correctly,

13   that you've got a lot more to do forensically and that

14   would -- by -- by aggregating somehow, it would save that

15   forensic cost, are you?

16   A.    No.

17   Q.    You're not.  So what is the less cost that arises by

18   aggregating?  I don't get it.

19   A.    Okay.  Well --

20   Q.    Help me through it.

21   A.    Okay.  I'll help you through it.  What -- what I'm

22   referring to here is, to the extent that you have two

23   different parties and it's not aggregated, I can certainly

24   see situations where there might be continued litigation

25   between the parties depending upon where assets are.  And

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 225

1    that's work that would not have to be done if there aren't
2    the two parties going at it.  So, in that regard, that will
3    be additional work that will --
4    Q.   Fair point.
5    A.   It won't necessarily change the base work for what we
6    know now.  But what may occur in the future can certainly
7    be incremental and you're having another firm and forensic
8    accountants doing work that, you know, we've done for the
9    last three years.
10   Q.   I saw you were here pretty much all day.  Right?
11   A.   Yes, I have been.
12   Q.   So you heard the testimony throughout the day.  Right?
13   A.   Yes.
14   Q.   Okay.  So you heard the testimony about a protocol,
15   the possibility of some sort of agreement whereby the
16   two -- the -- the Joint Liquidators and the SEC could work
17   together.  Have you ever worked in that environment before?
18   A.   No, I have not.
19   Q.   Does it sound logical to you?
20   A.   Yes.  I think it does.
21   Q.   Okay.  Your second point is that there -- and I'm not
22   sure it's a point in favor of aggregation as much as saying
23   if you aggregate, we won't have this problem.  So I'm not
24   quite sure I understand it.
25        But your second point seems to say that, and I'll quote

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 226

1   it, that you would not have a dilutative effect -- actually

2   I have them backwards, if we go to the first bullet point.

3   A.   Yeah.   That's what I was wondering.

4   Q.   Yeah.   Thank you.   I wondered why you had that confused

5   look on your --

6   A.   Yes.

7   Q.   -- on your face when I said second point when it was

8   actually the first.

9        You said it would not -- that the aggregation of the

10  Stanford companies, the other 130-odd companies, and SIB

11  would not likely--not likely--result in a significant

12  dilutative effect on distributions to the SIB claimants.

13  Right?

14  A.   You're on the bullet point at the bottom of 44?

15  Q.   Yes.

16  A.   Yes.   That's the --

17  Q.   You say that.   Right?

18  A.   -- very bottom line.

19  Q.   Right.   The very, very bottom of that.

20  A.   Yes.

21  Q.   Okay.   I am not sure I follow this.   I want to walk

22  through that with you.

23       You would agree that any recovered funds in the SEC

24  Estate would go pro rata to the various claimants, to the

25  various creditors.   Right?

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 227

1  A.   Under what scenario are you talking about?

2  Q.   Under any scenario, whether it's aggregated or not.

3  There are various creditors.

4  A.   Yes.

5  Q.   And the creditors get paid based on some sort of

6  pro rata formula, right, typically in a liquidation or a

7  receivership?

8  A.   And I understand that would be different in the U.S.

9  versus what you would do in Antigua.

10  Q.   Okay.  We can -- we can talk about that in a second,

11  but stay with me on this.  Did you help Mr. Janvey or

12  Mr. Sadler prepare the February 2000 report to this Court?

13  A.   February 2000, the interim report?

14  Q.   Yes.

15  A.   Yes.  We provided some of the financial information

16  that was contained in there.

17  Q.   Okay.  So that report says that there's 1.6 million in

18  local taxes to be paid.  Right?  I can show it to you and

19  walk you through it, but -- if you want me to.

20  A.   I don't remember the numbers.

21  Q.   Do you accept from -- that I'm -- that I'm going to

22  represent to you the -- the accurate number for now?  Will

23  you accept that?  And I'll posit as a hypothetical since

24  you're an expert.  Okay?

25       If it says there's 1.6 million in local taxes; and if

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 228

1    it says that there's an IRS tax claim to -- against Allen

2    Stanford, who is part of the consolidation or aggregation,

3    which is in the amount of $226 million, and it's likely

4    to rise; and if it says that there are vendor claims of

5    $25.4 million so far, and they're likely to rise; and that

6    there are employee claims of $17.3 million and landlord

7    claims of $79.3 million, that's over $123 million, putting

8    aside the tax -- the IRS tax claim right there, isn't it,

9    roughly?  79 plus 25 plus 17?  I'm testing you as an

10   accountant as well.

11   A.   I think that's right, yes.

12   Q.   Okay.  Great.  So that's $123 million in claims that

13   would not exist if we were just focusing on the depositors'

14   claims.  Right?  The victims, those are -- those are

15   nondepositors.

16            MR. ARLINGTON:  Calls for a legal conclusion,

17   Your Honor.

18            THE COURT:  Overruled.

19   Q.   (BY MR. DAVIS)  Right?  Those are nondepositor claims.

20   A.   Those are nondepositor claims, yes.

21   Q.   Okay.  Great.

22   A.   Whether they would be paid out equally, I'm not sure of

23   how that would work --

24   Q.   Okay.

25   A.   -- from a legal perspective.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

1   Q.   Okay.   So -- but if you aggregate, aren't you going to

2   have to pay them -- you're going to have to pay those claims

3   for all the other 130 Stanford companies along with the

4   claims to the -- to the victims.   Right?   The payouts of

5   the victims.

6   A.   Again, I'm not sure from a legal perspective how those

7   will have to be paid, if those come after payment to the

8   victims or -- or how that works.

9   Q.   Well, don't you think you'd want to know that answer

10   before you advocate aggregation?

11   A.   You know, I have looked at it and I think it's set

12   forth in here very much related to the kinds of work that

13   I am looking at having to be done as in the professional

14   fees and that kind of -- of information.

15   Q.   Okay.   Let me just take it one step further then.

16   Mr. Stanford, we all agree, has somehow finagled $1.8 billion

17   in loans somehow through the Stanford entities.   We agree on

18   that.   Right?   Roughly?

19   A.   It's hard to say they're really loans.   He's -- he

20   has not really taken them as money and it's a loan to him.

21   It's really kind of phony bookkeeping that gets it to that.

22   So --

23   Q.   There are some promissory notes, aren't there?   You've

24   seen them?

25   A.   There are but very few.

025147ba-a31c-4457-b73e-de48d28d06e2

Page 230

1    Q.   Well, however he booked it, he -- he sucked $1.8 billion

2    in value out to himself.  We agree on that?

3    A.   That's not quite true.

4    Q.   Okay.  How much is it?

5    A.   Well, no, there is 1.8 billion.  It went out to dif-

6    ferent entities that were used for a variety of purposes,

7    some of which would have gone to the benefit of -- of Mr.

8    Stanford.  But some of them were for homes for different

9    people.  Some of them were for aircraft, different

10   businesses that --

11   Q.   Uh-huh.

12   A.   -- out of the 130, that were -- were paid.

13   Q.   Basically the money comes into SIB, and you say in your

14   statement that the vast -- that -- that all of -- virtually

15   all of the money that funded the other Stanford companies

16   comes from SIB certificate of deposit funds.  Right?

17   A.   Yes, that's true.

18   Q.   Okay.  And it goes out of these other companies and

19   gets spent.  Right?

20   A.   Yes.

21   Q.   Okay.  Now, the Receiver, Mr. Janvey, he filed a

22   lawsuit, did he not, against Mr. Stanford on those -- on

23   those loans --

24   A.   Yes.

25   Q.   -- for $1.8 billion?

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 231

1  A.   As I understand it, yes, that there is a claim on that.

2  Q.   So if we -- if that gets recharacterized as income to

3  Mr. Stanford, and doing some quick math at 35 percent -- I

4  don't even know.  It might be higher than 35, but let's just

5  use 35 percent as the tax rate at that level.  That's $600

6  million, isn't it?

7  A.   That's about right, yes.

8  Q.   So if you aggregate with Mr. Stanford, does that not

9  attract the $600 million claim to the Estate to be shared

10 pro rata with all of the other claims that are in the Estate

11 if the IRS filed such a claim?

12 A.   But I think that would be true either way.

13 Q.   No.

14 A.   If you're looking at it from the bank's perspective,

15 the bank is the one who -- who had those loans.

16 Q.   How -- how could the IRS file a claim against SIB?

17 A.   No, not against SIB.

18 Q.   Exactly.  That's my point.  So if that -- that $600

19 million in claims gets attracted to this -- to the Receiver-

20 ship Estate but not to the Joint Liquidators Estate -- you

21 agree with that.

22 A.   I don't know.

23 Q.   You don't know.

24 A.   That's a legal conclusion --

25 Q.   Okay.  Fair enough.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 232

1    A.    -- that you're talking about.

2    Q.    That's a fair point.  So when you say it won't have a

3    dilutative effect by aggregating, did you take into account

4    the factors that I just -- that I just went with you of all

5    these extra claims that would have to be bundled together

6    with payments to the victims?

7    A.    Well, again, yes, I looked at that.  When you look at

8    it in aggregate, no matter how you look at it, with the CD

9    investors and most of the funds that were used being from

10   the CD investors, that is always going to be the vast

11   majority of -- of any claims.

12   Q.    Right, the vast majority.  But -- but it does have

13   an impact.  If you take all those monies that I just

14   referenced, 123 million plus the 600 million and -- and can

15   we agree that the amount that's -- that's missing, that the

16   amount of claims that ultimately are likely to be paid are

17   likely between 4 and $5 billion?  Is that a number that

18   you're comfortable with?  Because the Receiver has advocated

19   that number and --

20   A.    Well, I realize that that's where I think the claims

21   are right now.

22   Q.    And you heard Mr. Dickson say it's about 4.4 billion?

23   So you guys -- you're roughly in the same neighborhood,

24   aren't you?

25   A.    Again, I haven't looked at those numbers in some time,

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 233

1    but --

2    Q.   Well, then just -- let me posit it to you then as a

3    hypothetical since you're an expert.  If it is $4.4 billion

4    and we are talking about almost 800 million or $900 million

5    in extra claims that are not depositor claims, that's 16

6    cents on the dollar at a $550 million payout, isn't it?

7         If we stop the Estates today, you heard testimony today

8    that there's about $550 million in ready assets either that

9    are in the hands of Mr. Janvey, that are in the form of land

10   in the hands of the Joint Liquidators, or that the -- that

11   are being struggled over with the Department of Justice.

12   Isn't that about $550 million?

13   A.   The numbers that come from the Joint Liquidators, I

14   don't have any backup to.

15   Q.   You don't have that.  Okay.  But let me then posit it

16   to you as a hypothetical.  If it's $550 million --

17   A.   Okay.

18   Q.   -- okay, and that's the amount that's going to get

19   ultimately distributed against 4.4 billion -- and I'm -- I

20   don't -- I know you don't have a calculator in front of you.

21   Will you accept my representation to you that that means

22   16 cents on the dollar goes to nonvictims?

23   A.   Well, that's assuming that those get paid before at the

24   same rate as the victims.

25   Q.   Doesn't that happen automatically in an aggregation?

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 234

1    A.    I can't tell you.

2    Q.    You don't know?

3    A.    I don't know.

4    Q.    Okay.  On page 35 of your witness statement, you state

5    that 23 percent of the loans made by Stanford International

6    Bank were made to U.S. borrowers.  Isn't that right?

7    A.    Let me get there.

8    Q.    Sure.  Sure.  I'm just getting the --

9    A.    Okay.  I'm sorry.  What numbers are you looking at?

10   Q.    I'm just watching the clock.  You say that -- you admit

11   that 23 percent of the loans made by Stanford International

12   Bank were made to U.S. borrowers.

13   A.    At the end of the Receivership, that was the amount,

14   yes.

15   Q.    So by definition 70 percent of the loans made by SIB

16   were made to non-U.S. borrowers.  Even I can do that math.

17   Right?

18   A.    A little over 70 percent, but yes.

19   Q.    77 is what I said.

20   A.    Oh, I'm sorry.  I thought you said 70.

21   Q.    We agree?

22   A.    Yes.  Other than U.S., yes.

23   Q.    Super.  Let's talk about then the assets of the

24   Estates.  You would agree with me that right now there's

25   land in Antigua.  You have at least heard tell of it.  No?

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 235

1    A.    Yes, I understand there's land in Antigua.

2    Q.    Okay.  And the -- let me posit to you that the

3    Receiver's estimate that the fire sale value of that land,

4    whether it be in the name of SIB or other entities which

5    they have frozen, is somewhere between 70 and $115 million.

6    Do you accept that?

7    A.    I don't know that number, but --

8    Q.    Seem logical?

9    A.    I saw in one of their direct testimony that they --

10   they stated a number I think was about 110 million.

11   Q.    And -- and the -- you did mention on page 14 of your

12   witness statement that at least some of that land, Pelican

13   and Guyana Islands, was purchased for $63.5 million several

14   years ago.

15   A.    Yes, though I don't know what makes up their 110

16   million.  I'm -- I don't know if that's in there.

17   Q.    I -- I accept that.  But, again, I'm asking you as an

18   expert to posit that.  You would agree with me that about

19   $130 million of monies that are in the name of SIB are in

20   Switzerland right now.  Right?

21   A.    I don't know if that's the exact amount.  I think we

22   disagree on that, but it's close to that figure.

23   Q.    Close.  Okay.  Let's just call it that for the sake

24   of argument.  And about $100 million is on deposit in the

25   United Kingdom right now in SIB accounts.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

```
 1   A.   Yes.

 2   Q.   And about 18 million on deposit in Canada.  Right?

 3   A.   Yes.

 4   Q.   Another 3 million that was on deposit in the name of

 5   the bank in Panama.  Right?

 6   A.   I am not familiar with the amount in Panama.

 7   Q.   Okay.  So how much of the assets currently of the bank

 8   are here in the United States?  All of those I just read to

 9   you are all outside the United States.  Right?  We'll agree

10   on that.

11   A.   They -- they are located outside the U.S., yes.

12   Q.   Right.  So what assets of the bank are here in the

13   United States?

14   A.   We have assets that --

15   Q.   I'm talking about of SIB, of the bank.

16   A.   Yes.

17   Q.   Okay.  Sorry.

18   A.   There are private equity investments that are in the

19   Receivership and have been collected.

20   Q.   And you collected about $37 million from those?  Right?

21   A.   That's correct.

22   Q.   But they were valued on the books at over $290 million,

23   were they not, according to the schedule in your witness

24   statement?

25   A.   They are -- they're actually -- for those specific
```

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 237

1    items, we don't have it separated.

2    Q.    Okay.  But you've got this $37 million of the monies

3    that have been collected so far came from equity investments

4    made by SIB.

5    A.    That's correct.

6    Q.    Okay.  And how much else was in the name of SIB that

7    was here in the United States?

8    A.    There were bank accounts --

9    Q.    How much was that approximately?

10   A.    -- in the U.S.  It's been a long time since I thought

11   about the original balances in those.  That was probably

12   50 million?

13   Q.    Okay.  So $87 million roughly between the 37 and the

14   50 million were SIB-denominated assets.  Correct?  Here in

15   the States.

16   A.    Well, there's other assets that they had that -- that

17   might be here.

18   Q.    In the name of the bank.

19   A.    Yes.

20   Q.    What are they?

21   A.    Well -- well, in the name of the bank, you still have

22   the other -- the -- we have a remaining private equity

23   amount, not just the ones that have been collected.

24   Q.    The uncollected part?

25   A.    Yes.  And the cash.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 238

1    Q.    But have you valued those?

2    A.    The private equity?

3    Q.    Yes.

4    A.    No.  I have not done that.

5    Q.    Do you know if they have any value?

6    A.    I know that they continue to be marketed.  There is a

7    specific company who continues to do that, and that they

8    are looking to try to monetize those if they can.

9    Q.    For three years they've been trying to -- for two years

10   they've been marketing those and they still haven't sold

11   them.

12   A.    They've been trying to look for the right opportunity,

13   if there is one, to -- to do that.

14   Q.    So what does that tell you about the value?  Not so

15   good, huh?

16   A.    Oh, I -- no, I don't think so.

17   Q.    Okay.  All right.  You say in your witness statement --

18   I'm sorry, in your prior sworn statement on July 15, you say

19   that the SIB investment advisors were unaware of how SIB's

20   portfolio was invested.  Right?  The investment portfolio.

21   A.    There's a couple of things that I say in there.

22   There -- there's -- because there's different levels.

23   They're unaware of what was actually in there.  What they

24   did know was or what they thought was -- was told to them

25   was a different story.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 239

1    Q.    It was false.

2    A.    Yes.

3    Q.    What was told to the investment advisors was false.

4    A.    That's correct.

5    Q.    Right?  And you say on page 9 of your current witness

6    statement that the SIB CD portfolio did contain some

7    legitimate investments, and we all agree it's not a lot,

8    but did you ever calculate how much that was other than --

9    is it -- is that the equity positions you were just talking

10   about a minute ago?

11   A.    No --

12   Q.    Different?

13   A.    -- not necessarily that, that -- that it would be part

14   of it.

15   Q.    How much was it, the legitimate investments of SIB, at

16   the time the bank was taken over?

17   A.    What do you call investments?  Are you talking about

18   the assets at fair value?  What are you referring to?

19   Q.    Fair value, yeah.  That's all -- we want to know what

20   we can convert to dollars for these folks that got their

21   money stolen from them.

22   A.    Okay.  At the time of the Receivership, there was about

23   $350 million left in Tier 2.  And there was about I think

24   30 million in cash left.

25   Q.    The 350 million, though, includes the monies that are

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 240

1    in Switzerland and UK and Canada.  Right?

2    A.   That's correct.

3    Q.   Right.  Okay.  You say that the Antiguan employees

4    of SIB did not know how the assets of the bank were being

5    invested in the U.S.  Right?

6    A.   Generally.  I have not seen anything that leads me to

7    believe that they have.

8    Q.   Okay.  Even -- you even say that Antiguan's outside

9    accountant seemed to be oblivious to how the assets of the

10   bank were being invested.  Right?

11   A.   The evidence --

12   Q.   If not oblivious to even more than that, but at least

13   oblivious to that.

14   A.   Well, I think he certainly didn't have access that we

15   can tell to the real records.

16   Q.   Right.  He was --

17   A.   Whether he was oblivious to it or not, I don't know.

18   Q.   That's my point.  These investment advisors, the

19   accountants, the employees, the -- how that money was

20   invested, in fact it was being stolen behind the scenes,

21   was hidden from them.  Right?

22   A.   Well, there's certain -- certain employees who knew

23   what was happening.

24   Q.   Have you come across any evidence that the public knew

25   that those investments were being -- that were overstated

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 241

1    and that the money was being stolen from the bank?

2    A.    One, I don't know that I'd call it stolen.  But, two,

3    I don't have that information that the public would know.

4    What they were putting out to the public was -- was a very

5    different story.

6    Q.    Exactly.  To the public's view, what they saw was a

7    bank that had assets in the billions of dollars.  Right?

8    A.    What they saw was an entity that had -- yes, that had --

9    Q.    They claimed to have billions.

10   A.    -- purported assets in the billions of dollars, yes.

11   Q.    Right.  Thank you.  The SEC did no less than five

12   examinations, according to the documents you attach, from

13   1997 through 2004 and they didn't know how the assets were

14   being invested, did they, of the bank?

15   A.    There was no action taken and -- and nothing -- nothing

16   changed at the bank that I'm aware of.

17   Q.    Nothing in those reports says that they figured out how

18   these investments were being invested.  Right?

19   A.    Not that I'm aware of, no.

20   Q.    Okay.

21   A.    They certainly raised issues --

22   Q.    Right.

23   A.    -- that they knew that there were issues.

24   Q.    We agree, without going through a whole line of

25   questioning, if we can just cut to the chase, that there

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 242

1   is no loan owed on the books that you can find any evidence

2   of by the government of Antigua to Stanford International

3   Bank, don't we?

4   A.   No.   Those were taken into other entities.

5   Q.   Right.   Right.   And you have a whole schedule that's

6   attached to an Exhibit 46 and Exhibit 62 of your -- of your

7   witness statement that lays that out.   But none of those

8   loans are owed directly to SIB, are they?

9   A.   No.   There is nothing that I've seen, though there

10  is -- from the loan perspective, there is certainly a lot of

11  documentation or information from the perspective of what in

12  other proceedings related to loans, and he's talking about

13  Mr. Stanford and the bank, or the government is talking about

14  Mr. Stanford and the bank, additional loans over and above

15  any that I've seen.

16  Q.   There's some smoke there, right, that there's inquiry?

17  Don't you agree?

18  A.   There is some information there, yes.

19  Q.   Good enough.   You say in your witness statement,

20  paragraph 24, actually of your July 15th witness statement,

21  that SIB reached a tipping point in October of 2008 that

22  was essentially the beginning of a run on the bank.   Right?

23  A.   I don't think I used those terms -- that term.

24  Q.   You used the phrase "tipping point."   Do you want me

25  to show it to you?

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 243

1   A.   That -- that makes sense, tipping point, yes.

2   Q.   Okay.  So the tipping point of the bank was at some

3   point that the amount of CD redemptions was -- was over and

4   above that were being requested than the amount of money

5   coming in in order to meet those -- those demands.  Right?

6   A.   Yes.  Starting in October of 2008, the redemptions

7   exceeded the amounts that were coming into the bank.

8   Q.   Okay.  Did you do an analysis of how much money left

9   the bank in the last three months of the bank's -- before

10  the bank was -- was intervened?

11  A.   I don't know if I have it down specifically to the

12  last three months, but we've looked at it on a monthly

13  basis.  So -- I don't have that total, but we have looked

14  at it on a monthly basis.

15  Q.   Can you give us a rough sense of how much left the bank

16  in -- from October to February, October of 2008 to February

17  2009?

18  A.   I -- I don't know the amount.

19  Q.   Is it more than 100 million?

20  A.   Yes.

21  Q.   Is it more than 200 million?

22  A.   Yes.

23  Q.   Is it more than 500 million?

24  A.   I believe so.

25  Q.   Is it more than a billion?

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 244

1   A.   I don't -- I don't know that.

2   Q.   Is it more than $700 million?

3   A.   I don't know.

4   Q.   So somewhere between 500 million and a billion.

5   A.   That's my recollection, yes.

6   Q.   Okay.  That left in a five -- in a four-month period.

7   A.   Well, and when you're talking about left, are you

8   talking about CD redemptions or what are you --

9   Q.   Yes.  I'm talking about redemptions.

10  A.   Okay.  That's what I assumed.  That's my best

11  recollection.

12  Q.   Okay.  You say in your witness statement in exhibit --

13  in reference to Exhibit 8 and also at page 225 of your

14  witness statement that, without the CD proceeds, Stanford

15  Group Company was insolvent.  We agree on that?

16  A.   On page 225?

17  Q.   225.

18  A.   My report is only 45 pages long.  What are you --

19  Q.   No, I'm talking about the exhibits that go --

20  A.   Oh, okay.

21  Q.   They're -- they're just the -- the sort of Bates number

22  that's on there?

23  A.   Yes.

24  Q.   Okay.  That's -- that's one of your earlier -- you

25  include in your witness statement a bunch of your earlier

U.S. District Court

Linda J. Langford, CSR, RDR, CRR

1   declarations, your sworn statements, that are exhibits.

2   A.   Correct.

3   Q.   That's an earlier one dated May 24, 2010.

4   A.   Okay.

5   Q.   Okay.  In there, since we're running short on time,

6   would you accept that I represent to you that and quote you

7   that you say, without CD proceeds, Stanford Group Company

8   was insolvent.

9   A.   Yes, that's correct.

10  Q.   And in your March 11, 2000 (sic) witness statement at

11  page 27, you say that Stanford Financial Group Company would

12  have been insolvent from at least 2000 forward without the

13  funds -- funds from the other Stanford entities which came

14  primarily from the proceeds of sales of SIB certificates of

15  deposit.  Right?

16  A.   Yes, that's correct.

17  Q.   Okay.  And in your June 1st, 2011 sworn declaration,

18  you say that SIB itself was insolvent from at least 2004

19  forward.

20  A.   What declaration was that?

21  Q.   Your June 1st, 2001 -- 2011.  I'm sorry.  I said 2001

22  maybe, but it's 2011.

23  A.   Actually I think it's from 1999 forward, that --

24  Q.   Okay.

25  A.   -- my opinion currently is that it's from 1999 forward.

Linda J. Langford, CSR, RDR, CRR

Page 246

1    Q.   All these other Stanford companies, not SIB but the

2    other Stanford companies, would that be true if I asked you

3    the same question, that they would be insolvent but for the

4    monies that come in from the CDs that were sold by SIB?

5    A.   I don't know.  I haven't looked at all the companies.

6    Q.   Of the ones you've looked at, would they all be

7    insolvent but for those funds coming in to them?

8    A.   I can't think of any that I've looked at that would

9    not be in -- that would be in -- that would be solvent but

10   for CD proceeds --

11   Q.   Thank you.

12   A.   -- of some sort.

13   Q.   Thank you.  All right.  Oh, last question.  On page

14   19 of your witness statement, you state that extensive SIB

15   client records exist in the U.S.

16   A.   I'm sorry, where are you?

17   Q.   Page 19 of your witness --

18   A.   Okay.

19   Q.   -- statement.

20   A.   Which bullet?

21   Q.   Your witness statement, yeah.

22   A.   Yes.

23   Q.   There's no paragraph numbers there, so you have to find

24   it.  But it says that extensive SIB client records exist in

25   the U.S.

025147ba-a31c-4457-b73e-de48d28d06e2

Page 247

1   A.   That's correct.

2   Q.   But you don't have all the client records, do you?

3   A.   Well, I haven't gone through to reconcile total client

4   records to paper.  I do have and frankly was able to match

5   very closely with Mr. Hamilton-Smith on the client informa-

6   tion that was available to us.  It matched very closely with

7   his.  So I believe I do have the same client information

8   that is available to the Joint Liquidators.

9   Q.   Okay.  I know I said that was the last question, but

10   this is really going to be it, I promise.  Mr. Rodriguez-

11   Tolentino gave you a witness -- or interview.  Right?

12   A.   He did, yes.

13   Q.   Was that interview reduced to writing?

14   A.   No.

15   Q.   Do you have notes from that interview?

16   A.   I do not.

17   Q.   So it's literally what's in your witness statement.

18   When you recall what Mr. Rodriguez-Tolentino told you is --

19   is based on your recollection of what he told you.

20   A.   Well, I had a staff person who was taking notes.

21   Q.   Okay.

22   A.   And he has notes.

23   Q.   Okay.  That's what I meant.  I mean, do you have notes

24   of that -- of that interview?

25   A.   Yes, I do.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 248

1    Q.    You do.  But you didn't attach it to your --

2    A.    It's not mine.  Within the firm, we would have them.

3    Q.    Okay.  And you didn't attach them to your witness

4    statement, did you?

5    A.    No.

6    Q.    But you did -- you did rely on them, in part, to put

7    in statements about Mr. Rodriguez-Tolentino in your witness

8    statement, didn't you?

9    A.    Yes.

10   Q.    Okay.

11             MR. DAVIS:  Thank you, Judge.

12                    REDIRECT EXAMINATION

13   By Mr. Arlington:

14   Q.    Ms. Van Tassel, would liquidating SIB in a proceeding

15   by itself be consistent with how you understand the bank

16   to have operated vis-a-vis the other Stanford entities?

17   A.    No.

18   Q.    And what do you mean by that?

19   A.    Well, the bank was really only one part of what was

20   the entire Ponzi scheme.  Really all of it worked together

21   to create that scheme, and the assets and the CD proceeds

22   were disseminated throughout the -- all of those entities.

23   Q.    And do you have an understanding of who it was or what

24   group of people controlled or managed that Ponzi scheme?

25   A.    Yes, I do.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 249

1   Q.   And who are they?

2   A.   Primarily Mr. Stanford, Mr. Davis, and at least to

3   respect to investments, Laura Pendergest-Holt.

4   Q.   Okay.  And where was Mr. Davis located?

5   A.   He had offices in Memphis and in Houston.

6   Q.   And Ms. Holt?

7   A.   She was in Memphis as well.

8   Q.   And Mr. Stanford?

9   A.   He had offices in -- in Houston that I -- as far as

10  offices, that's the only office that I'm aware of.  He may

11  have had an office at the bank, I think.

12  Q.   Okay.  So the people that were running this Ponzi

13  scheme were primarily in the United States.

14  A.   Yes, that's correct.

15  Q.   Okay.  When you say in your witness statement in the

16  paragraph that Mr. Davis was asking you about, about the

17  consolidated liquidation, when you say that the Estate will

18  not support the costs of separate liquidations, what costs

19  are you referring to?

20  A.   And I think I have in here.  I refer to some -- the

21  professional fees of people on both sides of that have

22  to not only do the work, maybe replicate some of the work

23  that's already been done, but also if there's issues where

24  they are at odds with each other, that having to fund those

25  litigations on both side would increase the cost.

025147ba-a31c-4457-b73e-de48d28d06e2

Page 250

1    Q.   Okay.  And would part of the liquidation process be

2    the actual claim submission and distribution process?

3    A.   Yes.

4    Q.   And would there be fees and expenses incurred

5    associated with those activities?

6    A.   Yes.

7    Q.   You have reviewed the testimony and exhibits of Omari

8    Osbourne, have you not?

9    A.   Yes, I have.

10   Q.   And there is a notebook in front of you.  I would

11   ask you to take a look at -- it contains Mr. Osbourne's

12   testimony and exhibits.  If you would, take a look at

13   Exhibit Number 4 to his testimony.

14            MR. DAVIS:  Your Honor, if I might, we are not

15   calling Mr. Osbourne.  But if they want to move the evidence

16   in and let us move it in out of turn, we'll move it in.  But

17   we're not calling him.  So if they want to cross on him,

18   it's not evidence in the case.  We didn't call him.

19        But we have no problem putting the written evidence in

20   if -- if they want to do that.

21            MR. ARLINGTON:  Well, the evidence has been

22   submitted to the Court and is in the record.

23            MR. DAVIS:  It's not in the record.  It's not

24   moved into evidence, Judge, and that's our point.  We want

25   to move it into evidence if they're going to rely on it.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 251

1          MR. ARLINGTON:  Then, Your Honor, the Receiver

2     would -- would move to admit the Osbourne testimony and

3     exhibits into the record.

4          MR. DAVIS:  Okay.  No objection, Your Honor.

5     Q.   (BY MR. ARLINGTON)  Ms. Van Tassel, take a look at

6     Exhibit Number 4 to Mr. Osbourne's testimony.  Have you

7     reviewed that before?

8     A.   Yes.  The income statement as of -- or the financial

9     statement as of June 2001.

10    Q.   Well, and if you'll look through it, that -- that's

11    actually a collection of income --

12    A.   Right.

13    Q.   -- statements that were submitted to the FSRC.  Is that

14    right?

15    A.   That's correct.

16    Q.   Okay.

17    A.   That's where it begins, and then it goes through time,

18    I think the last being October of 2008.

19    Q.   Okay.  The last report that's in there begins, I

20    believe, at page 294 on the bottom?

21    A.   It was through -- sorry, it's hidden in writing.  Yes,

22    I have it.

23    Q.   Okay.  And that covers the quarter ended September 30,

24    2008.  Is that right?

25    A.   That's correct, yes.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 252

1    Q.   Okay.  And if you'll turn to page 320 of that document,

2    if you would, just generally describe what -- what that

3    reflects there.

4    A.   On page 320, what this reflects is an analysis of the

5    investments of Stanford International Bank --

6    Q.   So these would be --

7    A.   -- or purports to.

8    Q.   So these -- this was a report submitted to the FSRC

9    in Antigua purporting to show the value of the assets of

10   the portfolio of SIB.  Is that right?

11   A.   That's correct, yes.

12   Q.   Okay.  And what does it show the fair value as of

13   September 30, 2008 of private bonds to be?

14   A.   Private bonds are $2 billion roughly.

15   Q.   Okay.  Have you seen any evidence in your

16   two-and-a-half-plus years in investigating this case

17   that $2-plus billion in private bonds were held by SIB?

18   A.   No.

19   Q.   Okay.  What about equity securities?  What is the

20   value as of September 30, '08?

21   A.   That's 3.5 billion roughly.

22   Q.   Okay.  And have you seen any evidence in your

23   investigation showing that there were 3.5 billion in

24   equity securities that -- held by SIB?

25   A.   No.  I have not seen that.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 253

1    Q.    And do you see a reference there to the value of gold

2    held by SIB?

3    A.    I do.

4    Q.    And what is the value of the gold purported to be held

5    by SIB?

6    A.    Roughly $488 million.

7    Q.    Okay.  And then, underneath that, you see the value of

8    silver.  What is that?

9    A.    $104 million.

10   Q.    Okay.  Have you seen any evidence anywhere to suggest

11   that the bank held either contracts, actual gold, or some

12   type of interest totaling either $487 million in gold or

13   $103 million in silver?

14   A.    No, I have not.

15   Q.    Okay.  Based on your review of not only this page but

16   the rest of this report and the other reports in Exhibit 4,

17   do you have an opinion about the accuracy of the asset and

18   income figures in those documents?

19   A.    Yes, I do.

20   Q.    And what is that opinion?

21   A.    Those amounts I know come from spreadsheets that are

22   the fictitious numbers that were created by Mr. Davis and

23   others that were reported on the financial statements that

24   were simply made up to be what they needed it to be to

25   report for the investors.

Linda J. Langford, CSR, RDR, CRR

Page 254

1    Q.    So do you have an opinion as to whether those -- those

2    figures are accurate?

3    A.    They are -- they're -- they're not accurate.  They are

4    all completely false.

5    Q.    Okay.  And do you have an opinion -- well, I'll -- I'll

6    leave that.

7          The -- you've looked at the -- at those reports, and

8    they cover the time period at least -- they cover a larger

9    time period, but they cover at least 2008, do they not?

10   A.    Yes, they do.

11   Q.    Okay.  And did you see in those reports, in looking

12   at the asset values over the course of 2008, a trend in

13   the value of the assets that the bank claimed to hold?

14   A.    Actually the value of the assets through 2008, March

15   30th through September 30th, actually increased pretty

16   significantly.

17   Q.    Increased significantly.  And how does that compare

18   with -- I mean, we were all living through the market in

19   2008.  How does that compare with what you know the world

20   economy was experiencing during that time?

21   A.    Well, that's certainly contrary to what was happening

22   in the general markets.  And if you look at, as you pointed

23   out, so much of this being in supposedly equity securities

24   where, you know, those dropped at different times 20 to 40

25   percent, that certainly is in contrast with what they were

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 255

1    reporting.

2    Q.   Okay.  If you were either an employee, Mr. Osbourne,

3    the accounting manager, or some other employee of SIB or

4    representative of the FSRC and you saw these reports, would

5    that raise any kind of question or concern in your mind?

6    A.   Yes, it would.

7    Q.   And what -- what would that concern be?

8    A.   Well, the concern being how you're able to outpace

9    the market by this -- this percentage and do better than

10   the rest of the market in the world.  And based upon this

11   information, particularly with the spread between equities,

12   and that -- that just seems almost impossible.

13   Q.   So it would raise a concern as to whether or not the

14   information was anywhere close to accurate.

15   A.   Absolutely.

16   Q.   Okay.  Now, back on the issue of aggregation briefly,

17   are you saying that it would make economic sense or -- or

18   it wouldn't make economic sense to liquidate all of the

19   130 Stanford-related entities in separate proceedings?

20   A.   I think that it would make -- I don't think that would

21   make economic sense.  To the extent that you have 130

22   different proceedings with different entities, different

23   professionals, that would have to be more costly.

24            MR. ARLINGTON:  I have no further questions.

25   Thank you.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 256

1          MR. DAVIS:  Nothing further, Your Honor.

2          THE COURT:  Thank you, ma'am.  You may step down.

3          THE WITNESS:  Okay.

4          MR. SADLER:  And we'll call our --

5          MR. DAVIS:  I'm sorry.  Your Honor, could we just

6   get a quick time check?

7          THE COURT:  164 for you-all, and about 150 for

8   the Receiver team.

9          MR. SADLER:  We'll call our next and final

10  witness, Mr. Ralph Janvey, Your Honor.

11         MR. POWERS:  Good afternoon, Your Honor.  Scott

12  Powers for the Receiver, Ralph Janvey.  We would call our

13  last witness, Ralph Janvey.  We would offer his testimony

14  and his exhibits into evidence.

15         THE COURT:  All right.  Could you raise your right

16  hand, please?

17      (The witness was sworn by the Court.)

18                  RALPH JANVEY, SWORN,

19                  CROSS EXAMINATION

20  By Mr. Redmond:

21  Q.   Mr. Janvey, you were appointed on February 17th, 2009,

22  were you not?

23  A.   That's correct.

24  Q.   And the entities you were appointed on were a

25  combination of two areas.  You were appointed on Stanford

Linda J. Langford, CSR, RDR, CRR

Page 257

1    International Bank and Stanford Trust Company that were

2    Antiguan companies, and the rest were U.S. entities.  Is

3    that correct?

4    A.   Well, I was appointed over all the Stanford enterprise-

5    related entities.  I don't -- I didn't distinguish them the

6    way you just did.

7    Q.   Well, then my question is, there was -- all the other

8    entities except Stanford International Bank and Stanford

9    Trust Company were U.S. entities or U.S.-based entities,

10   were they not?

11   A.   I believe some of the entities were based in Mexico,

12   Colombia --

13   Q.   Okay.

14   A.   -- Panama, other countries, so I can't necessarily

15   agree with that.

16   Q.   Okay.  And clearly the --

17          THE COURT:  Mr. Janvey, can I get you to scoot up

18   a little closer to the mic, please, sir?

19          THE WITNESS:  Yes, Your Honor.

20          THE COURT:  Thank you.

21   Q.   (BY MR. REDMOND)  But clearly Stanford International

22   Bank and Stanford Trust Company were Antiguan corporations,

23   were they not?

24   A.   Yes, I can agree with that.

25   Q.   And did they have any physical operations in the United

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 258

1    States?

2    A.    Physical locations, no, they did not.

3    Q.    So they had no offices in the United States?

4    A.    Well, I -- I want to be clear.  They were run by people

5    who were located in the United States.  In answer to your

6    question, there was a building in Antigua.  But I think

7    that begs the point to who ran the bank and who ran the

8    entities.

9    Q.    Mr. --

10          MR. REDMOND:  I'd move to strike that, Your Honor,

11   as being nonresponsive.

12          THE COURT:  Overruled.

13   Q.    (BY MR. REDMOND)  When you were appointed as Receiver,

14   was one of your initial functions to go ahead and -- and

15   shut down the various Stanford entities?

16   A.    That was one of my functions under the order appointing

17   me, that's correct.

18   Q.    And that was for the purpose of trying to restrict any

19   kind of ongoing fraud or any kind of ongoing operations.

20   Is that correct?

21   A.    One of the purposes of my being appointed to shut down

22   the offices was to take control of all the assets of the

23   Stanford enterprise, which one of those was SIB.  That's

24   correct.

25   Q.    When -- when you were appointed, how soon after

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 259

1   February 17th were you able--and let's take the U.S.

2   entities to start with--able to physically take control

3   of those entities and shut them down?

4   A.   Well, we started taking control that day.  It took us

5   a while to take control of all the entities.  They were

6   located in, my recollection, 30-something states, numerous

7   countries, and it took a large team to do that.

8        But we started the day I was appointed.  We went in

9   that morning in Houston and Memphis and other locations and

10  shut them down.  That was an ongoing process over weeks, if

11  not months.

12  Q.   Okay.  And when did -- when did you as Receiver stop

13  transferring funds or money to Stanford International Bank?

14  A.   I really don't understand your question, when I

15  transferred money for them.  You'll have to -- I'm not sure

16  I understand the question.

17  Q.   Okay.  Well, let's -- let me reask it then.  Once you

18  were appointed as Receiver, were any funds transferred to

19  Stanford International Bank in Antigua?

20  A.   When I was appointed Receiver, we had a very difficult

21  time getting a handle on all the funds to begin with because

22  they're around the world.  My recollection is we seized bank

23  accounts--and it took a long time in a number of countries,

24  including this country and other countries--to try and get

25  control of those cash assets.  It was not -- it was not

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 260

1    like we'd walk into the -- one location and there was a

2    whole bunch of cash.  We had to get control of that.

3    Q.   Okay.  But as soon as you were appointed as Receiver,

4    you gave notification to the financial entities that you

5    were aware of to -- to cease honoring checks and sending

6    funds out.

7    A.   Yes.  We sent out letters to numerous financial

8    institutions the first week or two, saying, stop honoring

9    any payments by the Stanford enterprises.  That's correct.

10   Q.   That included Toronto Dominion Bank in Canada?

11   A.   That's correct.

12   Q.   And did it send any further funds out after your

13   notification?

14   A.   Sitting here today, I really have no recollection.  I

15   can't answer that.

16   Q.   Did you send notification to HSBC in London?

17   A.   I believe at a certain point we did, yes.

18   Q.   And did you send -- and did you send those to Trustmark

19   Bank in Houston?

20   A.   Yes, I believe we did.

21   Q.   Okay.  After the -- you were appointed as Receiver and

22   you initiated your actions to shut down or lock down the

23   various entities, to your knowledge was a fraud -- any

24   fraud that was -- had been perpetrated before continuing?

25   A.   Well, to my recollection, the morning we came into

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

1    Houston, there was money transferred out of Houston

2    unbeknownst to us to Canada.  But short of that, I believe

3    we tried to shut everything down starting that day.

4    Q.   Okay.  So you believed you shut down the physical

5    transfer of assets or physical transfer of funds in a very

6    short-term basis.

7    A.   Well, I believe we stopped the people perpetrating

8    the Ponzi scheme from transferring monies.  One may have

9    transferred some monies among the accounts as a Receiver

10   and my staff, but I don't believe any of the defendants had

11   the opportunity after February 17th to transfer money, no.

12   Q.   Okay.  And you realized after your appointment that

13   there were funds located in Great Britain, in Switzerland,

14   and in Canada.  Is that correct?

15   A.   That is correct, I did.

16   Q.   And you had an order from Judge Godbey regarding those

17   assets, did you not?

18   A.   That's correct.

19   Q.   Were you able just to go to Great Britain and say, turn

20   over all the funds to me?

21   A.   I -- I wish I was able to, but I was not.

22   Q.   Okay.  Is that because the United Kingdom is a

23   sovereign nation?

24   A.   Is that because it was a sovereign nation?  It was

25   because the bank in the United Kingdom would not agree to

Linda J. Langford, CSR, RDR, CRR

Page 262

1   give me the funds.

2   Q.   And so the bank would not recognize your authority as

3   a Receiver and your request to turn the funds over just on

4   a letter request.

5   A.   Well, at that time the Antiguan court had appointed the

6   Vantis liquidator, and they were making a concerted effort

7   to fight me and the Receivership and this Court's order to

8   get control of those funds in various countries.

9   Q.   Well, Vantis was initially appointed as a Receiver

10  Manager, then later on as Liquidator.  Wasn't that correct?

11  A.   Well, at a certain point.  But they started as Receiver

12  Manager I believe within two or three days after this Court

13  ordered the -- entered the order appointing me.

14  Q.   Okay.  If the date is February 26th, 2009, would --

15  would you disagree with that?

16  A.   I have no reason to disagree, no.

17  Q.   And then the liquidation was initiated and occurred

18  on April 17th of 2009 in Antigua.  Would you disagree with

19  that?

20  A.   If that's -- I have no reason to disagree with the

21  date.

22  Q.   Okay.  And so because of the fact that you couldn't

23  just go to Great Britain and have the bank turn the funds

24  over, you initiated an Article 15 proceeding in Britain,

25  did you not?

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 263

1    A.    Well, I know we initiated a proceeding.  Whether it

2    was Article 15, I really can't say sitting here in front of

3    the Court that's accurate.

4    Q.    You initiated a proceeding in order to have the funds

5    turned over to you, did you not?

6    A.    That is correct.

7    Q.    And a -- and a proceeding to be recognized, also?

8    A.    That is correct.

9    Q.    And as part of that proceeding -- as part of that

10   proceeding, were you given an opportunity to present your

11   case and argue it?

12   A.    My understanding, my counsel had the opportunity to

13   present the case to the court in the United Kingdom, yes.

14   Q.    Do you feel the proceedings in the United Kingdom were

15   fair and equitable?

16   A.    I have no reason to believe that the proceedings

17   themselves were not fair and were unequitable, no.

18   Q.    Okay.  And the United Kingdom ultimately denied your

19   petition for recognition and granted recognition to the

20   Joint Liquidators.  Is that correct?

21   A.    Ultimately that was their judgment, that's correct.

22   Q.    Okay.  The same situation occurred in Switzerland.

23   Switzerland is an independent country, is it not?

24   A.    Yes, it is.

25   Q.    And you submitted yourself -- did you try to get the

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 264

1    funds from Switzerland?

2    A.    Oh, we tried to get control of those funds, yes.

3    Q.    And -- and -- and you were not able to.  Is that

4    correct?

5    A.    That is correct.

6    Q.    And you filed a request to have -- be recognized, have

7    the funds turned over?

8    A.    That is correct, we did.

9    Q.    And Switzerland determined and did not provide recog-

10   nition to you in your capacity as Receiver but -- but

11   granted the recognition to the Joint Liquidators from

12   Antigua.

13   A.    Yes.  Swiss -- Swiss court would not recognize my

14   actions as a Receiver in Switzerland, that's correct.

15   Q.    And, Mr. Janvey, you were appointed at the request of

16   the SEC when they filed the initial complaint?

17   A.    That is correct.

18   Q.    And then Judge Godbey appointed you in your capacity as

19   Receiver?

20   A.    That is correct.

21   Q.    And Judge Godbey --

22         THE COURT:  Actually that's not correct.

23         MR. REDMOND:  I'm sorry, Your Honor.

24         THE WITNESS:  I was appointed by your --

25         THE COURT:  It's close.  It was the duty judge

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 265

1    the day it happened.

2              MR. REDMOND:  Oh, okay.  I'm sorry, Your Honor.

3    Q.  (BY MR. REDMOND)  But this Court supervises your

4    actions as a Receiver, does it not?

5    A.   Yes, this Court -- I am an officer of this Court, and

6    I report to this Court, that's correct.

7    Q.   And because of the fact this is a proceeding in the

8    United States, you're not an arm of the U.S. government,

9    are you?

10   A.   I am not an arm of the U.S. government, that's correct.

11   Q.   And you don't answer to the U.S. government in your

12   capacity as Receiver.

13   A.   Well, I think to say I'm not an arm does not mean I

14   don't discuss and cooperate with the U.S. government on

15   certain issues.  I think that's one of the duties -- as

16   a matter of fact, I believe under the court order, I am

17   required to cooperate with the SEC on producing certain

18   records and documents.  So I think the order is broader

19   than what you just said.

20   Q.   But you're not -- you're in control and you don't

21   answer to the SEC in regard to your actions.

22   A.   I am not in control of the SEC.  I do cooperate with

23   the SEC on certain functions.  And let me also add text

24   to that.  The Court ordered me, in connection with moving

25   forward on professional fees, to coordinate with the SEC

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 266

1    and also to provide a budget which the SEC has input to.

2        So I want to be clear on the answer.  No, I don't

3    report to the SEC, but I work with the SEC and I coordinate

4    my activities which are subject to their reviewing fees and

5    budgets.

6    Q.   And you understand that the Joint --

7            THE COURT:  If I could clarify.  Those of us in

8    the judicial branch think we are part of the U.S. govern-

9    ment.  We're not part of the executive branch, but we are

10   still part of the government.

11       And I say that somewhat facetiously, but there are some

12   issues I think that arise dealing with immunity where it

13   would affect Mr. Janvey.  And I don't want him to disclaim

14   any of those potential issues by saying he's not part of

15   the government.

16       I took your question to mean, and his answer to refer

17   to, the executive branch.

18           MR. REDMOND:  That's correct, Your Honor.

19           THE COURT:  Okay.

20           MR. REDMOND:  That's --

21   Q.   (BY MR. REDMOND)  Mr. Janvey, in regard to -- you're

22   aware the Joint Liquidators have been appointed by the

23   Antiguan court?

24   A.   I am aware they were appointed, that's correct.

25   Q.   And you're aware of the actions the Antiguan court

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 267

1    undertook in regard to -- to the removal of the prior

2    liquidators?

3    A.    I am aware of that, yes.

4    Q.    And that where a court appoints liquidators, that's a

5    difficult proposition to remove someone that the court's

6    physically appointed, is it not?

7    A.    I would hope it would be, but I really don't have any

8    experience with that issue.  So I can't answer that.

9    Q.    And do you have any evidence or -- or basis that the

10   Antiguan court is not an independent court?

11   A.    No reason to believe they're not.

12   Q.    And you have no indication that the -- the Antiguan

13   court is not properly overseeing the -- the insolvency

14   proceedings in Antigua.  Is that correct?

15   A.    No.  What does concern me, sir, is that there was a

16   year lapse between Vantis removed and the new liquidators

17   coming in.  But, short of that, I have no issue of

18   supervision.

19   Q.    Okay.  In the United States, we have appeals and

20   they -- appeals take a period of time, do they not?

21   A.    That is correct.

22   Q.    And so if there was an appeal in the United States, it

23   could take a year or 14 months.

24   A.    I am sorry to say that's accurate.  That's right.

25   Q.    And so if there's due process in Antigua and there's

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 268

1   an appeal process, then everybody has to abide by those

2   due process procedures, don't they?

3   A.   That's accurate, yes.

4   Q.   Mr. Janvey, at this point, have you been able to

5   reconcile the total dollars that were put into CDs at

6   Stanford International Bank and the total amount that

7   was paid out?

8   A.   I believe my forensic team has done that.  Sitting

9   here today, I can't tell you the exact numbers.

10  Q.   But you've not been able to reconcile additional

11  dollars that are unaccounted for, can you?

12  A.   I don't believe we -- no, I do not believe we can to

13  this day.

14  Q.   Okay.  Would that be something that would be beneficial

15  for creditors in order to determine the total amount of money

16  that went out and where it went to determine if they could

17  either be recovered or if there could be causes of actions

18  utilized to -- to bring those monies back in the Estate?

19  A.   I believe any information given to the Receivership

20  would be beneficial if it benefits claimants.  So I agree

21  with the general proposition of that statement.

22  Q.   And you've had the ability to communicate with Mr.

23  Wide, one of -- one of the Joint Liquidators in Antigua,

24  have you not?

25  A.   Yes, I have.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 269

1    Q.    And have you -- do you have any dispute about his

2    professionalism or his ability to -- or his background or

3    experience in regard of handling matters of this type?

4    A.    I have no reason to question his ability or his

5    background whatsoever.

6    Q.    And would it not be beneficial if the two proceedings

7    in Antigua and the SEC Receivership coordinate on a -- on a

8    protocol in order to effectuate exchange of information and

9    a uniform distribution procedure?

10   A.    We've tried to have a coordination a number of times.

11   We thought we had one.  We met with Mr. Wide and his counsel

12   twice.  We thought we had an agreement moving forward, but

13   I'm sorry to say to this day we don't have one yet.

14   Q.    Mr. Wide and Mr. Dickson, in preparing the protocols,

15   tried to be comprehensive based on their experience to

16   address a number of issues, issues such as allowing or

17   respecting the integrity of each court.  Do you disagree

18   with that basic concept?

19   A.    Well, I think the protocol that was provided to us was

20   not in -- was not in accordance with what we believed we

21   agreed to when we left the meeting with Mr. Wide and his

22   counsel.  It was contrary to what we thought we agreed to.

23   Q.    But my -- my question is this.  You didn't answer

24   the last question I asked, and that is, when you have two

25   different courts in different jurisdictions, the integrity

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 270

1    of both those courts have to be respected in -- in regard

2    to any kind of protocol, do they not?

3    A.   Well, I think -- I want to be clear.  Mr. Wide is

4    trying to come to this country trying to get information

5    from this Court.  I'm not trying to go to Antigua.  I'd like

6    to get records from Antigua.  I would like the information.

7    But I have not gone to the Antiguan court since the Antiguan

8    court denied my recognition and this Court's order.

9         So I think if there's a protocol, I think it needs

10   to be from the standpoint of what's beneficial to this

11   Receivership, not just what's beneficial to the Antiguan

12   proceeding.

13   Q.   Did Mr. Wide relate to you that if a protocol could be

14   effectuated, that they would -- he would file applications

15   in Antigua to have you recognized?

16   A.   He -- he did -- he did make, I believe, in the protocol

17   a representation they would attempt to do that.  There was

18   no guarantee that he could do that, but that's something he

19   did say he would attempt to do, that's correct.

20   Q.   And to the extent that those records in Antigua provide

21   for a joint -- a joint listing in detail of creditors who

22   have valid obligations, it would be beneficial to have a

23   joint creditor list, would it not?

24   A.   It would be -- the more information a receivership has,

25   the better -- the more beneficial it is, that's correct.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 271

1   Q.   And if -- if this Court wouldn't provide any relief

2   in regard to Chapter 15 and the proceeds from other juris-

3   dictions inured to the benefit of the Antiguan litigation,

4   it would make it much more effective if the two proceedings

5   could -- could coordinate between each other to make uniform

6   distributions as part of the process.

7   A.   Well, when you say uniform distribution, the protocol

8   that we received was using the Antiguan waterfall statute.

9   That is not something this Receivership is subject to.  I

10  would not recommend to this Court that he follow that

11  procedure.

12       I do believe it's helpful share information.  I agree

13  with that premise.  And it's helpful to have a claims

14  process which is beneficial to the investors.  I agree with

15  that premise, also.

16  Q.   Is it also beneficial to have a protocol so the courts,

17  if they want to, can communicate with each other as part of

18  the process?

19  A.   Well, I've never understood why Judge Godbey couldn't

20  communicate with the Antiguan judge on his own without a

21  protocol.  Maybe there's something in the law in Antiguan

22  that says you can't do that.

23  Q.   But you have not ever been involved in a cross-border

24  case or protocol before, do you?

25  A.   I have not.

025147ba-a31c-4457-b73e-de48d28d06e2

1   Q.   And it's -- it's important for the judges to establish

2   procedures to -- to follow due process and procedure.  And

3   one of the documents that was sent was a court-to-court

4   communication document that's been prepared and been inter-

5   nationally recognized as part of a procedure.  Have you

6   been -- are you familiar with that document?

7   A.   If it was sent to me, I'm sure I saw it.  But sitting

8   here today, I'm not familiar with it.

9   Q.   And, Mr. Janvey, there's -- unfortunately, there's --

10  there's corruption around the world, is there not?

11  A.   Unfortunate is accurate.

12  Q.   And there's corruption in each country.

13  A.   That's accurate, also.

14  Q.   In fact, if I remember right, during one cycle, Vice

15  President Spiro Agnew was removed from office because of

16  the fact he was taking bribes and then Richard Nixon,

17  conversely, was removed.  But the vice -- president and vice

18  president of the United States were removed for improper

19  conduct and criminal acts.  Do you remember that?

20  A.   I'm sorry to say I'm one of the people in this court-

21  room that's old enough to remember that.  That's correct.

22  Q.   But with that, that doesn't mean the United States

23  doesn't have a proper legal system.  It doesn't mean that

24  it's not a country that operates in a proper fashion.

25  A.   No.  I agree it does not mean that at all.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 273

1   Q.   And when individuals engage in corruption, then part

2   of the issue is that they should be removed and -- is that

3   correct?

4   A.   They should be removed and, where possible, prosecuted,

5   that's correct.

6   Q.   And you're aware that Mr. Leroy King, the former head

7   of FSRC, was removed from his position in Antigua.

8   A.   I'm aware he was removed.  It is my understanding he

9   has not been extradicted yet nor is he in my --

10  Q.   Well, that -- that wasn't my question.  My question

11  was that you understand he was removed from the FSRC --

12  A.   I do understand that, that's correct.

13  Q.   -- by the government of Antigua.

14  A.   I presume it was the government.  I know he was

15  removed.

16  Q.   And then you understand there's an attempt to

17  extradite, and Mr. King is -- is fighting those

18  extradition proceedings.

19  A.   That's my understanding.

20  Q.   You are familiar with the -- a lot of the base offering

21  documents in regard to the CD program at Stanford Inter-

22  national Bank?

23  A.   Yes, I am.

24  Q.   And you've looked at those?

25  A.   I have over the past 34 months.

Linda J. Langford, CSR, RDR, CRR

Page 274

1   Q.   Okay.  And those documents, as you have seen, including

2   the -- the qualified investor statement, all provide that

3   the center of -- the domicile of Stanford International

4   Bank is in Antigua.

5   A.   I know the documents provide that, that's correct.

6   Q.   And -- and the documents are replete that -- that the

7   laws of Antigua and Barbuda control in regard to the -- any

8   disputes between any investors.

9   A.   That's what the documents provide, that's correct.

10  Q.   Okay.  And those -- those documents are consistent,

11  including the financial statements which have been issued

12  over a number of years by Stanford International Bank.  Is

13  that correct?

14  A.   I'm not sure what you mean by consistent with.

15  Q.   They are consistent to show that the -- the main

16  office, the headquarters, of Stanford International Bank

17  is in Antigua.

18  A.   Well, I think the documents reflect a very clever way,

19  and I'm going to -- of by asking people to commit a Ponzi

20  scheme using documents in a legal format which enabled that

21  to happen.

22       So I will concede the documents say Antigua.  I will

23  agree they say domiciled.  That's all correct and accurate.

24  But I think it ignores the reality of what happened in this

25  Ponzi scheme.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 275

1              MR. REDMOND:  Your Honor, I move to strike the

2    rest of the portion of the answer.  I just asked whether the

3    documents show that it was -- Stanford International Bank

4    was domiciled in Antigua, and the rest of it was additional

5    amounts that -- that were -- that were provided that were

6    not -- not requested.

7              THE COURT:  You know, I think it's responsive

8    because I think your question could be interpreted as

9    meaning do the documents actually establish those facts

10   about the bank.

11        And I think his answer was, yes, the documents say

12   one thing but, no, the reality is something different.

13        And so I believe that's at least in the ball park of

14   responsive.

15   Q.   (BY MR. REDMOND)  There was annual financial reports

16   prepared by Stanford International Bank, were there not?

17   A.   There were annual financial reports prepared by the

18   Stanford enterprises.  I don't -- I cannot agree they were

19   prepared by the Stanford International Bank because I know

20   input into those financial statements came from people from

21   the United States.

22   Q.   But the -- the annual financial reports were -- were

23   published by Stanford International Bank and related that

24   they were annual financial reports of Stanford International

25   Bank, did they not?

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 276

1    A.    That is what they purported to be, that's correct.

2    Q.    Okay.  And those were sent to depositors and various

3    CD investors on a yearly basis, were they not?

4    A.    That's my understanding, that's correct.

5    Q.    And so if -- if a depositor is making a deposit and he

6    signed the Accredited Investor agreement and receives the

7    annual report, the only information that the investor has

8    from the documents he received and signed is that the

9    headquarters of Stanford International Bank is in Antigua.

10   Is that correct?

11   A.    Well, sir, I think you're trying to put onto this

12   Stanford International Bank location some corporate

13   formalities which do not exist in this Ponzi scheme.  So I

14   really can't agreed.  I'd like to agree, but I can't.  The

15   reality doesn't show that.

16        The reality shows there was a document which said

17   Stanford International Bank located in Antigua.  I agree

18   with that.  But everything else related to that document

19   was not accurate.

20   Q.    Mr. Janvey, that's not my question.  Please -- please

21   listen to my question.

22        If you're a depositor and you've taken -- and you've

23   entered into a CD arrangement with Stanford International

24   Bank, you've signed their documents, you get their annual

25   statements, if you look at those documents and you look

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 277

1    at the annual statement, is what the investor, the CD

2    investors, sees is that the headquarters of Stanford

3    International Bank and its operations are Antigua.

4    A.   That's what they would see, that's correct.

5    Q.   Thank you.

6         MR. REDMOND:   I have no further questions,

7    Your Honor.

8                   REDIRECT EXAMINATION

9    By Mr. Powers:

10   Q.   Good afternoon, Mr. Janvey.

11   A.   Good afternoon.

12   Q.   You gave some testimony earlier about a discussion with

13   the Joint Liquidators concerning a protocol.  Do you recall

14   that testimony?

15   A.   I do recall that.

16   Q.   Okay.  I want to ask you something about that.  You

17   were here earlier today when Mr. Wide testified?

18   A.   Yes, I was.

19   Q.   And did you hear Mr. Wide testify that he essentially

20   received a categorical no in response to the protocol?

21   A.   That's what he testified to, that's correct.

22   Q.   Is that accurate?

23   A.   That is not accurate.

24   Q.   Did you send the correspondence to Mr. Wide or you

25   through your counsel send correspondence to Mr. Wide in

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 278

1    response to that proposed protocol?

2    A.    Yes.  I believe my counsel sent a letter to Mr. Wide's

3    counsel in response to the protocol.

4              MR. POWERS:  Your Honor, may I approach the

5    witness and the bench?

6              THE COURT:  Yes.

7              MR. REDMOND:  Your Honor, we object.  If there's

8    an attempt to place a document in evidence that they were

9    of aware of before, they didn't incorporate in the witness

10   statement, this is -- this is improper and it should not be

11   utilized.

12             MR. POWERS:  Your Honor, it's in nature of

13   rebuttal evidence in response to testimony that was only

14   elicited this morning.

15             MR. REDMOND:  Your Honor, this is also settlement

16   negotiations between the different parties in regard to

17   negotiation discussions.  We did not put any of the letters

18   in as far as the -- the communications and -- and background

19   information.

20             MR. POWERS:  I think the horse is out of the barn

21   on that one, Your Honor.  And it's our letter and we did not

22   mark it "confidential."  And we're happy to have the Court

23   look at it since the Court was told incorrectly this morning

24   that we responded with a flat no to the protocol.  That's

25   simply not accurate, and I would like the evidence to

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

1    properly reflect that.

2                MR. REDMOND:  Your Honor --

3                THE COURT:  Okay.  I'm not going to admit the

4    letter.  I think you've established for your side of the

5    case that you countered.  So let's move on.  They didn't

6    like the counter, apparently.  Otherwise, we wouldn't be

7    here.

8                MR. POWERS:  Thank you, Your Honor.

9    Q.   (BY MR. POWERS)  Was one of the concerns that you had

10   with the -- excuse me.  You heard some discussion earlier

11   about a Department of Justice situation where they're

12   seeking control of assets overseas?

13   A.   Yes, I did hear that testimony.

14   Q.   Did you have any concern with respect to that issue

15   and the Joint Liquidators' proposed protocol?

16   A.   Yes, I did.  One of the requirements the Joint

17   Liquidators wanted was for us to assist them in fighting

18   the Department of Justice in the UK and Switzerland to

19   get hold of those funds.  And I didn't believe that was

20   appropriate as a U.S. Receiver under a federal court doing

21   something like that.

22   Q.   Do you have an understanding about whether the SEC

23   agrees with you?

24   A.   Yeah.  My understanding is the SEC agrees with me a

25   hundred percent.

025147ba-a31c-4457-b73e-de48d28d06e2

Page 280

 1              MR. REDMOND:  To which we'd object.  Hearsay,

 2    Your Honor.

 3              THE COURT:  Sustained.

 4    Q.   (BY MR. POWERS)  Do you have an understanding of --

 5              THE COURT:  We have counsel for the SEC here,

 6    don't we?

 7              MR. REECE:  Yes, Your Honor.

 8              THE COURT:  Do you agree that the Receiver should

 9    not be adverse to the Department of Justice with regard to

10    the trapped funds?

11              MR. REECE:  Yes, I agree with that, Your Honor.

12              THE COURT:  Okay.  Thank you.

13    Q.   (BY MR. POWERS)  Do you have any understanding about

14    whether the Department of Justice agrees with you?

15    A.   My understanding, the Department of Justice does agree

16    with my position.

17    Q.   And what's the basis of that understanding?

18    A.   I believe they sent a letter to the Court yesterday

19    setting forth the basis of how they believe the process

20    should work going forward.

21              MR. POWERS:  Your Honor, may I approach the

22    witness?

23              THE COURT:  Yes.

24              MR. REDMOND:  Your Honor, we -- we object to the

25    letter.  They're not a party to this proceeding.  And, as

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 281

1  such, we object to its admission or to this discussion.

2          MR. POWERS:  And, Your Honor, I would just -- the

3  Court can take judicial notice of this, but it's -- it's

4  the basis of Mr. Janvey's statement that he just made that

5  the Department of Justice agrees with him.

6      I'm just seeking to have it admitted into the record

7  since it's already before the Court because of the Depart-

8  ment of Justice submittance of it to the Court.

9          MR. REDMOND:  It's still hearsay.  They're not a

10  party.  There is no proper foundation for this, Your Honor.

11          MR. POWERS:  I think this has a substantial

12  indicia of reliability and at a minimum would be admissible

13  under the Rule 807 rule of the Federal Rules of Evidence,

14  Your Honor.

15          THE COURT:  I think I'm going to just on my own

16  docket the letter in the 09-721 action so that the public

17  can be aware of the communication that the Court received

18  and that counsel are already aware of.  But I'll just on my

19  own nickel docket it, and people can make of it whatever

20  they choose to.

21          MR. REDMOND:  And may we respond to that in a

22  pleading format?

23          THE COURT:  I'm sorry.  I couldn't quite hear

24  you.

25          MR. REDMOND:  I'm sorry, Your Honor.  May we

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 282

1    respond to that in pleading form at an appropriate time,

2    not now?

3              THE COURT:  Why don't we chat about that when

4    we get to the end of the day here.

5              MR. REDMOND:  Yes, Your Honor.

6    Q.   (BY MR. POWERS)  Mr. Janvey, you were asked some

7    questions about Stanford International Bank and where it

8    was located or domiciled.  Do you recall that testimony?

9    A.   I do recall that.

10   Q.   Was any of the work of Stanford International Bank

11   being performed in the United States before February 17th,

12   2009?

13   A.   I believe all the significant management operational

14   decisions --

15             MR. REDMOND:  We object to this testimony.  This

16   person does not have personal knowledge of activities taking

17   place prior to the time of his appointment as Receiver.

18             MR. POWERS:  Your Honor, I think his direct

19   testimony establishes that he has reviewed extensively the

20   records of Stanford International Bank.  He has been the

21   Receiver for SIB for almost three years.  He clearly has a

22   basis to understand how the work of SIB was being performed,

23   and he was asked these very questions earlier today by

24   Mr. Redmond.

25             MR. REDMOND:  Your Honor, there is no testimony

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 283

1   that Mr. Janvey has ever been to SIB, never been to Antigua

2   to understand how the bank operates.  So there's no

3   foundation, there's no basis for this testimony.

4          MR. POWERS:  Then that leaves me to question why

5   Mr. Janvey was asked about this subject only moments ago.

6          THE COURT:  Maybe I should just disregard all his

7   testimony and he can step down and we'll finish early.

8          MR. REDMOND:  Your Honor, his testimony is based

9   upon physical documents that he's reviewed.

10         MR. POWERS:  Yes.  And that's exactly the source

11   of his testimony here right now.  And that's already in his

12   direct, so there's no reason to replow that ground.

13         THE COURT:  I'm going to admit this under the

14   residual hearsay exception.  I think this is very familiar

15   or very similar to the exception for reports of governmental

16   entities on conclusions they've reached in the discharge

17   of their duties.

18      And as the Receiver, Mr. Janvey has some obligations on

19   behalf of the Court to sort through and try and determine

20   what's been done and has devoted considerable time and money

21   towards that end and I believe, under the residual exception,

22   is entitled to testify regarding what conclusions he reached.

23      In determining what, if any, weight I give to that, I

24   will of course take into account the fact that this is kind

25   of secondhand news coming from him.  But I do think he's

Linda J. Langford, CSR, RDR, CRR

Page 284

1    entitled to report to the Court his conclusions based on the

2    work he's done as Receiver and the work the professionals on

3    his behalf have done and reported to him.

4         So the objection is overruled.

5              MR. REDMOND:   Thank you, Your Honor, for that

6    commentation.

7    Q.   (BY MR. POWERS)  And, Mr. Janvey, I think you were just

8    helping us understand what important work of SIB was being

9    performed in the United States before February 17, 2009.

10   Please explain.

11   A.   Yes.  I believe all the significant managerial,

12   operational treasury functions and investment functions

13   were done in the United States and done out the United

14   States by Stanford employees.

15   Q.   And with respect to the marketing of CDs, what's your

16   understanding about whether that occurred in Antigua or

17   outside of Antigua?

18   A.   My understanding is it all occurred outside of Antigua.

19   Q.   And have you personally reviewed records related to

20   the work of Stanford International Bank and the affiliates

21   of Stanford International Bank?

22   A.   I have reviewed those.

23   Q.   And what else is this -- what information is your

24   testimony here today about Stanford International Bank

25   based upon?

Linda J. Langford, CSR, RDR, CRR

Page 285

1    A.    My testimony is based upon the records I've reviewed

2    and the evidence I've seen.  My conclusion is that I don't

3    believe the Stanford International Bank was anything but a

4    front for a Ponzi scheme.

5    Q.    And Mr. Redmond pointed out that you didn't actually

6    work at Stanford International Bank or SFG or any other

7    Stanford entity before February 17, 2009.  Correct?

8    A.    I did not, that's correct.

9    Q.    Are you in the same boat or in a different boat in

10   that respect than Mr. Wide and Mr. Dickson?

11   A.    I believe we're in the same boat.

12   Q.    That neither of you or none of you worked at Stanford

13   entities prior to February 17, 2009.

14   A.    That is correct.

15   Q.    Did Stanford International Bank continue to operate

16   after you were appointed formally on February 17th, 2009?

17   A.    No.  The bank was shut down on that date.

18   Q.    Did that have anything to do with your actions?

19   A.    I believe it did.

20   Q.    And what actions did you take that resulted in the

21   bank being shut down?

22   A.    Well, we notified all the employees of the Stanford

23   enterprises that the operations were shut down pursuant to

24   court order and they would cease doing any form of work and

25   to go home.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 286

1    Q.   Who controlled the money that nominally belonged to SIB

2    before February 16th, 2009?

3    A.   Allen Stanford, Jim Davis, Laura Holt, and the people

4    who worked for them.

5    Q.   You were asked if you had been recognized in the UK

6    and Switzerland.  Do you recall that testimony?

7    A.   I do.

8    Q.   Have you been recognized in Canada?

9    A.   I have been.

10   Q.   Did you apply for recognition in Antigua?

11   A.   I did apply for recognition.

12   Q.   What was the result there?

13   A.   The court determined that this Court's order was not

14   enforceable; therefore, I could not be recognized as an

15   interested party under Antiguan law.

16   Q.   Did the court in Antigua make any decision about

17   whether you had standing to appear in Antigua?

18   A.   I believe that I do not have standing to appear in

19   Antigua.

20   Q.   In this court, who has final say with respect to your

21   actions regarding the Receivership Estate?

22   A.   Judge Godbey.

23           THE COURT:  At least for a moment or two.

24   Q.   (BY MR. POWERS)  You mentioned --

25           THE COURT:  I have been advised by e-mail that

025147ba-a31c-4457-b73e-de48d28d06e2

1  the Fifth Circuit is sitting in the Northern District of

2  Texas tomorrow, but not about anything relating to us.  I'm

3  apprehensive they might make an exception if I did something

4  too wild.

5  Q.   (BY MR. POWERS)  You mentioned, Mr. Janvey, that you

6  had a concern about the Antiguan court and you mentioned

7  that the proceedings in Antigua were on pause for a year.

8  Do you recall that?

9  A.   I do recall that testimony, yes.

10 Q.   Do you have any other concerns about the Antiguan court

11 administering the liquidation of SIB?

12 A.   Yes.  Without in any way disparaging the Antiguan

13 judges, I have concern that the fraud that occurred occurred

14 in a regime which allowed it to happen through bribes of the

15 bank regulators, through no examination of the bank.  They

16 were assisting -- the bank agency assisting defrauding the

17 SEC, stopping their investigations.  That does concern me,

18 as well as a court in Antigua not recognizing this Court as

19 a legitimate court order.  All that concerns me.

20 Q.   And do you have any concerns about the waterfall that

21 we've heard so much about here today.

22 A.   Yes, I do.

23 Q.   And what are those concerns?

24 A.   Well, the concern is it sets a priority distribution

25 based upon, number one, employees of the SIB; number two,

025147ba-a31c-4457-b73e-de48d28d06e2

Page 288

```
 1   the government.  And I think that's a restriction which I

 2   don't believe a U.S. Receivership would have.

 3   Q.   How many cents on the dollar to your understanding

 4   would the Antiguan government be paid for its claims in

 5   Antigua before CD investors get paid in Antigua?

 6   A.   Well, I'm not sure what their claims would be, but it

 7   would be a priority over the CD investors for the possible

 8   taxes Allen Stanford may owe --

 9        MR. REDMOND:  Your Honor, we object to this

10   testimony of Mr. Janvey.  I don't believe he's an expert

11   on Antiguan law.

12        THE COURT:  Sustained.

13   Q.   (BY MR. POWERS)  You were asked some questions about

14   whether a protocol might get you access to records of SIB

15   in Antigua.  Do you recall that?

16   A.   Yes, I do.

17   Q.   Would you be perfectly happy to be given access to

18   records in Antigua?

19   A.   I would be.

20   Q.   Does Chapter -- do we need this Chapter 15 proceeding

21   for -- for the JLs to give you access to records in Antigua?

22   A.   I don't believe so.

23   Q.   Would you be perfectly happy to have the same access

24   to records that Mr. Stanford has been given in Antigua?

25   A.   Without question.
```

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 289

1    Q.    Do you have any views about whether the Antiguan court

2    has respected this Court's orders?

3    A.    I think I have testified previously that the Antiguan

4    court has said this Court's order is not enforceable and,

5    therefore, they won't view it as an enforceable order.

6    Q.    You were asked some questions about coordinating with

7    the Antiguan court and coordinating on distribution and

8    other things.

9    A.    Yes.

10   Q.    Does one have to have Chapter 15 to coordinate on

11   distributions?

12   A.    No, one does not.

13   Q.    Does Antigua itself have Chapter 15 or some other

14   version of the Model Law enacted in Antigua to your

15   knowledge?

16   A.    To my knowledge, they do not have the Model Law.

17   Q.    You were asked some questions about Leroy King --

18   A.    Yes.

19   Q.    -- and that his extradition is appealed.  Do you know

20   if Mr. King has been -- have any -- excuse me.  Do you

21   know if any charges have been brought against Mr. King in

22   Antigua?

23   A.    To the best of my knowledge, I know of no charge has

24   been brought against him.

25   Q.    Is there any question in your mind that Mr. King acted

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 290

```
 1   improperly and -- and likely unlawfully in Antigua?

 2   A.   Not based on the evidence I've seen, no.

 3   Q.   Do you know who Errol Cort is?

 4   A.   Yes, I do.

 5   Q.   Who is Errol Cort?

 6   A.   Errol Cort, I believe, now is currently the Minister

 7   of Finance and was Mr. Stanford's attorney in Antigua.

 8   Q.   So, to your understanding, Mr. Cort is still a part of

 9   the government of Antigua.

10   A.   That's my understanding.

11           MR. REDMOND:  To which we'd object, Your Honor.

12   That is hearsay.  There's no -- there's no foundation for

13   that testimony.

14           MR. POWERS:  I think one of the -- one of the JLs

15   this morning said that that was the case.  I believe it was

16   Mr. Wide.

17           MR. REDMOND:  Well, we'll withdraw the objection

18   then.

19           THE COURT:  Okay.

20   Q.   (BY MR. POWERS)  Andrea Stoelker, you testified about

21   her?

22   A.   Yes, I have.

23   Q.   Who is she?

24   A.   Andrea Stoelker is Mr. Stanford's, I believe, now

25   former girl friend, who was his former girl friend.
```

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 291

1   Q.   What can you tell the Court about what Ms. Stoelker --

2   where Ms. Stoelker currently is living and working?

3   A.   My understanding, Ms. Stoelker is in Antigua managing

4   properties on behalf of herself and whoever else she's

5   reporting to.

6   Q.   And is she managing properties that have any

7   relationship to the properties that the Court has taken

8   jurisdiction over?

9   A.   Yes.  She is managing Stanford enterprise properties.

10  Q.   And she is doing that today?

11  A.   Yes.  My understanding she is, yes.

12  Q.   You were asked a lot of questions about what disclosure

13  statements and offering documents showed with respect to SIB

14  CD contracts.  Do you recall that?

15  A.   Yes, I do.

16  Q.   In general, who was it that induced customers to sign

17  those CD contracts?

18  A.   The financial advisors.

19  Q.   Did the financial advisors work directly for Stanford

20  International Bank, the entity?

21  A.   No.  The Stanford Enterprises worked for the Stanford

22  Group Company, which is the brokerage firm, and other

23  brokerage firms in other countries.

24  Q.   Do you think the Stanford International Bank and the

25  financial advisors treated the customers appropriately?

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 292

1   A.    Absolutely not.

2   Q.    Do you believe that the contracts between the Stanford

3   financial advisors, Stanford International Bank, and the

4   customers were entered appropriately?

5   A.    No.  I believe they were fraudulent from the inception.

6   Q.    Was SIB a real bank?

7   A.    In my mind it was not.

8           MR. REDMOND:  To which we object.  That calls

9   for a conclusion on the part of the witness.  There's been

10  a lot of objective criteria as far as a Ponzi.

11          MR. POWERS:  And, Your Honor, Mr. Janvey has a

12  lot of banking experience.  He's a banking lawyer.  He can

13  testify whether he believes SIB is a real bank.  I think

14  it's appropriate under the circumstances considering his

15  vast factual knowledge of the information that's before

16  the Court.

17          THE COURT:  Overruled.  I'll consider the

18  substance of the objection in determining what, if any,

19  weight to give to the testimony.

20  Q.    (BY MR. POWERS)  Last question.  You do a lot of

21  corporate law work?

22  A.    Yes, I do.

23  Q.    Did the Stanford family of companies respect corporate

24  formalities in your view?

25  A.    Not according to my review, no, they did not.

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 293

1          MR. POWERS:  Thank you, Your Honor.  I pass the

2    witness.

3          THE COURT:  How much do you think you have on

4    recross?

5          MR. REDMOND:  Very short.

6          THE COURT:  Okay.

7                    RECROSS EXAMINATION

8    By Mr. Redmond:

9    Q.   Mr. Janvey, in the litigation in the United Kingdom,

10   there was substantial litigation there, wasn't it -- was

11   there not?

12   A.   Yes, there was.

13   Q.   And you raised many of the same issues you've raised

14   in this proceeding regarding the recognition issues, did

15   you not?

16   A.   I defer to the papers filed.  But as a general rule, I

17   agree with that.

18   Q.   And the court then disallowed those -- those positions

19   in the UK proceeding, did they not?

20   A.   The court did not recognize me in the UK proceeding,

21   that's correct.

22   Q.   And in the Antiguan proceedings when you were -- were

23   there, you were allowed -- your counsel was allowed to -- to

24   state your position.  You just weren't given recognition as

25   a Receiver.  Is that correct?

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 294

1   A.   I believe that's correct.

2   Q.   And have you sought recognition in Antigua on behalf

3   of the other entities that are -- that are non-SIB bank or

4   Stanford Trust Company?

5   A.   I have not.

6            MR. REDMOND:  I have no further questions, Your

7   Honor.

8            MR. POWERS:  No further questions for this

9   witness.

10            THE COURT:  Thank you, sir.  You may step down.

11            THE WITNESS:  Thank you, Your Honor.

12            THE COURT:  Why don't we take a break until about

13   a quarter of 5:00, and then we'll come back and wrap up.

14            MR. SADLER:  Yes, sir.

15            MR. REDMOND:  Can we know the time, Your Honor?

16            MR. DAVIS:  How much time we've got left?

17            THE COURT:  188.  So that's 22 minutes left for

18   closing, which is perhaps longer than I want to hear from

19   you.  So we'll see you back at a quarter of.

20      (Brief recess taken.)

21            MR. SADLER:  Your Honor, that was, by the way,

22   the Receiver parties' final witness.  I only have three

23   documents to offer, and -- and that's all of our evidence.

24            THE COURT:  All right.

25            MR. SADLER:  And I would like to tender to the

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 295

1    Court three exhibits.  First, going in reverse order,

2    Exhibit 9, which is the order allowing Mr. Stanford access

3    to records in Antigua, dated November 15, 2011.  This was

4    the order that I discussed in Mr. Wide's testimony.

5         And then Exhibits 6 and 7.  6 is Senate Resolution 346

6    from the 112th Congress on the matter of the Antigua and

7    Barbuda actions relating to the Stanford fraud, and House

8    Resolution 507, also from the 112th Congress, the House of

9    Representatives' resolution regarding the actions of the

10   government of Antigua and Barbuda and its actions related

11   to the Stanford fraud.

12        I have copies for counsel of both of those.

13        MR. GROSSMAN:  Your Honor, we would object to the

14   admission of a resolution by four senators as not being --

15   as being hearsay.

16        MR. SADLER:  And I think with respect to the

17   exhibits, Your Honor, what -- what I said earlier is we'd

18   like to proceed where both parties' paper that has been

19   offered is considered by the Court within the rules of

20   evidence and given what weight, if any, to all of it if

21   we don't spend time arguing about individual document

22   objections.

23        THE COURT:  Okay.  Just looking at these, I want

24   to be sure I'm understanding.  These appear to me to be

25   proposed resolutions that have not yet been adopted by

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 296

1    either house of Congress.

2                MR. SADLER:  That is correct.

3                THE COURT:  Okay.

4                MR. SADLER:  They were introduced very recently.

5                THE COURT:  Then I will take judicial notice of

6    those for whatever they may be worth.

7                MR. SADLER:  Yes, sir.

8                THE COURT:  And by that I don't mean to suggest

9    that they're not worth something.  I certainly have great

10   respect for the activities of Congress.  I just -- it's not

11   clear to me what impact or what significance or weight they

12   have in the context of this proceeding.

13        Any objection to 9, the Antiguan court's order?

14                MR. GROSSMAN:  No, Your Honor.

15                THE COURT:  Okay.  That's admitted.

16        How do y'all want to do objections?  Do you want to

17   make objections after the fact and brief them and argue

18   them and generate a bunch more paper and then have me go

19   off and think about them for weeks and rule on them?

20                MR. SADLER:  I'll --

21                THE COURT:  Which I'm happy to do.  There's

22   almost nothing I would rather do than that.

23                MR. SADLER:  From the Receiver's and our side's

24   point of view, Your Honor, almost all of the objections

25   lodged on their side are to the kind of documents they have

025147ba-a31c-4457-b73e-de48d28d06e2

1    submitted--copies of newspaper articles, stuff Your Honor

2    can find on the internet, judicial notice of pleadings.

3        And -- and it just seems to us to be, given that this

4    is not a trial to the jury where you have to worry about

5    jurors being misled about hearsay and lack of foundation and

6    all that and best evidence, that Your Honor can consider

7    everything that's been filed.  Things that are inadmissible

8    or you don't feel like you should give any weight, that is

9    totally within your discretion.

10       And it does seem to us not to be a good use of their

11   funds nor our funds to brief a bunch of what I think frankly

12   are not -- not very serious objections about documents.

13       And so we would just welcome the Court to receive

14   everything and give it what weight, if any, the Court feels

15   appropriate in light of the decision you need to make.

16           THE COURT:  Okay.  Let's put that on your homework

17   list to think about and converse with each other.  And if

18   you decide you want to brief all these things, why don't you

19   agree on a date and a page limit for supplemental briefing

20   and objections.  And if you decide just to dump it all in my

21   lap, then you can let me know.

22           MR. SADLER:  Yes, sir.  We'll do that.

23           THE COURT:  Okay.  Any other housekeeping?

24           MR. SADLER:  Nothing from our side, Your Honor.

25           MR. GROSSMAN:  Your Honor, from the Joint

025147ba-a31c-4457-b73e-de48d28d06e2

Page 298

1    Liquidators' side, I know we have got the last check --

2    check clock and we know how much time we have.

3        I wondered, Your Honor -- and typical in a case with

4    as many exhibits as we have and under the time frame that

5    we've had, I don't think either side has gone through the

6    submissions that are attached to each of the directs and

7    highlighted for the Court that which is in those exhibits

8    that we would call your attention to.

9        In cases where I've had sworn written directs with

10   lots of documents, oftentimes the judge will say, either

11   come in and walk me through the parts of the exhibit you

12   want me to look at or give me a proposed findings of fact

13   and conclusions of law and reference those pieces of the

14   exhibits that you want me to look at.  Because if there's

15   a 14-page document and it's one sentence in it, it doesn't

16   make sense to have you read the 14-page document and tell

17   you that's the sentence.

18       That would be a suggestion on our part, to file pro-

19   posed findings of fact and conclusions of law.  We can

20   frankly then dispense with a closing today and put it in

21   the proposed findings.

22       If it's specific to the portions of the record, then

23   the evidentiary point that we just talked about, we will all

24   know whether or not there is a document that either side

25   believes is essential to a finding they are requesting the

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 299

1    Court to make and will bring into sharper focus whether we

2    really need to fight about it or not.

3        Because if it's not going to be in their proposed

4    findings of fact or our proposed findings of fact, then it

5    is irrelevant to fight about the document.  But if it's

6    going to be essential theme, if someone's going to quote a

7    newspaper article and say that this is a mean finding that

8    they're asking the Court to make, then an evidentiary

9    discussion takes on a different meaning.

10           THE COURT:  Okay.  Let's reserve judgment on

11   timing of that.  I'm open conceptually to post hearing

12   briefs or proposed findings of fact and conclusions of law,

13   either.  I think, when we're done here, I'm going to want

14   to visit with counsel for a moment, and maybe that's one

15   thing that we can put on our subject of discussions.

16       So if I'm going to permit either proposed findings

17   or post hearing brief, is there anything more you want to

18   tell me today by way of closing?

19           MR. GROSSMAN:  Your Honor, if we do proposed

20   findings, we don't need an oral closing.

21           THE COURT:  Okay.

22           MR. SADLER:  And -- and not from the Receiver,

23   Your Honor.

24           THE COURT:  Okay.  Then I think we can consider

25   the evidentiary record closed subject to the possible issue

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 300

1    of later objections and briefing on objections, and I think

2    most of our work here today is done.  Yeah?

3              MR. GROSSMAN:  Yes, sir.

4              THE COURT:  Okay.  Good.  Then I appreciate

5    you-all working very hard to get a lot of material in in an

6    efficient manner.  I'm going to take this under advisement,

7    and I would like to see counsel back in chambers, please.

8         So you want to go out that way and back around and

9    then back around.

10             MR. SADLER:  Yes, sir.

11             MR. GROSSMAN:  Yes, sir.

12        (The proceedings were concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 301

1                        I N D E X

2                                                    PAGE

3

4    OPENING STATEMENT OF COUNSEL:

5         MR. GROSSMAN .....................................  7

6         MR. SADLER ......................................  20

7         MR. LITTLE ......................................  24

8

9    NICOLETTE DOHERTY

10        DIRECT EXAMINATION - MR. GROSSMAN ...............  25

11

12   MICHAEL GORDON

13        DIRECT EXAMINATION - MR. WIELEBINSKI ............  26

14

15   AUGUSTO CORRALES

16        DIRECT EXAMINATION - MR. DAVIS ..................  27

17        CROSS EXAMINATION - MR. LITTLE ..................  28

18        REDIRECT EXAMINATION - MR. DAVIS ................  30

19

20   RICARDO AGUIRRE RODRIGUEZ

21        DIRECT EXAMINATION - MR. REDMOND ................  32

22        CROSS EXAMINATION - MR. LITTLE ..................  32

23        REDIRECT EXAMINATION - MR. REDMOND ..............  33

24

25

U.S. District Court

025147ba-a31c-4457-b73e-de48d28d06e2

1                    I N D E X  continued

2                                                      PAGE

3

4   MARCUS WIDE

5       DIRECT EXAMINATION - MR. WIELEBINSKI .............. 36

6       CROSS EXAMINATION - MR. SADDLER .................. 37

7       REDIRECT EXAMINATION - MR. WIELEBINSKI ............ 90

8       RECROSS EXAMINATION - MR. SADDLER ................ 114

9

10  HUGH DICKSON

11      DIRECT EXAMINATION - MR. REDMOND ................. 118

12      CROSS EXAMINATION - MR. LITTLE ................... 119

13      REDIRECT EXAMINATION - MR. REDMOND ............... 142

14      RECROSS EXAMINATION - MR. LITTLE ................. 163

15

16  BEVERLY JACOBS

17      DIRECT EXAMINATION - MR. DAVIS ................... 169

18      CROSS EXAMINATION - MR. LITTLE ................... 170

19      REDIRECT EXAMINATION - MR. DAVIS ................. 185

20      RECROSS EXAMINATION - MR. LITTLE ................. 189

21

22  JOINT LIQUIDATORS REST ............................... 193

23

24

25

025147ba-a31c-4457-b73e-de48d28d06e2

Page 303

1                     I N D E X   continued

2                                                        PAGE

3    JOHN WADE

4         DIRECT EXAMINATION - MR. MORGENSTERN ............. 194

5         CROSS EXAMINATION - MR. WIELEBINSKI .............. 195

6         REDIRECT EXAMINATION - MR. MORGENSTERN ........... 209

7

8    KARYL VAN TASSEL

9         DIRECT EXAMINATION - MR. ARLINGTON ............... 211

10        CROSS EXAMINATION - MR. DAVIS .................... 212

11        REDIRECT EXAMINATION - MR. ARLINGTON ............. 248

12

13   RALPH JANVEY

14        DIRECT EXAMINATION - MR. POWERS .................. 257

15        CROSS EXAMINATION - MR. REDMOND .................. 257

16        REDIRECT EXAMINATION - MR. POWERS ................ 277

17        RECROSS EXAMINATION - MR. REDMOND ................ 293

18

19   RECEIVER RESTS ....................................... 294

20

21   JOINT LIQUIDATORS EXHIBITS INDEX ..................... 304

22

23   RECEIVER'S EXHIBITS INDEX ............................ 305

24

25   REPORTER'S CERTIFICATION.............................. 306

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 304

```
 1              JOINT LIQUIDATORS EXHIBITS INDEX

 2                                              (EXCLD)

 3    NO.            DESCRIPTION           OFRD   ADMTD

 4

 5         BLANKET SUBMISSION OF EXHIBIT(S)

 6         ATTACHED TO THE WRITTEN DIRECT

 7         TESTIMONY OF:

 8

 9         Nicolette Doherty                 25

10         Michael Gordon                    26

11         Augusto Corrales                  27

12         Ricardo Aguirre Rodriguez         32

13         Marcus Wide                       37

14         Hugh Dickson                     119

15         Beverly Jacobs                   169

16

17         BLANKET SUBMISSION OF EXHIBITS

18         JL-1 THROUGH JL-17               191

19

20         BLANKET SUBMISSION OF COURT'S

21         RULINGS AND ARTICLES BY JANVEY

22         AND OTHERS                       192

23

24

25
```

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 305

1                    RECEIVER'S EXHIBITS INDEX

2                                               (EXCLD)

3    NO.              DESCRIPTION              OFRD  ADMTD

4

5         BLANKET SUBMISSION OF EXHIBIT(S)

6         ATTACHED TO THE WRITTEN DIRECT

7         TESTIMONY OF:

8

9         Karyl Van Tassel                211

10        Ralph Janvey                    256

11

12   6    Senate Resolution 346           295

13   7    House Resolution 507            295

14   9    Court Order                     295    296

15

16

17

18

19

20

21

22

23

24

25

U.S. District Court

025147ba-a31c-4457-b73e-de48d28d06e2

Linda J. Langford, CSR, RDR, CRR

Page 306

1

2                        CERTIFICATION

3

4        I certify that the foregoing is a true and correct

5   transcript from the record of proceedings in the above-

6   entitled matter.   I further certify that the transcript

7   fees format comply with those prescribed by the Court

8   and the Judicial Conference of the United States.

9

10        s/Linda J. Langford        Date:   January 14, 2012

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

025147ba-a31c-4457-b73e-de48d28d06e2