IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

IN RE:                                     §
                                           §
STANFORD INTERNATIONAL BANK,               §          Civil Action No. 3:09-CV-0721-N
LTD.,                                      §
                                           §
        Debtor in a Foreign Proceeding.    §

## ORDER

This Order addresses the Joint Liquidators' motion for substitution as Plaintiff *nunc pro tunc* to May 12, 2011 [125], request that the Court take judicial notice [103], and objections to direct testimony and exhibits [149]; the Receiver's objections to the Joint Liquidators' evidence [152]; and the former Joint Liquidators' petition for recognition of foreign main proceeding pursuant to Chapter 15 of the Bankruptcy Code [4]. For the reasons that follow, the Court grants the Joint Liquidators' motion for substitution as Plaintiff *nunc pro tunc* and grants in part and denies in part their request that the Court take judicial notice. The Court overrules the parties' objections to each others' evidence. Finally, the Court grants in part and denies in part the Joint Liquidators' petition for recognition, holding that the Antiguan Proceeding is a foreign nonmain proceeding under Chapter 15 of the Bankruptcy Code.

## I. ORIGINS OF THE SUIT

On February 17, 2009, the United States Securities and Exchange Commission ("SEC") filed a securities enforcement action, 3:09-CV-0298-N, *SEC v. Stanford*

ORDER – PAGE 1

*International Bank, Ltd., et al.* (filed Feb. 17, 2009) ("SEC Action"), in this Court, alleging that R. Allen Stanford, through and/or with his associates and various entities under his control (the "Stanford Entities"), perpetrated a massive Ponzi scheme. As part of that litigation, the Court "assume[d] exclusive jurisdiction and t[ook] possession" of the "Receivership Assets"[1] and the "Receivership Records"[2] (collectively, the "Receivership Estate") and appointed a Receiver to oversee the Receivership Estate, of which Stanford International Bank ("SIB") is a part. *See* Second Am. Order Appointing Receiver, July 19, 2010, at 2-3 [1130] (the "Receivership Order"), *in* SEC Action.

Despite the Receivership Order, on February 26, 2009, the Eastern Caribbean Supreme Court in the High Court of Justice of Antigua and Barbuda ("Antiguan Court"), at the request of the Financial Services Regulatory Commission ("FSRC") of Antigua and Barbuda ("Antigua") – an entity that purported to license and regulate SIB – appointed Nigel Hamilton-Smith and Peter Wastell (the "Former Joint Liquidators) as receivers-managers of SIB. *See* 105-17, at 4.[3] On April 17, 2009, the Antiguan Court placed SIB into liquidation

---

[1]"The assets, monies, securities, properties, real and personal, tangible and intangible, of whatever kind and description, wherever located, and the legally recognized privileges (with regard to the entities), of the Defendants [in the SEC Action] and all entities they own or control."

[2]"The books and records, client lists, account statements, financial and accounting documents, computers, computer hard drives, computer disks, internet exchange servers telephones[,] personal digital devices and other informational resources of or in possession of the Defendants [in the SEC Action], or issued by Defendants and in possession of any agent or employee of the Defendants."

[3]For the sake of brevity, the Court refers to testimony and appendices by docket numbers in place of document titles.

and appointed the Former Joint Liquidators as SIB's liquidators (the "Antiguan Proceeding").
*See id.* at 12-13.  Soon thereafter, on April 20, 2009, the Former Joint Liquidators filed a
petition for recognition in this Court pursuant to Chapter 15 of the U.S. Bankruptcy Code.

On June 8, 2010, while the petition was still pending in this Court, the Antiguan Court
removed the Former Joint Liquidators as SIB's liquidators (the "Antiguan Removal Order"),
holding, among other things, that they had engaged in improper conduct with respect to
recognition proceedings in Canada.  *See* 105-19, at 85.  The Antiguan Removal Order
allowed the Former Joint Liquidators to remain as SIB's caretakers until the Antiguan Court
appointed new liquidators.  *See id.* at 86.  The Antiguan Court did so on May 12, 2011 ("JL
Appointment Order"), appointing Hugh Dickson and Marcus Wide (the "Joint Liquidators").[4]
*See* 105-20, at 5.  Counsel for the Joint Liquidators first appeared in this action in August
2011 [74, 75].

After extensive briefing by the parties and parties in interest,[5] the Court held an
evidentiary hearing on the petition for recognition on December 21, 2011.[6]  After
disagreement regarding whether the Joint Liquidators could, in essence, stand in as Plaintiffs

---

[4]The Antiguan Court also appointed Dickson and Wide as Receivers of Stanford Trust
Company Limited ("STCL") in November 2011.  Here, they only seek recognition of the
Antiguan Proceeding involving SIB.

[5]The SEC, the Examiner whom the Court appointed to represent the interests of the
Stanford Entities' alleged victims, and the Official Stanford Investors Committee ("OSIC")
have submitted briefs and appeared at hearings in this matter.

[6]Prior to the hearing, the Joint Liquidators moved the Court to take judicial notice of
certain facts, information, and materials.  The Court did not rule on this motion at the
hearing.

for the Former Joint Liquidators on their petition for recognition, the Court asked the Joint Liquidators to file a written motion. Accordingly, the Joint Liquidators moved for substitution as Plaintiff *nunc pro tunc*. Thereafter, the Court allowed the Receiver and the Joint Liquidators an opportunity to file written objections to the evidence presented at the hearing.

## II. THE COURT GRANTS THE JOINT LIQUIDATORS' MOTION TO SUBSTITUTE

The dispute over whether the Joint Liquidators may proceed on the Former Joint Liquidators' petition for recognition began when the Receiver argued that the Court should not consider the petition for recognition to have been filed until August 2011, the date on which the current Joint Liquidators appeared in the suit. Jt. Br. of Receiver, Examiner, & Investors Comm. in Resp. to Joint Liquidators' Suppl. Br. in Supp. Their Pet. for Ch. 15 Recognition 9 n.11 [119] [hereafter Receiver's Resp. to JL Suppl. Br.]. He reasoned that because Chapter 15 of the Bankruptcy Code requires the petition for recognition to identify the foreign representatives, *see* 11 U.S.C. § 1515, and because the petition referenced only the Former Joint Liquidators, the petition was deficient. *See* Receiver's Suppl. Resp. to JL Suppl. Br. at 9 n.11, 14. In response, at the December 2011 evidentiary hearing, the Joint Liquidators orally moved the Court to substitute them as party Plaintiffs.[7]

On their current briefing of the issue, the Joint Liquidators argue that the Court should substitute them under Federal Rule of Civil Procedure 25(c) because they hold the same interests as and positions of the Former Joint Liquidators. *See* Joint Liquidators' Mot. Subst.

---

[7]The Court asked the Joint Liquidators to brief the issue.

as Pl. *Nunc Pro Tunc* to May 12, 2011, at 2-3.  The Receiver requests that the Court refrain

from considering the petition for recognition and instead order the Joint Liquidators to file

an amended petition for recognition asserting themselves as the foreign representatives.[8]  *See*

Receiver's Resp. to JL Mot. for Subst. 6.

      Despite the way the parties have framed the issue, at first blush the question before

the Court appears to be one of mootness.  *See, e.g.*, *Qimonda AG v. LSI Corp.*, --- F. Supp.

2d ---, 2012 WL 777494, at *3 (S.D. Tex. 2012) (describing Supreme Court's distinction

between standing and mootness)  It is undoubtedly true that as foreign representatives of SIB

at the time of the commencement of the action, the Former Joint Liquidators had standing

---

[8]The Receiver states that "the U.S. Receivership Parties have no objection to the Court allowing the J[oint ]L[iquidator]s to file an 'amended' petition, provided that the amendment does not relate back to the date of the filing by the [F]ormer [J]oint [L]iquidators."  Jt. Resp. of Receiver, Examiner, Investors Comm., & SEC to Joint Liquidators' Mot. for Subst. as Pl. *Nunc Pro Tunc* to May 12, 2011, at 6 [146] [hereinafter Receiver's Resp. to JL Mot. for Subst.].  The Receiver reveals that his interest in having the Joint Liquidators replead to a later date is motivated by an understanding that, as per *Lavie v. Ran (In re Ran) (Ran IV)*, 607 F.3d 1017, 1025 (5th Cir. 2010), the time for determining SIB's center of main interest ("COMI") – a main point of contention in the recognition analysis – is at the time the foreign representative files the petition for recognition and, therefore, having a later COMI-determinant date will work in his favor.  *See, e.g.*, Receiver's Resp. to JL Suppl. Br. 14-15 & n.15.

      The Court notes that a later petition date would similarly seem to aid the Receiver's arguments regarding nonmain recognition because "[t]he use of the present tense [in the statute] implies that the court's [nonmain] establishment analysis should focus on whether the debtor has an establishment in the foreign country when the foreign representative files for recognition . . . ."  *Lavie v. Ran (Ran III)*, 406 B.R. 277, 284-85 (S.D. Tex. 2009), *aff'd*, *Ran IV*, 607 F.3d at 1027.  The Court surmises that the reason the Receiver does not wish for the Court to dismiss the action entirely is because of the number of years he has spent litigating the suit and because of the inevitability of dealing with the issue at some point during the pendency of the Stanford multi-district litigation ("MDL").

to bring their petition for recognition.[9]  *See* 28 U.S.C. § 1334(a).  Thus, at the time the Former Joint Liquidators filed their petition, the Court properly had subject matter jurisdiction over the suit.  The Court must go on to analyze, however, whether the Antiguan Court's removal of the Former Joint Liquidators as foreign representatives divested them of the personal interest necessary to continue the suit, thus rendering the action moot.[10]  *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189-92 (2000) (articulating the difference between standing and mootness).

The Fifth Circuit has stated that "[s]ubject matter jurisdiction, once it validly exists among the original parties, remains intact after substitution."  *Ransom v. Brennan*, 437 F.2d 513, 516 (5th Cir. 1971)  However, this assertion is based on the idea that a valid Rule 25

---

[9]In his briefing, the Receiver made the additional argument that the Antiguan Order appointing the Joint Liquidators vested all SIB's property in them as of April 15, 2009, thus retroactively divesting the Former Joint Liquidators of their rights and duties over SIB at any point in time so that the petition was deficient even when the Former Joint Liquidators filed it.  *See*  Receiver's Resp. to JL Mot. for Subst. 3.  A foreign court order cannot *retroactively* divest this Court of jurisdiction.  And the Joint Liquidators aver that the JL Appointment Order "did not render the activities of the Former [Joint Liquidators] null and void, nor did it treat such Former [Joint Liquidators] as if they had never existed."  New Joint Liquidators' Reply in Further Supp. of Mot. Subst. as Pl. *Nunc Pro Tunc* 6 [148] [hereinafter JL Reply to Mot. Subst.].  Rather, the JL Appointment Order stated that it was entered "without in any way altering or affecting the legal rights of the estate of S.I.B. or of its past, present or future Liquidators" and vests the Joint Liquidators with authority over SIB "as successors to and in substitution for the [Former Joint Liquidators]."  106-4, at 2, 4.  Thus, the Receiver's argument holds no water.

[10]It seems that the Receiver's arguments lead to an outcome more severe than that for which he bargained.  If the Court finds that the current petition is moot, it cannot direct the Joint Liquidators to file an amended petition for recognition.  Rather, a finding of mootness forces the Court to dismiss the action entirely, thus negating three years of effort on both sides.

substituted party "steps into the same position of the original party." *Id.* Thus, it follows that if subject matter jurisdiction is lost among the original parties to the action before the substitution occurs, substitution cannot cure the jurisdictional defect. However, the plain language of Rule 25 specifically contemplates that a case may continue where an original party has lost an interest in the action. *See* FED. R. CIV. P. 25. So, the Court goes on to analyze whether Rule 25 cures the jurisdictional defect.[11]

Federal Rule of Civil Procedure 25 provides that a Court may substitute a party for another in the event of a transfer of interest, a former party's death or incompetency, or, if the former party was a public officer, his/her death or separation from office. *See id.* Rule 25 is procedural and thus does not provide for the survival of rights or liabilities. *See* 7C CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1952, at 655 (3d ed. 2007). Accordingly, once a former party loses capacity via one of the methods named above, the action abates unless the action is one that survives

---

[11]The Receiver argues that Rule 25 does not apply to this proceeding because "[t]his is not a lawsuit in which the [F]ormer [Joint L]iquidators filed an action on behalf of SIB, and the J[oint ]L[iquidators] are seeking to continue that action . . . ." Receiver's Resp. to JL Mot. for Subst. 3. Rather, the Receiver continues, the Joint Liquidators "are representing . . . their own[]interest"; "Rule 15(c) has no application to these circumstances," the Receiver argues, "particularly given the specific direction that is provided by Chapter 15 of the Bankruptcy Code." *Id.* at 4.

However, the Receiver is mistaken. Rule 1001 of the Federal Rules of Bankruptcy Procedure provides that the rules of bankruptcy procedure apply to cases under the Bankruptcy Code. *See* FED. R. BANKR. P. 1001. Bankruptcy Rule 7025 provides that, subject to Bankruptcy Rule 2012, which the Court discusses below in the text, Federal Rule of Civil Procedure 25 applies in adversary proceedings. *See* FED. R. BANKR. P. 7025. And Bankruptcy Rule 1018 provides that Rule 7025, among others, applies to Chapter 15 cases. *See* FED. R. BANKR. P. 1018.

as a matter of substantive law. *See id.* at 655-56. In a federal question case, courts apply federal law to determine whether the action survives the event. *See id.* at 656.

There are numerous instances in American jurisprudence in which courts have substituted successor trustees for former trustees. For example, in the context of trusts and estates, "it is hornbook law that an action brought by a trustee 'is not ordinarily abated by his failure to continue in his office[;]' [w]hen a trustee party leaves office, 'an action is ordinarily revived in the name of the successor representative.'" *Corbin v. Blankenburg*, 39 F.3d 650, 653 (6th Cir. 1994). Based on this principle, courts have substituted successor ERISA trustees for their former counterparts. *See id.* (stating that nothing in ERISA statute suggests that civil action brought by ERISA trustee is personal to particular individual who held office upon filing suit). Additionally, the U.S. Bankruptcy Code provides that where a trustee dies, resigns, is removed, or otherwise ceases to hold office during the pendency of a case under the Code, his/her successor is automatically substituted as a party in the pending matter. FED. R. BANKR. P. 2012(b). Thus, these courts do not have a mootness issue because substantive law allows for the action to continue despite the shift in the original parties' interests. In other words, courts throughout the country rely on the legal fiction that a party's standing is not lost where substantive statutory law allows courts to substitute in a successor party. In this vein, the Court examines whether Chapter 15 of the Bankruptcy Code allows an action to proceed in this manner.[12]

---

[12]The Court acknowledges that mootness is a constitutional issue and that Congress cannot construct laws that expand the jurisdiction of the federal courts beyond the limits imposed by the Constitution. However, the Court is also mindful of the necessity of legal

Admittedly, the Court cannot decide the issue at hand solely based on the above jurisprudence because the Former Joint Liquidators were not trustees under United States law, but were rather "Foreign Representatives" under the Bankruptcy Code. However, the above jurisprudence informs the Court's substitution analysis by revealing (a) that courts may continue suits by substituting a new party in interest for a party who has lost an interest in the action if authorized by substantive law, and (b) that Congress' intention in cases involving trustees is to continue the suit by substituting the new trustee for the old.

Section 101(24) of the Bankruptcy Code defines a foreign representative as "a person or body, *including a person or body appointed on an interim basis*, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24) (emphasis added). "The 'interim' appointment language was designed to accommodate insolvency systems which have a two stage process for commencement. [For example,] England and many of the British Commonwealth countries provide for interim or provisional fiduciaries

---

fictions to deal with the practical needs of litigation. Such is the case here where a change in office could have the potential to negate three years of extensive briefing and hearings on the issue. To extinguish this possibility, courts have interpreted a party not to lose standing because of his/her removal from office. In a sense, courts – with the support of Congress – treat such suits as suits against/brought by an office, not an individual person. The Court will not disrupt this legal fiction because doing so would go against the weight of the caselaw, would cause impractical and inefficient results, and would go against the Supreme Court's doctrine of constitutional avoidance. *See, e.g.*, *Hersh v. U.S. ex rel. Mukasey*, 553 F.3d 743 (5th Cir. 2008) (citing the doctrine of constitutional avoidance from several Supreme Court authorities). Thus, the Court goes on to analyze whether substantive bankruptcy law authorizes the non-abatement of Chapter 15 suits during a shift in a foreign representative office.

at the outset of a proceeding who almost always become permanent appointees." 8-1501 COLLIER ON BANKRUPTCY ¶ 1501.03 (16th ed. 2012). Because the Code does not guarantee an interim appointee fiduciary status past the interim period, the plain language of the Code indicates that Congress contemplated the possibility of having both a "former foreign representative" – the interim fiduciary – and a "successor foreign representative" – the fiduciary post-interim period. Further, Collier on Bankruptcy teaches that the U.S. analog of the interim foreign representative is the "interim trustee" under the Bankruptcy Code's section 303(g) prior to entry of an order for relief in an involuntary case or under section 701 in a liquidation case. *Id.* Chapter 3 of the Code governs U.S. interim trustees, *see* 11 U.S.C. § 322(a) (referring to trustees appointed under section 701),[13] and section 325 specifically states that "[a] vacancy in the office of trustee during a case does not abate any pending action or proceeding, and the successor trustee shall be substituted as a party in such action or proceeding," 11 U.S.C. § 325. Further, as discussed above, the Code specifically states that Federal Rule of Civil Procedure 25 applies to Chapter 15 cases, and, as the Joint Liquidators point out, Congress decidedly pointed Chapter 15 at recognizing foreign proceedings, not foreign representatives. *See generally* 11 U.S.C. § 1501, *et seq.*

Given all of the above and the fact that foreign representatives generally play the same role as trustees in U.S. bankruptcy proceedings – that of estate representatives – the Court is satisfied that Chapter 15 of the Bankruptcy Code provides the authority for an action to

---

[13]Interim trustees appointed under section 303(g) are appointed pursuant to section 701. *See* 11 U.S.C. § 303(g).

survive the removal of a foreign representative from office.  Accordingly, the Court grants the Joint Liquidators' motion to substitute *nunc pro tunc*.  The Court substitutes the Joint Liquidators as party Plaintiffs *nunc pro tunc* as of June 8, 2010.

### III. THE COURT GRANTS IN PART AND DENIES IN PART THE JOINT LIQUIDATORS' MOTION TO TAKE JUDICIAL NOTICE

The Joint Liquidators request that the Court take judicial notice of several items.  The Court grants in part and denies in part the motion to the following extent: First, pursuant to Federal Rule of Evidence 201, the Court takes judicial notice of the filings and defenses raised in the Stanford MDL cases listed in Exhibit 1 to the Joint Liquidators' motion. Second, the Court declines to take judicial notice of the summary of defenses raised in the Stanford MDL cases, attached in chart form as Exhibit 2 to the Joint Liquidators' motion, because it is duplicative of what the Court has judicially noticed in Exhibit 1.  Third, the Court takes judicial notice of the first two U.S. State Department publications listed in Exhibit 3 to the Joint Liquidators' motion, but declines to take judicial notice of the third U.S. State Department publication, as the hyperlink is non-functional.  Lastly, the Court declines to take judicial notice of the various international organization and other commercial/media publications listed in Exhibit 4 to the Joint Liquidators' motion because they are publications that are subject to reasonable dispute.

### IV. THE COURT OVERRULES THE PARTIES' OBJECTIONS

At the hearing in December 2011, the Court reserved judgment on several evidentiary points and asked the parties to brief their objections.  Based upon the parties' briefing, the Court overrules all objections.

ORDER – PAGE 11

The Joint Liquidators first object to various exhibits attached to the Receiver's expert witness Karyl Van Tassel's written direct testimony as irrelevant, lacking foundation/authentication, and hearsay. The Court is satisfied that Van Tassel's exhibits are admissible under Rule 703 to demonstrate what she relied upon to form her opinions. *See generally* FED. R. EVID. 703.[14]

The Joint Liquidators next object to various exhibits attached to the Receiver's written direct testimony as irrelevant, lacking foundation/authentication, hearsay, and unfairly prejudicial. In response to the hearsay objection, the Receiver argues that his exhibits are admissible as statements of a public office under Federal Rule of Evidence 803(8). *See* Receiver's Resp. to JLs' Objections 1-2 [161]. While the Court finds the Receiver's argument to be erroneous, it holds that the exhibits are admissible because they are relevant, do not lack foundation/authentication, their probative value substantially outweighs any prejudice to the Joint Liquidators, and are admissible as an exception to the hearsay rule under Rule 807. *See* FED. R. EVID. 807 (residual hearsay exception).[15]

---

[14]*See infra* note 57.

[15]*See* Tr. of Evidentiary Proceedings, Dec. 21, 2011, at 283-84 [hereinafter Hr'g Tr.] (Court overruling Joint Liquidators' objection to Receiver's testimony, stating "I'm going to admit this under the residual hearsay exception. I think this is very familiar or very similar to the exception for reports of governmental entities on conclusions they've reached in the discharge of their duties. And as the Receiver, Mr. Janvey has some obligations on behalf of the Court to sort through and try and determine what's been done and has devoted considerable time and money towards that end and I believe, under the residual exception, is entitled to testify regarding what conclusions he reached. In determining what, if any, weight I give to that, I will of course take into account the fact that this is kind of secondhand news coming from him. But I do think he's entitled to report to the Court his conclusions based on the work he's done as Receiver and the work the professionals on his behalf have

Next, the Joint Liquidators object to various portions of Stanford investor-victim Dr. John R. Wade's direct testimony as hearsay statements and under the best evidence rule. The Court holds that the alleged hearsay statements are not hearsay because the Receiver offered them to show the effect the statements had on Dr. Wade – that he *believed* SIB's headquarters was in the United States, not for the truth of the matter asserted – that SIB's headquarters *actually was* in the United States. The Court also overrules the Joint Liquidators' best evidence objection because the Receiver did not seek to prove the content of writings. *See generally* FED. R. EVID. 1002.

Lastly, the Joint Liquidators object to the December 20, 2011 letter from the Department of Justice to this Court as irrelevant and hearsay. The Court holds that the letter is relevant and admissible under the residual hearsay exception. *See* FED. R. EVID. 807.

The Court overrules the Receiver's objections for substantially the same reasons that it overrules the Joint Liquidators' objections. Moreover, the Court notes that, as the Receiver recognizes, the Court disregards any evidence that would otherwise be inadmissible.

## V. THE ANTIGUAN PROCEEDING IS A FOREIGN NONMAIN PROCEEDING

The Joint Liquidators ask the Court to recognize the Antiguan Proceeding as a foreign main proceeding. In the alternative, the Court may recognize the Antiguan Proceeding as a foreign nonmain proceeding[16] or decline to grant recognition at all.[17]

_____

done and reported to him"). *See infra* note 57.

[16]Although the Receiver protests that the Joint Liquidators have requested that the Antiguan Proceeding be recognized only as a foreign main proceeding, the Court is free to consider foreign nonmain status because under the Code, foreign representatives apply to

### A. Chapter 15's Framework

Congress enacted Chapter 15 of the Bankruptcy Code via the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") "so as to provide effective mechanisms for dealing with cases of cross-border insolvency." *Ran IV*, 607 F.3d at 1020 (quoting 11 U.S.C. § 1501(a)). The Chapter's stated purpose is to incorporate the Model Law on Cross-Border Insolvency into United States jurisprudence to ensure (a) cooperation among courts and interested parties in different national jurisdictions, (b) greater legal certainty for trade and investment, (c) fair and efficient administration of cross-border insolvencies that protect the interests of all creditors and other interested entities, (d) protection and maximization of the value of debtors' assets, and (e) facilitation of the rescue of financially troubled businesses in order to protect investment and preserve employment. *See* 11 U.S.C. § 1501.

Chapter 15 permits a representative in a foreign bankruptcy proceeding to petition a U.S. court for recognition of the foreign proceeding under the Bankruptcy Code. *See Lavie v. Ran (Ran I)*, 384 B.R. 469, 470 (S.D. Tex. 2008); 11 U.S.C. § 1515. In order for a court

---

U.S. courts "for recognition," and U.S. courts then make the determination as to what kind of recognition to grant if they determine that recognition is warranted under Chapter 15. *See* 11 U.S.C. § 1515(a) ("A foreign representative applies to the court *for recognition* of a foreign proceeding . . . ." (emphasis added)); *id.* at § 1517(b) ("Such foreign proceeding shall be recognized – (1) as a foreign main proceeding . . . ; or (2) as a foreign nonmain proceeding . . . .").

[17]*See generally* Daniel M. Glosband, *SPhinX Chapter 15 Opinion Misses the Mark*, AM. BANKR. INST. J. 44, 45 (Dec./Jan. 2007) (coauthor of the model act on which Chapter 15 is based explaining Chapter 15 framework in detail).

to recognize a foreign proceeding, (a) it must be a foreign main proceeding or a foreign nonmain proceeding, (b) the foreign representative must be a person or body, and (c) the petition must meet the requirements of section 1515.[18]  *See* 11 U.S.C. § 1515.  A foreign proceeding is a collective judicial or administrative proceeding in a foreign country under a law relating to insolvency or adjustment of debt where the debtor's assets and affairs are subject to control or supervision by a foreign court for the purpose of reorganization or liquidation.  11 U.S.C. § 101(23).  Chapter 15 distinguishes a main proceeding from a nonmain proceeding as follows: the former is pending in the country where the debtor has its center of main interests ("COMI"), whereas the latter is pending in a country where the debtor merely has an establishment.  *See* 11 U.S.C. § 1502.

Notwithstanding the above, a U.S. court may not recognize a foreign proceeding at all "if the action would be manifestly contrary to the public policy of the United States."  11 U.S.C. § 1506.  This exception, however, "is intended to be invoked only under exceptional circumstances concerning matters of fundamental importance for the United States."  *Ran IV*, 607 F.3d at 1021.  "[C]hapter 15 contemplates recognition of not more than one main proceeding and any combination of nonmain proceedings for the same debtor."  *In re British*

---

[18]The petition must be accompanied by (1) a certified copy of the decision commencing the foreign proceeding and appointing the foreign representative, (2) a certificate from the foreign court affirming the existence of the foreign proceeding and the appointment of the foreign representative, or (3) in the absence of evidence under the above prongs, any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.  The petition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor of which the foreign representative is aware, and the above-referenced documents shall be translated into English.  11 U.S.C. § 1515.

*Am. Ins. Co. Ltd.*, 425 B.R. 884, 908 (Bankr. S.D. Fla. 2010); *see also In re Chiang*, 437 B.R.

397, 399 (Bankr. C.D. Cal. 2010) (holding that debtor can only have one COMI and therefore

only one main proceeding).

 If the U.S. court recognizes the foreign proceeding – subject to any limitations it may

impose consistent with Chapter 15's policy – the foreign representative gains the capacity

to sue and be sued in United States courts and the authority to apply directly to a U.S. court

for other appropriate relief.  *See* 11 U.S.C. § 1509; *Ran I*, 384 B.R. at 470 (quoting *Iida v.*

*Kitahara (In re Iida)*, 377 B.R. 243, 257 (B.A.P. 9th Cir. 2007)).   If the court grants

recognition as a foreign main proceeding,

> (a) the automatic stay under Bankruptcy Code section 362 (as well as the
> creditors' right to adequate protection and relief from the automatic stay under
> sections 361 and 362(d) of the Bankruptcy Code) applies with respect to the
> debtor and its property within the territorial jurisdiction of the United States,
> (b) sections 363, 549 and 552[19] of the Bankruptcy Code apply to restrict the
> ability to transfer such property absent court approval, and (c) unless the court
> orders otherwise, the foreign representative may operate the debtor's business
> and exercise the rights and powers of a trustee under Bankruptcy Code
> sections 363 and 552.

*In re SPhinX, Ltd. (SPhinX I)*, 351 B.R. 103, 115 (Bankr. S.D.N.Y. 2006); *see* 11 U.S.C.

§ 1520.

 Such relief does not automatically accompany recognition as a foreign nonmain

proceeding.  Rather, for foreign nonmain proceedings, the court has the *discretion* to order

"appropriate relief" including (a) staying the commencement or continuation of actions

---

[19]One court has noted that the reference to section 552 is a typographical error, stating
that the legislative history reveals that the text should have referred to section 542.  *See*
*Chiang*, 437 B.R. at 402 n.13.

concerning the debtor and its assets; (b) suspending the right to transfer, encumber, or otherwise dispose of the debtor's assets; (c) granting the authority to examine witnesses, take evidence, or deliver information concerning the debtor; (d) granting the authority to administer or realize the debtor's assets; and (e) granting any additional relief available to a U.S. trustee with certain exceptions. *See* 11 U.S.C. § 1521. Such discretionary relief is additionally available to foreign main proceedings.

On the other hand, if a court denies recognition, it may issue "any appropriate order necessary to prevent the foreign representative from obtaining comity or cooperation from courts in the United States." 11 U.S.C. § 1509. Thus, "a decision as to recognition is a serious matter." *In re Basis Yield Alpha Fund (Master)*, 381 B.R. 37, 45 (Bankr. S.D.N.Y. 2008).

### B. The Antiguan Proceeding Satisfies Chapter 15's Procedural Requirements

The Antiguan Proceeding meets Chapter 15's preliminary requirements for recognition. First, it is a "foreign proceeding" because it is collective,[20] judicial, in a foreign

---

[20]Courts have interpreted the term "collective" to mean "one that considers the rights and obligations of all creditors." *In re Betcorp Ltd.*, 400 B.R. 266, 281 (Bankr. D. Nev. 2009). In other words, the action must have been "instituted for the benefit of creditors generally rather than for a single creditor or class of creditors." *British Am. Ins. Co. Ltd.*, 425 B.R. at 902; *see also In re Ashapura Minechem Ltd.*, 2011 WL 5855475, at *4 (Bankr. S.D.N.Y. 2011) ("The notion of a 'collective' insolvency proceeding is based on the ability of a single insolvency representative to control the realization of assets for the purposes of pro rata distribution among all creditors (subject to domestic statutory priorities), as opposed to a proceeding designed to assist a particular creditor to obtain payment or a process designed for some purpose other than to address the insolvency of the debtor.").

The Joint Liquidators are correct in pointing out that specific provisions of the Antiguan International Business Corporation Act ("IBCA"), which governs the Antiguan Proceeding, highlight the collective nature of liquidations under it. *See, e.g.*, 105-2, IBCA

country, under a law relating to insolvency,[21] and the debtor's assets and affairs are subject to supervision by a foreign court for the purpose of liquidation. *See* 11 U.S.C. § 101(23). Next, the Joint Liquidators are "person[s]." *See* 11 U.S.C. 1515. And finally, the petition meets the requirements of section 1515.[22] *See id.* Accordingly, the Court proceeds to analyze whether the Antiguan Proceeding satisfies the Code's substantive recognition requirements.

### C. The Stanford Entities' COMI is Not in Antigua

---

§§ 286, 289. The Joint Liquidators are further correct in noting that the JL Appointment Order states that the proceeding is "a collective insolvency proceeding intended to marshal in and recover all assets and value owned by, or owed to, [SIB]," and that "[a]ll creditors, depositors and investors in [SIB] shall have the right to seek to prove [their claims] in the estate of [SIB] no matter where such parties are resident or located in the world." 106-4, at 6. Although admittedly the Antiguan Proceeding is only concerned with SIB creditors and investors rather than those of *all* the Stanford Entities, the Court believes that it is still collective under Chapter 15 because it is the type of proceeding to which the Chapter was intended to apply.

The Court notes language in other U.S. court opinions that contrasts a collective proceeding to a receivership, which they state is non-collective. *See, e.g.*, *Betcorp*, 400 B.R. at 281. However, those courts describe receiverships as "remed[ies] instigated at the request, and for the benefit, of a single secured creditor." *Id.* This is not the type of receivership in place here. Rather, the Court instituted this Receivership at the request of the SEC for the benefit of all Stanford Entities' investor-victims and creditors. Thus, although the Court does not need to find that the Receivership is collective in nature, it does so.

[21]The IBCA. *See supra* note 20.

[22]The petition for recognition is accompanied by a certified copy of the decision commencing the foreign proceeding and appointing the Former Joint Liquidators, *see* discussion *supra* Part II (substituting Joint Liquidators as plaintiffs for Former Joint Liquidators), a statement identifying all foreign proceedings with respect to SIB of which the Former Joint Liquidators were aware, *see* Decl. of Nigel Hamilton-Smith in Supp. of Pet. Recogn. Foreign Main Proceeding Pursuant to Ch. 15 of Bankr. Code 16 [3], and the above-referenced documents are in English. *See* 11 U.S.C. § 1515.

The principal issue in dispute between the parties is whether SIB's COMI is in Antigua. If so, the Court must grant the Antiguan Proceeding foreign main recognition, but if not, the Court must determine whether SIB has an establishment in Antigua, which would lead the Court to grant foreign nonmain recognition.

### 1. The Court Aggregates the Stanford Entities for COMI Purposes. – At the outset, the Court must determine whether to aggregate the Stanford Entities. The Receiver contends that because SIB was but one of many entities in Stanford's elaborate Ponzi scheme,[23] the Court's COMI analysis should center on the aggregated Stanford Entities. As the SEC expands,

> SIB was window dressing, part of an effort to mask from United States regulatory scrutiny the massive securities fraud Stanford and others orchestrated from the United States. The law does not give effect to legal trappings that are designed for a fraudulent purpose, and, therefore, Stanford's operations should be viewed in their entirety.

SEC's First Suppl. Opp'n to Pet. Recogn. Pursuant to Ch. 15 Bankr. Code 1-2 [59]. In response, the Joint Liquidators argue that the issue of aggregation is not ripe for review because the Receiver has not moved to substantively consolidate the Stanford Entities in the

---

[23]The Court has previously stated that Stanford operated a Ponzi scheme. *See, e.g.*, Order, Mar. 31, 2011 [1310], *in* SEC Action ("The Court previously determined that the Stanford Defendants operated a Ponzi scheme." (citing Order Granting Prelim. Inj., June 10, 2010 [456], *in Janvey v. Alguire*, Civil Action No. 3:09-CV-0724 (N.D. Tex. filed Apr. 20, 2009), *aff'd*, 628 F.3d 164 (5th Cir. 2010))). Although the Court acknowledges that it may have been inconsistent in recent orders by sometimes referring to the scheme as an "alleged Ponzi scheme," *see, e.g.*, Order Denying Stanford's Mot. Dismiss, at 13 ("Stanford's alleged Ponzi scheme spanned at least a decade an involved myriad actors and entities largely owned or controlled by Stanford."), the Court here clarifies that it holds that Stanford operated a Ponzi scheme.

SEC Action, that the language of Chapter 15 contemplates a single entity, and that aggregation is not in the best interests of Stanford's victims and creditors.  *See* Joint Liquidators' Resp. in Opp'n to Suppl. Briefs by Receiver Parties to Pet. Recogn. Pursuant to Ch. 15 Bankr. Code 11-13 [120] [hereinafter JL Resp. to Suppl. Briefs].

It is axiomatic that a corporation is a legal entity existing separate and apart from the persons composing it and entities related to it.  However, courts equally accept that they should disregard the corporate form where that form was the means to a subversive end.  *See, e.g.*, 18 AM. JUR. 2D *Corporations* § 46 (2012).  Indeed, the Fifth Circuit has applied corporate disregard doctrines in numerous instances, including to determine principal place of business.  *See, e.g.*, *Kuehne & Nagel (AG & Co.) v. Geosource, Inc.*, 874 F.2d 283, 290-91 (5th Cir. 1989); *J.A. Olson Co. v. City of Winona, Miss.*, 818 F.2d 401, 412-13 (5th Cir. 1987) (stating that courts cannot apply alter ego doctrine to impute parent company's principal place of business to subsidiary in effort to avoid diversity jurisdiction, but that "a corporation may, through consolidation with another entity or the alter ego doctrine, *gain* additional places of citizenship" and stating that "a corporation's nerve center does not have to be located within the corporate shell, but can be found wherever the nerve center exists . . . . We therefore consider substance over form in determining the nerve center"); *Freeman v. Nw. Acceptance Corp.*, 754 F.2d 553, 557 (5th Cir. 1985) ("[C]ourts will not permit themselves to be blinded or deceived by mere forms of the law, but, regardless of fictions, will deal with the substance of the transaction involved as if the corporate agency did not exist and as the justice of the case may require." (quoting *Chi., Milwaukee, & St. Paul Co.*

*v. Minneapolis Civic & Commerce Ass'n*, 247 U.S. 490, 501 (1918))); *cf. Frazier v. Ala. Motor Club, Inc.*, 349 F.2d 456, 460 (5th Cir. 1965) (imputing nondefendant parent corporation's situs of "doing business" for venue purposes to defendant subsidiary corporations because subsidiaries were not actually separate corporate entities).

Other circuits agree that courts should disregard formal separateness for principal place of business purposes where facts warrant piercing the corporate veil. *See, e.g.*, *Taber Partners, I v. Merit Builders, Inc.*, 987 F.2d 57, 61-63 (1st Cir. 1993); *Danjaq, S.A. v. Pathe Commc'ns Corp.*, 979 F.2d 772, 775 (9th Cir. 1992) ("The only recognized exception to [the rule that courts look to the principal place of business of the subsidiary] is where the subsidiary is the alter ego of the parent corporation."); *Fritz v. Am. Home Shield Corp.*, 751 F.2d 1152, 1153 (11th Cir. 1985) ("Determining a corporation's principal place of business may require a complex analysis of business relationships among a hierarchy of corporate entities, an inquiry sometimes necessitating the use of an alter ego theory."); *see also Leach Co. v. Gen. Sani-Can Mfg. Corp.*, 393 F.2d 183, 186 (7th Cir. 1968) (personal jurisdiction);[24]

---

[24]The Fifth Circuit has held that rationales for piercing the corporate veil in personal jurisdiction cases apply with equal force to diversity analyses. *Freeman*, 754 F.2d at 557-58 ("Although these cases refer to *in personam* rather than subject matter jurisdiction, their rationale applies with equal force to the latter. Indeed, it would be irrational to hold that a parent and a subsidiary have been refused for purposes of *in personam* jurisdiction, but remain separate for purposes of subject matter jurisdiction. Recognizing fusion as fusion for all jurisdictional purposes makes good sense . . . ." (internal citations omitted)).

ORDER – PAGE 21

13F CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3625, at 127-31, 134 (3d ed. 2009).[25]

It is appropriate to extend these corporate disregard doctrines to the Chapter 15 context. First, the COMI analysis is essentially a principal place of business analysis. *See, e.g.*, *In re British Am. Isle of Venice (BVI), Ltd.*, 441 B.R. 713, 720 (Bankr. S.D. Fla. 2010); *In re Fairfield Sentry Ltd.*, 440 B.R. 60, 64 (Bankr. S.D.N.Y. 2010), *aff'd*, 2011 WL 4357421 (S.D.N.Y. 2011); *British Am. Ins. Co.*, 425 B.R. at 908-09; *Basis Yield*, 381 B.R. at 48; *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd. (Bear Stearns II)*, 374 B.R. 122, 129 (Bankr. S.D.N.Y. 2007), *aff'd*, *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd. (Bear Stearns III)*, 389 B.R. 325 (S.D.N.Y. 2011); *In re Tri-Cont'l Exch.*, 349 B.R. 627, 634 (Bankr. E.D. Cal. 2006). As such, federal principal place of business doctrines should apply.[26] Second, two other Chapter 15 cases applied corporate disregard doctrines to their COMI analyses. *See In re Ernst & Young, Inc.*, 383 B.R. 773, 780-81 (Bankr. D. Colo. 2008) (2008) ("While not making a final determination on the issue [of alter ego], the Court finds, based on the evidence presented,

---

[25]Although most courts agree that piercing the corporate veil is appropriate only to add an additional state of citizenship in order to destroy diversity, *see, e.g.*, *Panalpina Welttransport GMBH v. Geosource, Inc.*, 764 F.2d 352, 354-55 (5th Cir. 1985), this requirement centers on an interpretation of 28 U.S.C. § 1332, which is inapplicable here.

[26]The Former Joint Liquidators argued that piercing the corporate veil is inappropriate where the party advocating piercing does not seek to hold the parent liable. *See, e.g.*, Antiguan Liquidators' Second Supplemental Br. Supp. of Their Pet. Recogn. Pursuant to Ch. 15 of U.S. Bankr. Code 17-18 [55] [hereinafter Former JL 2nd Suppl. Br.]. However, as just discussed, courts pierce corporate veils for other purposes, such as to determine principal places of business.

there is a reasonable probability [company 1] and [company 2] were operated as one for purposes of perpetrating a fraud on investors.");[27] *British Am. Isle of Venice (BVI), Ltd.*, 441 B.R. at 721-22 (court considered veil-piercing issue in its Chapter 15 COMI analysis but did not pierce veil because of lack of evidence).

Finally, it would defy logic and run afoul of equity to treat a fictitious corporation as a real entity for Chapter 15 purposes. The purpose of Chapter 15 recognition is to determine the jurisdiction that is most closely associated with the debtor entity; disallowing corporate disregard doctrines would proliferate recognition of foreign proceedings that have no real or rightful interest in liquidating the real estate. Proliferating corporate fictions in the Chapter 15 context would also protect sinister characters such as Ponzi schemers who may target offshore jurisdictions to run their fraudulent empires.[28] Thus, the Court holds that corporate disregard doctrines apply in the Chapter 15 context.[29]

---

[27]Notably, the alter ego finding in *Ernst & Young, Inc.* was largely overlooked in subsequent treatises, law reviews, and legal periodicals, seemingly indicating that it was uncontroversial. The subsequent literature instead focused on the court's public policy exception analysis.

[28]Indeed, the truth of Stanford's scheme belies the Former Joint Liquidators' argument that veil piercing is not available here because it is not "necessary to prevent an injustice," *see* Former JL 2nd Suppl. Br. 18. Not aggregating the entities, in this instance, would perpetuate an injustice.

[29]The Joint Liquidators' argument that the statutory language's use of the singular throughout the Chapter bars corporate disregard doctrines, *see, e.g.*, JL Resp. to Suppl. Briefs 12, holds no water. The Court concedes that Chapter 15 refers to a debtor as an "entity," and not "entities." *See* 11 U.S.C. § 1502. However, the Court is fairly certain that Chapter 15 is also meant to apply to *real* entities and not *fictitious* entities. It would be absurd to implement a law that would encourage U.S. courts to cooperate with foreign proceedings directed at fanciful organizations. The Court will not engage in semantics that obfuscate the

Courts have explained that piercing the corporate veil for jurisdictional purposes is unwarranted in many instances, even where the corporate separation between a parent and a subsidiary is merely formal. The key is whether the corporate entities maintained their separate natures – that makes the separation "real" for jurisdictional purposes. *See, e.g.*, *Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333, 335-37 (1925) (personal jurisdiction). For diversity purposes, courts consider such factors as the degree of control by the parent corporation, the relationship of the activities of the subsidiary to the activities of the parent, the overlap in membership of the board of directors, and the maintenance of separate corporate books. WRIGHT, MILLER & COOPER, *supra* at 135. This Court has previously applied that standard, *see Burnside v. Sanders Assocs.*, 507 F. Supp. 165, 166 (N.D. Tex. 1980) (Hill, J.), *aff'd*, 643 F.2d 389 (5th Cir. 1981), although it later applied a more minimalist standard, stating that veil piercing depended upon "the existence on paper of the two entities, and whether they kept separate books of accounting." *See Bennett v. Steak 'N Shake Operations, Inc.*, 2010 WL 2400160, at *1 (N.D. Tex. 2010) (Lynn, J.) (discussing *Amarillo Oil Co. v. Mapco, Inc.*, 99 F.R.D. 602, 606 (N.D. Tex. 1983) (Robinson, J.)).

――――――――――――――――――――

purpose of the statute.

In further support of their argument that aggregation is inappropriate in the Chapter 15 context, the Joint Liquidators point to *Fairfield Sentry Ltd.*, 440 B.R. 60, where the court granted recognition to a feeder fund established as an investment vehicle in the Madoff Ponzi scheme. The Court finds it surprising that the parties in that case were silent regarding the effect the Ponzi scheme may have had on the debtor's COMI. However, the Court is not persuaded that the absence of veil-piercing analysis in that case should influence its decision here.

Jurisdictional veil-piercing is substantively different from veil piercing for nonjurisdictional purposes. For example, in nonjurisdictional contexts, the Court pierces the corporate veil where the owner is "using the corporate entity as a sham to perpetrate a fraud, to avoid personal liability, avoid the effect of a statute, or in a few other exceptional situations." *Bell Oil & Gas Co. v. Allied Chem. Corp.*, 431 S.W.2d 336, 340 (Tex. 1968) (quoting *Drye v. Eagle Rock Ranch, Inc.*, 364 S.W.2d 196, 202 (Tex. 1962)).[30] "There must be something more than mere unity of financial interest, ownership and control for a court to treat the subsidiary as the alter ego of the parent and make the parent liable for the subsidiary's tort." *Lucas v. Tex. Indus., Inc.*, 696 S.W.2d 372, 374 (Tex. 1984) (quoting *Hanson Sw. Corp. v. Dal-Mac Constr. Co.*, 554 S.W.2d 712 (Tex. App. – San Antonio 1966, writ ref'd n.r.e.)) (italics omitted). Indeed, in tort cases, the party seeking to pierce the corporate veil must show that the subsidiary "is organized and operated as a mere tool or business conduit of [its parent] corporation," *Castleberry v. Branscum*, 721 S.W.2d 270, 272 (Tex. 1986), *superseded in part on other grounds by* TEX. BUS. CORP. ACT art. 2.21 *as recognized in W. Horizontal Drilling, Inc. v. Jonnet Energy Corp.*, 11 F.3d 65, 68 (5th Cir. 1994),[31] so that "there exists such unity between [the two corporations] that [they] cease[] to

---

[30]Federal common law and state law regarding the corporate disregard doctrines are substantively the same, *see United States v. Jon-T Chems., Inc.*, 768 F.2d 686, 690 n.6 (5th Cir. 1985), so the Court recites the Texas standard as the law of the forum.

[31]On January 1, 2010, the Texas Business Corporation Act art. 2.21 was recodified as the Texas Business Organizations Code §§ 21.223-21.226. Via these provisions, in 1989 the Texas legislature abrogated *Castleberry* to the extent that veil-piercing analysis now requires a showing of actual fraud in cases involving a corporation's contractual obligations. *See, e.g.*, *Acceptance Indem. Ins. Co. v. Maltez*, 619 F. Supp. 2d 289, 301 (S.D. Tex. 2008)

be separate," *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 228 (Tex. 1990) (citing *Castleberry*, 721 S.W.2d at 272).  And in contract cases, courts require a showing of actual fraud.  *See* TEX. BUS. ORGS. CODE § 21.223(b); *see also* discussion *supra* note 31. Ultimately, under substantive veil-piercing analyses, alter ego liability is appropriate where "holding only the [subsidiary] corporation liable would result in injustice." *SSP Partners v. Gladstrong Inv. (USA) Corp.*, 275 S.W.3d 444, 454 (Tex. 2008) (quoting *Castleberry*, 721 S.W.2d at 272).

Regardless of the standard the Court employs, the Court is of the opinion that the evidence supports piercing SIB's corporate veil.  First, the Court takes judicial notice that on March 6, 2012, a jury in Houston, Texas convicted Stanford of four counts of wire fraud, one count of conspiracy to commit wire and mail fraud, five counts of mail fraud, one count of conspiracy to obstruct an SEC proceeding, one count of obstruction of an SEC proceeding, and one count of conspiracy to commit money laundering, all related to his Ponzi scheme.[32]

_____

(discussing the Texas legislature's response to *Castleberry*).

[32]Specifically, the jury convicted Stanford of: (1) Count 1: conspiring to commit wire fraud and mail fraud by soliciting and obtaining billions of dollars of investors' funds through false pretenses, representations, and promises, all in order to obtain substantial economic benefits for himself and others through the payment of fees, wages, bonuses, and other monies, and unauthorized diversions, misuse, and misappropriation of funds; (2) Count 3: sending wire transfer of approximately $2.9 million from Stanford Financial Group ("SFG") account in Switzerland to Stanford's personal checking account; (3) Count 4: sending wire transmission of approximately $700,000 from Stanford Group Company ("SGC") account in Houston, Texas to SIB account in Houston, Texas regarding an investor's purchase of SIB CDs; (4) Count 5: sending email from Mark Kuhrt, Global Controller of SFG Global Management, to Gilberto Lopez, Chief Accounting Officer for SFG, in Houston, Texas, attaching a spreadsheet concerning artificial "roundtrip" real estate transaction to transfer interests in island properties back to SIB; (5) Count 6: sending email

*See* Verdict [808] *in United States v. Stanford*.  The District Court for the Southern District of Texas issued a final judgment in that case on June 14, 2012.  *See* Judgment [878] *in United States v. Stanford*.  Further, this Court has previously recognized that Stanford and his affiliates operated as one,[33] and there is substantial evidence in the record in this action to support that finding.

      The evidence demonstrates that SIB was nothing like a typical commercial bank. Although it officially offered six deposit products,[34] it had one principal product line –

---

from Stanford to SFG employees in Houston, Texas; Memphis, Tennessee; and elsewhere, representing that SIB "remains a strong institution" and that he had recently made "two capital infusions" into the bank; (6) Counts 7-11: sending packages of documents, including investor subscription information, from SGC in Houston, Texas, to SIB in Antigua; (7) Count 12: conspiring to corruptly influence, obstruct, and impede the SEC's investigation of SFG, including the SEC's efforts to ascertain SIB's true financial condition and the content and value of SIB's investment portfolio, all in an effort to, among other things, perpetuate and prevent detection of an ongoing fraud and continue receiving economic benefits from the fraud; (8) Count 13: obstructing the SEC investigation; and (9) Count 14: conspiring to commit money laundering by causing the movement of millions of dollars of fraudulently obtained investors' funds from and among bank accounts located in the Southern District of Texas and elsewhere in the United States to various bank accounts located outside of the United States.  Superseding Indictment [422], May 4, 2011, *in United States v. Stanford*, Criminal Action No. 4:09-CR-00342-001 (S.D. Tex. 2012) [hereinafter *United States v. Stanford*].

[33]*See, e.g.*, Order Granting Receiver's Mot. Summ. J., June 22, 2011, at 56 [109] *in Janvey v. Dem. Senatorial Campaign Comm., Inc.*, Civil Action No. 3:10-CV-0346-N (2011) ("The evidence further demonstrates that the Ponzi scheme was comprised of over 100 interrelated entities whose primary, if not exclusive, source of funding was derived from SIB CDs . . . ."); Order Denying Stanford's Mot. Dismiss, Nov. 30, 2011, at 13 [1483] *in* SEC Action ("Stanford's alleged Ponzi scheme spanned at least a decade and involved myriad actors and entities largely owned or controlled by Stanford.").

[34]Beverly Jacobs, SIB's Vice President of Customer Support, testified that SIB offered three types of CDs and three types of accounts, as well as credit card services, loan facilities, letters of credit, letters of guarantee, and private banking services. 110-1, at 13, 18-23; Hr'g

certificates of deposit ("CDs") – and one principal source of funds – customer deposits from CD purchases. 115-1, at 7; *see also* 107-1, at 11. Although SIB did invest some proceeds from CD sales, the amount it invested was grossly inadequate to cover redemptions or interest payments to investors and was far less than the amount it represented that it invested to customers and the public. 115-1, at 9. SIB had been insolvent since at least 1999 and remained in business by operating as a Ponzi scheme. *See* 115-1, at 7. In other words, SIB relied on the proceeds from the sale of new CDs to make purported interest and principal payments to existing CD investors. *See id.*

Stanford was the sole owner, directly or indirectly, of more than 130 separate Stanford Entities, including SIB, in more than 14 countries. *See id.* at 7; 62, at 10-13. The Stanford Entities comprised a single financial services network referred to as SFG. *See* 115-1, at 7. As to SIB specifically, Stanford owned 100% of Stanford Bank Holdings Limited, which in turn owned 100% of SIB. *See* 62, at 12. Funds from the Stanford Entities, consisting primarily of CD proceeds, *see* 115-3, at 8, almost exclusively comprised Stanford's reported income from at least 1999 onward. *See* 115-1, at 7. Stanford controlled the Stanford Entities with substantial assistance from James Davis, Chief Financial Officer ("CFO") of Stanford Financial Group Company ("SFGC") and SIB, and Laura Pendergest-Holt, Chief Investment Officer ("CIO") of SFGC. *Id.*

The evidence demonstrates that Stanford, Davis, and Pendergest-Holt provided misinformation regarding SIB's investment strategy, earnings, and safety to financial

_____

Tr. 92.

advisors at various Stanford Entities, who then used it to induce customers to purchase CDs. *See id.* at 8; *see also* 21-3, at 5. Davis determined bank earnings monthly, artificially pegging the amount at the number necessary to give the Bank an acceptable financial performance and capital ratios. 115-1, at 14.

Although in many instances Stanford and others doctored SIB's paperwork to look reassuringly like the paperwork of a real financial institution,[35] the reality is that SIB did not observe corporate formalities in all respects. For example, the SIB CD proceeds did more than just keep the bank afloat. Stanford Entities and Stanford himself received large disbursements of the proceeds. *Id.* at 9, 32-33. The evidence demonstrates, for instance, that SIB made a $1.8 billion loan payment to Stanford. *Id.* at 14; 107-1, at 19. Additionally, there were a number of material related-party transactions that SIB did not disclose in its annual financial statements. For example, a Stanford Entity would acquire real estate assets, and it would later transfer those assets among the SFG network entities, recorded at several times their original value without any evidence of capital improvements or independent appraisal. *See* 115-1, at 14, 32. Additionally, the Court notes that both the Former Joint Liquidators and the current Joint Liquidators were in agreement that Stanford operated all

---

[35]The Joint Liquidators state that "SIB entered into contracts with a number of Stanford-related entities for the provision of services, including certain oversight, marketing, investment and financial advisory, and treasury and accounting functions, and for customer, referral based services. These contracts were used as a mechanism to remove funds from SIB." New Joint Liquidators' Proposed Findings of Fact & Concs. of Law With Respect to Pet. Recogn. Pursuant to Ch. 15 U.S. Bankr. Code 23 [154] [hereinafter JL Proposed Facts & Law] (citing 106-1, at 24-26; 115-1, at 20-21; Hr'g Tr. 44-45, 131, 178). Joint Liquidator Wide also testified that the contracts "certainly weren't between arm's length parties. They were certainly related parties, yes." Hr'g Tr. 44.

of the Stanford Entities as a Ponzi scheme.  15, at 2 (Former JL Hamilton-Smith's affidavit

stating "Although I do not dispute that SIB and other Stanford entities were likely engaged

in a Ponzi scheme – indeed, my own findings to date are consistent with that allegation – I

take issue with the assertion that the companies in the Stanford group were in fact operating

as a single entity, at least so far as SIB is concerned."); Hr'g Tr. 38-39 (JL Wide stating that

on August 11, 2011 he certified to the Antiguan Court that "SIB operated a business model

which was a Ponzi scheme"); *id.* at 114-15 (JL Wide stating that he had not withdrawn or

amended the above statement); *id.* at 142 (JL Dickson testifying that he "hesitate[s] to use

the word 'Ponzi scheme' simply because [he] do[es not] think it's a defined term" but stating

that he's "already agreed that the vast majority of – of the activity appears to be fraudulent

and new monies are used to pay existing depositors").[36]

_____

[36]During the hearing, Joint Liquidator Wide attempted to backtrack from his previous
statement that SIB was run as part of a Ponzi scheme:

> A. [JL Wide:] As our investigations have continued and we've tracked the
> flow of funds and we've looked at how money was removed from control of
> the depositor, if you like, it became clear to me that the funds were being
> stripped out of SIB, partly through those contracts that were spoken about
> earlier and partly by simply removing them, putting them into other Stanford
> entities and then onwards for the benefit of either Mr. Stanford or other
> persons unknown.
> Q. [Receiver's counsel:] And how is that different than a Ponzi scheme?  Why
> did you make that distinction?
> A. From our view, it looked like the bank's money was being stolen rather
> than the bank was running a Ponzi itself.

Hr'g Tr. 90.

> Q. Are you telling this Court that since August of 2011 when you signed a
> claim saying SIB was run under a business model that was a Ponzi scheme,
> you have changed your mind and come to a different conclusion in the last 90
> days and it's – and concluded it's not a Ponzi scheme?
> A. I'm concluding there was a fraud committed, yes.  And I'm concluding that,

Further, SIB's purported president, Juan Rodriguez-Tentino, had an extremely limited role at the bank – Rodriguez-Tentino had no control over the control, trajectory, or investment of SIB's funds, 115-1, at 27; Hr'g Tr. 181 (Jacobs stating that she believed that Rodriguez-Tentino had no power to "free up" SIB funds to meet backlog of customer demand for their money); he referred all questions regarding SIB to Pendergest-Holt and Davis at SFG, *see* 115-1, at 27-29; his only role in the sale of CDs was to present slideshows, provided by Stanford, about SIB to potential large investors, *see id.* at 27; and he has described himself as Stanford and Davis's "puppet," in charge of only administrative tasks such as day-to-day management of basic operations, system account reviews, SIB client accounts, and customer service.    *See id.* at 26-29.    And, although SIB employed approximately ninety people, the evidence demonstrates that employees of other Stanford Entities largely ran SIB, as its employees[37] had no authority to make any significant managerial decisions and no access to SIB's records of investment values and income.    *See id.* at 10, 15, 18, 22.    Besides, the Court questions whether ninety employees could sufficiently operate a multibillion dollar bank.    *See id.*

———————————

for SIB's point of view, its money was stolen through these variety of contracts and sometimes just outright stolen by Mr. Stanford, yes, or his other companies.
Q. Have you taken any steps to withdraw or amend your statement under oath to the Antiguan [C]ourt stating that SIB operated a business model that was a Ponzi scheme?
A. Not as yet, no.
*Id.* at 114-15.

[37]Other than James Davis.

In attempting to speak against this overwhelming evidence, the Joint Liquidators argue that the Court should instead analyze the Receiver's aggregation request as a request to substantively consolidate the Stanford Entities and that the Receiver has failed to meet the requisite showing for substantive consolidation. *See, e.g.*, JL Proposed Fact & Law 66-68. However, the Joint Liquidators' argument lacks merit.

First, substantive consolidation is inapplicable. Substantive consolidation is a mechanism for administering the bankruptcy estates of multiple, related entities. *See In re Babcock & Wilcox Co.*, 250 F.3d 955, 958 (5th Cir. 2001). This seems to presuppose that the entities to be consolidated are already in bankruptcy proceedings. Here, the only entity in a bankruptcy proceeding is SIB in Antigua. The remainder of the entities are subject to an equitable receivership – not a bankruptcy. Thus, substantive consolidation is impossible under these facts, so veil-piercing is the applicable doctrine. *See Peoples State Bank v. GE Capital Corp. (In re Ark-La-Tex Timber Co., Inc.)*, 482 F.3d 319, 327 (5th Cir. 2007) (holding that bankruptcy judge's order did not substantively consolidate three juridical persons because two of the persons had not been placed into bankruptcy).[38]

---

[38]The Court notes that some courts have held that they can order consolidation of a debtor with a nondebtor. *See* 2-105 COLLIER ON BANKRUPTCY ¶ 105.09 (16th ed. 2012). Indeed, courts are split on this issue. *See, e.g.*, *In re Pearlman (Pearlman II)*, 462 B.R. 849, 854 (Bankr. M.D. Fla. 2012) (noting split and refusing to substantively consolidate debtor entities with nondebtor entities); *Kapila v. S&G Fin. Servs., LLC (In re S&G Fin. Servs. of S. Fla., Inc.)*, 451 B.R. 573 (Bankr. S.D. Fla. 2011) (noting that only the Ninth Circuit has substantively consolidated debtor entities with nondebtor entities). Although the Fifth Circuit has held in at least one instance that it is inappropriate to do so, *see Peoples State Bank*, 482 F.3d at 327, one court in this Circuit has held that substantive consolidation of debtor entities with nondebtor entities is appropriate where the nondebtors are the debtor's alter egos, *see Roberts v. Bass & Assocs., Inc. (In re Bass)*, 2011 WL 722384 (Bankr. W.D.

If substantive consolidation were appropriate between a debtor and nondebtor, however, the Receiver's showing would warrant it. Although courts have not developed a universally accepted standard for substantive consolidation, they frequently consider the following factors: (1) the degree of difficulty in segregating and ascertaining individual assets and liabilities, (2) the presence or absence of consolidated financial statements, (3) the profitability of consolidation at a single physical location, (4) the commingling of assets and business functions, (5) the unity of interests and ownership between the various corporate entities, (6) the existence of parent and intercorporate guarantees on loans, (7) the transfer of assets without formal observance of corporate formalities, and (8) whether other remedies, such as the doctrines of alter ego and fraudulent conveyance, are available.[39] *In re E'Lite*

_____

Tex. 2011); *see also Soviero v. Franklin Nat'l Bank*, 328 F.2d 446 (2d Cir. 1964) (substantively consolidating debtor with nondebtor); *Helena Chem. Co. v. Circle Land & Cattle Corp. (In re Circle Land & Cattle Corp.)*, 213 B.R. 870, 876 (Bankr. D. Kan. 1997) (collecting cases but ultimately refusing to substantively consolidate debtor with nondebtor). And "[i]n circumstances that would justify piercing the corporate veil, . . . courts have also substantively consolidated the assets and liabilities of the nondebtor shareholder with the estate of the debtor subsidiary where the misconduct has been sufficiently egregious." 2-105 COLLIER ON BANKRUPTCY, *supra*.

[39]*See also In re AHF Dev't, Ltd.*, 462 B.R. 186, 195-96 (Bankr. N.D. Tex. 2011) (Jones, Bankr. J.) (providing a comprehensive list of factors: "the presence or absence of consolidated financial statements; the unity of interests and ownership between the various corporate entities; the existence of parent and intercorporate guaranties on loans; the degree of difficulty in segregating and ascertaining individual assets and liabilities; the transfer of assets without formal observance of corporate formalities; the commingling of assets and business functions; the profitability of consolidation at a single physical location; parent corporation owns all or a majority of the capital stock of the subsidiary; parent and subsidiary have common officers and directors; parent finances subsidiary; parent is responsible for incorporation of subsidiary; subsidiary has grossly inadequate capital; parent pays salaries, expenses, or losses of subsidiary; subsidiary has substantially no business except with parent; subsidiary has essentially no assets except for those conveyed by parent; parent refers to

ORDER – PAGE 33

*Eyewear Holding, Inc.*, 2009 WL 349832, at *3 (E.D. Tex. 2009) (citing *Wells Fargo Bank*

*of Tex., N.A. v. Sommers*, 444 F.3d 690, 697 n.5 (5th Cir. 2006); *In re Permian Producers*

*Drilling, Inc.*, 263 B.R. 510, 518 (W.D. Tex. 2000); and *In re Vecco Indus., Inc.*, 4 B.R. 407

(Bankr. E.D. Va. 1980)).  Many of these factors overlap with the veil-piercing considerations

discussed above.[40]

      To put it shortly: (1) as a Ponzi scheme, all assets and liabilities are difficult to

segregate and ascertain, (2) the absence of consolidated financial statements matters not

because Stanford and/or his associates doctored the financial statements, (3) it makes

economic sense to consolidate the entities, *see* Hr'g Tr. 255, (4) commingling of funds

among the Stanford Entities was the norm, (5) Stanford directly or indirectly owned all

_____

subsidiary as department or division of parent; directors or officers of subsidiary do not act
in interests of subsidiary, but take directions from parent; formal legal requirements of the
subsidiary as a separate and independent corporation are not observed; the transfer of assets
without formal observance of corporate formalities;" and noting the different substantive
consolidation tests).

[40]*But cf. In re Owens Corning*, 419 F.3d 195, 206 (3d Cir. 2005) (noting that veil
piercing and substantive consolidation doctrines have subtle differences).
      For examples of cases where courts have substantively consolidated the estates of
entities involved in Ponzi schemes, see *In re New Times Secs. Servs., Inc.,* 371 F.3d 68, 73
(2d Cir. 2004); *Levy v. Kozyak (In re Fin. Federated Title & Trust, Inc.)*, 347 F.3d 880, 882
(11th Cir. 2003); *In re Bonham*, 229 F.3d 750, 763-71 (9th Cir. 2000); *Wesbanco Bank
Barnesville v. Rafoth (In re Baker & Getty Fin. Servs., Inc.)*, 106 F.3d 1255, 1258 (6th Cir.
1997); *Sender v. Simon*, 84 F.3d 1299, 1302 (10th Cir. 1996); *Grassmueck v. Am. Shorthorn
Ass'n*, 365 F. Supp. 2d 1042, 1043 (D. Neb. 2005); *In re Pearlman (Pearlman I)*, 450 B.R.
219 (Bankr. M.D. Fla. 2011); *Barclay v. Swiss Fin. Corp. Ltd. (In re Midland Euro Exch.
Inc.)*, 347 B.R. 708, 711 (Bankr. C.D. Cal. 2006); *Jacobs v. Matrix Capital Bank (In re
Apponline.com, Inc.)*, 315 B.R. 259, 267 (Bankr. E.D.N.Y. 2004); *Breeden v. L.I. Bridge
Fund, LLC (In re Bennett Funding Grp., Inc.)*, 232 B.R. 565, 567 (Bankr. N.D.N.Y. 1999);
and *Henderson v. Allred (In re W. World Funding, Inc.)*, 54 B.R. 470, 472 (Bankr. D. Nev.
1985).

Stanford Entities, (6) SIB "loaned" Stanford $1.8 billion without a guaranty, (7) Stanford and his associates transferred assets among the Stanford Entities in disregard of corporate formalities, and (8) other remedies are available. On balance, the evidence overwhelmingly supports substantive consolidation were it to apply.[41]

_____

[41]The Joint Liquidators argue that substantive consolidation is unwarranted because it is not in the best interest of the creditors. *See, e.g.*, JL Proposed Facts & Law 67-68. In support, they point to a balancing test adopted by certain courts. *See id.* at 67. The Second Circuit has simplified the test into two factors: (1) whether creditors dealt with the entities as a single economic unit and did not rely on the debtors' separate identity in extending credit, and (2) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors. *Permian Producers Drilling*, 263 B.R. at 518 (citing *Union Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.)*, 860 F.2d 515, 518 (2d Cir. 1988)). Notably, "[t]he presence of either factor provides a sufficient basis to order consolidation." *Id.* (citing *Bonham*, 229 F.3d at 765-66).

First, the Court notes that it is not substantively consolidating the Stanford Entities. However, even if it were, this test would not bar substantive consolidation. One cannot plausibly read the Second Circuit's second factor to mean that every single creditor must benefit from consolidation. Consolidation of entities inherently entails the addition of more creditors who attempt to stake a claim to the bankruptcy pot. So, in effect, each consolidation harms creditors to the extent that it dilutes each creditor's individual recovery. Rather, prong two of the Second Circuit test focuses on whether "'the time and expense necessary even to attempt to unscramble the[] [entities] [is] so substantial as to threaten the realization of any net assets for all the creditors,' or where no accurate identification and allocation of assets is possible." *Augie/Restivo*, 860 F.2d at 519 (last bracket in original) (citing *Chem. Bank NY Trust Co. v. Kheel*, 369 F.2d 845, 847 (2d Cir. 1966)). Courts have found the requisite level of entwinement where "the debtor corporations were operated as a single unit with little or no attention paid to the formalities usually observed in independent corporations, . . . the officers and directors of all, so far as ascertainable, were substantially the same and acted as figureheads for [the owner], . . . funds were shifted back and forth between the corporations in an extremely complex pattern and in effect pooled together, loans were made back and forth, borrowings made by some to pay obligations of others, freights due some pledged or used to pay liabilities and expenses of others, and withdrawals and payments made from and to corporate accounts by [the owner] personally not sufficiently recorded on the books." *Kheel*, 369 F.2d at 846. This is clearly analogous to the facts here. Additionally, the Receiver and his expert, Karyl Van Tassel, have declared that aggregation will not seriously dilute investors' recovery as SIB investor claims will comprise the vast majority of claims against the Stanford Entities, *see* Hr'g Tr. 221-22; Receiver's Resp. to

The Receiver has shown that Stanford operated the entire network of Stanford Entities as an integrated unit in order to perpetrate a massive worldwide fraud. Each Stanford Entity either participated in the scheme, derived benefit from the scheme, or lent the appearance of legitimacy to the entirety of Stanford's fraudulent enterprise. To ignore these findings would elevate form over substance – thereby legitimizing the corporate structure that Stanford utilized to perpetrate his fraud and running afoul of Fifth Circuit precedent cautioning courts to look beyond the surface. Thus, because SIB did not observe corporate formalities and because all the Stanford entities were "operated as one for purposes of perpetrating a fraud on investors," *Ernst & Young, Inc.*, 383 B.R. at 781, the Court pierces SIB's corporate veil and aggregates the Stanford Entities.

***2. The Stanford Entities' COMI is in the United States.*** – Chapter 15 of the Bankruptcy Code states that "in the absence of evidence to the contrary, the debtor's registered office, . . . is presumed to be the center of the debtor's main interests." 11 U.S.C. § 1516(c). However, the Receiver has presented evidence to the contrary, which rebuts the presumption, and, as always, the burden rests on the Joint Liquidators to establish that Antigua is the Stanford Entities' COMI.[42]

---

Antiguan Liquidators' Dec. 3 Suppl. Br. 61 [61]. *But see* Hr'g Tr. 226-32 (Joint Liquidators questioning Van Tassel about the effect of the addition of Stanford's U.S. tax liabilities as well as other Stanford Entities' claims upon aggregation). Moreover, there is evidence to support prong one of the test. *See* discussion *infra* regarding SIB's marketing materials referring to a global network of entities.

[42]As Judge Lifland, coauthor of the model act underlying Chapter 15, explained in the seminal case, *Bear Stearns II*:

Section 1516(c) provides that "[i]n the absence of evidence to the

Although Chapter 15 does not define COMI, courts have looked to a variety of factors

contrary, the debtor's registered office, . . . is presumed to be the center of the debtor's main interests." 11 U.S.C. § 1516(c); *In re Tri-Continental Exchange Ltd.*, 349 B.R. 627, 635 (Bankr.E.D.Cal.2006) (["]In effect, the registered office (or place of incorporation) is evidence that is probative of, and that may in the absence of other evidence be accepted as a proxy for, 'center of main interests.' The registered office, however, does not otherwise have special evidentiary value and does not shift the risk of nonpersuasion, i.e., the burden of proof, away from the foreign representative seeking recognition as a main proceeding.").

The legislative history to section 1516(c) further explains that "the presumption that the place of the registered office is also the center of the debtor's main interest is included for speed and convenience of proof where there is no serious controversy." *See* H.R.REP. NO. 31, 109th Cong., 1st Sess 1516 (2005), U.S.Code Cong. & Admin.News 2005, pp. 88, 175. This presumption "permits and encourages fast action in cases where speed may be essential, while leaving the debtor's true 'center' open to dispute in cases where the facts are more doubtful." *See* [Jay Lawrence Westbrook, *Locating the Eye of the Financial Storm*, 32 BROOK. J. INT'L L. 1019, 1033 (2007)]. This presumption is not a preferred alternative where there is a separation between a corporation's jurisdiction of incorporation and its real seat. *Id.*

Chapter 15 changed the Model Law standard that established the presumption in "the absence of *proof* to the contrary," to a presumption in "the absence of *evidence* to the contrary." The legislative history explains that the word "proof" was changed to "evidence" to make it clearer using United States terminology that the ultimate burden is on the foreign representative. *See* H.R.REP. NO. 109-31, 112-13 (2005). According to one commentator, "[w]hatever may be the proper interpretation of the EU Regulation, the Model Law and Chapter 15 give limited weight to the presumption of jurisdiction of incorporation as the COMI." *See* Westbrook[, *supra*, at 1033-34]. Accordingly, "[i]f the foreign proceeding is in the country of the registered office, and if there is evidence that the center of main interests might be elsewhere, then the foreign representative must prove that the center of main interest is in the same country as the registered office." *See In re Tri-Continental Exchange Ltd.*, 349 B.R. at 635; *see also In re Petition of Lloyd*, Case No. 05-60100(BRL), Verified Petition under Chapter 15 for Recognition of a Foreign Proceeding, ¶ 9 ECF # 2, *www.nysb.uscourts.gov* (Debtor was mutual insurance company registered in France but demonstrated that center of main interest was located in the United Kingdom ("UK")).

*Bear Stearns II*, 374 B.R. at 127-28 (footnotes omitted).

to make the determination, including:

> [T]he location of the debtor's headquarters; the location of those who actually manage the debtor (which, conceivably could be the headquarters of a holding company); the location of the debtor's primary assets; the location of the majority of the debtor's creditors or a majority of the creditors who would be affected [by] the case; and/or the jurisdiction whose law would apply to most disputes.

*Ran IV*, 607 F.3d at 1023 (citing *SPhinX*, 351 B.R. at 117).

The Fifth Circuit has stated that "*[a]dditionally*, it is important that the debtor's COMI be ascertainable by third parties." *Id.* at 1025 (emphasis added). It explains that "[t]he presumption [underlying the ascertainability factor] is that creditors will look to the law of the jurisdiction in which they perceive the debtor to be operating to resolve any difficulties they have with that debtor . . . ." *Id.* at 1026; *see also Betcorp*, 400 B.R. at 286 ("The rationale of this rule is not difficult to explain. Insolvency is a foreseeable risk. It is therefore important that international jurisdiction . . . be based on a place known to the debtor's potential creditors. This enables the legal risks which would have to be assumed in the case of insolvency to be calculated."). The above caselaw seems to contemplate that, although important, ascertainability is but one of many factors to consider in the COMI analysis. *See, e.g.*, *Betcorp*, 400 B.R. at 286 ("This [COMI] inquiry examines the debtor's administration, management, and operations *along with* whether reasonable and ordinary third parties can discern or perceive where the debtor is conducting these various functions." (emphasis added)); *In re Millennium Global Emerging Credit Master Fund Ltd.*, --- B.R. ---, 2012 WL 2403406, at *3 (S.D.N.Y. 2012) ("Courts *also* take into consideration the expectations of creditors and other interested parties . . . . In order to protect the expectation

interests of creditors, investors and other interested third parties, courts ask whether the debtor's COMI would have been 'ascertainable' to interested third parties." (emphasis added)).[43]

Ultimately, the COMI determination is analogous to a principal place of business analysis under U.S. law.  *See, e.g.*, *British Am. Isle of Venice (BVI), Ltd.*, 441 B.R. at 720; *Fairfield Sentry Ltd.*, 440 B.R. at 64; *British Am. Ins. Co.*, 425 B.R. at 908-09; *Basis Yield*, 381 B.R. at 48; *Bear Stearns II*, 374 B.R. at 129; *Tri-Cont'l Exch.*, 349 B.R. at 634.  In 2010, the Supreme Court substantially clarified the law concerning "principal place of business" in adopting the "nerve center" test.  Specifically, it stated: "'Principal place of business' is best read as referring to the place where a corporation's officers direct, control, and coordinate the corporation's activities."  *Hertz Corp. v. Friend*, 130 S. Ct. 1181, 1192.

---

[43]*But see, e.g.*, *Bear Stearns III*, 389 B.R. at 335 ("[The COMI] concept derives from the European Union Convention on Insolvency Proceedings . . . . The regulation adopting the EU Convention explains that [COMI] means 'the place where the debtor conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties.'"); *Krys v. Official Comm. of Unsecured Creditors of Refco Inc. (In re SPhinX, Ltd.) (SPhinX II)*, 371 B.R. 10, 19 (S.D.N.Y. 2008) (affirming bankruptcy court's opinion, which stated that "COMI must be identified based on criteria that are: (1) objective; and (2) ascertainable by third parties."); *Chiang*, 437 B.R. at 403 ("[T]he location of the COMI is an objective determination based on the viewpoint of third parties . . . ."); *Tri-Cont'l Exch.*, 349 B.R. at 634-35 ("[T]he key question is the situs of the conduct of the administration of the debtor's business on a regular basis that is known to third parties.").

These decisions do not sway the Court.  Rather, it believes that it would be illogical for an ascertainability requirement to strictly apply to all Chapter 15 cases.  Although the purpose of Chapter 15 is to ensure cooperation among bankruptcy proceedings around the world, Congress cannot have intended to grant formal recognition to letterbox companies merely because the schemers were adept at pulling the wool over investors, creditors, and regulators' eyes.  Surely, it is against U.S. public policy to reward such gamesmanship and manipulation.

Although it stated that this will "normally be the place where the corporation maintains its headquarters," it cautioned that this is only the case where "the headquarters is the actual center of direction, control, and coordination, i.e., the 'nerve center,' and not simply an office where the corporation holds its board meetings [for example] . . . ." *Id.* The Court explained that the shorthand headquarters approach is useful because "[t]he public often (though not always) considers it the corporation's main place of business." *Id.* at 1193. The Supreme Court was thus mindful that the location of a registered office or headquarters might provide insight into a company's principal place of business, although that location is not necessarily indicative of the business' locus of control, or nerve center. This is where the Court begins its analysis.[44]

---

[44]The Joint Liquidators contend that the Court should adopt the rulings of foreign authorities regarding recognition either under principles of res judicata or comity. Antigua, Switzerland, and the United Kingdom have refused this Receivership recognition. In contrast, Canada has recognized the Receiver as a foreign representative and the Receivership as the foreign main proceeding.

As a practical matter, res judicata is inappropriate in this instance because the foreign decisions are inconsistent. However, even if they were consistent, the decisions do not bind this Court. Particularly problematic are the following: In the United Kingdom, (a) the court placed the burden of proof on the Receiver, whereas under U.S. law the burden is on the Joint Liquidators, (b) the court limited its analysis to objectively ascertainable factors, whereas in U.S. jurisprudence it is one of many factors, and (c) the court analyzed the time period from the time that the Antiguan court instituted the foreign liquidation proceeding, whereas under U.S. law the relevant time period to analyze is at the time the representative files the Chapter 15 petition. The Swiss decision did not apply the Model Law upon which Chapter 15 is based and thus did not make a COMI determination. The Antiguan decision similarly did not analyze the Model Law because Antigua has not adopted it. Finally, the Canadian decision rested on the Former Joint Liquidators' unclean hands, an issue that is not before the Court in the same way.

The Court also cannot adopt any of the foreign decisions under the doctrine of comity. "[C]omity is not an element of recognition; it is rather, a consideration once recognition is granted." *In re Ran (Ran II)*, 390 B.R. 257, 292 (Bankr. S.D. Tex. 2008), *aff'd*, *Ran III*, 406

As explained in more detail above, R. Allen Stanford, a dual U.S. and Antiguan citizen,[45] was the sole owner, directly or indirectly, of the more than 130 Stanford Entities. 115-1, at 7. He controlled the Stanford Entities with substantial assistance from Davis and Pendergest-Holt, both U.S. citizens. *Id.* Stanford lived and worked principally in Houston,

---

B.R. 277, *aff'd*, *Ran IV*, 607 F.3d 1017; *see also Bear Stearns III*, 389 B.R. at 334 ("Both the plain language and legislative history of Chapter 15 . . . require[] a factual determination with respect to recognition before principles of comity come into play."); *In re Loy*, 380 B.R. 154, 164 (Bankr. E.D. Va. 2007) ("[T]he foreign representative must first pass through the bankruptcy court by way of a foreign proceeding recognition *prior* to applying to a court in the United States for relief requiring the comity or cooperation of that court." (emphasis added) (citing *Iida*, 377 B.R. at 257)); Westbrook, *supra* note 42, at 1024 ("A central point of the Model Law was meant to be adoption of a structure less amorphous than comity and a procedure more suited to bankruptcy than the ancient machinery of judgment recognition."). U.S. courts have specifically chosen to conduct their own COMI analyses despite prior foreign court COMI determinations. *See, e.g.*, *Ran II*, 390 B.R. at 267 ("Chapter 15 does not provide for recognition of an insolvency proceeding based on a foreign court's determination that it has jurisdiction as the location of the debtor's [COMI]. Indeed, Chapter 15 requires the U.S. court to make an independent evaluation of the location of the debtor's [COMI] at the time a petition for recognition is presented." (internal citation omitted)); *SPhinX I*, 351 B.R. at 120 n.22 ("[N]otwithstanding the respect that this Court has for the Cayman Court, even if the Cayman Court had made such a [foreign main proceeding] determination[,] it would not be binding on this Court."), *aff'd*, *SPhinX II*, 371 B.R. 10. Accordingly, the Court declines to apply or adopt the rulings of any authorities in the United Kingdom, Switzerland, Antigua, or Canada regarding recognition of the Antiguan Proceeding.

[45]Antigua granted Stanford citizenship and knighthood. *See* 116-11, at 4; 117-6, at 19-48.

The Former Joint Liquidators argued that the Court is bound to find that Stanford's residence was not in the United States because Judge Hittner, who oversaw Stanford's criminal proceeding, decided as much in June 2009. *See* Order [52], June 30, 2009, *in United States v. Stanford*. However, Judge Hittner did not base his decision on the entirety of this record, and suffice it to say that interests weighed in a pretrial detention proceeding are different than the interests weighed here. Thus, on this record the Court reaches a different conclusion than Judge Hittner. The evidence before the Court reveals that Stanford initially resided on the mainland United States and later also resided in St. Croix, U.S.V.I. *See* 116-1, at 3-4.

Texas; Miami, Florida; and Christiansted, St. Croix, U.S.V.I. *Id.* Davis and Pendergest-Holt lived in Mississippi and had offices in Houston, Texas; Tupelo, Mississippi; and Memphis, Tennessee. *Id.* The Stanford Entities' headquarters was in Houston, Texas. *See id.* at 37. Stanford never lived in Antigua, and Antigua did not serve as the base of the Stanford Entities' operations. 116-11, at 3.

Most of the Stanford Entities' revenue came from selling CDs. CD sales largely bypassed Antigua, as depositors wishing to deposit funds were usually introduced to SIB through their financial advisors, who maintained primary if not sole contact with the depositor and were often located where the depositor resided. *See* 115-1, at 33-34; Hr'g Tr. 124-26. U.S. investors exclusively purchased CDs through broker-dealers in the United States at SGC. 110-1, at 19; Hr'g Tr. 189. All financial advisors, regardless of location, would send client applications and requisite paperwork to Antigua, *see* 110-1, at 14, and SIB would then deposit the funds into U.S., Canadian, and English banks, *see id.* at 15; Hr'g Tr. 186-87. Investors wired money to Canadian banks or English banks. *See* Hr'g Tr. 186-87. Those who wished to pay via check provided checks to their financial advisors at a non-Antiguan location.[46]  *See* 115-1, at 31; Hr'g Tr. 186. Financial advisors would send the checks to SIB in Antigua, and, after endorsing them, SIB would send the checks to Houston,

---

[46]Jacobs testified that "SIB maintained a handful of financial advisors at its offices in Antigua who obtained customers directly, sold CDs, provided financial advice to customers, and other such similar services, if requested by the customer." 110-1, at 23. However, this "handful" of financial advisors pales in comparison to the advisers located outside of Antigua. The Court also notes that Antiguan law and SIB's own policies prohibited SIB from serving Antiguans. *See* Hr'g Tr. 39.

Texas for deposit in Canada or the United Kingdom.  *See* Hr'g Tr. 186-87; 110-1, at 15.[47]

After deposit, Davis would then disburse the funds among the Stanford Entities.  *See* 115-1,

at 9.

Stanford's broker-dealers included SGC in the United States, Stanford Bolsa y Banca

S.A. in Mexico, Comisionista de Bolsa in Colombia, and others.  *Id.* at 33.  Stanford

overwhelmingly marketed his CDs through Stanford broker-dealers in non-Antiguan

territories. *Id.*  In fact, the Joint Liquidators concede that "[t]he vast majority of SIB products

were not sold from Antigua."[48]  JL Proposed Facts & Law 20.  In reality, broker-dealers in

the United States generated substantially more CD sales, by dollar amount, than broker-

dealers in any other country, and no other country approached the magnitude of the United

States as a generator of CD sales.  115-1, at 34; *see also* Hr'g Tr. 127-28 (JL Dickson stating

that he couldn't disagree with Van Tassel's testimony that financial advisors at SGC in

United States were responsible for 42-48% of SIB CD sales in 2007 and 2008).  According

to the Receiver, U.S. residents hold more CDs, in terms of number and dollar amount, than

---

[47]SIB kept a small amount of funds at the Bank of Antigua, another Stanford Entity. $9 million was deposited into the Bank of Antigua at Davis' direction in November and December 2008, just before the February 2009 freeze.  The timing of the transfers could indicate that this was meant to be a "flight fund."  *See* 21-20, at 6, 8.

[48]The Joint Liquidators go on to explain that "SIB had a number of non-exclusive referral agreements with authorized financial advisory offices in several countries throughout the world who referred customers to SIB, in exchange for referral fees."  JL Proposed Facts & Law 20-21 (citing 106-1, at 26-27; 106-14; 111-1, at 15; Hr'g Tr. 125; 115-1, at 32).  They state that the amounts invoiced to SIB in Antigua and referral fees paid by SIB, either through TD Bank in Canada or Trustmark Bank in the United States, ranged from approximately $18 million in 2000 to approximately $157.7 million in 2008.  107-1, at 20; 107-2.

the residents of any other country in the world, including Antigua. 115-1, at 35 (showing that the United States comprised 7,072 clients, which accounted for 25.26% of clients, and $2,660,676,142 in deposit amount, which accounted for 37% of dollar amounts).[49]

Stanford employees managed and directed the CD enterprise from the United States with no meaningful input from Antigua. Although SIB, the issuing bank, was chartered and registered in Antigua, 106-1, at 16-17, Stanford and Davis controlled it – with assistance from Pendergest-Holt – from various places within the United States. *See, e.g.*, 115-1, at 7-8; Hr'g Tr. 178-181. And Davis facilitated several millions of dollars in transfers of CD proceeds among the Stanford Entities. *See* 115-1, at 9, 30, 32-33. Antiguan employees were excluded from decisions regarding SIB's self-professed primary business:[50] CD-proceed investments.[51] *See, e.g.*, *id.* at 15, 17-18. Other Stanford Entities managed and directed the

---

[49]According to the Receiver, the next highest client and dollar amount belonged to Mexico, with 2,801 clients (10%) and $605,649,240 (8.42%). 115-1, at 35. The Joint Liquidators argue that customers in Latin America constituted approximately 71.7% of total customers and 58.56% of the total amount of deposit. 124-2. Regardless of whether this is true, the Court is concerned with client statistics by country – not region of the world. Further, the Court finds the Receiver's tabulation to be more credible than the Joint Liquidators' competing numbers.

[50]In SIB's disclosure statement for the U.S. Accredited Investor Certificate of Deposit Program, it stated: "Our primary business is the investment of funds deposited with us by depositors." 3, at 52.

[51]Indeed, the Joint Liquidators state that "[d]ecisions and implementation of decisions as to the use and investment of the funds generated by the sale of SIB CDs and SIB deposits, to the extent invested at all, were made by Stanford related entities, Stanford, Davis, or [Pendergest-Holt]." JL Proposed Facts & Law 23 (citing 110-1, at 12; Hr'g Tr. 115, 179, 181, 284).
SIB employees were paid with funds administered from Houston. 115-1, at 26. CFO Davis and President Rodriguez-Tolentino were paid by other Stanford Entities in the United

investment accounts, and, although those entities sent bank statements to SIB in Antigua, personnel from other Stanford Entities reviewed and processed them. *See* Hr'g Tr. 179; 111-1, at 4; 115-1, at 11-18. Only Stanford, Davis, and Pendergest-Holt were primarily responsible for investments and investment accounting. 115-1, at 18.

Stanford and his associates in the United States generated and maintained SIB's financial information. Stanford, Davis, Pendergest-Holt, and other U.S. residents disseminated false information regarding SIB's financial strength, profitability, capitalization, investment strategy, investment allocation, value of its investment portfolio, and other matters to financial advisors around the world for use in inducing potential investors to purchase CDs. *Id.* at 39-42. Indeed, Davis managed the Stanford Entities Tier 1 assets – cash and cash equivalents – via the Treasury Department in Houston, Texas. *Id.* at 10-11. SIB invested its Tier 2 assets – investments and a small amount of cash or cash equivalents – with outside money managers at banks in the United Kingdom and Switzerland. *Id.* at 11-13. Pendergest-Holt and her team of research analysts in Memphis

---

States. *Id.* Although SIB employees performed limited administrative, bookkeeping, and operating functions in Antigua, these functions were heavily dependent upon Stanford's global human resources, accounting, and information technology ("IT") groups. *Id.* at 18, 22. SIB's Antiguan employees were primarily responsible for keeping client accounting records current, generating client statements, and performing certain private banking functions such as paying credit card bills. *Id.* at 22. Although the Joint Liquidators aver that the following departments were operational at SIB: operations, client services, general affairs, systems operations, accounting, compliance, quality control, human resources, protocol, and internal audit, *see* 106-1, at 18, 21; 110-1, at 9-12, the Receiver's evidence reveals that SIB's workforce of ninety employees could not have handled anything more; the SIB workforce was simply insufficient to operate SIB's CD business, much less the multi-billion dollar Stanford Entities enterprise. *See* 110-1, at 8 (stating that there were ninety SIB employees at SIB's peak).

oversaw these investments. *Id.* Finally, Stanford and Davis, with assistance from Pendergest-Holt and her team, managed Tier 3 assets – illiquid real estate, private equity investments, and undisclosed sham loans to Stanford. *Id.* at 13-14. Davis provided the fallacious investment earning amounts for Tier 3 assets; Stanford and his U.S. employees, consulting with outside U.S. counsel, created the inflated $3.174 billion real estate figure, representing a 50-fold baseless inflation of the properties; $1.8 billion of Tier 3 assets were notes receivable from Stanford, representing sham loans to him that he funneled to Stanford Entities, 76% of which were outside Antigua; and finally, an inflated $1.2 billion value was assigned to "merchant banking" assets, consisting mostly of equity and debt investments in private and public companies, most of which were headquartered in the United States. *Id.*[52]

Additionally, extensive SIB client records exist in the United States, and records regarding SIB's investments and cash balances were kept outside of Antigua, predominantly generated (i.e., fancifully created) and maintained in the United States by Stanford and Davis. *See id.* at 19.[53] Davis and other Houston-based Stanford employees – such as Harry Failing, Stanford's longtime accountant in Houston – also generated false reports to disseminate to

---

[52]As of February 2009, SIB reported that it had: $31.8 million in cash – approximately $8 million located in Antigua; $345 million in investments by outside money managers in Canada, Switzerland, and the United Kingdom; $1.2 billion in merchant banking in the United States; $1.8 billion in notes receivable by Stanford (i.e., loans to Stanford); and $3.174 billion in real estate in Antigua. 115-1, at 14. All of these assets were purportedly directed and managed from the United States. *Id.* at 9-13. And, as stated above, Stanford and his associates doctored most, if not all, of the numbers.

[53]Documents and records also exist in Antigua, *see* JL Proposed Facts & Law 29-32 (describing the files in detail), although, as explained above, many were based on doctored numbers provided by Stanford, Davis, and other associates outside of Antigua.

Stanford Entity investors and potential investors regarding SIB's assets and liquidity.[54] *Id.*
at 20-21.  Stanford Entity employees in the United States wrote SIB's purported internal
audit reports.  *Id.* at 23.  Although an Antiguan audit firm, C.A.S. Hewlett & Co. Ltd. also
performed audits, the Receiver has shown that these were of minimal utility and veracity
given that the firm did not review the records in the United States.[55]  *Id.* at 23-24.

As for SIB, Stanford Entity employees in the United States fulfilled most of its core
operational needs.  *Id.* at 7-8, 15, 21-22.  This includes, but is not limited to, legal, training,
investment, accounting, human resources, compliance, IT, and public relations services.  *See*
*id.* at 14-15, 21-22.  All of SIB's directors were non-Antiguans, and all but two were U.S.
citizens.  *Id.* at 7.  The Board met via tele- or video-conference or in person in Antigua, and
once in Miami, Florida.  106-1, at 23; 115-1, at 7-8.  Stanford Entity employees in the United
States also received vastly more monetary compensation than employees in Antigua.
Management, administrative, and marketing fees paid to Stanford Entities in the United
States and the U.S.V.I. – $268 million in 2008 – compared to total salary and benefits paid
to SIB's Antiguan employees – $3.6 million in 2008 – illustrate this disparity.  115-1, at 24-
25.  Indeed, the Joint Liquidators agree "that the amount of money that [SIB] was paying its
employees was a tiny fraction of the millions and millions it was paying to these other
Stanford [E]ntities."  *See* Hr'g Tr. 45, 132-33.

-----

[54]Failing, in particular, had a significant role in the structure of the Stanford Entities.
115-1, at 8.

[55]Additionally, there is evidence that Charlesworth Hewlett, SIB's "independent"
auditor, received funds from SFG over and above his audit fees.  *See* 42, at 3-4.

Stanford and his associates similarly managed and controlled other Stanford Entities from the United States. As discussed above, SFG and SGC were both U.S. companies, and at least approximately sixty-six other Stanford Entity companies were incorporated in the United States. *See* 62, at 10-13. STCL's core function, trust administration of mostly SIB CDs, was conducted in the United States, even though its physical structure was in Antigua, 115-1, at 25-26; its records were held in the United States, *id.* at 19; and its management and staff were paid from the United States, *id.* at 26. Of the remaining Stanford Entity companies not specifically incorporated in the United States, Stanford or a U.S. Stanford Entity owns 100% or nearly 100% of approximately forty-three of them; Stanford or a U.S. Stanford Entity owns 100% or nearly 100% of approximately twenty-eight more as a second-level parent; Stanford owns 100% of approximately eight more companies as a third-level parent; and finally, Stanford owns 100% or nearly 100% of the approximately three remaining companies as the ultimate parent. *See* 62, at 10-13.

Mixed evidence exists regarding third parties' expectations. Although much of the depositor opening documentation refers to SIB's domicile in Antigua and contains Antiguan law and jurisdiction clauses, *see* 110-1, at 26-36, and the marketing materials refer to SIB's Antiguan headquarters, *see id.* at 36, there is also evidence that many third parties were made to believe that the Stanford Entities were either U.S. enterprises, were U.S.-regulated, or had a substantial U.S. presence. For example, SIB held itself out to creditors, borrowers, other obligees, and the U.S. Internal Revenue Service ("IRS") as having locations in Memphis,

Tennessee and Houston, Texas.  115-1, at 25.[56]  SIB solicited or intended to solicit CD purchasers in all fifty U.S. states, and it made regulatory filings with state securities regulatory agencies in the United States.  *Id.*  Even the Antiguan government stated that Stanford ran SIB from Houston, Texas – referring to Antigua as a mere transit point.  *Id.* at 115.

Most CD purchasers never saw or interacted with Antiguan employees, and notably, only a small number actually went to SIB's Antiguan location to attempt to redeem their CDs.  *See* 106-1, at 19-20 (reporting that approximately 150 customers went to Antigua to demand return of their funds around the time SIB was shut down).  Investors instead dealt only with their financial advisors, few of whom were based in Antigua.  *See* 115-1, at 33-34.  *But see* Hr'g Tr. 28-31, 35-36 (two SIB investors stating that in addition to contact with their non-Antiguan financial advisors, they had some contact with SIB employees in Antigua and/or believed SIB's headquarters to be in Antigua).  These financial advisors were essentially the face of the Stanford enterprise to investors, providing CD applications, CD investment managing, and Stanford brokerage accounts.  *See, e.g.*, 115-1, at 33-34.  The financial advisors disseminated reports prepared by Stanford, Davis, Pendergest-Holt, and others, *id.* at 39-42, which portrayed a global group of companies under the name SFG, headquartered in the United States, *id.* at 37-41.  SIB's marketing materials, in fact, advertised that it was able to pay higher interest, in part, because of "synergies" and cost-

---

[56]This is in contrast to the Joint Liquidators' argument that SIB only had offices in Antigua and Canada.  106-1, at 20, 22.

savings that resulted from it being part of SFG and because of a globally diversified investment strategy. *Id.* at 38.

Ultimately, it is manifestly clear from the Court's findings of fact in this section and in Part V.C.1 above that the Stanford Entities' COMI was in the United States. In summary: (1) SIB, the Bank of Antigua, and STCL were only nominally headquartered in Antigua, and SIB's major activities, CD sales and investment of funds, took place outside of Antigua; a substantial number of the other aggregated Stanford Entities were headquartered outside of Antigua; (2) Stanford, Davis, Pendergest-Holt, and others who actually managed the Stanford Entities did so largely from the United States; (3) Stanford Entities and banks outside of Antigua primarily held the Stanford Entities' primary assets; (4) the vast majority of the Stanford Entities' investor-victims and creditors reside outside of Antigua; (5) although the Court does not here decide that U.S. law applies to all disputes, this Court is the jurisdictional locus of the entire Stanford Entities enterprise and estate, *see* Receivership Order; and (6) the Stanford Entities' nerve center (center of direction, control, and coordination) is in the United States. Thus, under the *SPhinX* COMI factors and under the U.S. principal place of business analysis, the Stanford Entities COMI is in the United States.[57]

Accordingly, the Antiguan Proceeding is not a foreign main proceeding, and the Court goes on to analyze whether it is a foreign nonmain proceeding.

---

[57]The Court notes that even if the Stanford Entities were not aggregated, it would still find that SIB's COMI is in the United States given the above factual findings, which largely center on CD sales and SIB's activities. The Court also notes it would reach this same result if it sustained the Joint Liquidators' hearsay objections to Van Tassel's exhibits and the Receiver's exhibits.

### *D. The Stanford Entities Have an Establishment in Antigua*

The Court notes again that the Joint Liquidators have not requested foreign nonmain recognition. Indeed, their petition only requests foreign main recognition. However, this technicality makes no difference. Chapter 15 specifically contemplates that a foreign representative applies for recognition generally. *See* 11 U.S.C. § 1509(a) ("A foreign representative may commence a case under section 1504 by filing directly with the court *a petition for recognition* of a foreign proceeding under section 1515." (emphasis added)); 11 U.S.C. § 1515(a) ("A foreign representative applies to the court *for recognition* of a foreign proceeding in which the foreign representative has been appointed by filing a *petition for recognition*." (emphases added)). It is for the Court to then decide whether the proceeding qualifies for recognition as either a foreign main or foreign nonmain proceeding. *See generally* 11 U.S.C. § 1517. Thus, having decided that the Antiguan Proceeding is not a foreign main proceeding, the Court analyzes whether the Antiguan Proceeding is a foreign nonmain proceeding.

A foreign nonmain proceeding means a proceeding "pending in a country where the debtor has an establishment." 11 U.S.C. § 1502(5). Chapter 15 defines an "establishment" as "any place of operations where the debtor carries out a nontransitory economic activity." 11 U.S.C. § 1502(2). Courts have likened this to a "local place of business." *See Bear Stearns II*, 374 B.R. at 131. A bankruptcy court in this Circuit has defined a "place of operations" as "'a place from which [commercial] economic activities are exercised on the

market (i.e. externally) . . . ,' in the country in which the foreign proceeding is maintained."
*Ran III*, 406 B.R. at 285 (bracketed text inserted).

As discussed above, the Stanford Entities had at least two physical structures in Antigua registered as separate businesses – SIB and Bank of Antigua.  Although Antiguan law barred the Stanford Entities from doing business in Antigua, *see* Hr'g Tr. 39, the Stanford Entities could and did do business with its Antiguan employees and Antiguan trust companies.  This resulted in 578 Antiguan clients: 31 individuals and 547 trust and corporate entities,[58] for a total of two percent of the total SIB customers and four percent of the total monies invested in SIB according to the Joint Liquidators.  *See* 124-1, at 2-3.  Additionally, SIB employees carried out functions related to three types of accounts, credit card services, loan facilities, letters of credit, letters of guarantee, and private banking services at SIB's facility according to Jacobs, *see supra* note 34, and at the time the Former Joint Liquidators filed their petition, SIB still had some employees at its facility, *see* JL Proposed Facts & Law 78-79 (stating that to this day four employees work at the SIB facility, fielding calls and inquiries from investor-victims).  Bank of Antigua held at least some of SIB's purported funds.  And finally, the Stanford Entities issued loans to the Antiguan government.[59]  Thus,

---

[58]The Court notes that it is unclear whether the trusts included in the number above have Antiguan residents as ultimate beneficiaries.  *See* Hr'g Tr. 122-23 (JL Dickson testifying eight days prior to the filing of this evidence that there were about 500 trusts where ultimate beneficiary residence information was unanalyzed).

[59]The Court notes but does not here consider Stanford's personal relationship with Antigua: Stanford used CD proceeds to influence Antiguan Prime Minister Lester Bird and his government for several years.  *See* 116-11, at 6-7.  Later, when the United Progressive Party came to power in 2004, Stanford immediately sought to foster close relations with the

the Stanford Entities conducted a measurable amount of local business in Antigua sufficient to have an establishment there, so the Court grants the Antiguan Proceeding foreign nonmain recognition.

### E. The Court Grants Limited, Conditional Relief

Section 1509 states that recognition generally entails that (1) the foreign representative has the capacity to sue and be sued in a U.S. court, (2) the foreign representative may apply directly to a U.S. court for appropriate relief in that court, and (3) a U.S. court shall grant comity or cooperation to the foreign representative. 11 U.S.C. § 1509. However, section 1509 also states that this automatic relief "is subject to any limitations that the court may impose consistent with the policy of this chapter." *Id.* Section

---

Party's members through favorable deals with the new government – for example, Stanford paid the government $1 million for the construction of an Antiguan national library, $10 million for an Antiguan entrepreneurial fund, and $25 million for the construction of a higher education complex. *See id.* at 7-8. He also agreed to write off $50 million in debt that Antigua owed to the Stanford Entities. *See id.* Concurrent with these payments, the Antiguan government ratified Stanford's acquisition of a piece of real estate in Antigua. *See id.* at 8.

Additionally, Stanford had an extremely close personal relationship with Leroy King, the former administrator and chief executive officer of the FSRC (SIB's purported Antiguan regulator), where, in addition to cash payments amounting to hundreds of thousands of dollars, Stanford provided King with the use of his fleet of private jets to travel throughout the United States and Caribbean and the use of a SIB corporate car. *See id.* at 13. In exchange, King facilitated Stanford's fraud by obstructing the SEC investigation and abdicating FSRC's oversight responsibilities. *Id.* The Receiver specifically outlines King's actions in his direct testimony, *see* 116-11, at 12-21, which included providing confidential SEC communications to Stanford, falsely telling the SEC that the FSRC had investigated SIB and that any further investigation was unwarranted, replying to SEC communications as dictated by Stanford, Davis, and SFG's general counsel, and posting on the FSRC's website that the FSRC performed continuous off-site supervision of SIB in the form of analyses of quarterly returns and annual audited financial statements, *id.*

1521 allows a court, "at the request of the foreign representative,"[60] to "grant any [additional] appropriate relief" in order to "effectuate the purpose of this chapter and to protect the assets of the debtors or the interests of the creditors." *See* 11 U.S.C. § 1521. A court should similarly condition that relief as it considers appropriate. *See* 11 U.S.C. § 1522(a-b).

This action has a peculiarly worrying history. Notwithstanding the Antiguan institution of proceedings despite this Court's Receivership Order, *see supra* p.2, the long account of happenings in the life of this suit demonstrates that the Joint Liquidators' repeated interference with the Receivership has been the norm. For example, early on in the action, without notice to the Receiver or the Canadian court, the Former Joint Liquidators entered one of the Stanford Entities in Canada and wiped its computer systems clean of information.[61] Second, the current Joint Liquidators have attempted numerous times to unseat the Receiver from his role as the recognized foreign representative in Canada. Further, the Joint Liquidators have actively objected to criminal seizure proceedings by the U.S. Department of Justice ("DOJ") in Canada, the United Kingdom, and Switzerland, 92, at 11-16, and have taken affirmative steps to block the repatriation of Estate assets generally in the United Kingdom and Canada, Hr'g Tr. 50. Fourth, the Joint Liquidators have proven to be extremely litigious and calculating in this Court, filing multiple notices of objection to

---

[60]Because in their petition for recognition the Former Joint Liquidators asked the Court to grant "other and further relief as is appropriate under the circumstances," *see* Pet Recogn. of Foreign Main Proceeding Pursuant to Ch. 15 of Bankr. Code 5, the Court considers section 1521's additional relief.

[61]The Antiguan Court thereafter removed the Former Joint Liquidators, rebuking them for their actions.

the Receiver's requests in this and other Stanford MDL suits, and filing motions to pursue claims the Receiver was already pursuing.[62]  The Joint Liquidators have admitted that they seek funds first and foremost to fund their current operations, which include challenging the Receiver's authority worldwide, not to distribute to investor-victims and creditors.  *Id.* at 50-53.

Finally, the Joint Liquidators have similarly been vocal about their preference that the Stanford Entities – or at least SIB – be placed in U.S. bankruptcy proceedings rather than continue as an equity receivership.  *See, e.g.*, Tr. of Hr'g on Receiver's Mot. Entry Claims Procedure, Apr. 25, 2012, at 26 [1579], *in* SEC Action ("Frankly, our belief is [SIB] should have been put in a bankruptcy, those particular entities, or just – just liquidate, just shut down.").  Although the Court does not here opine on the propriety of bankruptcy proceedings

---

[62]The Court also notes that the Receiver has presented evidence that Stanford had illicit dealings with and undue influence over the government of Antigua and Barbuda.  For example, (a) SFGC and the Bank of Antigua, two Stanford Entities, loaned the Antiguan government more than $90 million that remains unpaid, *see* JL Proposed Facts & Law 53 ("It is undisputed that loans were made by Stanford or Stanford related entities, other than SIB, that are estimated to amount to an aggregate of approximately US$150 million." (citing 115-1, at 41-42)); *see also* 115-1, at 42-44; (b) the Antiguan Offshore Financial Sector Planning Committee, with Stanford as the chairman, successfully influenced Antigua to remove the offenses of "false accounting," "fraud," and "illegal deposit-taking" from its Money Laundering Prevention Act, *see* 116-11, at 9-12, causing the U.S. Department of Treasury Financial Crimes Enforcement Network to issue an advisory requiring financial institutions to give enhanced scrutiny to all transactions involving Antiguan offshore banks, *id.* at 12-13; and (c) King, the former administrator and chief executive officer of the FSRC, received monetary and nonmonetary benefits from Stanford in apparent exchange for obstructing the SEC's investigation of the Stanford Entities and abdicating the FSRC's oversight responsibilities, *see id.* at 13-22.  The Court notes that the FSRC fired King in May 2009, King is under indictment in Texas, and he is currently appealing extradition proceedings in Antigua. 106-1, at 28; 116-11, at 21.  Perhaps relatedly, the Joint Liquidators have strangely made no efforts to assert any claims against the Antiguan government.

for the Stanford Entities, it notes that the collective wisdom of the Receiver, the Examiner, OSIC, and the SEC is that an equity receivership is preferable to bankruptcy,[63] and notes further that the current equity Receivership consists of more than 100 actions – more than 90 of which are active and have been pending for years – and an active claims process readying for an initial distribution to investor-victims and creditors. Thus, any future attempts to involuntarily place the Stanford Entities into bankruptcy proceedings would severely disrupt the current Receivership and result in untold expenditures of funds currently earmarked for Stanford investor-victims and creditors. Given this history, the Court's findings of fact, and the potential for duplication of effort and resulting diminution of funds for Stanford investor-victims and creditors, the Court believes that only strictly limited, conditional relief is warranted under its holding of foreign nonmain recognition.

Specifically, the Court limits the relief granted under section 1521 to "the examination of witnesses [and] the taking of evidence or the delivery of information concerning [SIB's] assets, affairs, rights, obligations or liabilities." 11 U.S.C. § 1521(a)(4). This limited relief facilitates the Joint Liquidators' U.S. discovery needs related to the Antiguan liquidation

---

[63]The SEC reminds the Court that

[R]eceivership proceeding[s] . . . [are] well-recognized vehicle[s] for ensuring the preservation, management, and, if appropriate, distribution of assets secured in a securities enforcement matter. Indeed, courts recognize that . . . the appointment of receivers in enforcement actions furthers the policies of the federal securities laws. *See SEC v. Wen*[c]*ke*, 622 F.2d 1363, 1373 (9th Cir. 1980). The policies are particularly implicated in a case like this one where the evidence is overwhelming that Stanford's fraud (and, in fact, [SIB] even if viewed in isolation) was orchestrated from the United States.

SEC's Second Suppl. Opp'n to Pet. Recogn. Pursuant to Ch. 15 of Bankr. Code 2 [101] [hereinafter SEC 2nd Suppl. Opp'n].

ORDER – PAGE 56

proceeding.  The Court then conditions all relief on (a) the Joint Liquidators' making available to the Receiver, the Examiner, OSIC, and the SEC all of SIB and STCL's records, documents, data, and any other relevant information regarding SIB and STCL under their control, possession, or knowledge, wherever located; (b) requiring the Joint Liquidators to use best efforts to acquire reciprocal rights for the Receiver in Antiguan courts; (c) precluding the Joint Liquidators from taking any action to disrupt, interfere, or otherwise prevent efforts related to the Receivership by the U.S. DOJ, the SEC, any other U.S. government agency, the Receiver, the Examiner, and OSIC absent approval of this Court; (d) precluding the Joint Liquidators from duplicating efforts by the Receiver, the Examiner, and OSIC, including playing any role – unless consented to by the Receiver, Examiner, and OSIC – in the prosecution of claims or actions that the Receiver and/or OSIC have already commenced prior to the date of this Order; (e) precluding the Joint Liquidators from filing any litigation or other proceeding in the United States, unless approved by this Court; (f) precluding the Joint Liquidators from filing U.S. bankruptcy petitions without the consent of the Receiver, the Examiner, OSIC, the SEC, and this Court; (g) requiring the Joint Liquidators to consult with the Receiver, the Examiner, OSIC, and the SEC and use best efforts to adopt a common claims and/or distribution process; (h) requiring the Joint Liquidators to apply to this Court for the authority to make any payment from SIB or STCL assets for any activity undertaken by them in the United States or to any U.S. person; and (i) requiring the Joint Liquidators to apply to this Court for the authority to take any action whatsoever in the United States except for "the examination of witnesses [and] the taking of

evidence or the delivery of information concerning [SIB's] assets, affairs, rights, obligations or liabilities."

To the extent that the Joint Liquidators require a court order from Antigua to comply with the above conditions, the Court leaves it up to the Joint Liquidators to attempt to obtain one. This Court will not modify its conditions simply because the Joint Liquidators are unable to secure the authority to comply.

In fashioning the above relief, the Court is careful to strike a "balance between relief that may be granted to the foreign representative and the interests of persons that may be affected by such relief." *See In re Int'l Banking Corp. B.S.C.*, 439 B.R. 614, 626 (Bankr. S.D.N.Y. 2010). Particularly, the Court seeks to instill reciprocal cooperation between the Antiguan and U.S. parties and parties in interest, as well as provide for checks on the Joint Liquidators' activity similar to the way that this Court oversees the Receiver, Examiner, and OSIC's activities. In this way, the Court balances the needs of the parties in interest with the needs of Stanford's investor-victims and creditors.

### F. Any Public Policy Problem is Resolved by the Court's Conditional Relief

The Receiver and the SEC ardently argue that the Court should not grant the Antiguan Proceeding foreign recognition of any kind because doing so would be against the public policy of the United States. *Cf. In re Gold & Honey, Ltd.*, 410 B.R. 357 (Bankr. E.D.N.Y. 2009) (refusing to grant recognition on public policy grounds). Specifically, they argue that recognition is against U.S. public policy because (a) the Antiguan Proceeding violates this Court's Receivership Order, (b) Stanford's influence in Antigua created favorable Antiguan

banking laws by which Stanford was able to perpetrate his fraud, (c) the FSRC and the Antiguan government were intimately involved and/or implicated in Stanford's fraud, (d) the Antiguan government has failed to cooperate with the Receiver and has expropriated Receivership assets, including real estate and Bank of Antigua's assets, (e) the Joint Liquidators' goal is to take full control of the Receivership Estate to the detriment of Stanford investor-victims and creditors, (f) the Antiguan Proceeding and Stanford Entities' documents in Antigua are subject to Antiguan secrecy laws, (g) the distribution scheme under the IBCA is inappropriate, and (h) the Joint Liquidators have made no showing that recognition would provide any benefit or advantage to the Receivership Estate or its investor-victims and creditors.  *See* Receiver's Proposed Facts & Law 49-50; JL Proposed Facts & Law 47.  The Court holds that recognition as granted here is not against U.S. public policy because the conditions imposed by the Court adequately address the concerns of the Receiver and SEC.

## CONCLUSION

The Court grants the Joint Liquidators' motion for substitution as Plaintiff *nunc pro tunc* to June 8, 2010 and grants in part and denies in part their request that the Court take judicial notice.  The Court overrules the parties' objections to each others' evidence.  Finally, because the Stanford Entities' COMI is in the United States and they have an establishment in Antigua, the Court grants the Antiguan Proceeding foreign nonmain recognition, granting in part and denying in part the Joint Liquidators' petition for recognition.  The Court grants the Joint Liquidators limited, conditional relief under Chapter 15.

ORDER – PAGE 59

In accordance with this Order, the Court orders the Clerk of the Court to terminate Peter Wastell and Nigel Hamilton-Smith as Plaintiffs and add Marcus Wide and Hugh Dickson as Plaintiffs.

Signed July 30, 2012.

David C. Godbey
United States District Judge

ORDER – PAGE 60