**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 3:09-CV-0298-N |
| | § | |
| STANFORD INTERNATIONAL BANK, LTD., ET AL., | § | |
| | § | |
| | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| STANFORD INTERNATIONAL BANK, LTD., | § | Civil Action No. 3:09-CV-0721-N |
| | § | |
| Debtor in a Foreign Proceeding. | § | |
| | § | |

_____

**APPENDIX IN SUPPORT OF JOINT MOTION OF THE SEC, RECEIVER, EXAMINER, AND OFFICIAL STANFORD INVESTORS COMMITTEE TO APPROVE SETTLEMENT AGREEMENT AND CROSS-BORDER PROTOCOL**
_____

Dated: March 12, 2013.

Respectfully submitted,

BAKER BOTTS L.L.P.

 /s/ Kevin M. Sadler
Kevin M. Sadler
Texas Bar No. 17512450
kevin.sadler@bakerbotts.com
Scott D. Powers
Texas Bar No. 24027746
scott.powers@bakerbotts.com
David T. Arlington
Texas Bar No. 00790238
david.arlington@bakerbotts.com
98 San Jacinto Blvd., Suite 1500
Austin, Texas 78701
(512) 322.2500 (Telephone)
(512) 322.2501 (Facsimile)

**ATTORNEYS FOR RECEIVER
RALPH S. JANVEY**

Respectfully submitted,

 /s/ David B. Reece
David B. Reece
Texas Bar No. 242002810
U.S. Securities and Exchange
Commission
Burnett  Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, TX 76102-6882
(817) 978.6476 (Telephone)
(817) 978.4927 (Facsimile)

**SECURITIES AND EXCHANGE
COMMISSION**

Respectfully submitted,

LITTLE PEDERSEN FANKHAUSER, LLP

 /s/ John J. Little
John J. Little
Texas Bar No. 12424230
jlittle@lpf-law.com
901 Main Street, Suite 4110
Dallas, Texas 75202
(214) 573.2300 (Telephone)
(214) 573-2323 (Facsimile)

**COURT-APPOINTED EXAMINER AND CHAIRMAN OF THE OFFICIAL STANFORD INVESTORS COMMITTEE**

## SETTLEMENT AGREEMENT AND CROSS-BORDER PROTOCOL

THIS SETTLEMENT AGREEMENT AND CROSS-BORDER PROTOCOL (the "Agreement") dated as of March 8, 2013, is made by and among (i) the United States of America, by and through the United States Department of Justice ("DOJ") who in turn in relation to proceedings in England and Wales are represented by the Serious Fraud Office ("SFO"); (ii) Marcus A. Wide and Hugh Dickson, solely in their capacities as the Eastern Caribbean Supreme Court appointed Joint Liquidators of Stanford International Bank Limited ("SIB") (in Liquidation) and of Stanford Trust Company Limited ("STC") (in Liquidation) (the "JLs") and not in their personal capacities; (iii) Ralph S. Janvey, solely in his capacity as US District Court appointed Receiver for SIB, Stanford Group Company, Stanford Capital Management, LLC, Robert Allen Stanford ("Stanford"), James M. Davis, Laura Pendergest-Holt, Stanford Financial Group, the Stanford Financial Group Bldg., Inc., and all entities the foregoing persons and entities own or control (the "Receiver") and not in his personal capacity; (iv) the United States Securities and Exchange Commission (the "SEC"); (v) John J. Little, in his capacity as Examiner appointed by the US Court (the "Examiner"); and (vi) the Official Stanford Investors Committee ("OSIC") by and through its Chairman, John J. Little (collectively, the "Parties").  The US Receiver and OSIC are sometimes hereinafter referred to collectively as the "Receivership Parties".

## DEFINITIONS

A.      "Execution Date" means the first date on which this Agreement has been executed by the Receiver, the JLs, DOJ, SEC, the Examiner, and OSIC.  On the Execution Date, the obligation of the Parties to seek the approvals outlined in Section 1.4 becomes effective.  The remainder of the Agreement becomes effective on, and not until, the Effective Date.

B.     "Effective Date" means the first date on which this Agreement has received all necessary approvals as outlined in Section 1.4.

C.     "Creditor-victims" means claimants seeking reimbursement for losses associated with their deposits with SIB.

D.     "Law Firm Claims" means damages claims, including but not limited to professional negligence, aiding and abetting, and conspiracy, asserted or filed against lawyers or law firms who formerly represented Stanford or any Stanford-related entity or individual.

E.     "Bank Claims" means damages claims, including but not limited to negligence, aiding and abetting, dishonest assistance, and conspiracy, asserted or filed against banks or institutions providing banking services to Stanford or any Stanford-related entity or individual.

F.     "Settlement Term Sheet" means that certain non-binding Settlement Term Sheet executed by the Receiver, the JLs, and the Examiner on November 20 and 21, 2012 and addressing and encompassing certain of the matters addressed by this Agreement.

G.     "Claw Back Net Winner Claims" means any claim against a SIB depositor to recover payments made to such depositor in excess of the principal the depositor deposited with SIB.

## RECITALS

A.     WHEREAS, the Parties have reached a global settlement on the terms outlined herein encompassing certain agreements (i) to work cooperatively with respect to the JLs' and Receiver's claims and distribution processes; (ii) with respect to claw-back and third-party liability litigation, to divide responsibility where possible for certain litigation and develop coordination mechanisms for certain other litigation; and (iii) to provide for the liquidation and release of the proceeds which are expected to be realized from approximately US$300 million of

certain assets, including those currently frozen in Canada, Switzerland and the United Kingdom, through an agreed protocol for ultimate distribution to Creditor-victims by the JLs and the Receiver.

**The Receiver and Receivership Estate**

B.    WHEREAS, the Receiver was appointed by the US District Court for the Northern District of Texas (the "US Court") at the request of the SEC on February 16, 2009. The order of appointment was amended by the US Court on March 12, 2009 and again on July 19, 2010.  The Receiver is an equity receiver whose duties and obligations are set forth in the order of the US Court dated July 19, 2010.

C.    WHEREAS, the Receiver's powers extend over the assets and affairs of SIB, Stanford Group Company, Stanford Capital Management, LLC, Stanford, James M. Davis, Laura Pendergest-Holt, Stanford Financial Group, the Stanford Financial Group Bldg., Inc., and all entities the foregoing persons and entities own or control (collectively, the "US Estate").

**The JLs and Antiguan Estate**

D.    WHEREAS, the JLs were appointed by the Eastern Caribbean Supreme Court in Antigua and Barbuda (the "Antiguan Court") on May 12, 2011, replacing the former Joint Liquidators, Mr. Nigel Hamilton-Smith and Mr. Peter Wastell ("Former JLs"), who themselves were originally appointed as receiver-managers of SIB on February 19, 2009, and, thereafter, as joint liquidators of SIB on April 15, 2009.

E.    WHEREAS, the JLs' powers currently extend over the assets and affairs of SIB and STC by order of the Antiguan Court.

F.    WHEREAS, in their respective proceedings, the Receiver and the JLs have been appointed, among other things, to (a) manage and/or liquidate the relevant debtors' affairs,

(b) collect and realize their respective assets, (c) develop and pursue claw-back and other claims to enlarge the sums available for distribution to creditors, (d) act as the representatives of their respective estates, and (e) to distribute the proceeds collected in accordance with applicable law. In the instance of the Receiver, certain aspects of his mandate have been delegated to OSIC by order of the US Court.

G.    WHEREAS, under section 289(1)(e) of the International Business Corporations Act, Cap 222 (Antigua and Barbuda) (the "IBC Act"), the JLs are required to follow a distribution waterfall which includes a duty to distribute funds to fully satisfy the claims of small depositors whose net account balance investments do not exceed EC$20,000 (approximately US$7,500), before depositors whose CDs are of a net value of in excess of EC$20,000 may receive a distribution. The JLs estimate that the total value of small-dollar depositors' claims on the SIB estate (again, whose net account balances do not exceed EC$20,000) will not exceed US$1 million *in toto.*

**The US Criminal and Forfeiture Proceedings**

H.    WHEREAS, Stanford was indicted in the US District Court for the Southern District of Texas on June 18, 2009, and charged with multiple felony counts based on his role in the Stanford Ponzi scheme.

I.    WHEREAS, Stanford was tried and convicted of thirteen felony counts related to his role in the Stanford Ponzi scheme, was sentenced to serve a prison term of 1,320 months, and is serving his prison sentence pending appeal.

J.    WHEREAS, a forfeiture trial was held in connection with Stanford's criminal case in the Southern District of Texas (the "Forfeiture Court") resulting in an Amended Order of Forfeiture, dated June 1, 2012, and Judgment, dated June 14, 2012, forfeiting to the DOJ certain

property identified in the Amended Order and including approximately US$300 million of assets frozen in Switzerland, the UK and Canada.

**The UK Proceedings**

K.   WHEREAS, on April 6, 2009, the DOJ issued a letter of request under a Mutual Legal Assistance Treaty ("MLAT") to the U.K. Central Authority requesting that: (i) SIB's assets in England & Wales be frozen and (ii) the SFO file an application before the Central Criminal Court (London) (the "CCC") for a restraint order by close of business on April 7, 2009.

L.   WHEREAS, on April 7, 2009, on the application of the SFO, the CCC granted a restraint order (the "Original Restraint Order") over the assets of SIB in England & Wales under the Proceeds of Crime Act 2000 (External Requests and Orders) Order 2005.  A list of the assets of SIB which remain frozen in the UK is set out on Schedule "A" to this Agreement, and such assets are referred to herein as the "UK Assets".  The estimated value of the remaining UK Assets is approximately US$80 million, which valuation is not exact due to difficulty in valuation of that portion which has not been monetized.

M.   WHEREAS, on February 25, 2010, the Court of Appeal of England & Wales (i) upheld the Recognition Order entrusting SIB's UK assets to the JLs, and (ii) discharged the Original Restraint Order and made a new restraint order on the same terms with effect from July 29, 2009 (the "Restraint Order").

N.   WHEREAS, on March 24, 2010, following the decision of the Court of Appeal of England & Wales of February 25, 2010, the JLs applied to the UK Supreme Court (the "UKSC") for permission to appeal the judgment of the Court of Appeal, to which the SFO filed a Notice of Objection.

O.     WHEREAS, on June 11, 2010, the SFO filed its application for permission to bring a cross-appeal in the UKSC.

P.     WHEREAS, on August 3, 2011, Gloster J, sitting in the CCC, heard the JLs' application for a variation to the Restraint Order for the release of US$20 million from the Restrained Assets under the jurisdiction which allows the Court to release funds to a defendant to fund legal fees, living expenses or operating costs (the "Funding Application").

Q.     WHEREAS, on August 4, 2011, Gloster J made an order (a) acceding to the Funding Application subject to certain undertakings, in certain circumstances, to restore the released US$20 million to the Restrained Assets, and (b) enabling the JLs to manage the Restrained Assets. The written judgment on the Funding Application was handed down on January 16, 2012.

R.     WHEREAS, after a stay of the UKSC proceedings to accommodate the hand-over of the SIB estate from the Former JLs to the JLs , on January 25, 2012, the UKSC heard the JLs' application for permission to appeal and ruled, in summary, that SIB did not require permission to appeal and the SFO did not require permission to cross-appeal. The hearing of the substantive appeal to the UKSC has been listed for July 10 and 11, 2013.

S.     WHEREAS, on June 21 and 22, 2012, Gloster J heard the JLs' application to discharge the Restraint Order, the judgment for which is outstanding.

T.     WHEREAS, as part of their duties to manage certain illiquid assets that were the subject of the freeze order in the UK (*i.e.*, the Argo funds and the Cheyne fund), the JLs monetized certain illiquid investments for redemption payments, which, in the amounts of approximately US$750,000, have been detained in a suspense account at Bank of New York in New York (the "Bank of New York $750,000"). The funds that are the subject of this paragraph

were destined to be transmitted to the jurisdiction of the CCC for distribution consistent with Article VIII hereof.  As soon as practicable following the Effective Date, the Receiver agrees to file a motion with the US Court requesting an order directing the Bank of New York to transfer such funds to an account under the control of the JLs in London, England.  The form of order to be sought shall include the following language: "The Bank of New York in New York is hereby ordered to transfer the amounts being held therein in the name of Stanford International Bank, in the approximate amount of $750,0000, to Account No. 302532-1 at Credit Suisse in London, England, referred to as the Distribution Account in the Settlement Agreement and Cross-Border Protocol."

**The Swiss Proceedings**

U.      WHEREAS, the Swiss Federal State Attorney's Office opened an investigation for money laundering on February 23, 2009, when several Swiss banks made suspicious transaction reports to the Anti-Money Laundering Control Authority of Switzerland.

V.      WHEREAS, on February 24, 2009, the Swiss Federal State Attorney's Office froze certain Stanford related bank accounts by way of a domestic Swiss freezing order.  The freezing order included *inter alia* also the accounts of Stanford Bank (Panama) Ltd., and was directed at accounts held with Société Générale Private Banking (Suisse) SA ("SG"), Union Bancaire Privée ("UBP"), Piguet Galland & Cie. SA (f/k/a Banque Franck Galland & Cie SA) and Coutts & Co. AG (f/k/a RBS Coutts AG), all in Geneva, and Credit Suisse AG and Bank Julius Bär & Co. AG, in Zurich.

W.      WHEREAS, on May 13, 2009, the DOJ issued an MLAT request to Switzerland, which was followed by a supplemental MLAT request on June 22, 2009.  On the basis of such MLAT requests, the Swiss Federal Office of Justice ("FOJ") froze all known Stanford related

bank accounts in Switzerland pursuant to the MLAT framework, including those of Stanford Bank (Panama) Ltd held at UBP, Geneva, and the bank accounts of Stanford Group (Suisse) AG (in Liquidation) with Credit Suisse AG, but excluding all of the bank accounts of Stanford Bank (Panama) Ltd held at institutions other than UBP (*i.e.*, those accounts with Franck Galland & Cie SA, SG Private Banking (Suisse) SA, RBS Coutts). Since then, there have been parallel Swiss domestic criminal proceedings and MLAT-based proceedings operating in Switzerland. Schedule "B" to this Agreement includes a list of all Stanford-related assets that remain frozen in Switzerland, as well as two accounts for which the freeze has recently been lifted, but which shall nevertheless be governed by this Agreement. The assets listed on Schedule "B" are referred to collectively herein as the "Swiss Assets". The value of the Swiss Assets is estimated to be approximately US$208 million (although some of the available underlying valuation data is dated); and it is acknowledged that the valuation data is not exact as to that portion of the assets which have not yet been monetized.

X. WHEREAS, on November 9, 2009, the Swiss Federal State Attorney's Office lifted all domestic freezes for the accounts of Stanford Bank (Panama) Ltd., and the FOJ lifted the freeze put in place on the account of Stanford Bank (Panama) Ltd with UBP pursuant to the MLAT. The funds in the accounts of Stanford Bank (Panama) Ltd. were sent to Panama in favor of a local administrator.

Y. WHEREAS, by a decision dated June 8, 2010, the Swiss Financial Market Supervisory Authority ("FINMA") recognized in Switzerland the order appointing the Former JLs rendered by the High Court of Antigua and Barbuda as the office holders for SIB, dated April 15, 2009, entered April 17, 2009, and opened in Switzerland an ancillary bankruptcy proceeding concerning SIB effective June 8, 2010, at 8:00 a.m. (File Nr. S1057082, the "Swiss

Mini-Bankruptcy"). By the same decision, FINMA rejected the concurrent request of the Receiver to recognize the appointment orders of the US Court of February 16, 2009, and March 12, 2009. FINMA was appointed liquidator of the Swiss Mini-Bankruptcy.

Z.     WHEREAS, on September 14, 2011, the Swiss Federal State Attorney's Office lifted all the freeze orders regarding the Swiss bank accounts under the Swiss domestic criminal proceedings, except for the Swiss domestic freeze order impacting the Stanford Group (Suisse) AG (in Liquidation) account with Credit Suisse.

AA.     WHEREAS, the freezes put in place by the FOJ pursuant to the MLAT regime remain in place, with the exception of the two accounts noted in Schedule B. In June 2012, the JLs, by and through FINMA, in its capacity as liquidator the Swiss Mini-Bankruptcy, launched certain claw-back claims against the funds held by Stanford Financial Group Limited, Antigua ("SFG Antigua"), Bank of Antigua Limited, and Stanford Group (Suisse) AG in Liquidation (collectively the "JLs' Swiss Claw-Back Claims").

BB.     WHEREAS, in FINMA's action against Stanford Groupe (Suisse) AG in Liquidation ("SGS"), FINMA and the liquidators for SGS have jointly requested and obtained a suspension of the proceedings between them until March 31, 2013. On November 30, 2012, the JLs lodged a criminal complaint against SG with the Swiss Prosecutor seeking damages by way of restitution for losses occasioned by SG's alleged criminal money laundering activities against SIB.

**The Canadian Proceedings**

CC.     WHEREAS, on April 24, 2009, the Attorney General of Ontario commenced a civil forfeiture proceeding in the Ontario Court of Justice seeking forfeiture of the assets listed in such application pursuant to the Ontario *Civil Remedies Act, 2001* (the "Ontario Forfeiture

Application"), to which the Receiver is a party, and amounting to approximately US$23.5 million held by SIB at the Toronto-Dominion Bank ("TD Bank") in Toronto (the "Canada Assets"). On September 11, 2009, Justice Claude Auclair set aside an order of April 6, 2009 recognizing the Former JLs as one time Receiver-Managers of SIB, and granted an order recognizing the Receiver as the representative of SIB in Canada.

DD.   WHEREAS, on August 19, 2011, the JLs were authorized by order of Justice Chantal Corriveau to act for SIB and its creditors as representatives in certain intended actions against TD Bank in Canada for compensation for loss caused by TD Bank's alleged dishonest assistance or negligence in respect of the fraud on SIB and its CD holders. On August 17, 2011, the JLs commenced an action against TD Bank in Québec; and on August 22, 2011, the JLs commenced a parallel placeholder action against TD Bank in Ontario.

EE.   WHEREAS, on December 22, 2011, the JLs filed before the Superior Court of Quebec, District of Montreal, a Motion to Vary an order, for recognition of a foreign proceeding and the appointment of a foreign representative and of a receiver (the "Motion to Vary") in their capacity as joint liquidators of SIB appointed by the Court in Antigua.

FF.   WHEREAS, on March 9, 2012, the Receiver and Interim Receiver filed a Motion to Dismiss the Motion to Vary; on March 30, 2012, the Motion to Vary was amended by the JLs (the "Amended Motion to Vary"); on April 5, 2012, the Receiver and the Interim Receiver filed an opposition *pro forma* in respect of the amendments to the Motion to Vary; on April 19, 2012, the Receiver and Interim Receiver filed an Amended Motion to Dismiss with regard to the Amended Motion to Vary; and on April 23, 2012, the JLs filed a Motion for Permission to Amend with regard to the Amended Motion to Vary.

GG.     WHEREAS on May 9, 2012, Justice Auclair, J.S.C., began to hear the Motion for Permission to Amend and the Amended Motion to Dismiss and this hearing was continued to May 22, 2012.  On May 22, 2012, Justice Auclair, J.S.C., decided to stay the hearing of said Motions in order to give the Receiver and Interim Receiver an opportunity to seek the approval of certain Minutes of Settlement concerning the Canada Assets by the Superior Court of Quebec.

HH.     WHEREAS, on July 27, 2012, the Receiver and Interim Receiver filed a Motion for Directions and to Authorize Petitioners to Enter into a Settlement (the "Motion for Directions") seeking the approval of an agreement they entered into with the Attorney General of Ontario (the "AGO") to settle the Ontario Forfeiture Application.

II.     WHEREAS, through their Motion for Directions, the Receiver and Interim Receiver seek the approval of the Minutes of Settlement in which they give their consent to the Ontario Forfeiture Application and the authorization to transfer the Canada Assets to DOJ to be held in its asset forfeiture accounts until they are remitted to the Receiver or distributed by DOJ.

JJ.     WHEREAS, on September 25, 2012, Justice Auclair held a conference call with counsel for the JLs, the Receiver, the Interim Receiver and the Autorité des Marchés Financiers (the Regulator of Financial Markets in Quebec) during which Justice Auclair was advised that a letter was forthcoming which would request a stay of the Receiver and the Interim Receivers' Motion for Directions until October 22, 2012, in order to enable the Parties to continue their discussions regarding a global settlement concerning, among other things, the Canada Assets. A letter seeking said stay of proceedings was sent to Justice Auclair on September 26, 2012, and Justice Auclair has agreed to the stay requested.  A list of the Canada Assets is set forth on Schedule "C" to this Agreement.

**Shared Focus on the Victims of the Stanford Ponzi Scheme**

KK.    WHEREAS, the Parties are each satisfied that Stanford, with the assistance of others, created and carried out a massive Ponzi Scheme, involving tens of thousands of customers and others in numerous states and over 100 countries, by which billions of dollars were fraudulently obtained and in which those clients were induced to purchase certificates of deposit issued by and/or deposit funds with SIB based on the promise of high returns on those deposits when, in fact, the funds were being used to pay returns or principal to earlier depositors; to create a complex, sprawling web of more than 100 companies, all of which were directly or indirectly owned by Stanford; to give the appearance of legitimacy to, and otherwise advance the goals of, his fraud scheme; and to fund Stanford's lavish lifestyle.

LL.    WHEREAS, it is the policy of the DOJ to assist victims of fraud perpetrated in whole or in part within the United States in the recovery of misappropriated assets.

MM.    WHEREAS, the Parties share the common goal of locating and distributing assets to the victims as quickly and cost-effectively as possible.

NN.    WHEREAS, the Parties are each satisfied that this Agreement is in the best interests of the victims of the Stanford Ponzi scheme and have concluded that a coordinated effort to distribute assets and to harmonize the activities of the Receiver and the JLs will further the ends of justice.

OO.    WHEREAS, the Parties have agreed that all funds and assets in Canada, Switzerland and the UK that are set out in the attached Schedules "A" [UK], "B" [Switzerland] and "C" [Canada] (collectively, the "Covered Assets") will be distributed pursuant to the protocol established by Article VIII hereof.

PP.    WHEREAS, the Parties hereto desire that this Agreement shall serve as the governing instrument for their joint efforts to distribute the Covered Assets.

NOW, THEREFORE, in consideration of the premises and agreements contained herein, the Parties agree as follows:

## ARTICLE I

## GENERAL PURPOSES

SECTION 1.1.    BROAD COOPERATION.    The Parties agree to coordinate and reasonably cooperate with each other and to use their best efforts to carry out the provisions and intent of this Agreement and to expeditiously take all appropriate actions and execute such additional documents as may be reasonably necessary to effectuate this Agreement.   The types of coordination and cooperation contemplated here shall include, but are not limited to:  (i) taking all reasonable actions to collect, liquidate and distribute the Covered Assets in accordance with the terms of this Agreement; (ii) making all necessary appearances before any judicial, quasi-judicial, or regulatory body, authority, agency or tribunal; and (iii) taking other reasonable action, including where necessary the execution and filing of certificates, affidavits, powers of attorney, or other legal documentation, to the extent permitted by law, necessary and desirable to effect the foregoing.   The Receiver and the JLs further restate their objective and willingness to cooperate to maximize the value to be realized from the monetization of the Covered Assets and to seek to maximize recoveries for the Creditor-victims by any reasonable means.

SECTION 1.2.    ASSETS SUBJECT TO THIS AGREEMENT.    All assets identified in the attached Schedules "A" [UK], "B" [Switzerland], and "C" [Canada] whether cash, securities, debt instruments, choses-in-action, interests in partnerships or other business ventures, real property, or personal property of every description whatsoever, whenever recovered by or

disgorged to any of the Parties, without any set off, deduction, or claim whatsoever, except as expressly provided for in this Agreement shall be monetized and then allocated and distributed pursuant to the terms of Article VIII hereof.

SECTION 1.3.   JOINT LITIGATION PRIVILEGE AND NON-DISCLOSURE AGREEMENT.  The Parties to this Agreement acknowledge the existence of a certain Joint Litigation Privilege and Non-Disclosure Agreement by and among the JLs, the Receiver, the Examiner, and OSIC dated September 20, 2012.  Nothing in this Agreement is meant to vary or modify the terms of that Joint Litigation Privilege and Non-Disclosure Agreement, and the Parties agree and intend that the Joint Litigation Privilege and Non-Disclosure Agreement shall remain in full force and effect following the Effective Date.

SECTION 1.4.  CONDITIONS ON THE EFFECTIVENESS OF THIS AGREEMENT. This Agreement shall be subject to review and approval by the US Court and the Antiguan Court, thus giving any interested party, including any depositor, an opportunity to speak in favor of or against the Agreement.  The approved form of the Proposed Orders to be submitted to the US Court and the Antiguan Court are included respectively within Schedules "D" and "E" attached hereto.  If the US Court or the Antiguan Court declines to approve the Agreement, then the Agreement will be cancelled and the parties will be returned to the status quo as it existed before the execution of the Settlement Term Sheet and this Agreement.  The Receiver and the JLs hereby agree to file motions seeking judicial approval of this Agreement before their respective Courts within seven days of the Execution Date.  Further, within seven days of the date of the entry of the latter of the order entered by the US Court or the Antiguan Court approving this Agreement, DOJ (by request to the SFO) and the JLs hereby agree to seek the approval of the CCC with respect to the Schedule referred to in Section 5.1, as hereby approved

by the Receiver.   If the CCC declines to approve the Schedule referred to in Section 5.1 in substantially the form attached hereto, then the Agreement will be cancelled and the parties will be returned to the status quo as it existed before the execution of the Settlement Term Sheet and this Agreement.   All required approvals shall be pursued expeditiously.   Pending the approvals identified in this section, the appropriate Parties will request a continuation of the stay of the international court proceedings that are currently stayed, including the proceedings related to the JLs' application in the UK to discharge the Restraint Order, the UKSC appeal, the JLs' Swiss Claw-Back Claims, and the Receiver and Interim Receiver's Motion for Directions.   If this Agreement has not received all necessary approvals by May 15, 2013, then, in the absence of an Agreement by all Parties to extend the deadline for obtaining such approvals, this Agreement will be cancelled and the parties will be returned to the status quo as it existed before the execution of the Settlement Term Sheet and this Agreement.

**ARTICLE II**

**CLAIMS PROCESS AND DISTRIBUTION PROTOCOL**

SECTION 2.1.   BROAD COOPERATION.   The Receiver and the JLs have agreed to coordinate their respective claims and distribution processes to achieve efficiencies and to minimize burdens on claimants where reasonably possible, to provide mutual assistance with respect to claims evaluation, and to minimize the occurrence of conflicting claims adjudications. To that end, the Receiver and the JLs have agreed to the provisions of Sections 2.2, 2.3, and 2.4 and may from time to time supplement the protocol regarding claims process coordination as they may, in their collective judgment, deem to be expedient.

SECTION 2.2.   INFORMATION CONCERNING CLAIMS PROCESS.   Information regarding claims from putative Creditor-victims that are filed with the Receiver, with the JLs, or

with both shall be exchanged between the Receiver and the JLs. The Receiver and the JLs shall hold in confidence the identifying data regarding all Creditor-victim claims (including name, Express Account Number or Client Number, and address) received from the other party.

SECTION 2.3.  INCLUSION OF CLAIMS FILED WITH THE OTHER ESTATE.  The Receiver will include in his claims process claims filed with the JLs prior to the Receiver's bar date, and the JLs will include in their claims process claims filed with the Receiver prior to the Receiver's bar date.  On a case-by-case basis, the Receiver will recommend to the US Court that claimants who filed claims with the JLs after the Receiver's bar date be included in the Receiver's claims process provided that the Receiver is satisfied that reasonable good cause exists for the claimant's failure to file his or her claim with the Receiver before the bar date. Notwithstanding the foregoing, any claimant who is unwilling to submit himself or herself to the jurisdiction of the US Court in relation to the submission, evaluation, and payment of such claimant's claim will not be included in the Receiver's claims process, and any claimant who is unwilling to submit himself or herself to the jurisdiction of the Antiguan Court in relation to the submission, evaluation, and payment of such claimant's claim will not be included in the JLs' claims process.  The JLs and the Receiver agree that, as a general principle, at the end of the dual-estate distribution process, all Creditor-victims who receive distributions should receive substantially the same percentage of their net loss, and the JLs and the Receiver will work with one another to the extent reasonably possible to adhere to that principle.  The JLs and the Receiver acknowledge that this result may not be possible in every case (*e.g.*, the JLs are required through their distribution process to fully satisfy the claims of depositors whose net account balance investments did not exceed EC$20,000 (approximately US$7,500)) and further acknowledge that the US Court is ultimately responsible for approving the Receiver's

distribution and that the CCC and the Antiguan Court will ultimately be responsible for approving the JLs' distribution. Further, neither the JLs nor the Receiver will be constrained as to the timing of their respective distributions as a result of their willingness to attempt to adhere to the general principle described in this paragraph.

SECTION 2.4.  INFORMATION CONCERNING ANTICIPATED DISTRIBUTIONS. The JLs and the Receiver shall exchange information of the proven creditors who are to receive a distribution and the amount of such distribution thirty (30) days or more before a distribution is made so that the other estate can comment on the list and furnish information relevant to it, for purposes of reconciliation of the accounts between the two estates.  In furtherance of the general principle described in Section 2.3, within thirty (30) days following the completion of each distribution, the estate responsible for making the distribution shall either confirm that the distribution was completed in accordance with the pre-distribution notice or, if the distribution changed following the notice, shall furnish the other estate with the identity of the recipients of the distribution and the amount distributed to each recipient.

## ARTICLE III

## LITIGATION PROTOCOL

SECTION 3.1.  CLAIMS TO BE PURSUED INDEPENDENTLY.  As to the Law Firm Claims, Bank Claims, and all other claims not referenced in Sections 3.2 or 3.3 below, except as otherwise may be agreed between or among the Parties, the Parties will continue to pursue and initiate claims in jurisdictions in which they are recognized (including the JLs' claim against TD Bank in Canada pursuant to the terms of the Order of Madam Justice Chantal Corriveau of August 2011).  Sharing of the proceeds of such claims between and among the JLs, the Receiver

Parties, and any appropriate classes will be negotiated and determined on a case-by-case basis as and if it becomes necessary and appropriate to do so.

SECTION 3.2.   CLAIMS TO BE PURSUED IN COORDINATION.   As to the claw-back and breach of fiduciary duty claims that the JLs and Receiver Parties are prosecuting or intend to prosecute, which are identified on Schedule "F" (Schedule F will be filed with the names of the potential defendants redacted when this Agreement is submitted for Court approval), each prosecuting Party will retain control of whatever it recovers in its territory of activity, but the JLs and the Receiver Parties will cooperate to maximize recoveries for the benefit of the victims.   To the extent that any Party's professionals are working on a contingency fee basis, then such contingency fee shall be calculated based on that Party's own recovery.

SECTION 3.3.   CLAW BACK NET WINNER CLAIMS.   As to the Claw Back Net Winner Claims, each Party will retain control of whatever it recovers unless the Receiver and the JLs are able, through cooperation with one another, to jointly pursue a claim or collection of a claim, or achieve a settlement or settlements with any defendants, in which case half of the proceeds of any such claims or settlements will be paid to the Receiver and will be subject to his control and half of the proceeds will be paid to the JLs and will be subject to their control.   To the extent that any Party's professionals are working on a contingency fee basis, then such contingency fee shall be calculated based on that Party's portion of the recovery.

SECTION 3.4.   ASSETS LIQUIDATED IN COORDINATION.   As to assets (as distinguished from claims) that can only be liquidated with the consent and cooperation of both the Receiver and JLs (*e.g.*, the Mountain Partners investment), the JLs and Receiver will split those proceeds equally, with each estate receiving half of the proceeds of such liquidations

(except that this Section shall not alter the overall split of Covered Assets as described in Section 8.1 or the timing and sequence of such distribution as described in Section 8.2 and 8.3).

SECTION 3.5.  FUTURE DISCOVERY OF ASSETS.  If Stanford assets are discovered on or after the Effective Date in a jurisdiction other than one in which the Receiver or the JLs are recognized as of the Effective Date or as of the discovery of such assets, the Receiver and the JLs each agree to inform the other of the discovery as soon as reasonably practicable and the Parties will work to avoid duplicating efforts with respect to the recovery of such assets.

## ARTICLE IV

## DISCOVERY AND OTHER INFORMATION SHARING PROTOCOL

SECTION 4.1.  BROAD SHARING OF INFORMATION.  The JLs and the Receiver Parties, including OSIC, agree to provide one another with unrestricted access to discovery materials (including materials obtained from a third-party other than through a formal discovery process), source documents (those documents in the possession of each estate upon taking office), and pleadings filed in any court (collectively, "Material"), subject only to any legal prohibition, restriction or duty that may be imposed on a party against making disclosure of Material (a "Restriction"). Any such Party that is subject to a Restriction against disclosing Material shall use its reasonable (both as to costs and effort required) best efforts and shall make a good faith attempt at obtaining the right to disclose the same. In Schedule "G", each of the JLs and the Receiver Parties have disclosed the types and categories of documents that are currently in their respective possession that the Party believes are subject to a Restriction.  To the extent documents shared or exchanged pursuant to this section are confidential, the Party who receives such confidential information may use that information but shall take reasonable steps to ensure that the confidentiality of the information is reasonably maintained, such as by filing such

information under seal or further disclosing the information only pursuant to the terms of an appropriate protective order.

SECTION 4.2.   ASSISTANCE TO OTHER PARTIES.   The Receiver and JLs agree, upon request of either one of them or OSIC, to undertake reasonable efforts (both as to costs and scope) to obtain documents in the hands of a third-party if the Party receiving the request has a right to demand such documents from the third-party without the necessity of a formal discovery process.   Any documents requiring confidential treatment will be shared on a confidential basis. No Party is compelled to share work product or attorney-client privileged materials, although the Parties may do so while preserving the privileged status of such materials.   Although neither Party is committing to share work product with one another, the Receiver and the JLs agree to discuss whether and under what circumstances it would be appropriate to share financial forensic work/reports with one another.   The Parties agree that with respect to any particular privileged information that may be shared among the Receiver Parties and the JLs, the Receiver Parties and the JLs may agree that such information will be shared pursuant to the provisions and protections of the Joint Litigation Privilege and Non-Disclosure Agreement by and among the JLs, the Receiver, the Examiner, and OSIC dated September 20, 2012.

SECTION 4.3.   STIPULATION REGARDING US DISCOVERY BY THE JLS.   The Parties will submit an agreed stipulation for approval by the US Court (the "Discovery Stipulation") in Case No. 3:09-CV-0721-N, which shall provide that the JLs will be granted reasonable access to conduct discovery and the right to seek the procurement of trial testimony or exhibits (by Letters Rogatory, the Chapter 15 proceedings, or otherwise) in the United States without having to fulfill the conditions to relief set forth in the US Court's Chapter 15 order dated July 30, 2012, which conditions are set forth on Pages 57 and 58 of the order.   The

Discovery Stipulation will provide that the JLs will seek the consent of the Receiver and Examiner to conduct discovery or to procure evidence for trial on a case-by-case basis, and such consent will not be unreasonably withheld.  Any disputes concerning such a request for taking discovery in the U.S. or obtaining evidence in the U.S. for trial abroad will be resolved on written motion filed with the United States Magistrate Judge assigned by the US Court to handle discovery disputes in connection with litigation filed by the Receiver (or the US Court if no such Magistrate Judge is then assigned).

SECTION 4.4.  DISCOVERY ASSISTANCE BY JLS.  In jurisdictions in which the JLs are recognized, the JLs agree to use reasonable (both as to cost and scope) efforts to assist the Receiver and the OSIC in obtaining access to discovery (including procedural mechanisms to procure evidence for trial) in a manner that is similar (both as to scope of access and as to the procedural mechanism for obtaining that access) to that provided in Section 4.3.

SECTION 4.5.  NON-INTERFERENCE WITH DISCOVERY EFFORTS.  Subject only to the provisions of Section 4.3, the Parties agree not to interfere with any other Party's discovery or investigative efforts.  The Parties shall have the right to gather publicly available information and to conduct other extra-judicial investigative activities (including witness interviews) in each other's territory of recognition or activity without restriction.

SECTION 4.6.  INFORMATION REGARDING FEE STATEMENTS.  The Receiver will continue to file his fee statements with the US Court in the manner he has filed them to date. The JLs agree to submit copies of their fee statements issued after the Effective Date to the Receiver, the Examiner, and a representative of the DOJ for review, but not approval, in a manner that protects the privileged nature of the documents, including redaction (in the sole discretion of the JLs) on a confidential basis, and such fee statements shall not be disclosed by

the Receiver, the Examiner or the DOJ to any other party absent written consent by the JLs. The prospective submission of fee statements will be made quarterly. The JLs agree to submit copies of their redacted (which redactions shall be in the sole discretion of the JLs) historical fee statements (meaning those fee statements covering the period from May 12, 2011, until the Effective Date) to the Examiner and the Receiver on a confidential basis, and neither the Receiver nor the Examiner shall disclose the same to any other party absent the written consent of the JLs.

## ARTICLE V

## THE UNITED KINGDOM PROCEEDINGS

SECTION 5.1. THE CCC PROCEEDING. The SFO, upon the request of the DOJ, and the JLs shall file an agreed application before the CCC seeking approval of a variation to the Restraint Order (the "Varied Restraint Order"). The specific terms of the Varied Restraint Order are attached hereto as Schedule "H", however, in summary it: (a) states that the proceeds of liquidation of the UK Assets shall be distributed as follows: (i) only to the JLs in the sum of US$18 million (or up to US$36 million, as provided in Section 8.2) for use as working capital for the estate of SIB under their administration, and (ii) the balance for a pro rata distribution only to proven Creditor-victims (the "Distribution of the UK Assets"); (b) stays the JLs' application to the CCC to discharge the Varied Restraint Order, and further varies the Varied Restraint Order subject to the parties having liberty to apply to the CCC to supervise and enforce the implementation of the Varied Restraint Order; (c) directs that each party shall bear its own costs of the CCC proceeding and, in doing so, directs that any costs award(s) made in the CCC proceeding shall, to the extent that they have not been satisfied, be set aside; and (d) in all other respects, discharges the terms of the Restraint Order (as amended by Gloster J on 4 August and

17 October 2011). Upon all the UK Assets and Swiss Assets being distributed pursuant to this Agreement, the Varied Restraint Order shall, on the application of the SFO (unopposed by the JL) be discharged.

SECTION 5.2.   DISTRIBUTION OF THE UK ASSETS.   The terms of the Order providing for the distribution of the UK Assets shall ensure that the funds to be distributed by the JLs are distributed on a pro rata basis only to proven Creditor-victims except as set forth in Section 8.4. These funds are to be maintained in a bank account in London in the name of the JLs (the "Distribution Account") and held there until such time as they are transmitted to such Creditor-victims directly and under the supervision of the CCC.

SECTION 5.3.   WRITTEN CONSENT FOR DISTRIBUTIONS.   Save for that portion of the UK Assets detailed at Section 5.1(a)(i) above, any distribution from the Distribution Account may be made with the prior written consent of the DOJ and the SFO, in coordination with the Receiver.   The JLs shall seek such consent in writing from the DOJ and the SFO, with contemporaneous notice to the Receiver, and the DOJ and SFO shall have fourteen (14) business days from receipt of such request to respond to the request.   Should consent be given by both the DOJ and SFO or should both the DOJ and the SFO fail to respond to the JLs within fourteen (14) business days of the dates of their respective receipt of the request, the JLs shall make the proposed distribution from the Distribution Account to the Creditor-victims.   If consent is denied by either the DOJ or the SFO, any distribution from the Distribution Account (other than the amounts referred to in Section 5.1(a)(i) above) shall require an Order of the CCC by application of the JLs upon a minimum of three working days notice to the DOJ, the SFO, and the Receiver. For the purposes of any such application, the DOJ shall consult with the Receiver, and the SFO

will provide legal assistance to the DOJ in accordance with mutual legal assistance agreements between the UK and the United States.

SECTION 5.4.   APPROVAL OF ANTIGUA COURT FOR CCC SUPERVISION.   As part of the approval of this Agreement, the JLs will seek an order of the Antiguan Court that the Antiguan Court will defer to the CCC on the issue of the authority to supervise the distribution of funds from the Distribution Account.   The entry of such an order is considered a necessary component of the Antiguan Court's approval of this Agreement and, as such, entry of such an order is a prerequisite to the effectiveness of this Agreement.   The approved form of the Proposed Order to be submitted before the Antiguan Court is attached hereto as Schedule "E".

SECTION 5.5.   THE UK SUPREME COURT PROCEEDING.   The JLs and the SFO, upon instruction from the DOJ, shall file a joint application in the UKSC seeking an order of discontinuance of the JLs' appeal and the SFO's cross-appeal and with no order as to costs (each party having to bear its own costs in the appeal).

SECTION 5.6. FEES AND COSTS.   Each Party shall bear its own costs of implementing the provisions of Article 5 of this Agreement.

## ARTICLE VI

### THE SWISS PROCEEDINGS

SECTION 6.1.   FORFEITURE.   All Parties shall pursue release and monetization of the Swiss Assets by means of the DOJ's Swiss MLAT and U.S. federal criminal asset forfeiture process as expeditiously as possible, with the proceeds to be distributed as described in Article VIII.   To the extent that the Parties are unable to obtain release and monetization of the Swiss Assets by means of the DOJ's Swiss MLAT and U.S. federal criminal asset forfeiture process (as the Parties expect they will be unable to do with respect to those Swiss Assets that are not

currently frozen), the Parties agree to pursue the release and monetization of the Swiss Assets through other cost-effective and expeditious means. Regardless of the means pursued, the funds realized from the liquidation of the Swiss Assets shall be allocated and distributed as provided in Article VIII below.

SECTION 6.2. DISCONTINUANCE OF SWISS CLAW-BACK PROCEEDINGS. The JLs will dismiss the JLs' Swiss Clawback Claims in respect of the Swiss Assets with prejudice and with no order as to fees or costs (each party having to bear its own fees and costs).

## ARTICLE VII

## THE CANADIAN PROCEEDINGS

SECTION 7.1. THE ONTARIO AND QUEBEC PROCEEDINGS. The Parties agree to seek a hearing to approve the Canadian Minutes of Settlement in both Ontario and Quebec as expeditiously as possible. The JLs will support the Motion for Directions and the Canadian Minutes of Settlement, with the understanding that any funds being held back for legitimate owner claims as described in paragraph 7 of the Minutes of Settlement that are not distributed to proven legitimate owners will be released by the Attorney General of Ontario to the DOJ for distribution by the Receiver, as per the terms of the Canadian Minutes of Settlement. The JLs shall cause the motions referred to in Recitals EE and FF above to be withdrawn.

SECTION 7.2. SAVINGS CLAUSE. To the extent that the Parties are unable to obtain release and monetization of the Canada Assets by means of the procedure contemplated by Section 7.1, the Parties agree to pursue the release and monetization of the Canada Assets through other cost-effective and expeditious means. Regardless of the means pursued, the funds realized from the liquidation of the Canada Assets shall be allocated and distributed as provided in Article VIII below.

## ARTICLE VIII

## ALLOCATION AND DISTRIBUTION OF THE COVERED ASSETS PROTOCOL

SECTION 8.1.   APPORTIONMENT.   All or any portion of the Covered Assets recovered by any of the Parties hereto from the United Kingdom, Switzerland or Canada, including without limitation accounts frozen or subject to a request by the DOJ to freeze accounts in the United Kingdom, Switzerland or Canada, shall be monetized and then allocated among the JLs and the Receiver as follows:

(a)    **Canada**:   The proceeds from the monetization of the Canada Assets shall be allocated 100% to the Receiver.

(b)    **UK**:   The proceeds from the monetization of the UK Assets shall be allocated 100% to the JLs.

(c)    **Switzerland**: The proceeds from the monetization of the Swiss Assets shall be allocated to the Receiver and the JLs in a ratio of 2.2 to 1 ("the Payment Ratio"). Thus, for example, if the funds realized from the liquidation of the Swiss Assets amount to US$208 million, then US$143 million will be allocated to the Receiver and US$65 million will be allocated to the JLs.

SECTION 8.2. ALLOCATION OF WORKING CAPITAL TO THE JLS. The JLs will be allocated up to US$36 million of working capital for the estate that they administer (the "Working Capital") from the UK Assets. The Working Capital shall be funded as follows:

(a)    on or about the Effective Date, Working Capital in the amount of US$18 million will be released to the JLs from the UK Assets;

(b)    the balance of the UK Assets (the "Balance") shall be maintained in the Distribution Account in London, England as set forth in Section 5.2, and, with the

exception of a further US$18 million of such funds which shall be segregated from the Balance and deposited into a separate bank account in London, England in the names of the JLs (the "Supplemental Working Capital Account"), the Balance shall be made available for prompt distribution in accordance with Section 5.3; and

(c)     for every three dollars in Swiss Assets that are transferred to the JLs for distribution to victims as described in Section 8.3, the JLs may draw out, as further Working Capital, one dollar (US) from the US$18 million on deposit in the Supplemental Working Capital Account.

In no event shall the Working Capital to be distributed to the JLs under the terms of this Agreement exceed US$36 million.  For any funds that the JLs withdraw from the Supplemental Working Capital Account pursuant to subsection (c) of this section, the JLs shall provide written notice (which can be by email) to DOJ and the Receiver prior to or contemporaneous with the withdrawal of such funds.  Any Working Capital (as well as any funds in the Supplemental Working Capital Account that have not yet been drawn out as Working Capital) that the JLs determine, in their sole judgment, are not needed to fund their operations and litigation claims will be distributed to Creditor-victims pursuant to the procedures identified in Sections 5.2 and 5.3.  The Working Capital cannot be used to fund any litigation adverse to any other Party to this Agreement or the SFO.  The Working Capital shall not be used to pay any portion of the Former JLs' claim for US$18 million in professional fees and disbursements.  The Working Capital shall be deemed to be impressed with a Quistclose trust such that it may only be applied to pay for the costs of the administration and litigations of the SIB estate incurred after the appointment of the JLs or to be distributed to Creditor-victims.

SECTION 8.3.  DISTRIBUTION OF SWISS ASSETS.  The portion of the Swiss Assets allocated to the JLs shall be transferred by the DOJ to the JLs by depositing the same into the Distribution Account in London, England, within fifteen working days from the DOJ's receipt of the funds from the FOJ.  The DOJ shall notify the Receiver and the JLs of the release date of the Swiss Assets forthwith upon the DOJ having knowledge of when all or any portion of the Swiss Assets are to be released.  All or any portion of the Swiss Assets shall be transferred by the DOJ to the Receiver and the JLs, as set forth above, as soon as they become available and in proportion to their agreed interest in those Assets as established by the Payment Ratio.  The payment to which the JLs are entitled shall be (i) made in accordance with their agreed interest in those forfeited funds, pursuant to the Payment Ratio, (ii) deposited by the DOJ into the Distribution Account, and (iii) distributed as soon as the JLs are ready to make a distribution.

SECTION 8.4.  AUTHORIZED USE OF DISTRIBUTIONS.  All of the Covered Assets that are allocated to the JLs and the Receiver, except for the Working Capital, will be distributed to Creditor-victims and only to Creditor-victims.  Distributions to Creditor-victims from the Covered Assets will be made on a pro rata basis, except for the small amount of Creditor-victims who are required to be paid in full by the JLs up to EC$20,000 pursuant to the International Business Corporation Act of Antigua and Barbuda, who will be paid from the UK Assets portion of the Covered Assets.  Any other claimants who are entitled to payment from either the Receiver or the JLs will be paid from funds other than the Covered Assets or the funds realized therefrom.  The JLs and the Receiver agree that to be entitled to payment, a claimant must demonstrate a net pecuniary loss of a specific amount resulting directly from one or more deposits made by the Creditor-victim.  A recognized loss is determined by the value of funds deposited by a Creditor-victim less any refunds, dividends, earnings, or similar returns.  A

recognized loss does not include collateral expenses incurred by the Creditor-victim, including, but not limited to, investigative costs, lost wages, and attorney fees. A claimant is to be deemed ineligible to participate in the distribution if the JLs or the Receiver are in possession of evidence that the claimant was a knowing contributor to, participant in, or beneficiary of, any of the fraud schemes committed by Stanford and/or any of his co-conspirators or collaborators.

## ARTICLE IX

## DISPOSITION OF CHAPTER 15 COURT PROCEEDINGS

SECTION 9.1.  DISPOSITION OF THE CHAPTER 15 APPEALS.  The US Court's July 30, 2012 Chapter 15 order will not be changed.  Notwithstanding the foregoing, however, the actions that this Agreement authorizes the JLs to take shall not be deemed to be a violation of the Chapter 15 order or be construed as any act precluded by the Chapter 15 Order and the conditional relief granted therein, notwithstanding anything in the Chapter 15 Order to the contrary. The JLs will dismiss their appeal in Case No. 12-10157 in the US Court of Appeals for the Fifth Circuit once this agreement has been executed and has received all necessary approvals as provided in Section 1.4. The JLs will also allow the 180-day reinstatement period in Case No. 12-10836 in the US Court of Appeals for the Fifth Circuit to expire.  The JLs will issue a statement, in a form acceptable to the Receiver and the Examiner, that they have agreed to the dismissal of their appeals not because they agree that the orders in question are correct but to benefit the victims through cross-border cooperation between the two estates and the avoidance of continuing inter-estate litigation. The SEC and Receivership Parties have entered into this Agreement, under which the JLs have agreed to the dismissal of their appeals, not because they doubt the that the orders in question are correct but likewise to benefit the victims through cross-border cooperation between the two estates and the avoidance of continuing inter-estate

litigation. No provision of this Agreement shall be construed to limit any party's ability to take a position in any forum, or to affect the analysis in any forum, regarding the issue whether the legal separateness of the various entities in the US Estate should be disregarded for any or all purposes.

**ARTICLE X**

**REPRESENTATIONS AND WARRANTIES**

SECTION 10.1.  AUTHORITY; NONCONTRAVENTION.  The United States, by and through DOJ and the SEC, has all requisite power and authority to enter into this Agreement and to perform each and every agreement, obligation, and covenant to be performed by it under this Agreement.  The execution and delivery of this Agreement and the performance by the DOJ and SEC of the agreements, obligations, and covenants to be performed by them hereunder have been duly authorized by all necessary action on the part of the United States, DOJ and the SEC.  This Agreement when duly executed and delivered by the DOJ and SEC constitutes the legal, valid, and binding obligation of the DOJ and SEC and their departments and agencies, enforceable in accordance with its terms.

SECTION 10.2.  AUTHORITY OF THE JLS.  The JLs have full power and authority to enter into and perform this Agreement, subject to approval by the Antiguan Court.  Upon such Court approval, the JLs have all such power and authority necessary to effectuate the performance of this Agreement.

SECTION 10.3.  AUTHORITY OF THE RECEIVER, THE EXAMINER, AND OSIC. The Receiver, the Examiner, and OSIC have full power and authority to enter into and perform this Agreement, subject to approval by the US Court.  Upon such Court approval the Receiver,

the Examiner, and OSIC shall have all such power and authority necessary to effectuate the performance of this Agreement.

**ARTICLE XI**

**MISCELLANEOUS PROVISIONS**

SECTION 11.1.   COMMERCIALLY REASONABLE EFFORTS.   Except where otherwise provided in this Agreement, each of the Parties hereto shall use their commercially reasonable efforts to take promptly or cause to be taken all actions, and to do promptly or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper and advisable under applicable law and otherwise to consummate and make effective transactions contemplated by this Agreement.

SECTION 11.2. AMENDMENT, EXTENSION, WAIVER. This Agreement may not be amended except by an instrument in writing signed on behalf of all of the Parties to be bound hereby and approved by the relevant tribunals.   A Party may (a) extend the time for the performance of any of the agreements, obligations, covenants, or other acts of the other Parties, (b) waive any inaccuracies in the representations and warranties of the other Parties contained in this Agreement or in any document delivered pursuant to this Agreement or (c) waive compliance by another Party with any of the agreements, obligations or covenants contained in this Agreement.   Any agreement on the part of a Party to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such Party.   The failure of any Party to this Agreement to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of such rights.

SECTION 11.3.   NOTICES.   All notices, requests, claims, demands, and other communications under this Agreement shall be in writing and shall be deemed given if delivered

personally, emailed (so long as receipt is confirmed), or sent by overnight courier (providing proof of delivery) to the Parties at the following addresses (or at such other address for a Party as shall be specified):

(a) If to the DOJ to:

United States Department of Justice
Criminal Division
Asset Forfeiture and Money Laundering
    Section
1400 New York Ave., NW, Suite 10100
Washington, DC 20530
Attn: Gene Patton
Via Email to: Gene.Patton@usdoj.gov

(b) If to the SEC to:

United States Securities and Exchange
    Commission
Fort Worth Regional Office
Burnet Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, TX 76102
Attn: David Reece
Via Email to: reeced@sec.gov

(c) If to the JLs to:

Astigarraga Davis
701 Brickell Ave., Suite 1650
Miami, Florida 33131
    Attn: Edward H. Davis, Jr.
    Via Email to: edavis@astidavis.com

And to:

Martin Kenney & Co., Solicitors
Third Floor, Flemming House
Road Town, Tortola
British Virgin Islands
West Indies VG 1110
    Attn: Martin S. Kenney
    Via Email: mkenney@mksolicitors.com

(d) If to the Receiver to:

Ralph S. Janvey
Krage & Janvey, L.L.P.
2100 Ross Avenue, Suite 2600

Dallas, Texas 75201
Via Email to:  rjanvey@kjllp.com

And to:

Baker Botts L.L.P.
98 San Jacinto Blvd., Suite 1500
Austin, Texas 78701
Attn:  Kevin M. Sadler
Via Email to:  kevin.sadler@bakerbotts.com

(e) If to the Examiner or OSIC to:

John J. Little
Little Pedersen Fankhauser LLP
901 Main Street, Suite 4110
Dallas, Texas 75202
Via Email to: jlittle@lpf-law.com

SECTION 11.4.  INTERPRETATION.  When a reference is made in this Agreement to an Article, Section, or Schedule, such reference shall be to an Article or, Section of, or a Schedule to, this Agreement unless otherwise indicated.   The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  Whenever the words "include," "includes," or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The words "hereof," "herein," and "hereunder," and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  The words "and" and "or" shall be interpreted broadly to have the most inclusive meaning, regardless of any conjunctive or disjunctive tense.  All terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined.  The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such terms.  Any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means in

the case of any agreement or instrument, such agreement or instrument as from time to time amended, modified or supplemented, including by waiver or consent and, in the case of statutes, such statutes as in effect on the date of this Agreement. References to a person are also to its permitted successors and assigns. The Parties have participated jointly in the negotiations and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption and burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any Federal, state, local or foreign statute or law shall be deemed to also refer to any amendments thereto and all rules and regulations promulgated thereunder, unless the context requires otherwise. Where this Agreement requires a Party to take an action but does not specify a deadline for acting, the Party shall take such action as soon as reasonably practicable.

SECTION 11.5. COUNTERPARTS. This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same instrument. A facsimile or e-mailed PDF copy of a signature page shall be deemed to be an original signature page.

SECTION 11.6. ENTIRE AGREEMENT; NO THIRD-PARTY BENEFICIARIES. This Agreement (including the documents and instruments referred to herein and the Schedules attached hereto) (a) constitutes the entire agreement, and supersedes all prior agreements and understandings, both written and oral, between the Parties with respect to the subject matter in this Agreement and (b) is not intended to confer upon any person other than the Parties any rights or remedies under or by reason of this Agreement. The parties acknowledge that each is unaware of any person or entity that is an intended third party beneficiary of this Agreement. Each Party further acknowledges that other than as stated in this Agreement, no other Party, or

employee, agent, representative, or attorney of any other Party, has made any promises, representations, or warranties to induce it to enter into this Agreement. Each Party further acknowledges that it has not executed this Agreement in reliance upon any promise, representation, or warranty, other than promises, representations, or warranties that are expressly set forth in this Agreement.

SECTION 11.7.   ASSIGNMENTS.   Neither this Agreement nor any of the rights, interests, or obligations under this Agreement shall be assigned, in whole or in part, by operation of law or otherwise by any Party hereto without the prior written consent of the other Parties. Any assignment in violation of the proceeding sentence shall be void. Subject to the preceding two sentences, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the Parties and their respective successors and assigns.

SECTION 11.8. SEVERABILITY. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible to the fullest extent permitted by applicable law in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible. The foregoing is without prejudice to the fact that US and Antiguan Court approval foreseen herein must be of the entirety of this Agreement for any portion hereof to be effective and does not modify the conditions on the effectiveness of this agreements set forth in Section 1.4 hereof.

SECTION 11.9.  DISPUTE RESOLUTION.  This Agreement shall be governed by and construed in accordance with the laws of the State of Texas applicable to contracts executed in and to be performed in that jurisdiction. With the limited exception of disputes arising under the Discovery Stipulation under Section 4.3 above, the Parties hereby agree to submit any or all disputes arising between them concerning a breach or alleged breach of this Agreement to be resolved by arbitration seated in Washington, DC before a sole arbitrator, who shall speak English and be a lawyer or retired judge by profession, and who shall be jointly designated by the Parties.  If the Parties are unable to reach agreement on a sole arbitrator, the Parties shall formulate a list of five (5) potential arbitrators acceptable to the Parties, from which list the International Centre for Dispute Resolution (the "ICDR") of the American Arbitration Association shall select the sole arbitrator.  All arbitral proceedings shall be conducted under the protection of confidentiality. All arbitral proceedings shall be administered by the ICDR and all such proceedings shall be governed by the UNCITRAL International Commercial Arbitration Rules.  EACH PARTY HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF THIS AGREEMENT. Notwithstanding the foregoing, the Parties do not agree to arbitrate any matter other than a breach or alleged breach of the Agreement. If any dispute between the Parties contains or includes allegations of a breach or alleged breach of this Agreement and also contains or includes other matters, then only the allegations of a breach or alleged breach of this Agreement will be subject to arbitration, irrespective of the extent to which the breach or alleged breach of this Agreement is or may be intertwined with such other matters. Except to the extent otherwise expressly set forth herein, nothing in this Agreement shall be construed to diminish the jurisdiction of the United States District Court for the Northern District of Texas or the High

Court of Antigua and Barbuda or to deprive the United States District Court for the Northern District of Texas or the High Court of Antigua and Barbuda of any of the assets that are subject to their respective jurisdictions and control (except that the High Court of Antigua and Barbuda is required, as a condition of the effectiveness of this Agreement, to defer to the UK Court to the extent provided in Section 5.4).

SECTION 11.10.    JURISDICTION OVER RECEIVER AND JLs.   To the extent applicable, the appearance before the Antiguan Court and the US Court by the Receiver and the JLs respectively, shall not, in and of itself, subject the Receiver or the JLs to the general jurisdiction of that court for any purpose other than any relief that the Receiver or the JLs may be seeking from such court at such hearing or in such proceeding.   The JLs are subjecting themselves to the jurisdiction of the US Court only as pertains to the Chapter 15 proceeding, as provided for in 11 U.S.C. § 1510 of the Bankruptcy Code and, to the extent they seek discovery relief from the US Court, with the consents foreseen herein, such expressed or implied submission to the jurisdiction of the US Court shall be limited to the corresponding discovery that is the subject of that submission.

SECTION 11.11. SCHEDULES. The Schedules attached to this Agreement are hereby made a part of this Agreement.

SECTION 11.12. INVESTORS COMMITTEE RIGHTS AND OBLIGATIONS.   No provision of this agreement shall be deemed to modify, alter, limit or otherwise restrict or expand the rights and obligations of OSIC pursuant to orders entered by the US Court.

**THE UNITED STATES OF AMERICA**, by and through the United States Department of Justice

By: _____

Date: _____ 3/11/13 _____

█████  ████████████████████

██████

**MARCUS A. WIDE AND HUGH DICKSON**, in their capacities as the Court appointed Joint Liquidators of Stanford International Bank Limited (in Liquidation) and Stanford Trust Company Limited (in Liquidation)

By: _____

Mr. Marcus A. Wide
Date:

And By: _____

Mr. Hugh Dickson
Date:

**RALPH S. JANVEY**, in his capacity as Court appointed Receiver for the US Receivership Estate

By: _____

Mr. Ralph Janvey
Date:

**U.S. SECURITIES AND EXCHANGE COMMISSION**

By: _____

Date:

**THE UNITED STATES OF AMERICA,** by and through the United States Department of Justice

By:  _____

Date:

By:  _____

Date:

**MARCUS A. WIDE AND HUGH DICKSON,** in their capacities as the Court appointed Joint Liquidators of Stanford International Bank Limited (in Liquidation) and Stanford Trust Company Limited (in Liquidation)

By:  _____
Mr. Marcus A. Wide
Date: 8 March 2013

And By:  _____
Mr. Hugh Dickson
Date: 8/3/13

**RALPH S. JANVEY,** in his capacity as Court appointed Receiver for the US Receivership Estate

By:  _____
Mr. Ralph Janvey
Date:

**U.S. SECURITIES AND EXCHANGE COMMISSION**

By:  _____

Date:

**THE UNITED STATES OF AMERICA,** by and through the United States Department of Justice

By: _____

Date:

By: _____

Date:

**MARCUS A. WIDE AND HUGH DICKSON,** in their capacities as the Court appointed Joint Liquidators of Stanford International Bank Limited (in Liquidation) and Stanford Trust Company Limited (in Liquidation)

By: _____
    Mr. Marcus A. Wide
    Date:

And By: _____
    Mr. Hugh Dickson
    Date:

**RALPH S. JANVEY,** in his capacity as Court appointed Receiver for the US Receivership Estate

By: *Ralph Janvey*  _____
    Mr. Ralph Janvey
    Date: 3 | 8 | 13

**U.S. SECURITIES AND EXCHANGE COMMISSION**

By: _____

Date:

**THE UNITED STATES OF AMERICA**, by and through the United States Department of Justice

By: _____

Date:

By: _____

Date:

**MARCUS A. WIDE AND HUGH DICKSON**, in their capacities as the Court appointed Joint Liquidators of Stanford International Bank Limited (in Liquidation) and Stanford Trust Company Limited (in Liquidation)

By: _____
Mr. Marcus A. Wide
Date:

And By: _____
Mr. Hugh Dickson
Date:

**RALPH S. JANVEY**, in his capacity as Court appointed Receiver for the US Receivership Estate

By: _____
Mr. Ralph Janvey
Date:

**U.S. SECURITIES AND EXCHANGE COMMISSION**

By: _David Reavley_

Date: March 11, 2013

**JOHN J. LITTLE**, in his capacity as Court appointed Examiner for the Stanford Receivership Estate

By: _____

Mr. John J. Little

Date: MARCH 8, 2013

**THE OFFICIAL STANFORD INVESTORS COMMITTEE**

By: _____

Mr. John J. Little, Chairman

Date: MARCH 8, 2013

# Schedule "A"
## to
# Settlement Agreement

# List of Frozen Assets in the UK

## List of Frozen Assets in the UK

### Accounts

Credit Suisse, Account Nos. ███████ and ███████

HSBC, Account No. ███████

Marex, Account No. ███████

### Securities

GLG Emrg Mkts Spec Shs A, ███████

GLG Market Neutral Side Pocket - Usd Class, ███████

Cheyne Spec SIT Realsing Fund CL K (USD), ███████

Argo Special Situation Fund (SSF), ███████

Eddington Triple A Side Pocket S2 – ███████

Cane Global Macro Class A Series 1107, ███████

Mountain Super ANG CHF0.10 (BR), ███████

Cleantech Inv AG CHF1.00 (BR), ███████

Bluehill ID AG CHF1.00, ███████

# Schedule "B"
## to
# Settlement Agreement

# List of Swiss Assets

## List of Frozen Assets in Switzerland

### Accounts

SocGen Private Banking, Account No. ███

SocGen Private Banking, Account No. ███████

Julius Bär, Account No. ████

Coutts & Co. AG Zurich, Account No ██████

Coutts & Co. AG Zurich, Account No. █████

Coutts & Co. AG Zurich, Account No. █████

Piguet Galland & Cie. SA Geneva*, Account No. ████

Credit Suisse Zurich, Account No. ██████

SocGen Private Banking, Account No. ████

UBP Geneva Bank of Antigua Ltd. , Account No. ██████

SocGen Private Banking, Account No. ████

SocGen Geneva Private Banking, Account No. █████

RBS Coutts Geneva/Southpac Life Insurance Limited, Account No. ██████

## List of Assets in Switzerland on Which Freeze Has Recently Been Lifted

### Accounts

RBS Coutts Geneva, Account No. ███████

RBS Coutts Geneva, Account No. ██████

# Schedule "C"
## to
# Settlement Agreement

# List of Frozen Assets in Canada

## List of Frozen Assets in Canada

### Accounts

Toronto-Dominion Bank, Account No. ████████████

Toronto-Dominion Bank, Account No. ████████████

Toronto-Dominion Bank, Account No. ████████████

Toronto-Dominion Bank, Account No. ████████████

Toronto-Dominion Bank, Account No. ████████████

Toronto-Dominion Bank, Account No. ████████████

Toronto-Dominion Bank, Account No. ████████████

Toronto-Dominion Bank, Account No. ████████████

Toronto-Dominion Bank, Account No. █████████

Toronto-Dominion Bank, Account No. ████████████

TD Waterhouse, Account No. ██████

# Schedule "D"
## to
## Settlement Agreement

# Form of Proposed Order to be Sought by the Receiver from the US Court

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 3:09-CV-0298-N |
| | § | |
| STANFORD INTERNATIONAL BANK, LTD., ET AL., | § | |
| | § | |
| | § | |
| Defendants. | § | |
| In re: | § | |
| | § | |
| STANFORD INTERNATIONAL BANK, LTD., | § | Civil Action No. 3:09-CV-0721-N |
| | § | |
| Debtor in a Foreign Proceeding. | § | |
| | § | |

**ORDER GRANTING JOINT MOTION OF THE SEC, RECEIVER, EXAMINER, AND OFFICIAL STANFORD INVESTORS COMMITTEE TO APPROVE SETTLEMENT AGREEMENT AND CROSS-BORDER PROTOCOL**

Before the Court is the Joint Motion of the SEC, the Receiver, the Examiner, and the Official Stanford Investors Committee to Approve the Settlement Agreement and Cross-Border Protocol. The Court has reviewed the Motion, any responses and replies, and the applicable authorities. The Court finds the Motion to be well-taken. Therefore, the Motion shall be and is hereby GRANTED. It is therefore ORDERED that the Settlement Agreement and Cross-Border Protocol, entered into by and among the SEC, the Department of Justice, the Receiver, the Examiner, the Official Stanford Investors Committee, and the Joint Liquidators shall be and is hereby APPROVED. The parties to the Settlement Agreement and Cross-Border

Protocol are hereby authorized to perform in accordance with their rights and obligations as outlined in the Settlement Agreement and Cross-Border Protocol.

Signed on _____, 2013.

_____
HONORABLE DAVID C. GODBEY
UNITED STATES DISTRICT JUDGE

# Schedule "E"
# to
# Settlement Agreement

# Form of Proposed Order to be Sought by the JLs from the Antiguan Court

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
ANTIGUA AND BARBUDA

Claim No. ANUHCV 2009/0149

In the Matter of Stanford International Bank Limited (In Liquidation)

-and-

In the Matter of the International Business Corporations Act, Cap 222 of the
Laws of Antigua and Barbuda

-and-

In the Matter of an Application seeking the Court's Directions and Approvals


MARCUS A. WIDE AND HUGH DICKSON AS JOINT LIQUIDATORS OF STANFORD
INTERNATIONAL BANK LIMITED (IN LIQUIDATION)

Applicants

---

DRAFT ORDER
[Approval of Settlement Agreement and Cross Border Protocol entered into by the Joint
Liquidators, US Receiver, the US Securities and Exchange Commission, the Official
Stanford Investor's Committee, the US Department of Justice and the US Court Appointed
Examiner John J. Little]

---

BEFORE THE HONOURABLE [                    ] IN CHAMBERS

DATED: [        ] March, 2013.

ENTERED: [            ] March, 2013.

UPON READING (a) the Amended Notice of Application dated [    ] March 2013, (b) the Eighth
Affidavit of Marcus Wide sworn on 22nd May 2012; and (c) the Affidavit of Mark McDonald
sworn on [DATE]; and (d) the Settlement Agreement and Cross Border Protocol entered into
between the Joint Liquidators of Stanford International Bank (the "Joint Liquidators"), the US
Department of Justice (the "DoJ"), the US Securities Exchange Commission (the "SEC"), the US

Court Appointed Examiner, John J. Little (the Examiner") and the Official Stanford Investor's Committee (as defined in the Settlement Agreement) ("OSIC") (together the "Settlement Parties") on [ ] March 2013 (the "Settlement Agreement")

**AND UPON** the Court finding that the execution of, and compliance with the rights and obligations under the Settlement Agreement by the Joint Liquidators, is consistent with the performance and exercise of the Joint Liquidators' functions and duties under the International Business Corporations Act Cap 222 of Antigua and Barbuda (the "Act") (including under section 244 (1)(a) of the Act, which concerns the disclosure of information relating to the business affairs of a banking corporation's customer).

**AND UPON HEARING** counsel for the Applicant [          ] of [          ]

It is hereby **ORDERED** as follows:

1. The terms of the Settlement Agreement as attached at Appendix "A" to this Order are approved.

2. In accordance with section 5.4 of the Settlement Agreement, this Court hereby defers the supervision over, and authorisation of, the distribution of the approximately US$80 million of funds currently frozen in the United Kingdom, to the Central Criminal Court of England and Wales, in case number POCA No.9 of 2009.

3. The costs of this application be costs in the liquidation.

_____

By the Court

(Deputy) Registrar

# Schedule "F"
# to
# Settlement Agreement


# List of Claw-Back and

# Breach of Fiduciary Duty Claims (as *per* ¶3.2)

**Schedule F**



**Schedule F**



**Schedule F**



**Schedule F**



**Schedule F**



**Schedule F**



**Schedule F**



Schedule F



**Schedule F**



**Schedule F**



# Schedule "G"
## to
## Settlement Agreement

# Disclosure of Types and Categories

# of Documents Currently in the Possession

# of the JLs and the Receiver Parties (as *per* ¶4.1)

The following types and categories of documents are documents which are in the Joint Liquidators' possession and which are subject to a Restriction:

| Jurisdiction | Types / Categories of Documents |
|---|---|
| Antigua | (i) documents, information and materials disclosed by opponents and third parties; and<br><br>(ii) any Affidavit which has not been referred to open Court; and<br><br>(iii) documents, information and materials disclosed under compulsion by any party; and<br><br>(iv) any Court filing, save for a Claim Form, any Order or Judgment given or made in Court; and a Notice of Appeal;<br><br>in the following proceedings in the High Court of Antigua and Barbuda:<br><br>(a) Stanford International Bank Limited (In Liquidation) Claim No. ANUHCV 2009/0149;<br>(b) Igors Kippers v Stanford International Bank (In Liquidation) Claim No. ANUHCV 2009/0347;<br>(c) Jevgenijs Eugene Kippers v Stanford International Bank (In Liquidation) Claim No. ANUHCV 2009/0348;<br>(d) Mission Finance Ltd v Stanford International Bank (In Liquidation) Claim No. ANUHCV 2009/0349;<br>(e) Elena Spivak v Stanford International Bank (In Liquidation) Claim No. ANUHCV 2009/0350;<br>(f) Stanford International Bank Limited (In Liquidation) –v- Allen Stanford, Andrea Stoelker & Ors Claim No. ANUHCV 2011/0478;<br>(g) Stanford International Bank Ltd (In Liquidation v. Franciscus P. Vingerhoedt, and Ors ANUHCV2012/0319; and<br>(h) Stanford International Bank Limited (In Liquidation) v (1) Bank of Antigua Limited; (2) Robert Allen Stanford Claim No. ANUHCV2012/0436. |
| Canada | (i) Ontario<br><br>Stanford International Bank (In Liquidation) v Toronto Dominion Bank – Case No. CV-12-9780-00CL (formerly CV-11-433385)<br><br>Any evidence obtained through documentary discovery, examination for discovery, inspection of property or examination for discovery by written questions and information obtained from these aforementioned sources for any purposes other than those of the proceeding in which the evidence was obtained. |

|  | (ii) Quebec |
|---|---|
|  | In respect of the TD Bank case in Quebec, there are currently no documents in the JLs' possession which are subject to a legal prohibition, restriction or duty of non-disclosure. |
|  | However, any evidence obtained through documentary discovery, examination for discovery, inspection of property or examination for discovery by written questions and information obtained from these aforementioned sources may be used only for purposes of the proceeding in which the evidence was obtained. |
| United Kingdom | UK Central Criminal Court - Stanford International Bank Limited (in liquidation) (POCA 9 of 2009) |
|  | 1.      The heads of terms agreement for funding between the SIB estate and Sorrell Investments Limited dated 21 June 2011 (the "Term Sheet") and any information obtained (whether oral or written) as a result of entering into or performing the resulting settlement agreement dated 29 November 2011 between Sorrell and SIB (the "Settlement Agreement", attached) which relates to: (a) the non-public information or documentation provided to Sorrell by SIB in relation to the Term Sheet; (b) the Term Sheet itself (including all supporting pricing and calculations); (c) the provisions of the Settlement Agreement; and (d) the negotiations proceeding the execution of the Settlement Agreement. |
|  | 2.      Any information, documents and materials covered by orders made by Gloster J on 15 March and 1 June 2012 relating to the Confidential Annex to the Witness Statement of Marcus Wide. |
| United States | Documents produced by HSBC Bank plc that are subject to a confidentiality agreement. |
| Switzerland | FINMA Ancillary Bankruptcy Proceeding - Stanford International Bank Ltd (In Liquidation) No. S1057082: all information, documents and materials contained in the FINMA Ancillary Bankruptcy Proceeding files in Switzerland and to which the Joint Liquidators obtained access through FINMA. |
|  | Documents obtained from the prosecutor's file in pending domestic criminal proceedings. |

The following types and categories of documents are documents which are in the Receiver's possession and which are subject to a Restriction:

| Jurisdiction | Types / Categories of Documents |
|---|---|
| United States | Documents produced by HSBC Bank plc that are subject to a confidentiality agreement. |
| United States | Documents produced by Societe Generale pursuant to request under Hague Convention. |

# Schedule "H"
# to
# Settlement Agreement

# Form of Consent Order to Govern
# the Liquidation and Distribution of the
# UK Assets (as *per* ¶5.1)

POCA No. 9 of 2009

<u>IN THE CENTRAL CRIMINAL COURT</u>

Before the Right Honourable Lady Justice Gloster DBE
[date]

IN THE MATTER OF THE PROCEEDS OF CRIME ACT 2002
(EXTERNAL REQUESTS AND ORDERS) ORDER 2005

AND IN THE MATTER OF:

(1) ROBERT ALLEN STANFORD
(2) JAMES DAVIS
(3) LAURA PENDERGAST-HOLT

<u>Defendants</u>

BETWEEN:-

STANFORD INTERNATIONAL BANK LIMITED
(acting by its Joint Liquidators)

<u>Applicant</u>

-and-

THE DIRECTOR OF THE SERIOUS FRAUD OFFICE

<u>Respondent</u>

---

ORDER

---

**UPON THE APPLICANT AND RESPONDENT** ("the Parties") coming to terms as part of a general Settlement Agreement (the terms of which are annexed to this Order) between:

(i)  The Department of Justice of the United States of America ("DoJ");

(ii) The Joint Liquidators of Stanford International Bank Limited (in liquidation) and Stanford Trust Company Limited (in liquidation) ("the Joint Liquidators");

(iii) The United States Securities and Exchange Commission;

(iv) The US District Court appointed Receiver for Stanford International Bank Limited and other companies and individuals ("The Receiver");

(v) John J. Little, in his capacity as Examiner appointed by the US District Court; and

(vi) The Official Stanford Investors Committee

("the Settlement Agreement")

**AND UPON THE APPLICANT AND RESPONDENT** agreeing that this Order shall constitute full and final settlement of all matters arising between them as at the date of this Order in proceedings related to and arising from the Restraint Order made by His Honour Judge Kramer QC sitting at the Central Criminal Court on 7th April 2009 and the Restraint Order made by the Court of Appeal on 25 February 2010,

**AND IN CONSIDERATION OF** each Party entering into the Settlement Agreement,

**AND BY CONSENT,**

**IT IS ORDERED THAT:**

1. The Restraint Order of the Court of Appeal dated 25 February 2010, as amended by Mrs Justice Gloster on 4 August 2011 and 17 October 2011 ("the Restraint Order"), shall be varied so that paragraphs 1-7 of that Order be discharged and replaced as follows:

"1.     Save as provided for in this Order, SIB shall not, until further order, remove from England and Wales the assets listed in Schedule B to this Order.

2.     SIB, by its Joint Liquidators, may convert the assets listed in Schedule B to this Order into cash. Save as provided for in paragraphs 3-5 below, those funds, and any sums held in bank accounts by the Joint Liquidators as of the date of this Order, shall be paid into the bank account in the UK, which shall be designated as the Distribution Account ("the Distribution Account"), the bank, branch, sort code and account number of which

shall be notified to the SFO not more than two business days after funds have been deposited.

3.      SIB, by its Joint Liquidators, shall retain the sum of US$18 million from funds held in bank account(s) and/or the proceeds of liquidation of the assets listed in Schedule B as working capital of the liquidation.

4.      SIB, by its Joint Liquidators, shall deposit the sum of US$18 million from funds held in bank account(s) and/or the proceeds of liquidation of the assets listed in Schedule B into a further designated account ("the Funding Reserve Account"), the bank, branch, sort code and account number of which shall be notified to the SFO not more than two business days after funds have been deposited.

5.      SIB, by its Joint Liquidators, shall be permitted to deal with the funds described in paragraphs 3 and 4 above in accordance with the provisions of sections 5.1 and 8.2 of the Settlement Agreement.

6.      For any funds that the JLs withdraw from the Funding Reserve Account, the JLs shall provide written notice (which can be by email) to the DoJ and the Receiver prior to or contemporaneous with the withdrawal of such funds.

7.      The funds held in the Distribution Account, and any surplus sums held in the Funding Reserve Account as may become available for distribution in accordance with the provisions of section 8.2 of the Settlement Agreement, shall be dealt with as follows:

(i)      The Joint Liquidators shall distribute the funds in the Distribution Account (and any surplus sums held in the Funding Reserve Account) only to Creditor-victims (as defined in the Settlement Agreement), which Creditor-victims shall rank *pari passu* as between each other, such that each distribution to each Creditor-victim shall be a *pro rata* share of each total distribution, reflecting the proportion which each Creditor-victim's admitted claim bears to the total combined value of all Creditor-victims' admitted claims, except as to those Creditor-victims whose claim is admitted in an amount less than EC$20,000, who shall be paid their claims in full.

(ii)     Before making any distribution in accordance with paragraph 6(i) above the Joint Liquidators shall give 14 business days' notice of their intention to do so to the SFO and the DoJ, and the Receiver, and shall make such

distribution only in the circumstances set out in paragraphs 6(iii) and 6(iv) below.

(iii)   If consent is given by the SFO and the DoJ (and such consent is not to be unreasonably withheld) to make the distribution notified in accordance with paragraph 6(ii) above, or both the SFO and the DoJ fail to respond within 14 business days' of their respective receipt of the Joint Liquidators' notice given in accordance with paragraph 6(ii) above, the Joint Liquidators shall make the proposed distribution direct to Creditor-victims forthwith.

(iv)   If consent is withheld by the SFO and/or the DoJ, the Joint Liquidators may make an application to the Court for directions, but:

(a) Such application shall be made on notice to the SFO, the DoJ and the Receiver, giving not less than three clear working days' notice; and
(b) If on such an application the Court directs that a distribution be made, the Joint Liquidators shall make a distribution in accordance with the directions of the Court.

(v)   The parties have liberty to apply in relation to any aspect of this Order. For the avoidance of doubt this Court shall have exclusive jurisdiction to determine, as between the Joint Liquidators, the SFO, the DoJ and the Receiver, any and all issues related to or arising from the distribution of funds from the Distribution Account (subject to rights of appeal as set out in the Proceeds of Crime Act 2002 (External Requests and Orders) Order 2005 and the Proceeds of Crime Act 2002 (External Requests and Orders) 2005 (England and Wales)(Appeals under Part 2) Order 2012)."

2.  Save as set out in paragraph 1 above, upon the making of this Order the Parties shall be released from all obligations and limitations placed on them by or in relation to the Restraint Order. For the avoidance of doubt the effect of this paragraph is in particular that, upon the making of this Order, the Joint Liquidators shall be released from any and all obligations to repay sums drawn, and any interest accrued, under the Order of the Court of Appeal dated 18 August 2009 and 25 February 2010 (as varied from time to time) and the Orders of this Court dated 4 August 2011 and 17 October 2011.

3.  Each Party shall bear its own costs of and occasioned by these proceedings in this Court, the Court of Appeal (Criminal Division) and the Supreme Court up to the date of this

Order. For the avoidance of doubt, all Orders that costs be paid by either Party to the other are set aside, to the extent that the same have not already been satisfied.

4. This Order shall stand as the Order of the Court on the Application of the Joint Liquidators dated [          ] 2012 ("the Discharge Application"). However, this Order shall not constitute a final determination between the Parties of the issues arising in the Discharge Application.

5. There be no order as to the costs of and occasioned by the Discharge Application.

Dated this [                    ]

BY THE COURT